<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3

 4
      UNITED STATES OF AMERICA,          )   Docket No. 11 CR 119
 5                                       )
                            Plaintiff,   )
 6                                       )
               vs.                       )
 7                                       )
      JASWINDER RAI CHHIBBER,            )   Chicago, Illinois
 8                                       )   March 1, 2012
                            Defendant.   )   9:00 o'clock a.m.
 9
                   TRIAL TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE SUZANNE B. CONLON, AND A JURY
                            VOLUME 1-A
11
      APPEARANCES:
12
      For the Plaintiff:       HON. PATRICK FITZGERALD
13                             United States Attorney
                               BY:  MR. SAMUEL B. COLE
14                                  MR. JOEL M. HAMMERMAN
                               219 S. Dearborn St., Suite 500
15                             Chicago, Illinois  60604

16

17    For the Defendant:       PUGH, JONES & JOHNSON, P.C.
                               BY:  MR. WALTER JONES, JR.
18                                  MR. JONATHAN B. CIFONELLI
                               180 North LaSalle Street, Suite 3400
19                             Chicago, IL  60601
                               (312) 768-7800
20
                               LAW OFFICE OF ROBERT ORMAN
21                             BY:  MR. ROBERT ORMAN
                               One North LaSalle Street, Suite 1775
22                             Chicago, IL  60602
                               (312) 372-0515
23

24    Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                               Official Court Reporter
25                             219 S. Dearborn Street, Suite 1854-B
                               Chicago, Illinois  60604
                               (312) 435-5639
</pre>

1                          I N D E X

2     DESCRIPTION                                          PAGE

3

4
      MR. COLE, OPENING STATEMENT                           60
5

6     MR. JONES, OPENING STATEMENT                          69

7
      TIFFANY SHIRLEY-TERRELL, DIRECT EXAMINATION           85
8     BY MR. COLE:

9
      TIFFANY SHIRLEY-TERRELL, CROSS-EXAMINATION           107
10    BY MR. JONES:

11
      TIFFANY SHIRLEY-TERRELL, REDIRECT EXAMINATION        117
12    BY MR. COLE:

13
      DENNARIS TERRELL COLEMAN, DIRECT EXAMINATION         122
14    BY MR. HAMMERMAN:

15
      DENNARIS TERRELL COLEMAN, CROSS-EXAMINATION          146
16    BY MR. JONES:

17
      DENNARIS TERRELL COLEMAN, REDIRECT EXAMINATION       169
18    BY MR. HAMMERMAN:

19
      DENNARIS TERRELL COLEMAN, RECROSS-EXAMINATION        175
20    BY MR. JONES:

21
      DENNARIS TERRELL COLEMAN, REDIRECT EXAMINATION       178
22    BY MR. HAMMERMAN:

23
      KORY BAKKEN, DIRECT EXAMINATION                      179
24    BY MR. HAMMERMAN:

25
      KORY BAKKEN, CROSS-EXAMINATION                       191

1  BY MR. ORMAN:

2
   KORY BAKKEN, REDIRECT EXAMINATION                      193
3  BY MR. HAMMERMAN:

4
   TWAHKI RHODES, DIRECT EXAMINATION                      195
5  BY MR. HAMMERMAN:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (The following proceedings were had in open court in the
2   presence and hearing of the prospective jurors:)
3          THE COURT:  Good morning.  Thank you for helping us
4   in the trial of a case.  We are here to select a jury for a
5   criminal case.  I will tell you a bit about the case in a
6   moment.
7          I will also be asking you some questions this
8   morning.  As I am sure you were told during orientation by the
9   chief judge, the role of a jury is especially sensitive in our
10  society.  Juries are chosen on the basis of ability to be fair
11  and impartial to both sides.  Jurors are at the very hub of
12  our judicial process.  Jurors, not judges, make the decisions
13  about the facts of a case.  Jurors, not judges, make the
14  decision about whether or not in a criminal case the
15  government has proven its case beyond a reasonable doubt as to
16  each charge.
17         So, as you can see, jurors play an essential role in
18  the American judicial system.
19         Now, in order to select the kind of fair and
20  impartial jury that can come to a case with an open mind and
21  without any agenda, I must ask you some questions.  And if any
22  of my questions touch on personal matters you'd rather not
23  discuss in front of the entire group, just say that you'd like
24  a sidebar conference and we'll come up here literally to the
25  side of the bench and we can discuss whatever the matter is.

09:17:30  1  And on some occasions, I will suggest that you come up to

09:17:34  2  sidebar if you have a response to a question.

09:17:40  3       You will be under oath, so it's really important that

09:17:42  4  my questions be clear to you.  If you can't hear me or you

09:17:48  5  find a question confusing, do not hesitate to bring that up or

09:17:54  6  ask me to repeat it.

09:17:56  7       The acoustics in this room are not the best.  You

09:18:00  8  probably can hear the undertones of the air conditioning

09:18:06  9  system.  So if you respond to a question, we would all

09:18:12  10 appreciate it if you would stand and try to project your voice

09:18:16  11 as I'm trying to project mine now.

09:18:20  12      And also would you first identify yourself.  The

09:18:26  13 court reporter takes down everything that's said in court for

09:18:30  14 the record, so she has to be able to put a name with the

09:18:36  15 speaker.  So if you are responding, please state your name

09:18:42  16 first, even if you respond to more than one question.  I have

09:18:48  17 a reasonably good memory, and so does the court reporter, hers

09:18:54  18 is probably better, but we still can't remember everybody's

09:18:56  19 name the first day.

09:18:58  20      All right.  I am going to ask that the clerk now

09:19:02  21 administer the oath to the prospective jurors.  Would you

09:19:04  22 stand, please.

09:19:34  23    (Prospective jurors sworn.)

09:19:38  24      THE COURT:  Let me tell you a bit about the case, and

09:19:44  25 the reason why I'm doing this, and I will also introduce the

09:19:50  1  people sitting at counsel tables, we need to know whether or

09:19:58  2  not you know anybody in this case, whether or not you know of

09:20:02  3  anybody in this case, or whether you or anyone close to you,

09:20:10  4  regardless of relationship, blood, friend, someone that is

09:20:16  5  important to you, has had any life experiences similar to the

09:20:22  6  ones that will be involved in this case.  When in doubt, just

09:20:30  7  bring it to my attention.

09:20:32  8          All right.  Thank you.

09:20:34  9          This is a criminal case.  The defendant is Jaswinder,

09:20:40  10  the first name is spelled J-a-s-w-i-n-d-e-r, Chhibber,

09:20:48  11  C-h-h-i-b-b-e-r.  Dr. Chhibber is a medical doctor who

09:20:56  12  operated a clinic called Cottage Grove Community Medical

09:21:02  13  Center located at 642 East 79th Street in Chicago.  He is

09:21:10  14  charged with eight counts of healthcare fraud and eight counts

09:21:14  15  of making materially false statements in connection with the

09:21:22  16  delivery of and payment for healthcare services.

09:21:24  17          Dr. Chhibber has pleaded not guilty to all charges.

09:21:28  18  He is presumed to be innocent.  It is the government's burden

09:21:34  19  to prove beyond a reasonable doubt that Dr. Chhibber is guilty

09:21:38  20  of each charge.

09:21:40  21          The trial is expected to take approximately one week.

09:21:50  22          Now, do you know anything about this case or have you

09:21:52  23  or anyone close to you had a life experience or a work

09:21:58  24  experience that may be related to the nature of this case?  If

09:22:04  25  so, please raise your hand.

| | | |
|---|---|---|
| 09:22:06 | 1 | All right.  This is the kind of question I'd like to |
| 09:22:10 | 2 | address at sidebar, so we will have a sidebar right off the |
| 09:22:14 | 3 | bat.  Would you step forward, please. |
| 09:22:14 | 4 | (Whereupon, the following discussion was had at the bench |
| 09:22:50 | 5 | outside the hearing of the prospective jurors:) |
| 09:22:50 | 6 | THE COURT:  Good morning. |
| 09:22:54 | 7 | PROSPECTIVE JUROR STERLING:  I am an executive with a |
| 09:22:56 | 8 | hospital here -- Matthew Sterling -- Elmhurst Memorial |
| 09:22:58 | 9 | Hospital.  I am an executive here.  Elmhurst Hospital.  I am |
| 09:23:02 | 10 | in the I.T. group, but I am, you know. |
| 09:23:06 | 11 | THE COURT:  Interacting with doctors -- |
| 09:23:08 | 12 | PROSPECTIVE JUROR STERLING:  Absolutely. |
| 09:23:08 | 13 | THE COURT:  -- and the medical field. |
| 09:23:10 | 14 | PROSPECTIVE JUROR STERLING:  Absolutely. |
| 09:23:12 | 15 | THE COURT:  I will excuse you from the case.  I thank |
| 09:23:14 | 16 | you for coming in.  Just go back to the jury room. |
| 09:23:18 | 17 | PROSPECTIVE JUROR STERLING:  Thank you. |
| 09:23:18 | 18 | MR. JONES:  Thank you, your Honor. |
| 09:23:18 | 19 | (The following proceedings were had in open court in the |
| 09:23:38 | 20 | presence and hearing of the prospective jurors:) |
| 09:23:38 | 21 | THE COURT:  Is there anybody else -- I should have |
| 09:23:40 | 22 | asked.  Anybody else? |
| 09:23:46 | 23 | All right.  Let me introduce the people sitting at |
| 09:23:50 | 24 | the tables in the front of the courtroom. |
| 09:23:56 | 25 | We have Assistant U.S. Attorneys Joel M. Hammerman, |

| | | |
|---|---|---|
| 09:24:04 | 1 | H-a-m-m-e-r-m-a-n, Samuel B. Cole, C-o-l-e, and would you |
| 09:24:14 | 2 | introduce the other persons sitting at the government's table, |
| 09:24:18 | 3 | please? |
| 09:24:18 | 4 | MR. HAMMERMAN:  Yes, your Honor.  With us is Special |
| 09:24:22 | 5 | Agent Ashley Roelofs from the FBI and Special Agent Ed Leitelt |
| 09:24:30 | 6 | from the Department of Health and Human Services. |
| 09:24:32 | 7 | THE COURT:  Thank you. |
| 09:24:32 | 8 | Do any of you know Mr. Hammerman, Mr. Cole, Special |
| 09:24:38 | 9 | Agent Roelofs from the FBI, or Special Agent Leitelt from the |
| 09:24:44 | 10 | Department of Health and Human Services? |
| 09:24:48 | 11 | Thank you. |
| 09:24:50 | 12 | Whenever I say "do you know," I also mean in the |
| 09:24:54 | 13 | context are they known to you for any reason, through friends |
| 09:25:00 | 14 | or family. |
| 09:25:02 | 15 | The United States attorney for this district is |
| 09:25:08 | 16 | Patrick Fitzgerald.  Do any of you know Mr. Fitzgerald? |
| 09:25:18 | 17 | Have any of you ever been employed by the United |
| 09:25:22 | 18 | States Department of Justice or any United States Attorney's |
| 09:25:28 | 19 | Office or have any of your friends or relatives been employed |
| 09:25:36 | 20 | by either the -- any U.S. Attorney's Office or the Department |
| 09:25:44 | 21 | of Justice? |
| 09:25:44 | 22 | Yes.  Would you stand and give us your name, please. |
| 09:25:46 | 23 | PROSPECTIVE JUROR PFISTER:  Jim Pfister.  I had a |
| 09:25:50 | 24 | friend five years ago who worked for the Pennsylvania DA. |
| 09:25:58 | 25 | THE COURT:  A district attorney? |

09:26:00  1    PROSPECTIVE JUROR PFISTER:  Right.

09:26:02  2    THE COURT:  And without going into details, did your

09:26:06  3  friend work on criminal or civil cases, or do you know?

09:26:14  4    PROSPECTIVE JUROR PFISTER:  I think criminal.

09:26:14  5    THE COURT:  And did your friend discuss his

09:26:18  6  experiences with you?

09:26:20  7    PROSPECTIVE JUROR PFISTER:  Not in detail.

09:26:24  8    THE COURT:  Without going into detail, is there any

09:26:26  9  impressions that you were given that might give you a point of

09:26:32  10  view about the trial of a criminal case?

09:26:36  11    PROSPECTIVE JUROR PFISTER:  Nothing that I haven't

09:26:40  12  seen on TV.

09:26:40  13    THE COURT:  All right.  All right.  Thank you.  We

09:26:46  14  will get into that soon.

09:26:48  15    In the back, yes.  Would you stand and give us your

09:26:50  16  name.

09:26:50  17    PROSPECTIVE JUROR MARTINAK:  Roberta Martinak.  My

09:26:52  18  brother-in-law was a state's attorney for Harris County.  He

09:26:56  19  has been deceased now for 12 years.

09:26:58  20    THE COURT:  Is there anything about your

09:27:00  21  brother-in-law's -- your late brother-in-law's employment that

09:27:02  22  might give you a point of view, without going into details at

09:27:06  23  this point?

09:27:06  24    PROSPECTIVE JUROR MARTINAK:  No, I don't believe so,

09:27:08  25  because he was in Southern Illinois and I have always been

09:27:10  1   here in Chicago.

09:27:10  2          THE COURT:  So you didn't communicate with him about

09:27:12  3   his work?

09:27:14  4          PROSPECTIVE JUROR MARTINAK:  No, ma'am.

09:27:14  5          THE COURT:  All right.  Thank you.

09:27:22  6          PROSPECTIVE JUROR WESCOTT:  Stacey Wescott.  My

09:27:24  7   father-in-law is a special agent.

09:27:24  8          THE COURT:  Who is --

09:27:26  9          PROSPECTIVE JUROR WESCOTT:  Homeland Security.  I

09:27:28  10  don't know if that pertains.

09:27:34  11         THE COURT:  Your brother-in-law is a special agent

09:27:36  12  with whom?

09:27:36  13         PROSPECTIVE JUROR WESCOTT:  Homeland Security.

09:27:38  14         THE COURT:  Homeland Security.  And has he discussed

09:27:40  15  his work with you?

09:27:42  16         PROSPECTIVE JUROR WESCOTT:  Yes.  Not a specific

09:27:46  17  nature.

09:27:46  18         THE COURT:  Yes.  And what is the general nature of

09:27:50  19  his responsibilities?

09:27:50  20         PROSPECTIVE JUROR WESCOTT:  He tracks online sexual

09:27:54  21  predators.

09:27:54  22         THE COURT:  I see.  Is there anything about his work,

09:27:58  23  without going into detail, that you think might affect your

09:28:02  24  attitude toward the criminal justice system?  Yes or no?

09:28:10  25  That's closer yes or no?  Or maybe.  Is it maybe?

09:28:14  1      PROSPECTIVE JUROR WESCOTT:  It's hard to say.

09:28:16  2      THE COURT:  All right.  You are excused.  You are

09:28:20  3  conflicted about it.  You are excused.

09:28:24  4      Anybody else?

09:28:26  5      All right.  There are two people, one closer to me.

09:28:30  6  Yes, would you stand, sir, and give us your name.

09:28:32  7      PROSPECTIVE JUROR OTTLEY:  My name is Bruce Ottley.

09:28:34  8  Can I request a sidebar?

09:28:36  9      THE COURT:  Yes.

09:28:36  10  (Whereupon, the following further proceedings were had at

09:28:50  11  sidebar outside the hearing of the prospective jurors:)

09:28:50  12      THE COURT:  Mr. Ottley.

09:28:52  13      PROSPECTIVE JUROR OTTLEY:  My name is Bruce Ottley.

09:28:54  14  I am a professor with DePaul law school, and I have taught

09:28:56  15  criminal law for many years, wrote books on the prosecution.

09:29:02  16  I have written recently a number of articles on the

09:29:04  17  admissibility of -- admissibility in criminal cases.  So I am

09:29:06  18  not -- you know, you need to know that.

09:29:08  19      THE COURT:  Yes, I think so.  Yes.  We have an

09:29:14  20  authority in the courtroom.  It would probably be interesting

09:29:16  21  for you to participate in the trial, but I have some concerns.

09:29:20  22      PROSPECTIVE JUROR OTTLEY:  My books involve from the

09:29:22  23  prosecution's point of view, so I am not sure how you would

09:29:24  24  react to that.

09:29:26  25      THE COURT:  I am not sure how the defense attorney

09:29:28   1    would react to that.

09:29:30   2         MR. JONES: I think he knows, Judge.

09:29:32   3         THE COURT: All right. I am going to thank you and

09:29:34   4    excuse you. I really appreciate your coming in today. I know

09:29:40   5    how busy you are.

09:29:40   6         PROSPECTIVE JUROR OTTLEY: Thank you.

09:29:40   7     (The following proceedings were had in open court in the

09:29:42   8    presence and hearing of the prospective jurors:)

09:29:42   9         THE COURT: There was another hand back. Would you

09:29:44  10    step up here, please.

09:29:44  11     (Whereupon, the following discussion was had at the bench

09:29:44  12    outside the hearing of the prospective jurors:)

09:29:56  13         THE COURT: Good morning.

09:29:56  14         PROSPECTIVE JUROR BOBKO: My name is Janine Bobko,

09:29:58  15    and I was just going to say that my father-in-law has been

09:30:02  16    formerly employed by the State's Attorney's Office in Cook

09:30:06  17    County.

09:30:06  18         THE COURT: Is he in criminal or civil work?

09:30:06  19         PROSPECTIVE JUROR BOBKO: He was in investigative

09:30:10  20    work, so I'm not sure. Both or either.

09:30:12  21         THE COURT: Well, given the relationship, I will

09:30:14  22    excuse you.

09:30:16  23         PROSPECTIVE JUROR BOBKO: Thank you.

09:30:16  24         THE COURT: Would you go back to the jury room now.

09:30:18  25    They might have some other work for you.

| | | |
|---|---|---|
| 09:30:24 | 1 | PROSPECTIVE JUROR BOBKO:  Absolutely. |
| 09:30:24 | 2 | MR. JONES:  Judge, how many challenges, are we six |
| 09:30:28 | 3 | and 10? |
| 09:30:28 | 4 | THE COURT:  Yes.  Yes. |
| 09:30:50 | 5 | (The following proceedings were had in open court in the |
| 09:31:18 | 6 | presence and hearing of the jury:) |
| 09:31:18 | 7 | THE COURT:  Is there anybody else who is related to |
| 09:31:20 | 8 | someone who might have a role in the investigation or |
| 09:31:22 | 9 | prosecution of the case? |
| 09:31:26 | 10 | Now, the second table.  Representing Dr. Chhibber are |
| 09:31:34 | 11 | Walter Jones, Jr., of the law firm Pugh, Jones & Johnson, |
| 09:31:42 | 12 | which is located at 180 North LaSalle Street in Chicago, and |
| 09:31:48 | 13 | John Cifonelli, that's C-i-f-o-n-e-l-l-i. |
| 09:31:58 | 14 | Do any of you know either of Dr. Chhibber's lawyers, |
| 09:32:06 | 15 | Mr. Jones or Mr. Cifonelli, or know of them? |
| 09:32:14 | 16 | Mr. Jones, would you introduce your client, please. |
| 09:32:20 | 17 | MR. JONES:  Yes, your Honor.  This is Dr. Chhibber. |
| 09:32:22 | 18 | And this is -- standing next to Dr. Chhibber is attorney |
| 09:32:30 | 19 | Robert Orman. |
| 09:32:32 | 20 | THE COURT:  Do any of you know Dr. Chhibber or know |
| 09:32:38 | 21 | of Dr. Chhibber or Mr. Orman? |
| 09:32:50 | 22 | Thank you. |
| 09:32:50 | 23 | Have you or anyone close to you been employed by or |
| 09:32:54 | 24 | been a patient at the Cottage Grove Community Medical Clinic? |
| 09:33:02 | 25 | Have you or anyone close to you worked for or as a |

09:33:08   1   healthcare provider; in other words, are there any doctors,

09:33:12   2   nurses, technicians, physician's assistant, medical lab

09:33:20   3   people?

09:33:20   4           Okay. We have a number. All right. We will start

09:33:26   5   my right, your left. Second row, there was a hand. Would you

09:33:32   6   stand and give us your name.

09:33:32   7           PROSPECTIVE JUROR SHERIDAN: My name is Brian

09:33:34   8   Sheridan. My sister-in-law's father is a doctor, and I worked

09:33:38   9   in his office and met with some insurance for about a year.

09:33:42   10   That's my extent, but I don't have anything specifically

09:33:44   11   related to the medical field that I am qualified for.

09:33:48   12           THE COURT: What office was that?

09:33:48   13           PROSPECTIVE JUROR SHERIDAN: He is a nephrology and

09:33:54   14   hypertension specialist in Park Ridge.

09:33:58   15           THE COURT: Thank you.

09:33:58   16           Yes. Over next to the wall.

09:34:00   17           PROSPECTIVE JUROR MUNTNER: My name is Dan Muntner.

09:34:04   18   I have a daughter who is an operating room nurse at Kishwaukee

09:34:10   19   Hospital in Sycamore.

09:34:10   20           THE COURT: Thank you.

09:34:10   21           Yes, sir.

09:34:10   22           PROSPECTIVE JUROR AGUILAR: Good morning, your Honor.

09:34:12   23   Mark Aguilar. I am a pharmacy technician for a home infusion

09:34:16   24   company based in Elmhurst, Illinois.

09:34:18   25           THE COURT: Thank you.

09:34:20  1      Yes.  A couple hands back there.  Yes.

09:34:22  2      PROSPECTIVE JUROR MANALO:  I am Christine Manalo.  My

09:34:26  3  sister-in-law is a nurse.  My aunt is a nurse as well.

09:34:30  4      THE COURT:  Where are each of the nurses?

09:34:32  5      PROSPECTIVE JUROR MANALO:  One of them is Sherman

09:34:38  6  Hospital in Elgin, and Cook County -- John Stroger Cook County

09:34:42  7  Hospital.

09:34:44  8      THE COURT:  And in what department at Stroger?

09:34:48  9      PROSPECTIVE JUROR MANALO:  The emergency pediatric

09:34:50  10  emergency department.

09:34:50  11      THE COURT:  I see.  Thank you.

09:34:54  12      Another hand in the back, yes.

09:34:54  13      PROSPECTIVE JUROR TEDORE:  My name is Diane Tedore,

09:34:56  14  and my brother-in-law is a doctor in Kane County.

09:35:00  15      THE COURT:  What kind of practice does he have?

09:35:02  16      PROSPECTIVE JUROR TEDORE:  Family practice.

09:35:04  17      THE COURT:  I see.  Thank you.

09:35:06  18      Yes.

09:35:06  19      PROSPECTIVE JUROR WILLERT:  Nathan Willert.  My

09:35:10  20  mother is a surgical technician at Northwestern.

09:35:12  21      THE COURT:  Thank you.

09:35:14  22      Yes.

09:35:14  23      PROSPECTIVE JUROR ENKE:  Scott Enke.  My uncle is a

09:35:20  24  technician at Evanston Hospital, and I work for a medical

09:35:20  25  practitioner.

09:35:20  1      THE COURT:  All right.  Your uncle is a physician at

09:35:26  2  what hospital?

09:35:26  3      PROSPECTIVE JUROR ENKE:  He is a vascular surgeon at

09:35:28  4  Evanston Hospital.

09:35:28  5      THE COURT:  And who is your employer?

09:35:30  6      PROSPECTIVE JUROR ENKE:  Covidien, a medical device

09:35:34  7  company.

09:35:36  8      THE COURT:  I see.  Thank you.

09:35:38  9      Yes, anybody else on this side of the courtroom?

09:35:40  10  Yes.

09:35:40  11      PROSPECTIVE JUROR:  My sister is a nurse, my

09:35:42  12  sister-in-law is a nurse, my mom used to work --

09:35:46  13      THE COURT:  Let's take them one at a time.  First

09:35:52  14  your mom, where --

09:35:56  15      PROSPECTIVE JUROR:  My mom was an office manager at a

09:36:00  16  medical office.

09:36:00  17      THE COURT:  Which medical office?

09:36:00  18      PROSPECTIVE JUROR:  In Joliet.

09:36:02  19      Then my sister is a nurse, and she just changed jobs.

09:36:04  20  She gives meds to -- I don't know how to put it -- people that

09:36:10  21  are not stable.

09:36:12  22      And then my sister-in-law is a nurse at Evanston

09:36:16  23  Hospital.

09:36:18  24      THE COURT:  Yes.  Is it your sister who changed

09:36:24  25  employers?

09:36:26    1            PROSPECTIVE JUROR:   Just recently.

09:36:26    2            THE COURT:   Who was her old employer?

09:36:28    3            PROSPECTIVE JUROR:   Ottawa Hospital.

09:36:32    4            THE COURT:   Ottawa Hospital?

09:36:34    5            And who is her new employer?

09:36:36    6            PROSPECTIVE JUROR:   I don't know the name of it.

09:36:38    7            THE COURT:   Do you know where her new employer is

09:36:40    8 located?

09:36:40    9            PROSPECTIVE JUROR:   I do not.

09:36:40   10            THE COURT:   Okay.   All right.   Thank you.

09:36:42   11            Anybody else in your family?

09:36:46   12            PROSPECTIVE JUROR:   No.   That's it.

09:36:46   13            THE COURT:   Anybody else on the left side of the

09:36:48   14 courtroom?

09:36:50   15            All right.   We will move to the other side now.   Yes.

09:36:56   16            PROSPECTIVE JUROR MARTINAK:   Roberta Martinak.   My

09:36:58   17 sister is an emergency room nurse at Sarah Bush in Mattoon; I

09:37:06   18 have been in the laboratory profession for 35 years; and I am

09:37:10   19 an instructor at Joliet Junior College in phlebotomy.

09:37:14   20            THE COURT:   And what do you teach?

09:37:16   21            PROSPECTIVE JUROR MARTINAK:   Phlebotomy.

09:37:18   22            THE COURT:   Thank you.

09:37:22   23            All right.   There are more hands over there.   Yes.

09:37:24   24            PROSPECTIVE JUROR FLEMING:   Elizabeth Fleming.   My

09:37:26   25 brother is a doctor.

| | | |
|---|---|---|
| 09:37:28 | 1 | THE COURT:  Okay.  Your brother is a doctor? |
| 09:37:30 | 2 | PROSPECTIVE JUROR FLEMING:  In Minnesota. |
| 09:37:32 | 3 | THE COURT:  All right.  What is his specialty? |
| 09:37:32 | 4 | PROSPECTIVE JUROR FLEMING:  Geriatrics, internal |
| 09:37:38 | 5 | medicine. |
| 09:37:38 | 6 | And my sister is a nurse in Omaha, Nebraska. |
| 09:37:46 | 7 | THE COURT:  All right.  Thank you. |
| 09:37:50 | 8 | Back in the corner. |
| 09:37:50 | 9 | PROSPECTIVE JUROR ROCKEY:  Lorrie Rockey.  And my mom |
| 09:37:54 | 10 | is a nurse at Lake Forest Hospital.  And my husband's aunt is |
| 09:38:06 | 11 | a dentist.  She has an office in Skokie. |
| 09:38:12 | 12 | THE COURT:  Thank you. |
| 09:38:14 | 13 | Yes. |
| 09:38:14 | 14 | PROSPECTIVE JUROR:  I have two registered nurse |
| 09:38:20 | 15 | sisters.  One works -- she used to be in San Francisco, and |
| 09:38:24 | 16 | the other one works at North Avenue for Seniors.  And I work |
| 09:38:30 | 17 | at the healthcare.  I am a nurse back home in the Philippines, |
| 09:38:34 | 18 | but I work as quality assurance at Medline Home Health Care. |
| 09:38:40 | 19 | THE COURT:  Thank you. |
| 09:38:42 | 20 | Yes. |
| 09:38:42 | 21 | PROSPECTIVE JUROR HOLMES:  My sister-in-law is a |
| 09:38:44 | 22 | nurse -- |
| 09:38:44 | 23 | THE COURT:  Your name. |
| 09:38:46 | 24 | PROSPECTIVE JUROR HOLMES:  I'm sorry.  My name is |
| 09:38:46 | 25 | Sharon Holmes.  My sister-in-law is a nurse at Trinity |

09:38:50  1  Hospital in Chicago.

09:38:50  2          THE COURT:  Thank you.

09:38:52  3          PROSPECTIVE JUROR HACKETT:  My name is Natalie

09:38:56  4  Hackett.  I am a physical therapist at Loyola University

09:38:58  5  Medical Center in Maywood.

09:39:00  6          THE COURT:  Thank you.

09:39:02  7          Yes, in the the back.

09:39:02  8          PROSPECTIVE JUROR MAYEDA:  Chris Mayeda.  My father

09:39:04  9  is internal medicine, retired out of Denver.  My mother was a

09:39:12  10  toxicology nurse, retired also.  Godfather, ear, nose, and

09:39:18  11  throat specialist, Pennsylvania.  And another ear, nose, and

09:39:22  12  throat specialist in New York.  That's it.

09:39:24  13          THE COURT:  Thank you.

09:39:24  14          Anybody else with a medical connection?

09:39:32  15          I missed somebody?  Yes.

09:39:34  16          PROSPECTIVE JUROR TILLIS:  My name is Edie Tillis.

09:39:38  17  My sister was a nurse at West Suburban.  She recently changed,

09:39:42  18  and I am not sure which hospital she is at now.  And I do

09:39:46  19  volunteer work at pediatrics at Mount Sinai Hospital.

09:39:52  20          THE COURT:  Mount Sinai?  All right.  Thank you.

09:39:56  21          Anybody else?

09:40:02  22          Have you or anyone close to you ever been -- ever

09:40:06  23  applied for a job with a law enforcement agency, either

09:40:14  24  federal, state, or local?

09:40:18  25          Yes.  Would you stand again.

09:40:20    1         PROSPECTIVE JUROR MARTINAK: Roberta Martinak. My

09:40:24    2   son is a DuPage Sheriff police officer. My daughter-in-law is

09:40:28    3   a Naperville police officer.

09:40:30    4         THE COURT: Thank you.

09:40:30    5         Over here. Yes.

09:40:34    6         PROSPECTIVE JUROR BANKS: Derrick Banks. My nephew

09:40:36    7   is a police officer with Chicago, CPD.

09:40:42    8         THE COURT: Thank you.

09:40:42    9         Yes.

09:40:42   10         PROSPECTIVE JUROR ANDRACKI: Joseph Andracki. My

09:40:46   11   aunt is retired from County Sheriff's police, and her husband

09:40:50   12   is also Cook County Sheriff's police.

09:40:52   13         THE COURT: Thank you.

09:40:54   14         Yes.

09:40:54   15         PROSPECTIVE JUROR BLECK: Laura Bleck. My dad used

09:40:58   16   to work the 911 system for Kane County, and I know several

09:41:04   17   police officers in Geneva.

09:41:06   18         THE COURT: Thank you.

09:41:08   19         More over here. Yes.

09:41:10   20         PROSPECTIVE JUROR LASHLEY: Althea Lashley. I worked

09:41:12   21   for the Chicago Police Department about 10 years ago,

09:41:18   22   administrative assistant.

09:41:18   23         THE COURT: All right. Thank you.

09:41:22   24         Yes.

09:41:22   25         PROSPECTIVE JUROR TILLIS: Edie Tillis. I have two

| | | |
|---|---|---|
| 09:41:24 | 1 | nephews that are Chicago police officers, and have a niece |
| 09:41:30 | 2 | also with Chicago, private investigations. |
| 09:41:36 | 3 | THE COURT:  Where are they police officers? |
| 09:41:38 | 4 | PROSPECTIVE JUROR TILLIS:  Chicago. |
| 09:41:38 | 5 | THE COURT:  Chicago Police Department? |
| 09:41:40 | 6 | PROSPECTIVE JUROR TILLIS:  Right. |
| 09:41:40 | 7 | THE COURT:  Thank you. |
| 09:41:42 | 8 | Anybody else with a law enforcement connection? |
| 09:41:48 | 9 | Thank you. |
| 09:41:48 | 10 | Do any of you have legal training or experience as |
| 09:41:56 | 11 | lawyers, paralegals, in that field? |
| 09:42:02 | 12 | Yes, sir. |
| 09:42:04 | 13 | PROSPECTIVE JUROR KIRBY:  Robert Kirby.  I have been |
| 09:42:06 | 14 | an attorney for 32 years. |
| 09:42:06 | 15 | THE COURT:  What kind of practice do you have? |
| 09:42:08 | 16 | PROSPECTIVE JUROR KIRBY:  Corporate, securities, |
| 09:42:10 | 17 | commercial finance. |
| 09:42:12 | 18 | THE COURT:  Thank you. |
| 09:42:14 | 19 | Anybody else in the very back? |
| 09:42:18 | 20 | PROSPECTIVE JUROR FLEMING:  Elizabeth Fleming.  I |
| 09:42:26 | 21 | used to work for a legal assistant for a workers' compensation |
| 09:42:26 | 22 | firm. |
| 09:42:26 | 23 | THE COURT:  A legal assistant for a workers' |
| 09:42:30 | 24 | compensation firm?  What is the name of the firm? |
| 09:42:32 | 25 | PROSPECTIVE JUROR:  Corti, Aleksy & Castaneda. |

09:42:38  1      THE COURT:  Thank you.

09:42:46  2      Do any of you have relatives or close friends who

09:42:52  3  practice criminal law either as a prosecutor or as a defense

09:42:58  4  attorney?

09:43:02  5      Yes.

09:43:02  6      PROSPECTIVE JUROR BANKS:  Derrick Banks.  My boss

09:43:06  7  practices criminal -- he is a criminal attorney.

09:43:12  8      THE COURT:  And who is that?

09:43:14  9      PROSPECTIVE JUROR BANKS:  His name is John Wyatt.

09:43:16  10     THE COURT:  And does he do mostly state work or

09:43:18  11  federal work or both?

09:43:20  12     PROSPECTIVE JUROR BANKS:  I'm not sure, your Honor.

09:43:22  13     THE COURT:  You don't know -- and what is your

09:43:24  14  position?

09:43:24  15     PROSPECTIVE JUROR BANKS:  I am a building engineer.

09:43:26  16     THE COURT:  I see.  Thank you.

09:43:32  17     Yes, over here by the aisle.

09:43:34  18     PROSPECTIVE JUROR PFISTER:  James Pfister.  I have a

09:43:38  19  cousin, second cousin, that's an attorney in New Jersey.  I

09:43:42  20  have no idea what his practice is.

09:43:44  21     THE COURT:  Thank you.

09:43:46  22     I saw some other hands over on the left side.

09:43:48  23     PROSPECTIVE JUROR MUNTNER:  Dan Muntner.  I have a

09:43:50  24  cousin who is a defense attorney in Oak Lawn, criminal

09:43:54  25  defense.

| | | |
|---|---|---|
| 09:43:54 | 1 | THE COURT:  Does he discuss his work with you? |
| 09:43:58 | 2 | PROSPECTIVE JUROR MUNTNER:  He has from time to time |
| 09:44:02 | 3 | discussed cases with me.  Pretty generic terms. |
| 09:44:06 | 4 | THE COURT:  All right.  Thank you. |
| 09:44:12 | 5 | Yes. |
| 09:44:12 | 6 | PROSPECTIVE JUROR KIRBY:  In my job, I'm acquainted |
| 09:44:14 | 7 | with quite a few attorneys.  Many of them do criminal. |
| 09:44:20 | 8 | THE COURT:  Thank you. |
| 09:44:24 | 9 | Anybody else? |
| 09:44:32 | 10 | Some of the witnesses will be agents of the Federal |
| 09:44:44 | 11 | Bureau of Investigation.  Would you have difficulty judging |
| 09:44:46 | 12 | the credibility of an FBI agent using the same standards you |
| 09:44:50 | 13 | would use to judge the credibility of any other witness? |
| 09:44:54 | 14 | In other words, what I am asking, would you have a |
| 09:45:02 | 15 | point of view that would affect your decision about the |
| 09:45:06 | 16 | believability of an FBI agent simply because the person was an |
| 09:45:12 | 17 | FBI agent, give that person more or less credibility simply |
| 09:45:16 | 18 | because of their job?  Would any of you think you might have a |
| 09:45:22 | 19 | problem with that? |
| 09:45:32 | 20 | I will see you at sidebar. |
| 09:45:32 | 21 | (Whereupon, the following discussion was had at the bench |
| 09:45:52 | 22 | outside the hearing of the prospective jurors:) |
| 09:45:52 | 23 | THE COURT:  Your name, please. |
| 09:45:54 | 24 | PROSPECTIVE JUROR TILLIS:  Edie Tillis. |
| 09:45:56 | 25 | THE COURT:  Yes, Ms. Tillis. |

09:45:58 1      PROSPECTIVE JUROR TILLIS:  I think that I might have

09:46:00 2 a problem with it because my brother, they did some

09:46:06 3 investigating on my brother, and he got sent away to prison

09:46:08 4 because of -- sorry.

09:46:12 5      THE COURT:  I'm sorry.

09:46:14 6      PROSPECTIVE JUROR TILLIS:  What happened, a

09:46:16 7 gangbanger tried to solicit him to join a gang, but he had a

09:46:22 8 gun, the guy got killed, and they had all this investigations

09:46:28 9 done, but they found -- even though my brother was in school,

09:46:32 10 the gangbanger didn't, always in trouble, they wind up sending

09:46:36 11 my brother to prison for it.

09:46:38 12      THE COURT:  I'm sorry.  I know that upsets you.

09:46:42 13      PROSPECTIVE JUROR TILLIS:  Sorry about that.

09:46:44 14      THE COURT:  I am sorry that you had to remember, this

09:46:46 15 triggered all that memory for you, but I think it would

09:46:50 16 probably be difficult for you under the circumstances to sit

09:46:54 17 as a juror in a case.

09:46:54 18      PROSPECTIVE JUROR TILLIS:  I'm sorry.

09:46:56 19      THE COURT:  Well, I will excuse you, and I'm sorry

09:47:00 20 that we brought all this mind.  I will excuse you.  Would you

09:47:04 21 go back to the jury room, please.

09:47:14 22      We will stay over here for the next question.

09:47:14 23    (Whereupon, the following proceedings were had in open court

09:47:14 24 in the presence and hearing of the prospective jurors:)

09:47:18 25      THE COURT:  Ladies and gentlemen, I am going to ask a

| | | |
|---|---|---|
| 09:47:20 | 1 | question that will -- I will talk to you individually if you |
| 09:47:28 | 2 | have a response. |
| 09:47:30 | 3 | Have you ever been either the victim of a crime or |
| 09:47:38 | 4 | have you ever been charged, arrested, or prosecuted for a |
| 09:47:44 | 5 | crime other than a minor traffic violation?  If so, I'd like |
| 09:47:50 | 6 | to see you at sidebar. |
| 09:47:52 | 7 | Yes.  Would you step over here, please. |
| 09:47:52 | 8 | (Whereupon, the following discussion was had at the bench, |
| 09:47:52 | 9 | outside the hearing of the prospective jurors:) |
| 09:48:06 | 10 | THE COURT:  Good morning. |
| 09:48:06 | 11 | PROSPECTIVE JUROR ANDRACKI:  Good morning.  Joseph |
| 09:48:10 | 12 | Andracki.  I was charged with a felony DUI. |
| 09:48:12 | 13 | THE COURT:  Just a moment, please. |
| 09:48:18 | 14 | Yes, I'm sorry. |
| 09:48:20 | 15 | PROSPECTIVE JUROR ANDRACKI:  I was charged with a |
| 09:48:22 | 16 | felony DUI. |
| 09:48:22 | 17 | THE COURT:  I see.  When was that? |
| 09:48:24 | 18 | PROSPECTIVE JUROR ANDRACKI:  Five years ago.  About |
| 09:48:30 | 19 | five years ago. |
| 09:48:32 | 20 | THE COURT:  And what was the result? |
| 09:48:34 | 21 | PROSPECTIVE JUROR ANDRACKI:  Probation. |
| 09:48:36 | 22 | THE COURT:  I see.  Do you have some feelings about |
| 09:48:38 | 23 | the criminal justice system -- |
| 09:48:42 | 24 | PROSPECTIVE JUROR ANDRACKI:  Slightly. |
| 09:48:42 | 25 | THE COURT:  All right.  Well, I will excuse you and |

09:48:46   1   ask you to return to the jury room.

09:48:48   2           PROSPECTIVE JUROR ANDRACKI:  Thank you.

09:48:50   3           THE COURT:  Could you step over here, please.  Good

09:48:54   4   morning.

09:48:54   5           PROSPECTIVE JUROR MAYEDA:  Good morning.  Chris

09:48:56   6   Mayeda.  My charge was back in March, a battery charge,

09:49:02   7   misdemeanor battery, destruction of property, involving a

09:49:06   8   peace officer was the person that was assaulted.

09:49:10   9           THE COURT:  What happened with -- what was the final

09:49:14  10   decision in the case?

09:49:16  11           PROSPECTIVE JUROR MAYEDA:  First-time offense, so

09:49:18  12   they gave me supervision.

09:49:18  13           THE COURT:  I see.  By the way, what police

09:49:22  14   department was involved?

09:49:22  15           PROSPECTIVE JUROR MAYEDA:  That was Cook County.

09:49:24  16           THE COURT:  Cook County Sheriff?

09:49:26  17           PROSPECTIVE JUROR MAYEDA:  The person that was

09:49:28  18   assaulted was a sheriff, yes, and the police department that

09:49:30  19   arrested me was the Chicago PD.

09:49:32  20           THE COURT:  I see.  You have some feelings about the

09:49:34  21   criminal justice system?

09:49:36  22           PROSPECTIVE JUROR MAYEDA:  It's still pretty soon.

09:49:38  23   This was just in March.

09:49:40  24           THE COURT:  All right.  I'm sorry.  We will excuse

09:49:42  25   you from this case.  Would you report back to the jury room?

| | | |
|---|---|---|
| 09:49:46 | 1 | PROSPECTIVE JUROR MAYEDA:  Sure. |
| 09:49:48 | 2 | THE COURT:  Another judge might need you in another |
| 09:49:50 | 3 | type of case. |
| 09:49:56 | 4 | Good morning. |
| 09:49:56 | 5 | PROSPECTIVE JUROR JANUS:  Good morning.  Rhonda |
| 09:49:58 | 6 | Janus.  Our house was broken into twice. |
| 09:50:00 | 7 | THE COURT:  How recently was that? |
| 09:50:02 | 8 | PROSPECTIVE JUROR JANUS:  The most recent one was |
| 09:50:04 | 9 | about five years ago. |
| 09:50:06 | 10 | THE COURT:  I see.  And what community? |
| 09:50:08 | 11 | PROSPECTIVE JUROR JANUS:  Zion. |
| 09:50:14 | 12 | THE COURT:  Do you have any views about the police -- |
| 09:50:16 | 13 | PROSPECTIVE JUROR JANUS:  No. |
| 09:50:16 | 14 | THE COURT:  -- one way or the other? |
| 09:50:18 | 15 | PROSPECTIVE JUROR JANUS:  We have a wonderful -- |
| 09:50:20 | 16 | THE COURT:  Do you think you would be inclined to be |
| 09:50:24 | 17 | more sympathetic with one side or the other? |
| 09:50:28 | 18 | PROSPECTIVE JUROR JANUS:  No. |
| 09:50:28 | 19 | THE COURT:  Thank you.  You can be seated. |
| 09:50:36 | 20 | Good morning again. |
| 09:50:36 | 21 | PROSPECTIVE JUROR BANKS:  Derrick Banks.  Two and a |
| 09:50:38 | 22 | half years ago, I had a domestic charge put against me.  My |
| 09:50:42 | 23 | girlfriend and I, we still live together today, it was more so |
| 09:50:48 | 24 | once the charges were made, we had to go through with it. |
| 09:50:50 | 25 | THE COURT:  What was the result of the charge? |

09:50:52  1    PROSPECTIVE JUROR BANKS:  We were arguing and she
09:50:54  2  called.  It was based on that.  So the next morning when I
09:51:00  3  appeared before the judge, you have to bail out, I chose
09:51:08  4  guilty because I did grab her.  I did a year and a half
09:51:12  5  probation, anger management, drug evaluation.
09:51:16  6    I came out.  It's been two and a half years now.
09:51:20  7    THE COURT:  Was this the Chicago Police Department?
09:51:20  8    PROSPECTIVE JUROR BANKS:  Yes, ma'am, Chicago.
09:51:22  9    THE COURT:  Do you think they treated you fairly?
09:51:24  10    PROSPECTIVE JUROR BANKS:  Yes.  Yes.
09:51:24  11    THE COURT:  Do you have any feelings about the system
09:51:28  12  that might affect your point of view?
09:51:30  13    PROSPECTIVE JUROR BANKS:  I think it works.  Ma'am, I
09:51:32  14  do not.
09:51:34  15    THE COURT:  Thank you.  Please be seated.
09:51:38  16    MR. HAMMERMAN:  I believe the question you phrased
09:51:40  17  is, if you have been charged with a crime or if you have been
09:51:42  18  a victim.  Just based on the first witness -- or the first,
09:51:48  19  I'm sorry, prospective juror before you that we ask any of the
09:51:52  20  prospective jurors' family members also just to be sure we
09:51:58  21  covered in case, there are brothers or sisters.
09:52:00  22    THE COURT:  I think that was covered previously.  All
09:52:02  23  right.  Thank you.
09:52:04  24    MR. HAMMERMAN:  Thank you, your Honor.
09:52:26  25    (The following proceedings were had in open court in the

09:52:26  1  presence and hearing of the prospective jurors:)

09:52:26  2      THE COURT:  This question might be a bit duplicative

09:52:30  3  of an earlier question, but I would still like a response if

09:52:34  4  the question applies to you.

09:52:34  5      Have you or anyone close to you been employed by a

09:52:40  6  healthcare benefit provider, and I would include insurers that

09:52:46  7  provide medical insurance, anything of that nature, a medical

09:52:48  8  provider?

09:52:56  9      Would any of you have any difficulty or reservations

09:53:00  10  about applying the presumption of innocence and holding the

09:53:06  11  government to its burden of proof proving guilt beyond a

09:53:10  12  reasonable doubt?  Would any of you feel uncomfortable with

09:53:16  13  that?

09:53:16  14      Do you have any personal opinions or beliefs that

09:53:24  15  might affect your ability to be fair and impartial to either

09:53:28  16  side in this case?

09:53:32  17      The clerk is now going to call 14 names.  If your

09:53:38  18  name is called, please take a chair in the jury box in the

09:53:42  19  same sequence in which your name is called.

09:53:46  20      You will see biographical questionnaires in each

09:53:50  21  chair, and I will be going through those questionnaires with

09:53:56  22  you individually.

09:53:58  23      If your name is not called, please stay in the

09:54:02  24  courtroom because I suspect we will need more than 14 people,

09:54:06  25  we will need to question more than 14 people.

09:54:08　1　　　　　All right.  Would you proceed?

09:54:12　2　　　　　THE CLERK:  Rachel Aduana, Kenneth Dumas, Diane

09:54:32　3　Tedore, Robert Kirby, Daniel Muntner, Rhonda Janus, Lori

09:55:02　4　Benshish, Stephanie Ryl, Elizabeth Fleming, John Pope, Thomas

09:55:30　5　Koontz, Robin Gols, April Siegfried, and Corinne Carroll.

09:56:08　6　　　　　THE COURT:  Beginning with the first person in the

09:56:10　7　first chair closest to me, would you stand and state your full

09:56:14　8　name for us.

09:56:16　9　　　　　PROSPECTIVE JUROR ADUANA:  I am Rachel Joy Aduana.

09:56:20　10　　　　　THE COURT:  Yes.  And where have you lived during the

09:56:22　11　past 10 years?

09:56:24　12　　　　　PROSPECTIVE JUROR ADUANA:  I live in 1902 North

09:56:28　13　Pinetree Drive, Arlington Heights, Illinois, and I work at

09:56:34　14　Medline Home Health Care for almost six years.  And aside from

09:56:38　15　that, I work as a dialysis technician for almost 11 years.

09:56:46　16　　　　　THE COURT:  And what do you do at Medline?

09:56:48　17　　　　　PROSPECTIVE JUROR ADUANA:  I work as a quality

09:56:50　18　assurance.

09:56:50　19　　　　　THE COURT:  And what are -- when you evaluate

09:56:56　20　quality, quality of what?

09:56:58　21　　　　　PROSPECTIVE JUROR ADUANA:  We make sure that whatever

09:57:02　22　the doctors order, that it is signed by the doctor and the

09:57:06　23　correct date, and we follow our policy regarding that, and be

09:57:10　24　sure that all doctors' orders was carried out.  And we check

09:57:18　25　the -- we do the -- we have nurses that work in the field who

09:57:24  1  are seeing the patients.  And we have -- we check the order,

09:57:34  2  the doctor's order.  If there's physical therapy, occupational

09:57:38  3  therapy, and home health aide, we be sure that it's all

09:57:42  4  carried out.  That's all.

09:57:44  5       THE COURT:  Is there anybody else in your household

09:57:48  6  who is employed?

09:57:52  7       PROSPECTIVE JUROR ADUANA:  Yeah, my husband.  He

09:57:54  8  works at the Walgreens company as a senior network analyst in

09:58:00  9  Deerfield.

09:58:06  10      The rest, I have two kids, eight years old and two

09:58:10  11  and a half years old.

09:58:10  12      THE COURT:  They are too young, I guess, for

09:58:12  13  employment.

09:58:16  14      Have you ever served on a jury before or a grand

09:58:18  15  jury?

09:58:20  16      PROSPECTIVE JUROR ADUANA:  They called me, but they

09:58:20  17  let me go.

09:58:22  18      THE COURT:  Okay.  I just need to know if you have

09:58:24  19  ever served, been sworn as a juror.

09:58:28  20      PROSPECTIVE JUROR ADUANA:  No.

09:58:30  21      THE COURT:  Or a grand juror.

09:58:32  22      What is your educational background?

09:58:34  23      PROSPECTIVE JUROR ADUANA:  I was a nurse in

09:58:36  24  Philippines, and I came here, I work as a dialysis technician,

09:58:42  25  and work in -- like in medical field, and I work in home

| | | |
|---|---|---|
| 09:58:52 | 1 | health. |
| 09:58:52 | 2 | THE COURT:  And what do you do in home health? |
| 09:58:58 | 3 | PROSPECTIVE JUROR ADUANA:  Quality assurance. |
| 09:59:00 | 4 | THE COURT:  I see.  Have you ever been a party or a |
| 09:59:06 | 5 | witness in a lawsuit or a legal proceeding? |
| 09:59:10 | 6 | PROSPECTIVE JUROR ADUANA:  No. |
| 09:59:10 | 7 | THE COURT:  Thank you. |
| 09:59:14 | 8 | Next person. |
| 09:59:20 | 9 | PROSPECTIVE JUROR DUMAS:  My name is Kenneth Dumas. |
| 09:59:22 | 10 | I have lived in Glendale Heights for the last 10 years.  I |
| 09:59:26 | 11 | have had at least four or five employers in the last 10 years. |
| 09:59:32 | 12 | They are all basically within construction trades. |
| 09:59:38 | 13 | My wife is the only other person in my household who |
| 09:59:42 | 14 | works -- |
| 09:59:42 | 15 | THE COURT:  Who is your employer now? |
| 09:59:44 | 16 | PROSPECTIVE JUROR DUMAS:  Right now, Superior |
| 09:59:46 | 17 | Construction. |
| 09:59:50 | 18 | My wife is a membership coordinator at River Forest |
| 09:59:54 | 19 | Country Club. |
| 09:59:54 | 20 | THE COURT:  Which country club? |
| 09:59:58 | 21 | PROSPECTIVE JUROR DUMAS:  River Forest Country Club |
| 09:59:58 | 22 | in Elmhurst. |
| 10:00:00 | 23 | I have never been on a jury or a grand jury.  I have |
| 10:00:08 | 24 | about two classes short of an associate's degree. |
| 10:00:12 | 25 | THE COURT:  In what field? |

10:00:12　1　　　　　PROSPECTIVE JUROR DUMAS:  Just general studies.

10:00:18　2　　　　　And I have been -- what's it called when they bring

10:00:30　3　you into a room and ask you a bunch of questions?

10:00:32　4　　　　　THE COURT:  Deposition?

10:00:32　5　　　　　PROSPECTIVE JUROR DUMAS:  Yes, I have been deposed.

10:00:36　6　　　　　THE COURT:  What kind of a lawsuit was it?

10:00:36　7　　　　　PROSPECTIVE JUROR DUMAS:  Workers' compensation.

10:00:40　8　　　　　THE COURT:  Was it your claim or somebody else's?

10:00:42　9　　　　　PROSPECTIVE JUROR DUMAS:  Somebody else's.

10:00:42　10　　　　　THE COURT:  I see.  How long ago was that?

10:00:46　11　　　　　PROSPECTIVE JUROR DUMAS:  Over 10 years.

10:00:48　12　　　　　THE COURT:  Okay.  Thank you.

10:00:56　13　　　　　PROSPECTIVE JUROR TEDORE:  My name is Diane Tedore.

10:01:00　14　I have lived in Villa Park for six years.  Before that, I

10:01:06　15　lived in Iowa and went to school in Indiana.

10:01:08　16　　　　　For the past four and a half years, I have been

10:01:10　17　employed at Nicor Gas as an accountant in Naperville.  And

10:01:16　18　before that, I was an accountant at two other places.  There's

10:01:24　19　no one else in my household.

10:01:26　20　　　　　I have never been on a jury.  I went to college at

10:01:32　21　the University of Notre Dame.  I have a bachelor's of business

10:01:36　22　administration and master's of science in accounting.  And I

10:01:40　23　have never been a witness.

10:01:44　24　　　　　THE COURT:  You haven't been involved in any kind of

10:01:46　25　lawsuit?

10:01:48   1           PROSPECTIVE JUROR TEDORE:   No.

10:01:48   2           THE COURT:   Thank you.

10:01:50   3           PROSPECTIVE JUROR KIRBY:   My name is Robert Kirby.   I

10:01:52   4 have lived in Northbrook for the last 20 years.   I am employed

10:01:58   5 by a company called Case New Holland that manufactures

10:02:02   6 construction, agricultural equipment.   My son works as a

10:02:08   7 computer engineer in California.

10:02:12   8           I served on a jury.   I was on a jury three or four

10:02:14   9 years ago in a Cook County case, car accident.   I have a J.D.

10:02:22 10 from Washington University.   I have never been a party or

10:02:26 11 witness.   In my job, one of my -- I work in-house.   One of my

10:02:32 12 responsibilities is managing outside litigation, so I am

10:02:36 13 involved in quite a bit of litigation on behalf of my

10:02:38 14 employer.   I have given deposition testimony a couple of times

10:02:42 15 involved in primary collections, contract disputes, civil

10:02:48 16 fraud cases.

10:02:50 17           THE COURT:   All right.   Thank you.

10:02:54 18           PROSPECTIVE JUROR MUNTNER:   My name is Dan Muntner.

10:02:58 19 I have lived in Orland Park for the past 25 years.   I have

10:03:02 20 been retired for almost 12 years.   I work at Silver Lake

10:03:06 21 Country Club.   My primarily responsibility is teaching golf.

10:03:12 22           I have a daughter, as I mentioned previously, who is

10:03:14 23 a nurse in Sycamore and another daughter who is a kindergarten

10:03:18 24 teacher in Orland Park.   Both of them have been in those jobs

10:03:22 25 for about 10 years.   My wife is retired.

| | | |
|---|---|---|
| 10:03:26 | 1 | THE COURT: What did she do prior to retirement? |
| 10:03:30 | 2 | PROSPECTIVE JUROR MUNTNER: She was a |
| 10:03:32 | 3 | paraprofessional in Orland Park District 135. |
| 10:03:34 | 4 | THE COURT: What did she do? |
| 10:03:36 | 5 | PROSPECTIVE JUROR MUNTNER: Teacher's aide. |
| 10:03:38 | 6 | THE COURT: What did you do before you retired? |
| 10:03:40 | 7 | PROSPECTIVE JUROR MUNTNER: I worked for Illinois |
| 10:03:42 | 8 | Bell Ameritech for 30 years primarily as a manager in data |
| 10:03:46 | 9 | processing-related departments. |
| 10:03:48 | 10 | THE COURT: I see. |
| 10:03:50 | 11 | PROSPECTIVE JUROR MUNTNER: I have been -- I'm sorry. |
| 10:03:52 | 12 | THE COURT: Have you ever actually been sworn as a |
| 10:03:56 | 13 | juror? |
| 10:03:56 | 14 | PROSPECTIVE JUROR MUNTNER: Yes, I was a juror on a |
| 10:03:58 | 15 | civil case, Cook County, and I was on a grand jury for 30 |
| 10:04:04 | 16 | days. |
| 10:04:04 | 17 | THE COURT: Which court was that? Is that county |
| 10:04:08 | 18 | court? |
| 10:04:08 | 19 | PROSPECTIVE JUROR MUNTNER: It was a county grand |
| 10:04:10 | 20 | jury. |
| 10:04:10 | 21 | THE COURT: Was that at 26th and California or -- |
| 10:04:14 | 22 | PROSPECTIVE JUROR MUNTNER: Yes, it was. |
| 10:04:14 | 23 | THE COURT: And as a grand juror, you only heard one |
| 10:04:20 | 24 | side of the story. You realize that this is quite a different |
| 10:04:26 | 25 | proceeding than a grand jury? |

| | | |
|---|---|---|
| 10:04:28 | 1 | PROSPECTIVE JUROR MUNTNER:  Yes.  Yes.  Pretty |
| 10:04:30 | 2 | one-sided. |
| 10:04:34 | 3 | I have a high school education and some college. |
| 10:04:38 | 4 | Numerous technical training through the phone company.  I |
| 10:04:46 | 5 | guess I answered the last one. |
| 10:04:48 | 6 | THE COURT:  No to the last one?  Okay. |
| 10:04:52 | 7 | Did you say no to the last one? |
| 10:04:28 | 8 | PROSPECTIVE JUROR MUNTNER:  I have not been a party |
| 10:04:56 | 9 | to any kind of civil action. |
| 10:04:58 | 10 | THE COURT:  Thank you. |
| 10:05:00 | 11 | PROSPECTIVE JUROR JANUS:  My name is Rhonda K. Janus. |
| 10:05:02 | 12 | I have lived in Zion, Illinois, for the last -- forever, 10 |
| 10:05:08 | 13 | years.  I was -- the last 10 years, I have owned two |
| 10:05:10 | 14 | businesses.  I was a pet sitter, professional pet sitter, for |
| 10:05:16 | 15 | 10 years; but since the most recent, I own a coffee shop in |
| 10:05:22 | 16 | Zion.  My husband and I are partners with another couple in a |
| 10:05:26 | 17 | coffee shop.  I was the owner.  My husband is retired.  It's |
| 10:05:32 | 18 | just he and I in our household. |
| 10:05:34 | 19 | I never served on a jury or grand jury before.  High |
| 10:05:38 | 20 | school education, some college.  And about three years ago, my |
| 10:05:46 | 21 | husband and I did consult and hired an attorney in order to |
| 10:05:52 | 22 | sell out from the coffee shop. |
| 10:05:54 | 23 | THE COURT:  I see. |
| 10:06:00 | 24 | PROSPECTIVE JUROR JANUS:  It didn't work out. |
| 10:06:00 | 25 | THE COURT:  I see.  Thank you. |

10:06:02  1      PROSPECTIVE JUROR BENSHISH:  I am Lori Benshish.  I

10:06:06  2   have lived in South Elgin for the last 15 years.  I worked for

10:06:08  3   22 years in the Schaumburg school district.  I am a speech

10:06:12  4   therapist.  My husband is a musician.  He is director of music

10:06:18  5   at a church.  He is on staff in the music department at

10:06:22  6   Hoffman Estates High School.  He has a band, he has a

10:06:26  7   recording studio.

10:06:28  8      I have never served on a jury before.  I have a

10:06:32  9   master's degree in communication disorders.  And I have never

10:06:36  10  been a party or witness in any kind of legal proceeding.

10:06:40  11     THE COURT:  Thank you.

10:06:46  12     PROSPECTIVE JUROR RYL:  My name is Stephanie Ryl.  I

10:06:48  13  currently -- my permanent home address is Arlington Heights.

10:06:56  14  Right now, I am staying with my fiance in Chicago close to

10:07:00  15  Addison and Ashland.  I am an admissions advisor for DeVry

10:07:04  16  University.  That's been about four years.  Prior to that, I

10:07:10  17  worked for Careerbuilder.com in sales.  And prior to that, I

10:07:14  18  was in college.  My fiance also works at DeVry University.

10:07:22  19     I have served on a jury.  It was in the Rolling

10:07:26  20  Meadows court.  It was just a car accident, just like a civil

10:07:30  21  insurance case.  My educational background, I have a

10:07:36  22  bachelor's degree from Bradley University in marketing, and I

10:07:40  23  am currently working on my MBA at Keller.  I have never been

10:07:48  24  any sort of party or witness.

10:07:52  25     THE COURT:  Thank you.

| | | |
|---|---|---|
| 10:07:56 | 1 | PROSPECTIVE JUROR FLEMING:  My name is Elizabeth |
| 10:07:58 | 2 | Fleming.  I have lived in Riverside for the past 20 years.  I |
| 10:08:02 | 3 | have been employed by the law office of Corti, Aleksy & |
| 10:08:06 | 4 | Castaneda for the last 20 years as a legal assistant.  No one |
| 10:08:12 | 5 | else in my household is employed. |
| 10:08:16 | 6 | I have never served on a jury.  I am a college |
| 10:08:20 | 7 | graduate. |
| 10:08:20 | 8 | THE COURT:  What was your field of study? |
| 10:08:24 | 9 | PROSPECTIVE JUROR FLEMING:  Criminal justice. |
| 10:08:28 | 10 | THE COURT:  Well, let me ask you, the role of the |
| 10:08:30 | 11 | judge at the trial, one of the responsibilities of the judge |
| 10:08:34 | 12 | is to give the jury instructions as to the law that applies to |
| 10:08:40 | 13 | the case.  We usually do that at the end of the case. |
| 10:08:46 | 14 | If from your studies of criminal justice you have an |
| 10:08:52 | 15 | opinion that's different than mine about the law, would you be |
| 10:08:54 | 16 | willing to follow my opinion? |
| 10:09:00 | 17 | PROSPECTIVE JUROR FLEMING:  Yes. |
| 10:09:00 | 18 | THE COURT:  Thank you. |
| 10:09:02 | 19 | PROSPECTIVE JUROR FLEMING:  And I have not been a |
| 10:09:04 | 20 | party or witness to any legal proceeding. |
| 10:09:06 | 21 | THE COURT:  Thank you.  I think you described the |
| 10:09:14 | 22 | specialty of the firm you worked with before? |
| 10:09:18 | 23 | PROSPECTIVE JUROR FLEMING:  Workers' compensation. |
| 10:09:18 | 24 | THE COURT:  Yes.  Thank you. |
| 10:09:22 | 25 | PROSPECTIVE JUROR POPE:  John Pope, Jr.  Born and |

| | | |
|---|---|---|
| 10:09:24 | 1 | raised in Glen Ellyn.  Still live there.  Been employed with |
| 10:09:30 | 2 | Pope Landscaping, Incorporated, and now owner.  I have a wife |
| 10:09:36 | 3 | and two kids.  Wife is not employed. |
| 10:09:42 | 4 | I have never actually been on a jury.  Done two years |
| 10:09:46 | 5 | at Iowa State University for college background.  Never been a |
| 10:09:52 | 6 | party or witness. |
| 10:09:52 | 7 | THE COURT:  Thank you. |
| 10:09:58 | 8 | PROSPECTIVE JUROR KOONTZ:  My name is Thomas A. |
| 10:10:00 | 9 | Koontz, Jr.  I live in Morton Grove.  I am employed by Abbott |
| 10:10:06 | 10 | Laboratories, which is a pharmaceutical manufacturer, products |
| 10:10:12 | 11 | manufacturer. |
| 10:10:12 | 12 | THE COURT:  What do you do? |
| 10:10:14 | 13 | PROSPECTIVE JUROR KOONTZ:  I am an engineer, a |
| 10:10:16 | 14 | maintenance engineer.  I support manufacturing activities. |
| 10:10:24 | 15 | My wife is a substitute teacher. |
| 10:10:28 | 16 | THE COURT:  Where does she work? |
| 10:10:28 | 17 | PROSPECTIVE JUROR KOONTZ:  She works primarily in |
| 10:10:30 | 18 | Morton Grove and Skokie. |
| 10:10:36 | 19 | My daughter is a student and works a part-time job. |
| 10:10:42 | 20 | I have served on a jury on a case that was concluded or |
| 10:10:50 | 21 | determined before we heard any of it. |
| 10:10:52 | 22 | THE COURT:  I see.  Was it a civil or a criminal |
| 10:10:56 | 23 | case? |
| 10:10:56 | 24 | PROSPECTIVE JUROR KOONTZ:  It was a criminal case. |
| 10:10:58 | 25 | THE COURT:  Which court was that, federal or state? |

10:11:02  1    PROSPECTIVE JUROR KOONTZ:  It was about 10 or 12
10:11:04  2  years ago.  It was down on Michigan Avenue, about 14th and
10:11:08  3  Michigan.  It was kind of a satellite courtroom.
10:11:14  4    THE COURT:  I see.
10:11:14  5    PROSPECTIVE JUROR KOONTZ:  My educational background,
10:11:16  6  I have a bachelor's of science in chemical engineering.  No, I
10:11:22  7  have not been a party or witness in a case.
10:11:24  8    THE COURT:  Thank you.
10:11:28  9    PROSPECTIVE JUROR GOLS:  Good morning.  My name is
10:11:30  10  Robin Gols.  I have lived in Chicago for the past 15 years,
10:11:34  11  Jefferson Park neighborhood.  I am currently unemployed.  I am
10:11:40  12  legally disabled.  But what I did in the past, I worked as a
10:11:46  13  customs broker for DHL and for an Italian freight ordering
10:11:54  14  firm.
10:11:54  15    THE COURT:  What kind of work did you do for them?
10:12:00  16    PROSPECTIVE JUROR GOLS:  I would assess and determine
10:12:02  17  harmonized tariffs applicable to customs duty for import
10:12:06  18  commodities, whether it be foodstuffs or industrial equipment,
10:12:12  19  whatnot.
10:12:14  20    My husband is currently employed as a senior
10:12:18  21  supervisor, air cargo at DHL.
10:12:24  22    I have never served on a jury previously.  My
10:12:30  23  educational background, high school diploma and just technical
10:12:38  24  programs.  No college, no formal college.  And No. 7, never a
10:12:46  25  party or witness in any kind of legal proceeding.

| | | |
|---|---|---|
| 10:12:50 | 1 | THE COURT:  Thank you. |
| 10:12:54 | 2 | PROSPECTIVE JUROR SIEGFRIED:  April Siegfried.  I've |
| 10:12:58 | 3 | lived in the East Rogers Park neighborhood of Chicago for the |
| 10:13:00 | 4 | last 15 years.  I am not currently employed but in the last 10 |
| 10:13:04 | 5 | years taught web design for DePaul, through DePaul University. |
| 10:13:10 | 6 | My husband -- |
| 10:13:10 | 7 | THE COURT:  I'm sorry, what do you do at DePaul? |
| 10:13:12 | 8 | PROSPECTIVE JUROR SIEGFRIED:  Taught web design |
| 10:13:14 | 9 | through the Institute of Professional Development at DePaul. |
| 10:13:18 | 10 | My husband is a dean at DePaul University, computer |
| 10:13:22 | 11 | science and digital cinema. |
| 10:13:24 | 12 | I have not served on a jury.  Completed college -- |
| 10:13:32 | 13 | completed high school, a year of college, two years of |
| 10:13:34 | 14 | technical training. |
| 10:13:36 | 15 | I have not been a witness or a party in a legal |
| 10:13:40 | 16 | proceeding. |
| 10:13:42 | 17 | THE COURT:  Thank you. |
| 10:13:46 | 18 | PROSPECTIVE JUROR CARROLL:  My name is Corinne |
| 10:13:48 | 19 | Carroll.  For the last 17 years, I've lived in Round Lake |
| 10:13:52 | 20 | Beach.  For the last three years, I've worked for a |
| 10:13:58 | 21 | (inaudible).  I am the only person in my household who is |
| 10:14:00 | 22 | employed. |
| 10:14:04 | 23 | I have never served on a jury of any kind.  I have a |
| 10:14:10 | 24 | BA in English.  And I have never been a party or witness. |
| 10:14:22 | 25 | THE COURT:  Never been a party or witness in a legal |

| | | |
|---|---|---|
| 10:14:24 | 1 | proceeding? |
| 10:14:26 | 2 | PROSPECTIVE JUROR CARROLL:  No. |
| 10:14:26 | 3 | THE COURT:  All right.  I will ask counsel to prepare |
| 10:14:30 | 4 | their lists.  It will be a few minutes.  I will ask everybody |
| 10:14:34 | 5 | to be patient. |
| 10:14:36 | 6 | You can step out in the hallway.  That's the lockup |
| 10:14:40 | 7 | in there. |
| 10:14:46 | 8 | MR. JONES:  I have seen it. |
| 10:14:50 | 9 | MR. HAMMERMAN:  Your Honor, may we use the room to |
| 10:14:52 | 10 | the right of the bench? |
| 10:14:54 | 11 | THE COURT:  No.  That's part of my chambers.  No. |
| 10:14:56 | 12 | You can sit out in the hallway if you'd like. |
| 10:23:10 | 13 | (Brief pause.) |
| 10:23:12 | 14 | THE COURT:  The courtroom deputy in a few minutes is |
| 10:23:14 | 15 | going to read several of your names.  If your name is read, it |
| 10:23:18 | 16 | means that you're excused as potential jurors in this case. |
| 10:23:24 | 17 | And believe me, I appreciate the time you've spent and the |
| 10:23:30 | 18 | candor with which you've addressed the questions. |
| 10:23:34 | 19 | If your name is called, please return to the |
| 10:23:38 | 20 | second-floor jury room. |
| 10:23:40 | 21 | THE CLERK:  Rachel Aduana, Diane Tedore -- |
| 10:23:48 | 22 | THE COURT:  Could you leave the questionnaires in the |
| 10:23:48 | 23 | chairs, please. |
| 10:23:50 | 24 | THE CLERK:  Robert Kirby, Elizabeth Fleming, Corinne |
| 10:24:04 | 25 | Carroll. |

10:24:16    1    THE COURT:  I am going to ask those remaining in the
10:24:18    2    first row, would you move to your right.  Stay in the same
10:24:24    3    sequence, though.
10:24:40    4         And the first three people closest to me in the
10:24:44    5    second row, would you stay in the same order and move down to
10:24:48    6    the first row.  And the last person, can the last person in
10:24:54    7    the second row, last from my point of view, will take the
10:25:00    8    first chair in the second row.
10:25:02    9         Oh, I'm sorry.  I neglected somebody.  Exactly.
10:25:26   10    Exactly.  Thank you.  Musical chairs.
10:25:50   11         THE CLERK:  Mark Aguilar, Roberta Martinak, Loy
10:26:06   12    Baluyot, Nathan Willert, and Scott Enke.
10:26:22   13         THE COURT:  All right.  Will the first new person in
10:26:26   14    the jury box stand and go through the questionnaire with us.
10:26:30   15         PROSPECTIVE JUROR AGUILAR:  My name is Mark Aguilar.
10:26:32   16    I have lived for the past 10 years in Chicago, Bridgeport
10:26:38   17    neighborhood.  I have been employed with Critical Care
10:26:42   18    Systems.  It's a home infusion company based in Elmhurst,
10:26:46   19    Illinois.  I have been there for 14 years.  My wife is
10:26:50   20    currently an RN at neuro ICU at University of Illinois Chicago
10:26:56   21    Hospital on Taylor Street.
10:26:58   22         I have served on two juries, both at 26th and
10:27:02   23    California, and once as a juror and as an alternate juror,
10:27:10   24    both of them murder cases.
10:27:12   25         My background education, I -- high school education,

| | | |
|---|---|---|
| 10:27:16 | 1 | some college, technical training as a pharmacy technician. |
| 10:27:22 | 2 | And I have not been in any court-related matters personally. |
| 10:27:28 | 3 | THE COURT:  All right.  Thank you. |
| 10:27:32 | 4 | PROSPECTIVE JUROR MARTINAK:  My name is Roberta |
| 10:27:34 | 5 | Martinak.  I have been a resident in Plainfield for over 20 |
| 10:27:38 | 6 | years.  My employer, I have been at LaGrange Hospital for 32. |
| 10:27:44 | 7 | My son, the only one home, works for Apple. |
| 10:27:48 | 8 | THE COURT:  All right.  Going back to -- |
| 10:27:54 | 9 | PROSPECTIVE JUROR MARTINAK:  Yes. |
| 10:27:54 | 10 | THE COURT:  Would you tell us more detail what the |
| 10:27:56 | 11 | nature of your work is. |
| 10:27:58 | 12 | PROSPECTIVE JUROR MARTINAK:  I work in a laboratory. |
| 10:28:00 | 13 | I am support services league, so I am in charge of phlebotomy, |
| 10:28:06 | 14 | clerical, policies, procedures, payroll. |
| 10:28:10 | 15 | My husband works in purchasing at LaGrange as well. |
| 10:28:14 | 16 | He's been there over 10 years. |
| 10:28:18 | 17 | THE COURT:  LaGrange Hospital? |
| 10:28:20 | 18 | PROSPECTIVE JUROR MARTINAK:  Yes, ma'am. |
| 10:28:20 | 19 | And then I teach phlebotomy certification at Joliet |
| 10:28:24 | 20 | Junior.  I have been there three, four semesters now.  Again, |
| 10:28:28 | 21 | my son is the only one out of the four that's home, and he |
| 10:28:32 | 22 | works for Apple in Naperville. |
| 10:28:34 | 23 | THE COURT:  What does he do? |
| 10:28:36 | 24 | PROSPECTIVE JUROR MARTINAK:  He is -- it sounds |
| 10:28:38 | 25 | silly, but he is at the level of genius. |

| | | |
|---|---|---|
| 10:28:42 | 1 | THE COURT:  He is your son. |
| 10:28:44 | 2 | PROSPECTIVE JUROR MARTINAK:  And it's each level.  He |
| 10:28:48 | 3 | does a lot of the programming repairing, people bring things |
| 10:28:50 | 4 | in, and they need to be tweaked or informed. |
| 10:28:52 | 5 | THE COURT:  Your other three children, are they |
| 10:28:56 | 6 | employed? |
| 10:28:56 | 7 | PROSPECTIVE JUROR MARTINAK:  Yes.  Well, two of the |
| 10:28:58 | 8 | three.  My eldest son is, again, a DuPage sheriff; my middle |
| 10:29:04 | 9 | daughter works for Navistar, she works in contracting; and |
| 10:29:10 | 10 | then the youngest one is just going to be a mom. |
| 10:29:16 | 11 | I have been on a jury at Joliet.  It was a |
| 10:29:22 | 12 | malpractice case.  I have an associate's, science, plus trade |
| 10:29:34 | 13 | over the years for phlebotomy.  And I had a workmen's comp |
| 10:29:40 | 14 | case over 10 years ago for myself. |
| 10:29:42 | 15 | THE COURT:  Thank you. |
| 10:29:48 | 16 | PROSPECTIVE JUROR BALUYOT GUEVARRA:  My name is Loy |
| 10:29:52 | 17 | Theresa Baluyot Guevarra.  For the past 10 years, I've lived |
| 10:29:54 | 18 | in Chicago when I was going to school, and right now I live in |
| 10:29:56 | 19 | Gurnee.  For the past 10 years, I worked for a land |
| 10:30:04 | 20 | development company, a civil engineer for four years.  And |
| 10:30:06 | 21 | right now I am working for Handi-Foil for the county.  My |
| 10:30:12 | 22 | husband works for -- |
| 10:30:14 | 23 | THE COURT:  I'm sorry.  What do you do at your |
| 10:30:16 | 24 | present employer's? |
| 10:30:20 | 25 | PROSPECTIVE JUROR BALUYOT GUEVARRA:  Accounts |

10:30:20   1   receivable and accounting.

10:30:22   2          My husband is a web developer for Brunswick
10:30:26   3   Corporation.  And I have a one year old at home that doesn't
10:30:28   4   work.

10:30:30   5          And I have never served on a jury before.  My
10:30:34   6   occupational background, I have a B.S. in civil engineering, a
10:30:40   7   graduate certificate in business administration, and I am
10:30:42   8   currently pursuing my MBA.  And I have never been a party or
10:30:46   9   witness in a legal proceeding.

10:30:48  10          THE COURT:  Thank you.

10:30:52  11          PROSPECTIVE JUROR WILLERT:  Good morning.  My name is
10:30:54  12   Nathan Willert.  I currently live in Plainfield for the last
10:30:56  13   seven years.  Before that, I was living here in Chicago.
10:30:58  14   Currently work for Cintas Corporation.  It will be 10 years in
10:31:04  15   June.  I am a market sales manager out of Schaumburg, so my
10:31:08  16   role is to -- I have a team of eight people that report to me,
10:31:12  17   we bring in new business as far as companies that would rent
10:31:16  18   uniforms, floor mats, other products and services from us.  My
10:31:20  19   wife is a loan officer for Diamond Bank in Schaumburg.

10:31:26  20          I have never served on a jury or grand jury before.
10:31:30  21   I have a bachelor's degree from University of Illinois in
10:31:32  22   economics.  And never been a witness in any kind of legal
10:31:36  23   proceeding.

10:31:36  24          THE COURT:  Thank you.

10:31:42  25          PROSPECTIVE JUROR ENKE:  I am Scott Enke.  Past 10

10:31:44  1  years, I have lived in Naperville, Omaha, Nebraska, and

10:31:48  2  Plainfield.  Last 10 years of employment, I have been with AJ

10:31:54  3  Dynamics and currently Covidien Neurovascular.

10:32:00  4  THE COURT:  What do you do?

10:32:02  5  PROSPECTIVE JUROR ENKE:  I am a clinical specialist

10:32:04  6  and sales manager for Covidien.

10:32:08  7  THE COURT:  What kind of -- would you describe the

10:32:10  8  practice?

10:32:14  9  PROSPECTIVE JUROR ENKE:  Basically working closely

10:32:16  10  with physicians with new medical device products new to the

10:32:18  11  market, and also the sales side of that as well.  So training

10:32:22  12  and then also usage and procedures.

10:32:24  13  THE COURT:  Could you kind of describe the general

10:32:26  14  nature of the products that you work with.

10:32:14  15  PROSPECTIVE JUROR ENKE:  Yes.  They are neurovascular

10:32:34  16  products, so they're mechanical stroke devices, neuro coils

10:32:36  17  for brain aneurysms, liquid embolic systems for brain AVMs.

10:32:42  18  THE COURT:  I see.  Thank you.

10:32:44  19  PROSPECTIVE JUROR ENKE:  My wife stays at home with

10:32:48  20  our 10 month old, so no one else is employed.

10:32:50  21  Never served on a jury before.  My background is BA

10:32:56  22  from the University of Iowa, MBA from the University of Notre

10:33:00  23  Dame.  Have I ever been -- never been a witness to a legal

10:33:04  24  proceeding.

10:33:04  25  THE COURT:  All right.  Thank you.

10:33:10  1         If counsel would like to consult out in the hallway,

10:33:14  2  that would be fine.

10:37:00  3    (Brief pause.)

10:38:02  4         THE COURT:  In a few minutes, the courtroom deputy is

10:38:04  5  going to call several names.  If your name is called, please

10:38:10  6  return to the second-floor jury room with our sincere

10:38:14  7  appreciation for your help today.

10:38:16  8         THE CLERK:  Mark Aguilar, Roberta Martinak.

10:38:30  9         THE COURT:  Would the three people -- yes, you know

10:38:32  10  the routine, keeping the same order, would you move to your

10:38:36  11  right.

10:38:46  12         The 12 of you have been selected by both sides to be

10:38:50  13  the jury in the case.  We will need two alternates, but we can

10:38:58  14  in the meantime administer the oath to the jury and excuse

10:39:02  15  them from the questioning of the alternates.

10:39:06  16         Would you all please stand.

10:39:10  17    (Jury sworn.)

10:39:26  18         THE COURT:  You may leave your questionnaires in the

10:39:30  19  chairs, and the courtroom deputy, Ms. Rone, will show you the

10:39:36  20  jury room.

10:39:36  21         Please don't discuss the case.  After we select the

10:39:40  22  alternates, we will take a break, and I will give you some

10:39:44  23  preliminary instructions about the trial and the dos and

10:39:50  24  don'ts for jurors, that sort of thing.

10:39:52  25         So in the meantime, feel free to discuss whatever you

| | | |
|---|---|---|
| 10:39:56 | 1 | wish, but don't discuss the case.  Thank you. |
| 10:40:30 | 2 | (The jury leaves the courtroom.) |
| 10:40:30 | 3 | THE COURT:  Please be seated.  The clerk will be back |
| 10:40:32 | 4 | in a moment.  The clerk will be calling four names.  We will |
| 10:40:42 | 5 | call the four people who will take the first four empty chairs |
| 10:40:52 | 6 | closest to me in the front row of the jury box. |
| 10:40:52 | 7 | (Brief pause.) |
| 10:44:28 | 8 | THE COURT:  Well, I am not sure what happened to the |
| 10:44:30 | 9 | clerk, but I do have a copy of the jury list here, so I will |
| 10:44:32 | 10 | call the next four names. |
| 10:44:36 | 11 | Susanne Carroccia, James Pfister, Ingo Pilli, |
| 10:45:10 | 12 | P-i-l-l-i, Shirley Belcher. |
| 10:45:32 | 13 | PROSPECTIVE JUROR CARROCCIA:  Hi.  My name is Susanne |
| 10:45:36 | 14 | Carroccia.  I lived in Lake Villa, Illinois, for the past 12 |
| 10:45:40 | 15 | years.  I have been employed at BMO Harris Bank as a portfolio |
| 10:45:44 | 16 | manager for the past 17 years.  I do underwriting for |
| 10:45:48 | 17 | commercial loans.  My husband is an I.T. person, so |
| 10:45:52 | 18 | information technologies, desktop support.  He works for a |
| 10:45:56 | 19 | company called CoreTech, but he is a contractor at Abbott |
| 10:46:02 | 20 | Laboratories doing I.T. work. |
| 10:46:04 | 21 | I have never served on a jury.  My educational |
| 10:46:08 | 22 | background, I have a BA in economics and a master's in |
| 10:46:10 | 23 | business administration.  And I have never been a party or |
| 10:46:14 | 24 | witness to any legal proceedings. |
| 10:46:16 | 25 | THE COURT:  Thank you. |

10:32:12    1           PROSPECTIVE JUROR PFISTER: Good morning. James

10:46:22    2   Pfister. I have lived here for about five years and Baltimore

10:46:26    3   for about three years and, prior to that, Pennsylvania. I

10:46:32    4   have been employed with Marriott International for

10:46:36    5   approximately the last eight years, and then prior to that, I

10:46:38    6   was in school.

10:46:40    7           THE COURT: What do you do with Marriott?

10:46:44    8           PROSPECTIVE JUROR PFISTER: Banquet manager. My

10:46:48    9   responsibilities for the job is kind of taking care of the

10:46:52   10   banquet servers and banquet bartenders, running functions. My

10:46:58   11   wife is a sales manager at Marriott at the regional sales

10:47:02   12   office in Rosemont.

10:47:08   13           I have never served on a jury. My education, I have

10:47:14   14   a bachelor in hospitality at Pennsylvania State University.

10:47:22   15           And on question 7, can I have a sidebar on that one?

10:47:26   16           THE COURT: Yes.

10:47:26   17    (Whereupon, the following discussion was had at the bench

10:47:50   18   outside the hearing of the prospective jurors:)

10:47:50   19           PROSPECTIVE JUROR PFISTER: It was probably about 15

10:47:56   20   years ago, I was arrested on possession of marijuana, but then

10:48:00   21   later I was -- it was dropped.

10:48:02   22           THE COURT: I see. The charges were dismissed?

10:48:04   23           PROSPECTIVE JUROR PFISTER: Yes.

10:48:06   24           THE COURT: How old were you?

10:48:08   25           PROSPECTIVE JUROR PFISTER: Probably 17 or 18.

| | | |
|---|---|---|
| 10:48:10 | 1 | THE COURT:  Is there anything about that experience |
| 10:48:12 | 2 | that -- |
| 10:48:12 | 3 | PROSPECTIVE JUROR PFISTER:  No. |
| 10:48:14 | 4 | THE COURT:  -- that carries over in terms of your |
| 10:48:16 | 5 | views of law enforcement or views of courts? |
| 10:48:20 | 6 | PROSPECTIVE JUROR PFISTER:  No.  No. |
| 10:48:20 | 7 | THE COURT:  All right. |
| 10:48:24 | 8 | PROSPECTIVE JUROR PFISTER:  It was like 18 years ago. |
| 10:48:24 | 9 | THE COURT:  Thank you. |
| 10:48:24 | 10 | (The following proceedings were had in open court in the |
| 10:48:40 | 11 | presence and hearing of the prospective jurors:) |
| 10:48:40 | 12 | PROSPECTIVE JUROR PILLI:  My name is Ingo Pilli. |
| 10:48:42 | 13 | I've lived in Arlington Heights for the past 10 years.  Been |
| 10:48:44 | 14 | employed by Regis Technologies.  We're a pharmaceutical |
| 10:48:50 | 15 | manufacturer.  My wife works for Greenbrier School in |
| 10:48:54 | 16 | Arlington Heights as an administrative assistant. |
| 10:48:58 | 17 | I have served on a jury in a criminal case, and there |
| 10:49:00 | 18 | was a verdict returned. |
| 10:49:02 | 19 | THE COURT:  Which court was that? |
| 10:49:06 | 20 | PROSPECTIVE JUROR PILLI:  26th and California. |
| 10:49:08 | 21 | THE COURT:  What was the charge, if you recall? |
| 10:49:10 | 22 | PROSPECTIVE JUROR PILLI:  Drug sales. |
| 10:49:10 | 23 | THE COURT:  I see. |
| 10:49:12 | 24 | PROSPECTIVE JUROR PILLI:  I have a degree in chemical |
| 10:49:16 | 25 | engineering.  And I have not been a witness to a legal |

10:49:18  1  proceeding.

10:49:18  2          THE COURT:  Thank you.

10:49:24  3          PROSPECTIVE JUROR BELCHER:  Shirley Belcher.  I lived

10:49:26  4  in Bloomingdale for the last 20 years.  I am employed at

10:49:30  5  JCPenney in commission sales.  Previous to that, I was in

10:49:34  6  Montgomery Wards in the same position.  My husband is retired.

10:49:38  7          THE COURT:  What did he do before he was retired?

10:49:40  8          PROSPECTIVE JUROR BELCHER:  He was human resources

10:49:42  9  for the shoe department in K-Mart, and then he was a car

10:49:46  10  salesman.

10:49:48  11          I have never been on a jury.  And I have a high

10:49:52  12  school education.  And I have never been party to any legal

10:49:56  13  proceedings.

10:49:56  14          THE COURT:  All right.  Thank you.  I will see

10:50:00  15  counsel at sidebar.

10:50:00  16    (Whereupon, the following discussion was had at the bench

10:50:16  17  outside the hearing of the prospective jurors:)

10:50:16  18          THE COURT:  Each side has one preemptory on

10:50:24  19  alternates.  Are you prepared?

10:50:26  20          MR. JONES:  It will just take a second.

10:50:30  21          THE COURT:  I will wait over here.

10:50:30  22    (Brief pause.)

10:50:30  23    (The following proceedings were had in open court in the

10:52:56  24  presence and hearing of the prospective jurors:)

10:52:56  25          THE COURT:  I'd like to thank the two of you.  We

| | |
|---|---|
| 10:53:00 | 1 |
| 10:53:02 | 2 |
| 10:53:10 | 3 |
| 10:53:30 | 4 |
| 10:53:34 | 5 |
| 10:53:44 | 6 |
| 10:53:50 | 7 |
| 10:53:54 | 8 |
| 10:53:58 | 9 |
| 10:54:00 | 10 |
| 10:54:36 | 11 |
| 10:54:38 | 12 |
| 10:54:52 | 13 |
| 10:55:00 | 14 |
| 10:55:02 | 15 |
| 10:55:06 | 16 |
| 10:55:08 | 17 |
| 10:55:10 | 18 |
| 11:13:30 | 19 |
| 11:13:30 | 20 |
| 11:13:34 | 21 |
| 11:13:38 | 22 |
| 11:13:42 | 23 |
| 11:13:48 | 24 |
| 11:13:50 | 25 |

have two more people than we need, but that's always a good
situation for a judge.  I thank you very much.  Mr. Pfister,
you're excused, and Mr. Pilli.  Thank you.

I guess it will be my job to administer the oath to
the alternates.  In the meanwhile, I will excuse the rest of
the people who appeared today for jury selection.  And we
didn't quite get to you, almost, but thank you very much.
Would you return to the jury room on the second floor.

Please stand to be sworn.

(Alternate jurors sworn.)

THE COURT:  You may join the rest of the jury in the
jury room.  Would you show the alternates.

(Alternate jurors excused.)

THE COURT:  We will take a 20-minute recess, let's
say 15-minute recess so we can get openings in before lunch.
We will take a lunch break for an hour.

Thank you.

(Short break.)

(The jury entered the courtroom.)

THE COURT:  Well, members of the jury, welcome.  And
before we hear from the lawyers in opening statements, I would
like to say a few words about your role in the case, my role,
and the role of the lawyers.  We all have important roles, but
they're distinctly different roles, and we must keep those
different roles in mind.

11:13:52   1    It will be your duty as jurors to find from the

11:13:56   2  evidence what the facts are.  You and you alone are the judges

11:14:02   3  of the facts.  You will then apply the facts to the law that I

11:14:08   4  will give you in the form of jury instructions at the end of

11:14:12   5  the case.

11:14:14   6    You must follow the law whether or not you personally

11:14:18   7  agree with the law.

11:14:20   8    Nothing I may do or say during the trial is intended

11:14:26   9  to communicate any message to you as to what your verdict

11:14:30  10  should be.  That decision is yours and yours alone.

11:14:34  11    The evidence from which you will find the facts will

11:14:40  12  consist of testimony from witnesses who will come before you

11:14:46  13  here in the witness box and testify.  There will also be a

11:14:52  14  number of physical exhibits that may be offered into evidence.

11:15:00  15  And at the end of the trial, you will have access to the

11:15:04  16  physical exhibits that are offered in evidence.

11:15:10  17    Now, certain things are not evidence, and you have to

11:15:14  18  keep that in mind as well.  The statements, arguments,

11:15:20  19  questions of the lawyers are not evidence.  The lawyers on

11:15:24  20  each side are advocates, able advocates for their clients, so

11:15:32  21  they will be making an opening statement, closing arguments,

11:15:44  22  examining witnesses, cross-examining witness, and occasionally

11:15:48  23  probably making some objections.  Those statements by lawyers

11:15:50  24  are not evidence.  The opening statements and closing

11:16:02  25  arguments are to give you an understanding of each side's

11:16:02  1   point of view, and each side will be using their persuasive

11:16:06  2   skills for whatever their point of view is.  Just remember

11:16:08  3   that those statements are not evidence.

11:16:14  4        Any testimony that I exclude or exhibits I don't

11:16:24  5   admit into evidence are not evidence and must not be

11:16:28  6   considered.

11:16:30  7        Anything you have seen or heard outside the courtroom

11:16:34  8   is not evidence.  As you have heard me say probably a half

11:16:38  9   dozen times this morning, the important -- one of the

11:16:44  10  important aspects, essential aspects of a jury trial is the

11:16:50  11  consideration of evidence that is before you, not outside

11:16:54  12  influences of any kind.

11:16:56  13       There are basically two kinds of evidence:

11:17:00  14  circumstantial evidence and direct evidence.  Direct evidence

11:17:06  15  is evidence that a witness who has personal knowledge

11:17:14  16  testifies about.  Circumstantial evidence is the proof of a

11:17:20  17  fact through a number of facts and circumstances that lead you

11:17:24  18  to a reasonable conclusion.  For example, when you entered the

11:17:32  19  courthouse today, at least when I entered, it wasn't raining,

11:17:36  20  but if you see some people coming in from outside who have

11:17:44  21  umbrellas that are wet and dripping, you can conclude

11:17:48  22  reasonably that, well, it's raining now or it's rained since

11:17:52  23  you came in the building.  That's a circumstance that you can

11:17:56  24  conclude that can support a conclusion with a reasonable

11:18:00  25  inference.

| | | |
|---|---|---|
| 11:18:02 | 1 | It will be one of your most important roles to assess |
| 11:18:12 | 2 | the believability or the credibility of the witnesses and to |
| 11:18:16 | 3 | decide what weight, if any, you decide a witness' testimony |
| 11:18:24 | 4 | should have.  That will be your decision and yours alone.  So |
| 11:18:30 | 5 | as the witnesses testify, keep that in mind in assessing and |
| 11:18:34 | 6 | evaluating the demeanor and credibility of the witnesses.  And |
| 11:18:40 | 7 | I will give you some further instructions about the general |
| 11:18:44 | 8 | guidelines of determining witness credibility in the final |
| 11:18:48 | 9 | instructions. |
| 11:18:48 | 10 | Well, as you know, this is a criminal case.  There |
| 11:18:54 | 11 | are some basic rules that apply to criminal cases.  These |
| 11:18:58 | 12 | rules don't apply to civil cases, they apply to criminal |
| 11:19:02 | 13 | cases. |
| 11:19:02 | 14 | The defendant is presumed to be innocent.  It is the |
| 11:19:12 | 15 | indictment -- the indictment against the defendant is an |
| 11:19:16 | 16 | allegation or, in this case, allegations, and it is a general |
| 11:19:22 | 17 | accusation and nothing more.  The indictment is not proof of |
| 11:19:26 | 18 | guilt or anything else.  Therefore, Dr. Chhibber starts the |
| 11:19:34 | 19 | trial with a complete -- with a clean slate. |
| 11:19:40 | 20 | Second, the burden of proof is on the government at |
| 11:19:44 | 21 | all times.  It is the government's burden to show guilt as to |
| 11:19:48 | 22 | each charge beyond a reasonable doubt.  The defendant has no |
| 11:19:54 | 23 | burden to prove his innocence or to present any evidence at |
| 11:19:58 | 24 | all or to testify. |
| 11:20:04 | 25 | So the law and the Constitution prohibit us from |

11:20:08  1   considering the fact the defendant may not testify -- may or

11:20:14  2   may not decide to testify.

11:20:16  3       The third principle is, of course, the one that the

11:20:20  4   government must prove each charge beyond a reasonable doubt,

11:20:26  5   and you keep this burden in mind throughout the trial.

11:20:30  6       Some of the general matters of service on a jury were

11:20:42  7   probably covered during your orientation with the clerk, but I

11:20:46  8   want to stress several of them that are essential.

11:20:52  9       During the trial of the case, you are not to discuss

11:20:56  10  the case with anyone.  Now, I know this is easy for me to say

11:21:02  11  but much more difficult for you to do.  I am sure family and

11:21:08  12  friends will want to know why you're down here and what's

11:21:12  13  going on and is it interesting, et cetera.  The reason why we

11:21:20  14  have this difficult requirement is because of the danger of

11:21:26  15  outside influences and the danger if you start discussing the

11:21:30  16  case among yourselves before you have heard everything and

11:21:34  17  before you have heard the instructions of law that apply to

11:21:38  18  the case would likely rush you to a judgment in the case way

11:21:42  19  before you have heard all the evidence, way before you have

11:21:46  20  heard the jury instructions.  And so it's essential to the

11:21:52  21  integrity of the trial to not discuss the case or to

11:21:58  22  deliberate among yourselves as the trial goes on.

11:22:02  23      At the end of the case, after the closing arguments,

11:22:06  24  I will give you the instructions of law that apply to the

11:22:10  25  case, and then you can discuss the case, of course, to

11:22:18    1    whatever extent the jury determines is appropriate.

11:22:24    2         I do ask you to use the back elevator and the bank of

11:22:30    3    elevators that was closest to the courtroom, and I ask that

11:22:38    4    the lawyers and witnesses or people associated with either

11:22:44    5    side in the case use the north bank of elevators so we don't

11:22:50    6    have everybody getting on the same elevator and avoid contact

11:22:58    7    outside the courtroom.  If you see somebody involved in the

11:23:06    8    case coming into the building or someplace else, they are not

11:23:14    9    going to be friendly with you, and I assure you it's not

11:23:18   10    because they are unfriendly people.  But we all respect the

11:23:24   11    sensitivity of your responsibilities and no one in the case

11:23:28   12    will be approaching you or chatting with you.

11:23:36   13         Do not read, watch, or listen to anything about this

11:23:42   14    case or about the issues in this case.  I know in this day and

11:23:48   15    age, that's also a difficult one to follow.  Again, the case

11:23:58   16    must be decided on the evidence presented here in court, and

11:24:02   17    that means do not access or research the case independently,

11:24:08   18    including online or any other way.  That's more of a concern

11:24:14   19    than it used to be, but I will tell you that would compromise

11:24:20   20    your position were you to do research on the case because,

11:24:24   21    again, it's possible you may be influenced by circumstances

11:24:30   22    that would not be admissible evidence or soundly based.  And

11:24:36   23    the parties -- each party deserves a fair trial, and this is

11:24:44   24    part and parcel of a fair trial.

11:24:54   25         Finally, do not -- this is implicit in what I said

11:24:58  1  earlier, but do not make any judgment or form an opinion about

11:25:02  2  the case until you have heard everything.  That's so important

11:25:08  3  to the integrity of your decision.

11:25:10  4        Now, if you wish, you may take notes.  Your notes

11:25:16  5  would not be evidence.  You are not obligated to take notes.

11:25:20  6  I see that some of you do have notebooks I guess provided by

11:25:26  7  the courtroom deputy.  It's a highly individual decision

11:25:34  8  whether or not a person wishes to take notes.  Some people

11:25:38  9  find taking notes is distracting and would rather watch the

11:25:44  10  witness testify.  Others find that taking notes keeps them

11:25:50  11  focused and might be helpful in triggering memory.

11:25:58  12        So if you decide for yourselves whether you want to

11:26:02  13  take notes or you might change your opinion at some point as

11:26:06  14  to whether you should or should not, that's fine.  But if you

11:26:10  15  take notes, leave your notebooks in the jury room at the end

11:26:12  16  of the day.  The clerk keeps the jury room locked, so no one

11:26:20  17  would have access to your notes, and your notes would be

11:26:22  18  destroyed after the trial is concluded.

11:26:30  19        The trial day, we will start at 9:00 and end

11:26:38  20  approximately 4:30, as close to 4:30 as we can, and I would

11:26:44  21  ask that you return to the jury room before 9:00.  I would

11:26:54  22  suggest between 8:30 and quarter to 9:00.  The clerk will

11:27:02  23  order coffee and something unhealthy for you.  So that's good,

11:27:10  24  and we will start at 9:00 o'clock.

11:27:16  25        Sometimes I have other matters in other cases I have

11:27:20  1  to hear, but the first priority is this trial.  When I have a

11:27:28  2  jury here, that's always my first priority.  So we will do our

11:27:34  3  very best to keep the case on track an on schedule, and, of

11:27:38  4  course, we're dependent on you and the lawyers to all be here

11:27:42  5  and ready to go.

11:27:44  6       We generally take an hour break around noon or

11:27:50  7  shortly thereafter and a 15-, 20-minute break mid morning, mid

11:28:00  8  afternoon.  Those are sort of the logistics of the trial.

11:28:06  9       The trial begins with the opening statements by each

11:28:14  10  side.  They are not obligated to make an opening statement,

11:28:16  11  but very few lawyers miss the opportunity to address a jury,

11:28:20  12  so I suspect you are going to hear opening statements.  They

11:28:24  13  will be relatively brief statements, but they will be designed

11:28:28  14  to help you understand each side's position in the case.

11:28:32  15  Again, those opening statements are not evidence.

11:28:38  16       Opening on behalf of the United States?

11:28:40  17       MR. COLE:  Thank you, your Honor.

11:28:42  18                      - - -

11:28:44  19            MR. COLE, OPENING STATEMENT

11:28:44  20       MR. COLE:  This is a healthcare fraud case.  This is

11:28:48  21  a case about a physician who lied about his patient's medical

11:28:54  22  diagnoses.  He lied about their health conditions.  He did

11:28:58  23  that to justify unnecessary, expensive, and sometimes even

11:29:06  24  painful tests that he billed to insurance companies.

11:29:12  25       This is a case about a physician, the defendant,

| | |
|---|---|
| 11:29:16 | 1 |
| 11:29:22 | 2 |
| 11:29:26 | 3 |
| 11:29:30 | 4 |
| 11:29:40 | 5 |
| 11:29:44 | 6 |
| 11:29:52 | 7 |
| 11:29:52 | 8 |
| 11:29:58 | 9 |
| 11:30:02 | 10 |
| 11:30:12 | 11 |
| 11:30:14 | 12 |
| 11:30:18 | 13 |
| 11:30:24 | 14 |
| 11:30:28 | 15 |
| 11:30:32 | 16 |
| 11:30:40 | 17 |
| 11:30:46 | 18 |
| 11:30:48 | 19 |
| 11:30:52 | 20 |
| 11:30:56 | 21 |
| 11:31:00 | 22 |
| 11:31:06 | 23 |
| 11:31:10 | 24 |
| 11:31:16 | 25 |

1  Jaswinder Chhibber, and his greed.

2        The evidence will show, ladies and gentlemen of the

3  jury, that the defendant ordered unnecessary tests on his

4  patients, unnecessary tests, time and time and time again, and

5  sometimes he didn't even bother to review the results of the

6  tests.  He ordered tests and didn't look at the results or

7  interpret them.

8        Ladies and gentlemen of the jury, the evidence will

9  show that when defendant thought someone was looking over his

10  shoulder, was worried, became worried about what someone was

11  thinking about what he was doing, directed his office staff to

12  go back through the patient chart, patient by patient by

13  patient and year by year by year, looking for missing

14  documentation.  And he told his office staff to create these

15  documents to make it look as if the defendant had actually

16  reviewed these tests weeks, months, or even years earlier.  He

17  did this because he was worried.  He was worried about someone

18  figuring out that what he was doing was billing for

19  unnecessary tests and procedures.

20        The evidence will show that the defendant made a lot

21  of money on these tests.  He would order echocardiograms,

22  which are an ultrasound examination of the heart, that he was

23  paid by insurance companies like Blue Cross $300 for this

24  test.  He ordered unnecessary tests like carotid doppler

25  ultrasounds, which is an ultrasound of the arteries, the

11:31:20  1  carotid arteries in the neck, looking for blockages which

11:31:24  2  could lead to stroke.  He was paid over $300 for these tests.

11:31:32  3  He made over $400 for nerve conduction studies, a

11:31:36  4  very painful procedure for many of the patients.

11:31:42  5  He made this money based on unnecessary diagnoses,

11:31:50  6  the unnecessary tests based on fraudulent diagnoses, and he

11:31:56  7  put both in the patient's medical charts as well as on

11:32:00  8  insurance claim forms.  These diagnoses he wrote down one

11:32:06  9  after the other, the same diagnoses.  You will hear them.

11:32:08  10  Heart murmur, shortness of breath, diagnoses that patients

11:32:14  11  will tell you they did not tell the defendant and the

11:32:18  12  defendant did not tell them.

11:32:20  13  The defendant is charged with eight counts of

11:32:26  14  healthcare fraud and eight counts of making materially false

11:32:30  15  statements in the medical records of his patients.

11:32:36  16  Let me tell you what some of the evidence will show.

11:32:38  17  The first witness you'll hear from is someone named Tiffany

11:32:42  18  Shirley-Terrell.  She is going to tell you that she was a

11:32:50  19  student who needed a school physical.  She was a student at

11:32:56  20  the Illinois School of Health Careers, and she went to the

11:32:58  21  defendant just to get a physical checkup.  She was feeling

11:33:00  22  fine, everything was fine, she just needed a form filled out

11:33:04  23  for school.  But she had great insurance.  She had Blue

11:33:10  24  Cross/Blue Shield through her husband, and she went to the

11:33:12  25  defendant for a checkup, and she gave him her Blue Cross/Blue

11:33:16   1   Shield identification card.  And he examined her, checked her

11:33:20   2   heart, her breathing, felt her neck, and told her that at her

11:33:26   3   age, she needed some additional tests, the ripe old age of 28

11:33:32   4   years old.  She got additional tests.  She got an

11:33:36   5   echocardiogram, a carotid doppler exam, an EKG, a pulmonary

11:33:48   6   function test; all these tests because the defendant told her

11:33:52   7   she was at that age, that she needed them.

11:33:54   8        Now, he didn't send her out to have these tests

11:33:58   9   performed by a cardiologist or a radiologist.  He didn't send

11:34:02  10   her to a hospital or even to a mobile testing facility.  No.

11:34:06  11   Waiting in the room next door was an ultrasound technician

11:34:10  12   waiting to perform the ultrasound tests.

11:34:14  13        When defendant sent Tiffany Shirley-Terrell on her

11:34:20  14   way home, she had a clean bill of health.  She had a form

11:34:24  15   filled out by the defendant saying she was good, everything

11:34:30  16   was fine.  But what she didn't know was what the defendant had

11:34:34  17   written in her permanent medical chart.  He wrote that she had

11:34:42  18   a heart murmur, that she had carotid bruit, which is a sound

11:34:50  19   you hear when listening to the blood flow through the arteries

11:34:54  20   of her neck associated with stroke, carotid bruit, heart

11:35:00  21   murmur, shortness of breath, chest pains, dizziness.

11:35:06  22        Ladies and gentlemen of the jury, you will hear from

11:35:08  23   Ms. Shirley-Terrell.  She will tell you that she never told

11:35:12  24   the defendant about any of these things.  She never said she

11:35:16  25   was dizzy.  She never said she was short of breath.  She never

11:35:20   1   said she had chest pain.  The defendant never told her there

11:35:24   2   was a problem with her heart, that he heard carotid bruit.

11:35:32   3   But all these things are exactly what he wrote down on her

11:35:36   4   permanent medical chart.  And that's not all.  These are the

11:35:42   5   diagnoses he put on the claim form that he submitted to Blue

11:35:48   6   Cross/Blue Shield to justify the tests that he ordered.

11:35:52   7          You will see, ladies and gentlemen of the jury, for

11:35:54   8   this ultrasound, for this simple medical physical exam for her

11:36:04   9   school, for the physical for the school, plus all these tests,

11:36:08   10  the defendant billed Blue Cross/Blue Shield over $1600.  You

11:36:16   11  will hear that Blue Cross paid for a very large percentage of

11:36:22   12  that.

11:36:22   13         Let me tell you about some of the other patients you

11:36:24   14  will hear from.  You will hear from someone named Terrell

11:36:30   15  Cole.  Now, Terrell Cole, like Ms. Shirley-Terrell, went to

11:36:36   16  the defendant's clinic for a checkup.  His grandmother had

11:36:40   17  been sick, and she wanted him just to look out for his health.

11:36:44   18  So he went for a checkup.  He went to the defendant's clinic

11:36:48   19  on 79th Street on the South Side of Chicago in February 2010.

11:36:54   20  And at that time, Terrell Cole was just 30 years old and had a

11:37:00   21  Blue Cross/Blue Shield insurance card.  The defendant examined

11:37:04   22  Terrell Cole, listened to his breathing, listened to his

11:37:12   23  heart.  Perfect.  That's what he said.  That's what the

11:37:14   24  defendant told Terrell Cole after listening to his heart.

11:37:20   25  Perfect.

11:37:22   1      But you don't have to take Terrell Cole's word for

11:37:26   2  it.  You could actually listen to what the defendant said for

11:37:28   3  yourself because Terrell Cole's real name is not Terrell Cole.

11:37:34   4  It's FBI Special Agent Dennaris Coleman, who went to the

11:37:40   5  defendant in an undercover capacity wearing a recording

11:37:44   6  device, and you can hear exactly what happened during that

11:37:50   7  visit, and you can hear the defendant describe Terrell Cole as

11:38:00   8  perfect.

11:38:00   9      But that's not what the defendant wrote in Terrell

11:38:04  10  Cole's medical chart.  He wrote that Terrell Cole, Special

11:38:10  11  Agent Dennaris Coleman, had a heart murmur.  And when the

11:38:12  12  defendant submitted the claims to Blue Cross/Blue Shield for

11:38:14  13  the EKG, that was the diagnosis he used to justify the test.

11:38:20  14  He didn't tell Blue Cross that Terrell Cole was perfect.  He

11:38:26  15  said that Terrell Cole had a heart murmur.

11:38:30  16      You are going to hear from other patients as well,

11:38:32  17  both FBI special agents and real patients.  You are going to

11:38:36  18  hear from real patients like Cierra Thompson, like Alan Vaval,

11:38:42  19  and what they are going to tell you is what they told the

11:38:46  20  defendant about their medical conditions and their symptoms

11:38:50  21  and what the defendant told them about what he was finding.

11:38:54  22  There is absolutely no relation to what the defendant wrote in

11:38:58  23  the medical charts of these patients.  There is no relation to

11:39:04  24  the diagnoses he submitted to Blue Cross/Blue Shield to

11:39:08  25  justify the tests that he ordered.

11:39:10  1    You're going to hear from additional FBI special
11:39:16  2  agents.  You are going to hear from Brian Cipry and Brian
11:39:20  3  Watts.  They are going to tell you the exact same thing, that
11:39:24  4  what they told the defendant and the defendant told them about
11:39:26  5  their medical conditions does not match what's in the medical
11:39:30  6  charts written by the defendant.
11:39:34  7    You're also going to hear from FBI Special Agent
11:39:38  8  Robert Fortt, who went to the defendant's clinic and, after
11:39:42  9  several hours, went home, but written in his medical chart is
11:39:48 10  an order for tests.  Without ever seeing Robert Fortt, the
11:39:54 11  defendant said that he should have tests, expensive tests like
11:39:58 12  the ones you've heard about.
11:40:00 13    Now, you're also going to hear from defendant's
11:40:04 14  office staff.  You're going to hear from the receptionist, the
11:40:06 15  technicians, the people who knew what was going on at the
11:40:10 16  clinic.  And one of the things they're going to tell you is
11:40:14 17  that patients were scheduled at the clinic for 9:00 in the
11:40:18 18  morning and the defendant showed up about 11:00 o'clock or
11:40:22 19  even later, and during that time that the patients were there
11:40:24 20  and the defendant wasn't, he would call in to the clinic, call
11:40:28 21  in and ask about who was at the clinic, and he would order
11:40:34 22  tests.  And you will learn the questions that he asked his
11:40:38 23  staff before he ordered tests.  You will hear that he asked
11:40:44 24  his staff when was the last time they had tests and what
11:40:48 25  insurance did the patients have.  When was the last time they

11:40:52  1  had tests and what was their insurance company.

11:40:58  2       What he did not ask is why they were there.  What he

11:41:02  3  did not ask was how they were doing.

11:41:04  4       This was true for patients that he treated previously

11:41:10  5  and for patients the defendant had never even seen, like

11:41:18  6  Special Agent Robert Fortt.

11:41:18  7       You will hear other evidence as well.  You will see

11:41:22  8  lists of patients who were treated on the same day, and for

11:41:26  9  patient after patient, for many of them, they received the

11:41:30  10  same expensive ultrasound tests, patient after patient, time

11:41:40  11  and again.

11:41:40  12       You are also going to hear from representatives of

11:41:44  13  insurance companies like Blue Cross, and they are going to

11:41:46  14  tell you that the defendant submitted claims to Blue Cross for

11:41:50  15  these procedures.  And you are also going to learn how

11:41:52  16  physicians submit claims for reimbursement.  You are going to

11:41:56  17  hear about this medical claim form.  The medical claim form,

11:42:00  18  you will learn, includes the patient, includes the date of

11:42:04  19  service, it includes codes describing specifically what tests

11:42:08  20  and procedures were performed.  And you are going to learn

11:42:12  21  also that this claim form includes diagnoses, diagnoses that

11:42:18  22  justify, that explain, why these tests were ordered.  You will

11:42:24  23  hear that when these diagnoses support the tests, insurance

11:42:30  24  companies paid the claims.  It was simple, it was easy, the

11:42:36  25  money rolls out the door from the insurance companies into the

11:42:38    1   defendant's pocket.

11:42:44    2        If the tests and the procedures don't match each
11:42:46    3   other, there are issues, there are concerns, they look deeper
11:42:50    4   what's going on.  And this is why it is very important that
11:42:54    5   the defendant lied in his medical chart as well.  Insurance
11:43:00    6   companies have the right to review physician medical charts,
11:43:04    7   and they do it periodically.  They audit the physician's
11:43:08    8   claims.  They go back and look behind the claim form and see
11:43:12    9   what the physicians write in their medical chart.  And the
11:43:16   10   defendant knew this, which is why he lied both on the claim
11:43:20   11   form and on the medical chart for his patients.

11:43:24   12        Now, you will hear from employees of the clinic that
11:43:32   13   sometime around the summer of 2010, they were interviewed by
11:43:34   14   law enforcement.  Defendant found out about the investigation.
11:43:40   15   And when he did, the number of tests that he ordered dropped.
11:43:46   16   Didn't drop a little; it dropped dramatically for many of
11:43:50   17   these tests.  When the defendant figured out he was under the
11:43:56   18   microscope, he stopped ordering so many tests.

11:44:00   19        Ladies and gentlemen of the jury, the defendant is
11:44:04   20   charged in a 16-count indictment with healthcare fraud and
11:44:10   21   with making false statements in his patients' medical records.
11:44:14   22   You will hear that defendant did whatever it took to keep the
11:44:20   23   insurance money flowing.  He lied on claim forms, he lied in
11:44:28   24   his patients' medical charts, he performed unnecessary and
11:44:32   25   painful tests to keep the money coming, and at the end of the

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:44:38 | 1  | case, you will have no reasonable doubt that the defendant is |
| 11:44:46 | 2  | guilty of the crimes charged.                                |
| 11:44:48 | 3  | THE COURT:  Thank you.                                        |
| 11:44:50 | 4  | Opening statement on behalf of Dr. Chhibber?                 |
| 11:44:52 | 5  | MR. JONES:  Yes, your Honor.                                  |
| 11:44:52 | 6  | - - -                                                        |
| 11:44:54 | 7  | MR. JONES, OPENING STATEMENT                                 |
| 11:44:54 | 8  | MR. JONES:  May it please the court, counsel, and            |
| 11:44:56 | 9  | ladies and gentlemen of the jury.  As you probably know, my  |
| 11:45:00 | 10 | name is Walter Jones, Jr., and along with Mr. Cifonelli,     |
| 11:45:06 | 11 | Mr. Orman, it is our pleasure to represent Dr. Chhibber in   |
| 11:45:08 | 12 | this case.                                                   |
| 11:45:10 | 13 | As you've heard, it is the government's argument in          |
| 11:45:14 | 14 | this case that Dr. Chhibber devised a scheme to defraud the  |
| 11:45:20 | 15 | health benefit plan which is namely in this case Blue        |
| 11:45:24 | 16 | Cross/Blue Shield; that is, that somehow he submitted claims |
| 11:45:28 | 17 | for payment that were not medically necessary and that the   |
| 11:45:32 | 18 | diagnosis for those claims were false.                       |
| 11:45:34 | 19 | We have entered a plea of not guilty in this case and        |
| 11:45:38 | 20 | we will tell you and we will show you that we unequivocally   |
| 11:45:44 | 21 | deny those charges.                                          |
| 11:45:44 | 22 | Now, before I begin, I just want to reiterate               |
| 11:45:48 | 23 | something.  I want to take this opportunity to remind you what |
| 11:45:50 | 24 | you just heard was the court's charge; that in this case, it  |
| 11:45:56 | 25 | is not Dr. Chhibber's burden to prove anything in this case.  |

11:45:58　1　This is a criminal case.  It's not a negligence case.  It is

11:46:04　2　the government's burden to prove throughout this case that he

11:46:08　3　intentionally devised a scheme to defraud Blue Cross and Blue

11:46:16　4　Shield, and that burden remains with the government throughout

11:46:18　5　this case.

11:46:18　6　　　　Now, with that said, I'd like to preface my remarks

11:46:24　7　by telling you that what the evidence is really going to show

11:46:26　8　in this case is that Dr. Chhibber is a respected physician who

11:46:34　9　has devoted himself to curing the medical problems of his

11:46:38　10　community.

11:46:38　11　　　　Let me just take a moment to give you Dr. Chhibber's

11:46:42　12　background.  He indeed -- he is a native of India, and as

11:46:46　13　such, he graduated from medical school in India in 1985.

11:46:50　14　Significantly, he was number one in his class.  And after

11:46:54　15　graduating from medical school, he completed a three-year

11:46:58　16　residency in orthopedic surgery in India.  Upon graduation, he

11:47:04　17　attended -- he was an attending physician in orthopedic

11:47:10　18　surgery in the trauma ward.

11:47:12　19　　　　In 1990, he traveled to the United States and first

11:47:16　20　passed his board examinations.  Second, in 1992, he did what

11:47:20　21　all doctors have to do who have received their -- who received

11:47:24　22　their training abroad.  He began another residency in the

11:47:28　23　United States.  He undertook that residency at the Chicago

11:47:32　24　Medical School and completed it three years later.

11:47:36　25　　　　Now, the day after he finished his residency in 1985,

11:47:40   1   he began working at a clinic on Chicago's South Side.  He also

11:47:46   2   began working at Trinity Hospital, which is on the South Side.

11:47:50   3   And then at the address that you are going to hear a lot

11:47:52   4   about, at 642 East 79th Street, he began his own practice in

11:47:58   5   October of 2003.

11:47:58   6          Along the way he married a lovely lady, and he has

11:48:04   7   two children.

11:48:06   8          Now, what the prosecutor didn't tell you in opening

11:48:08   9   statement that I think is very important that you are going to

11:48:12  10   hear in this case is let's talk about the community that

11:48:16  11   Dr. Chhibber served.  It is essential for your understanding

11:48:20  12   of this case.  This community is bordered on Chicago's South

11:48:24  13   Side.  It is a community called Chatham.  You will hear from

11:48:30  14   my experts in this case that a study done last year,

11:48:36  15   February 11, 2011, by the University of Chicago alerts us to

11:48:40  16   the fact that the residents of Chicago's South Side, namely,

11:48:44  17   Chatham, have a critical need for quality healthcare.  They

11:48:50  18   suffer in this community from disproportionate high rates of

11:48:56  19   both hypertension, diabetes, and asthma.

11:49:02  20          And, specifically, again, the study tells us that

11:49:06  21   Chatham of course has a population of 3,700 individuals.  You

11:49:12  22   need to know because it's important for this case that 93.- --

11:49:16  23   97.3 percent of those people in Chatham are African-Americans.

11:49:22  24   Most live below the federal poverty level.

11:49:24  25          Now, with the exception of just one community in

11:49:30   1   Chicago, and that would be Woodlawn, Chatham has the highest
11:49:34   2   rate of deaths in the city of Chicago that result from
11:49:38   3   cardiovascular disease.  Deaths in Chatham from cardiovascular
11:49:42   4   disease are twice the national average.  In addition, the same
11:49:48   5   community has more deaths from cancer than any other community
11:49:52   6   in the city and, again, twice the national average.
11:49:56   7          Now, when Dr. Chhibber began his practice, he was
11:50:00   8   well aware that the patients that visit his clinic have
11:50:06   9   enormous serious deficiencies in the kind of medical care that
11:50:10  10   they have received.  A great majority of his patients were all
11:50:16  11   elderly, they generally were afflicted with hypertension as
11:50:20  12   well as diabetes.  The only time most of Dr. Chhibber's
11:50:26  13   patients ever saw a doctor was in the emergency room.  It is
11:50:34  14   with this understanding that Dr. Chhibber geared his practice
11:50:36  15   to serve this unique group of individuals.
11:50:40  16          You have to remember the evidence is going to show
11:50:44  17   you that he is an internist in an environment where the only
11:50:48  18   way his patients get quality care is that he has to be the
11:50:54  19   kind of physician that treats the whole patient.  When they
11:50:58  20   come in -- not just maybe for something that they voice, but
11:51:00  21   he's got to treat that entire patient.  And in terms of in
11:51:10  22   this environment, you're going to hear, he has to be part
11:51:12  23   psychologist.  He has to realize that many of us, and his
11:51:14  24   patients, like everybody else, going to the doctor, they don't
11:51:18  25   want to tell him everything that's wrong with them.

11:51:20   1      Dr. Chhibber is a throwback, you will hear, to when
11:51:24   2   doctors actually cared about you.  He has been like a member
11:51:30   3   of the family to all of the people that he treated.  And it is
11:51:34   4   true as a primary physician, he relies on the vital signs,
11:51:40   5   that when the patients come in, he frequently uses tests to
11:51:42   6   determine the patients' problems.  But above all, he relies
11:51:48   7   upon his intuition and his experience with the population that
11:51:54   8   he is treating.
11:51:54   9      You will hear this because, yeah, you're going to
11:51:58  10   hear some tapes in this case.  We will talk about those.  He's
11:52:00  11   the kind of doctor, he can't stop talking.  If you ask him any
11:52:06  12   questions, he will just answer anything for you.  He never
11:52:08  13   tried to hide anything.
11:52:10  14      You will not hear in this case one patient that was
11:52:14  15   ever pressured into taking a test, and there will not be a
11:52:20  16   single instance where if a patient asked what this test is
11:52:26  17   for, that the doctor didn't willingly tell them what it was
11:52:28  18   for.
11:52:28  19      And let me tell you what else the evidence is going
11:52:32  20   to show in this case.  You are not going to hear one patient
11:52:34  21   step into this courtroom and say that he does anything but
11:52:38  22   love this doctor.
11:52:42  23      Now, it is true, Dr. Chhibber, he worked
11:52:48  24   extraordinarily long hours.  He worked in a couple of
11:52:52  25   hospitals, Trinity, St. Margaret's.  He had the kind of

11:52:56  1  clientele that first in, first served.  But I will tell you

11:53:00  2  what you are going to find.  Yeah, he was late all right, but

11:53:02  3  those patients, not a single one would leave because they

11:53:06  4  loved him.  They understood that by coming to him, he was

11:53:12  5  going to give them the best care that they could possibly

11:53:14  6  receive.

11:53:16  7         You're going to learn in the long run with this case,

11:53:20  8  that this case is going to be, it's going to be about patients

11:53:22  9  and not about charts.

11:53:24  10         Now, let's talk about this equipment that the

11:53:26  11  government alluded to.  Yes, it is true, one of the very first

11:53:32  12  things that Dr. Chhibber became aware of was he decided to

11:53:36  13  make a huge investment in equipment.  He realized that his

11:53:40  14  patients needed to have certain tests conducted.  He knew that

11:53:44  15  it was useless to send these patients other places for these

11:53:50  16  tests to be conducted because, one, in this community, most

11:53:54  17  don't own cars, most of these people all use public

11:54:00  18  transportation.  If he did anything other than treat them with

11:54:04  19  his own equipment, it would mean that they would not receive

11:54:06  20  the care that they needed.

11:54:10  21         Yes, it is true, some of the equipment that you are

11:54:12  22  going to hear about in this case are EKGs.  As you will find

11:54:16  23  out, they register the electrical impulses of the heart.

11:54:20  24  Echocardiograms would give you a picture of the structure of

11:54:24  25  the heart.  There are going to be -- it's called PFT cases

11:54:28  1  where you blow into a tube and they might show you some, some

11:54:32  2  defects in the lung, and maybe some abdominal ultrasounds that

11:54:38  3  will give you a structure of the liver, the stomach, and some

11:54:40  4  other things.

11:54:42  5      Now, this equipment in this day and age is very

11:54:46  6  uncomplicated equipment with respect to the kind of equipment

11:54:50  7  that most of you are used to, CAT scans, et cetera, and the

11:54:54  8  truth of the matter is that most of this equipment is

11:54:56  9  relatively inexpensive. And, yes, it is true, the evidence

11:55:02  10  will show that he was proactive in the use of this equipment

11:55:08  11  because he needed to see -- he needed to treat his specific

11:55:12  12  population.

11:55:12  13      Now, with respect to heart murmurs, let me tell you

11:55:16  14  what the evidence is really going to show about this. The

11:55:20  15  detection of heart murmurs in this case is significant. It is

11:55:24  16  indeed, as you're going to hear from experts, it can be an

11:55:28  17  indication of heart disease. The government maintains that

11:55:34  18  every time that he found a heart murmur, that his diagnosis

11:55:36  19  was false.

11:55:38  20      Now, much to the contrary, you're going to hear the

11:55:40  21  real evidence about heart murmurs. You're going to hear

11:55:44  22  experts tell you that heart murmurs are not permanent

11:55:48  23  conditions most of the time, that they are what they call

11:55:50  24  transitory conditions. Depending on the various patients,

11:55:54  25  they come and they go.

You're going to hear that the number one American medical journal in the United States, the Journal of the American Medical Association, has said that 20 to 50 percent of Americans have had instances of heart murmurs.  More such murmurs, of course, would be expected in Chatham.

Now, what happens is because Dr. Chhibber knew about this, unlike a doctor in Lake Forest, he becomes an expert in diagnosing heart murmurs, which could definitely be a prelude to your having heart disease.  He would actually -- as opposed, perhaps, to a doctor in Lake Forest, he would look for instances of heart murmurs.

Now, doctors may differ on this point.  What Dr. Chhibber's practice was, if he found one, he didn't want to alarm his patients with that.  He would order -- he would diagnose the murmur, perform the test, and then if something was wrong when they returned, he would tell them what it was.

You will hear evidence in this case of how his talent with these heart murmurs probably saved at least one of the lives that you are going to hear about in this case.

Let me tell you also about this shortness of breath. When a patient comes in, the doctor, while he checks for heart murmurs, he definitely checks for shortness of breath.  Now, this is subjective.  This is not something that the patient has to complain about, but these are observations that a good doctor makes.

| | | |
|---|---|---|
| 11:57:32 | 1 | Now, I've told you what I think the evidence is going |
| 11:57:36 | 2 | to show you a lot about Dr. Chhibber.  Let me tell you what I |
| 11:57:38 | 3 | think the evidence is going to show you about the government's |
| 11:57:40 | 4 | case.  The evidence is going to show you that this whole |
| 11:57:46 | 5 | government investigation was misguided from the outset.  As |
| 11:57:52 | 6 | best we can see, this evidence was begun by an individual who |
| 11:58:00 | 7 | brought fraudulent information into the government for |
| 11:58:02 | 8 | purposes of securing financial gain for himself; that once the |
| 11:58:08 | 9 | government accepted these allegations without conducting their |
| 11:58:12 | 10 | own investigation into that, that the government's |
| 11:58:18 | 11 | investigation proceeded like a horse with blinders on. |
| 11:58:22 | 12 | Because the government's premise from the very |
| 11:58:24 | 13 | beginning was that Dr. Chhibber was guilty, it tainted each |
| 11:58:30 | 14 | and every aspect of their case. |
| 11:58:34 | 15 | Now, let's talk about these agents.  You're going to |
| 11:58:40 | 16 | hear in this case that the government sent undercover agents |
| 11:58:46 | 17 | in to Dr. Chhibber's office.  Now, the evidence will show that |
| 11:58:50 | 18 | the government's use of its undercover agents in this case |
| 11:58:54 | 19 | suffers from the same set of blinders that it did in |
| 11:58:58 | 20 | conducting all other aspects of this investigation. |
| 11:59:02 | 21 | In this case, the government recognized that in order |
| 11:59:06 | 22 | to send in undercover agents, they had to be African-Americans |
| 11:59:12 | 23 | because -- |
| 11:59:12 | 24 | MR. HAMMERMAN:  Objection, your Honor. |
| 11:59:14 | 25 | THE COURT:  Overruled. |

11:59:14   1      MR. JONES:  This is an African-American community.

11:59:18   2   He couldn't send in Chinese.  You have to find four

11:59:20   3   African-American agents to go in.

11:59:24   4      Now, the premise was that these four African-American

11:59:26   5   agents would be free of any kind of cardiovascular disease.

11:59:34   6   And you will hear that that is because if they were free from

11:59:36   7   cardiovascular disease and Dr. Chhibber diagnosed tests for

11:59:44   8   them, they'd come back to you, ladies and gentlemen of the

11:59:46   9   jury, and say, Hey, look, they were free of cardiovascular

11:59:54   10  disease.

11:59:56   11     But let me tell you what the evidence is really going

12:00:00   12  to show in this case.  Because the government had blinders on,

12:00:02   13  they did not pre-screen these agents for cardiovascular

12:00:04   14  disease.  They just brought them in.  And guess what the

12:00:08   15  evidence is going to tell us?

12:00:08   16     MR. HAMMERMAN:  Objection, your Honor.

12:00:10   17     THE COURT:  Overruled.

12:00:10   18     MR. JONES:  We will show that the African-American

12:00:16   19  agents were virtually to a man overweight, and they all

12:00:20   20  suffered from the same infirmities that the people -- the

12:00:22   21  population of Chatham did.  You're going to hear that the

12:00:28   22  tests that Dr. Chhibber did on these agents showed that they

12:00:32   23  all had heart disease.

12:00:34   24     You know, I'm glad -- the prosecutor mentions Terrell

12:00:38   25  Cole as one of the undercover people.  I can't wait for him to

| | |
|---|---|
| 12:00:40 | 1 |
| 12:00:46 | 2 |
| 12:00:50 | 3 |
| 12:00:54 | 4 |
| 12:00:58 | 5 |
| 12:01:00 | 6 |
| 12:01:02 | 7 |
| 12:01:06 | 8 |
| 12:01:10 | 9 |
| 12:01:14 | 10 |
| 12:01:24 | 11 |
| 12:01:28 | 12 |
| 12:01:30 | 13 |
| 12:01:34 | 14 |
| 12:01:40 | 15 |
| 12:01:46 | 16 |
| 12:01:50 | 17 |
| 12:01:54 | 18 |
| 12:01:54 | 19 |
| 12:01:54 | 20 |
| 12:01:58 | 21 |
| 12:02:02 | 22 |
| 12:02:08 | 23 |
| 12:02:12 | 24 |
| 12:02:16 | 25 |

1  testify.  The evidence is going to show that Terrell Cole had

2  -- when the doctor sees the murmur, finds -- and he does the

3  EKG, there is a spike in his heart.  That is uncontested.

4  Their own expert is going to tell you that it was an abnormal

5  EKG.

6           And with respect to the other two, you're going to

7  find out that they also had heart disease.

8           Now, the undercover tapes in this case, we absolutely

9  embrace them, as the evidence will show, because they show

10  that Dr. Chhibber is a loving professional.  And I say

11  "embrace."  There are only going to be two tapes because what

12  the evidence is going to show that they sent in -- they tell

13  us that two of the times that they went in, the tape recorder

14  didn't work, leaving us with no evidence of fraud.

15          Now, when I tell you that the evidence will show that

16  these -- the conduct of these agents is misguided, we are also

17  going to show you misconduct on behalf of these agents.

18          MR. HAMMERMAN:  Objection, your Honor.

19          THE COURT:  Overruled.

20          MR. JONES:  And let me tell you what the misconduct

21  on behalf of these agents is that we are going to show you.

22  These -- a couple of these agents really wanted to get into an

23  undercover probe because it was a feather in their cap.  So

24  what we're going to show you is that a couple of these agents

25  even lied to their fellow FBI agents about their true

12:02:20    1   cardiovascular disease.  And then during the course of the
12:02:24    2   case where we start asking for their records and their records
12:02:28    3   come out and show that they really had cardiovascular disease
12:02:32    4   before they even go in to see Dr. Chhibber, they continue to
12:02:36    5   lie to cover up their misdeeds.
12:02:38    6           MR. HAMMERMAN:  Objection, your Honor.
12:02:40    7           THE COURT:  Overruled.
12:02:42    8           MR. JONES:  Now, as far as patients in this case, we
12:02:52    9   expect, as the prosecutor says, that from 2007 to 2010, that
12:02:56   10   the government will attempt to introduce the testimony of four
12:03:00   11   patients that they allege will substantiate this case.
12:03:06   12           Well, the very first thing that we tell you that the
12:03:08   13   evidence is going to show, that during this period from 2007
12:03:12   14   to 2010, that the doctor treated over 3700 patients, and what
12:03:20   15   the government has done to attempt to make its case is scraped
12:03:24   16   up the bottom of the barrel to come up with four patients.
12:03:34   17   Nevertheless, we will show that the patients they bring in --
12:03:38   18   and, in fact, what else the evidence is going to show is that
12:03:40   19   in order to get these patients, they were interviewed by the
12:03:42   20   government years later, most of these patients are going to
12:03:46   21   tell you they couldn't remember a single detail about what
12:03:50   22   went on, but the government interviewed them and
12:03:54   23   re-interviewed them and re-interviewed them until they got a
12:03:56   24   story that they were satisfied with.
12:03:58   25           MR. HAMMERMAN:  Objection, your Honor.

| | | |
|---|---|---|
| 12:04:00 | 1 | THE COURT: Overruled. |
| 12:04:00 | 2 | MR. JONES: We will show that the treatment they |
| 12:04:04 | 3 | received was reasonable and consistent with good health and |
| 12:04:10 | 4 | above all is not indicative of any kind of fraud. |
| 12:04:14 | 5 | For instance, one of the patients that you are going |
| 12:04:16 | 6 | to hear from in the next couple of days, she comes into |
| 12:04:20 | 7 | Dr. Chhibber's office, she's been treated in the emergency |
| 12:04:22 | 8 | room at one of the suburban hospitals, and she's been treated |
| 12:04:28 | 9 | the night before for a viral infection. And what happens is |
| 12:04:32 | 10 | that the doctor sees her the next day, and the doctor realizes |
| 12:04:36 | 11 | that this infection has spread and that this -- he believes |
| 12:04:42 | 12 | that it is the bacterial infection that is the most vicious of |
| 12:04:46 | 13 | all kinds, it's called MRSA, and that it's a flesh-eating |
| 12:04:50 | 14 | bacteria, and that immediately what the doctor does is he sees |
| 12:04:54 | 15 | the infection spread from the previous day, he gives her three |
| 12:04:56 | 16 | of the antibiotics, known ones that will kill this superbug, |
| 12:05:02 | 17 | and what he does, because he also knows that this MRSA will |
| 12:05:08 | 18 | affect the linings of the heart, he orders one of the tests |
| 12:05:12 | 19 | that the government complains of. That test probably saved |
| 12:05:16 | 20 | this woman's life. |
| 12:05:22 | 21 | Now, one thing about the patients. You heard about |
| 12:05:32 | 22 | the cost from the government. I will tell you what. The |
| 12:05:36 | 23 | total cost for all the patients in this indictment was -- the |
| 12:05:40 | 24 | total amount of money the doctor received was $5,255.70. |
| 12:05:48 | 25 | Now, I want to spend just a moment about these former |

12:05:52    1    employees that he says are going to testify.

12:05:54    2          Well, it is expected that the government will bring

12:05:58    3    these former employees in to attempt to sustain its burden

12:06:06    4    that Dr. Chhibber ordered tests sometimes before he saw the

12:06:10    5    patients at the clinic.  Of course, keeping in mind that what

12:06:14    6    the evidence in this case is is not the fact of ordering tests

12:06:18    7    but whether the tests were normally ordered and billed to Blue

12:06:22    8    Cross/Blue Shield.  That's the crime.

12:06:24    9          We will tell you that several of these employees that

12:06:32   10    the government is going to use have had nothing but improper

12:06:36   11    motivations, including being fired for legitimate purposes,

12:06:40   12    including the negligent handling of drugs in his own clinic.

12:06:44   13    But we will also tell you that, sure, there were occasions

12:06:46   14    where Dr. Chhibber was at Trinity or he was at St. Margaret

12:06:50   15    that he would talk to some of his employees, he would find out

12:06:54   16    what the vital signs were for the waiting patients, and if --

12:07:02   17    we will have expert testimony that if the vital signs included

12:07:04   18    their weight, their hypertension, there was nothing wrong for

12:07:08   19    him ordering an EKG for an echo.

12:07:10   20          You will also hear, yeah, sure, he would talk, and

12:07:14   21    then sometimes he would order a test for a patient where the

12:07:16   22    next visit said that the patient ought to receive the test.

12:07:22   23    And included among some of those would be patients, regular

12:07:24   24    patients, whose symptoms he well knew.

12:07:28   25          We will say to you, ladies and gentlemen, as I

| | | |
|---|---|---|
| 12:07:32 | 1 | conclude, we are convinced at the conclusion of this case that |
| 12:07:38 | 2 | you will find that Dr. Chhibber is not guilty of any criminal |
| 12:07:42 | 3 | acts, that there will be no proof that he somehow willfully |
| 12:07:48 | 4 | devised a scheme to defraud, and at the conclusion of the |
| 12:07:52 | 5 | evidence, we are going to ask you to do the single thing that |
| 12:07:56 | 6 | we believe that the evidence will dictate:  Find him not |
| 12:08:00 | 7 | guilty. |
| 12:08:02 | 8 | Thank you. |
| 12:08:02 | 9 | THE COURT:  Thank you. |
| 12:08:04 | 10 | Well, members of the jury, that's perfect timing |
| 12:08:06 | 11 | because it's time for lunch.  We will take a one-hour lunch |
| 12:08:12 | 12 | break.  We will resume at 1:00 o'clock.  Have a good lunch, |
| 12:08:16 | 13 | and remember, don't discuss the case with anyone.  Thank you. |
| 12:08:52 | 14 | (The trial was adjourned at 12:05 p.m. until 1:00 p.m. of |
| 12:08:58 | 15 | this same day and date.) |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3

 4
        UNITED STATES OF AMERICA,        )     Docket No. 11 CR 119
 5                                        )
                            Plaintiff,   )
 6                                        )
                    vs.                   )
 7                                        )
        JASWINDER RAI CHHIBBER,          )     Chicago, Illinois
 8                                        )     March 1, 2012
                            Defendant.    )     1:00 o'clock p.m.
 9
                         TRIAL TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE SUZANNE B. CONLON, AND A JURY
                                   VOLUME 1-B
11
        APPEARANCES:
12

13      For the Plaintiff:        HON. PATRICK FITZGERALD
                                  United States Attorney
14                                BY:  MR. SAMUEL B. COLE
                                       MR. JOEL M. HAMMERMAN
15                                219 S. Dearborn St., Suite 500
                                  Chicago, Illinois  60604
16

17      For the Defendant:       PUGH, JONES & JOHNSON, P.C.
                                  BY:  MR. WALTER JONES, JR.
18                                     MR. JONATHAN B. CIFONELLI
                                  180 North LaSalle Street, Suite 3400
19                                Chicago, IL  60601
                                  (312) 768-7800
20
                                  LAW OFFICE OF ROBERT ORMAN
21                                BY:  MR. ROBERT ORMAN
                                  One North LaSalle Street, Suite 1775
22                                Chicago, IL  60602
                                  (312) 372-0515
23
        Court Reporter:           MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                                Official Court Reporter
                                  219 S. Dearborn Street, Suite 1854-B
25                                Chicago, Illinois  60604
                                  (312) 435-5639
```

|  | 1 | (The following proceedings were had in open court in the |
| 01:04:16 | 2 | presence and hearing of the jury:) |
| 01:04:16 | 3 | THE COURT:  Good afternoon, members of the jury. |
| 01:04:18 | 4 | Please be seated. |
| 01:04:28 | 5 | Would the government call its first witness. |
| 01:04:32 | 6 | MR. COLE:  Yes, your Honor.  The government calls |
| 01:04:36 | 7 | Tiffany Shirley-Terrell to the stand. |
| 01:05:06 | 8 | (Witness sworn.) |
| 01:05:06 | 9 | THE COURT:  Would you tell us your full name and |
| 01:05:08 | 10 | spell your last name. |
| 01:05:14 | 11 | THE WITNESS:  Tiffany Shirley-Terrell, T-i-f-f-a-n-y, |
| 01:05:20 | 12 | S-h-i-r-l-e-y, hyphen, Terrell, T-e-r-r-e-l-l. |
| 01:05:26 | 13 | - - - |
| 01:05:26 | 14 | TIFFANY SHIRLEY-TERRELL, DIRECT EXAMINATION |
| 01:05:26 | 15 | BY MR. COLE: |
| 01:05:28 | 16 | Q.  Ms. Shirley-Terrell, where do you work? |
| 01:05:30 | 17 | A.  I am currently a stay-at-home mom. |
| 01:05:34 | 18 | Q.  How long have you been a stay-at-home mom? |
| 01:05:36 | 19 | A.  Since October. |
| 01:05:38 | 20 | Q.  What did you do prior to that time? |
| 01:05:40 | 21 | A.  I worked at National Motive Diesel (phonetic).  I was a |
| 01:05:48 | 22 | production associate. |
| 01:05:54 | 23 | Q.  How long did you have that job? |
| 01:06:00 | 24 | A.  I was there from March until October 20th. |
| 01:06:02 | 25 | Q.  Of which year? |

01:06:04  1   A.  2011.

01:06:06  2   Q.  Why did you leave that job?

01:06:08  3   A.  I left the job because they switched my hours from 6:00 in

01:06:14  4   the morning until 2:30 in the afternoon to 3:00 in the

01:06:20  5   morning.

01:06:20  6   Q.  Are you married, Ms. Shirley-Terrell?

01:06:22  7   A.  Yes.

01:06:22  8   Q.  How long have you been married for?

01:06:24  9   A.  Seven years.

01:06:26  10  Q.  Do you have any kids?

01:06:26  11  A.  Yes.

01:06:26  12  Q.  How many kids?

01:06:26  13  A.  Two.

01:06:28  14  Q.  How old are they?

01:06:28  15  A.  Three and five.

01:06:28  16  Q.  Can you describe for the jury your educational background.

01:06:32  17  A.  I went to college.  I went to Central State University,

01:06:36  18  which is in River Forest, Ohio.  I graduated with a bachelor's

01:06:42  19  in performing arts.

01:06:42  20  Q.  Any other education after you graduated college?

01:06:48  21  A.  Yes.  I went to Illinois School of Health Careers.  I was

01:06:54  22  taking a medical assistant (sic).

01:06:56  23  Q.  And approximately when was that?

01:06:58  24  A.  That was in 2009.

01:07:00  25  Q.  Did you earn any degrees or certificates from that

01:07:04  1   education?

01:07:06  2   A.  No.

01:07:06  3   Q.  Now, when you were at the Illinois School of Health

01:07:10  4   Careers, they require you to take a physical exam?

01:07:12  5   A.  Yes.

01:07:12  6   Q.  Can you explain to the jury why that was.

01:07:12  7   A.  We have to take a physical exam to let you know your

01:07:16  8   history because we will be doing injections on each other,

01:07:20  9   clinicals, so you have to take the whole physical, like you go

01:07:26 10   see the doctor, you go in and you get your complete physical

01:07:30 11   done, your blood pressure, your heart rate, temperature,

01:07:32 12   things of that nature.

01:07:32 13   Q.  And who did you see for your physical exam?

01:07:34 14   A.  Dr. Chhibber.

01:07:36 15   Q.  Now, when you went to see Dr. Chhibber for your physical,

01:07:40 16   what health problems were you worried about at that time?

01:07:42 17   A.  I wasn't worried about any problems.

01:07:44 18   Q.  Now, how did you come to see the defendant, Dr. Chhibber?

01:07:48 19   A.  Well, I had a friend of mine that referred me to

01:07:52 20   Dr. Chhibber.

01:07:54 21   Q.  And is this clinic near where you live?

01:07:56 22   A.  Yes.

01:07:56 23   Q.  And how did you make an appointment with the defendant?

01:08:02 24   A.  I went up there after school one day and explained to him

01:08:06 25   that I needed a physical done for school.

01:08:10  1   Q.  And did you go see -- get the physical that day, or was it

01:08:14  2   for a different day?

01:08:14  3   A.  No, it was later on, at a later date.

01:08:16  4   Q.  So did you eventually then go see the defendant for a

01:08:22  5   physical?

01:08:22  6   A.  Yes.

01:08:22  7   Q.  Who went with you?

01:08:24  8   A.  My husband went with me.

01:08:26  9   Q.  Approximately when was this?

01:08:28  10  A.  Like what day?

01:08:34  11  Q.  Yeah, what month, what year?

01:08:36  12  A.  It was in 2009.

01:08:38  13  Q.  Was it in the spring of 2009?

01:08:40  14  A.  Yes.

01:08:40  15  Q.  Did you bring anything with you when you went to the exam?

01:08:46  16  A.  Yes, I brought my physical form that the school had

01:08:48  17  provided for me to take.

01:08:50  18  Q.  Bring an insurance card too?

01:08:52  19  A.  Yes.

01:08:52  20  Q.  A driver's license?

01:08:52  21  A.  Yes.

01:08:54  22  Q.  Now, can you tell the jury what happened when you first

01:08:58  23  went into the defendant's clinic.

01:08:58  24  A.  When I first went in, you know, you have to go to the

01:09:04  25  window, and you explain to them you have an appointment, and

01:09:06    1    they give you a clipboard with things to fill out on it, your

01:09:12    2    medical history, and they ask for your ID and your medical

01:09:16    3    card.

01:09:18    4              MR. COLE:  Your Honor, may I approach the witness?

01:09:20    5              THE COURT:  There is no need to ask.  Go ahead.

01:09:22    6    BY MR. COLE:

01:09:22    7    Q.  I am going to show you what's marked as Government Exhibit

01:09:26    8    340.  Please take a look through that.

01:10:26    9              Does that look to be the patient chart for your visit

01:10:28   10    with the defendant?

01:10:30   11    A.  Can you repeat that?

01:10:32   12    Q.  Sure.  That would be the chart for your visit, your

01:10:32   13    patient chart, correct?

01:10:38   14    A.  Yes.

01:10:38   15    Q.  Your name is on that chart?

01:10:38   16    A.  Yes.

01:10:38   17    Q.  Does it have some of the paperwork you filled out when you

01:10:42   18    saw the defendant?

01:10:44   19    A.  Yes.

01:10:44   20    Q.  Your signature appears on several of documents in that

01:10:50   21    chart; is that correct?

01:10:52   22    A.  Yes.

01:10:52   23    Q.  And on the right side, there is a progress note dated

01:10:54   24    March 4, 2009.  Do you see that?

01:10:56   25    A.  Yes.

| | | |
|---|---|---|
| 01:10:56 | 1 | Q.  Is that approximately the date you saw the defendant? |
| 01:10:58 | 2 | A.  Yes. |
| 01:11:00 | 3 | MR. COLE:  Your Honor, the government moves to admit |
| 01:11:02 | 4 | Government Exhibit 340. |
| 01:11:02 | 5 | MR. JONES:  We have no objection, Judge. |
| 01:11:04 | 6 | THE COURT:  All right.  The exhibit is admitted. |
| 01:11:06 | 7 | (Above-mentioned exhibit was received in evidence.) |
| 01:11:08 | 8 | BY MR. COLE: |
| 01:11:10 | 9 | Q.  Turning your attention to Government Exhibit 340, page 19. |
| 01:11:12 | 10 | MR. COLE:  Your Honor, may I publish this to the jury |
| 01:11:14 | 11 | on the screen? |
| 01:11:16 | 12 | THE COURT:  Yes. |
| 01:11:18 | 13 | BY MR. COLE: |
| 01:11:24 | 14 | Q.  Do you recognize this form? |
| 01:11:26 | 15 | A.  Yes. |
| 01:11:26 | 16 | Q.  What is that? |
| 01:11:28 | 17 | A.  That's the medical form from his clinic that you fill out |
| 01:11:36 | 18 | with your information. |
| 01:11:36 | 19 | Q.  And you filled out that form when you first arrived at the |
| 01:11:40 | 20 | clinic; is that right? |
| 01:11:40 | 21 | A.  Yes. |
| 01:11:40 | 22 | Q.  Is that your signature at the bottom? |
| 01:11:42 | 23 | A.  Yes. |
| 01:11:42 | 24 | Q.  Now, let me direct your attention to Government Exhibit |
| 01:11:46 | 25 | 340, page 21.  Do you recognize that form? |

01:11:52   1   A.  Yes.

01:11:52   2   Q.  Is that your signature at the bottom?

01:11:54   3   A.  Yes.

01:11:56   4   Q.  And when did you sign that form?

01:12:00   5   A.  On March 4.

01:12:02   6   Q.  And is this one of the forms you filled out when you first

01:12:06   7   arrived at the clinic?

01:12:06   8   A.  Yes.

01:12:06   9   Q.  Now, I want to direct your attention to the very top

01:12:10  10   paragraph of that form.  Could you please read that for the

01:12:16  11   jury.

01:12:16  12   A.  It says, Consent for diagnosis and treatment.  I authorize

01:12:22  13   the above doctor to perform the treatment/procedures described

01:12:26  14   below --

01:12:26  15         THE COURT:  All right.  The document is in evidence.

01:12:28  16   We are not going to read from 800 exhibits.

01:12:32  17         MR. COLE:  That's fine.

01:12:32  18   BY MR. COLE:

01:12:36  19   Q.  So I see there's nothing checked on this form; is that

01:12:40  20   right?

01:12:40  21   A.  Correct.

01:12:40  22   Q.  Did -- prior to signing this form, did anyone explain to

01:12:48  23   you any of these medical procedures?

01:12:50  24   A.  No.

01:12:52  25   Q.  So they asked you to sign this form that was blank,

01:12:54  1  essentially; is that correct?

01:12:56  2  A.  Correct.

01:12:56  3  Q.  Now, when you went to see the defendant, did you have any

01:13:04  4  insurance?

01:13:04  5  A.  Yes.

01:13:04  6  Q.  Can you describe that insurance for the jury, please.

01:13:06  7  A.  I had Blue Cross/Blue Shield PPO.

01:13:10  8  Q.  And how did you have that insurance?

01:13:12  9  A.  Through my husband's job.

01:13:14  10  Q.  Where did your husband work?

01:13:20  11  A.  Metro Motors.

01:13:20  12  Q.  Let me show you what's been marked as Government Exhibit

01:13:24  13  340, page 17.  Is this a copy of your insurance card?

01:13:28  14  A.  Yes.

01:13:28  15  Q.  And this is what was in the chart, correct, in front of

01:13:34  16  you?

01:13:34  17  A.  Yes.

01:13:34  18  Q.  And that was the card you gave to the defendant that day?

01:13:36  19  A.  Yes.

01:13:36  20  Q.  Now, after you filled out the paperwork and gave your

01:13:42  21  insurance card, tell the jury what happened next.

01:13:46  22  A.  I filled out the paperwork, gave my insurance card, and I

01:13:50  23  had to wait until the medical assistant would come to get me

01:13:56  24  to go back and do vitals.

01:13:56  25  Q.  Approximately how long did you wait?

01:13:58　1　A.　It was like a long time.  Maybe about 30 minutes.

01:14:10　2　Q.　And can you describe for the jury the vitals that were

01:14:16　3　taken?

01:14:16　4　A.　Yes.  I had my weight, height, temperature, blood

01:14:24　5　pressure.

01:14:28　6　Q.　Now, was your husband with you the entire visit?

01:14:34　7　A.　Yes.

01:14:34　8　Q.　Then at some point, did he have to leave early?

01:14:36　9　A.　Yes.

01:14:36　10　Q.　Can you describe that for the jury.

01:14:38　11　A.　My husband had to leave.  I was there a really long time,

01:14:44　12　so my husband had to leave to go pick the kids up at day care

01:14:48　13　when day care lets out at 6:30, so you have to get there

01:14:52　14　before 6:30.

01:14:52　15　Q.　Do you remember approximately what time you arrived at the

01:14:56　16　clinic?

01:14:56　17　A.　Yes, 3:30, 4:00 o'clock.

01:14:58　18　Q.　So after you had your vitals taken, what happened next?

01:15:00　19　A.　After I had my vitals taken, I sat there until the medical

01:15:06　20　assistant went to go and let Dr. Chhibber know that I was

01:15:12　21　ready to be seen by him.  And I sat and waited.  He was in the

01:15:14　22　room with another patient.  And once he got done with the

01:15:18　23　patient, then I went in to be seen.

01:15:20　24　Q.　Now, I want you to describe for the jury exactly what

01:15:24　25　happened to you during your examination by the defendant.

01:15:26  1  What happened first?

01:15:28  2  A.  When I first went in, I sat on the table, and Dr. Chhibber

01:15:34  3  came in, and he asked me my medical history, and I explained

01:15:38  4  to him my medical history.

01:15:40  5  Q.  What did you tell him?

01:15:42  6  A.  I told Dr. Chhibber -- he asked me if I had any kids or

01:15:50  7  about pregnancies.  I said, Yes, I had two kids.  He asked me

01:15:54  8  if I had any surgeries.  I told him I had two Cesarian

01:15:58  9  sections, and I told him when I was pregnant with my five year

01:16:02  10  old, that I was suffering from shortness of breath, and with

01:16:06  11  my three year old, I suffered from migraines with my three

01:16:12  12  year old.

01:16:12  13  Q.  And did you tell him whether -- what those conditions you

01:16:16  14  suffered from after your pregnancies?

01:16:18  15  A.  Can you repeat that?

01:16:20  16  Q.  Sure.  You said you told him that you had two surgeries,

01:16:22  17  right?

01:16:24  18  A.  Correct.

01:16:24  19  Q.  And that you were suffering from shortness of breath

01:16:26  20  during your pregnancy; is that correct?

01:16:28  21  A.  Correct.

01:16:28  22  Q.  What did you tell him about any medical conditions that

01:16:30  23  you had at that time?

01:16:30  24  A.  I didn't have any medical conditions at that time.

01:16:32  25  Q.  How long had it been since you suffered from -- did you

01:16:36    1    have asthma during your pregnancy?

01:16:40    2    A. With my five year old, yes.

01:16:40    3    Q. That was how many years before you had seen the defendant?

01:16:44    4    A. Like two.

01:16:44    5    Q. And did you tell him whether or not you had any asthma

01:16:50    6    problems or shortness of breath since your pregnancies?

01:16:54    7    A. No.

01:16:54    8    Q. What did you tell him about that?

01:16:54    9    A. I explained to him that I didn't have any problems as of

01:17:00    10    that day or since I had my pregnancy. I was just explaining

01:17:04    11    to him the problems that I had when I was pregnant.

01:17:06    12    Q. When was the last time you had an asthma issue?

01:17:10    13    A. Like five years ago when I was pregnant.

01:17:16    14    Q. Now, after the birth of your second child up to when you

01:17:22    15    saw the defendant, had you had any problems with migraines?

01:17:26    16    A. No.

01:17:26    17    Q. Now, you have had some migraines recently or more

01:17:30    18    recently; is that correct?

01:17:30    19    A. Yes, correct.

01:17:30    20    Q. But when you saw the defendant in March of 2009, you

01:17:34    21    weren't suffering from migraines; is that correct?

01:17:38    22    A. Right.

01:17:38    23    Q. Can you describe the actual physical examination that the

01:17:40    24    defendant gave you.

01:17:42    25    A. I sat on the table, and he listened to my heart rate, and

01:17:52   1   he felt on my neck to see my thyroid.  He told me that he felt

01:18:02   2   that one of my thyroids may be enlarged or he'd look further

01:18:06   3   into it.  And then I made a joke like, I guess that's why I

01:18:12   4   can't lose weight after I had my kids.

01:18:12   5   Q.  Now, when he listened to your heart, how did he do that?

01:18:16   6   A.  He used a stethoscope.

01:18:20   7   Q.  What position were you in?

01:18:22   8   A.  I was sitting.

01:18:22   9   Q.  Now, did he have you change positions at all during that

01:18:28   10  examination listening to your heart?

01:18:30   11  A.  No.

01:18:30   12  Q.  Did he have you squat down on the floor?

01:18:34   13  A.  No.

01:18:34   14  Q.  Or lay down?

01:18:36   15  A.  No.

01:18:36   16  Q.  How long did he take listening to your heart,

01:18:38   17  approximately?

01:18:38   18  A.  Not that long, maybe -- listen, minutes, but not long.

01:18:50   19  Q.  Now, you mentioned he said something about your thyroid.

01:18:54   20  What other medical problems did he mention to you?

01:18:56   21  A.  That was all.

01:19:00   22  Q.  Did he mention anything about your heart?

01:19:02   23  A.  No.

01:19:02   24  Q.  About your breathing?

01:19:06   25  A.  No.

01:19:06  1   Q.  Now, did the defendant tell you that he wanted to give you

01:19:08  2   any tests?

01:19:10  3   A.  After he said my thyroid that was swollen, he said he

01:19:20  4   wanted to do an ultrasound test.

01:19:24  5   Q.  Did he explain that he was going to do any additional

01:19:28  6   tests other than the ultrasound test?

01:19:30  7   A.  No.

01:19:30  8   Q.  Did he say anything about needing tests at your age?

01:19:34  9   A.  Yes.

01:19:34  10  Q.  When did he say that?

01:19:36  11  A.  I asked him, Why do I have to have the test done, and he

01:19:42  12  told me because of my age.

01:19:44  13  Q.  How old were you at the time?

01:19:46  14  A.  Twenty-eight.

01:19:48  15  Q.  And looking at the right side of the form, the patient

01:19:50  16  progress report, it's Government Exhibit 340, page 23.  Now,

01:19:58  17  if you look at the middle right section of the form, if we

01:20:02  18  could blow that up, please.

01:20:04  19       So did he tell you -- at the very top, do you see it

01:20:12  20  says, TB skin test?

01:20:14  21  A.  Yes.

01:20:14  22  Q.  Did you know you were going to get a TB skin test?

01:20:18  23  A.  Yes, I needed that for school.

01:20:20  24  Q.  Below that it says -- it looks like, Diabetes profile.  Do

01:20:24  25  you see that?

01:20:24    1    A.   Um-hmm.

01:20:24    2    Q.   Did he mention that to you?

01:20:26    3    A.   No.

01:20:26    4    Q.   Below that, it says, Hepatitis A, B, C profile.   Did he

01:20:32    5    mention that to you?

01:20:34    6    A.   No.

01:20:34    7    Q.   Below that, do you see it says, Echo?

01:20:36    8    A.   Yes, I see.

01:20:38    9    Q.   Did he mention he was going to do an echocardiogram of

01:20:42   10    your heart?

01:20:42   11    A.   No.

01:20:44   12    Q.   What about below that, it looks like something like,

01:20:46   13    Carotid.   Do you see that?

01:20:48   14    A.   Yes.

01:20:48   15    Q.   Did he mention he was going to do an ultrasound of your

01:20:52   16    carotid arteries?

01:20:54   17    A.   No.

01:20:54   18    Q.   And below that, it says, EKG.   Do you see that?

01:20:58   19    A.   Yes.

01:20:58   20    Q.   And below that, PFT?   Do you see that?

01:21:00   21    A.   Yes.

01:21:00   22    Q.   Did he tell you that he wanted you to have an EKG or PFT

01:21:06   23    test?

01:21:06   24    A.   No.

01:21:06   25    Q.   Did he explain what these tests were?

01:21:06  1  A.  No.

01:21:06  2  Q.  Did he explain why you needed them?

01:21:08  3  A.  Because of my age.

01:21:12  4  Q.  Now, let me back out of here and show you the bottom left

01:21:16  5  of that same progress note, the whole bottom part of it.  Do

01:21:18  6  you see in the diagnosis section, it says 1 and it's circled?

01:21:22  7  A.  Yes.

01:21:22  8  Q.  Heart murmur.  Did the defendant tell you that you had a

01:21:26  9  heart murmur?

01:21:26  10  A.  No.

01:21:26  11  Q.  Did he tell you there was anything weird about the sound

01:21:30  12  of your heart?

01:21:30  13  A.  No.

01:21:30  14  Q.  Mention anything about your heart at all?

01:21:32  15  A.  No.

01:21:32  16  Q.  Below that, it says, Chest pain.  Did you tell the

01:21:36  17  defendant that you were suffering from chest pain?

01:21:40  18  A.  No.

01:21:40  19  Q.  Did the defendant tell you that it looked like you were

01:21:42  20  suffering from chest pain?

01:21:44  21  A.  No.

01:21:44  22  Q.  Did you put your hand over your chest a couple times

01:21:48  23  during the visit?

01:21:48  24  A.  No.

01:21:48  25  Q.  Below that, it says -- do you see that it says, Carotid

01:21:56  1  bruit number 3?

01:21:56  2  A.  Yes.

01:21:56  3  Q.  Did the defendant ever say anything to you about the

01:22:00  4  problem with the sound of blood in your carotid artery?

01:22:06  5  A.  No.

01:22:06  6  Q.  Did he mention to you that he was concerned about a higher

01:22:08  7  risk of a stroke?

01:22:10  8  A.  No.

01:22:10  9  Q.  Would you remember that if he said that?

01:22:12  10  A.  Yes.

01:22:12  11  Q.  Below that, do you see No. 4, it says, Dizziness?  Did you

01:22:16  12  complain to the defendant that you had been dizzy?

01:22:18  13  A.  No.

01:22:18  14  Q.  Did you fall and trip when you went to see the defendant

01:22:22  15  in his office?

01:22:22  16  A.  No.

01:22:22  17  Q.  Is there anything you could possibly think of that you did

01:22:26  18  to give the defendant the impression that you were suffering

01:22:28  19  from dizziness?

01:22:28  20  A.  No.

01:22:30  21  Q.  No. 5, Chest pain.  It's the same as No. 2.  Did you say

01:22:36  22  that you had chest pain two different times?

01:22:38  23  A.  No.

01:22:38  24  Q.  Do you see below that, number 6, SOB, shortness of breath.

01:22:44  25  Did you tell the defendant you were suffering from shortness

01:22:46  1   of breath?

01:22:46  2   A.  No.

01:22:48  3   Q.  Did he tell you that, Boy, you look like you're winded?

01:22:52  4   A.  No.

01:22:52  5   Q.  Did he ask you if you had been running?

01:22:56  6   A.  No.

01:22:56  7   Q.  Did you walk to his clinic that day?

01:22:58  8   A.  No.

01:22:58  9   Q.  How did you get to his clinic?

01:23:00  10  A.  I drove.

01:23:00  11  Q.  You have a car?

01:23:00  12  A.  Yes.

01:23:00  13  Q.  Did you tell him that you had -- other than the shortness

01:23:06  14  of breath that we talked about during your pregnancy several

01:23:12  15  years before, did you tell him that you ever suffered from any

01:23:14  16  of these symptoms?

01:23:16  17  A.  No.

01:23:16  18  Q.  Did he ask you if you had ever been treated for a heart

01:23:18  19  murmur before?

01:23:20  20  A.  No.

01:23:20  21  Q.  Did he ask you if you had ever been tested for a heart

01:23:24  22  murmur?

01:23:24  23  A.  No.

01:23:24  24  Q.  Any tests run because someone was concerned about a heart

01:23:28  25  murmur?

01:23:28  1   A.  No.

01:23:28  2   Q.  Now, when you had your pregnancies, did you get treated by

01:23:34  3   a physician?

01:23:34  4   A.  Yes.

01:23:34  5   Q.  What kind of doctor?

01:23:36  6   A.  OB/GYN.

01:23:38  7   Q.  And did you see the OB regularly?

01:23:40  8   A.  Yes.

01:23:40  9   Q.  After these two pregnancies, were you concerned that you

01:23:44  10  had a heart murmur?

01:23:44  11  A.  No.

01:23:44  12  Q.  Were any of these things discussed at all during your

01:23:54  13  visit with the defendant?

01:23:54  14  A.  No.

01:23:54  15  Q.  Now, did the defendant tell you he was writing, Heart

01:24:00  16  murmur, chest pain, carotid bruit, dizziness, chest pain, and

01:24:04  17  shortness of breath, and he was writing these in your medical

01:24:08  18  chart?

01:24:08  19  A.  No.

01:24:08  20  Q.  Now, do you recall getting an ultrasound of your heart

01:24:14  21  that day?

01:24:14  22  A.  Yes.

01:24:14  23  Q.  And how about of the neck area?

01:24:16  24  A.  Yes.

01:24:18  25  Q.  Do you remember who administered the ultrasound?

| | | |
|---|---|---|
| 01:24:20 | 1 | A. Oharad, Orahad (phonetic), something. |
| 01:24:24 | 2 | Q. How do you remember his name? |
| 01:24:24 | 3 | A. Because I asked him his name, and I told him it sounded -- |
| 01:24:28 | 4 | it was different. |
| 01:24:30 | 5 | Q. Do you recall getting an EKG? |
| 01:24:34 | 6 | A. Yes. |
| 01:24:34 | 7 | Q. Now, were you sitting up or lying down for the EKG? |
| 01:24:38 | 8 | A. I was sitting up. |
| 01:24:38 | 9 | Q. Who administered it? |
| 01:24:40 | 10 | A. The medical assistant. |
| 01:24:42 | 11 | Q. Do you remember what the medical assistant looked like? |
| 01:24:44 | 12 | A. Yes. |
| 01:24:44 | 13 | Q. Can you describe that for the jury. |
| 01:24:44 | 14 | A. She was an African-American female about five-five, |
| 01:24:50 | 15 | five-six, she had braids in her hair, she was nicely shaped. |
| 01:25:02 | 16 | That's about all. |
| 01:25:02 | 17 | Q. What was her build? |
| 01:25:04 | 18 | A. Her build was she was slimmer, like hourglass. |
| 01:25:12 | 19 | Q. And do you recall getting a test where you have to blow |
| 01:25:16 | 20 | into a tube? |
| 01:25:16 | 21 | A. Yes. |
| 01:25:18 | 22 | Q. Who administered that test? |
| 01:25:18 | 23 | A. The medical assistant. |
| 01:25:20 | 24 | Q. The same one you just described? |
| 01:25:22 | 25 | A. Yes. |

01:25:22  1  Q.  Now, if you go back and look at the tests, did you that
01:25:34  2  day get the results of any of these tests?
01:25:36  3  A.  No.
01:25:36  4  Q.  In fact, to this day, other than the TB test, have you
01:25:42  5  gotten the results of any of those exams?
01:25:44  6  A.  No.
01:25:44  7  Q.  Can you describe for the jury what happened when you were
01:25:48  8  finished with all these tests.
01:25:50  9  A.  After I was finished with all those tests, I went back to
01:25:54  10  the waiting area -- well, no, actually, I'm sorry.
01:26:00  11       When I finished the test, I was going to get my coat,
01:26:02  12  I was on my way out the door to go home, and then I remembered
01:26:08  13  that I didn't get my sheet I needed filled out for school, my
01:26:10  14  physical form, so I went back in to get my physical form.
01:26:14  15  Q.  So you went back in to get the physical form.  Tell the
01:26:16  16  jury what happened.
01:26:16  17  A.  I went in, I went back to the desk, and I explained to the
01:26:20  18  receptionist at the desk that I didn't get my form that I
01:26:26  19  needed for the school.  And she called Dr. Chhibber, and he
01:26:28  20  came and filled out the form and gave it to her, and she gave
01:26:32  21  it to me.
01:26:32  22  Q.  Did you watch the defendant fill out that form?
01:26:36  23  A.  Yes.
01:26:36  24  Q.  Where were you in relation to the defendant?
01:26:38  25  A.  I was standing -- like there was a door here, this is the

01:26:42   1   glass, this is the door.  The door was open, he was standing

01:26:46   2   -- she called him, he came out of one of the rooms, and he was

01:26:50   3   standing right and just filled it out on the wall, you know.

01:26:56   4   She was standing there, I was standing on the outside of the

01:26:58   5   door, she was behind the glass, and he filled it out, he

01:27:02   6   passed it to her, and she passed it to me.

01:27:04   7   Q.  Approximately how long a time a gap had there been between

01:27:10   8   when you finished these tests and when the defendant filled

01:27:12   9   out that form?

01:27:12   10  A.  It wasn't that long because, like I stated, I was on my

01:27:20   11  way out the door, and I realized that I didn't get my form.

01:27:24   12  Q.  Let me show you what's marked as Government Exhibit 348,

01:27:30   13  8.  Do you recognize that form?

01:27:38   14  A.  Yes.

01:27:38   15  Q.  At the top, it says, Physical examination?

01:27:40   16  A.  Yes.

01:27:40   17  Q.  Is this the physical examination form you got from your

01:27:44   18  school?

01:27:44   19  A.  Yes.

01:27:44   20  Q.  And you saw the defendant fill out this form; is that

01:27:52   21  correct?

01:27:52   22  A.  Yes.  Correct.

01:27:54   23  Q.  Now, when he filled out the form, did he make any comments

01:27:58   24  to you about the results of your tests?

01:28:00   25  A.  No.

| | | |
|---|---|---|
| 01:28:00 | 1 | Q.  Now, you see under the top, it says, General appearance? |
| 01:28:06 | 2 | A.  Yes. |
| 01:28:06 | 3 | Q.  It says -- what does that say? |
| 01:28:08 | 4 | A.  Good. |
| 01:28:08 | 5 | Q.  And under findings section -- |
| 01:28:12 | 6 | THE COURT:  Again, I am going to admonish you about |
| 01:28:14 | 7 | reading documents in evidence.  You are displaying them to the |
| 01:28:18 | 8 | jury.  You don't have to read it to them. |
| 01:28:20 | 9 | BY MR. COLE: |
| 01:28:20 | 10 | Q.  There is nothing on this form that says, Heart murmur, is |
| 01:28:24 | 11 | there? |
| 01:28:24 | 12 | A.  No. |
| 01:28:24 | 13 | Q.  Nothing that says dizziness, right? |
| 01:28:26 | 14 | A.  No. |
| 01:28:26 | 15 | Q.  Shortness of breath? |
| 01:28:28 | 16 | A.  No. |
| 01:28:28 | 17 | Q.  Chest pain? |
| 01:28:30 | 18 | A.  No. |
| 01:28:30 | 19 | Q.  It says, Good, right? |
| 01:28:32 | 20 | A.  Correct. |
| 01:28:32 | 21 | Q.  Now, did you pay any money for these tests that you |
| 01:28:36 | 22 | received from the defendant? |
| 01:28:36 | 23 | A.  No. |
| 01:28:36 | 24 | Q.  Did he collect a copay? |
| 01:28:38 | 25 | A.  No. |

01:28:38    1    Q.  Co-insurance?

01:28:40    2    A.  No.

01:28:40    3    Q.  Ever get a bill?

01:28:42    4    A.  No.

01:28:48    5        MR. COLE:  No further questions, your Honor.

01:28:50    6        THE COURT:  Cross-examination.

01:28:52    7        MR. JONES:  Yes, your Honor.

01:29:22    8             - - -

01:29:22    9       TIFFANY SHIRLEY-TERRELL, CROSS-EXAMINATION

01:29:22   10    BY MR. JONES:

01:30:08   11    Q.  Good afternoon, Ms. Terrell.

01:30:12   12    A.  Good afternoon.

01:30:12   13    Q.  Ms. Terrell, I gather that the government first approached

01:30:18   14    you about this case, oh, in September of 2011; is that

01:30:26   15    correct?

01:30:26   16    A.  Correct.

01:30:26   17    Q.  And this was about a visit that had taken place in '09; is

01:30:36   18    that correct?

01:30:36   19    A.  Can you repeat that?

01:30:38   20    Q.  Yes.  What they approached you about was your visit that

01:30:40   21    took place in March of 2009; is that correct?

01:30:44   22    A.  Correct.

01:30:44   23    Q.  So it had been two years since the time you had this visit

01:30:48   24    at Dr. Chhibber's office; is that correct?

01:30:52   25    A.  Right.

01:30:52  1   Q.  And during -- do you know, ma'am, during the last six

01:30:58  2   years how many doctors' visits that you've had?

01:31:02  3   A.  No, I don't.

01:31:06  4   Q.  I'm sorry?

01:31:06  5   A.  You said how many did I have?

01:31:08  6   Q.  Yes.  In the last six years, ma'am, how many doctors'

01:31:12  7   visits do you think you have had?

01:31:14  8   A.  I'm not sure.

01:31:14  9   Q.  Well, you've had quite a few, haven't you, even going back

01:31:20  10  to visiting Trinity's emergency room going back to 2005; isn't

01:31:20  11  that correct?

01:31:28  12  A.  I'm not sure.

01:31:28  13  Q.  And even this last job you had, you said you were there

01:31:36  14  from March to October; is that correct?

01:31:40  15  A.  That's correct.

01:31:40  16  Q.  Do you recall that even during that short period of time,

01:31:44  17  you had approximately seven visits to a doctor?  Do you recall

01:31:46  18  that?

01:31:46  19  A.  I'm not sure.

01:31:50  20  Q.  All right.  And one of the things that happened is that

01:31:56  21  during that time that even this last job you had, you had --

01:32:02  22  your physical condition had deteriorated to some extent

01:32:06  23  because you began to have the migraines again; is that

01:32:08  24  correct?

01:32:08  25  A.  Correct.

| | | |
|---|---|---|
| 01:32:08 | 1 | Q. All right. Now, I want to ask you that we talked about |
| 01:32:18 | 2 | this asthma thing. Do you recall, for instance, that you |
| 01:32:26 | 3 | thought -- I believe you said that you thought that the last |
| 01:32:30 | 4 | time that you had had some form of attack of asthma before you |
| 01:32:36 | 5 | had gone to see Dr. Chhibber was five years before you saw |
| 01:32:40 | 6 | him? |
| 01:32:42 | 7 | A. Can you repeat that? |
| 01:32:44 | 8 | Q. Well, when do you think it was that you had your last |
| 01:32:48 | 9 | asthma attack before you saw Dr. Chhibber? |
| 01:32:52 | 10 | A. The last time I stated. I had my asthma attack when I was |
| 01:32:58 | 11 | pregnant. |
| 01:32:58 | 12 | Q. And what year was that, ma'am? |
| 01:33:00 | 13 | A. My son was born in '06, so it was before '06. |
| 01:33:06 | 14 | Q. Well, obviously, you do not remember that -- |
| 01:33:16 | 15 | MR. COLE: Objection, your Honor. |
| 01:33:18 | 16 | THE COURT: I haven't heard the question yet. |
| 01:33:20 | 17 | Could you turn the light off on the screen? |
| 01:33:30 | 18 | BY MR. JONES: |
| 01:33:42 | 19 | Q. Do you recall on May 22nd, 2007, that you had an emergency |
| 01:33:50 | 20 | visit regarding your asthma to Trinity Hospital? |
| 01:33:56 | 21 | A. No, I don't. |
| 01:33:56 | 22 | Q. All right. I'm going to show you what's marked Exhibit 1 |
| 01:34:44 | 23 | for this day. This purports to be an emergency room visit for |
| 01:34:48 | 24 | you regarding your asthma on May 22nd, 2007. |
| 01:34:52 | 25 | MR. COLE: Objection, your Honor. It's hearsay. |

| | | |
|---|---|---|
| 01:34:54 | 1 | THE COURT: Overruled. Foundation. |
| 01:34:56 | 2 | BY MR. JONES: |
| 01:34:56 | 3 | Q. Do you now recall that emergency room visit to Trinity |
| 01:35:00 | 4 | Hospital? |
| 01:35:00 | 5 | A. No. |
| 01:35:00 | 6 | Q. Well, let me ask you this. |
| 01:35:04 | 7 | And, incidentally, that person, that's your name on |
| 01:35:12 | 8 | this exhibit; isn't that correct? |
| 01:35:14 | 9 | A. Correct. |
| 01:35:14 | 10 | Q. It's got your vitals on this, it's got your address and |
| 01:35:20 | 11 | all of that; isn't that correct? |
| 01:35:28 | 12 | A. I don't see the address. |
| 01:35:28 | 13 | Q. Well, do you see other things that indicate that that's |
| 01:35:34 | 14 | you? |
| 01:35:34 | 15 | A. Besides my name, no. |
| 01:35:40 | 16 | Q. Now, let me ask you this. Did you -- when you were having |
| 01:35:48 | 17 | your asthma attacks, you had -- you used an inhaler, did you |
| 01:35:54 | 18 | not? |
| 01:35:54 | 19 | A. Yes. |
| 01:35:54 | 20 | Q. And you used albuterol, did you not? |
| 01:35:58 | 21 | A. Yes. |
| 01:36:00 | 22 | Q. And do you recall at that time that your primary care |
| 01:36:10 | 23 | physician was a Mr. Charles Austin? |
| 01:36:12 | 24 | A. No. |
| 01:36:14 | 25 | Q. Did you live at the time at 8020 South Maryland? |

01:36:34   1   A.  Correct.

01:36:34   2   Q.  Here, if I might approach you, this might help refresh

01:36:40   3   your recollection.  Take a look at that part of the emergency

01:36:42   4   room record.  Is that you, ma'am?

01:36:46   5   A.  Yes.

01:36:46   6   Q.  That record also says that at the time you came in for

01:36:50   7   this emergency room, that you had a history of pulmonary

01:36:56   8   disease and that you were using an inhaler with albuterol.

01:37:00   9   And you did, in fact, use an inhaler with albuterol; is that

01:37:04  10   correct?

01:37:04  11   A.  I used an inhaler, correct, but me having a history of --

01:37:10  12   that's incorrect.

01:37:10  13   Q.  All right.  Do you recall that later that year, do you

01:37:18  14   recall going to the emergency room again for an asthma attack

01:37:24  15   on September 12th, 2007?  Do you remember being admitted

01:37:30  16   there?

01:37:30  17   A.  No.

01:37:30  18   Q.  And you had -- here, if I might just show you this record

01:37:46  19   from 2007 and just have you look at this, and tell me, are you

01:37:48  20   the Shirley-Terrell that's referenced in that document?

01:37:50  21        MR. COLE:  Your Honor, objection.  May I have a

01:37:52  22   sidebar about this?

01:37:54  23        THE COURT:  All right.

01:37:54  24     (Whereupon, the following further proceedings were had at

01:38:18  25   sidebar, out of the hearing of the jury:)

01:38:18  1      MR. COLE:  The numbers you are using aren't the

01:38:24  2   numbers you are using here.  I would like the documents.

01:38:26  3      MR. JONES:  I have copies.

01:38:28  4      THE COURT:  All right,

01:38:28  5      MR. JONES:  We didn't mark these, but I have copies

01:38:30  6   of these.

01:38:30  7      THE COURT:  Mark them defendant exhibit, not the

01:38:32  8   date, because otherwise --

01:38:34  9      MR. JONES:  I apologize.  I didn't realize that these

01:38:36  10  had not been marked.  But you have them; we just didn't mark

01:38:40  11  them.

01:38:42  12     THE COURT:  Counsel needs a reasonable opportunity to

01:38:44  13  see what you're doing.

01:38:44  14     MR. JONES:  He does, he does, and I will give it to

01:38:46  15  him.

01:38:46  16     MR. COLE:  Right now?

01:38:48  17     MR. JONES:  Yes, right now.

01:39:06  18   (The following proceedings were had in open court in the

01:39:08  19  presence and hearing of the jury:)

01:39:10  20  BY MR. JONES:

01:39:10  21  Q.  Ma'am, you were still living at 8020 South Maryland,

01:39:14  22  correct?

01:39:14  23  A.  Correct.

01:39:14  24  Q.  I want to turn to -- just go one, two, three, four, and I

01:39:18  25  will show you a document that has a signature of

01:39:24  1   Shirley-Terrell.  Do you see that?  You're on the right page.

01:39:28  2   Is that your signature?

01:39:30  3   A.  No.

01:39:30  4   Q.  That's not your signature, Shirley-Terrell?

01:39:32  5   A.  No.  That's my name, but I did not write this.

01:39:38  6   Q.  All right.  Of 9/12- -- which is -- right there?  No,

01:39:48  7   right here.

01:39:50  8   A.  No.

01:39:50  9   Q.  You don't recognize that as your signature?

01:39:52  10  A.  No.

01:39:52  11  Q.  All right.  Now, when you came to Dr. Chhibber's office,

01:40:10  12  it is true, ma'am, that you brought your inhaler with you, did

01:40:14  13  you not?

01:40:14  14  A.  No.

01:40:16  15  Q.  Well, on the chart that Mr. Cole showed you, the progress

01:40:42  16  report, you see up at the top, you see that in the doctor's

01:41:08  17  progress chart there, it has the word Asthma?  Do you see

01:41:10  18  that?

01:41:12  19  A.  I see something, but I am not sure what it says.

01:41:16  20  Q.  And do you see, Albuterol, two puffs a day?  Do you see

01:41:26  21  that?  Can you read there?

01:41:26  22  A.  I'm not sure what it says, but I see something.

01:41:30  23  Q.  Now, I just want to ask you, when you saw Dr. Chhibber

01:41:34  24  that day, do you recall telling him that you were still using

01:41:36  25  the albuterol and that you were taking two puffs every six

01:41:40   1   hours?

01:41:42   2   A.  No.

01:41:42   3   Q.  All right.  Now, the prosecutor asked you, do you recall

01:41:52   4   blowing in the tube for what they call the pulmonary function

01:41:56   5   test?

01:41:56   6   A.  Correct.

01:41:56   7   Q.  Are you aware that that pulmonary function test indicates

01:42:02   8   that you have asthma?

01:42:02   9   A.  No.

01:42:02   10   Q.  And you do recall because you did tell the government at

01:42:12   11   some prior time that when you saw Dr. Chhibber, you did

01:42:16   12   complain to him that you had a pain in your back.  Do you

01:42:18   13   recall that?

01:42:18   14   A.  No.

01:42:26   15   Q.  Well, do you recall being interviewed by the government on

01:42:30   16   September 28th, 2011, and telling them that you complained to

01:42:34   17   the doctor that you did have a pain in your back?

01:42:36   18   A.  I don't remember.

01:42:36   19   Q.  All right.  Now, with this asthma, when you did have

01:42:46   20   asthma attacks, would those asthma attacks be marked by

01:42:52   21   shortness of breath?

01:42:54   22   A.  I'm not sure.

01:42:54   23   Q.  You mean you don't recall when -- you did -- the reason

01:43:00   24   you had albuterol, which is a powerful inhalent, is it not, is

01:43:08   25   because when you had those attacks, would you have shortness

01:43:10  1    of breath?  Isn't that true?

01:43:10  2    A.  When I had the attacks, I had them when I was pregnant.  I

01:43:14  3    haven't had an attack since.

01:43:16  4    Q.  That's not my question, ma'am.

01:43:18  5         When you did have the attacks, you had shortness of

01:43:22  6    breath?

01:43:22  7    A.  I was wheezing.

01:43:22  8    Q.  I'm sorry?

01:43:24  9    A.  Wheezing.

01:43:24  10   Q.  Yes, wheezing.  And from time to time when you had that

01:43:28  11   wheezing when you had those attacks, would you become slightly

01:43:32  12   dizzy?

01:43:34  13   A.  I don't remember.

01:43:36  14   Q.  When you had those kinds of attacks, would your chest

01:43:40  15   tighten up?

01:43:42  16   A.  I don't remember.

01:43:46  17   Q.  And, finally, the note that you say that Dr. Chhibber

01:44:24  18   filled out in your presence, that just -- that note just

01:44:28  19   merely said that there was no finding of anything that would

01:44:38  20   keep you from working in a medical or a dental office; isn't

01:44:42  21   that what it said?

01:44:42  22   A.  It said everything -- that my health was good.

01:44:46  23   Q.  Yes, it does say, General appearance good, right?

01:44:48  24        But then all the rest of it says is, Summary of

01:44:56  25   problem or condition, if any, which may affect the ability of

01:45:00   1   the person to work in a medical/dental office, and it says,

01:45:02   2   None, right?

01:45:04   3   A.  Correct.

01:45:04   4   Q.  And all it says is that you were found fit to work at a

01:45:10   5   medical or dental facility; is that correct?

01:45:12   6   A.  Right.

01:45:12   7   Q.  And when you visited with Dr. Chhibber, Dr. Chhibber did

01:45:32   8   not refuse to answer any of your questions, did he?

01:45:34   9   A.  No.

01:45:42   10           MR. JONES:  May I have one moment, Judge?

01:45:44   11           THE COURT:  Yes.

01:46:18   12   BY MR. JONES:

01:46:18   13   Q.  You met with the government just one or two days ago; is

01:46:22   14   that correct?

01:46:22   15   A.  Correct.

01:46:22   16   Q.  Isn't it true that you told the government that the reason

01:46:28   17   you left your last job was not because of the change in hours

01:46:32   18   but because you were having migraine headaches?  Isn't that

01:46:36   19   what you told the government?

01:46:36   20   A.  No.

01:46:36   21   Q.  Well, if the government has that in their report, you

01:46:40   22   don't know how it got there?

01:46:42   23           MR. COLE:  Objection, your Honor.

01:46:42   24           THE COURT:  Sustained.  Argumentative.

01:46:46   25           THE WITNESS:  What I told them was --

01:46:46    1    THE COURT:  When I sustain an objection, that means
01:46:50    2  you don't -- when there is an objection, let me rule on it
01:46:54    3  because you might not have to answer the question.  All right.
01:46:56    4  BY MR. JONES:
01:46:56    5  Q.  So you didn't tell one of the government agents that the
01:46:58    6  reason you left was because of migraine headaches?
01:47:02    7  A.  No.
01:47:08    8    MR. JONES:  I don't have anything further, Judge.
01:47:10    9    THE COURT:  Any redirect?
01:47:14    10    MR. COLE:  Just a little bit.
01:47:18    11                        - - -
01:47:18    12    TIFFANY SHIRLEY-TERRELL, REDIRECT EXAMINATION
01:47:18    13  BY MR. COLE:
01:47:18    14  Q.  When you went to see the defendant for your medical exam,
01:47:22    15  did you tell him that when you were pregnant, you were dizzy?
01:47:26    16  A.  Repeat that?
01:47:26    17  Q.  When you went to see the defendant for your exam, did you
01:47:30    18  tell him two years ago when you were pregnant that you were
01:47:32    19  dizzy?
01:47:34    20  A.  No.
01:47:34    21  Q.  Did you tell him that you were wheezing when you were
01:47:36    22  pregnant?
01:47:36    23  A.  No.
01:47:36    24  Q.  Did you tell him that your chest constricted two years ago
01:47:40    25  when you were pregnant?

01:47:42  1   A.  No.

01:47:42  2   Q.  Did the subject of chest constriction come up?

01:47:46  3   A.  No.

01:47:46  4   Q.  Did you mention anything to him about pain in your chest?

01:47:54  5   A.  No.

01:47:56  6   Q.  Shortness of breath?

01:47:56  7   A.  No.

01:47:56  8   Q.  Dizziness?

01:48:00  9   A.  No.

01:48:00  10  Q.  Did he mention anything to you at all about heart murmurs?

01:48:06  11  A.  No.

01:48:06  12  Q.  Carotid bruit?

01:48:08  13  A.  No.

01:48:20  14          MR. COLE:  I have no further questions, your Honor.

01:48:22  15          THE COURT:  Anything further?

01:48:24  16          MR. JONES:  I have none, Judge.

01:48:24  17          THE COURT:  Thank you.  You are excused.

01:48:24  18     (Witness excused.)

01:48:38  19          THE COURT:  Who is the government's next witness?

01:48:40  20          MR. HAMMERMAN:  Your Honor, the government's next

01:48:42  21  witness is Dennaris Coleman.

01:48:48  22          MR. JONES:  Judge, could we have a quick sidebar?

01:48:52  23          THE COURT:  Yes.

01:48:52  24     (Whereupon, the following further proceedings were had at

01:49:06  25  sidebar, out of the hearing of the jury:)

01:49:06  1    MR. JONES:  Judge, this is a small matter.  I think

01:49:08  2    we ironed this out.  They are going to play a tape with the

01:49:12  3    witness.  Fine.  They have a transcript they are going to pass

01:49:16  4    out.  The first version of their transcript -- what they have

01:49:20  5    done is we have a different idea of what's said during the

01:49:24  6    tape, and we have our own version.  And what the case law in

01:49:28  7    the Seventh Circuit says is that when that happens playing the

01:49:32  8    same tape, they hand out their version, we replay the tape,

01:49:36  9    and we hand out our version.  So that's what I would like to

01:49:40  10   do.

01:49:40  11       THE COURT:  On cross-examination?

01:49:40  12       MR. JONES:  Yes, because they have the right -- it's

01:49:46  13   being played.  Incidentally, the version that we are going to

01:49:48  14   give them is their first version that the government gave us,

01:49:52  15   and what happens is when they get to the second version,

01:49:54  16   things change a little bit.

01:49:56  17       All I want to do is when the jury hears the tape,

01:50:00  18   they say one version and then play the tape, and it's only --

01:50:04  19   Judge, it's only like, what, 10 minutes, if that much?

01:50:08  20       MR. HAMMERMAN:  May I address, your Honor?

01:50:10  21       THE COURT:  Yes.

01:50:10  22       MR. HAMMERMAN:  First, when the recordings were first

01:50:14  23   done, there was an individual from the steno pool that types

01:50:18  24   up transcripts.  We type draft over those transcripts.  We

01:50:22  25   provide them to defense counsel, as I did in this case, with a

01:50:24    1   letter that says, This is a draft.  It is only intended to be

01:50:26    2   a draft.  We are providing it to you with the understanding

01:50:30    3   that you will not seek to use this in any court proceeding.

01:50:34    4   If you do not accept these conditions because it is not a

01:50:36    5   final draft, we will not provide it to you, and we will wait

01:50:38    6   to give you a final draft.

01:50:40    7           The final drafts were, of course, the drafts that are

01:50:44    8   proofed by the individual who partook in the conversation, who

01:50:46    9   listens to it, who adopts it.  The agent who partook in these

01:50:50   10   conversations has listened, he has made any corrections he

01:50:54   11   thought were necessary, those corrections were made on the

01:50:56   12   final draft that have been provided to counsel for months.  He

01:50:58   13   signed every page of it.

01:51:00   14           Mr. Jones did not bring up this issue until about

01:51:02   15   five minutes before your Honor took the bench this afternoon.

01:51:06   16   We believe it would be, A, improper to use an old copy that

01:51:10   17   was provided to defense counsel with the express provision

01:51:14   18   that it was not to be used in any way, shape, or form because

01:51:16   19   it was a draft and we were providing it as a courtesy and no

01:51:20   20   other reason; and, B, this is the government's case in chief,

01:51:22   21   this witness has not adopted this draft, he has not reviewed

01:51:26   22   this draft.  We believe it would be improper for a defense

01:51:30   23   exhibit --

01:51:30   24           THE COURT:  So what's the foundation for playing it

01:51:32   25   with this witness if he doesn't -- he is not the foundation

01:51:36    1   witness?

01:51:36    2        MR. HAMMERMAN:  This witness is actually the

01:51:38    3   foundation witness for the final draft, not the draft that was

01:51:42    4   typed by somebody else.

01:51:42    5        What Mr. Jones is going to try to do is in the

01:51:44    6   government's case in chief introduce and publish, it is my

01:51:48    7   understanding, a defense exhibit that has not been reviewed or

01:51:50    8   adopted by this witness.  I believe there is no foundation for

01:51:54    9   that, and it would be inappropriate for all of those reasons,

01:51:56   10   your Honor.

01:51:56   11        MR. JONES:  Judge, I am only doing what the Seventh

01:52:02   12   Circuit says.  We have the cases here that says this is what

01:52:04   13   you do.  I am not going to say that this was the government's

01:52:06   14   draft.  I am going to say this was ours.  This was how we hear

01:52:10   15   it.

01:52:10   16        THE COURT:  I am going not going to rule

01:52:12   17   prospectively on something I haven't seen any draft.

01:52:16   18        MR. HAMMERMAN:  And neither have I, your Honor.

01:52:18   19        MR. JONES:  Can we hand you our draft?

01:52:20   20        THE COURT:  Yes.

01:52:22   21        MR. JONES:  We will hand you our draft, we will hand

01:52:24   22   you his.

01:52:26   23        THE COURT:  When you cross-examine.

01:52:28   24        MR. HAMMERMAN:  Just for the record, we also have not

01:52:30   25   seen the cases or been cited any cases, and this was not, of

01:52:32 1  course, put forth before the court in a motion in limine.

01:52:34 2  THE COURT: The burden is on you to show that the

01:52:38 3  transcript would be helpful to the jury, and I haven't heard

01:52:40 4  the questions or the answers yet.

01:52:42 5  MR. HAMMERMAN: Yes, your Honor.

01:52:42 6  MR. JONES: Judge, we are going to hand up a clean

01:52:44 7  copy because they are very short, very short, to both sides,

01:52:48 8  hand one to your Honor and one to them.

01:52:52 9  THE COURT: Okay. We will see what happens.

01:53:12 10  (The following proceedings were had in open court in the

01:53:12 11  presence and hearing of the jury:)

01:53:36 12  (Witness sworn.)

01:53:36 13  THE COURT: Please be seated. Would you tell us your

01:53:40 14  full name and spell your last name, please.

01:53:42 15  THE WITNESS: Dennaris Terrell Coleman,

01:53:46 16  C-o-l-e-m-a-n.

01:53:48 17  MR. HAMMERMAN: May I proceed, your Honor?

01:53:50 18  THE COURT: Yes.

01:53:52 19  - - -

01:53:52 20  DENNARIS TERRELL COLEMAN, DIRECT EXAMINATION

01:53:52 21  BY MR. HAMMERMAN:

01:53:52 22  Q. Sir, would you please tell the members of the jury how you

01:53:54 23  are employed?

01:53:54 24  A. I am a special agent with the Federal Bureau of

01:54:00 25  Investigation.

| | | |
|---|---|---|
| 01:54:00 | 1 | Q. Agent Coleman, how long have you been a special agent with |
| 01:54:04 | 2 | the FBI? |
| 01:54:04 | 3 | A. Approximately 10 years. |
| 01:54:06 | 4 | Q. Are you on any particular squad with the FBI? |
| 01:54:08 | 5 | A. I am on a squad called VC 2, which stands for violent |
| 01:54:12 | 6 | crimes 2. |
| 01:54:14 | 7 | Q. What kind of crimes do you investigate as a member of |
| 01:54:16 | 8 | violent crimes 2? |
| 01:54:18 | 9 | A. Gangs and violent crimes. |
| 01:54:20 | 10 | Q. At some point, did you become involved in the |
| 01:54:22 | 11 | investigation of Dr. Jaswinder Chhibber? |
| 01:54:24 | 12 | A. Yes, I did. |
| 01:54:26 | 13 | Q. In what capacity, sir? |
| 01:54:26 | 14 | A. In an undercover capacity. |
| 01:54:28 | 15 | Q. What do you mean by that? |
| 01:54:28 | 16 | A. Undercover capacity is to go into a situation covertly and |
| 01:54:36 | 17 | fictitious name, hiding your identity as a law enforcement |
| 01:54:40 | 18 | officer in order to gain vital intelligence for evidence of a |
| 01:54:44 | 19 | crime. |
| 01:54:44 | 20 | Q. What were you asked to do in particular in connection with |
| 01:54:48 | 21 | this particular investigation? |
| 01:54:50 | 22 | A. To go into a doctor's office and get a physical |
| 01:54:52 | 23 | examination. |
| 01:54:52 | 24 | Q. What did you understand the purpose of your role in this |
| 01:54:56 | 25 | investigation to be? |

01:54:56  1  A.  To go in and to ask for a physical examination and see

01:55:04  2  what the doctor would perform the type of tests he does and

01:55:10  3  what he would bill me for.

01:55:10  4  Q.  Did you agree to participate in this investigation?

01:55:12  5  A.  Yes, I did.

01:55:14  6  Q.  Did you use an undercover identity in connection with your

01:55:16  7  role in the investigation?

01:55:18  8  A.  Yes, I did.

01:55:18  9  Q.  What was the name that you used, Special Agent Coleman?

01:55:22  10  A.  Terrell Cole.

01:55:24  11  Q.  Did you have identification that night?

01:55:26  12  A.  Yes, I did.

01:55:26  13  Q.  What kind of identification did you have in the name of

01:55:30  14  Terrell Cole?

01:55:30  15  A.  I had a driver's license and I had a Blue Cross/Blue

01:55:34  16  Shield card.

01:55:34  17  Q.  Did you, in fact, make an appointment to see Dr. Chhibber?

01:55:36  18  A.  Yes, I did.

01:55:38  19  Q.  Do you remember approximately when that occurred, sir?

01:55:40  20  A.  Yes, sir.

01:55:40  21  Q.  When was that?

01:55:40  22  A.  February 23rd, 2010.

01:55:44  23  Q.  Okay.  And did you attend that appointment?

01:55:46  24  A.  Yes, I did.

01:55:46  25  Q.  Prior to arriving at Dr. Chhibber's office, did you meet

01:55:50   1   with any other investigating agents?

01:55:52   2   A.  Yes, I did.

01:55:52   3   Q.  Did they give you any instructions?

01:55:54   4   A.  Yes, they did.

01:55:56   5   Q.  What instructions did they give you?

01:55:56   6   A.  They gave me devices, and they gave me instruction to go

01:56:02   7   into the doctor's office where I was at and to go and check in

01:56:06   8   and to essentially not get anything in terms of like any shots

01:56:12   9   or things of that nature.

01:56:12   10   Q.  Now, you said they gave you devices.  What do you mean by

01:56:16   11   "devices"?

01:56:16   12   A.  A recording device.

01:56:16   13   Q.  Did you, in fact, go to the doctor's office and record

01:56:20   14   your visit?

01:56:20   15   A.  Yes, I did.

01:56:20   16   Q.  Have you listened to the recording of your visit to

01:56:24   17   Dr. Chhibber's office?

01:56:24   18   A.  Yes, I have.

01:56:26   19   Q.  Have you listened to it in its entirety?

01:56:28   20   A.  Yes, I have.

01:56:28   21   Q.  Have you also listened to a disk that contains clips of

01:56:32   22   that recording?

01:56:34   23   A.  Yes, I have.

01:56:34   24   Q.  And are those clips that you have reviewed, in fact,

01:56:38   25   portions of the larger entire recording of your visit to

| | | |
|---|---|---|
| 01:56:40 | 1 | Dr. Chhibber's office? |
| 01:56:42 | 2 | A.  Yes, they are. |
| 01:56:44 | 3 | MR. HAMMERMAN:  May I approach, your Honor? |
| 01:56:44 | 4 | THE COURT:  Yes. |
| 01:56:46 | 5 | BY MR. HAMMERMAN: |
| 01:56:56 | 6 | Q.  Special Agent Coleman, I am going to hand you what's been |
| 01:56:58 | 7 | marked as Government Exhibit 420 and 421. |
| 01:57:02 | 8 | A.  Thank you, sir. |
| 01:57:04 | 9 | Q.  Special Agent Coleman, do you recognize the two exhibits |
| 01:57:06 | 10 | that I just handed you? |
| 01:57:08 | 11 | A.  Yes, I do. |
| 01:57:08 | 12 | Q.  Can you describe them for the jury, sir. |
| 01:57:12 | 13 | A.  One is a compact disk and the other is transcripts. |
| 01:57:16 | 14 | Q.  And you said you recognized them? |
| 01:57:18 | 15 | A.  Yes, I do. |
| 01:57:18 | 16 | Q.  How do you recognize them? |
| 01:57:20 | 17 | A.  By my signature and the date that I placed on them. |
| 01:57:24 | 18 | Q.  All right.  And did you, in fact, listen to all the |
| 01:57:26 | 19 | recordings that are on that disk? |
| 01:57:28 | 20 | A.  Yes, I did. |
| 01:57:28 | 21 | Q.  And is it your understanding or belief that the recordings |
| 01:57:32 | 22 | contained on that disk are true and accurate recordings of |
| 01:57:36 | 23 | your visit to Dr. Chhibber's office on the date that you went |
| 01:57:40 | 24 | in in an undercover capacity? |
| 01:57:42 | 25 | A.  Yes. |

01:57:44  1    MR. HAMMERMAN:  Your Honor, at this point in time,

01:57:46  2  the government would move to admit what's been marked as

01:57:48  3  Government Exhibit 420.

01:57:50  4    THE COURT:  That is the recording?

01:57:50  5    MR. HAMMERMAN:  It is, your Honor.

01:57:52  6    THE COURT:  Any objection to the recording?

01:57:54  7    MR. JONES:  Only to what we talked about at sidebar,

01:57:56  8  Judge.

01:57:56  9    THE COURT:  All right.  The recording -- is it the

01:58:00  10  recording?

01:58:02  11    MR. HAMMERMAN:  Yes, your Honor.

01:58:02  12    THE COURT:  Exhibit 420 is admitted.

01:58:04  13    (Above-mentioned exhibit was received in evidence.)

01:58:06  14    MR. HAMMERMAN:  Thank you, your Honor.

01:58:08  15  BY MR. HAMMERMAN:

01:58:08  16  Q.  Now, Special Agent Coleman, have you also looked at what's

01:58:12  17  been marked as Government Exhibit 421?

01:58:12  18  A.  Yes, I have.

01:58:14  19  Q.  Is that the transcript that you mentioned previously?

01:58:14  20  A.  Yes.

01:58:14  21  Q.  And have you reviewed that transcript?

01:58:16  22  A.  Yes, I have.

01:58:16  23  Q.  How do you know you reviewed it?

01:58:18  24  A.  By my signature and the date that I affixed on it.

01:58:22  25  Q.  Okay.  And did you review the transcript while listening

| | | |
|---|---|---|
| 01:58:24 | 1 | to the recordings? |
| 01:58:24 | 2 | A.  Yes. |
| 01:58:26 | 3 | Q.  You listened to the recording at the same time you looked |
| 01:58:28 | 4 | at the transcript? |
| 01:58:30 | 5 | A.  Yes. |
| 01:58:30 | 6 | Q.  Did you look at the transcript to try to ensure its |
| 01:58:32 | 7 | accuracy at the time that you were listening to the |
| 01:58:36 | 8 | recordings? |
| 01:58:36 | 9 | A.  Yes. |
| 01:58:36 | 10 | Q.  To obtain an understanding or -- let me rephrase that.  I |
| 01:58:42 | 11 | apologize. |
| 01:58:42 | 12 | Does that transcript accurately reflect the |
| 01:58:44 | 13 | recordings of the meetings that you participated in when you |
| 01:58:48 | 14 | went to Dr. Chhibber's office in 2011? |
| 01:58:50 | 15 | A.  Yes. |
| 01:58:50 | 16 | Q.  I misspoke, 2010. |
| 01:58:56 | 17 | A.  Yes. |
| 01:58:56 | 18 | Q.  Sorry about that. |
| 01:59:00 | 19 | MR. HAMMERMAN:  Your Honor, at this point in time, |
| 01:59:02 | 20 | the government would seek to admit what's been marked as |
| 01:59:06 | 21 | Government Exhibit 421. |
| 01:59:06 | 22 | THE COURT:  It's the recording that's the evidence. |
| 01:59:08 | 23 | Not the transcript.  So to the extent the transcript may be |
| 01:59:12 | 24 | helpful to the jury, you may use it; but ladies and gentlemen |
| 01:59:16 | 25 | of the jury, it's the recording that's the evidence.  That is |

01:59:20   1    what you actually hear.

01:59:22   2         MR. HAMMERMAN:  In a moment, your Honor, I would

01:59:24   3    request permission to publish both.

01:59:28   4         THE COURT:  Any objection to playing the recording?

01:59:32   5         MR. JONES:  No, Judge.

01:59:34   6         THE COURT:  Any objection to distributing the

01:59:36   7    transcript?

01:59:36   8         MR. JONES:  Only with what we talked about at

01:59:42   9    sidebar, Judge.

01:59:42  10         THE COURT:  Yes.

01:59:42  11         MR. JONES:  If we could --

01:59:44  12         THE COURT:  That could be done on cross-examination.

01:59:46  13         MR. JONES:  If we could hand up what we talked to you

01:59:50  14    about at sidebar?

01:59:50  15         THE COURT:  How long is the transcript?

01:59:52  16         MR. JONES:  A couple pages.

01:59:54  17         THE COURT:  All right.  Both versions -- the

01:59:58  18    government and the defendant have different versions of the

02:00:00  19    transcript; but, again, members of the jury, it's what you

02:00:06  20    hear, actually hear on the recording, that controls.

02:00:20  21    BY MR. HAMMERMAN:

02:00:22  22    Q.  Special Agent Coleman, approximately what time did you get

02:00:24  23    to Dr. Chhibber's office on February 23rd of 2010?

02:00:26  24    A.  Approximately 1:45 p.m.

02:00:28  25    Q.  Where was Dr. Chhibber's office located?

| | | |
|---|---|---|
| 02:00:36 | 1 | A.  South Side of Chicago, 642 East 79th Street. |
| 02:00:40 | 2 | Q.  What did Dr. Chhibber's office look like? |
| 02:00:42 | 3 | A.  It looked like an office building.  When you walk through |
| 02:00:46 | 4 | the door, there is a greeting area and a seating area, a |
| 02:00:50 | 5 | window for the receptionist. |
| 02:00:54 | 6 |         MR. HAMMERMAN:  Your Honor, may I approach once |
| 02:00:56 | 7 | again? |
| 02:00:56 | 8 |         THE COURT:  Yes.  No need to ask. |
| 02:01:00 | 9 |         MR. HAMMERMAN:  I apologize, your Honor. |
| 02:01:00 | 10 | BY MR. HAMMERMAN: |
| 02:01:02 | 11 | Q.  Special Agent Coleman, I am going to show you what's been |
| 02:01:04 | 12 | marked as Government Exhibit 600.  Have you seen that exhibit |
| 02:01:08 | 13 | before, sir? |
| 02:01:08 | 14 | A.  Yes, I have. |
| 02:01:10 | 15 | Q.  What does Government Exhibit 600 depict, Special Agent |
| 02:01:12 | 16 | Coleman? |
| 02:01:12 | 17 | A.  The office of Dr. Chhibber. |
| 02:01:14 | 18 | Q.  Is that a fair and accurate depiction of the office that |
| 02:01:18 | 19 | you visited on February 23rd, 2010? |
| 02:01:20 | 20 | A.  Yes, it is. |
| 02:01:22 | 21 |         MR. HAMMERMAN:  The government would seek to admit |
| 02:01:24 | 22 | what's been marked as Government Exhibit 600. |
| 02:01:26 | 23 |         MR. JONES:  No objection, Judge. |
| 02:01:26 | 24 |         THE COURT:  Government Exhibit 600 is admitted. |
| 02:01:30 | 25 |         MR. HAMMERMAN:  Permission to publish, your Honor? |

| | | |
|---|---|---|
| 02:01:30 | 1 | THE COURT:  Yes. |
| 02:01:32 | 2 | BY MR. HAMMERMAN: |
| 02:01:36 | 3 | Q.  Is that, in fact, an accurate depiction, Special Agent |
| 02:01:40 | 4 | Coleman, of the office you went into that day? |
| 02:01:42 | 5 | A.  Yes, sir. |
| 02:01:42 | 6 | Q.  And is the doors that are depicted on the right-hand side |
| 02:01:44 | 7 | under the blue awning in fact the entrance to Dr. Chhibber's |
| 02:01:48 | 8 | office at that time? |
| 02:01:48 | 9 | A.  Yes. |
| 02:01:48 | 10 | Q.  When you went into the office, was it located on the first |
| 02:01:52 | 11 | floor or the second floor? |
| 02:01:52 | 12 | A.  The first floor. |
| 02:01:54 | 13 | Q.  And when you went into the office, can you generally |
| 02:02:00 | 14 | explain to the members of the jury what transpired. |
| 02:02:02 | 15 | A.  I walked into the office, and I step up to the |
| 02:02:06 | 16 | receptionist desk and explain to her that I had an |
| 02:02:12 | 17 | appointment. |
| 02:02:12 | 18 | Q.  At this point in time, Special Agent Coleman, we are going |
| 02:02:16 | 19 | to play the first portion of the recording that's been |
| 02:02:18 | 20 | previously entered into evidence. |
| 02:02:22 | 21 | (Audio recording played.) |
| 02:02:38 | 22 | BY MR. HAMMERMAN: |
| 02:02:38 | 23 | Q.  Special Agent Coleman, had you, in fact, ever been to |
| 02:02:40 | 24 | Dr. Chhibber's office before? |
| 02:02:42 | 25 | A.  No, I had not. |

02:02:42  1   Q.  Where did this conversation take place?

02:02:44  2   A.  In the receptionist area.

02:02:46  3   Q.  And when you told the receptionist -- was this a

02:02:50  4   receptionist you were speaking to?

02:02:52  5   A.  Yes.

02:02:52  6   Q.  When you told the receptionist that you had never been to

02:02:56  7   Dr. Chhibber's clinic before, did she ask you to fill out any

02:03:00  8   forms?

02:03:00  9   A.  Yes, she did.

02:03:00  10  Q.  Were you asked to present any ID?

02:03:02  11  A.  Yes, I was.

02:03:02  12  Q.  What type of ID were you asked to present, sir?

02:03:06  13  A.  My driver's license and my insurance card.

02:03:08  14  Q.  I am going to show you, Special Agent Coleman, what's been

02:03:10  15  marked as Government Exhibit 320 and ask you to turn to the

02:03:16  16  pages of the registration form which I believe are on the

02:03:20  17  left-hand side.

02:03:20  18  A.  Okay.

02:03:20  19  Q.  First of all, Special Agent Coleman, have you reviewed

02:03:24  20  this exhibit before?

02:03:24  21  A.  Yes, I have.

02:03:26  22  Q.  And do you recognize the forms that are on the left side

02:03:28  23  of this particular exhibit registration forms?

02:03:30  24  A.  Yes, I do.

02:03:40  25  Q.  Did you, in fact, fill out these forms?

02:03:42  1    A.  Yes, I did.

02:03:44  2    Q.  They are true and accurate copies of the forms you filled

02:03:46  3    out on the day you visited Dr. Chhibber's office?

02:03:48  4    A.  Yes, they are.

02:03:48  5            MR. HAMMERMAN:  Your Honor, the government would move

02:03:50  6    to admit what's been marked as Government Exhibit 320.

02:03:56  7            MR. JONES:  No objection, your Honor.

02:03:58  8            THE COURT:  Government Exhibit 320 is admitted.

02:04:06  9            MR. HAMMERMAN:  Permission to publish, your Honor?

02:04:06  10           THE COURT:  Yes.

02:04:06  11   BY MR. HAMMERMAN:

02:04:06  12   Q.  Is that the ID that you presented that day, Special Agent

02:04:08  13   Coleman?

02:04:08  14   A.  Yes, it is.

02:04:08  15   Q.  Is it, once again, in the name of Terrell Cole?

02:04:14  16   A.  Yes, it is.

02:04:14  17   Q.  And then if you go to the next page.  Do you see the

02:04:20  18   registration form?  Probably on the screen in front of you

02:04:26  19   too.

02:04:26  20   A.  Yes, I do.

02:04:26  21   Q.  Is that the form you filled out on that day?

02:04:28  22   A.  Yes, it is.

02:04:28  23   Q.  Did you, in fact, sign this document in the name of

02:04:34  24   Terrell Cole?

02:04:34  25   A.  Yes, I did.

02:04:34   1    Q. Is this a fictitious identity that you placed on the

02:04:38   2    registration form at that time?

02:04:38   3    A. Yes, it is.

02:04:38   4    Q. Did you also sign a consent form?

02:04:40   5    A. Yes, I did.

02:04:44   6    Q. Go to the next page. Is this the consent form that you

02:04:46   7    signed?

02:04:46   8    A. Yes, it is.

02:04:48   9    Q. Once again, as Terrell Cole?

02:04:50   10    A. Yes, it is.

02:04:50   11    Q. Go to the next page, please. Once again, is this another

02:04:56   12    form that has another consent for diagnosis form? Do you see

02:05:00   13    that?

02:05:00   14    A. Yes.

02:05:00   15    Q. There is no boxes checked. Did you sign this form also?

02:05:04   16    A. Yes.

02:05:04   17    Q. Did you do all this as part of the registration process at

02:05:08   18    Dr. Chhibber's office on that afternoon?

02:05:08   19    A. Yes, I did.

02:05:10   20    Q. What happened after you filled out these forms sitting in

02:05:18   21    Dr. Chhibber's office?

02:05:18   22    A. I was asked to sit down and wait being called back.

02:05:24   23    Q. And did you, in fact, sit and wait?

02:05:26   24    A. Yes, I did.

02:05:26   25    Q. And after a period of time, did something occur?

02:05:28    1   A.  Yes.

02:05:28    2   Q.  First of all, how long did you have to wait,

02:05:30    3   approximately?

02:05:30    4   A.  Approximately 15, 20 minutes.

02:05:32    5   Q.  And after that 15 or 20 minutes, can you tell the members

02:05:36    6   of the jury what transpired.

02:05:36    7   A.  Yes.  I was called back by one of the attendants, females

02:05:40    8   in the office, taken back into a medical room, and was

02:05:46    9   basically given heart rate and basic vital sign checks that

02:05:54   10   you would get when you go to a doctor, weight, they weighed

02:05:56   11   me, got my height and such.

02:05:58   12   Q.  And then what happened, sir?

02:06:00   13   A.  After that, I was instructed to go back up to the front

02:06:04   14   and sit and wait.

02:06:04   15   Q.  Did you wait for another period of time?

02:06:08   16   A.  Yes.

02:06:08   17   Q.  Approximately how long?

02:06:10   18   A.  Approximately 10, 15 minutes.

02:06:12   19   Q.  What happened next, sir?

02:06:12   20   A.  I was called back to another waiting room to see

02:06:16   21   Dr. Chhibber.

02:06:22   22        I'm sorry.  It was a medical room, not waiting room.

02:06:24   23   Q.  Did, in fact, you meet an individual you understood to be

02:06:30   24   Dr. Chhibber?

02:06:30   25   A.  Yes, I did.

02:06:32　1　Q.　Would you recognize the individual that you met in the

02:06:36　2　doctor's office on that day that you understood to be

02:06:38　3　Dr. Chhibber?

02:06:38　4　A.　Yes, I would.

02:06:40　5　Q.　I'd ask you to look around the courtroom and if you see

02:06:42　6　the individual you understood to be Dr. Chhibber, would you

02:06:44　7　point him out to the members of the jury by naming an article

02:06:48　8　of clothing that he is wearing or the color of the clothing

02:06:52　9　that he's wearing?

02:06:52　10　　　　　MR. JONES:　Your Honor, we stipulate to the identity.

02:06:54　11　　　　　THE COURT:　So stipulated.

02:06:56　12　　　　　MR. HAMMERMAN:　Thank you, your Honor.

02:06:56　13　BY MR. HAMMERMAN:

02:06:56　14　Q.　Special Agent Coleman, did Dr. Chhibber ask you any

02:07:00　15　preliminary questions at the time you first met with him?

02:07:02　16　A.　Yes, he did.

02:07:02　17　Q.　What type of questions?

02:07:04　18　A.　General health questions, what was I there for, had I had

02:07:08　19　-- did I have any concerns or conditions, my reasoning for

02:07:12　20　being there, basically.

02:07:14　21　　　　　MR. HAMMERMAN:　Can we play the next audio clip,

02:07:16　22　please.

02:07:16　23　　(Audio recording played.)

02:09:40　24　BY MR. HAMMERMAN:

02:09:40　25　Q.　Now, Special Agent Coleman, the story that you told

02:09:44　1　Dr. Chhibber that's depicted in that audio clip, was that also

02:09:46　2　part of the ruse, that you had an aunt and would pass by the

02:09:52　3　clinic from time to time?

02:09:52　4　A.  Yes, it was.

02:09:52　5　Q.  That was part of your undercover persona, if you will?

02:09:56　6　A.  Yes, it was.

02:09:56　7　Q.  During the time that you met with Dr. Chhibber and he

02:09:58　8　asked you about your general medical background, did you tell

02:10:00　9　him at any point in time that there was anything wrong with

02:10:04　10　you?

02:10:04　11　A.  No, I did not.

02:10:06　12　　　　　MR. HAMMERMAN:  Could we play the next audio clip,

02:10:08　13　please.

02:10:08　14　　(Audio recording played.)

02:11:32　15　BY MR. HAMMERMAN:

02:11:34　16　Q.  Special Agent Coleman, during that portion of the

02:11:34　17　transcript, you told Dr. Chhibber that you were engaged in

02:11:38　18　martial arts.  Is that actually true?

02:11:40　19　A.  Yes.

02:11:40　20　Q.  Do you, in fact, practice martial arts?

02:11:46　21　A.  Yes, I do.

02:11:46　22　Q.  Is that something that you did back in the time that you

02:11:46　23　visited Dr. Chhibber on a regular basis?

02:11:46　24　A.  Yes, I did.

02:11:46　25　Q.  You also told Dr. Chhibber that you ran three to five

02:11:50  1   miles every other day.  Is that also true?

02:11:52  2   A.  Yes, it is.

02:11:52  3   Q.  Was that something that you did back in 2010 when you went

02:11:56  4   to go visit Dr. Chhibber?

02:11:56  5   A.  Yes, I did.

02:11:56  6   Q.  In fact, were you a physically active man back in 2010

02:12:02  7   when you went to Dr. Chhibber's office?

02:12:02  8   A.  Yes, I was.

02:12:02  9   Q.  At any point during your examination, did Dr. Chhibber

02:12:14  10  indicate to you that you should be concerned about the

02:12:14  11  physical activity that you do?

02:12:16  12  A.  No, he did not.

02:12:18  13  Q.  Did he suggest any conditions that should be a concern for

02:12:20  14  a physically active individual like yourself?

02:12:22  15  A.  No.

02:12:22  16  Q.  In your -- what was your impression of his reaction to

02:12:28  17  your statements that you were physically active?

02:12:30  18       MR. JONES:  Judge, I am going to object.

02:12:34  19       THE COURT:  Sustained as to the form of the question.

02:12:34  20  BY MR. HAMMERMAN:

02:12:34  21  Q.  At any point in time, did Dr. Chhibber express any concern

02:12:38  22  about your physical activity?

02:12:40  23  A.  No, he did not.

02:12:40  24  Q.  Was he congratulatory?

02:12:42  25  A.  Yes, he was.

| | | |
|---|---|---|
| 02:12:44 | 1 | Q.  Now, in addition to questioning you about your health, |
| 02:12:50 | 2 | generally, at some point, did Dr. Chhibber actually perform an |
| 02:12:52 | 3 | examination on you? |
| 02:12:54 | 4 | A.  Yes, he did. |
| 02:12:54 | 5 | Q.  What types of examination did he do? |
| 02:12:56 | 6 | A.  He looked in my -- he looked down my throat, he took a |
| 02:13:02 | 7 | stethoscope, put it to my chest and to my neck and listened to |
| 02:13:06 | 8 | me. |
| 02:13:06 | 9 | Q.  And what do you mean when you say "a stethoscope"?  What |
| 02:13:10 | 10 | are you talking about? |
| 02:13:10 | 11 | A.  The device that he puts in his ears so he can actually |
| 02:13:14 | 12 | hear what's going on inside me. |
| 02:13:16 | 13 | MR. HAMMERMAN:  Can we listen to the next clip, |
| 02:13:18 | 14 | please. |
| 02:13:20 | 15 | (Audio recording played.) |
| 02:15:22 | 16 | BY MR. HAMMERMAN: |
| 02:15:24 | 17 | Q.  Special Agent Coleman, during this period of the |
| 02:15:26 | 18 | examination that we just listened to, did you have your shirt |
| 02:15:30 | 19 | off? |
| 02:15:30 | 20 | A.  Yes, sir. |
| 02:15:30 | 21 | Q.  And was Dr. Chhibber listening to your body using that |
| 02:15:34 | 22 | stethoscope that you described? |
| 02:15:34 | 23 | A.  Yes, he was. |
| 02:15:36 | 24 | Q.  There was a period in the transcript that you just read |
| 02:15:38 | 25 | and we just heard where Dr. Chhibber said, Okay, perfect.  Did |

02:15:40  1   you hear that?

02:15:40  2   A.  Yes, I did.

02:15:44  3   Q.  What had Dr. Chhibber been doing prior to the time that he

02:15:48  4   said, Okay, perfect?

02:15:48  5   A.  Listening to my neck, chest, and heart.

02:15:50  6   Q.  At any point after listening to your body using that

02:15:50  7   stethoscope, did Dr. Chhibber indicate to you that he heard

02:16:00  8   anything that concerned him or that should concern you?

02:16:00  9   A.  No, he did not.

02:16:02  10  Q.  Did Dr. Chhibber ask you to lie down, that he wanted to

02:16:06  11  listen to your heart a little bit longer?

02:16:08  12  A.  No, he did not.

02:16:08  13  Q.  Did he ask you to stand up so that he could listen to your

02:16:10  14  heart a little bit longer?

02:16:12  15  A.  No, he did not.

02:16:12  16  Q.  Did he ask you to squat down and then stand up and squat

02:16:16  17  down so he could listen to your heart where you were in

02:16:18  18  different positions or after movement?

02:16:20  19  A.  No, he did not.

02:16:20  20  Q.  Did he express any need to do any further examination of

02:16:24  21  you at that time or to listen to anything else in your body?

02:16:28  22  A.  No, he did not.

02:16:32  23  Q.  Following that point in the examination, can you tell the

02:16:34  24  members of the jury what happened next.

02:16:36  25  A.  He asked me about possibly getting some blood drawn.

02:16:42 1    Q.  I'm sorry to interrupt.  Let me go ahead and play the next

02:16:46 2    portion of the clip.

02:16:46 3       (Audio recording played.)

02:18:26 4    BY MR. HAMMERMAN:

02:18:28 5    Q.  During that portion of the clip, Special Agent Coleman,

02:18:30 6    you hear Dr. Chhibber tell you that you should do an EKG

02:18:34 7    because it is a must every year.  Did you hear that?

02:18:36 8    A.  Yes.

02:18:36 9    Q.  Did Dr. Chhibber ever tell you that it was a must for you

02:18:40 10   in particular?

02:18:40 11   A.  No.

02:18:40 12   Q.  Did he ever tell you that he heard anything during your

02:18:42 13   exam that he thought an EKG was something that needed to be

02:18:46 14   done based on what he had heard?

02:18:48 15   A.  No, he did not.

02:18:48 16   Q.  Did you hear the portion of the transcript -- or, I'm

02:18:52 17   sorry, of the recording where Dr. Chhibber says at the time

02:18:54 18   he's telling you you need an EKG that you are a very healthy

02:18:58 19   man?

02:18:58 20   A.  Yes, I did.

02:18:58 21   Q.  Did he ever qualify that statement?

02:19:00 22   A.  No, he did not.

02:19:00 23   Q.  Did he ever express any concerns in any way, shape, or

02:19:04 24   form other than to tell you that you were just a healthy man?

02:19:06 25   A.  No, he did not.

02:19:08  1  Q.  Now, you said there that you wouldn't get blood drawn

02:19:12  2  because you had a phobia of needles.  Is that what we heard in

02:19:14  3  the recording?

02:19:14  4  A.  Yes, it is.

02:19:16  5  Q.  Do you actually have a phobia of needles, Special Agent

02:19:18  6  Coleman?

02:19:18  7  A.  No, I do not.

02:19:20  8  Q.  Why did you say that?

02:19:20  9  A.  I was instructed not to get any intrusive tests, and a

02:19:26  10  needle drawing blood would be just that.

02:19:28  11  Q.  You also heard during that portion of the recording that

02:19:32  12  Dr. Chhibber told you that your blood pressure was good.  Do

02:19:34  13  you remember hearing that?

02:19:34  14  A.  Yes, I do.

02:19:36  15  Q.  Did he ever qualify that statement telling you that he had

02:19:38  16  real concerns about your blood pressure and it was something

02:19:40  17  that needed to be further examined?

02:19:42  18  A.  No, he did not.

02:19:44  19        MR. HAMMERMAN:  Could we play the next clip, please.

02:19:46  20     (Audio recording played.)

02:19:46  21  BY MR. HAMMERMAN:

02:20:32  22  Q.  Once again, Dr. Chhibber told you your blood pressure was

02:20:34  23  fine.  Did he ever qualify that statement?

02:20:36  24  A.  No, he did not.

02:20:36  25  Q.  He told you that doing exercise was good.  Did he ever

02:20:40  1  express any concerns about someone in your physical condition

02:20:42  2  doing exercise?

02:20:44  3  A.  No, he did not.

02:20:44  4  Q.  Did he ever tell you anything you heard to qualify either

02:20:46  5  of those statements?

02:20:50  6  A.  No, he did not.

02:20:56  7      MR. HAMMERMAN:  Let's play the next portion of the

02:20:58  8  transcript.

02:20:58  9    (Audio recording played.)

02:21:08  10  BY MR. HAMMERMAN:

02:21:22  11  Q.  Dr. Chhibber told you he wanted you to have an EKG,

02:21:24  12  correct?

02:21:26  13  A.  That's correct.

02:21:26  14  Q.  And he stated to you that he also wanted you to do it once

02:21:28  15  a year.  Is that also right?

02:21:30  16  A.  Yes.

02:21:30  17  Q.  Did he ever explain why except to say it was something you

02:21:32  18  need to do once a year?

02:21:34  19  A.  No, he did not.

02:21:36  20  Q.  Did you, in fact, have an EKG done?

02:21:38  21  A.  Yes, I did.

02:21:38  22  Q.  Can you tell the members of the jury how that occurred.

02:21:40  23  What transpired next after meeting with Dr. Chhibber?

02:21:44  24  A.  I walked back to the initial medical room that I was in

02:21:48  25  and took a seat and took off my shirt.  And one of the female

02:21:54  1  attendants, medical staff, I assume, put leads on me, the

02:22:00  2  sticky portion, on my body that also were linked to cables and

02:22:04  3  to a machine.  It took about five minutes.

02:22:06  4  Q.  Once that test was done, what did you do next?

02:22:10  5  A.  I put my clothes back on and left shortly thereafter.

02:22:14  6  Q.  Did you have another occasion to talk to Dr. Chhibber,

02:22:16  7  though, before you left the clinic?

02:22:18  8  A.  Yes, I did.

02:22:22  9       MR. HAMMERMAN:  Can we play the next portion of the

02:22:24  10  audio clip.

02:22:26  11    (Audio recording played.)

02:22:36  12  BY MR. HAMMERMAN:

02:22:38  13  Q.  At the very end there, you asked Dr. Chhibber, Am I good

02:22:42  14  to go?

02:22:42  15  A.  Yes.

02:22:42  16  Q.  And how did he respond to that?

02:22:44  17  A.  That I was fine, good to go.

02:22:46  18  Q.  Did he say you were perfect?

02:22:48  19  A.  Yes.

02:22:48  20  Q.  That was after you had the EKG done; is that right,

02:22:54  21  Special Agent Coleman?

02:22:54  22  A.  That is correct.

02:22:56  23  Q.  Did Dr. Chhibber at any point in time during your

02:23:02  24  examination talk to you about what's referred to as a heart

02:23:06  25  murmur?

02:23:06    1    A.  No, he did not.

02:23:08    2    Q.  At any point in time during your examination, did

02:23:12    3    Dr. Chhibber ask you if your family had a history of heart

02:23:16    4    murmurs?

02:23:16    5    A.  No.

02:23:16    6    Q.  At any point in time during your examination, did

02:23:22    7    Dr. Chhibber ask you if you had been previously diagnosed with

02:23:26    8    a heart murmur?

02:23:26    9    A.  No.

02:23:28    10   Q.  At any point in time during your entire visit to

02:23:32    11   Dr. Chhibber's office, did anybody mention the word "murmur"

02:23:38    12   to you at all during that examination?

02:23:40    13   A.  No.

02:23:40    14   Q.  Did anyone suggest to you that the physical activity you

02:23:46    15   were engaging in, running, doing martial arts, could be

02:23:50    16   dangerous and that your heart showed some signs of

02:23:54    17   abnormalities?

02:23:56    18   A.  No.

02:23:56    19   Q.  Was there anyone, Dr. Chhibber, his staff, anyone in that

02:24:00    20   clinic, that suggested to you on that day that there was

02:24:04    21   something wrong or could be wrong with your heart that needed

02:24:08    22   further examination?

02:24:10    23   A.  No.

02:24:12    24        MR. HAMMERMAN:  Your Honor, I have no further

02:24:14    25   questions at this time.

| | | |
|---|---|---|
| 02:24:14 | 1 | THE COURT: Okay. Cross-examination, |
| 02:25:04 | 2 | MR. JONES: May I proceed, your Honor? |
| 02:25:06 | 3 | THE COURT: Yes. |
| 02:25:08 | 4 | - - - |
| 02:25:08 | 5 | DENNARIS TERRELL COLEMAN, CROSS-EXAMINATION |
| 02:25:08 | 6 | BY MR. JONES: |
| 02:25:08 | 7 | Q. Special Agent, there came a time when you were recruited |
| 02:25:12 | 8 | for the undercover assignment in this case; is that correct? |
| 02:25:14 | 9 | A. Yes, sir. |
| 02:25:14 | 10 | Q. Approximately when was it that you were recruited for this |
| 02:25:16 | 11 | undercover program? |
| 02:25:16 | 12 | A. I don't recall the exact date, sir. |
| 02:25:20 | 13 | Q. Well, give me about when do you think it was? |
| 02:25:22 | 14 | A. Within the months or weeks leading up to me actually doing |
| 02:25:30 | 15 | an undercover operation. |
| 02:25:30 | 16 | Q. Was it months or weeks? |
| 02:25:32 | 17 | A. I'm not sure. |
| 02:25:34 | 18 | Q. And when you got into this undercover probe, your group |
| 02:25:38 | 19 | leader was Special Agent Kathy Anton; is that correct? |
| 02:25:42 | 20 | A. Yes, sir. |
| 02:25:44 | 21 | Q. And one of the requirements that you knew when you got |
| 02:25:48 | 22 | into this special probe was that they were looking for |
| 02:25:52 | 23 | African-American agents; isn't that correct? |
| 02:25:56 | 24 | A. I don't remember. I'm not sure. |
| 02:25:58 | 25 | Q. You don't recall that you -- first of all, you know all |

| | | |
|---|---|---|
| 02:26:04 | 1 | your other agents who were in this case with you, don't you? |
| 02:26:06 | 2 | A.  I know some of them, yes. |
| 02:26:08 | 3 | Q.  Any of them white? |
| 02:26:10 | 4 | A.  Not that I know of. |
| 02:26:12 | 5 | Q.  So you knew that one of the requirements, sir, was that |
| 02:26:16 | 6 | they wanted an African-American to go into a black |
| 02:26:18 | 7 | neighborhood, didn't you? |
| 02:26:20 | 8 | A.  I did not know that.  I don't recall that. |
| 02:26:22 | 9 | Q.  And as an FBI agent, you couldn't figure that out? |
| 02:26:24 | 10 | A.  I don't -- |
| 02:26:26 | 11 | MR. HAMMERMAN:  Objection.  Relevance. |
| 02:26:26 | 12 | MR. JONES:  It's relevant. |
| 02:26:28 | 13 | THE COURT:  Sustained.  Argumentative. |
| 02:26:30 | 14 | BY MR. JONES: |
| 02:26:32 | 15 | Q.  Now, you also knew when you got recruited for this probe |
| 02:26:38 | 16 | that they wanted people who were medically fit, right? |
| 02:26:42 | 17 | A.  I don't know if that came up, but I would assume yes. |
| 02:26:52 | 18 | Q.  You mean you would -- you were getting ready to go into a |
| 02:26:56 | 19 | doctor's office, and are you trying to say that nobody ever |
| 02:27:00 | 20 | said to you during the time that you were being recruited that |
| 02:27:02 | 21 | you ought to be medically fit to go into a doctor's office? |
| 02:27:06 | 22 | A.  I just don't recall that.  I don't recall any |
| 02:27:12 | 23 | conversation. |
| 02:27:12 | 24 | Q.  All right.  Well, did anybody ever say to you that you |
| 02:27:16 | 25 | were going to go into a doctor's office where you were going |

02:27:18  1  to be checked for cardiovascular problems, that you ought not

02:27:22  2  have any cardiovascular problems yourself?  Did anybody ever

02:27:28  3  say that to you?

02:27:28  4  A.  No.

02:27:28  5  Q.  And what else is that prior to this undercover probe that

02:27:36  6  you went in that you can't exactly recall when, you never were

02:27:42  7  given an examination by an FBI doctor just for this undercover

02:27:48  8  probe, were you?

02:27:50  9  A.  No, I was not.

02:27:50  10  Q.  Now, you know, the prosecutor asked you about did you have

02:28:06  11  a pre-meeting where you were given instructions.  Do you

02:28:10  12  recall that?

02:28:10  13  A.  Yes.

02:28:10  14  Q.  And you told the ladies and gentlemen of the jury that,

02:28:14  15  yeah, there was a pre-meeting where you were given

02:28:16  16  instructions, right?

02:28:16  17  A.  Yes.

02:28:16  18  Q.  And those instructions were given to you by Special Agent

02:28:24  19  Kathy Anton, right?

02:28:24  20  A.  That's correct.

02:28:24  21  Q.  And she was the group leader at that time, right?

02:28:28  22  A.  That is correct.

02:28:28  23  Q.  It was this meeting that was in the form of a briefing;

02:28:28  24  isn't that correct?

02:28:34  25  A.  That's correct.

02:28:34  1   Q.  Now, do you recall that because we have the tape recording

02:28:40  2   of that briefing that prior to your going in to see

02:28:44  3   Dr. Chhibber, Special Agent Anton asked you whether you had

02:28:48  4   had your blood pressure checked the week before.  Do you

02:28:52  5   recall that?

02:28:52  6   A.  I believe I do, yes.

02:28:54  7   Q.  And on that tape, you advised Ms. Anton that you had your

02:29:00  8   blood pressure checked twice the week before.  Do you recall

02:29:04  9   that?

02:29:04  10  A.  Yes.

02:29:04  11  Q.  And you told Ms. Anton that one of those checks had been

02:29:10  12  by a doctor.  Do you recall that?

02:29:10  13  A.  I'm not sure.  I don't recall that.

02:29:16  14  Q.  And you don't recall telling her that not only had you had

02:29:22  15  it checked by a doctor, but they were available for her if she

02:29:26  16  wanted it?  Do you recall that?

02:29:26  17  A.  I do not recall exactly what I said.

02:29:34  18  Q.  Well, here, let me play this for you and see if you tell

02:29:38  19  me if this is you and this is Kathy Anton.

02:29:42  20          MR. HAMMERMAN:  Objection, your Honor.

02:29:44  21          THE COURT:  Overruled.

02:29:44  22          MR. JONES:  Go ahead.

02:29:46  23    (Audio recording played.)

02:30:18  24  BY MR. JONES:

02:30:18  25  Q.  That's you, isn't it?

02:30:18  1  A.  Yes, sir.

02:30:20  2  Q.  And you told her that you could get those records for her

02:30:24  3  if she needed them?

02:30:26  4  A.  Yes, I did.

02:30:26  5  Q.  My very first question to you is, who was the doctor that

02:30:30  6  you allegedly went to?

02:30:32  7  A.  I don't recall.

02:30:34  8  Q.  And I bet you what else you can't recall is how --

02:30:38  9      MR. HAMMERMAN:  Objection to the form of the

02:30:38  10  question.

02:30:38  11      THE COURT:  Please, Mr. Jones.

02:30:42  12      MR. JONES:  I'm sorry, Judge.

02:30:42  13  BY MR. JONES:

02:30:42  14  Q.  In fact, you don't know how we could get those records

02:30:46  15  either, do you?

02:30:46  16      MR. HAMMERMAN:  Objection, your Honor.  There is a

02:30:48  17  motion in limine on this issue.

02:30:50  18      THE COURT:  Overruled.

02:30:50  19  BY MR. JONES:

02:30:50  20  Q.  You don't know how we could get those records, do you?

02:30:52  21  A.  No, I do not.

02:30:54  22  Q.  Has the government asked you to produce those records?

02:30:58  23      MR. HAMMERMAN:  Objection, your Honor.

02:30:58  24      THE COURT:  Overruled.

02:31:00  25      THE WITNESS:  No, they have not.

| | | |
|---|---|---|
| 02:31:00 | 1 | BY MR. JONES: |
| 02:31:00 | 2 | Q.  They haven't told you that we have asked for those |
| 02:31:02 | 3 | records? |
| 02:31:04 | 4 | MR. HAMMERMAN:  Objection, your Honor. |
| 02:31:04 | 5 | THE COURT:  Overruled. |
| 02:31:04 | 6 | BY MR. JONES: |
| 02:31:08 | 7 | Q.  You hear me, don't you? |
| 02:31:08 | 8 | A.  I'm sorry.  Repeat that again. |
| 02:31:12 | 9 | Q.  They haven't told you that we have asked for those records |
| 02:31:14 | 10 | and they say they don't have them? |
| 02:31:18 | 11 | A.  They told me that you guys seeked (sic) medical records, |
| 02:31:22 | 12 | and I have given everything -- |
| 02:31:24 | 13 | Q.  No, I am talking -- you know what I am talking about.  I |
| 02:31:26 | 14 | am talking about these records -- |
| 02:31:28 | 15 | MR. HAMMERMAN:  Objection to the form of the |
| 02:31:28 | 16 | question, your Honor.  Argumentative. |
| 02:31:30 | 17 | THE COURT:  No comments. |
| 02:31:30 | 18 | MR. JONES:  I'm sorry, Judge. |
| 02:31:32 | 19 | THE COURT:  Just ask a question. |
| 02:31:32 | 20 | BY MR. JONES: |
| 02:31:34 | 21 | Q.  Sir, you know what I mean.  Has the government asked you |
| 02:31:34 | 22 | to produce these records that I just played this tape |
| 02:31:38 | 23 | regarding? |
| 02:31:38 | 24 | A.  They have asked me for all the records that I had. |
| 02:31:42 | 25 | Q.  Wait a minute.  Listen to me.  Have they asked you for |

02:31:48   1   these records?

02:31:48   2   A.  That's a hard question to answer because they just asked

02:31:58   3   me for all my medical records, and I have given them what I

02:32:02   4   have.

02:32:02   5   Q.  And you don't happen to have these records, right?

02:32:04   6        MR. HAMMERMAN:  Objection, your Honor.

02:32:06   7        THE COURT:  Overruled.

02:32:06   8        THE WITNESS:  At this point, I don't even remember

02:32:08   9   what doctor I went to.  That was two years ago.  I can't

02:32:14   10  remember what that would have been about.

02:32:14   11  BY MR. JONES:

02:32:16   12  Q.  Even you as an FBI agent, what you are telling us is even

02:32:20   13  you have a little trouble with recollection from two years

02:32:22   14  ago.  Is that what you're telling us?

02:32:24   15  A.  Yes, sir.

02:32:24   16  Q.  Now, when you visited the clinic on February 23rd, 2010,

02:33:14   17  your vital signs were taken; is that correct?

02:33:16   18  A.  That is correct.

02:33:16   19  Q.  And at that time, your vital signs were listed as you

02:33:22   20  being five-nine and your weight 253 pounds; is that correct?

02:33:28   21  A.  That is correct.

02:33:28   22  Q.  Now, you recall that when you have mandatory physical by

02:33:32   23  the FBI in January 29th, '09, that at that time, you weighed

02:33:38   24  250 pounds; is that correct?

02:33:40   25  A.  That is correct.

02:33:40  1  Q.  And when you weighed 250 pounds, the FBI doctor told you

02:33:46  2  that you ought to lose somewhere between 50 and 70 pounds,

02:33:50  3  didn't he?

02:33:50  4  A.  That is correct.

02:33:52  5  Q.  But you didn't point -- in fact, in the interim, you

02:33:56  6  gained three pounds, right?

02:33:58  7  A.  That is correct.

02:33:58  8  Q.  Now, you got an EKG in the doctor's office; is that

02:34:08  9  correct?

02:34:08  10  A.  That's correct.

02:34:08  11  Q.  And you are aware, sir, are you not, that that EKG that

02:34:16  12  you got in the doctor's office that the government complains

02:34:22  13  about in this case --

02:34:22  14       MR. HAMMERMAN:  Object to the form of the question,

02:34:24  15  your Honor.

02:34:24  16       THE COURT:  Would you rephrase, please.

02:34:26  17       MR. JONES:  I can, Judge.

02:34:28  18  BY MR. JONES:

02:34:28  19  Q.  You are aware, sir, that the EKG that you received in the

02:34:32  20  doctor's office that day the government -- that's one of the

02:34:36  21  counts in this indictment, for giving you that EKG, right?

02:34:42  22  A.  That's correct.

02:34:42  23  Q.  You are aware, sir, are you not, that your EKG that day

02:34:48  24  registered abnormal, are you not?

02:34:48  25  A.  According to what I've seen, yes.

02:34:52  1  Q. And haven't you been told that even the government's
02:34:56  2  expert in this case finds that that EKG is abnormal?
02:35:00  3          MR. HAMMERMAN: Objection. Foundation.
02:35:02  4          THE COURT: Sustained.
02:35:04  5          MR. JONES: Well, Judge, I am only asking --
02:35:04  6  BY MR. JONES:
02:35:08  7  Q. Has the government told you anything about the experts in
02:35:10  8  this case?
02:35:10  9  A. Yes.
02:35:10  10 Q. Well, have they told you that their own expert finds that
02:35:14  11 your EKG is abnormal?
02:35:16  12 A. No.
02:35:16  13 Q. But, of course, when you were told that your EKG was
02:35:24  14 abnormal, sir, that didn't come as a surprise to you, did it?
02:35:30  15 A. I was not told that my EKG was abnormal by the government.
02:35:34  16 Q. Well, didn't you have, on March 11th, 2010 -- 2011, I'm
02:35:48  17 sorry. On March 11th, 2011, did you have a conversation with
02:35:54  18 Special Agent Roelofs, who sits at this table here?
02:36:02  19 A. I don't remember the date, but I had several conversations
02:36:06  20 with her.
02:36:06  21 Q. Well, do you recall on that date having a conversation
02:36:08  22 with her where she asked you, where she told you that your EKG
02:36:12  23 had registered an abnormal spike?
02:36:16  24 A. According to the EKG that they got from Dr. Chhibber, yes.
02:36:20  25 Q. And she told you that, right?

02:36:22   1   A.  Correct.

02:36:22   2   Q.  In fact, on that day that you had that conversation with

02:36:26   3   her, didn't you tell Special Agent Roelofs that you had had

02:36:36   4   two bureau physicals in January and April that same year and

02:36:42   5   both showed the same abnormal spike as on Dr. Chhibber's EKG?

02:36:46   6   Didn't you tell Special Agent Roelofs that?

02:36:50   7   A.  I don't recall that, sir.

02:36:52   8   Q.  Well, are you aware that on that date, Special Agent

02:37:00   9   Roelofs said just what I read?

02:37:02  10          MR. HAMMERMAN:  Object to the form of the question.

02:37:04  11   Hearsay and already answered.

02:37:04  12          THE COURT:  Sustained.  Sustained.

02:37:06  13   BY MR. JONES:

02:37:06  14   Q.  Are you aware that the contents of your conversation with

02:37:10  15   Special Agent Roelofs were immediately reported to the United

02:37:14  16   States Attorney's Office?

02:37:16  17          MR. HAMMERMAN:  Objection to the form of the

02:37:16  18   question, foundation.

02:37:18  19          THE COURT:  Well, it's a foundational question.  The

02:37:22  20   question is are you aware?

02:37:24  21          MR. JONES:  Yes.

02:37:24  22          THE COURT:  All right.

02:37:26  23   BY MR. JONES:

02:37:26  24   Q.  Are you aware of that?

02:37:26  25   A.  No, I'm not.

| | | |
|---|---|---|
| 02:37:28 | 1 | Q.  Well, let me show you this, which has been marked as |
| 02:37:32 | 2 | Defendant's Exhibit 36, which purports to be -- |
| 02:37:36 | 3 | MR. HAMMERMAN:  Objection, your Honor. |
| 02:37:36 | 4 | THE COURT:  All right. |
| 02:37:38 | 5 | MR. JONES:  That would be hearsay, and Agent -- |
| 02:37:38 | 6 | THE COURT:  Well, it's a foundational question.  I am |
| 02:37:42 | 7 | just going to ask Mr. Jones, don't characterize the contents. |
| 02:37:46 | 8 | It's not in evidence. |
| 02:37:46 | 9 | BY MR. JONES: |
| 02:37:48 | 10 | Q.  All right.  Let me show you Defendant's Exhibit 36, which |
| 02:37:50 | 11 | purports to be a summary of your conversation with Special |
| 02:38:02 | 12 | Agent Anton.  I want you to read that. |
| 02:38:22 | 13 | A.  Okay.  I read it. |
| 02:38:22 | 14 | Q.  Well, are you aware of the contents of this email from |
| 02:38:26 | 15 | Special Agent Anton? |
| 02:38:26 | 16 | MR. HAMMERMAN:  Object to the form of the question. |
| 02:38:30 | 17 | THE COURT:  Sustained.  Sustained as to form. |
| 02:38:32 | 18 | BY MR. JONES: |
| 02:38:32 | 19 | Q.  Have you ever seen this email before? |
| 02:38:34 | 20 | A.  Not until just now. |
| 02:38:36 | 21 | Q.  And are you trying to tell me that -- well, I guess then |
| 02:38:46 | 22 | you don't recall telling Special Agent Anton that you have had |
| 02:38:52 | 23 | two previous bad spikes? |
| 02:38:54 | 24 | MR. HAMMERMAN:  Object to the form of the question. |
| 02:38:54 | 25 | THE COURT:  Overruled. |

02:38:56  1  BY MR. JONES:

02:38:58  2  Q.  Do you understand my question?

02:38:58  3  A.  Yes.

02:38:58  4  Q.  What's the answer?

02:39:00  5  A.  I don't recall.

02:39:02  6  Q.  Telling her that.

02:39:04  7  A.  No, I do not.

02:39:04  8  Q.  Well, you know, let me ask you something about FBI

02:39:06  9  procedure.  When FBI agents write things down, that's very

02:39:14  10  serious, isn't it?

02:39:14  11  A.  Yes, it is.

02:39:14  12  Q.  In fact, it's the kind of seriousness that once you write

02:39:20  13  something down and people don't tell you the truth, they can

02:39:24  14  be indicted; isn't that right?

02:39:26  15      MR. HAMMERMAN:  Objection, your Honor.

02:39:28  16      THE COURT:  Sustained.

02:39:28  17  BY MR. JONES:

02:39:30  18  Q.  Well, you expect that when a special agent writes

02:39:36  19  something down, do you not, that it's truthful?

02:39:40  20  A.  Yes.

02:39:42  21  Q.  Now, do you recall that when you were being briefed by

02:40:08  22  Special Agent Anton that she told you that Dr. Chhibber,

02:40:16  23  according to the other agents who had gone in, had been quite

02:40:20  24  engaging?  Do you remember that?

02:40:20  25  A.  I don't recall.

02:40:22   1   Q.  Do you recall -- you don't recall that Special Agent Anton

02:40:28   2   said, look, He'll talk to you?  You don't recall that?

02:40:30   3   A.  No, I do not.

02:40:34   4        MR. JONES:  Play it.

02:40:36   5        MR. HAMMERMAN:  Objection your Honor.  It's not in

02:40:38   6   evidence.

02:40:38   7        THE COURT:  Overruled.

02:40:42   8     (Audio recording played.)

02:41:02   9   BY MR. JONES:

02:41:04  10   Q.  That's Special Agent Anton talking to you, right?

02:41:06  11   A.  Yes, sir.

02:41:08  12   Q.  And what she says to you is that he'll gladly talk to you.

02:41:10  13   Isn't that what she said?

02:41:12  14   A.  Yes, she did.

02:41:12  15   Q.  And during the course -- we've seen here that during the

02:41:22  16   course of the tape recording that the doctor talks to you

02:41:26  17   about the EKG, doesn't he?

02:41:28  18   A.  Yes, leading up to it, he does.

02:41:32  19   Q.  Yeah.  And he wants you to have the EKG.  You remember

02:41:34  20   that?

02:41:36  21   A.  Yes.

02:41:36  22   Q.  And at that point, sir, you could have asked him any

02:41:40  23   question that you wanted to; isn't that true?

02:41:44  24   A.  That is true.

02:41:44  25   Q.  You could have asked him, including, Doctor, tell me why

02:41:52   1   you want me to have the EKG?  You could have done that,

02:41:54   2   couldn't you?

02:41:56   3   A.  I could have.

02:41:58   4   Q.  But you know what?  You chose not to do it here; isn't

02:41:58   5   that correct?

02:42:02   6   A.  I relied on his expertise.

02:42:04   7   Q.  I didn't ask you that.

02:42:06   8          MR. HAMMERMAN:  Objection.  Argumentative, your

02:42:08   9   Honor.

02:42:08  10          MR. JONES:  No, I asked him a simple question, Judge.

02:42:08  11   BY MR. JONES:

02:42:12  12   Q.  You chose not to do it?

02:42:10  13          THE COURT:  Objection is overruled.

02:42:14  14          Now, when there is an objection, would you hold off?

02:42:16  15   Okay.

02:42:16  16          MR. JONES:  I'm sorry, Judge.

02:42:16  17   BY MR. JONES:

02:42:16  18   Q.  You chose not to do it, didn't you?

02:42:18  19   A.  I chose not to.

02:42:20  20   Q.  In fact, you know, normally, when the FBI -- you have been

02:42:24  21   an FBI agent for 10 years, and you go out on various probes

02:42:30  22   and you go to people's houses and all that; normally, what you

02:42:34  23   want people to do is to talk their heads off, don't you?

02:42:36  24   A.  That is correct.

02:42:38  25   Q.  You want them to talk themselves into the penitentiary;

02:42:42　1　isn't that right?

02:42:44　2　A.　No.

02:42:44　3　Q.　Well, but you know what?　On this particular case with

02:42:50　4　Dr. Chhibber, you chose not to do that, right?

02:42:54　5　A.　I chose to?

02:42:56　6　Q.　Not to ask him any questions.

02:43:00　7　A.　Yes, I chose not to ask him questions.

02:43:02　8　Q.　And the reason you chose to forego the opportunity to seek

02:43:06　9　the answers out of the doctor's own mouth was that your

02:43:10　10　investigation was not a search for the truth, was it?

02:43:14　11　　　　　MR. HAMMERMAN:　Object to the form of the question,

02:43:14　12　your Honor.

02:43:16　13　　　　　THE COURT:　Sustained.

02:43:16　14　BY MR. JONES:

02:43:18　15　Q.　You did not, sir -- the sole purpose of your investigation

02:43:22　16　was to try to set the doctor up, wasn't it?

02:43:24　17　　　　　MR. HAMMERMAN:　Objection to the form of the

02:43:26　18　question, your Honor.

02:43:26　19　　　　　THE COURT:　Sustained.

02:43:26　20　BY MR. JONES:

02:43:30　21　Q.　Well, you know, we talked about that pre-interview that

02:43:36　22　you had with Kathy Anton.　I want to ask you this, do you

02:43:40　23　remember this.　Do you remember that Special Agent Anton told

02:43:44　24　you, Special Agent, that if you didn't screw up the interview

02:43:52　25　with Dr. Chhibber, you would be a star?　Do you remember that?

02:43:56    1      MR. HAMMERMAN:  Objection, your Honor.

02:43:58    2      THE COURT:  Overruled.

02:43:58    3   BY MR. JONES:

02:44:00    4   Q.  Do you remember that?

02:44:00    5   A.  I don't.

02:44:02    6      MR. JONES:  Play it.

02:44:10    7   BY MR. JONES:

02:44:10    8   Q.  And, incidentally, she didn't use the words "screw up,"

02:44:14    9   but play it.

02:44:14   10      (Audio recording played.)

02:44:22   11   BY MR. JONES:

02:44:22   12   Q.  That's you, isn't it?  And that's Special Agent Kathy

02:44:26   13   Anton, isn't it?

02:44:28   14   A.  Yes, it is.

02:44:28   15   Q.  Now, what she meant by your being a star was to get a

02:44:38   16   feather in your cap by getting a conviction; isn't that what

02:44:40   17   she meant?

02:44:42   18      MR. HAMMERMAN:  Objection as to foundation as to what

02:44:44   19   Anton thought.

02:44:44   20      THE COURT:  Sustained as to the form of the question.

02:44:46   21   BY MR. JONES:

02:44:46   22   Q.  Isn't that what you believed that she meant?

02:44:48   23      MR. HAMMERMAN:  Objection.  Relevancy.

02:44:50   24      THE COURT:  Overruled.

02:44:52   25   BY MR. JONES:

02:44:52   1   Q.  Isn't that what you believed what she meant?

02:44:54   2   A.  No.

02:44:56   3   Q.  Well, how else were you going to be a star?  Tell the

02:45:00   4   ladies and gentlemen of the jury how else you were going to be

02:45:02   5   a star.

02:45:02   6   A.  Agents aren't stars.  As an undercover, I have never been

02:45:08   7   a star in a case.

02:45:10   8   Q.  And, incidentally, when she tells you that if you don't

02:45:12   9   fuck this up, you could be a star, you don't say that to her,

02:45:14  10   do you?  You just laugh and smile, don't you?

02:45:18  11         MR. HAMMERMAN:  Objection.  Relevance, your Honor.

02:45:18  12         THE COURT:  Overruled.

02:45:22  13   BY MR. JONES:

02:45:32  14   Q.  Now, they talked to you on direct examination about this.

02:45:38  15   One of the things that Special Agent Anton told you not to do

02:45:44  16   was to get any blood work, right?

02:45:46  17   A.  That's correct.

02:45:46  18   Q.  And she told you if they ask you for any blood work, just

02:45:50  19   make up something.  Isn't that what she told you?

02:45:52  20   A.  I can't remember if she directed me as to what to say, but

02:45:56  21   she told me not to get any blood work.

02:46:00  22   Q.  And the reason she didn't want you to get any blood work

02:46:02  23   was that if you got any blood work, you might come up with the

02:46:06  24   kind of exculpatory evidence that would help the doctor; isn't

02:46:10  25   that right?

02:46:10   1   MR. HAMMERMAN: Objection. Foundation. Form of the

02:46:12   2   question.

02:46:12   3   THE COURT: Sustained as to form.

02:46:14   4   BY MR. JONES:

02:46:14   5   Q. Well, let me put it to you this way. It was the FBI's

02:46:24   6   belief that if you got blood work, it might give exculpatory

02:46:30   7   evidence; isn't that right?

02:46:32   8   MR. HAMMERMAN: Objection, your Honor.

02:46:32   9   THE COURT: Sustained.

02:46:32   10   BY MR. JONES:

02:46:34   11   Q. Well, why don't you tell us why the FBI didn't want you to

02:46:36   12   have blood work.

02:46:38   13   A. It's intrusive. As an undercover, the FBI tries not to

02:46:44   14   put us in positions that overly intrudes upon us. Just like

02:46:46   15   when I do dope undercover, I don't go smoke dope. In this

02:46:50   16   case, I was just told to not get any intrusive checks.

02:46:54   17   Q. In fact, she didn't tell you intrusive. She just told you

02:46:58   18   not to get any blood work. She didn't use the word

02:47:02   19   "intrusive," did she?

02:47:02   20   A. Not at this instance, no.

02:47:04   21   Q. What do you mean not -- certainly not when she was giving

02:47:06   22   you the briefing on tape, she didn't use the word "intrusive,"

02:47:10   23   did she?

02:47:10   24   A. Not on tape.

02:47:10   25   Q. And are you trying to equate for the ladies and gentlemen

02:47:18  1  of the jury that getting a little blood done was like smoking

02:47:22  2  dope?  Is that what you want us to believe?

02:47:26  3  A.  I followed the instructions.

02:47:28  4  Q.  Now, the prosecutor asked you about the EKG.  Do you

02:48:00  5  recall that?

02:48:00  6  A.  Yes, I do.

02:48:00  7  Q.  Now, the truth of the matter is that you were interviewed

02:48:08  8  on March 11th by Special Agent Roelofs, who sits at the table,

02:48:16  9  and didn't she ask you about your recollections about what

02:48:24  10  happened with you and the doctor and the EKG?  Do you recall

02:48:32  11  that?

02:48:32  12  A.  Yes, we had a conversation that day.  I don't remember all

02:48:36  13  the impacts of the conversation.

02:48:36  14  Q.  Do you recall Special Agent Roelofs writing in an FBI 302

02:48:42  15  or asking you and you said --

02:48:44  16      MR. HAMMERMAN:  Objection to the form of the

02:48:46  17  question, your Honor.  Counsel is reading a 302 again.

02:48:50  18      THE COURT:  That objection is overruled.

02:48:52  19  BY MR. JONES:

02:48:52  20  Q.  Do you recall Special Agent Roelofs -- you telling Special

02:49:02  21  Agent Roelofs that you were unable to recall whether

02:49:04  22  Dr. Chhibber reviewed the results of the EKG?  Do you remember

02:49:08  23  that?

02:49:08  24  A.  I don't recall the details of our conversation from a

02:49:14  25  year, two years ago.

02:49:14   1   Q.  Well, maybe if I showed you her FBI 302, that would help?

02:49:22   2   A.  Yes, sir.

02:49:22   3   Q.  And you know what an FBI 302 is, right?

02:49:28   4   A.  Yes, I do.

02:49:28   5   Q.  That's a report that's written out by a special agent

02:49:34   6   after they have had an opportunity to interview a witness,

02:49:38   7   right?

02:49:38   8   A.  That's correct.

02:49:40   9   Q.  And if you lie to an FBI agent who puts out the 302, go to

02:49:44  10   jail, right?

02:49:44  11        MR. HAMMERMAN:  Objection.  Relevance, your Honor.

02:49:46  12        THE COURT:  Sustained as to the form of the question.

02:49:48  13   BY MR. JONES:

02:49:48  14   Q.  You have to tell an agent, even you as an FBI agent, you

02:49:52  15   have to tell another agent the truth; isn't that right?

02:49:56  16   A.  Correct.

02:49:56  17   Q.  Now, does that refresh your recollection as to what you

02:50:00  18   told Special Agent Roelofs?

02:50:02  19   A.  Yes, it does.

02:50:04  20   Q.  And the question I just asked you was, didn't you tell

02:50:08  21   Special Agent Roelofs that you couldn't remember whether

02:50:12  22   Dr. Chhibber had the EKG -- wait a minute.

02:50:16  23        First of all, did you put you were unable to recall

02:50:18  24   whether Dr. Chhibber reviewed the results of the EKG?  That's

02:50:22  25   what you told her, right?

02:50:24    1   A.  Yes, at that time.  I did not recall.

02:50:26    2   Q.  All right.  And you also told her when she asked you that

02:50:30    3   you did not remember whether Dr. Chhibber had the EKG results

02:50:34    4   in his hand as you spoke to him.  Isn't that what you told

02:50:40    5   her?

02:50:42    6   A.  At that time, I couldn't recall, so, yes.

02:50:44    7   Q.  Incidentally, your recorder worked that day; is that

02:51:06    8   correct?

02:51:06    9   A.  That's correct.

02:51:06   10   Q.  Now, before you walked into the office, had you been told

02:51:12   11   that there had been two prior occasions where the tape

02:51:14   12   recorders of other agents had not worked?

02:51:16   13           MR. HAMMERMAN:  Objection.  Relevance.

02:51:18   14           THE COURT:  Would you rephrase, please.

02:51:22   15   BY MR. JONES:

02:51:24   16   Q.  Did you know whether -- had you been -- were you aware in

02:51:28   17   any fashion that the tape recorders of two other agents had

02:51:32   18   failed?

02:51:34   19   A.  I don't remember.  I do know that there were some tape

02:51:38   20   recording failure, but I don't know if I learned that before

02:51:40   21   or after I did this recording.

02:51:40   22   Q.  Did they take special precautions with you to make sure

02:51:44   23   that the tape did not fail?

02:51:46   24   A.  I don't know what precautions they took.  I didn't handle

02:51:50   25   -- I was just handed the device.

02:52:04  1    MR. JONES:  May I have a moment, Judge?
02:52:06  2    THE COURT:  Yes.
02:52:08  3    (Brief pause.)
02:52:56  4    MR. JONES:  Judge, you know, my last thing would be,
02:53:00  5    you recall the motion at sidebar, we wanted a certain
02:53:04  6    portion --
02:53:04  7    THE COURT:  Yes.
02:53:06  8    MR. JONES:  -- played with our version?
02:53:06  9    THE COURT:  Yes.  Go ahead.
02:53:10  10   MR. JONES:  All right.
02:53:24  11   THE COURT:  Members of the jury, when the recording
02:53:26  12   was played before, you recall I said there was some difference
02:53:30  13   of opinion about the transcript itself and it's what you hear,
02:53:34  14   not what you see in the transcript, that counts.
02:53:38  15   MR. HAMMERMAN:  Your Honor, may I at least inquire of
02:53:40  16   Mr. Jones what he is going to play?
02:53:42  17   THE COURT:  Would you talk privately, please.
02:53:46  18   MR. HAMMERMAN:  Thank you, your Honor.
02:53:54  19   Your Honor, may we have a sidebar?
02:53:54  20   (Whereupon, the following further proceedings were had at
02:54:14  21   sidebar, out of the hearing of the jury:)
02:54:14  22   MR. HAMMERMAN:  Your Honor, counsel for Mr. Chhibber
02:54:18  23   has just informed me they intend to play the entire 14 minutes
02:54:22  24   of a totally new transcript without identifying for the
02:54:24  25   government the portion of the transcript they think is

02:54:26  1   inaccurate.  We have no idea why they are now going to suggest

02:54:30  2   to the jury that the entire transcript is inaccurate.

02:54:32  3         Mr. Jones has not pointed to a single portion of this

02:54:34  4   transcript that he thinks is wrong, and I think the impression

02:54:38  5   that is left with the jury is that, once again, the

02:54:40  6   government, consistent with some of the questions Mr. Jones

02:54:44  7   has asked, is trying to deceive.  I think it would be

02:54:48  8   incredibly unfair to do this, 14-minute replaying of this

02:54:54  9   entire transcript.

02:54:54  10        MR. JONES:  You know, Judge, what I want to do with

02:54:56  11  this is -- you know what?  If we can recall this witness at a

02:55:06  12  later time, I might see if I can truncate the whole thing.

02:55:10  13        THE COURT:  Yes.

02:55:12  14        MR. JONES:  It seems like --

02:55:14  15        THE COURT:  Yes.  Let's do that.

02:55:14  16        MR. HAMMERMAN:  Thank you, your Honor.

02:55:16  17        MR. JONES:  Incidentally, one thing.  One thing,

02:55:20  18  Judge, while we are here.  Obviously, as your Honor knows, we

02:55:34  19  whipped through jury selection today.

02:55:36  20        THE COURT:  It was admirable.

02:55:40  21        MR. JONES:  I thought you would think that.  What

02:55:42  22  happens is, admirably, he told us last night who three

02:55:48  23  witnesses were.  I was just wondering if we get through those

02:55:50  24  three, this will be the only day we ask this, Judge, the

02:55:56  25  court's indulgence, to quit after those three.

| | | |
|---|---|---|
| 02:55:58 | 1 | THE COURT:  No. |
| 02:56:00 | 2 | MR. JONES:  In a word, no.  Okay. |
| 02:56:14 | 3 | (The following proceedings were had in open court in the |
| 02:56:16 | 4 | presence and hearing of the jury:) |
| 02:56:16 | 5 | MR. JONES:  I don't have any further questions, |
| 02:56:18 | 6 | Judge. |
| 02:56:18 | 7 | THE COURT:  Any redirect? |
| 02:56:20 | 8 | MR. HAMMERMAN:  Yes, your Honor. |
| 02:56:42 | 9 | - - - |
| 02:56:42 | 10 | DENNARIS TERRELL COLEMAN, REDIRECT EXAMINATION |
| 02:56:42 | 11 | BY MR. HAMMERMAN: |
| 02:56:44 | 12 | Q.  Special Agent Coleman, I have a few questions for you.  Do |
| 02:56:46 | 13 | you remember the questions that Mr. Jones was asking you about |
| 02:56:48 | 14 | the need to put a feather in your cap?  Do you remember that? |
| 02:56:52 | 15 | A.  Yes. |
| 02:56:52 | 16 | Q.  How long have you been an FBI agent, sir? |
| 02:56:56 | 17 | A.  Ten years. |
| 02:56:56 | 18 | Q.  How long have you been doing undercover work? |
| 02:56:58 | 19 | A.  The entire 10 years. |
| 02:57:00 | 20 | Q.  And during that entire 10 years that you have been doing |
| 02:57:02 | 21 | undercover work, how often do you do undercover work?  Weekly, |
| 02:57:06 | 22 | monthly? |
| 02:57:08 | 23 | A.  Weekly, at times. |
| 02:57:08 | 24 | Q.  And you are a member of violent crimes squad number 2? |
| 02:57:14 | 25 | A.  I am. |

| | | |
|---|---|---|
| 02:57:16 | 1 | Q.  And you said before that you do work with gang and drugs |
| 02:57:18 | 2 | and violent crimes? |
| 02:57:20 | 3 | MR. JONES:  Judge, I am going to object. |
| 02:57:22 | 4 | THE COURT:  Sustained.  Improper redirect. |
| 02:57:24 | 5 | BY MR. HAMMERMAN: |
| 02:57:26 | 6 | Q.  Did you need a feather in your cap, Special Agent Coleman? |
| 02:57:28 | 7 | A.  No, I did not. |
| 02:57:28 | 8 | Q.  Mr. Jones asked you a lot of questions about your |
| 02:57:36 | 9 | conversation with Special Agent Anton before you went in to |
| 02:57:40 | 10 | that meeting.  Do you remember those questions? |
| 02:57:42 | 11 | A.  Yes, sir. |
| 02:57:42 | 12 | Q.  Just so it's clear, you had said you had a physical and |
| 02:57:48 | 13 | your blood pressure done; is that right? |
| 02:57:50 | 14 | A.  That's correct. |
| 02:57:50 | 15 | Q.  All right.  Is it your understanding that your medical |
| 02:57:52 | 16 | records were requested by the defense? |
| 02:57:56 | 17 | A.  Yes. |
| 02:57:56 | 18 | Q.  And did you consent to have those turned over? |
| 02:58:00 | 19 | A.  Yes, I did. |
| 02:58:00 | 20 | Q.  Did you -- in fact, when you went in to Dr. Chhibber's |
| 02:58:06 | 21 | office, did you receive an EKG? |
| 02:58:08 | 22 | A.  I did. |
| 02:58:08 | 23 | Q.  Did Dr. Chhibber -- I think Mr. Jones asked you a lot of |
| 02:58:12 | 24 | questions about the questions you could ask Dr. Chhibber about |
| 02:58:14 | 25 | why you were getting an EKG.  Do you remember those questions? |

02:58:16  1   A.  I do.

02:58:18  2   Q.  Did Dr. Chhibber ever tell you why you were getting an

02:58:20  3   EKG?

02:58:20  4   A.  No, he did not.

02:58:22  5   Q.  I am going to show you a record out of Dr. Chhibber's

02:58:32  6   medical file for Terrell Cole.  Do you see that, sir?

02:58:44  7   A.  I do.

02:58:46  8   Q.  This is a progress note.  It's a chart inside of your

02:58:54  9   Terrell Cole file.  Do you see that?

02:58:54 10   A.  I do.

02:58:54 11   Q.  When we go down to the diagnosis section, do you see that

02:58:58 12   right there?

02:58:58 13   A.  I do.

02:59:00 14   Q.  Did Dr. Chhibber tell you you had a heart murmur?

02:59:06 15        MR. JONES:  Judge, wait a minute.  I object.

02:59:06 16        THE COURT:  Sustained.  Sustained.  All right.

02:59:10 17   Control yourself, Mr. Jones.

02:59:12 18   BY MR. HAMMERMAN:

02:59:14 19   Q.  Mr. Jones asked you about whether you learned what the

02:59:20 20   results of that tests were.  Do you remember those questions?

02:59:22 21   A.  Yes.

02:59:22 22   Q.  He asked you whether as a result of that EKG, you were

02:59:26 23   told that you had to undergo any additional examination?

02:59:34 24        MR. JONES:  Objection.  Never asked that question.

02:59:36 25        THE COURT:  Sustained.

02:59:38  1     MR. HAMMERMAN:  I will rephrase, your Honor.

02:59:40  2   BY MR. HAMMERMAN:

02:59:40  3   Q.  He asked you whether or not you had learned whether the

02:59:44  4   EKG showed I think he called it a spike.  Do you remember that

02:59:46  5   question?

02:59:46  6   A.  Yes.

02:59:48  7   Q.  I am going to show you -- once again, this is a printout.

02:59:56  8   It looks like a chart with some lines squiggling across there.

03:00:00  9   Do you see the name in the upper left-hand corner?

03:00:02  10  A.  Yes, I do.

03:00:04  11  Q.  Do you see the name Terrell Cole?

03:00:06  12  A.  Yes, I do.

03:00:06  13  Q.  Do you see here where it says on the top, Abnormal EKG?

03:00:14  14  A.  Yes, I do.

03:00:14  15  Q.  Did Dr. Chhibber, after you received the EKG, say,

03:00:20  16  Mr. Cole, we need to talk, you had an abnormal EKG?

03:00:24  17  A.  No, he did not.

03:00:24  18  Q.  Did he tell you that there had been an abnormal spike in

03:00:28  19  your EKG report?

03:00:30  20  A.  No, he did not.

03:00:32  21  Q.  Did he suggest to you that abnormalities in an EKG report

03:00:36  22  could be the sign of a serious medical condition?

03:00:40  23  A.  No, he did not.

03:00:42  24  Q.  Did he tell you that you needed any further testing for

03:00:44  25  your abnormal EKG?

| | | |
|---|---|---|
| 03:00:48 | 1 | A.  No, he did not. |
| 03:00:48 | 2 | Q.  Did he tell you that he wanted to send to you a specialist |
| 03:00:52 | 3 | to look into that heart murmur and your abnormal EKG? |
| 03:00:56 | 4 | A.  No, he did not. |
| 03:00:58 | 5 | Q.  Did he give you any instructions regarding physical |
| 03:01:00 | 6 | activity? |
| 03:01:02 | 7 | A.  No, he did not. |
| 03:01:02 | 8 | Q.  Did he give you any instructions over diet? |
| 03:01:06 | 9 | A.  No, he did not. |
| 03:01:06 | 10 | Q.  Did he tell you that he wanted to see you again in 30 |
| 03:01:08 | 11 | days? |
| 03:01:08 | 12 | A.  No, he did not. |
| 03:01:10 | 13 | Q.  Did he want to take your blood pressure again? |
| 03:01:12 | 14 | A.  No, he did not. |
| 03:01:14 | 15 | Q.  Did he tell you he needed to further his examination? |
| 03:01:20 | 16 | A.  No, he did not. |
| 03:01:20 | 17 | Q.  Did he tell you instead that everything was good and you |
| 03:01:24 | 18 | were perfect? |
| 03:01:24 | 19 | A.  He did. |
| 03:01:24 | 20 | Q.  There were some questions that Mr. Jones asked about you |
| 03:01:30 | 21 | having a conversation with Special Agent Roelofs and that she |
| 03:01:34 | 22 | showed you an email.  Do you remember those questions? |
| 03:01:38 | 23 | A.  Yes, I do. |
| 03:01:38 | 24 | Q.  At the time that you had that conversation with Special |
| 03:01:42 | 25 | Agent Roelofs, were you listening to the audio clips from your |

| | | |
|---|---|---|
| 03:01:46 | 1 | meeting at the time? |
| 03:01:46 | 2 | MR. JONES: Judge, leading, subjective. |
| 03:01:50 | 3 | THE COURT: Sustained. |
| 03:01:50 | 4 | BY MR. HAMMERMAN: |
| 03:01:52 | 5 | Q. At the time you met with Special Agent Roelofs, did she |
| 03:01:56 | 6 | show you any evidence? |
| 03:01:56 | 7 | A. No, she did not. |
| 03:01:58 | 8 | Q. Did she play you any evidence? |
| 03:02:02 | 9 | A. No, she did not. |
| 03:02:02 | 10 | Q. Had you reviewed the audio clips at any time in the |
| 03:02:04 | 11 | immediate proximity of that conversation? |
| 03:02:06 | 12 | A. No, I had not. |
| 03:02:06 | 13 | Q. Have you listened to the audio clips after that? |
| 03:02:08 | 14 | MR. JONES: Judge, I am going to object. |
| 03:02:10 | 15 | THE COURT: Sustained. |
| 03:02:12 | 16 | BY MR. HAMMERMAN: |
| 03:02:12 | 17 | Q. Have you listened to the audio clips in advance of your |
| 03:02:14 | 18 | testimony today? |
| 03:02:16 | 19 | A. Yes, I have. |
| 03:02:16 | 20 | Q. Does listening to audio of your meeting with Dr. Chhibber |
| 03:02:20 | 21 | help refresh your recollection over what the conversations |
| 03:02:22 | 22 | were between you and Dr. Chhibber? |
| 03:02:24 | 23 | MR. JONES: Judge, I would object to the form of |
| 03:02:26 | 24 | these questions. |
| 03:02:26 | 25 | THE COURT: Sustained. |

| | | |
|---|---|---|
| 03:02:26 | 1 | BY MR. HAMMERMAN: |
| 03:02:28 | 2 | Q.  Do you have a better recollection today having reviewed |
| 03:02:32 | 3 | those audio clips? |
| 03:02:34 | 4 | MR. JONES:  Judge, object. |
| 03:02:34 | 5 | THE COURT:  Overruled. |
| 03:02:36 | 6 | MR. JONES:  Better recollection as to what? |
| 03:02:38 | 7 | THE COURT:  Overruled. |
| 03:02:40 | 8 | THE WITNESS:  Yes, I do. |
| 03:02:40 | 9 | BY MR. HAMMERMAN: |
| 03:02:42 | 10 | Q.  At the time that Dr. Chhibber -- let me rephrase the |
| 03:02:48 | 11 | question. |
| 03:02:48 | 12 | After you had the EKG, at the time you had that EKG, |
| 03:02:58 | 13 | did Dr. Chhibber tell you that you were in good and perfect |
| 03:03:02 | 14 | health? |
| 03:03:02 | 15 | A.  Yes, he did. |
| 03:03:04 | 16 | MR. HAMMERMAN:  No further questions, your Honor. |
| 03:03:06 | 17 | THE COURT:  Anything further? |
| 03:03:06 | 18 | MR. JONES:  I do have a couple, Judge. |
| 03:03:08 | 19 | - - - |
| 03:03:08 | 20 | DENNARIS TERRELL COLEMAN, RECROSS-EXAMINATION |
| 03:03:08 | 21 | BY MR. JONES: |
| 03:03:08 | 22 | Q.  Wait a minute.  Special Agent, Special Agent Kathy -- I |
| 03:03:16 | 23 | mean Ms. Roelofs, Special Agent Roelofs talked to you on |
| 03:03:20 | 24 | March 11th, you couldn't remember any questions about -- you |
| 03:03:26 | 25 | couldn't remember any interaction you had with Dr. Chhibber |

| | | |
|---|---|---|
| 03:03:30 | 1 | about the EKG; isn't that true? |
| 03:03:32 | 2 | A.  That's correct. |
| 03:03:34 | 3 | Q.  And you knew that when Special Agent Roelofs was asking |
| 03:03:38 | 4 | you these questions that these were going to go into an FBI |
| 03:03:42 | 5 | 302.  You knew that, didn't you? |
| 03:03:44 | 6 | A.  No, I did not. |
| 03:03:46 | 7 | Q.  Did you think she was just asking these questions for her |
| 03:03:50 | 8 | health? |
| 03:03:50 | 9 | A.  No, I did not. |
| 03:03:50 | 10 | MR. HAMMERMAN:  Object to the form of the question, |
| 03:03:52 | 11 | your Honor. |
| 03:03:52 | 12 | THE COURT:  Overruled. |
| 03:03:52 | 13 | BY MR. JONES: |
| 03:03:54 | 14 | Q.  You knew that Special Agent Roelofs was writing 302s |
| 03:03:56 | 15 | regarding this case, didn't you? |
| 03:03:58 | 16 | A.  Regarding this case, but not that conversation in |
| 03:04:02 | 17 | particular. |
| 03:04:02 | 18 | Q.  And so when she asked you those questions -- and, of |
| 03:04:04 | 19 | course, March 11th, 2011, is a whole lot closer to the |
| 03:04:10 | 20 | incident than today; isn't that true? |
| 03:04:12 | 21 | A.  That's true. |
| 03:04:12 | 22 | Q.  And it is true, sir, that you set up a return visit with |
| 03:04:28 | 23 | Dr. Chhibber but you never went to that return visit; isn't |
| 03:04:32 | 24 | that right? |
| 03:04:32 | 25 | MR. HAMMERMAN:  Objection, your Honor.  Beyond |

03:04:34  1  redirect.

03:04:34  2         MR. JONES:  Judge, he --

03:04:36  3         THE COURT:  Overruled.

03:04:36  4  BY MR. JONES:

03:04:36  5  Q.  You set up a return visit, and you didn't come back,

03:04:40  6  right?

03:04:40  7  A.  I don't recall that.

03:04:42  8  Q.  And let's just say this.  If you didn't come back to

03:04:46  9  Dr. Chhibber, there would be no way that Dr. Chhibber could

03:04:50  10  tell you about your abnormal spike in your EKG; is that

03:04:54  11  correct?

03:04:54  12        MR. HAMMERMAN:  Object to the form of the question.

03:04:56  13        THE COURT:  Sustained.

03:04:56  14  BY MR. JONES:

03:04:58  15  Q.  Have you had conversations with the government expert in

03:05:04  16  this case about your abnormal spikes?

03:05:06  17        MR. HAMMERMAN:  Asked and answered, your Honor.

03:05:08  18  Objection.

03:05:08  19        THE COURT:  Sustained.

03:05:08  20        MR. JONES:  I don't have anything further, Judge.

03:05:12  21        Wait, whoa, whoa, whoa.  Wait a minute.  Whoa.  Hold

03:05:16  22  on one second.

03:05:32  23  BY MR. JONES:

03:05:32  24  Q.  In fact, when you went in to see Dr. Chhibber, you gave a

03:05:34  25  phony name, right?

| | | |
|---|---|---|
| 03:05:36 | 1 | A.  That is correct. |
| 03:05:36 | 2 | Q.  Phony address, right? |
| 03:05:38 | 3 | A.  That is correct. |
| 03:05:40 | 4 | Q.  So if he even tried to contact you, it would be through |
| 03:05:44 | 5 | that phony name and phony address; is that correct? |
| 03:05:46 | 6 | A.  That would be false.  The number I gave him was correct. |
| 03:05:50 | 7 | Q.  What number was that? |
| 03:05:50 | 8 | A.  That was my cell phone number that's on the paperwork, and |
| 03:05:54 | 9 | he did not call me. |
| 03:05:54 | 10 | Q.  Well, you don't know what happened with respect to your |
| 03:05:56 | 11 | address, do you? |
| 03:05:56 | 12 | A.  I do not. |
| 03:05:58 | 13 | Q.  All right. |
| 03:06:02 | 14 | MR. JONES:  I don't have anything further, Judge. |
| 03:06:04 | 15 | THE COURT:  Anything else? |
| 03:06:06 | 16 | - - - |
| 03:06:06 | 17 | DENNARIS TERRELL COLEMAN, REDIRECT EXAMINATION |
| 03:06:06 | 18 | BY MR. HAMMERMAN: |
| 03:06:06 | 19 | Q.  Special Agent Coleman, did Dr. Chhibber ever try to call |
| 03:06:10 | 20 | you at that phone number? |
| 03:06:10 | 21 | A.  No, he did not. |
| 03:06:10 | 22 | Q.  Did anyone from Dr. Chhibber's office at all call that |
| 03:06:14 | 23 | phone number to tell you that you had an abnormal EKG? |
| 03:06:16 | 24 | A.  No, they did not. |
| 03:06:18 | 25 | MR. HAMMERMAN:  No further questions, your Honor. |

| | | |
|---|---|---|
| 03:06:20 | 1 | MR. JONES:  None, Judge. |
| 03:06:20 | 2 | THE COURT:  We better take our break this afternoon |
| 03:06:22 | 3 | while we can.  We will take a 15-minute break.  The jury is |
| 03:06:26 | 4 | excused. |
| 03:06:32 | 5 | (Short break.) |
| 03:25:00 | 6 | (The following proceedings were had in open court in the |
| 03:25:02 | 7 | presence and hearing of the jury:) |
| 03:25:02 | 8 | THE COURT:  Please be seated.  Would the new witness |
| 03:25:04 | 9 | stand to be sworn. |
| 03:25:16 | 10 | (Witness sworn.) |
| 03:25:16 | 11 | THE COURT:  Please be seated.  Would you tell us your |
| 03:25:18 | 12 | full name and spell your last name, please. |
| 03:25:20 | 13 | THE WITNESS:  Yes, my name is Kory Bakken.  That's |
| 03:25:22 | 14 | B-a-k-k-e-n. |
| 03:25:26 | 15 | - - - |
| 03:25:26 | 16 | KORY BAKKEN, DIRECT EXAMINATION |
| 03:25:26 | 17 | BY MR. HAMMERMAN: |
| 03:25:28 | 18 | Q.  Sir, can you tell the members of the jury how you're |
| 03:25:30 | 19 | employed? |
| 03:25:30 | 20 | A.  Yes, I am employed as a special agent of the FBI. |
| 03:25:32 | 21 | Q.  And how long have you been employed as a special agent |
| 03:25:38 | 22 | with the FBI? |
| 03:25:38 | 23 | A.  Approximately seven and a half years. |
| 03:25:40 | 24 | Q.  Special Agent Bakken, will you tell the members of the |
| 03:25:42 | 25 | jury what squad you are assigned to with the FBI. |

03:25:44   1   A.   I'm assigned to squad West RA 3, which is a healthcare
03:25:50   2   fraud squad.
03:25:50   3   Q.   What kind of crimes do you investigate as part of that
03:25:54   4   healthcare fraud squad?
03:25:56   5   A.   It's white-collar crimes specifically having to do with
03:26:00   6   cases involving health care.
03:26:00   7   Q.   Special Agent Bakken, did you become involved in the
03:26:04   8   investigation of Dr. Jaswinder Chhibber?
03:26:08   9   A.   Yes, I did.
03:26:10  10   Q.   In what capacity?
03:26:10  11   A.   I was asked in February 2011 to be a search team leader
03:26:12  12   for a search warrant.
03:26:14  13   Q.   And what do you mean to be a search team leader?  What
03:26:18  14   does that mean?
03:26:20  15   A.   Well, we had a search warrant for a clinic on the South
03:26:22  16   Side of Chicago that was issued the day before.  I was asked
03:26:24  17   to be a search team leader, which basically is that I would
03:26:28  18   coordinate members of multi agencies.  We had several law
03:26:34  19   enforcement agencies that took part.  I would make sure that
03:26:36  20   they all knew what the search warrant was, what it entailed,
03:26:40  21   where we were supposed to go, and what we were supposed to
03:26:42  22   take.
03:26:44  23   Q.   Special Agent Bakken, had you been involved in this
03:26:46  24   investigation prior to the search on that date?
03:26:48  25   A.   I was not.

03:26:50  1    Q.  Is your job that of a search team leader, that of a

03:26:54  2    coordinator or administrator?

03:26:56  3    A.  Yes, it was.

03:26:58  4    Q.  Where was the search that you're referring to located?

03:27:04  5    A.  It was on East 79th Street on the South Side of Chicago,

03:27:08  6    in the 600 block.

03:27:08  7    Q.  And what type of institution was it?

03:27:10  8    A.  It was a clinic.

03:27:12  9    Q.  I have previously handed you, Special Agent Bakken, two

03:27:16  10   photographs that have been marked as Government Exhibit 601

03:27:18  11   and 602.  Do you have those in front of you?

03:27:22  12   A.  I do.

03:27:22  13   Q.  What do those depict, Special Agent Bakken?

03:27:26  14   A.  Those depict the site of where we executed the search

03:27:28  15   warrant.

03:27:28  16   Q.  And have you seen those photographs before?

03:27:32  17   A.  Yes, I have.

03:27:32  18   Q.  Do they fairly and accurately depict what was the

03:27:36  19   storefront of the area that was searched on that day?

03:27:40  20   A.  Yes, it was snowing on that day, but it does accurately

03:27:42  21   depict it.

03:27:44  22          MR. HAMMERMAN:  Your Honor, at this point in time,

03:27:44  23   the government would move to admit what's been marked

03:27:48  24   Government Exhibit 601 and 602.

03:27:50  25          THE COURT:  Any objection?

| | | |
|---|---|---|
| 03:27:50 | 1 | MR. JONES:  No objection, your Honor. |
| 03:27:50 | 2 | THE COURT:  Government Exhibit 601 and 602 are |
| 03:27:50 | 3 | admitted. |
| 03:27:54 | 4 | (Above-mentioned exhibits were received in evidence.) |
| 03:27:54 | 5 | MR. HAMMERMAN:  Permission to publish? |
| 03:27:56 | 6 | THE COURT:  Yes. |
| 03:27:56 | 7 | BY MR. HAMMERMAN: |
| 03:27:58 | 8 | Q.  Special Agent Bakken, we will start with Government |
| 03:28:00 | 9 | Exhibit 601.  Is that, once again, a fair and accurate |
| 03:28:08 | 10 | depiction of the site that was searched that day? |
| 03:28:10 | 11 | A.  It is. |
| 03:28:12 | 12 | Q.  All right.  And is that the clinic of J.R. Chhibber that |
| 03:28:16 | 13 | was searched on that day? |
| 03:28:18 | 14 | A.  Yes. |
| 03:28:18 | 15 | Q.  And let's go to 602.  Is that, once again, a picture of |
| 03:28:30 | 16 | the clinic? |
| 03:28:30 | 17 | A.  Yes, it is. |
| 03:28:30 | 18 | Q.  And you said there were multiple people involved in the |
| 03:28:32 | 19 | search? |
| 03:28:34 | 20 | A.  Yes. |
| 03:28:34 | 21 | Q.  Approximately how many? |
| 03:28:34 | 22 | A.  Over 25. |
| 03:28:34 | 23 | Q.  And what was your understanding of what the government was |
| 03:28:38 | 24 | searching for on the date of the search? |
| 03:28:38 | 25 | A.  We were looking for mostly patient records; but on top of |

03:28:44  1  patient records, we were also looking for business records,

03:28:46  2  financial records, diagnostic test records, things such as

03:28:52  3  that, employee records.

03:28:54  4  Q.  And did law enforcement seize those type of records as

03:28:58  5  part of its search on that date?

03:29:00  6  A.  Yes, we did.

03:29:02  7  Q.  What was done with the records taken?

03:29:04  8  A.  We took them to the FBI building for evidence.

03:29:06  9  Q.  And approximately, if you could summarize the volume of

03:29:08  10  records that were taken for the members of the jury.

03:29:12  11  A.  We took approximately 130 containers of evidence.

03:29:14  12  Q.  And when you say "containers," what kind of containers are

03:29:18  13  you talking about?

03:29:18  14  A.  It ranged from a couple of plastic storage tubs to mostly

03:29:22  15  banker's boxes and a few brown paper bags.

03:29:26  16  Q.  Special Agent Bakken, I want to show you what's been

03:29:30  17  marked as Government Exhibit 310, 320, 330, 340, 350, 360,

03:29:46  18  370, and 395.  I believe Government Exhibit 320 and 340 have

03:29:52  19  already been admitted into evidence.  I'm going to hand these

03:29:54  20  up to you, Special Agent Bakken.

03:30:04  21      You mentioned that as part of a search, investigating

03:30:08  22  agents seized medical files?

03:30:10  23  A.  Yes.

03:30:10  24  Q.  Are these the type of medical files that were seized as

03:30:14  25  part of the search?

03:30:16  1   A.  Yes, it appears so.

03:30:18  2   Q.  In fact, they are patient files, right?

03:30:20  3   A.  Correct.

03:30:20  4   Q.  And they -- as part of the search, do these files contain

03:30:26  5   information or at least appear to show medical records of

03:30:28  6   patients?

03:30:30  7   A.  Yes.

03:30:30  8   Q.  And is that why they were taken?

03:30:32  9   A.  Yes.

03:30:42  10          MR. HAMMERMAN:  At this point in time, your Honor,

03:30:44  11  the government would seek to admit what's been marked as

03:30:46  12  Government Exhibit 310, 330, 350, 360, 370, and 395.

03:30:56  13          MR. JONES:  Judge, if we could just see them for just

03:30:58  14  a second?

03:30:58  15          THE COURT:  Yes.

03:31:24  16  BY MR. HAMMERMAN:

03:31:26  17  Q.  Special Agent Bakken, while counsel reviews the files we

03:31:28  18  discussed, I will move on to my next question.

03:31:30  19          THE COURT:  No, wait just a minute.

03:31:32  20          MR. HAMMERMAN:  Yes, your Honor.

03:33:38  21          Once again, your Honor, the government would move for

03:33:40  22  the admission of those documents.

03:33:42  23          MR. JONES:  No objection, your Honor.

03:33:42  24          THE COURT:  All right.  Those documents are admitted.

03:33:44  25     (Above-mentioned exhibits were received in evidence.)

03:33:48  1  BY MR. HAMMERMAN:

03:33:52  2  Q.  Special Agent Bakken, in addition to patient files, during

03:33:56  3  the search, did investigating agents locate patient

03:34:00  4  registration forms?

03:34:00  5  A.  Yes, we did.

03:34:02  6  Q.  Generally speaking, what do those patient registration

03:34:06  7  forms look like?

03:34:06  8  A.  They are a piece of paper.  On top is a title that says

03:34:10  9  Patient Registration Form or New Patient Registration Form,

03:34:12  10  it's dated with a -- it has a date handwritten on it, and then

03:34:18  11  there's names and possibly contact information for those

03:34:22  12  names.

03:34:22  13  Q.  In addition, let me show you what's been marked as

03:34:30  14  Government Exhibit 624, 625, and 630.

03:34:40  15        Special Agent Bakken, have you seen these exhibits

03:34:42  16  before?

03:34:42  17  A.  Yes, I have.

03:34:52  18  Q.  Starting with 630, have you seen -- can you just tell the

03:34:56  19  jury, generally speaking, what that exhibit is comprised of.

03:34:58  20  A.  This is a composite exhibit, which means that we didn't

03:35:04  21  find this exhibit in the way that it is now.

03:35:06  22  Q.  Is this an exhibit that was put together by law

03:35:10  23  enforcement?

03:35:10  24  A.  Yes, that's accurate.

03:35:12  25  Q.  Can you tell the members of the jury what this exhibit is

03:35:14  1  comprised of.

03:35:16  2  A.  The first page is the patient registration form with

03:35:20  3  approximately 24 names.

03:35:22  4  Q.  Okay.  And is that on page 22?

03:35:24  5  A.  Page 1 of 2.

03:35:28  6  Q.  And what are the pages that follow as part of that

03:35:30  7  composite exhibit?

03:35:32  8  A.  These are all patient progress reports.

03:35:42  9  Q.  And when you say "patient progress reports," where were

03:35:44  10  these particular patient progress reports found?

03:35:46  11  A.  The patient progress reports were found in the patient

03:35:48  12  files that we removed from the clinic.

03:35:50  13  Q.  How did law enforcement compile these composite exhibits

03:35:54  14  using Government Exhibit 630 as an example?

03:35:56  15  A.  One of two ways.  We matched up the names that we found on

03:36:04  16  this patient registration form, and we pulled those patient

03:36:10  17  files; or, two, we also looked at the service date that goes

03:36:12  18  along with that exhibit, and we pulled those patient files,

03:36:14  19  and then -- even if their names were not on this list, and

03:36:18  20  then we pulled those records from those files.

03:36:20  21  Q.  You will see in addition to the handwritten patient

03:36:22  22  progress reports, there are some what look like typed pages

03:36:28  23  that are in there.  Do you see those in Government Exhibit

03:36:32  24  630?

03:36:32  25  A.  Yes, I do.

03:36:32   1   Q.  Can you tell the members of the jury where those

03:36:34   2   particular pages came from.

03:36:34   3   A.  Those were also taken from the patient charts.

03:36:38   4   Q.  And why were those particular pages added to these

03:36:42   5   composite exhibits?

03:36:42   6   A.  Because a patient progress report was not located within

03:36:46   7   that patient chart for that service date.

03:36:52   8   Q.  Did you seek to find printed notes like the ones that are

03:36:56   9   contained within Government Exhibit 630 that had patient

03:37:00   10  information from the same date of service as reflected on

03:37:02   11  page 1 on the page registration form?

03:37:08   12  A.  Yes, I did.

03:37:08   13  Q.  In the end, do these composite exhibits put together so

03:37:12   14  that either patient forms or those -- I'm sorry, progress

03:37:12   15  notes or those printed summaries from the same dates

03:37:18   16  representing the same patient names that are on the patient

03:37:20   17  registration forms were basically put together?

03:37:22   18  A.  Yes.

03:37:22   19  Q.  And is that the process that was used to compile

03:37:28   20  Government Exhibit 630, 624, and 625?

03:37:34   21  A.  Yes.

03:37:34   22  Q.  Did, in fact, law enforcement find progress notes on those

03:37:42   23  printed pages for every name that was on the patient

03:37:44   24  registration form that is pages 1 and 2 of Government Exhibit

03:37:48   25  630?

03:37:48   1   A.  We did not find progress reports for every patient in

03:37:54   2   these exhibits.

03:37:54   3   Q.  You're talking about the composite exhibits that were put

03:37:58   4   together?

03:38:00   5   A.  Correct.

03:38:00   6   Q.  In fact, do these composite exhibits just include those

03:38:04   7   progress notes that could be found for the patients that are

03:38:12   8   listed on the form?

03:38:12   9   A.  That's accurate.

03:38:12   10  Q.  I'd like to show you what we've marked as Government

03:38:22   11  Exhibit 631, 627, and 632.  Agent Bakken, are these exhibits,

03:38:36   12  once again, compiled in the same way as 624, 625, and 630?

03:38:42   13  A.  Yes.

03:38:44   14  Q.  And, once again, was this information that was acquired

03:38:50   15  either directly from the defendant himself or through the

03:38:52   16  search of his office?

03:38:54   17  A.  Yes.

03:39:02   18        MR. HAMMERMAN:  At this point in time, your Honor,

03:39:04   19  the government would seek to admit what's been marked as

03:39:06   20  Government Exhibit 624, 625, 630, 631, 627, and 632.

03:39:16   21        MR. ORMAN:  Your Honor, we will object to some of

03:39:18   22  these and request a sidebar.

03:39:20   23        THE COURT:  All right.  I will defer ruling on any

03:39:26   24  objected ones until the jury leaves for the day.

03:39:28   25        Are there any that you don't object to so we can

03:39:32  1   proceed with those?

03:39:34  2          MR. ORMAN:  Yes, Judge.  There is no objection to 624

03:39:36  3   and no objection to Government's 625.

03:39:42  4          THE COURT:  All right.  Government Exhibit 624 and

03:39:44  5   625 are admitted.  The admissibility of the other documents is

03:39:50  6   deferred until later today.

03:39:52  7      (Above-mentioned exhibits were received in evidence.)

03:39:54  8   BY MR. HAMMERMAN:

03:40:16  9   Q.  Special Agent Bakken, I am going to hand you what's now

03:40:18  10  been marked as Government Exhibit 620.

03:40:32  11         Can you tell the members of the jury what Government

03:40:34  12  Exhibit 620 is.

03:40:36  13  A.  Yes, these are procedure logs.

03:40:38  14  Q.  Were logs such as these recovered from the search of

03:40:42  15  Dr. Chhibber's office that you referred to earlier in your

03:40:44  16  testimony today?

03:40:44  17  A.  Yes, they were.

03:40:46  18  Q.  Now, have you conducted an audit to see if all the pages

03:40:50  19  are the same as the ones that were taken in the search?

03:40:52  20  A.  No, I haven't.

03:40:54  21  Q.  But suffice it to say, were procedure logs such as this

03:41:02  22  obtained in the search?

03:41:04  23  A.  Yes.

03:41:04  24  Q.  Is it your understanding that certain procedure logs were

03:41:06  25  also obtained from the defendant directly?

03:41:08  1  A.  That's my understanding.

03:41:10  2  Q.  Special Agent Bakken, I am now going to show you what's

03:41:28  3  been marked as Government Exhibit 650.  It's three folders,

03:41:36  4  one blue, two orange, that are entitled Daily Log Ultrasound

03:41:42  5  and then Daily Log Ultrasound and Daily Log -- Ultrasound Log

03:41:46  6  Reports and Echo US Log Reports.

03:41:52  7       Once again, have you seen this exhibit before,

03:41:54  8  Special Agent Bakken?

03:41:54  9  A.  Yes, I have.

03:41:56  10  Q.  Once again, were these types of materials obtained in the

03:42:02  11  search of Dr. Chhibber's office?

03:42:02  12  A.  Yes.

03:42:04  13  Q.  Finally, I'd like to show you what's been marked as

03:42:08  14  Government Exhibit 628 and 629.  You mentioned before that as

03:42:28  15  part of the search, Special Agent, law enforcement when

03:42:34  16  conducting the search retrieved certain business and patient

03:42:36  17  records?

03:42:36  18  A.  Yes.

03:42:36  19  Q.  Were some of those records combined in the form that they

03:42:40  20  were found?

03:42:40  21  A.  Yes, such as these exhibits.

03:42:42  22  Q.  In fact, is it your understanding that these exhibits that

03:42:46  23  have been marked as Government Exhibit 628 and 629 were

03:42:48  24  records that were obtained as part of the search?

03:42:50  25  A.  Yes.

| | | |
|---|---|---|
| 03:42:54 | 1 | MR. HAMMERMAN:  Your Honor, at this point in time, |
| 03:42:56 | 2 | the government would seek to admit Government Exhibit 628 and |
| 03:42:58 | 3 | 629. |
| 03:43:00 | 4 | THE COURT:  All right.  Any objection to 628 and 629? |
| 03:43:04 | 5 | MR. ORMAN:  Yes. |
| 03:43:04 | 6 | THE COURT:  All right.  Ruling is reserved. |
| 03:43:10 | 7 | MR. HAMMERMAN:  I have no further questions, your |
| 03:43:16 | 8 | Honor. |
| 03:43:16 | 9 | THE COURT:  Cross-examination? |
| 03:43:18 | 10 | - - - |
| 03:43:18 | 11 | KORY BAKKEN, CROSS-EXAMINATION |
| 03:43:18 | 12 | BY MR. ORMAN: |
| 03:43:48 | 13 | Q.  Special Agent, are you positive that all of the exhibits, |
| 03:43:54 | 14 | whether objected to or not, came from the search that you did? |
| 03:43:58 | 15 | A.  I am positive that these are the types of records that we |
| 03:44:00 | 16 | removed from the search location. |
| 03:44:02 | 17 | Q.  I don't understand what you mean when you say, "These are |
| 03:44:06 | 18 | the types of records."  Are these the documents, these |
| 03:44:10 | 19 | documents, did they come from your search? |
| 03:44:14 | 20 | A.  These documents came from boxes that we removed from the |
| 03:44:16 | 21 | search. |
| 03:44:18 | 22 | Q.  The first time you saw these documents was when? |
| 03:44:22 | 23 | A.  At the search location, I saw several of these documents. |
| 03:44:28 | 24 | I also saw these documents in the office of the U.S. |
| 03:44:30 | 25 | Attorney's Office. |

| 03:44:30 | 1 | Q. Who put these exhibits together? |
| 03:44:32 | 2 | A. Other agents. |
| 03:44:32 | 3 | Q. You didn't do that? |
| 03:44:34 | 4 | A. No. |
| 03:44:34 | 5 | Q. You talked about 130 boxes of documents? |
| 03:44:40 | 6 | A. Yes, 130 containers, yes. |
| 03:44:44 | 7 | Q. About how many documents are in a box? |
| 03:44:46 | 8 | A. It varies. |
| 03:44:46 | 9 | Q. High and low, tell me. |
| 03:44:50 | 10 | A. I couldn't. I couldn't estimate. Some of the patient |
| 03:44:52 | 11 | files were a quarter inch thick, some of them were 3 inches |
| 03:44:56 | 12 | thick. |
| 03:44:56 | 13 | Q. So what you're telling me is these few documents were |
| 03:45:00 | 14 | selected by somebody and all the rest of the documents are |
| 03:45:04 | 15 | sitting somewhere else? |
| 03:45:06 | 16 | A. Yes. |
| 03:45:06 | 17 | Q. Where? |
| 03:45:08 | 18 | A. At the FBI. |
| 03:45:10 | 19 | Q. So those 130 boxes of documents are piled up over at the |
| 03:45:14 | 20 | FBI? |
| 03:45:16 | 21 | A. They are not piled up there. They are kept according to |
| 03:45:18 | 22 | our evidence control rules. |
| 03:45:20 | 23 | Q. Who made the selection to choose these particular |
| 03:45:22 | 24 | documents? |
| 03:45:22 | 25 | A. I don't know that answer. |

03:45:26  1  Q.  Do you know what any of these documents mean?

03:45:30  2  A.  I have never conducted any investigation myself on this

03:45:34  3  except for conducting the search warrant.

03:45:36  4  Q.  So let me get this straight.  Somebody, and you don't know

03:45:42  5  who, selected a small portion of a great deal of documents,

03:45:44  6  put them together, marked them as exhibits, and brought them

03:45:48  7  here today; is that correct?

03:45:50  8  A.  Yes.

03:46:00  9         MR. ORMAN:  No more questions, Judge.

03:46:02  10        THE COURT:  Redirect?

03:46:04  11        MR. HAMMERMAN:  Yes, your Honor.

03:46:06  12                        - - -

03:46:06  13             KORY BAKKEN, REDIRECT EXAMINATION

03:46:06  14  BY MR. HAMMERMAN:

03:46:06  15  Q.  With respect to composite exhibits that were presented to

03:46:08  16  you, Special Agent Bakken, did you go back to look in the

03:46:10  17  patient files to verify that the documents that were part of

03:46:12  18  those composites in fact came out of patient files with the

03:46:14  19  same names?

03:46:16  20  A.  Yes, I did.

03:46:18  21  Q.  Though you didn't put those composite exhibits together,

03:46:24  22  you did seek to verify that, in fact, those progress notes

03:46:26  23  came out of patient files with the same names; is that right?

03:46:28  24  A.  Yes, personally over the last few names.

03:46:30  25  Q.  And those particular patient files that you're talking

03:46:34  1  about came from the search of Dr. Chhibber's office; is that

03:46:36  2  correct?

03:46:36  3  A.  That's correct.

03:46:36  4  Q.  And not, you know, because you were the team leader of

03:46:40  5  that search; is that correct?

03:46:40  6  A.  That's correct.

03:46:40  7  Q.  Okay.  With respect to the question Mr. Orman asked about

03:46:46  8  have you gone back and verified that these all came from the

03:46:48  9  search, do you remember that question?

03:46:50  10  A.  Yes.

03:46:50  11  Q.  Is it your understanding that some, for example, patient

03:46:56  12  registration sheets were also provided to the government as

03:46:58  13  part of its investigation directly from the defendant himself

03:47:02  14  at times?

03:47:02  15  A.  That's my understanding.

03:47:04  16  Q.  And is it your understanding that those were the documents

03:47:06  17  that you used to verify -- those patient registration forms

03:47:12  18  were then used as part of the verification process of these

03:47:16  19  composite exhibits we're talking about?

03:47:18  20  A.  That's correct.

03:47:18  21  Q.  Also with the procedure logs, you stated before that

03:47:22  22  procedure logs were obtained through the search; is that

03:47:24  23  accurate?

03:47:24  24  A.  Yes.

03:47:24  25  Q.  And also from the defendant himself?

03:47:28    1   A.  Yes.

03:47:28    2   Q.  All right.  And I think I asked you before, have you done

03:47:34    3   an audit to determine which patients came from which?

03:47:38    4          MR. ORMAN:  Objection, Judge.  He did ask that.

03:47:40    5          THE COURT:  Yes, sustained.

03:47:40    6          MR. HAMMERMAN:  No further questions, your Honor.

03:47:42    7          THE COURT:  Anything further?

03:47:46    8          MR. ORMAN:  No further questions.

03:47:48    9          THE COURT:  Thank you.  You are excused.

03:47:52   10          MR. HAMMERMAN:  Your Honor, we are calling our next

03:47:54   11   witness.  May I have an opportunity to retrieve all the

03:47:56   12   exhibits?

03:47:58   13          THE COURT:  Yes.  Certainly.

03:47:58   14          MR. HAMMERMAN:  Thank you.

03:48:42   15    (Witness sworn.)

03:48:42   16          THE COURT:  Please be seated.  Would you state your

03:48:48   17   full name and spell your last name.

03:48:50   18          THE WITNESS:  Twahki Rhodes, R-h-o-d-e-s.

03:48:58   19              - - -

03:48:58   20        TWAHKI RHODES, DIRECT EXAMINATION

03:48:58   21   BY MR. HAMMERMAN:

03:49:08   22   Q.  Good afternoon, Ms. Rhodes.

03:49:10   23   A.  Good afternoon.

03:49:10   24   Q.  Please tell the members of the jury where you live.

03:49:22   25   A.  The South Side of Chicago.

03:49:24  1   Q.  And can you tell the members of the jury how old you are,
03:49:26  2   ma'am.
03:49:26  3   A.  Thirty-nine.
03:49:28  4   Q.  How are you currently employed, Ms. Rhodes?
03:49:30  5   A.  I work at Metro South Health Center.
03:49:34  6   Q.  And where is the Metro South Health Center located?
03:49:36  7   A.  On the South Side of Chicago, Stony Island.
03:49:40  8   Q.  In the Stony Island neighborhood?
03:49:46  9   A.  Avalon.
03:49:46  10  Q.  Avalon?  Okay.
03:49:46  11       And what do you do at Metro South, ma'am?
03:49:48  12  A.  I am a registered nurse's assistant.
03:49:52  13  Q.  And how long have you worked for Metro South?
03:49:54  14  A.  Since July of 2011.
03:50:00  15       THE COURT:  I'm sorry.  What year?
03:50:02  16       THE WITNESS:  July of 2011.
03:50:06  17       MR. JONES:  Judge, I was just wondering, I am having
03:50:10  18  some difficulty.  I don't know if that speaker works.
03:50:12  19       THE COURT:  Yes.  Could you project your voice and
03:50:14  20  sit forward a little bit, please?  The chair I am afraid
03:50:18  21  doesn't move.  You will have to lean forward.
03:50:22  22  BY MR. HAMMERMAN:
03:50:22  23  Q.  Okay.  Can you just speak into the microphone.
03:50:24  24  A.  All right.
03:50:26  25  Q.  Thank you, Ms. Rhodes.

| | | |
|---|---|---|
| 03:50:26 | 1 | Can you tell the members of the jury how you were |
| 03:50:28 | 2 | employed prior to working for Metro South. |
| 03:50:30 | 3 | A. I worked for Dr. Chhibber. |
| 03:50:32 | 4 | Q. How long did you work for Dr. Chhibber? |
| 03:50:34 | 5 | A. Two and a half years. |
| 03:50:38 | 6 | Q. And what was the position that you had when you worked for |
| 03:50:40 | 7 | him? |
| 03:50:42 | 8 | A. Registered medical assistant. |
| 03:50:44 | 9 | Q. And where was Dr. -- where did you work for Dr. Chhibber, |
| 03:50:48 | 10 | at what location? |
| 03:50:48 | 11 | A. That was located on the South Side of Chicago also. |
| 03:50:50 | 12 | Q. And on what street, ma'am? |
| 03:50:52 | 13 | A. We were right on 79th, a few blocks off of Cottage Grove. |
| 03:50:58 | 14 | Q. At some point, did that clinic move? |
| 03:51:00 | 15 | A. Yes. |
| 03:51:00 | 16 | Q. And where did it move to? |
| 03:51:02 | 17 | A. It moved to -- the one on Stony Island, 82- -- 8348 South |
| 03:51:10 | 18 | Stony Island. |
| 03:51:12 | 19 | Q. Is that the same location where Metro South is currently |
| 03:51:14 | 20 | located? |
| 03:51:14 | 21 | A. Yes, it is. |
| 03:51:16 | 22 | Q. Can you tell the members of the jury when that change |
| 03:51:20 | 23 | occurred, when you moved from the 79th Street location to the |
| 03:51:24 | 24 | Stony Island location. |
| 03:51:24 | 25 | A. That was about April of 2011. |

03:51:28   1   Q.  And at the time that your employment moved from the 79th
03:51:36   2   Street location to the 83rd Street location, were you still
03:51:40   3   employed by Dr. Chhibber?
03:51:40   4   A.  Yes, I was.
03:51:42   5   Q.  You said that you worked for Dr. Chhibber for two,
03:51:50   6   two-plus years.  Would you recognize him if you saw him again,
03:51:52   7   Ms. Rhodes?
03:51:52   8   A.  Yes.
03:51:54   9          MR. JONES:  I'm stipulating, Judge.
03:51:56  10          THE COURT:  Identity is not an issue.
03:51:58  11          MR. HAMMERMAN:  Thank you, your Honor.
03:51:58  12   BY MR. HAMMERMAN:
03:52:00  13   Q.  Ms. Rhodes, would you tell the members of the jury how far
03:52:04  14   you went in school.
03:52:04  15   A.  About four years of college.
03:52:08  16   Q.  And do you have any degrees or certificates as a result of
03:52:12  17   your education?
03:52:14  18   A.  Yes, I have certificates.
03:52:16  19   Q.  Can you tell the members of the jury what certificates you
03:52:16  20   have.
03:52:18  21   A.  I am a certified nurse's assistant, a registered
03:52:24  22   phlebotomist, and a registered medical assistant.
03:52:28  23   Q.  And did you obtain those certificates through your
03:52:32  24   education?
03:52:34  25   A.  Yes, I did.

03:52:34  1  Q.  How did you come to work for Dr. Chhibber?

03:52:42  2  A.  My mother and my grandmother were patients of his, and I

03:52:48  3  asked him about a position there.

03:52:48  4  Q.  Had you been working as a medical assistant prior to

03:52:52  5  working for Dr. Chhibber?

03:52:54  6  A.  Yes.

03:52:54  7  Q.  For approximately how long?

03:52:56  8  A.  For about four years.

03:53:04  9  Q.  And when, in your best estimate, did you actually begin

03:53:10  10  working for Dr. Chhibber?

03:53:12  11  A.  The year of 2009.

03:53:14  12  Q.  And what was the name of the clinic that he had at that

03:53:20  13  time?

03:53:20  14  A.  Cottage Grove Medical.

03:53:22  15  Q.  What was your title while working for Dr. Chhibber?

03:53:26  16  A.  Medical assistant.

03:53:28  17  Q.  How much were you paid by Dr. Chhibber when you first

03:53:30  18  started working for him?

03:53:32  19  A.  $9 an hour.

03:53:34  20  Q.  When you stopped working for Dr. Chhibber in July of 2011,

03:53:38  21  how much were you paid?

03:53:38  22  A.  About $10 an hour.

03:53:42  23  Q.  You said that the Metro South clinic that you are

03:53:48  24  currently working at is the same location as Dr. Chhibber's

03:53:52  25  clinic was at when it moved; is that correct?

03:53:54 1 A. That's correct

03:53:54 2 Q. Do you have an understanding of how that clinic switched

03:53:58 3 from Dr. Chhibber to Metro South?

03:54:00 4 A. No, I don't have a clear understanding of how it actually

03:54:02 5 switched.

03:54:02 6 Q. Well, did you have any conversations with anybody about

03:54:06 7 that switch?

03:54:08 8 A. Yes, I did.

03:54:08 9 Q. Did you have a conversation with Dr. Chhibber about that

03:54:10 10 switch?

03:54:10 11 A. Yes.

03:54:12 12 Q. What did Dr. Chhibber tell you?

03:54:14 13       MR. JONES:  Foundation, Judge.

03:54:14 14       THE COURT:  Sustained.

03:54:16 15 BY MR. HAMMERMAN:

03:54:16 16 Q. Well, you said the switch occurred in April of 2011?

03:54:20 17 A. Yes.

03:54:20 18 Q. When did that conversation with Dr. Chhibber occur,

03:54:24 19 Ms. Rhodes?

03:54:26 20 A. Repeat that question.  Did I say that the switch was in

03:54:36 21 April 2011?

03:54:36 22 Q. Well, let's start there.  When did the switch from Cottage

03:54:42 23 Grove Community Center or -- I apologize.  Let me rephrase.

03:54:46 24       The 83rd Street clinic you said switched ownership

03:54:52 25 from Dr. Chhibber to Metro South.  When did that occur?

03:54:54  1    A.  That occurred in July or June, the end of June.

03:54:58  2    Q.  Of what year?

03:54:58  3    A.  2009.

03:55:00  4    Q.  Did you have a conversation with Dr. Chhibber about the

03:55:04  5    switch?

03:55:04  6    A.  Yes.

03:55:04  7    Q.  In relation to the timing of that switch, when did that

03:55:08  8    conversation with Dr. Chhibber occur?

03:55:10  9    A.  That occurred in the end of June 2011.

03:55:14  10   Q.  And where did that conversation occur?

03:55:16  11   A.  That occurred at the Stony Island location.

03:55:20  12   Q.  Can you now tell the members of the jury what Dr. Chhibber

03:55:24  13   told you about the switch in ownership at that time.

03:55:26  14          MR. JONES:  Judge, only who is present.

03:55:28  15          THE COURT:  Sustained.

03:55:30  16   BY MR. HAMMERMAN:

03:55:30  17   Q.  Okay.  Ms. Rhodes, the conversation that you're referring

03:55:34  18   to where Dr. Chhibber and you spoke inside the clinic?

03:55:38  19   A.  Yes.

03:55:38  20   Q.  Was there anyone else present at the time?

03:55:40  21   A.  A co-worker.

03:55:42  22   Q.  Who was the co-worker?

03:55:42  23   A.  Tyanna Holmes.

03:55:46  24   Q.  Other than Tyanna Holmes, was anyone else present for this

03:55:50  25   conversation?

03:55:50  1   A.  No.

03:55:50  2   Q.  What did Dr. Chhibber tell you in the conversation at

03:55:52  3   which he explained the switch of that facility from his

03:55:58  4   ownership to Metro South?

03:56:00  5          MR. JONES:  Judge, I object to the leading nature of

03:56:02  6   these questions.

03:56:02  7          THE COURT:  Sustained.

03:56:04  8   BY MR. HAMMERMAN:

03:56:04  9   Q.  Can you please tell the members of the jury about the

03:56:06  10  conversation that you had with Dr. Chhibber about that switch.

03:56:10  11  A.  At the end of the day, the doctor asked us to come into

03:56:14  12  his office, and he sat us down, and he said that there would

03:56:20  13  be another facility taking over the clinic and that we will be

03:56:26  14  employed by them, he spoke with them, and they were going to

03:56:28  15  give us a position with them, and he explained to us that they

03:56:32  16  will be in to have a conversation with us.

03:56:34  17  Q.  Did you ever have to interview with Metro South?

03:56:38  18  A.  Yes, I did.

03:56:38  19  Q.  All right.  And did that happen before or after this

03:56:44  20  conversation?

03:56:44  21  A.  After.

03:56:44  22  Q.  Did you have an understanding, based on that interview, of

03:56:48  23  whether or not you had been recommended for a position with

03:56:52  24  Metro South?

03:56:54  25          MR. JONES:  Objection to the speculation, Judge.

03:56:56  1    THE COURT:  Could you rephrase, please?

03:57:00  2    MR. HAMMERMAN:  Yes, your Honor.

03:57:00  3  BY MR. HAMMERMAN:

03:57:04  4  Q.  Ms. Rhodes, did you have an understanding, you, did you

03:57:08  5  have an understanding yourself, whether or not you had been

03:57:12  6  recommended for the position with Metro South?

03:57:16  7    MR. JONES:  Objection, Judge.  If there is no

03:57:16  8  conversation, it's speculation and hearsay.

03:57:20  9    THE COURT:  Sustained.

03:57:20  10  BY MR. HAMMERMAN:

03:57:22  11  Q.  Based -- you said you had to interview with Metro South;

03:57:28  12  is that correct, Ms. Rhodes?

03:57:30  13  A.  That's correct.

03:57:30  14  Q.  And when you interviewed with Metro South, did you have a

03:57:32  15  conversation regarding your employment history?

03:57:36  16  A.  Yes.

03:57:36  17  Q.  Did that conversation also address your employment history

03:57:40  18  with Dr. Chhibber?

03:57:42  19  A.  Yes.

03:57:42  20  Q.  Did you have a basis -- let me go back to the conversation

03:57:48  21  you had with Dr. Chhibber before you had your interview with

03:57:52  22  Metro South.

03:57:52  23    Based on your conversation with Dr. Chhibber, did you

03:57:58  24  have an understanding of whether you had been recommended for

03:58:02  25  the Metro South position?

| | | |
|---|---|---|
| 03:58:02 | 1 | MR. JONES: Judge, I object. |
| 03:58:04 | 2 | THE COURT: Sustained. |
| 03:58:04 | 3 | BY MR. HAMMERMAN: |
| 03:58:08 | 4 | Q. You were hired by Metro South; is that right? |
| 03:58:10 | 5 | A. That's correct. |
| 03:58:12 | 6 | Q. And what was the rate of pay that you received from Metro |
| 03:58:16 | 7 | South? |
| 03:58:16 | 8 | A. $17 an hour. |
| 03:58:18 | 9 | Q. When you spoke to Dr. Chhibber about the switch, did he |
| 03:58:30 | 10 | explain -- |
| 03:58:32 | 11 | MR. HAMMERMAN: Well, let me strike that, your Honor. |
| 03:58:34 | 12 | I apologize. |
| 03:58:34 | 13 | BY MR. HAMMERMAN: |
| 03:58:36 | 14 | Q. I want to go back and ask you some questions about the |
| 03:58:40 | 15 | 79th Street clinic, the one that was down on Cottage Grove or |
| 03:58:44 | 16 | off of Cottage Grove. |
| 03:58:44 | 17 | Can you explain to the members of the jury what that |
| 03:58:48 | 18 | clinic looked like, what it was? |
| 03:58:50 | 19 | A. The clinic was a front, basically like a front store kind |
| 03:58:58 | 20 | of clinic. When you walk into the clinic, there is a waiting |
| 03:59:02 | 21 | area for the patients. Right there to the right side, there |
| 03:59:06 | 22 | is the office where me and my co-workers would answer the |
| 03:59:12 | 23 | phone, schedule patients. There was about six exam rooms |
| 03:59:16 | 24 | going down the hall to the -- that would be the right side. |
| 03:59:20 | 25 | On the left side towards the end of the hall, you have our |

03:59:24   1   file room and the laboratory and then a patient restroom.   In

03:59:30   2   the back off to the right, there is a section leading to our

03:59:36   3   cafeteria, and then the office, the doctor's office.

03:59:38   4   Q.  And who else was employed at Dr. Chhibber's clinic at the

03:59:44   5   time that you worked for him?

03:59:44   6   A.  At the time I worked for him, there was Tyanna Holmes --

03:59:54   7   are you talking about the entire time?

03:59:54   8   Q.  The entire time, ma'am.

03:59:56   9   A.  There was Tyanna Holmes, Dena Hopkins, Fahad, Dr. B, Dr.

04:00:10   10   Joshi, Faith Washington.

04:00:12   11   Q.  And what was -- you said that you were a medical

04:00:14   12   assistant?

04:00:14   13   A.  Yes.

04:00:14   14   Q.  What did these other individuals do for Dr. Chhibber

04:00:18   15   during the time that you worked for him, what were their

04:00:22   16   titles?

04:00:22   17   A.  We had medical assistant, a doctor.

04:00:28   18   Q.  Let me rephrase my question.

04:00:30   19        You mentioned Dena Hopkins.  What did she do?

04:00:36   20   A.  She did the billing and answered phones and scheduled.

04:00:40   21   Q.  And Tyanna Holmes, what did she do?

04:00:42   22   A.  She did lab work, she took vitals, did charting, answered

04:00:52   23   phones, scheduled.

04:00:54   24   Q.  Faith Washington, what was her job at Dr. Chhibber's

04:00:58   25   clinic?

04:00:58   1   A.  She did nerve conductivity test.

04:01:04   2          MR. JONES:  Judge, I'm sorry.  I just couldn't hear

04:01:06   3   that.

04:01:10   4          THE COURT:  Could the reporter read back.

04:01:10   5     (Record read.)

04:01:10   6   BY MR. HAMMERMAN:

04:01:10   7   Q.  Did she do other things -- I apologize.

04:01:14   8          THE COURT:  You're going to have to project your

04:01:16   9   voice a little more.  I have a hard time hearing you

04:01:18  10   sometimes.

04:01:20  11   BY MR. HAMMERMAN:

04:01:20  12   Q.  Speak into the microphone.

04:01:22  13          Did Faith Washington do anything else, Ms. Rhodes?

04:01:24  14   A.  Sometimes she would help us with taking bios and charting.

04:01:30  15   Q.  And you mentioned a gentleman by the name of Fahad.  Is

04:01:34  16   that his first name or last name?

04:01:34  17   A.  I just know him as Fahad.  I am guessing first name.

04:01:38  18   Q.  What did he do at Dr. Chhibber's clinic?

04:01:42  19   A.  He was an ultrasound tech.

04:01:44  20   Q.  You mentioned Dr. B.

04:01:48  21   A.  Yes.

04:01:48  22   Q.  Who was Dr. B?

04:01:50  23   A.  An ultrasound tech.

04:01:52  24   Q.  And you mentioned a Dr. Joshi?

04:01:54  25   A.  Yes.

04:01:54  1   Q.  Who was Dr. Joshi?

04:01:56  2   A.  He was a physician.

04:01:58  3   Q.  Now, during the days that you worked for Dr. Chhibber at

04:02:02  4   that 79th Street clinic, how many physicians were on staff on

04:02:06  5   any one day?

04:02:08  6   A.  One.

04:02:08  7   Q.  You mentioned a Dr. Joshi.  Did he work any of the same

04:02:14  8   days as Dr. Chhibber?

04:02:16  9   A.  No.

04:02:18  10  Q.  What days did you work at the clinic when it was on the

04:02:24  11  79th Street location, Ms. Rhodes?

04:02:24  12  A.  Monday, Tuesday, Thursday and Friday.

04:02:30  13  Q.  And on those days, who was the physician that was on

04:02:32  14  staff?

04:02:32  15  A.  Dr. Chhibber.

04:02:32  16  Q.  What day did Dr. Joshi work?

04:02:38  17  A.  Wednesday.

04:02:38  18  Q.  So did you ever really work with Dr. Joshi?

04:02:42  19  A.  No, not really.

04:02:44  20  Q.  What days -- let me ask you this.  When did the clinic

04:02:48  21  open?

04:02:50  22  A.  We opened at 9:00.

04:02:52  23  Q.  And what time did patients arrive at that clinic?

04:02:56  24  A.  9:00.

04:02:58  25  Q.  What time, in your experience, did Dr. Chhibber arrive at

04:03:06   1   the clinic?

04:03:06   2   A.  It varied; between 10:00, 10:30, sometimes 11:00.

04:03:20   3   Q.  Did he ever come after 11:00?

04:03:24   4   A.  Yes, sometimes he did.

04:03:24   5   Q.  In your experience, how often in the two years that you

04:03:28   6   were there was he there before 10:00 o'clock?

04:03:32   7   A.  I would say -- you said before 10:00?

04:03:42   8   Q.  Yes, ma'am.

04:03:42   9   A.  Once out of a week, I guess.  Once out of a week.

04:03:50  10   Q.  And how often was he there after 11:00?

04:03:52  11   A.  I would say once out of a week.

04:03:58  12   Q.  What did you do as a medical assistant working for

04:04:14  13   Dr. Chhibber?

04:04:16  14   A.  I answered phones, I scheduled patients, I did the patient

04:04:18  15   exams, took vital signs, I did charting and lab work.

04:04:24  16   Q.  Well, let's start with charting.  What does that mean when

04:04:26  17   you say, "I did charting"?

04:04:28  18   A.  Charting would be if a new patient came, we would have to

04:04:34  19   get a chart together for them putting their lab work and

04:04:38  20   things, things that go inside of the chart, which would be lab

04:04:42  21   work, their progress notes, any diagnostic tests, and anything

04:04:50  22   that their patient history would go inside the chart, so we

04:04:54  23   would get that together for them.  And when any tests were

04:04:58  24   done, we would put those into the chart.

04:05:00  25   Q.  Did the Cottage Grove Community Medical Clinic maintain

| | | |
|---|---|---|
| 04:05:04 | 1 | charts for all its patients? |
| 04:05:06 | 2 | A.  Yes, we did. |
| 04:05:08 | 3 | Q.  I want to show you a chart that's been marked as |
| 04:05:10 | 4 | Government Exhibit 340, which has been admitted into evidence. |
| 04:05:22 | 5 | Ms. Rhodes, that is a patient chart in the name of |
| 04:05:26 | 6 | Tiffany Shirley-Terrell.  Do you see that? |
| 04:05:28 | 7 | A.  Yes. |
| 04:05:28 | 8 | Q.  Is that the type of chart that you're referring to? |
| 04:05:32 | 9 | A.  Yes, it is. |
| 04:05:34 | 10 | Q.  Is that the type of chart that you were responsible for |
| 04:05:38 | 11 | overseeing as part of your charting work? |
| 04:05:40 | 12 | A.  Yes. |
| 04:05:40 | 13 | Q.  And through your work in which you did charting, were you |
| 04:05:44 | 14 | responsible for being able to read portions of this chart? |
| 04:05:48 | 15 | A.  Yes, I was. |
| 04:05:48 | 16 | Q.  Through your experience working for Dr. Chhibber, are you |
| 04:05:52 | 17 | familiar with his handwriting? |
| 04:05:56 | 18 | A.  Yes. |
| 04:05:56 | 19 | Q.  Were you required to read his handwriting? |
| 04:05:58 | 20 | A.  Yes. |
| 04:05:58 | 21 | Q.  Is that an integral part of your job? |
| 04:06:02 | 22 | A.  Yes. |
| 04:06:02 | 23 | Q.  Is that something that you did on a daily basis? |
| 04:06:04 | 24 | A.  Yes, it is. |
| 04:06:04 | 25 | Q.  I am going to show you, Ms. Rhodes, what's been marked as |

04:06:20 1 Government Exhibit 300. Take a look at that exhibit.

04:06:30 2 Ms. Rhodes, you met with the government before to

04:06:32 3 prepare for your testimony; is that right?

04:06:32 4 A. Yes.

04:06:34 5 Q. And during that preparation, you looked over some

04:06:36 6 exhibits; is that right?

04:06:36 7 A. Yes.

04:06:36 8 Q. Did you look over Government Exhibit 300?

04:06:40 9 A. No, I did not.

04:06:42 10 Q. You never looked at these progress notes before?

04:06:44 11 A. Yes.

04:06:44 12 MR. ORMAN: Objection, your Honor. Asked and

04:06:46 13 answered.

04:06:46 14 THE COURT: Sustained.

04:06:48 15 BY MR. HAMMERMAN:

04:06:48 16 Q. Have you looked at progress notes as part of your

04:06:50 17 preparation for your testimony today?

04:06:52 18 A. Yes.

04:06:52 19 Q. All right. Go through the pages that make up Government

04:06:56 20 Exhibit 300.

04:07:12 21 Ms. Rhodes, are these the type of progress notes that

04:07:16 22 you reviewed before during your testimony preparation?

04:07:18 23 A. Yes.

04:07:18 24 Q. And, in fact, are these the types of progress notes that

04:07:22 25 you would have to review as part of your employment with

| | | |
|---|---|---|
| 04:07:26 | 1 | Dr. Chhibber? |
| 04:07:26 | 2 | A.  That's correct. |
| 04:07:26 | 3 | Q.  Ms. Rhodes, starting on the first page -- |
| 04:07:36 | 4 | MR. HAMMERMAN:  Well, actually, your Honor, at this |
| 04:07:38 | 5 | point in time, the government would move to admit what's been |
| 04:07:42 | 6 | marked as Government Exhibit 300. |
| 04:07:44 | 7 | THE COURT:  Any objection? |
| 04:07:46 | 8 | MR. ORMAN:  Yes, your Honor. |
| 04:07:46 | 9 | THE COURT:  Objection is deferred. |
| 04:07:48 | 10 | MR. HAMMERMAN:  Your Honor, may we be heard at |
| 04:07:50 | 11 | sidebar briefly? |
| 04:07:50 | 12 | THE COURT:  Not at this point.  If you have other |
| 04:07:52 | 13 | questions to ask the witness, after the jury is excused, we |
| 04:07:56 | 14 | will discuss it. |
| 04:07:58 | 15 | BY MR. HAMMERMAN: |
| 04:07:58 | 16 | Q.  Ms. Rhodes, I'm going to show you now what's been marked |
| 04:08:00 | 17 | as Government Exhibit 310, 330, 320, 360, 370, and 395. |
| 04:08:22 | 18 | Starting with Government Exhibit 310, will you find the |
| 04:08:32 | 19 | progress note in that chart. |
| 04:08:58 | 20 | Do you see the progress note, ma'am? |
| 04:09:00 | 21 | A.  Yes. |
| 04:09:00 | 22 | Q.  Is that a progress note that's there in the name of Louis |
| 04:09:12 | 23 | Teague? |
| 04:09:12 | 24 | A.  Yes, it is. |
| 04:09:18 | 25 | Q.  Have you seen this type of progress note before? |

04:09:20   1   A.   Yes.

04:09:20   2   Q.   Do you recognize the handwriting on this progress note?

04:09:22   3   A.   Yes.

04:09:22   4   Q.   I'm going to ask you to turn to Government Exhibit 340,

04:09:26   5   which is the first one I handed to you, which is the patient

04:09:28   6   chart in the name of Tiffany Shirley-Terrell.

04:09:44   7        Do you see that progress note?

04:09:44   8   A.   Yes.

04:09:44   9   Q.   And is the progress note of Tiffany Shirley-Terrell, do

04:09:50  10   you recognize the handwriting on this chart?

04:09:52  11   A.   Yes, I do.

04:09:52  12   Q.   I would like to review the handwriting on it with you.

04:09:56  13        Going through the progress note, do you see the

04:09:58  14   handwriting in the lower section under the diagnosis section?

04:10:02  15   A.   Yes.

04:10:02  16   Q.   Do you recognize that handwriting?

04:10:06  17   A.   Yes, I do.

04:10:06  18   Q.   Was it your job to be able to read the diagnosis section

04:10:10  19   of a progress note while working at the Cottage Grove

04:10:14  20   Community Medical Clinic?

04:10:14  21   A.   Yes.

04:10:14  22   Q.   Whose handwriting is that?

04:10:14  23   A.   Dr. Chhibber's.

04:10:16  24   Q.   Do you see the section on the left-hand side here next to

04:10:22  25   the notations for HEENT, do you see that handwriting?

| 04:10:26 | 1 | A. Yes. |
| 04:10:26 | 2 | Q. Do you recognize the handwriting, Ms. Rhodes? |
| 04:10:28 | 3 | A. Yes. |
| 04:10:28 | 4 | Q. As part of your job, did you have to recognize the |
| 04:10:32 | 5 | handwriting on these charts? |
| 04:10:34 | 6 | A. Yes. |
| 04:10:34 | 7 | Q. Whose handwriting is that? |
| 04:10:34 | 8 | A. Dr. Chhibber's. |
| 04:10:36 | 9 | Q. Now, as part of your job, did you generally review this |
| 04:10:38 | 10 | section, or do you just recognize the handwriting? |
| 04:10:42 | 11 | A. I just recognize the handwriting. |
| 04:10:42 | 12 | Q. Going to the right-hand section next to that where it |
| 04:10:46 | 13 | says, TB skin test, diabetes, echo, carotid. Do you see that? |
| 04:10:50 | 14 | A. Yes. |
| 04:10:52 | 15 | Q. Do you recognize that handwriting? |
| 04:10:52 | 16 | A. Yes. |
| 04:10:52 | 17 | Q. Whose handwriting is that, Ms. Rhodes? |
| 04:10:56 | 18 | A. Dr. Chhibber's. |
| 04:10:56 | 19 | Q. Once again, was this handwriting that you would have to be |
| 04:10:58 | 20 | able to recognize? |
| 04:11:00 | 21 | A. Yes. |
| 04:11:00 | 22 | Q. Is that handwriting that would you actually have to read |
| 04:11:02 | 23 | on a daily basis while working for Dr. Chhibber? |
| 04:11:04 | 24 | A. Yes. Yes. |
| 04:11:04 | 25 | Q. Is this section of a progress note a section that would |

04:11:08   1   you read on a daily basis working for Dr. Chhibber?

04:11:12   2   A.  Yes.

04:11:12   3   Q.  Looking at the top of the chart, there is a section where

04:11:14   4   the patient's name is.  Do you see that?

04:11:16   5   A.  Yes.

04:11:16   6   Q.  Now, is that Dr. Chhibber's handwriting?

04:11:18   7   A.  No.

04:11:18   8   Q.  Underneath that, though, where it says, Chief complaint,

04:11:22   9   there is handwriting written there?

04:11:24   10  A.  Um-hmm.

04:11:24   11  Q.  Do you recognize that handwriting, ma'am?

04:11:26   12  A.  Yes, I do.

04:11:26   13  Q.  Whose is that?

04:11:28   14  A.  You said whose is it?

04:11:30   15  Q.  Yes.  In this section here.

04:11:32   16  A.  Dr. Chhibber's.

04:11:34   17  Q.  There's also a line here where it says, Smoking, gen exam,

04:11:40   18  HT, weight, BP, pulse, RR, temp, et cetera.  Do you see that

04:11:44   19  line?

04:11:44   20  A.  Yes.

04:11:46   21  Q.  Do you recognize -- first of all, do you recognize that

04:11:50   22  section of a progress note?

04:11:52   23  A.  Yes.

04:11:52   24  Q.  What was that section of a progress note?

04:11:52   25  A.  That is the section where we would do the vitals when the

04:11:58   1   patient first came.

04:12:00   2   Q.  Now, when you say, "We would do the vitals," who is the

04:12:04   3   "we" you're talking about?

04:12:06   4   A.  The medical assistants.

04:12:06   5   Q.  Is that -- part of your job, was it to fill in that

04:12:12   6   section of a progress note?

04:12:12   7   A.  Yes.

04:12:12   8   Q.  When you say you do the vitals, can you explain to the

04:12:14   9   members of the jury what you mean when you say to do the

04:12:16   10  vitals?

04:12:16   11  A.  Blood pressure, respiration, height, weight, and then we

04:12:18   12  would ask a brief patient history.

04:12:20   13  Q.  Is that something you did with patients on a regular basis

04:12:26   14  at the clinic?

04:12:26   15  A.  Yes.

04:12:26   16  Q.  Going back to Government Exhibit 395, do you recognize

04:12:30   17  Dr. Chhibber's handwriting in the additional comments,

04:12:34   18  diagnosis -- the diagnosis section and the test section on

04:12:38   19  every page of that exhibit?  Would you just look through it,

04:12:44   20  please, and tell the members of the jury if you recognize that

04:12:46   21  handwriting?

04:12:46   22  A.  Which exhibit?

04:12:46   23  Q.  I'm sorry, 300.  I apologize.

04:12:50   24  A.  Yes.

04:12:54   25  Q.  Whose handwriting do you see in the diagnosis and testing

04:12:58   1   section for that exhibit?

04:12:58   2   A.  Dr. Chhibber's.

04:13:00   3   Q.  In your role as a medical assistant working for

04:13:22   4   Dr. Chhibber, did you have interaction with the patients in

04:13:26   5   addition to taking their vitals?

04:13:28   6   A.  Yes.

04:13:28   7   Q.  In what way?

04:13:28   8   A.  I had to get a patient history.  I had to also basically

04:13:34   9   get a physical of them with my eyes, look to see, make sure

04:13:40   10  everything was okay.

04:13:40   11  Q.  And would you write any of that down in a patient progress

04:13:44   12  note?

04:13:46   13  A.  No.

04:13:46   14  Q.  Would you tell Dr. Chhibber of anything you saw?

04:13:48   15  A.  Yes.

04:13:50   16  Q.  Now, when you did the vitals, was that written in the

04:13:52   17  progress note?

04:13:52   18  A.  Yes, it is.

04:13:54   19  Q.  And would you do that before or after Dr. Chhibber saw a

04:13:56   20  patient?

04:13:56   21  A.  Before.

04:13:58   22  Q.  Did you have any role in the testing of patients?

04:14:04   23  A.  Yes.

04:14:04   24  Q.  What kind of testing role did you have, Ms. Rhodes?

04:14:08   25  A.  I would --

04:14:14   1   Q. What kind of tests did you administer?

04:14:16   2   A. I administered PFT, ICGs, EKGs, hearing tests --

04:14:24   3   Q. Well --

04:14:24   4   A. -- and the ABI.

04:14:26   5   Q. Let's start with the first one of those you mentioned, the

04:14:44   6   PFT. What is a PFT?

04:14:46   7   A. It's a test basically to give a measurement of the

04:14:50   8   breathing in their lungs. We will ask the patient to take a

04:14:56   9   deep breath in and then blow in a tube, and it will measure

04:15:00   10   the breath.

04:15:00   11   Q. And how would you determine when or when not to administer

04:15:04   12   that test to a patient?

04:15:04   13   A. If it was not told to us, then usually if a patient has

04:15:12   14   asthma, we automatically give that test.

04:15:14   15   Q. Let me ask you that. How did you know automatically to do

04:15:18   16   that?

04:15:18   17   A. Because it was a test for breathing.

04:15:22   18   Q. Well, Ms. Rhodes, did someone instruct you that all

04:15:24   19   patients that had asthma written in their charts should get

04:15:28   20   that test?

04:15:30   21        MR. JONES: Judge, I am objecting to the leading

04:15:32   22   nature.

04:15:32   23        THE COURT: Sustained. Sustained.

04:15:32   24   BY MR. HAMMERMAN:

04:15:34   25   Q. Why did you -- Ms. Rhodes, what was the basis of your

| | | |
|---|---|---|
| 04:15:36 | 1 | understanding of why asthma patients should receive that test? |
| 04:15:40 | 2 | A.  I was used to doing it on asthma patients. |
| 04:15:48 | 3 | Q.  And did you, in fact, if you saw asthma written in a |
| 04:15:52 | 4 | chart, always perform that test? |
| 04:15:52 | 5 | A.  Yes. |
| 04:15:52 | 6 | Q.  Was there any other indications that you would see that in |
| 04:15:58 | 7 | your -- let me rephrase. |
| 04:16:00 | 8 | For what other reasons would you perform that test, |
| 04:16:02 | 9 | what other instruction would you receive before you |
| 04:16:08 | 10 | administered that test? |
| 04:16:10 | 11 | MR. JONES:  Judge, I'll object.  She gave the answer. |
| 04:16:12 | 12 | These are leading questions. |
| 04:16:12 | 13 | THE COURT:  Sustained. |
| 04:16:14 | 14 | BY MR. HAMMERMAN: |
| 04:16:14 | 15 | Q.  Ms. Rhodes, was that the only instance, asthma, that you |
| 04:16:18 | 16 | would perform the test? |
| 04:16:18 | 17 | A.  No. |
| 04:16:18 | 18 | Q.  What other reasons would you perform that test? |
| 04:16:24 | 19 | A.  Shortness of breath. |
| 04:16:26 | 20 | Q.  Well, let's go back to Ms. Tiffany Shirley-Terrell's |
| 04:16:38 | 21 | chart.  Do you see that, ma'am? |
| 04:16:38 | 22 | A.  Um-hmm. |
| 04:16:38 | 23 | Q.  This has been admitted into evidence as Government |
| 04:16:42 | 24 | Exhibit 340. |
| 04:16:46 | 25 | Do you see that? |

04:16:46    1    A.   Yes.

04:16:46    2    Q.   Do you see a notation here that says PFT?

04:16:50    3    A.   Yes.

04:16:50    4    Q.   If you saw a notation that looked like that in a patient

04:16:52    5    chart, what would you do?

04:16:54    6    A.   Give them a PFT.

04:16:56    7    Q.   And why would you do that?

04:16:56    8    A.   Because it was in the -- this box is usually any test that

04:17:02    9    the medical assistants were to perform.

04:17:04   10    Q.   And what was your basis -- why did you understand that to

04:17:10   11    be?

04:17:10   12    A.   Because I was told that if it was wrote in the chart here,

04:17:14   13    that it's something we are to perform.

04:17:16   14    Q.   And who told you that?

04:17:16   15    A.   The other medical assistant, as well as the doctor.

04:17:18   16    Q.   And what doctor are you referring to, ma'am?

04:17:20   17    A.   Dr. Chhibber.

04:17:20   18    Q.   And did you, when you saw that written in a patient chart,

04:17:24   19    perform that test?

04:17:24   20    A.   Yes, I did.

04:17:26   21    Q.   You've mentioned asthma, and now the PFT being written in

04:17:32   22    the chart.  Were there any other reasons that you would

04:17:34   23    perform a PFT test?

04:17:34   24    A.   For shortness of breath.

04:17:44   25    Q.   What do you mean by that?

| | | |
|---|---|---|
| 04:17:46 | 1 | A.  If patient complained of shortness of breath, we would |
| 04:17:50 | 2 | give them the breathing test. |
| 04:17:50 | 3 | Q.  And how would you know if a patient complained of |
| 04:17:54 | 4 | shortness of breath? |
| 04:17:54 | 5 | A.  If they said it when they came in or the doctor would let |
| 04:17:58 | 6 | us know. |
| 04:17:58 | 7 | Q.  Now, this PFT test that you administered, is it a test |
| 04:18:02 | 8 | that you administer often in Dr. Chhibber's office? |
| 04:18:04 | 9 | A.  Yes. |
| 04:18:06 | 10 | Q.  Did Dr. Chhibber tell you you shouldn't be administering |
| 04:18:10 | 11 | the test to patients that you did? |
| 04:18:10 | 12 | A.  Yes. |
| 04:18:12 | 13 | Q.  How many occasions did that occur? |
| 04:18:14 | 14 | A.  I would say about five. |
| 04:18:20 | 15 | Q.  In the two years that you worked there, five times he told |
| 04:18:24 | 16 | you you should not have administered that test? |
| 04:18:26 | 17 | A.  Yes. |
| 04:18:26 | 18 | Q.  Did he explain why? |
| 04:18:26 | 19 | A.  Yes. |
| 04:18:28 | 20 | Q.  What did he say? |
| 04:18:28 | 21 | A.  That patient -- |
| 04:18:34 | 22 | MR. JONES:  Objection, foundation, Judge, too. |
| 04:18:36 | 23 | THE COURT:  Sustained. |
| 04:18:36 | 24 | BY MR. HAMMERMAN: |
| 04:18:38 | 25 | Q.  All right.  Let's go -- do you remember the instances of |

04:18:40    1    Dr. Chhibber telling you this?

04:18:42    2    A. Yes.

04:18:44    3    Q. All right. Let's take the first one. Do you remember

04:18:46    4    approximately how long you had been working at Dr. Chhibber's

04:18:48    5    office when he told you you should not have administered the

04:18:52    6    PFT test?

04:18:52    7    A. I would say about a year.

04:18:58    8    Q. And where did the conversation take place?

04:19:00    9    A. In the exam room.

04:19:02    10    Q. And who was present?

04:19:04    11    A. Dr. Chhibber, myself, and Tyanna.

04:19:08    12    Q. And what did Dr. Chhibber tell you in this conversation

04:19:12    13    when you were instructed that you should not have performed

04:19:14    14    the test? What did he say?

04:19:18    15    A. That this test shouldn't be performed on this patient

04:19:24    16    because the insurance wasn't going to cover it.

04:19:26    17    Q. The second time that you had one of these conversations

04:19:32    18    with Dr. Chhibber, do you remember approximately how much

04:19:36    19    longer after that first conversation this occurred?

04:19:38    20    A. No, not much longer.

04:19:44    21    Q. Not much longer?

04:19:46    22    A. I believe it wasn't that much longer, some months.

04:19:50    23    Q. Where did that conversation occur?

04:19:52    24    A. In the office.

04:19:52    25    Q. Who was present for that conversation?

04:19:54  1  A.  I believe it was me, Tyanna, Dr. B, and Dr. Chhibber.

04:20:02  2  Q.  What did Dr. Chhibber tell you during this second

04:20:06  3  conversation where he told you you shouldn't have performed a

04:20:08  4  PFT?

04:20:10  5  A.  The patient at that time didn't need a PFT.

04:20:14  6  Q.  Did he explain to you --

04:20:16  7          MR. JONES:  Judge, I'm going to object.  Whatever the

04:20:20  8  conversation is, she should be able to relate it without

04:20:24  9  leading questions.

04:20:24  10         THE COURT:  All right.  That's enough, ladies and

04:20:32  11 gentlemen, for today.  We have had a long day, and the lawyers

04:20:36  12 and I still have some work to do, so don't think we're just

04:20:40  13 taking off early, but we appreciate your attention and your

04:20:44  14 hard work today.

04:20:46  15         Please don't discuss the case with anyone.  We will

04:20:48  16 see you -- we will resume at 9:00 o'clock, so please try to be

04:20:52  17 here between 8:30, quarter to 9:00, the clerk will come in,

04:20:56  18 make sure everybody is here because we can't start until

04:21:00  19 everybody is here.

04:21:00  20         Thanks.  Have a good evening.

04:21:40  21   (The jury leaves the courtroom.)

04:21:40  22         THE COURT:  Please be seated.  The witness is excused

04:21:44  23 until tomorrow morning.  Start at 9:00 o'clock, so please be

04:21:48  24 back before 9:00.

04:21:52  25         We have some exhibits that were objected to, and I

04:22:00 1    didn't want to have prolonged sidebars, and nothing deadens a

04:22:08 2    jury's interest in a case than a lot of sidebars, especially

04:22:10 3    if they are lengthy.

04:22:14 4        I reserved ruling on Government Exhibit 628, 629, and

04:22:18 5    300.  I know there were others, but let's take them one at a

04:22:24 6    time so the defense can explain their objections and I can

04:22:30 7    take a look at any disputed exhibits.

04:22:36 8        MR. HAMMERMAN:  Your Honor, may we start with 300?

04:22:38 9        THE COURT:  Yes.

04:22:40 10       MR. HAMMERMAN:  Your Honor, Government Exhibit --

04:22:40 11       THE COURT:  Let me get 300 here.

04:22:48 12       All right.  I have it.

04:22:52 13       MR. HAMMERMAN:  Government Exhibit 300, your Honor,

04:22:56 14   are the patient progress notes from the patient charts that

04:22:58 15   have already been admitted into evidence.  In a sense, this is

04:23:02 16   just a composite of documents that are, in fact, already in

04:23:04 17   evidence that makes it easier for witnesses to move quickly

04:23:10 18   through the individual progress notes without having to go

04:23:14 19   through chart after chart.  We simply made this composite so

04:23:18 20   that we could actually be more expeditious in our questions of

04:23:22 21   witnesses.  All of these pages, every single page, has already

04:23:26 22   been admitted into evidence.

04:23:28 23       THE COURT:  What is the basis of the objection?

04:23:30 24       MR. ORMAN:  The basis of the objection, your Honor,

04:23:34 25   is exactly what counsel said.  These are all in evidence.

04:23:38  1  What the government has done is they have created a document

04:23:44  2  that unduly focuses the jury's emphasis on certain aspects of

04:23:50  3  the chart but not on others.  They have the documents, Judge.

04:23:58  4         THE COURT:  Are the documents marked in any way?  I

04:24:08  5  mean, is there a difference between the documents in

04:24:10  6  Government Exhibit 300 and the underlying documents?  I see

04:24:16  7  certain things circled.  That's why I am asking.

04:24:20  8         MR. HAMMERMAN:  There are nine, your Honor.  They are

04:24:22  9  photocopies of pages out of larger patient charts.  What we

04:24:24  10  were trying to do is we understood that we were going to want

04:24:28  11  to question certain witnesses about the progress notes

04:24:30  12  contained in the charts that have already been admitted into

04:24:32  13  evidence.  What we didn't want to do was waste your Honor's

04:24:36  14  time and the jurors' time with witnesses fumbling through

04:24:42  15  chart after chart trying to find an individual page out of a

04:24:44  16  hundred or however many pages may be in a chart.  We wanted to

04:24:50  17  staple them, in effect, all together so they can be gone

04:24:52  18  through more easily and expeditiously.

04:24:56  19         Every page in Government Exhibit 300 is already in

04:24:58  20  evidence.  This is just a way in which every witness that we

04:25:00  21  are going to call will address these pages, and there will be

04:25:04  22  many, can move through them more quickly and easily.

04:25:12  23         MR. ORMAN:  What counsel is saying is that these are

04:25:14  24  merely demonstrative.  If we treat this as a demonstrative

04:25:18  25  exhibit, there is no objection, Judge.

04:25:22  1    MR. HAMMERMAN:  Your Honor, we don't believe it to be
04:25:24  2  demonstrative.  We believe it to be evidence.  They are
04:25:26  3  photocopies of charts that the defendant drew up and wrote.
04:25:32  4  We'd like this to be in evidence so that it goes back to the
04:25:34  5  jury and so that the jury, also in their deliberations,
04:25:38  6  doesn't have to fumble through all of the charts to find these
04:25:42  7  individual pages.
04:25:42  8    It's simply a means of convenience.  The foundation
04:25:46  9  has been laid.  The defense didn't object to the underlying
04:25:48  10 charts.  We think this will really make the trial and
04:25:52  11 deliberations easier.
04:26:00  12    THE COURT:  Yes.
04:26:00  13    MR. ORMAN:  Yes.
04:26:00  14    THE COURT:  Do you really want us all to fumble
04:26:06  15 through boxes and boxes of documents?
04:26:10  16    MR. ORMAN:  I will stipulate that I don't want
04:26:12  17 anybody to fumble through anything, Judge.
04:26:16  18    THE COURT:  I respect that.  Well, I think there
04:26:32  19 should be some explanation as to what the basis is for
04:26:34  20 selecting -- how many excerpts are there?
04:26:40  21    MR. HAMMERMAN:  These are just the progress notes
04:26:42  22 that were found in the charts that have been admitted into
04:26:44  23 evidence.
04:26:44  24    MR. ORMAN:  Can I give the court an example of my
04:26:46  25 concern?

04:26:48  1    THE COURT:  Yes.

04:26:48  2    MR. ORMAN:  If you look at the very first page of

04:26:52  3    Exhibit 300, it's a chart of somebody named Louis Teague.

04:26:58  4    Now, in the real chart, the complete chart, there's also

04:27:04  5    echocardiogram -- I'm sorry, an electrocardiogram.  That

04:27:08  6    electrocardiogram is abnormal.  To look at just the progress

04:27:12  7    note away from the electrocardiogram could mean that the

04:27:20  8    significance of an abnormal electrocardiogram gets lost.

04:27:24  9    Cutting through what I'm saying is this creates a picture that

04:27:28  10   takes out of context exactly what the problems are for the

04:27:34  11   government.

04:27:38  12   MR. HAMMERMAN:  Your Honor, that sounds more like

04:27:40  13   argument than foundational objections to the actual exhibit.

04:27:48  14   That is the underlying base of which have already been

04:27:50  15   admitted by the court.

04:27:52  16   THE COURT:  Well, that may be, but this is -- this is

04:27:56  17   not truly -- it's duplicative in a sense, but it also is out

04:28:04  18   of context to just take a page.

04:28:06  19   The objection to 300 is sustained.  The underlying

04:28:08  20   documents are in evidence.

04:28:10  21   By the way, I do want to say, I have seen people go

04:28:14  22   in and out of what is the lockup for this courtroom and other

04:28:16  23   courtrooms where secured prisoners are kept and have files,

04:28:26  24   case files that are confidential court files, and it's not an

04:28:32  25   exit to go through the lockup.  We don't want to lock the door

| | | |
|---|---|---|
| 04:28:38 | 1 | because the marshals bring prisoners down, and one is |
| 04:28:40 | 2 | scheduled for tomorrow, so we can't lock that door. |
| 04:28:46 | 3 | Next. |
| 04:28:46 | 4 | MR. JONES:  Judge, I have to say I'm sorry.  I didn't |
| 04:28:48 | 5 | know what the room was.  I thought maybe they didn't have a |
| 04:28:52 | 6 | coat room or something. |
| 04:28:52 | 7 | THE COURT:  No, this courtroom doesn't have a coat |
| 04:28:56 | 8 | room.  We have a lockup back there.  In some courtrooms, the |
| 04:29:00 | 9 | lockup is completely separate.  Here it's combined.  And also |
| 04:29:04 | 10 | our case files, some case files are back there. |
| 04:29:10 | 11 | What's the next one? |
| 04:29:14 | 12 | MR. ORMAN:  Your Honor, if I objected to Government |
| 04:29:20 | 13 | Exhibit 627, I did not mean to.  I will withdraw that |
| 04:29:24 | 14 | objection. |
| 04:29:24 | 15 | THE COURT:  Government Exhibit 627 is admitted. |
| 04:29:28 | 16 | (Above-mentioned exhibit was received in evidence.) |
| 04:29:34 | 17 | MR. HAMMERMAN:  Your Honor, the government presented, |
| 04:29:38 | 18 | I believe, six documents that were, for all practical |
| 04:29:44 | 19 | purposes, the same.  They were 632 -- |
| 04:29:48 | 20 | THE COURT:  Just a moment.  I have to get the book. |
| 04:30:18 | 21 | Got it. |
| 04:30:18 | 22 | MR. HAMMERMAN:  Maybe I should start at the |
| 04:30:20 | 23 | beginning.  They were 624, 625, 630, 631, 627, and 632. |
| 04:30:38 | 24 | Now, it's my understanding the defense does not |
| 04:30:40 | 25 | object to 62- -- and I know Mr. Orman will correct me if I'm |

04:30:46  1   incorrect here -- 624, 625, and 627.  Is that correct, sir?

04:30:50  2        MR. ORMAN:  Correct.

04:30:52  3        THE COURT:  All right.  Just go through the ones that

04:30:54  4   are in dispute so that I can take a look at them in the

04:31:00  5   context of your objection.

04:31:02  6        MR. HAMMERMAN:  Yes, your Honor.  The reason I bring

04:31:02  7   all six to the court's attention is because we believe the

04:31:06  8   foundation for all six is the same.

04:31:08  9        THE COURT:  All right.  Tell me the first one that's

04:31:12  10  in dispute.

04:31:12  11       MR. HAMMERMAN:  Sure.  630.

04:31:22  12       THE COURT:  Patient registration dated April 24th,

04:31:28  13  2009?

04:31:28  14       MR. ORMAN:  That's correct, your Honor.

04:31:28  15       THE COURT:  What's the objection?

04:31:30  16       MR. ORMAN:  Let me point out that the objection to

04:31:36  17  all of these is the same.

04:31:40  18       We will just talk about 630.  If we go to the third

04:31:48  19  page of the document and what appears to be every other page

04:31:56  20  thereafter, roughly, what you see are charts for patients.

04:32:02  21  None of these patients are listed in the indictment, Judge.

04:32:08  22  Nobody will testify as to whether any test given to any of

04:32:14  23  these patients is unnecessary.  That makes these documents

04:32:22  24  irrelevant, and beyond being irrelevant, they are dangerous,

04:32:26  25  because you're going to have a bunch of documents going to

04:32:28   1   jurors showing tests being given with no explanation, and the

04:32:34   2   jurors may assume that, yeah, all of these tests are improper

04:32:42   3   where nobody will testify that the tests are improper, which

04:32:46   4   is the basis of this litigation.  These are meaningless.

04:32:50   5   That's true for every single other exhibit.

04:32:52   6              MR. HAMMERMAN:  May I address it, your Honor?

04:32:54   7              THE COURT:  Yes.

04:33:00   8              MR. HAMMERMAN:  I would like to address two points,

04:33:02   9   if I may.  The first is that the reason we introduced these in

04:33:04   10  sets of three to Special Agent Bakken, as the court may

04:33:08   11  recall, is because, as you may see in Government Exhibit 624

04:33:10   12  and 625 and 630, two of those days have written at the top of

04:33:14   13  them, Free clinic.  We intend to elicit evidence --

04:33:18   14             THE COURT:  Which three --

04:33:26   15             MR. HAMMERMAN:  I could hand it up if it makes it

04:33:28   16  easier, your Honor.

04:33:28   17             THE COURT:  No.  I have a book that's tabbed, but I

04:33:40   18  don't want to talk about theoretical objections.  I really

04:33:42   19  would like to see the document and hear the basis.

04:33:44   20             I see under Government Exhibit 624, there is a page,

04:33:50   21  patient registration for -- the first number is 2 and the

04:34:00   22  second number is written over.  I am not sure if it's a 5

04:34:02   23  or 6.

04:34:04   24             MR. HAMMERMAN:  Correct, your Honor.

04:34:04   25             MR. ORMAN:  And there is no objection to that

04:34:06   1   document, your Honor.

04:34:06   2           THE COURT:  All right.

04:34:08   3           MR. HAMMERMAN:  These -- if you look --

04:34:10   4           THE COURT:  Well, 624 is in evidence then?

04:34:14   5           MR. ORMAN:  Yes.

04:34:14   6           MR. HAMMERMAN:  These documents -- the reason that

04:34:16   7   these were put together, your Honor, as the court will see, in

04:34:18   8   Government Exhibit 624 and 625 are entitled Free Clinic.  We

04:34:28   9   intend to offer evidence that Dr. Chhibber offered a free

04:34:32   10  clinic on certain days where patients weren't required to pay.

04:34:36   11  And these progress notes, Special Agent Bakken explained where

04:34:38   12  they came from and how these exhibits were compiled, lists in

04:34:40   13  a sense the diagnoses -- not in a sense.  They list the

04:34:44   14  diagnoses and tests found and ordered by Dr. Chhibber for

04:34:48   15  those days.

04:34:48   16          Government Exhibit 630, which was a day or two

04:34:54   17  before, does the exact same thing.

04:34:56   18          We put these composites together, your Honor, because

04:34:58   19  we intend to elicit testimony that on the free days, the

04:35:04   20  patients effectively weren't sick and tests weren't done; but

04:35:08   21  on the paying days, the patients were sick and the testing was

04:35:14   22  done, and that's reflected in the progress notes where

04:35:18   23  diagnoses and tests are written by Dr. Chhibber.

04:35:22   24          Now, Mr. Orman is not objecting to the free clinic

04:35:26   25  days that would show that no tests are done and would like

04:35:28   1   those into evidence, but the foundation for all three records

04:35:32   2   are the same, and it would be -- it's almost -- it would be

04:35:38   3   prejudicial to the government to now admit only the free

04:35:40   4   clinic days without the other day that shows the contrast.

04:35:46   5   These documents were all presented under the same foundation

04:35:50   6   to the court because the contrast is of what is important

04:35:54   7   here.

04:35:54   8           For Mr. Orman to suggest that the day in which

04:36:00   9   Dr. Chhibber found everybody to be ill and had them all

04:36:06   10   subjected to tests is prejudicial, but want to put in the free

04:36:08   11   clinic days where he wasn't paid for those tests and, thus, no

04:36:12   12   one was sick and no one was tested would be unfair to the

04:36:16   13   government, and, frankly, it's a little cynical, your Honor.

04:36:24   14           THE COURT:  What's the foundation for your conclusion

04:36:26   15   as to what happened on free days and what happened on days

04:36:30   16   that were insured patients?  What's the basis for your

04:36:34   17   conclusion?

04:36:36   18           MR. HAMMERMAN:  The progress notes from the charts

04:36:38   19   written by Dr. Chhibber.  And, if need be, we can present

04:36:42   20   these exhibits to additional witnesses to verify that the

04:36:46   21   progress notes are written by Dr. Chhibber, but they came from

04:36:50   22   the files that were taken from his office.

04:36:56   23           And the foundation for 624, 625, and 630 was all the

04:37:02   24   same, your Honor.  There was no difference in the foundation

04:37:06   25   for these three.  Mr. Orman wants the two free clinic days in

04:37:10    1    but not the contrasting paid day that shows something

04:37:14    2    completely different.

04:37:22    3            MR. ORMAN:  The way I understand this to work, Judge,

04:37:26    4    is the government gets to offer exhibits, and I have the right

04:37:28    5    to object to whatever I want.  That's what I understood the

04:37:30    6    process to be, but, apparently, I was operating under some

04:37:34    7    sort of misapprehension.

04:37:38    8            Indeed, what counsel doesn't understand is the tests

04:37:44    9    given on Sundays, which are free clinic days, are going to be

04:37:48   10    different from tests that were done during the week for this

04:37:52   11    reason.  Two of the people who did the critical tests during

04:37:58   12    the week didn't work on Sundays.  So that's why there's a

04:38:04   13    difference, not a large difference, but there is a difference.

04:38:12   14            But let's get back to what I am objecting to.  I am

04:38:16   15    objecting to getting any chart before the jury showing any

04:38:20   16    test that's being conducted without somebody to step up and

04:38:24   17    say, That test is wrong.  No one is going to do that.

04:38:30   18            So now I got a bunch of jurors sitting in the back

04:38:32   19    saying, Yeah, on 5/19/09, Dr. Chhibber did an echocardiogram

04:38:44   20    on Kelly Adams, someone who isn't in the indictment, someone

04:38:48   21    the jurors won't know anything about, someone who isn't going

04:38:52   22    to testify, saying, Gee, that must be an improper test.  There

04:38:56   23    will never be a foundation to justify these documents coming

04:39:00   24    into evidence, and counsel knows it.

04:39:04   25            THE COURT:  How would you connect these up?

04:39:06  1    MR. HAMMERMAN:  Your Honor, we believe that these

04:39:06  2  exhibits, first of all, speak for themselves and are

04:39:10  3  circumstantial evidence.  If you look through these

04:39:12  4  exhibits --

04:39:14  5    THE COURT:  Now, wait a minute.  We don't want jurors

04:39:16  6  interpreting medical records.

04:39:18  7    MR. ORMAN:  That's right.

04:39:18  8    THE COURT:  Tell me how you're going to connect it up

04:39:22  9  other than asking the jurors to go through and substitute

04:39:26  10  their judgment as to what is medically necessary.

04:39:28  11    MR. HAMMERMAN:  We have an expert that Mr. Jones

04:39:32  12  spoke a lot about, the experts that are going to testify in

04:39:34  13  this trial, during his opening.  We have an expert that will

04:39:36  14  testify that some of these conditions and these tests are

04:39:40  15  actually, although appropriate in certain circumstances,

04:39:46  16  infrequently found, infrequently used.

04:39:48  17    For example, you've heard testimony today on the

04:39:52  18  carotid bruit, that sound in the throat that is a precursor to

04:39:58  19  someone having a stroke.  Our expert will tell the jury that

04:40:00  20  while that occurs, it's actually rare.  And if you look

04:40:04  21  through a day's worth of charts and half the people have that

04:40:10  22  sound, that our expert will say that just doesn't happen.

04:40:14  23    One of the exhibits to which Mr. Orman has objected

04:40:18  24  shows that on a given day, every patient that was reflected in

04:40:22  25  the exhibit, and this is going to a different exhibit, but

04:40:26  1   this is 628, one of the ones he objected to, every single

04:40:32  2   person, everyone, was short of breath or had asthma.  Our

04:40:34  3   expert will say that that simply doesn't occur.  He will

04:40:38  4   explain what it means for a person to be short of breath.

04:40:42  5         THE COURT:  Well, if the expert is going to identify

04:40:46  6   what he relied on, I think it would be more appropriate to

04:40:48  7   move these into evidence at that time.

04:40:52  8         MR. HAMMERMAN:  He didn't --

04:40:52  9         THE COURT:  Not in isolation, but whatever the expert

04:40:56  10  considered.

04:40:56  11        MR. HAMMERMAN:  The expert --

04:40:58  12        MR. ORMAN:  Judge, we need some clarification.  This

04:41:00  13  expert has never seen these documents which are at issue now.

04:41:06  14  How do I know that?  I know that because we looked at the

04:41:12  15  submissions to the experts, and we know what documents were

04:41:16  16  given to the expert.  None of these documents that we are

04:41:20  17  talking about now were provided to this expert, and I have

04:41:26  18  read every 302 that he has provided.  He referenced none of

04:41:32  19  this.

04:41:32  20        So he's not going to say anything about these

04:41:34  21  documents, unless something has happened here that I don't

04:41:38  22  know about.

04:41:38  23        MR. HAMMERMAN:  Your Honor, Mr. Orman is correct.  We

04:41:40  24  don't intend to have our expert weigh in and judge every piece

04:41:46  25  of evidence the government presents.  Instead, our expert has

04:41:48  1  reviewed certain records but will talk about medical care for

04:41:54  2  an internal medicine doctor.  And what we intend to do, as

04:41:58  3  both parties do anytime they try to present a case, is you

04:42:02  4  present a mosaic with different pieces of evidence and you

04:42:06  5  allow the jury to interpret that.

04:42:06  6      All we're asking the jury to do is make reasonable

04:42:10  7  inferences from the evidence that's presented.  We believe

04:42:12  8  that the testimony that this court will hear will make the

04:42:16  9  jury understand that it is unreasonable for every single

04:42:20  10  person for Dr. Chhibber to have seen on the same day to have

04:42:24  11  the same condition or the vast majority to suffer from the

04:42:28  12  same conditions.

04:42:30  13      This case is about whether or not Dr. Chhibber was

04:42:34  14  diagnosing in patient charts that are reflected in these

04:42:38  15  exhibits the same types of diagnoses that did not actually

04:42:42  16  occur in the patients so that he could order the tests that

04:42:44  17  are reflected in the same exact progress notes.  We're asking

04:42:48  18  the jury to review these particular exhibits, put them side by

04:42:54  19  side, and draw whatever reasonable inference they believe

04:42:56  20  appropriate based on all the evidence that they hear, both

04:43:00  21  expert, lay testimony from fact witnesses like Ms. Rhodes, and

04:43:04  22  allow them to make a decision.

04:43:06  23      We will, of course, argue, I know Mr. Jones will do

04:43:10  24  the same, but what we're trying to do is present our case

04:43:12  25  where we say, Look, there is this evidence out there, the

04:43:18   1   experts have told you that this doesn't occur, draw the

04:43:22   2   reasonable inference.

04:43:22   3        And these documents, the foundation has been laid.

04:43:24   4   Mr. Orman wants the jury to see only the ones where

04:43:28   5   Dr. Chhibber didn't provide the tests because it was free.

04:43:32   6   The day after when it wasn't free is totally different, and

04:43:36   7   that is a reasonable --

04:43:36   8        THE COURT:  That's something you need foundation for

04:43:40   9   at this point, so you certainly may connect these documents up

04:43:50  10   during the testimony, including the testimony of the expert,

04:43:52  11   if there is a foundation for it.

04:43:56  12        MR. HAMMERMAN:  Well, I hear your Honor's ruling --

04:43:58  13        THE COURT:  And I think for the record, we should not

04:44:02  14   just have a generalization.  I know you referred to several

04:44:06  15   specific documents, but for the record, would you identify

04:44:10  16   which exhibits ruling was deferred on where, in defense's

04:44:22  17   view, there isn't a foundation?

04:44:24  18        MR. HAMMERMAN:  The government had presented --

04:44:26  19        THE COURT:  Other than handwriting.

04:44:28  20        MR. HAMMERMAN:  I'm sorry?

04:44:30  21        THE COURT:  Other than handwriting.  I think there

04:44:32  22   has been a foundation as to handwriting on these documents.

04:44:34  23        MR. HAMMERMAN:  And we will present the -- so the six

04:44:38  24   that we have been discussing with your Honor today, actually,

04:44:42  25   the eight, are 624, 625, 630, 631, 627, 632, 628, and 629.

04:44:54   1   Mr. Orman has agreed to the admission of the free clinic days,
04:45:00   2   624, 625, and 627.  The remaining days, the non-free clinic
04:45:06   3   days, we will present them to the staff, like Ms. Rhodes, and
04:45:08   4   have her go through, if necessary, page by page so that she
04:45:12   5   can say that, in fact, those are Dr. Chhibber's handwriting to
04:45:14   6   lay the foundation that those are from the progress notes.
04:45:18   7        And if the court would like -- you know, one of the
04:45:20   8   things we didn't want to do in this trial, as reflected by
04:45:24   9   630, was bring in a pallet of patient records.  We have the
04:45:30  10   pallet that underlie every one of these exhibits, and, if
04:45:34  11   necessary, we can bring them all in.  We just thought that
04:45:36  12   that would -- it's a voluminous, voluminous amount of
04:45:40  13   documents that we didn't intend to waste the court's or the
04:45:46  14   jury's time with.  We believe these composites are excellent
04:45:48  15   summaries, they accurately reflect only statements of the
04:45:52  16   defendant, and that's why we put them together.
04:45:54  17        THE COURT:  Are they summaries, really, under the
04:45:56  18   Federal Rules of Evidence, or are they just selected patient
04:46:00  19   records?
04:46:02  20        MR. ORMAN:  They are selected documents, your Honor.
04:46:04  21   They are not summaries.
04:46:10  22        THE COURT:  The Federal Rules of Evidence are fairly
04:46:12  23   specific as what qualifies as a summary exhibit.
04:46:14  24        MR. HAMMERMAN:  They are the -- I think you could
04:46:16  25   characterize them either way, your Honor, because what you're

04:46:18  1  talking about is it would be a pallet of patient charts

04:46:22  2  because for every one of the pages that follows these patient

04:46:30  3  registration forms, there is a progress note, and for every

04:46:32  4  progress note, there is a patient chart like the court has

04:46:36  5  seen.  And we would literally be bringing in every patient

04:46:38  6  record and piling those up for the jury to send back into the

04:46:42  7  jury room so that they could see those pages.  That's not an

04:46:46  8  efficient use -- I imagine if I tried to do that, the court

04:46:48  9  would be quite displeased with me.

04:46:50  10  THE COURT:  You're very perceptive.

04:46:58  11  MR. HAMMERMAN:  Right.  And so this was a way in

04:47:00  12  which to lay the foundation with an agent who said, I took

04:47:02  13  those pages out because those are the pages that we, the

04:47:04  14  government, want to make our argument around.  We copied them,

04:47:08  15  this is the way we copied them, we put them together.

04:47:10  16  I understand Mr. Orman might want to argue

04:47:12  17  differently about a piece of evidence.  That is, in fact, what

04:47:16  18  happens over all pieces of evidence in all trials.  I expect

04:47:18  19  him to do that.  But we believe the foundation has been laid

04:47:20  20  for these.

04:47:20  21  THE COURT:  Let me ask, Mr. Orman, is it misleading,

04:47:26  22  do you think, can you identify anything that would be

04:47:28  23  misleading by just -- by the selective use of the records?

04:47:34  24  MR. ORMAN:  Sure.  We are going to go back to the

04:47:42  25  issue.  The issue is not the number of tests that were done.

04:47:48  1   That doesn't matter.  You can do 10,000 tests.  If all of them

04:47:52  2   are necessary, there's nothing wrong with that.

04:47:56  3          The defect in counsel's reasoning is this.  He's

04:48:00  4   telling you there was a lot of tests; therefore, some had to

04:48:08  5   be unnecessary or all had to be unnecessary.  Under that kind

04:48:14  6   of reasoning, they could go out and pick up Bill Gates as a

04:48:18  7   criminal because he made a lot of money, so something had to

04:48:20  8   be wrong because nobody should have that much money.  That's

04:48:24  9   their argument.

04:48:28 10          They have to go a step further.  They have to say

04:48:32 11   that irrespective of the number of tests given, that test

04:48:36 12   shouldn't have been.  The only person who can say that -- and

04:48:42 13   this cuts to the heart of this trial -- is an expert.  The

04:48:46 14   expert has never seen these documents.  The expert doesn't

04:48:50 15   know about them.  They go to the jury.  And they can say --

04:48:56 16   and the jurors can say, Well, they've put on four patients,

04:49:00 17   but here's a hundred charts of other patients.  Those must be

04:49:04 18   bad tests.  Otherwise, they wouldn't be in evidence.  That

04:49:10 19   would be a tragedy.

04:49:10 20          MR. HAMMERMAN:  Your Honor, I presume in all of the

04:49:14 21   trials that you do, you give a certain set of instructions

04:49:18 22   that are the standard instructions in the Seventh Circuit that

04:49:20 23   say that jurors can make reasonable inferences from the

04:49:24 24   evidence presented and that they can use their common sense.

04:49:26 25          Mr. Orman, to use his example, if, in fact,

04:49:30  1   Dr. Chhibber saw 10,000 patients and he ordered 10,000 tests
04:49:34  2   for the same people, it is reasonable for the government to
04:49:40  3   present that evidence and to argue to the jury, yes, some of
04:49:44  4   these were inappropriate.
04:49:48  5          A case should not -- a criminal case where a jury of
04:49:52  6   one's peers are the determinants -- determiners of fact is not
04:49:56  7   only to be determined by experts.  This is not a case in which
04:50:00  8   only the experts can tell the jury whether or not a crime has
04:50:04  9   been committed.  They are allowed to make reasonable
04:50:06  10  inferences --
04:50:06  11         THE COURT:  Well, that's not what an expert does.
04:50:08  12         MR. HAMMERMAN:  I know.
04:50:10  13         THE COURT:  An expert doesn't tell a jury whether or
04:50:12  14  not --
04:50:12  15         MR. HAMMERMAN:  And Mr. Orman suggests that they do,
04:50:16  16  and we don't agree with that.  We think the jury should make
04:50:18  17  the determination by seeing the records --
04:50:20  18         THE COURT:  A medical determination of necessity?
04:50:22  19         MR. HAMMERMAN:  The jury should be allowed to look
04:50:24  20  and say, If 14 patients came to Dr. Chhibber's office on the
04:50:30  21  same day, which Government Exhibit 628 shows, of those 14
04:50:34  22  patients, two had asthma, the other 12 all had shortness of
04:50:40  23  breath, and everybody gets a PFT.  It would be as if they all
04:50:46  24  came in after the Chicago Marathon, your Honor.  We want to
04:50:48  25  put that in front of the jury and say that didn't happen.

04:50:52 1    What happened is Dr. Chhibber lied, and he lied in

04:50:54 2    the charts so that he could bill for the tests.  That's a

04:51:00 3    reasonable inference that a jury should be able to draw.

04:51:02 4         THE COURT:  Well, you are talking there is a

04:51:04 5    difference between inference and speculation by a jury on

04:51:08 6    medical matters as to medical necessity.

04:51:10 7         The objection is sustained, but you may connect it

04:51:12 8    up, you may connect it up, subject to reoffering.

04:51:22 9         I am afraid to ask if there is anything else?

04:51:24 10        MR. ORMAN:  I am afraid to answer.

04:51:32 11        THE COURT:  What's next?

04:51:32 12        MR. HAMMERMAN:  Your Honor, there might be one more

04:51:34 13   issue.

04:51:34 14        MR. ORMAN:  You see?

04:51:38 15        MR. HAMMERMAN:  Mr. Orman, and this is something we

04:51:40 16   have discussed with him, and we are asking, and I think we are

04:51:44 17   in agreement on this, so Mr. Orman, it is our understanding,

04:51:48 18   that there is a witness on the government's witness list who

04:51:50 19   has been there since the beginning of our witness list in this

04:51:54 20   case has entered into a representation arrangement with that

04:52:00 21   prospective witness.

04:52:00 22        THE COURT:  Could you tell me who the witness is?

04:52:02 23        MR. HAMMERMAN:  The witness is named Jayesh Tolia,

04:52:06 24   and the government at this point still intends to call

04:52:14 25   Mr. Tolia.  In the last few months, Mr. Orman has engaged in

04:52:18   1   an attorney-client representation with that witness.

04:52:20   2          Our position is that, at a bare minimum, that

04:52:22   3   presents a potential conflict that needs to be addressed with

04:52:24   4   the defendant.  Our understanding is that the defendant can be

04:52:28   5   advised of that conflict by your Honor and can knowingly weigh

04:52:30   6   it, but we believe that the defendant has to weigh that

04:52:34   7   conflict.

04:52:34   8          It's also my understanding that Mr. Orman intends to

04:52:38   9   cross-examine his own client when he testifies.  We once again

04:52:42  10   think that Dr. Chhibber has to weigh any potential conflict.

04:52:50  11   We believe that there is a potential there and has to waive it

04:52:52  12   on the record such that he cannot claim later that his counsel

04:52:56  13   pulled punches, if you will, and that he didn't get fair

04:53:00  14   representation because he didn't understand the potential

04:53:04  15   client conflict of having his counsel cross-examine another

04:53:06  16   one of his counsel's clients.

04:53:10  17          THE COURT:  What's the witness' name again?

04:53:12  18          MR. HAMMERMAN:  Jayesh Tolia.

04:53:16  19          THE COURT:  When do you anticipate calling him?

04:53:18  20          MR. HAMMERMAN:  Next week, your Honor, and that's

04:53:22  21   only because we are moving much more quickly than we thought.

04:53:24  22   Our days might be off a little.

04:53:26  23          THE COURT:  Yes.  Is it true that you represent

04:53:28  24   Mr. Tolia?

04:53:30  25          MR. ORMAN:  It is.

04:53:32  1   THE COURT:  Okay.  Explain to me why this isn't a
04:53:38  2  conflict.
04:53:38  3   MR. ORMAN:  There is no conflict, Judge.  I got a
04:53:42  4  letter last week, an email from counsel, indicating that I was
04:53:46  5  potentially in violation of Rule 7.1 of the Illinois DIs.  And
04:53:56  6  I wrote him back and I said, There is an exception, and that
04:54:02  7  is if both clients are given informed consent and do not
04:54:06  8  object.  Informed consent, issue disappears.
04:54:10  9   Mr. Tolia sent counsel a letter this morning through
04:54:18  10  email indicating that he doesn't object.  I think he got it
04:54:20  11  about 2:30 in the morning.  And Dr. Chhibber will tell you he
04:54:24  12  doesn't object to the representation.
04:54:26  13   What we are talking about here is that I filed a debt
04:54:30  14  collection case for Mr. Tolia.  Somebody stiffed him out of
04:54:34  15  some money.  He asked me to collect it, and I did, and I filed
04:54:38  16  a lawsuit.  It never occurred to me that anybody would ever
04:54:42  17  raise an issue like that.  To the extent it has merit, it will
04:54:46  18  be waived.
04:54:50  19   THE COURT:  Do you have any objection to my asking
04:54:52  20  Dr. Chhibber to put his position on the record as to your
04:54:58  21  representation of a government witness --
04:55:02  22   MR. ORMAN:  No.
04:55:02  23   THE COURT:  -- specifically, Jayesh Tolia?
04:55:14  24   Dr. Chhibber, are you familiar with this
04:55:16  25  circumstance?

| | | |
|---|---|---|
| 04:55:18 | 1 | THE DEFENDANT:  I have no objection. |
| 04:55:22 | 2 | THE COURT:  All right. |
| 04:55:24 | 3 | MR. ORMAN:  Now are we done? |
| 04:55:26 | 4 | THE COURT:  And I assume you have verified this |
| 04:55:28 | 5 | through your witness, Mr. Tolia? |
| 04:55:34 | 6 | MR. COLE:  All I have is I received an email from |
| 04:55:38 | 7 | Mr. Orman forwarding an email from Mr. Tolia.  So assuming -- |
| 04:55:42 | 8 | THE COURT:  If there is any question as to Mr. Tolia, |
| 04:55:44 | 9 | then we will take it up outside the jury's presence with |
| 04:55:48 | 10 | Mr. Tolia present and with Dr. Chhibber. |
| 04:55:50 | 11 | MR. COLE:  I don't anticipate that being an issue. |
| 04:55:52 | 12 | THE COURT:  All right.  Well, have a good evening.  I |
| 04:55:54 | 13 | assume you're going to be working.  Thank you. |
| 04:55:56 | 14 | MR. COLE:  Thank you. |
| 04:56:00 | 15 | (The trial was adjourned at 4:55 p.m. on March 1, 2012, |
| 04:56:18 | 16 | until 9:00 a.m. on March 2, 2012.) |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |