IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. 11 CR 119 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JASWINDER RAI CHHIBBER, | ) | Chicago, Illinois |
| | ) | March 2, 2012 |
| Defendant. | ) | 9:00 o'clock a.m. |

TRIAL TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SUZANNE B. CONLON, AND A JURY
VOLUME 2-A

APPEARANCES:

For the Plaintiff:      HON. PATRICK FITZGERALD
                        United States Attorney
                        BY:  MR. SAMUEL B. COLE
                             MR. JOEL M. HAMMERMAN
                        219 S. Dearborn St., Suite 500
                        Chicago, Illinois  60604

For the Defendant:      PUGH, JONES & JOHNSON, P.C.
                        BY:  MR. WALTER JONES, JR.
                             MR. JONATHAN B. CIFONELLI
                        180 North LaSalle Street, Suite 3400
                        Chicago, IL  60601
                        (312) 768-7800

                        LAW OFFICE OF ROBERT ORMAN
                        BY:  MR. ROBERT ORMAN
                        One North LaSalle Street, Suite 1775
                        Chicago, IL  60602
                        (312) 372-0515

Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Suite 1854-B
                        Chicago, Illinois  60604
                        (312) 435-5639

1                          I N D E X

2    <u>DESCRIPTION</u>                                        <u>PAGE</u>

3

4
     TWAHKI RHODES, DIRECT EXAMINATION CONTINUED          248
5    BY MR. HAMMERMAN:

6
     TWAHKI RHODES, CROSS-EXAMINATION                     283
7    BY MR. JONES:

8
     TWAHKI RHODES, REDIRECT EXAMINATION                  324
9    BY MR. HAMMERMAN:

10
     TWAHKI RHODES, RECROSS-EXAMINATION                   332
11   BY MR. JONES:

12
     ROBERT ARTHUR FORTT, DIRECT EXAMINATION              332
13   BY MR. HAMMERMAN:

14
     ROBERT ARTHUR FORTT, CROSS-EXAMINATION               345
15   BY MR. JONES:

16
     ROBERT ARTHUR FORTT, REDIRECT EXAMINATION            359
17   BY MR. HAMMERMAN:

18
     ROBERT ARTHUR FORTT, RECROSS-EXAMINATION             360
19   BY MR. JONES:

20
     DANIEL HERDEMAN, M.D., DIRECT EXAMINATION            363
21   BY MR. HAMMERMAN:

22
     DANIEL HERDEMAN, DIRECT EXAMINATION CONTINUED        386
23   BY MR. HAMMERMAN:

24
     DANIEL HERDEMAN, M.D., CROSS-EXAMINATION             477
25   BY MR. ORMAN:

1
2
```
DANIEL HERDEMAN, M.D., REDIRECT EXAMINATION          515
BY MR. HAMMERMAN:
```
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    (The following proceedings were had in open court in the
08:59:42    2    presence and hearing of the jury:)
08:59:42    3         THE COURT:  Good morning, members of the jury.
08:59:42    4    Please be seated.
08:59:44    5         Will the witness resume the stand, please.
09:00:02    6         You are still under oath in this case.  Would you
09:00:04    7    restate your name for the jury and court reporter.
09:00:06    8         THE WITNESS:  Twahki Rhodes.
09:00:10    9         THE COURT:  Thank you.  Please be seated.
09:00:14    10                        - - -
09:00:14    11        TWAHKI RHODES, DIRECT EXAMINATION CONTINUED
09:00:14    12   BY MR. HAMMERMAN:
09:00:24    13   Q.  Good morning, Ms. Rhodes.
09:00:24    14   A.  Good morning.
09:00:26    15   Q.  Yesterday we talked a little bit about a test that you
09:00:28    16   performed at Dr. Chhibber's office called a PFT.
09:00:32    17        You mentioned that while you worked for Dr. Chhibber,
09:00:34    18   you performed a number of different tests; is that right?
09:00:38    19   A.  Yes.
09:00:38    20   Q.  What other tests did you perform?
09:00:38    21   A.  EKG, AVI, and ICG.
09:00:46    22   Q.  Once again, Ms. Rhodes, if you could make sure you speak
09:00:48    23   into that microphone so everyone can hear you.  Thank you.
09:00:52    24        I'd like to ask you a few questions about the EKGs
09:00:56    25   that you just mentioned.  First of all, what is an EKG, from

| | | |
|---|---|---|
| 09:00:58 | 1 | your understanding? |
| 09:01:00 | 2 | A. It is a test to measure the heart rhythm. |
| 09:01:06 | 3 | Q. And is that a test you perform? |
| 09:01:08 | 4 | A. Yes. |
| 09:01:08 | 5 | Q. How often did you perform that test at Dr. Chhibber's |
| 09:01:12 | 6 | office? |
| 09:01:12 | 7 | A. Daily. |
| 09:01:16 | 8 | Q. Did you do it multiple times a day? |
| 09:01:18 | 9 | A. Yes. |
| 09:01:20 | 10 | Q. How did you administer the EKG test? |
| 09:01:26 | 11 | A. Well, there were -- we ask the patient to either remove |
| 09:01:32 | 12 | their shirt or lift the shirt up, and we would apply foil |
| 09:01:38 | 13 | electrodes to the chest. |
| 09:01:40 | 14 | Q. Who taught you to administer that test, Ms. Rhodes? |
| 09:01:42 | 15 | A. Besides remembering from school, my co-worker. |
| 09:01:50 | 16 | Q. And which co-worker are you talking about? |
| 09:01:52 | 17 | A. Tyanna Holmes. |
| 09:01:58 | 18 | Q. Did Dr. Chhibber ever give you any instruction on how to |
| 09:02:00 | 19 | apply the EKG test? |
| 09:02:02 | 20 | A. Yes. |
| 09:02:02 | 21 | Q. On how many occasions did he do that? |
| 09:02:04 | 22 | A. About five. |
| 09:02:06 | 23 | Q. And what kind of instructions did he give you? |
| 09:02:10 | 24 | A. To use alcohol pads to wipe off certain areas. |
| 09:02:16 | 25 | Q. Any other instruction? |

09:02:18  1  A.  No.

09:02:20  2  Q.  Now, you mentioned that these electrodes would be put on

09:02:26  3  patients.  Where would the patients be, in what position would

09:02:28  4  they be when you administered this test?

09:02:30  5  A.  They would be sitting in a chair.

09:02:34  6  Q.  Were patients ever lying down?

09:02:38  7  A.  Yes, sometimes.

09:02:40  8  Q.  How would you determine whether a patient should lie down

09:02:44  9  or sit for this test to be performed?

09:02:46  10  A.  Usually we were told to take the patient and lie them down

09:02:54  11  for that test.

09:02:54  12  Q.  What do you mean by "usually"?  Are you talking about in

09:03:00  13  all instances or just those instances in which they lied down?

09:03:04  14  A.  Just the instances where they lied down.

09:03:08  15  Q.  And who instructed you that certain patients should have

09:03:10  16  the test lying down?

09:03:12  17  A.  The doctor, Dr. Chhibber.

09:03:16  18  Q.  And you performed these tests in Dr. Chhibber's office?

09:03:20  19  A.  Yes.

09:03:20  20  Q.  Was Dr. Chhibber ever present while you were performing

09:03:24  21  these tests?

09:03:26  22  A.  Sometimes, yes.

09:03:26  23  Q.  Would that include tests where patients were sitting?

09:03:30  24  A.  Yes.

09:03:32  25  Q.  And patients that were lying down?

09:03:34    1   A.  Yes.

09:03:34    2   Q.  After Dr. Chhibber had instructed you on certain instances

09:03:38    3   to have the patients lie down, did you still perform tests on

09:03:42    4   other patients while they were sitting?

09:03:44    5   A.  Yes.

09:03:44    6   Q.  Was Dr. Chhibber ever present during those instances where

09:03:48    7   they were still sitting?

09:03:50    8   A.  Yes.

09:03:50    9   Q.  Did he correct you and tell you that the patient had to

09:03:54   10   lie down?

09:03:54   11   A.  No.

09:03:56   12   Q.  Ms. Rhodes, did you have an understanding on those types

09:04:04   13   of patients that would receive the test lying down?

09:04:10   14   A.  Could you repeat that?

09:04:12   15   Q.  Did you have an understanding on which types of patients

09:04:14   16   should receive this test lying down?

09:04:16   17   A.  Yes.

09:04:16   18   Q.  What was your understanding?

09:04:18   19   A.  My understanding was the EKG machine didn't read it right

09:04:22   20   or they had a heart problem.

09:04:24   21   Q.  Were those the two instances that you understood the

09:04:26   22   patient should be lying down, if they had a heart problem?

09:04:30   23   A.  Yes.

09:04:30   24   Q.  You mentioned an ICG test.  What is an ICG test?

09:04:42   25   A.  To my understanding, it measures the pulmonary system, the

09:04:48  1  rhythm of it.  We would apply electrodes to the side where the

09:04:56  2  lungs are and then go onto the carotid artery.

09:05:02  3  Q.  Is that a test that you performed at Dr. Chhibber's

09:05:04  4  office?

09:05:04  5  A.  Yes.

09:05:04  6  Q.  How often would you perform ICG tests?

09:05:08  7  A.  Almost every day.

09:05:10  8  Q.  Would you perform it multiple times a day?

09:05:12  9  A.  Sometimes.

09:05:14  10  Q.  Who taught you how to administer the ICG test?

09:05:24  11  A.  Co-workers.

09:05:26  12  Q.  Did Dr. Chhibber ever give you instruction on how to apply

09:05:28  13  the ICG test?

09:05:30  14  A.  No.

09:05:32  15  Q.  Did there come a point in time where you received any

09:05:34  16  other instruction in Dr. Chhibber's office on how to actually

09:05:38  17  perform this test?

09:05:40  18  A.  Yes.

09:05:40  19  Q.  Who taught you -- who was the other instructor?

09:05:44  20  A.  That was the young lady that came from the actual company

09:05:48  21  of the machine that came in and instructed us.

09:05:50  22  Q.  How long had you been working at Dr. Chhibber's office

09:05:56  23  before this company representative came to teach you how to

09:05:58  24  actually perform this test?

09:06:00  25  A.  It was within the first year.

09:06:04  1  Q.  Well, was it within a few months, or towards the end of
09:06:08  2  the year?
09:06:08  3  A.  Towards the end.
09:06:10  4  Q.  For the first year before -- after you started working at
09:06:16  5  Dr. Chhibber's office before this instructor came to the
09:06:18  6  office, were you performing ICG tests?
09:06:20  7  A.  Yes.
09:06:20  8  Q.  Were you still performing them on a daily basis?
09:06:24  9  A.  Yes.
09:06:24  10  Q.  You mentioned an AVI stress test.  What's an AVI stress
09:06:32  11  test?
09:06:32  12  A.  That's the test where we would put blood pressure cuffs on
09:06:36  13  the calves and then on the arms of the patient, and it would
09:06:42  14  basically give pressure to arteries in the arms and the legs.
09:06:44  15  Q.  Who taught you how to administer that test, Ms. Rhodes?
09:06:48  16  A.  Tyanna Holmes.
09:06:50  17  Q.  Did Dr. Chhibber ever sit you down and give you
09:06:54  18  instructions on how to perform an AVI stress test?
09:06:58  19  A.  No, he didn't actually sit me down to show me how to do
09:07:04  20  it.  He had explained it, but...
09:07:08  21  Q.  Okay.  You worked for Dr. Chhibber for two years?
09:07:10  22  A.  Yes.
09:07:10  23  Q.  During that period of time, approximately when did he
09:07:14  24  explain how to do the AVI stress test?
09:07:18  25  A.  I believe it was in the first year.

09:07:20  1  Q.  Beginning of the year or the end of the year, Ms. Rhodes?

09:07:24  2  A.  I'll say towards the end.

09:07:28  3  Q.  Had you been performing AVI stress tests at Dr. Chhibber's

09:07:32  4  office in the time from which you started to towards the end

09:07:40  5  of that first year when he instructed you as how to perform

09:07:42  6  that test?

09:07:42  7  A.  Yes.

09:07:42  8  Q.  These tests that you've testified about, PFT, pulmonary

09:07:50  9  function test, the ICG test, the AVI test, EKG test, who in

09:07:56  10  Dr. Chhibber's office ordered those tests?

09:07:58  11  A.  Dr. Chhibber.

09:08:00  12  Q.  How would you know when Dr. Chhibber wanted you to perform

09:08:06  13  that test?

09:08:06  14  A.  Either it was in the chart in the progress note or it was

09:08:14  15  verbally told to me by phone or by himself.

09:08:18  16  Q.  I want to start with you said in a progress note.

09:08:24  17  A.  Yes.

09:08:26  18  Q.  What do you mean by it was in a "progress note"?

09:08:28  19  A.  In the progress notes, sometimes tests were put in there

09:08:36  20  that he knew that a patient would need, or it would say NV,

09:08:40  21  which means next visit that the test was to be performed.

09:08:42  22  Q.  I'd like to show you now what's been marked as Government

09:08:46  23  Exhibit 330.  And we will put it up on the screen for you too.

09:09:04  24  This is one of those charts that you looked at yesterday.

09:09:08  25  A.  Yes.

09:09:08   1   Q.  Do you see in the chart in front of you, there's some
09:09:18   2   tests notated in the center of the progress note on the
09:09:22   3   right-hand side?
09:09:22   4   A.  Yes.
09:09:22   5   Q.  Can you -- there's four tests listed there, right,
09:09:28   6   Ms. Rhodes?
09:09:30   7   A.  Yes.
09:09:30   8   Q.  There's two that are circled and then two that are not.
09:09:34   9   Do you see that?
09:09:34  10   A.  Yes.
09:09:34  11   Q.  Looking at those four tests, as a medical assistant
09:09:38  12   working in Dr. Chhibber's office, would you know which of the
09:09:40  13   four tests to perform that day?
09:09:42  14   A.  Yes.
09:09:42  15   Q.  What tests were to be performed that day on Brian O'Neal?
09:09:46  16   A.  By myself, or by a medical assistant?
09:09:50  17   Q.  Yes.
09:09:50  18   A.  The ones that were circled.
09:09:52  19   Q.  That day they were supposed to be done?
09:10:00  20   A.  No, they are supposed to be done next visit.
09:10:02  21   Q.  Which ones were supposed to be done that day, Ms. Rhodes?
09:10:06  22   A.  The ones that were not circled.
09:10:08  23   Q.  Would that be the echo and the carotid?
09:10:10  24   A.  Yes.
09:10:10  25   Q.  The ones that are circled, do you see those?

09:10:12   1   A.  Yes.

09:10:12   2   Q.  Those are the ones that you said were to be done on the

09:10:16   3   next visit; is that right?

09:10:18   4   A.  That's correct.

09:10:18   5   Q.  And what were those?

09:10:18   6   A.  GHP, EKG, and a PFT.

09:10:22   7   Q.  Does it say in the progress note when the next visit is?

09:10:26   8   A.  No.

09:10:26   9   Q.  If you saw a chart like that -- let me ask you a different

09:10:36  10   question.  I apologize.

09:10:42  11        That NV that you noted that is next to the circle, do

09:10:42  12   you see that?

09:10:42  13   A.  Yes.

09:10:44  14   Q.  Is that a notation that you would see in progress notes on

09:10:48  15   a fairly regular basis in Dr. Chhibber's office?

09:10:50  16   A.  Yes.

09:10:50  17   Q.  Ms. Rhodes, were there certain patients that received

09:10:56  18   tests on a regular basis?

09:10:58  19   A.  Yes.

09:11:00  20   Q.  What type of tests?

09:11:02  21   A.  PFT or EKG.

09:11:06  22   Q.  And when you say a regular basis, what do you understand

09:11:10  23   that to mean?  What do you mean?

09:11:10  24   A.  On their visits to the clinic, which was usually every

09:11:18  25   three months or so.

09:11:18  1   Q.  Ms. Rhodes, I asked you some questions yesterday about a

09:11:32  2   PFT test that you did that Dr. Chhibber told you you should

09:11:34  3   not have run?

09:11:34  4   A.  Yes.

09:11:36  5   Q.  Do you remember that question?

09:11:36  6   A.  Yes.

09:11:36  7   Q.  And during that conversation, you stated that Dr. Chhibber

09:11:40  8   had instructed you that there was a problem with the

09:11:42  9   insurance?

09:11:44  10  A.  Yes.

09:11:44  11  Q.  Did you ever have other conversations with Dr. Chhibber

09:11:52  12  about what insurance would cover what tests?

09:11:54  13  A.  What insurance would cover what tests?

09:12:04  14  Q.  Yes.

09:12:04  15  A.  Yes.

09:12:06  16  Q.  Did you an understanding if certain tests couldn't be

09:12:12  17  performed on certain patients because of their insurance

09:12:16  18  coverage?

09:12:16  19       MR. JONES:  Objection to the form, Judge.

09:12:18  20       THE COURT:  Sustained.

09:12:18  21  BY MR. HAMMERMAN:

09:12:20  22  Q.  Did you have an understanding of whether certain tests

09:12:26  23  couldn't be performed on certain patients?

09:12:28  24       MR. JONES:  Judge, my objection only is he can ask

09:12:30  25  her what is her understanding, rather than leading.

| | | |
|---|---|---|
| 09:12:34 | 1 | THE COURT:  Sustained. |
| 09:12:34 | 2 | BY MR. HAMMERMAN: |
| 09:12:44 | 3 | Q.  Ms. Rhodes, based on your two and a half years' experience |
| 09:12:50 | 4 | working for Dr. Chhibber, were you aware of whether there were |
| 09:12:52 | 5 | any restrictions on the type of tests that could be performed |
| 09:12:58 | 6 | on certain patients? |
| 09:12:58 | 7 | A.  Yes. |
| 09:12:58 | 8 | Q.  What was the basis -- what was the understanding of what |
| 09:13:02 | 9 | those restrictions were?  Tell the jury what those |
| 09:13:06 | 10 | restrictions were. |
| 09:13:08 | 11 | A.  Insurance wouldn't cover certain tests if given too many |
| 09:13:14 | 12 | times within, say, a few months or more than, say, three times |
| 09:13:18 | 13 | a year, something like that.  So they wouldn't be covered if |
| 09:13:22 | 14 | they were given over -- if you had a test that was done four |
| 09:13:24 | 15 | times but it would only be covered within the year three |
| 09:13:30 | 16 | times, like that. |
| 09:13:30 | 17 | Q.  And how did you come to learn of those restrictions? |
| 09:13:34 | 18 | A.  Dr. Chhibber. |
| 09:13:34 | 19 | Q.  These machines that you used to perform these tests, the |
| 09:13:44 | 20 | PFT, the ICG, the EKG, the AVI stress test, how were the |
| 09:13:52 | 21 | results of those tests -- what was the result of those tests? |
| 09:13:56 | 22 | What would you get when you were done? |
| 09:13:58 | 23 | A.  There would be a printout. |
| 09:14:00 | 24 | Q.  What would you do with that printout? |
| 09:14:04 | 25 | A.  I would put it in the patient's chart and then give it to |

09:14:06   1   the doctor.

09:14:08   2   Q.   In addition to these tests that we talked about, those

09:14:12   3   four tests, are you aware of other tests that were performed

09:14:16   4   in Dr. Chhibber's office?

09:14:18   5   A.   Yes.

09:14:18   6   Q.   What type of tests?

09:14:20   7   A.   The echo, the carotid, nerve conductivity test, and then a

09:14:26   8   stress test.

09:14:26   9   Q.   Did you help assist in performing any of those tests?

09:14:32   10  A.   No.

09:14:32   11  Q.   Who performed those tests, to your knowledge?

09:14:36   12  A.   That would be Dr. Baig.

09:14:46   13  Q.   Do you know who in Dr. Chhibber's office could order those

09:14:48   14  tests?

09:14:50   15  A.   The doctor.

09:14:50   16  Q.   And who is the doctor?

09:14:52   17  A.   Dr. Chhibber.

09:14:54   18  Q.   Was anyone other than Dr. Chhibber authorized, to your

09:14:58   19  knowledge, to order tests in his clinic?

09:15:00   20  A.   No.

09:15:02   21  Q.   During the time that you worked for Dr. Chhibber, how

09:15:12   22  often would the patients that came in provided or ordered to

09:15:18   23  receive one form of test?

09:15:22   24       MR. JONES:   Objection to the form of that question,

09:15:24   25  Judge.

09:15:24   1    THE COURT:  Sustained.

09:15:24   2    BY MR. HAMMERMAN:

09:15:28   3    Q.  Ms. Rhodes, on your average daily workday, how many tests

09:15:32   4    did you perform, any type of test?

09:15:36   5    A.  Two, maybe.

09:15:38   6    Q.  Two tests daily?

09:15:40   7    A.  Um-hmm.

09:15:40   8    Q.  And what type of tests are you talking about?

09:15:44   9    A.  Either the PFT, the EKG, or the AVI.

09:15:50   10   Q.  And how many times would you perform one of those two

09:15:52   11   tests in a day?

09:15:54   12        MR. JONES:  Judge, I object.  She said --

09:15:56   13        THE COURT:  Sustained.  Asked and answered.

09:15:58   14   BY MR. HAMMERMAN:

09:16:02   15   Q.  Ms. Rhodes, just so it's clear for the jury, when you said

09:16:06   16   that you performed two tests daily, is that the number of

09:16:08   17   times you performed the test or the types of tests you

09:16:12   18   performed in the day?

09:16:12   19   A.  The types of tests.

09:16:12   20   Q.  How many times did you perform those two types of tests in

09:16:18   21   a day?

09:16:18   22   A.  On average about -- say about five times.

09:16:30   23   Q.  Of each type or combined?

09:16:32   24   A.  Combined.

09:16:42   25   Q.  Did you often perform multiple tests on the same patients?

| | | |
|---|---|---|
| 09:16:46 | 1 | A.  More than two tests on one patient? |
| 09:16:52 | 2 | Q.  Yes. |
| 09:16:52 | 3 | A.  Yes. |
| 09:16:56 | 4 | Q.  What type of test? |
| 09:16:56 | 5 | A.  It could be anything from the EKG to AVI, ICG, or PFT. |
| 09:17:02 | 6 | Q.  And how often did you do that, Ms. Rhodes? |
| 09:17:06 | 7 | A.  Daily. |
| 09:17:06 | 8 | Q.  Did patients ever ask you why they were receiving tests? |
| 09:17:16 | 9 | A.  Yes. |
| 09:17:16 | 10 | Q.  Did patients ever complain to you about the tests they |
| 09:17:22 | 11 | were being asked to take? |
| 09:17:24 | 12 | MR. JONES:  Judge, I am going to object to foundation |
| 09:17:26 | 13 | here. |
| 09:17:26 | 14 | THE COURT:  Sustained. |
| 09:17:26 | 15 | BY MR. HAMMERMAN: |
| 09:17:28 | 16 | Q.  Ms. Rhodes, how often -- you said that patients sometimes |
| 09:17:36 | 17 | complained about tests? |
| 09:17:36 | 18 | A.  Yes. |
| 09:17:36 | 19 | Q.  How often did that occur? |
| 09:17:38 | 20 | A.  Daily. |
| 09:17:40 | 21 | Q.  And where did they complain to you? |
| 09:17:44 | 22 | A.  In the exam room. |
| 09:17:46 | 23 | Q.  And what were the types of complaints that you got from |
| 09:17:52 | 24 | patients? |
| 09:17:52 | 25 | MR. JONES:  Objection.  Foundation and hearsay, |

09:17:54    1    Judge.

09:17:54    2                THE COURT:  Sustained.

09:17:56    3                MR. HAMMERMAN:  Your Honor, 803(4).

09:17:58    4                THE COURT:  Sustained.

09:17:58    5    BY MR. HAMMERMAN:

09:18:00    6    Q.  How did you respond to patient complaints about the tests

09:18:04    7    they were being asked to receive?

09:18:10    8    A.  I tell them they will have to talk to their doctor.

09:18:12    9    Q.  Did patients ever see charts at the time -- let me

09:18:18   10    rephrase my question.

09:18:20   11                Are you aware or were you ever present when a patient

09:18:22   12    reviewed a portion of their chart?

09:18:24   13    A.  Yes.

09:18:24   14    Q.  Do you remember any instances where that occurred?

09:18:30   15    A.  Yes.

09:18:30   16    Q.  Can you recall any specific instances where a patient

09:18:38   17    reviewed their chart in your presence?

09:18:42   18    A.  Yes.

09:18:42   19    Q.  Let's take the first instance that you can recall that

09:18:46   20    occurring.  Do you remember when that happened?

09:18:48   21    A.  I can't -- I cannot recall the exact month or year.

09:18:56   22    Q.  Did it happen towards the beginning of your employment

09:19:00   23    with Dr. Chhibber or toward the end?

09:19:00   24    A.  I would say about in the middle.

09:19:02   25    Q.  And where did that instance where patients saw their chart

09:19:08   1   occur?

09:19:10   2   A.  I don't know.

09:19:10   3   Q.  Where did it occur?  Where were the two of you?

09:19:12   4   A.  In the exam room.

09:19:14   5   Q.  Who was present?

09:19:16   6   A.  Myself and the patient.

09:19:16   7   Q.  How did the patient observe the chart in your presence?

09:19:18   8   A.  Usually we would have the chart sitting by the machine so

09:19:22   9   we could document what's going on, what we were doing, in the

09:19:28   10  chart, and the chart would be open, and some patients would

09:19:30   11  get up and look over, or if we turned around, they would pull

09:19:34   12  their chart down and look in there.

09:19:36   13  Q.  The instance that you're recalling, was the patient a male

09:19:42   14  or female?

09:19:44   15  A.  Male.

09:19:44   16  Q.  What was the race of the patient?

09:19:46   17  A.  African-American.

09:19:46   18  Q.  Was the patient young or old?

09:19:48   19  A.  I would say young.

09:19:50   20  Q.  Did the patient make any comments to you after reviewing

09:19:54   21  their chart?

09:19:54   22          MR. JONES:  Objection, Judge.

09:19:56   23          MR. HAMMERMAN:  803(4), your Honor.

09:19:58   24          THE COURT:  Sustained.

09:20:00   25  BY MR. HAMMERMAN:

| | | |
|---|---|---|
| 09:20:02 | 1 | Q. After the patient reviewed the chart, did you give the |
| 09:20:04 | 2 | patient any instructions? |
| 09:20:06 | 3 | MR. JONES: Objection. Hearsay, Judge. |
| 09:20:08 | 4 | THE COURT: Sustained. |
| 09:20:08 | 5 | BY MR. HAMMERMAN: |
| 09:20:18 | 6 | Q. Ms. Rhodes, did you ever tell patients that they didn't |
| 09:20:24 | 7 | have to receive the tests that had been ordered for them? |
| 09:20:26 | 8 | MR. JONES: Objection. Hearsay, Judge. |
| 09:20:28 | 9 | THE COURT: Sustained. |
| 09:20:28 | 10 | BY MR. HAMMERMAN: |
| 09:20:32 | 11 | Q. Ms. Rhodes, did you ever discourage patients from |
| 09:20:36 | 12 | receiving the tests you were to actually perform? |
| 09:20:38 | 13 | MR. JONES: Judge, we object to the form of this |
| 09:20:40 | 14 | question. |
| 09:20:40 | 15 | THE COURT: Sustained. |
| 09:20:42 | 16 | BY MR. HAMMERMAN: |
| 09:20:44 | 17 | Q. Ms. Rhodes, did you ever try to not perform tests on |
| 09:20:54 | 18 | patients? |
| 09:20:54 | 19 | MR. JONES: Judge, we object. |
| 09:20:56 | 20 | THE COURT: Sustained. |
| 09:20:56 | 21 | MR. HAMMERMAN: Your Honor, can we have a sidebar? |
| 09:20:58 | 22 | THE COURT: We will discuss this later. |
| 09:21:00 | 23 | BY MR. HAMMERMAN: |
| 09:21:10 | 24 | Q. In your work for Dr. Chhibber, Ms. Rhodes, did you ever |
| 09:21:12 | 25 | work as part of the registration process? |

09:21:14    1   A.   Yes.

09:21:16    2   Q.   What was involved in registering patients at

09:21:22    3   Dr. Chhibber's office?

09:21:26    4   A.   It would entail timing the patient in, doing the progress

09:21:36    5   notes, taking the vital signs, and that was basically it.

09:21:46    6   Q.   When patients came in, were they charged copays?

09:21:52    7   A.   If it was on the card, say, the Blue Cross card will have

09:21:58    8   it or something like that, yes.

09:21:58    9   Q.   Can you tell the members of the jury what a copay is, your

09:22:02   10   understanding.

09:22:02   11   A.   From my understanding, a copay is what is left over after

09:22:08   12   the insurance has paid their portion.

09:22:10   13   Q.   And would you instruct patients if they had to pay these

09:22:12   14   payments?

09:22:14   15   A.   Yes.

09:22:14   16   Q.   In your two and a half years of working for Dr. Chhibber,

09:22:18   17   did you ever ask patients to pay a copay for diagnostic tests

09:22:24   18   that they received?

09:22:24   19   A.   No.

09:22:24   20   Q.   You testified yesterday that the clinic opened at 9:00

09:22:40   21   o'clock; is that right?

09:22:42   22   A.   Yes.

09:22:42   23   Q.   What time did Dr. Chhibber usually arrive at the office?

09:22:46   24           MR. JONES:   Judge, I think we covered this yesterday.

09:22:48   25           THE COURT:   Yes, we did.

09:22:48  1  BY MR. HAMMERMAN:

09:22:50  2  Q.  Well, Ms. Rhodes, were patients there on occasion when

09:22:52  3  Dr. Chhibber was not?

09:22:54  4  A.  Yes.

09:22:54  5  Q.  How often did that occur?

09:22:56  6         MR. JONES:  Judge, I object.  This has been asked and

09:22:58  7  answered yesterday.

09:22:58  8         THE COURT:  Sustained.  Sustained.

09:23:00  9  BY MR. HAMMERMAN:

09:23:02  10  Q.  Ms. Rhodes, on the instances where Dr. Chhibber was late,

09:23:06  11  what would you do with the patients?

09:23:08  12  A.  We would usually take their vital signs and ask them to

09:23:14  13  wait.

09:23:14  14  Q.  Were patients required to wait for long periods of time on

09:23:20  15  occasion?

09:23:22  16  A.  Sometimes, yes.

09:23:22  17  Q.  Did you ever perform tests on patients before Dr. Chhibber

09:23:30  18  arrived at the office?

09:23:32  19  A.  Yes.

09:23:32  20  Q.  How often did that occur?

09:23:36  21  A.  Maybe twice a week.

09:23:42  22  Q.  How often in your experience were other medical assistants

09:23:48  23  performing tests on patients before Dr. Chhibber arrived at

09:23:50  24  the office?

09:23:50  25         MR. JONES:  Objection.  Foundation, Judge.

| | | |
|---|---|---|
| 09:23:52 | 1 | THE COURT: Sustained. |
| 09:23:54 | 2 | BY MR. HAMMERMAN: |
| 09:23:54 | 3 | Q. Ms. Rhodes, were you aware of whether or not other medical |
| 09:23:58 | 4 | assistants were performing tests before Dr. Chhibber arrived |
| 09:24:02 | 5 | in the office? |
| 09:24:02 | 6 | A. Yes. |
| 09:24:02 | 7 | Q. How were you aware of that? |
| 09:24:02 | 8 | A. How -- |
| 09:24:10 | 9 | Q. How did you know that? |
| 09:24:12 | 10 | A. By just being two medical assistants, either I would do it |
| 09:24:16 | 11 | or the co-worker, my co-worker, the co-worker would do it. |
| 09:24:20 | 12 | Q. In addition to you performing those tests, are you aware |
| 09:24:22 | 13 | if your co-worker was? |
| 09:24:24 | 14 | A. Yes. |
| 09:24:24 | 15 | Q. How often was your co-worker performing tests on patients |
| 09:24:30 | 16 | before Dr. Chhibber arrived at the office? |
| 09:24:32 | 17 | MR. JONES: Judge, I still object on a foundation |
| 09:24:34 | 18 | basis. |
| 09:24:34 | 19 | THE COURT: Overruled. |
| 09:24:36 | 20 | BY MR. HAMMERMAN: |
| 09:24:36 | 21 | Q. You can answer, ma'am. |
| 09:24:38 | 22 | A. I would say about the same, about maybe two days out of a |
| 09:24:46 | 23 | week. |
| 09:24:46 | 24 | Q. How would you know what tests to perform on a patient if |
| 09:24:54 | 25 | Dr. Chhibber wasn't there? |

09:24:54   1   A.  If it was stated in the progress note or he would tell us

09:25:00   2   verbally that he would want some tests done on that patient.

09:25:06   3   Q.  You said he would tell you verbally.  What do you mean by

09:25:08   4   that?

09:25:08   5   A.  He would call and let us know that he was on his way and

09:25:14   6   to perform certain tests or -- he would usually call and let

09:25:26   7   us know certain patients were coming in or if a patient was

09:25:30   8   there to perform the test.

09:25:32   9   Q.  Did you participate in any of these telephone calls with

09:25:36   10  Dr. Chhibber?

09:25:36   11  A.  Yes.

09:25:36   12  Q.  How often did you talk to him?

09:25:38   13  A.  Did you say how often did I talk to him?

09:25:50   14  Q.  How often?

09:25:52   15  A.  In a week or...

09:25:52   16  Q.  Let's use a week.  How often would you talk to him in a

09:25:56   17  week when he was not in the office yet about this subject

09:25:58   18  matter?

09:25:58   19  A.  I would say maybe once out of a week.

09:26:06   20  Q.  And during those calls, what questions would Dr. Chhibber

09:26:14   21  ask of you or what would he tell you?

09:26:16   22  A.  He would just ask how many patients are in the office,

09:26:28   23  what were they there for, and what kind of insurance did they

09:26:34   24  have.

09:26:34   25  Q.  Would you provide him that information?

09:26:34   1    A.  Yes.

09:26:34   2    Q.  How -- would you review any medical information of the

09:26:40   3    patients in those conversations with Dr. Chhibber?

09:26:46   4    A.  Yes.

09:26:46   5    Q.  What?

09:26:46   6    A.  Sometimes he would ask what was done on the last visit.

09:26:54   7    Q.  And what do you mean by "what was done on the last visit"?

09:26:56   8    A.  What tests were done on the last visit and if they have

09:27:06   9    any complaints from the last visit.

09:27:08   10   Q.  In your conversations on the telephone with Dr. Chhibber,

09:27:10   11   did you tell him what the patients were complaining of?

09:27:12   12   A.  Sometimes, yes.

09:27:14   13   Q.  Did you physically examine the patients?

09:27:18   14   A.  I did a brief patient history.

09:27:24   15   Q.  Did you physically examine the patients, Ms. Rhodes?

09:27:28   16   A.  No.

09:27:30   17   Q.  Did you provide Dr. Chhibber the patient's physical

09:27:34   18   condition in these telephone conversations?

09:27:36   19            MR. JONES:  Judge, I object as to -- there's been no

09:27:40   20   definition what he means by "physical condition."

09:27:42   21            THE COURT:  Objection is overruled.

09:27:46   22            THE WITNESS:  Could you repeat that?

09:27:48   23   BY MR. HAMMERMAN:

09:27:48   24   Q.  Did you perform a physical of these patients?

09:27:50   25   A.  No.

09:27:50  1  Q.  Based on these conversations where you provided

09:28:00  2  Dr. Chhibber the name of the patients that were waiting, the

09:28:04  3  tests that they had received, the insurance that they had,

09:28:06  4  what type of tests did Dr. Chhibber have you perform before he

09:28:16  5  got to the office?

09:28:16  6          MR. JONES:  Objection.  Foundation, Judge.

09:28:18  7          THE COURT:  Sustained.

09:28:18  8  BY MR. HAMMERMAN:

09:28:18  9  Q.  What type of tests did you perform before Dr. Chhibber got

09:28:20  10  to the office?

09:28:22  11          MR. JONES:  Same question, Judge.

09:28:24  12          THE COURT:  Sir, foundation, please.

09:28:28  13  BY MR. HAMMERMAN:

09:28:28  14  Q.  Ms. Rhodes, you said that you performed these tests two

09:28:30  15  times a week before Dr. Chhibber arrived?

09:28:32  16  A.  Yes.

09:28:34  17  Q.  And did you do that throughout the duration of the two

09:28:38  18  years that you worked for him?

09:28:40  19  A.  Yes.

09:28:42  20  Q.  On those occasions, what types of tests did you perform?

09:28:48  21  A.  I performed PFTs, ICGs, EKG, and the AVI.

09:29:00  22  Q.  Are you aware of whether or not other forms of tests were

09:29:06  23  performed on patients before Dr. Chhibber arrived at the

09:29:10  24  office?

09:29:10  25  A.  Yes.

09:29:12   1   Q.  What type of tests?

09:29:14   2              MR. JONES:  Foundation, Judge.

09:29:16   3              THE COURT:  Overruled.

09:29:18   4              THE WITNESS:  The echo and the carotid.

09:29:22   5   BY MR. HAMMERMAN:

09:29:26   6   Q.  When patients checked into the office, would you ask them

09:29:32   7   if they were new patients or returning patients?

09:29:34   8   A.  Yes, I would ask them if they were new or returning.

09:29:38   9   Q.  If they were a new patient, was the procedure different

09:29:42  10   than a returning patient?

09:29:46  11   A.  Yes.

09:29:46  12   Q.  In what way?

09:29:48  13   A.  They had a little bit more done, they would have blood

09:29:58  14   work, a physical, certain things that someone that has already

09:30:02  15   been there wouldn't need.

09:30:04  16   Q.  Based on those procedures, are you aware -- let me

09:30:10  17   rephrase that question.

09:30:12  18              Did Dr. Chhibber ever ask you to perform tests on

09:30:18  19   patients who were new patients before he arrived at the

09:30:22  20   office?

09:30:22  21   A.  Yes.

09:30:22  22   Q.  Ms. Rhodes, are you aware of whether or not Dr. Chhibber

09:30:50  23   worked at any hospitals?

09:30:52  24   A.  Yes.

09:30:52  25   Q.  How are you aware of that?  How do you know that?

| | | |
|---|---|---|
| 09:30:56 | 1 | A. From talking to some people from the hospital, patients |
| 09:31:04 | 2 | coming from the hospital, and then him telling me himself. |
| 09:31:10 | 3 | Q. Did there come occasions that you were asked to call |
| 09:31:14 | 4 | patients from hospitals? |
| 09:31:14 | 5 | A. Yes. |
| 09:31:16 | 6 | Q. What -- first of all, how often did you call patients that |
| 09:31:22 | 7 | had been seen in hospitals? |
| 09:31:24 | 8 | MR. JONES: Judge, I am going to object to the |
| 09:31:26 | 9 | relevance of this. |
| 09:31:28 | 10 | MR. HAMMERMAN: Your Honor, we addressed this in a |
| 09:31:30 | 11 | motion in limine. |
| 09:31:32 | 12 | THE COURT: The objection is sustained. |
| 09:31:34 | 13 | BY MR. HAMMERMAN: |
| 09:31:46 | 14 | Q. Ms. Rhodes, did you do any billing work while you worked |
| 09:31:48 | 15 | for Dr. Chhibber? |
| 09:31:50 | 16 | A. No. |
| 09:31:50 | 17 | Q. Were you trained to do billing work? |
| 09:31:58 | 18 | A. Yes, we were shown how to do billing. |
| 09:32:00 | 19 | Q. Why did you not do billing work? |
| 09:32:06 | 20 | MR. JONES: I object, Judge. |
| 09:32:06 | 21 | THE COURT: Sustained. |
| 09:32:10 | 22 | BY MR. HAMMERMAN: |
| 09:32:16 | 23 | Q. In your work for Dr. Chhibber, Ms. Rhodes, you reviewed |
| 09:32:20 | 24 | progress notes like the one that's up on the screen, right? |
| 09:32:22 | 25 | A. Yes. |

09:32:22    1    Q.  We talked about the test section; is that right?

09:32:26    2    A.  Yes.

09:32:26    3    Q.  Would you also have occasion to review the diagnoses

09:32:32    4    section?

09:32:32    5    A.  Yes.

09:32:32    6    Q.  How often would you look at the diagnoses section of a

09:32:38    7    patient chart?

09:32:38    8    A.  Daily.

09:32:40    9    Q.  Would you look at the diagnoses section in connection with

09:32:46   10    the tests that you were being asked to perform?

09:32:48   11    A.  Yes.

09:32:48   12    Q.  Ms. Rhodes, did you observe any patterns in the type of

09:32:54   13    diagnoses associated with the type of tests you were asked to

09:32:58   14    perform?

09:33:00   15                MR. JONES:  Judge, we object with this witness.

09:33:04   16                THE COURT:  Yes.  We will address this issue later,

09:33:08   17    but for the present, the objection is sustained on foundation

09:33:10   18    grounds.

09:33:12   19    BY MR. HAMMERMAN:

09:33:30   20    Q.  Are you --

09:33:46   21                MR. HAMMERMAN:  Can I have one moment, your Honor?

09:33:48   22                THE COURT:  Yes.

09:33:50   23    BY MR. HAMMERMAN:

09:34:08   24    Q.  Ms. Rhodes, I am going to show you what's been marked as

09:34:10   25    Government Exhibit 340 again.  Do you see that, Ms. Rhodes?

| | | |
|---|---|---|
| 09:34:38 | 1 | A.  Yes. |
| 09:34:38 | 2 | Q.  It's got some tests on there, like an EKG and a PFT test |
| 09:34:42 | 3 | that you talked about are the type of tests that you |
| 09:34:46 | 4 | performed? |
| 09:34:46 | 5 | A.  Yes. |
| 09:34:46 | 6 | Q.  You will also see there's diagnoses down there.  Do you |
| 09:34:52 | 7 | see that? |
| 09:34:52 | 8 | A.  Yes. |
| 09:34:52 | 9 | Q.  Do you see the SOB? |
| 09:34:54 | 10 | A.  Yes. |
| 09:34:54 | 11 | Q.  What is SOB? |
| 09:34:56 | 12 | A.  Shortness of breath. |
| 09:34:58 | 13 | Q.  Is that a diagnosis that you saw frequently -- or how |
| 09:35:04 | 14 | often would you see that diagnosis in the charts that you |
| 09:35:06 | 15 | reviewed? |
| 09:35:08 | 16 | A.  Pretty often. |
| 09:35:12 | 17 | Q.  For the people you performed PFTs on, how often would you |
| 09:35:18 | 18 | see that diagnosis? |
| 09:35:18 | 19 | A.  Often along with the PFT. |
| 09:35:28 | 20 | Q.  You performed a lot of EKGs like the one that's referenced |
| 09:35:32 | 21 | here for Ms. Tiffany Shirley-Terrell.  Do you see that? |
| 09:35:36 | 22 | A.  Yes. |
| 09:35:36 | 23 | Q.  Do you see there is a diagnosis there, like heart murmur |
| 09:35:38 | 24 | and chest pain? |
| 09:35:40 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 09:35:40 | 1 | Q.  Did you see diagnose -- did you see any type of diagnosis |
| 09:35:46 | 2 | with any kind of regularity in connection with the EKGs? |
| 09:35:50 | 3 | MR. JONES:  Judge, I am going to object with this |
| 09:35:52 | 4 | witness. |
| 09:35:52 | 5 | THE COURT:  Sustained. |
| 09:35:54 | 6 | BY MR. HAMMERMAN: |
| 09:35:54 | 7 | Q.  Did you observe any type of pattern with the EKG |
| 09:36:02 | 8 | diagnoses? |
| 09:36:04 | 9 | MR. JONES:  Judge, I object. |
| 09:36:04 | 10 | THE COURT:  Sustained. |
| 09:36:04 | 11 | BY MR. HAMMERMAN: |
| 09:36:12 | 12 | Q.  Ms. Rhodes, other than -- who wrote the diagnoses down in |
| 09:36:16 | 13 | Dr. Chhibber's charts? |
| 09:36:16 | 14 | A.  Dr. Chhibber. |
| 09:36:18 | 15 | Q.  Anybody else, to your knowledge? |
| 09:36:20 | 16 | A.  No. |
| 09:36:20 | 17 | Q.  Ms. Rhodes, how often would you see a diagnosis in a chart |
| 09:36:42 | 18 | in a day that said heart murmur at Dr. Chhibber's office? |
| 09:36:46 | 19 | MR. JONES:  Judge, I object. |
| 09:36:48 | 20 | THE COURT:  Sustained. |
| 09:36:50 | 21 | BY MR. HAMMERMAN: |
| 09:37:00 | 22 | Q.  Ms. Rhodes, are you aware of how Dr. Chhibber sought to |
| 09:37:06 | 23 | recruit new patients? |
| 09:37:08 | 24 | MR. JONES:  Judge, I object. |
| 09:37:08 | 25 | THE COURT:  Calls for a yes-or-no answer. |

09:37:12  1  BY MR. HAMMERMAN:

09:37:12  2  Q.  Are you aware of how Dr. Chhibber sought to obtain new

09:37:14  3  patients?

09:37:14  4  A.  No.

09:37:16  5  Q.  Did you have -- did you ever assist in trying to obtain

09:37:22  6  new patients?

09:37:24  7      MR. JONES:  Judge, I am objecting to any foundation

09:37:28  8  here.  The lady said no.

09:37:30  9      THE COURT:  The question calls for a yes-or-no

09:37:32  10  answer.  The objection is overruled to this question.

09:37:34  11      THE WITNESS:  Could you repeat?

09:37:36  12  BY MR. HAMMERMAN:

09:37:36  13  Q.  Did you ever assist in trying to recruit new patients for

09:37:38  14  Dr. Chhibber's clinic?

09:37:40  15  A.  No.

09:37:40  16  Q.  Did you ever make calls to new patients?

09:37:44  17  A.  Yes.

09:37:46  18  Q.  How often did you make calls to new patients?

09:37:52  19      MR. JONES:  Judge, I would object to the relevance.

09:37:54  20      THE COURT:  Sustained.

09:37:54  21  BY MR. HAMMERMAN:

09:38:00  22  Q.  At some point, Ms. Rhodes, did you learn of an FBI

09:38:08  23  investigation of Dr. Chhibber?

09:38:08  24  A.  Yes.

09:38:08  25  Q.  How did you learn of it?

| | | |
|---|---|---|
| 09:38:10 | 1 | A.  When two FBI agents came to the clinic. |
| 09:38:16 | 2 | Q.  Did you learn of the investigation prior to that time in |
| 09:38:18 | 3 | any way? |
| 09:38:18 | 4 | A.  Yes, I heard rumors. |
| 09:38:24 | 5 | Q.  How long before the FBI agents came into the clinic did |
| 09:38:28 | 6 | you hear rumors? |
| 09:38:30 | 7 | MR. JONES:  Judge, I am going to object to rumors. |
| 09:38:32 | 8 | THE COURT:  Sustained. |
| 09:38:32 | 9 | BY MR. HAMMERMAN: |
| 09:38:34 | 10 | Q.  Before the FBI agents came to the clinic, how long had you |
| 09:38:44 | 11 | known of a possible FBI investigation? |
| 09:38:46 | 12 | MR. JONES:  Objection.  Foundation. |
| 09:38:48 | 13 | THE COURT:  Sustained. |
| 09:38:48 | 14 | BY MR. HAMMERMAN: |
| 09:38:50 | 15 | Q.  How did you learn of an FBI investigation, Ms. Rhodes? |
| 09:38:54 | 16 | MR. JONES:  Objection.  Asked and answered with the |
| 09:38:56 | 17 | two agents, Judge. |
| 09:39:00 | 18 | THE COURT:  No, she may answer if she has personal |
| 09:39:04 | 19 | knowledge. |
| 09:39:10 | 20 | BY MR. HAMMERMAN: |
| 09:39:12 | 21 | Q.  Ms. Rhodes, you can answer. |
| 09:39:12 | 22 | A.  Before they came in, I would say it was some months, a few |
| 09:39:16 | 23 | months, maybe. |
| 09:39:16 | 24 | Q.  And -- |
| 09:39:20 | 25 | MR. JONES:  Judge, I am going to object because I |

09:39:22  1   think it was if she had personal knowledge.

09:39:24  2          THE COURT:  Yes.  Please just confine your questions

09:39:28  3   to her personal knowledge.

09:39:30  4          MR. HAMMERMAN:  Yes, your Honor.

09:39:30  5   BY MR. HAMMERMAN:

09:39:32  6   Q.  When did you learn of a possible FBI investigation in

09:39:38  7   relation to the time that the agents came into the office?

09:39:40  8   A.  A few months prior to them coming to the office.

09:39:46  9          MR. JONES:  Judge, that's the answer I object.

09:39:50  10         THE COURT:  You still haven't established a basis for

09:39:54  11  personal knowledge.

09:39:58  12  BY MR. HAMMERMAN:

09:40:00  13  Q.  How did you learn it at that time?

09:40:04  14         MR. JONES:  Judge, at what time?

09:40:06  15         MR. HAMMERMAN:  Your Honor, this is not being offered

09:40:08  16  for the truth.

09:40:10  17         THE COURT:  It sure isn't.  Move on.

09:40:16  18  BY MR. HAMMERMAN:

09:40:16  19  Q.  At the time that you learned of the FBI investigation, did

09:40:18  20  you observe any changes in the practices at Dr. Chhibber's

09:40:24  21  office with regard to testing?

09:40:26  22         MR. JONES:  Objection.  Foundation, Judge.

09:40:26  23         THE COURT:  Sustained.

09:40:28  24  BY MR. HAMMERMAN:

09:40:28  25  Q.  Well, Ms. Rhodes, after you learned of the FBI

| | | |
|---|---|---|
| 09:40:30 | 1 | investigation, did you continue to work at Dr. Chhibber's |
| 09:40:32 | 2 | office? |
| 09:40:32 | 3 | A.  Yes. |
| 09:40:32 | 4 | Q.  Did you still go to work three or four times a week? |
| 09:40:36 | 5 | A.  Yes. |
| 09:40:36 | 6 | Q.  Were you still a medical assistant? |
| 09:40:40 | 7 | A.  Yes. |
| 09:40:40 | 8 | Q.  Did you still see patients on every day? |
| 09:40:42 | 9 | A.  Yes. |
| 09:40:42 | 10 | Q.  Were you still taking vital signs of patients? |
| 09:40:46 | 11 | A.  Yes. |
| 09:40:46 | 12 | Q.  Were you still following Dr. Chhibber's orders? |
| 09:40:48 | 13 | A.  Yes. |
| 09:40:48 | 14 | Q.  Did you observe during that period of time a change in the |
| 09:40:52 | 15 | testing that you were required to do? |
| 09:40:56 | 16 | MR. JONES:  Judge, we still don't have a time period. |
| 09:40:58 | 17 | THE COURT:  All right.  Establish the time period. |
| 09:41:00 | 18 | BY MR. HAMMERMAN: |
| 09:41:02 | 19 | Q.  At the time that you learned of the FBI investigation, did |
| 09:41:06 | 20 | you see a change in the type of -- the rate of testing that |
| 09:41:10 | 21 | you were required to do, Ms. Rhodes? |
| 09:41:10 | 22 | MR. JONES:  Objection.  When is this, Judge? |
| 09:41:14 | 23 | THE COURT:  Objection is well taken. |
| 09:41:18 | 24 | BY MR. HAMMERMAN: |
| 09:41:18 | 25 | Q.  All right.  Ms. Rhodes, two months before the FBI agents |

09:41:22    1    came to your office, let's use that as a benchmark, okay?  Two

09:41:26    2    months before the time the FBI agents came to your office, did

09:41:30    3    you begin to realize a change in the amount of testing you

09:41:34    4    were doing at Dr. Chhibber's office?

09:41:34    5              MR. JONES:  Judge --

09:41:36    6              THE COURT:  Sustained.  Move on to something else.

09:41:38    7    BY MR. HAMMERMAN:

09:41:40    8    Q.  After the FBI agents came to your office, did the testing

09:41:44    9    -- the rate of testing you did change?

09:41:46   10              MR. JONES:  Judge, we still object because there is

09:41:48   11    no date to this.

09:41:52   12              THE COURT:  All right.  Now, it's well taken.  Would

09:41:54   13    you establish a date?

09:41:56   14              MR. HAMMERMAN:  Yes.

09:41:56   15    BY MR. HAMMERMAN:

09:41:56   16    Q.  Ms. Rhodes, do you remember --

09:41:56   17              THE COURT:  We have no idea of the time frame or

09:41:58   18    reliability of this testimony.

09:42:00   19              MR. HAMMERMAN:  Yes, your Honor.

09:42:00   20    BY MR. HAMMERMAN:

09:42:02   21    Q.  Do you remember when there was a search at the office of

09:42:08   22    Dr. Chhibber?

09:42:08   23    A.  Yes.

09:42:10   24    Q.  Okay.  Do you remember approximately when that was,

09:42:12   25    Ms. Rhodes?

09:42:12   1    A.  I believe it was in February of 2009.

09:42:20   2    Q.  And prior to that search, had agents come to the office?

09:42:24   3    A.  Yes.

09:42:26   4    Q.  How much time prior to that search?

09:42:28   5    A.  I would say almost a month.

09:42:34   6    Q.  And I'd like you then to go three months before the

09:42:38   7    search, three months before February, so it would have been in

09:42:42   8    late 2010.

09:42:44   9           MR. JONES:  Objection to the leading nature of this,

09:42:46  10    Judge.

09:42:46  11           MR. HAMMERMAN:  Judge, I haven't asked a question.

09:42:48  12           THE COURT:  All right.  Why don't you rephrase.  It

09:42:52  13    might solve the problem.

09:42:54  14    BY MR. HAMMERMAN:

09:42:54  15    Q.  In November and December of 2010, using that as a time

09:42:58  16    frame, did you see a change in the amount of tests you

09:43:02  17    performed after that date at Dr. Chhibber's office?

09:43:06  18    A.  Before the agents came in?

09:43:10  19    Q.  Starting in December of 2010.

09:43:14  20    A.  Yes, there was a slight change.

09:43:18  21    Q.  What was the change, Ms. Rhodes?

09:43:20  22    A.  I wasn't performing EKGs as much, ICGs and EKGs as much.

09:43:34  23    Q.  Did you perform AVI stress tests after that point in time?

09:43:36  24    A.  Sometimes, yes.

09:43:38  25    Q.  As often?

09:43:40   1   A.  No.

09:43:46   2   Q.  Nerve conduction tests, were those still being performed

09:43:48   3   as often?

09:43:48   4   A.  Yes.

09:43:50   5   Q.  The ICG tests, were those being performed as often?

09:43:58   6   A.  No.

09:43:58   7   Q.  Who was ordering the tests after that point in time?

09:44:02   8   A.  Dr. Chhibber.

09:44:04   9   Q.  Was -- the patients that were being seen, were they still

09:44:08   10   Dr. Chhibber's patients?

09:44:08   11   A.  Yes, they were.

09:44:10   12         MR. HAMMERMAN:  May I have a moment, your Honor?

09:44:20   13         THE COURT:  Yes.

09:44:22   14         MR. HAMMERMAN:  Your Honor?

09:44:30   15         THE COURT:  Yes.

09:44:30   16         MR. HAMMERMAN:  May we have a sidebar before we

09:44:34   17   tender the witness?

09:44:36   18         THE COURT:  We will discuss.  You can reserve certain

09:44:42   19   areas to reopen on redirect.  We are not going to have a

09:44:44   20   sidebar at this time.  We will be taking our morning break in

09:44:50   21   about 20 minutes or so.

09:44:52   22         MR. HAMMERMAN:  Then at this point in time, your

09:44:54   23   Honor, we tender the witness to the defense.

09:44:56   24         THE COURT:  All right.  Cross-examination.

09:44:58   25         MR. JONES:  Yes, your Honor.

```
09:44:58   1                           - - -
09:44:58   2              TWAHKI RHODES, CROSS-EXAMINATION
09:44:58   3   BY MR. JONES:
09:46:08   4   Q.  Good morning, Ms. Rhodes.
09:46:12   5   A.  Good morning.
09:46:12   6   Q.  You know, one of the things that you talked about was the
09:46:18   7   free clinic.  Do you recall your testimony with respect to the
09:46:22   8   free clinic?
09:46:26   9          MR. HAMMERMAN:  Objection.  I don't believe there was
09:46:26  10   testimony on the free clinic.
09:46:32  11          THE COURT:  All right.
09:46:38  12   BY MR. JONES:
09:46:40  13   Q.  Well, I will say this.  Okay.  You recall that you had
09:46:44  14   testimony about -- that you said you had conversations with
09:46:48  15   the doctor about the giving of PFTs; is that correct?
09:46:54  16   A.  Yes.
09:46:54  17   Q.  And that you said that the doctor said, Well, wait a
09:46:58  18   minute, we don't want to give PFTs to people that don't have
09:47:02  19   insurance.  Isn't that what you said?
09:47:04  20   A.  No.
09:47:06  21   Q.  You didn't say that yesterday?
09:47:08  22   A.  No, I didn't say to people that didn't have insurance.
09:47:12  23   Q.  What did you say?
09:47:12  24   A.  I said to certain types of insurance, not no insurance --
09:47:20  25   Q.  Well, would that be the kind of insurance that --
```

09:47:24  1    MR. HAMMERMAN:  Your Honor, I just ask that the
09:47:26  2  witness answer.
09:47:26  3    MR. JONES:  I'm sorry, Judge.
09:47:28  4  BY MR. JONES:
09:47:30  5  Q.  Were you implying that it would be the kind of insurance
09:47:32  6  that wouldn't pay?
09:47:32  7  A.  Yes.
09:47:32  8  Q.  Well, you knew for a fact, however, that on Sundays, the
09:47:38  9  doctor ran free clinics; is that correct?
09:47:44  10  A.  Yes.
09:47:44  11  Q.  And these free clinics were for people who didn't have
09:47:48  12  insurance, right?
09:47:48  13  A.  That's correct.
09:47:50  14  Q.  In fact, the doctor -- even though we might call them free
09:47:54  15  clinics, you got paid on those days; is that correct?
09:47:58  16  A.  Yes.
09:47:58  17  Q.  And the doctor also on those days, did he not give free
09:48:06  18  tests on those days?
09:48:08  19  A.  Yes.
09:48:08  20  Q.  In fact, you often, I gather, worked from time to time on
09:48:36  21  these free clinic days; is that correct, ma'am?
09:48:38  22  A.  Yes.
09:48:38  23  Q.  I want to show you what's been marked as Exhibit 134-4.
09:48:44  24    THE COURT:  Government or defense?
09:48:44  25    MR. JONES:  This is Defendant's Exhibit 130-4.

09:48:52   1   BY MR. JONES:

09:48:52   2   Q.  And ask, do you recognize that kind of exhibit, ma'am?

09:48:54   3   A.  Yes.

09:48:54   4   Q.  What is that exhibit, ma'am?

09:48:56   5   A.  This is the sign-in sheet for the free clinic.

09:48:58   6   Q.  And these were all the people that came to the free clinic

09:49:00   7   on 4/26/09; is that correct?

09:49:04   8   A.  That's correct.

09:49:04   9   Q.  And that's just one of the sign-in sheets.  This first

09:49:08  10   sheet shows that 16 people came --

09:49:10  11        MR. HAMMERMAN:  Objection, your Honor.  Mr. Jones is

09:49:12  12   not allowed to read from a document that's not in evidence.

09:49:16  13   BY MR. JONES:

09:49:16  14   Q.  All right.  This is a free clinic document.  How many

09:49:20  15   people does it show came?

09:49:24  16   A.  Sixteen.

09:49:24  17        MR. HAMMERMAN:  Objection.  Now he is just asking the

09:49:26  18   witness to do the same, your Honor.

09:49:28  19        THE COURT:  Yes.  Are you moving it into evidence?

09:49:30  20        MR. HAMMERMAN:  We would object to defense exhibits

09:49:32  21   during the government's case in chief, your Honor.

09:49:36  22        THE COURT:  That objection is overruled.  You may use

09:49:38  23   this document --

09:49:40  24        MR. JONES:  Yes, Judge, I am.  I will lay the

09:49:42  25   foundation.

09:49:42 1    THE COURT:  Please, let me finish.  You can use

09:49:44 2  documents for cross-examination.

09:49:48 3  BY MR. JONES:

09:49:50 4  Q.  That is a document, ma'am, that is a document that's kept

09:49:52 5  in the ordinary course of business at the clinic, isn't it,

09:49:56 6  ma'am?

09:49:56 7  A.  Yes.

09:49:56 8  Q.  And it's the kind of document that you worked with at the

09:49:58 9  clinic all the time when the patients would come in for the

09:50:04 10  free clinic; isn't that right?

09:50:06 11  A.  Yes.

09:50:06 12  Q.  In fact, on this particular day, it shows that on this one

09:50:10 13  sheet right here, 16 patients came into the clinic?

09:50:16 14    MR. HAMMERMAN:  Objection.

09:50:16 15    THE COURT:  Are you moving it into evidence?

09:50:18 16    MR. JONES:  Yes, I am moving it into evidence, Judge.

09:50:20 17    THE COURT:  Is it Defendant's Exhibit 134?

09:50:24 18    MR. JONES:  130-4.

09:50:26 19    MR. HAMMERMAN:  We object, your Honor.

09:50:28 20    THE COURT:  The objection is overruled.  You may use

09:50:28 21  it for cross-examination.

09:50:32 22  BY MR. JONES:

09:50:34 23  Q.  Sixteen patients for this one sheet, right, ma'am?

09:50:36 24  A.  Yes.

09:50:36 25  Q.  In fact, there was another sheet for this day, ma'am, that

| | | |
|---|---|---|
| 09:50:40 | 1 | is sheet 130-21 for the same day; is that correct? |
| 09:50:44 | 2 | A. Yes. |
| 09:50:44 | 3 | Q. And it reflects that there were an additional seven people |
| 09:50:46 | 4 | that came in to the free clinic; is that correct? |
| 09:50:50 | 5 | A. That's correct. |
| 09:50:50 | 6 | Q. Now, if I showed you that on this particular day there |
| 09:51:00 | 7 | were at least three people who came in -- |
| 09:51:02 | 8 | MR. HAMMERMAN: Objection, your Honor. If he is |
| 09:51:04 | 9 | going to show it to her. |
| 09:51:06 | 10 | MR. JONES: Fine. I will. |
| 09:51:06 | 11 | THE COURT: I haven't heard the complete -- |
| 09:51:08 | 12 | MR. JONES: I will. I will take care of that, Judge. |
| 09:51:14 | 13 | BY MR. JONES: |
| 09:51:38 | 14 | Q. If I show you what has been marked as Defendant's Exhibit |
| 09:51:42 | 15 | 130-9, do you recognize this kind of exhibit for that day, |
| 09:51:46 | 16 | ma'am? |
| 09:51:48 | 17 | A. Yes. |
| 09:51:48 | 18 | Q. Does this exhibit show that on the free clinic day that a |
| 09:51:52 | 19 | PFT was given? |
| 09:51:52 | 20 | A. Yes, it was. |
| 09:51:54 | 21 | Q. Let me show you what's been marked as -- showing what's |
| 09:52:46 | 22 | been marked as -- |
| 09:52:48 | 23 | MR. JONES: Let me have one second, Judge. |
| 09:52:48 | 24 | BY MR. JONES: |
| 09:53:06 | 25 | Q. I want to show you what's been marked as 130-18 for that |

| | | |
|---|---|---|
| 09:53:12 | 1 | same day, and look at the bottom.  Does it show that a PFT was |
| 09:53:20 | 2 | given on that day? |
| 09:53:20 | 3 | A.  No. |
| 09:53:26 | 4 | Q.  I'm sorry.  Do you see PFT there? |
| 09:53:28 | 5 | A.  I see the PFT there, yes. |
| 09:53:30 | 6 | Q.  And what does that mean to you? |
| 09:53:32 | 7 | A.  That it should have been given. |
| 09:53:34 | 8 | Q.  And are you trying to say that it wasn't given that day? |
| 09:53:38 | 9 | A.  No, there is no initials next to it.  Usually when a test |
| 09:53:42 | 10 | is given, we put our initials next to it. |
| 09:53:46 | 11 | Q.  And what you're saying is that you're not sure whether it |
| 09:53:48 | 12 | was given that day -- |
| 09:53:48 | 13 | A.  Right, I am not sure it was given.  There are no initials. |
| 09:53:54 | 14 | Q.  I want to show you what's been marked as 130-25, and |
| 09:54:18 | 15 | that's one of the records from that day.  Does it show that an |
| 09:54:22 | 16 | EKG was given that day? |
| 09:54:22 | 17 | A.  Again, I'm not sure if it was given or not, but there is |
| 09:54:28 | 18 | EKG. |
| 09:54:28 | 19 | Q.  In fact, that EKG is listed in that procedure box where |
| 09:54:34 | 20 | tests -- |
| 09:54:34 | 21 | MR. HAMMERMAN:  Objection, your Honor.  It's not in |
| 09:54:36 | 22 | evidence. |
| 09:54:36 | 23 | MR. JONES:  Judge, I would move that this -- she's |
| 09:54:42 | 24 | identified it.  I would move that this document be admitted |
| 09:54:44 | 25 | into evidence. |

09:54:44  1    MR. HAMMERMAN:  I don't believe a foundation has been

09:54:46  2    laid, your Honor.  We object.

09:54:48  3    MR. JONES:  You know --

09:54:48  4    THE COURT:  Wasn't this marked as a government

09:54:52  5    exhibit?

09:54:52  6    MR. JONES:  Yes, Judge, these were originally

09:54:54  7    Government Exhibit 624.

09:54:58  8    MR. HAMMERMAN:  I believe these were the subject

09:54:58  9    matter of our conversation after court yesterday, your Honor.

09:55:02  10   THE COURT:  Right.  There is no basis to object on

09:55:06  11   authenticity, I take it.  The objection is overruled as to

09:55:14  12   what was -- let's keep them government exhibit numbers.  It's

09:55:20  13   too confusing to have the same exhibits with different numbers

09:55:24  14   simply because different lawyers are using them.  So what was

09:55:30  15   the government exhibit number, 624?

09:55:34  16   MR. JONES:  Yes, they marked the whole thing 624,

09:55:38  17   Judge, and it's a little difficult when you have different

09:55:42  18   pages.

09:55:42  19   THE COURT:  You have remarked them Defense Exhibit

09:55:44  20   130 --

09:55:46  21   MR. JONES:  Yes.

09:55:46  22   THE COURT:  -- dash 5 and dash 9?

09:55:52  23   MR. JONES:  Yes, the face sheets with the sign-in was

09:55:54  24   130-4, the second sign-in sheet is 130-21 for the same day,

09:56:04  25   and the other individual sheets that I have shown are the

| | | |
|---|---|---|
| 09:56:06 | 1 | various tests that were done those days. |
| 09:56:12 | 2 | THE COURT: And are those -- are the test pages |
| 09:56:14 | 3 | marked with a number? |
| 09:56:16 | 4 | MR. JONES: Yes, your Honor. Those are the ones that |
| 09:56:18 | 5 | I referred to. |
| 09:56:20 | 6 | THE COURT: Okay. What number? |
| 09:56:20 | 7 | MR. JONES: Judge, I refer to 130-9, 130-18, and |
| 09:56:28 | 8 | 130-25. |
| 09:56:34 | 9 | THE COURT: All right. Those exhibits are admitted. |
| 09:56:42 | 10 | In fact, I think they were yesterday. |
| 09:56:44 | 11 | (Above-mentioned exhibits were received in evidence.) |
| 09:56:48 | 12 | BY MR. JONES: |
| 09:56:48 | 13 | Q. Now, Ms. Rhodes, you know, I am going to show you some |
| 09:56:50 | 14 | with your initials on them. I will show you a group of |
| 09:57:00 | 15 | exhibits which was originally Government's 627 that we have |
| 09:57:04 | 16 | remarked as the face page 131-3. I'd like to show you this, |
| 09:57:12 | 17 | and this is another day. Do you see that, ma'am? |
| 09:57:16 | 18 | A. Yes. |
| 09:57:16 | 19 | Q. You recognize this, of course, as being one of the sign-in |
| 09:57:20 | 20 | sheets for the free clinic; is that correct? |
| 09:57:22 | 21 | A. That's correct. |
| 09:57:24 | 22 | Q. And that do you also see on the very next page that |
| 09:57:36 | 23 | there's another sign-in sheet for that exact same day? Is |
| 09:57:40 | 24 | that correct? |
| 09:57:40 | 25 | A. Yes. |

09:57:40  1  Q.  And that is 134-4, and that's an additional 15 people who

09:57:48  2  signed in for that day; is that correct?

09:57:48  3  A.  Yes, that's correct.

09:57:50  4  Q.  All right.  I want to show you out of this book 131-8 for

09:58:36  5  that same day of the free clinic.  Do you see that document,

09:58:38  6  ma'am?

09:58:38  7  A.  Yes.

09:58:38  8  Q.  Now, you were talking about initials, weren't you, ma'am?

09:58:42  9  A.  Yes.

09:58:42  10  Q.  And this has that an EKG was done on that day, right?

09:58:46  11  A.  Yes, it was.

09:58:46  12  Q.  And whose initials are those?

09:58:48  13  A.  Mine.

09:58:48  14  Q.  And that EKG was done for free, wasn't it, ma'am?

09:58:52  15  A.  Yes.

09:58:54  16        MR. HAMMERMAN:  Objection, your Honor.  Foundation.

09:58:54  17        THE COURT:  Overruled.

09:58:56  18  BY MR. JONES:

09:59:10  19  Q.  I want to show you the same day, 131-10.  Do you see that

09:59:18  20  document, ma'am?

09:59:18  21  A.  Yes.

09:59:18  22  Q.  And that's a document for a day of the free clinic, right?

09:59:26  23  A.  Yes.

09:59:26  24  Q.  And it has a PFT on it?

09:59:26  25  A.  Yes.

292

09:59:28    1    Q.  I want to show you on that same day 131-11.  It has a PFT
09:59:48    2    on it, doesn't it?
09:59:50    3    A.  Yes, it does.
09:59:50    4    Q.  Whose initials are on there?
09:59:52    5    A.  Mine.
09:59:54    6    Q.  And that was a free clinic day, right?
09:59:56    7    A.  Yes, it was.
09:59:56    8    Q.  This person got free work done?
09:59:58    9          MR. HAMMERMAN:  Objection.  Foundation.
10:00:00   10          THE COURT:  Overruled.
10:00:00   11          THE WITNESS:  Yes.
10:00:02   12    BY MR. JONES:
10:00:14   13    Q.  On the very next page, same day, there is an EKG that was
10:00:20   14    done at the free clinic; is that correct?
10:00:22   15    A.  Yes.
10:00:24   16    Q.  Whose initials are there?
10:00:24   17    A.  Mine and a co-worker's.
10:00:28   18    Q.  Person got a free EKG, didn't they?
10:00:30   19          MR. HAMMERMAN:  Objection.  Foundation.
10:00:32   20          THE COURT:  Overruled.
10:00:34   21    BY MR. JONES:
10:00:34   22    Q.  Right?
10:00:34   23    A.  Yes.
10:00:34   24    Q.  Thank you.
10:00:34   25          On that same free clinic day, I want to show you

| | | |
|---|---|---|
| 10:01:00 | 1 | 131-15.  That shows that the person received -- that person |
| 10:01:06 | 2 | received an EKG; is that correct, ma'am? |
| 10:01:06 | 3 | A.  Yes. |
| 10:01:06 | 4 | Q.  Whose initials are there? |
| 10:01:08 | 5 | A.  Mine and a co-worker's. |
| 10:01:10 | 6 | Q.  That's another person that got a free EKG that day, right? |
| 10:01:14 | 7 | MR. HAMMERMAN:  Objection.  Foundation. |
| 10:01:14 | 8 | THE COURT:  Overruled. |
| 10:01:16 | 9 | THE WITNESS:  Yes. |
| 10:01:16 | 10 | BY MR. JONES: |
| 10:01:16 | 11 | Q.  Thank you, ma'am. |
| 10:01:18 | 12 | Here's another exhibit of the same day, and I will |
| 10:01:42 | 13 | have you take a look at that, ma'am.  Does that indicate a |
| 10:01:46 | 14 | PFT? |
| 10:01:46 | 15 | A.  Yes. |
| 10:01:46 | 16 | THE COURT:  Excuse me.  Is there an exhibit number? |
| 10:01:48 | 17 | MR. JONES:  Yeah, I'm sorry, your Honor.  It's |
| 10:01:54 | 18 | 131-17. |
| 10:01:54 | 19 | BY MR. JONES: |
| 10:01:54 | 20 | Q.  Do you recognize that, ma'am? |
| 10:01:56 | 21 | A.  Yes. |
| 10:01:56 | 22 | Q.  Same day, same free clinic day; is that correct? |
| 10:02:00 | 23 | A.  That's correct. |
| 10:02:00 | 24 | Q.  And it has an initial next to the PFT, right? |
| 10:02:02 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:02:02 | 1 | Q.  That person got a free PFT; isn't that correct? |
| 10:02:06 | 2 | A.  Yes. |
| 10:02:06 | 3 | MR. HAMMERMAN:  Objection, your Honor. |
| 10:02:06 | 4 | THE COURT:  Overruled. |
| 10:02:08 | 5 | BY MR. JONES: |
| 10:02:28 | 6 | Q.  Finally, 131-19 from the same free clinic day.  Do you see |
| 10:02:34 | 7 | that there is -- the person received an EKG; is that correct? |
| 10:02:40 | 8 | A.  That's correct. |
| 10:02:40 | 9 | Q.  Tell the ladies and gentlemen of the jury whose initials |
| 10:02:44 | 10 | are on that. |
| 10:02:44 | 11 | A.  Mine. |
| 10:02:44 | 12 | Q.  Did that person get a free EKG that day? |
| 10:02:48 | 13 | MR. HAMMERMAN:  Objection.  Foundation. |
| 10:02:50 | 14 | THE COURT:  Overruled. |
| 10:02:52 | 15 | THE WITNESS:  Yes. |
| 10:02:52 | 16 | BY MR. JONES: |
| 10:02:52 | 17 | Q.  I'm sorry, what was it?  Yes, right? |
| 10:02:54 | 18 | A.  Yes. |
| 10:02:56 | 19 | Q.  And there is another initial for a PFT; is that correct? |
| 10:02:58 | 20 | A.  Correct. |
| 10:02:58 | 21 | Q.  Same person, right?  And that person got a PFT? |
| 10:03:02 | 22 | A.  Yes. |
| 10:03:02 | 23 | Q.  And that person got a free PFT and an EKG that day; is |
| 10:03:06 | 24 | that correct? |
| 10:03:06 | 25 | A.  That's correct. |

|  |  |  |
|---|---|---|
| 10:03:06 | 1 | Q.  You know, I believe that the government elicited a lot of |
| 10:03:52 | 2 | testimony from you about what you said was the regularity of |
| 10:03:56 | 3 | people getting tests; is that correct? |
| 10:03:58 | 4 | A.  Yes. |
| 10:04:00 | 5 | Q.  I decided that I picked some people that you might know. |
| 10:04:06 | 6 | What was your mother's -- well, wait a minute. |
| 10:04:08 | 7 | You had a grandmother; is that correct? |
| 10:04:10 | 8 | A.  Yes. |
| 10:04:10 | 9 | Q.  And the grandmother came to the clinic on a number of |
| 10:04:16 | 10 | occasions, did she not? |
| 10:04:16 | 11 | A.  Yes. |
| 10:04:18 | 12 | Q.  And you accompanied your grandmother to the clinic on a |
| 10:04:26 | 13 | number of occasions; is that correct? |
| 10:04:28 | 14 | A.  Yes. |
| 10:04:28 | 15 | Q.  And what you told the FBI was that every time your |
| 10:04:30 | 16 | grandmother came, that there was a procedure done on her; |
| 10:04:34 | 17 | isn't that correct? |
| 10:04:36 | 18 | A.  I don't remember telling anybody that in this court. |
| 10:04:40 | 19 | Q.  No, not in court, but do you remember giving an interview |
| 10:04:44 | 20 | to the FBI where you told them that? |
| 10:04:46 | 21 | A.  I don't recall telling anyone that she got a test every |
| 10:05:00 | 22 | time she came to the clinic. |
| 10:05:02 | 23 | Q.  Well, did you tell the FBI that you thought that |
| 10:05:40 | 24 | Dr. Chhibber was doing something wrong because of the number |
| 10:05:44 | 25 | of tests that your grandmother got when she went to see him? |

10:05:48　　1　A.　No.

10:05:48　　2　Q.　Here; let me -- if I -- well, here, let me just show

10:05:54　　3　you --

10:05:54　　4　　　　　　MR. HAMMERMAN:　Your Honor, the witness has answered

10:05:58　　5　the question.

10:05:58　　6　　　　　　MR. JONES:　I want to show her something to refresh

10:06:02　　7　her recollection.

10:06:02　　8　　　　　　MR. HAMMERMAN:　She didn't say she doesn't remember.

10:06:04　　9　　　　　　THE COURT:　The objection is overruled.

10:06:04　10　BY MR. JONES:

10:06:04　11　Q.　I just want to show you --

10:06:06　12　　　　　　THE COURT:　You may show -- now, Mr. Jones, let me

10:06:08　13　continue.　You may show the witness the document after you

10:06:12　14　establish -- if you can establish it will refresh her memory.

10:06:18　15　BY MR. JONES:

10:06:18　16　Q.　You know, I have asked you a couple of times -- here, let

10:06:22　17　me ask you this.　You met with the FBI on a number of

10:06:24　18　occasions, have you not?

10:06:26　19　A.　Yes.

10:06:26　20　Q.　In fact, you have met with them what you say at least four

10:06:36　21　times with the FBI?

10:06:38　22　A.　Yes.

10:06:38　23　Q.　And that's to say nothing of all the times that you met

10:06:44　24　with the assistant United States attorney in getting prepared

10:06:46　25　for your testimony in this trial; isn't that correct?

| | | |
|---|---|---|
| 10:06:50 | 1 | A.  No. |
| 10:06:50 | 2 | Q.  How many times have you met with the assistant United |
| 10:06:52 | 3 | States attorney? |
| 10:06:54 | 4 | A.  I thought you were talking about coming down here. |
| 10:06:58 | 5 | Q.  No.  But you met with the FBI at least four times? |
| 10:07:02 | 6 | A.  No. |
| 10:07:02 | 7 | Q.  Well -- |
| 10:07:04 | 8 | A.  You have to explain it more.  Are you talking about just |
| 10:07:06 | 9 | down here getting prepared for this, or are you talking about |
| 10:07:10 | 10 | outside this building? |
| 10:07:10 | 11 | Q.  Outside of this building. |
| 10:07:12 | 12 | A.  No, I have not met with them about four times outside of |
| 10:07:16 | 13 | this building that I can recall. |
| 10:07:16 | 14 | Q.  Well, did you meet with the FBI -- let me just give you |
| 10:07:20 | 15 | some dates. |
| 10:07:30 | 16 | Did you meet with the FBI on January 7, 2011? |
| 10:07:34 | 17 | A.  Where at? |
| 10:07:36 | 18 | Q.  The FBI sheet doesn't say.  Do you have any recollection |
| 10:07:50 | 19 | of meeting with Special Agent Edward Leitelt and Jay Roberts |
| 10:07:58 | 20 | of the Department of Labor on January 5th, 2011? |
| 10:08:00 | 21 | A.  I can't recall the exact dates, but I came here to FBI |
| 10:08:08 | 22 | agency. |
| 10:08:10 | 23 | Q.  Well, do you recall that you had an interview with the FBI |
| 10:08:12 | 24 | on February 11th, 2011, with Special Agent Ed Leitelt and |
| 10:08:18 | 25 | Agent Ashley Roelofs?  Do you recall having a meeting with |

10:08:22  1  them on that day?

10:08:24  2  A.  Okay.  It was the first two because I thought you were

10:08:30  3  talking about the gentleman and the lady.

10:08:32  4  Q.  Well -- excuse me, ma'am --

10:08:34  5  A.  I only remember meeting two FBI agents.  There was a

10:08:38  6  gentleman and then a lady.

10:08:40  7  Q.  Ma'am, I can only go by the FBI reports that I have.

10:08:44  8  A.  Okay.

10:08:44  9       MR. HAMMERMAN:  Your Honor, I will object to

10:08:46  10  Mr. Jones' testimony.

10:08:48  11  BY MR. JONES:

10:08:48  12  Q.  My question is, do you remember on February 22nd, 2011,

10:08:52  13  meeting with Special Agent Leitelt and this special agent over

10:09:00  14  here, Ms. Ashley Roelofs?

10:09:02  15  A.  Yes.

10:09:02  16  Q.  All right.  And you had another meeting, did you not, on

10:09:14  17  your interviews by Special Agent Leitelt and Assistant United

10:09:20  18  States Attorney Joel Hammerman on September 16th, 2011?  Isn't

10:09:24  19  that correct?

10:09:24  20  A.  Is that here in this building?

10:09:28  21  Q.  It doesn't say, ma'am, so I have to ask you.

10:09:32  22       MR. HAMMERMAN:  Once again, your Honor, I will object

10:09:34  23  to that.

10:09:36  24       THE COURT:  Well, she asked a question.

10:09:36  25  BY MR. JONES:

| | | |
|---|---|---|
| 10:09:38 | 1 | Q.  Ma'am, I don't know. |
| 10:09:48 | 2 | A.  I remember meeting with them, yes. |
| 10:09:50 | 3 | Q.  And then do you recall meeting at the offices of the |
| 10:09:54 | 4 | United States Attorney's Office on 10/15/2011 where you met |
| 10:10:00 | 5 | with Mr. Hammerman?  Do you recall that? |
| 10:10:04 | 6 | A.  Say that again? |
| 10:10:08 | 7 | Q.  Do you recall meeting with Assistant United States |
| 10:10:12 | 8 | Attorney Joel Hammerman on August 15th, 2011, at his offices? |
| 10:10:16 | 9 | A.  Yes. |
| 10:10:18 | 10 | Q.  All right.  Now I want to get back -- do you recall having |
| 10:10:24 | 11 | another meeting with the federal prosecutors and Mr. Hammerman |
| 10:10:32 | 12 | and I suppose at his office on February 27th, 2012? |
| 10:10:34 | 13 | A.  Yes. |
| 10:10:36 | 14 | Q.  All right.  So, ma'am, it is fair to say that you met with |
| 10:10:40 | 15 | these people on a number of occasions; isn't that true? |
| 10:10:44 | 16 | A.  That's correct. |
| 10:10:44 | 17 | Q.  Now, I want to go back, and I want to go back to the |
| 10:10:48 | 18 | question that was on the table.  I am going to ask you, do you |
| 10:10:56 | 19 | recall on September 16th, 2011, having an interview with the |
| 10:11:06 | 20 | government where you told them that you knew what Dr. Chhibber |
| 10:11:10 | 21 | was doing because you observed it when you accompanied your |
| 10:11:14 | 22 | grandmother and mother on visits?  Do you remember telling |
| 10:11:18 | 23 | these folks that? |
| 10:11:18 | 24 | A.  Yes, I -- |
| 10:11:22 | 25 | Q.  My question is, do you remember telling these folks that? |

| | | |
|---|---|---|
| 10:11:24 | 1 | A.  I actually don't remember it, but... |
| 10:11:28 | 2 | Q.  All right.  Well, I want to show you a couple of exhibits. |
| 10:11:34 | 3 | Your grandmother's name was Mary Spain (phonetic)? |
| 10:11:40 | 4 | A.  That's correct. |
| 10:11:40 | 5 | Q.  I just want to show you a couple of exhibits, ma'am.  I |
| 10:11:44 | 6 | want to show you -- in fact, your grandmother was a very sick |
| 10:11:50 | 7 | woman, was she not? |
| 10:11:52 | 8 | MR. HAMMERMAN:  Objection.  Foundation, time. |
| 10:11:54 | 9 | THE COURT:  Overruled. |
| 10:12:00 | 10 | BY MR. JONES: |
| 10:12:00 | 11 | Q.  She was a very sick woman, wasn't she, ma'am? |
| 10:12:04 | 12 | A.  Yes. |
| 10:12:04 | 13 | Q.  In fact, she had a form of cancer that came up twice; |
| 10:12:06 | 14 | isn't that correct? |
| 10:12:08 | 15 | A.  Yes. |
| 10:12:08 | 16 | Q.  She had hypertension; isn't that correct? |
| 10:12:12 | 17 | A.  Yes. |
| 10:12:12 | 18 | Q.  She had diabetes? |
| 10:12:14 | 19 | A.  Yes. |
| 10:12:14 | 20 | Q.  And she had a stroke; isn't that correct? |
| 10:12:16 | 21 | A.  Yes. |
| 10:12:16 | 22 | Q.  And she had heart trouble, did she not, ma'am? |
| 10:12:20 | 23 | A.  Yes. |
| 10:12:20 | 24 | Q.  I want to show you a couple of documents and see if you |
| 10:12:24 | 25 | recognize this.  I am going to show you 128-1. |

10:12:26　　1　　　　　MR. HAMMERMAN:  Your Honor, I am objecting to

10:12:30　　2　relevance.

10:12:32　　3　　　　　THE COURT:  Well, this is cross-examination.

10:12:36　　4　BY MR. JONES:

10:12:38　　5　Q.  You recognize this 128-1 being a document of the clinic?

10:12:44　　6　A.  Yes.

10:12:44　　7　Q.  And it purports to show a visit of your mother --

10:12:48　　8　　　　　MR. HAMMERMAN:  Objection, your Honor.  The document

10:12:50　　9　is not in evidence.

10:12:52　　10　　　　　THE COURT:  Overruled.

10:12:54　　11　BY MR. JONES:

10:12:56　　12　Q.  For a visit of your mother on 10/7 -- your grandmother on

10:13:00　　13　10/7/04; is that correct?

10:13:02　　14　A.  That's correct.

10:13:02　　15　Q.  No procedures or tests were given to her on that date; is

10:13:02　　16　that correct?

10:13:06　　17　A.  That's correct.

10:13:06　　18　Q.  I want to show you another one, that on 128-2, which

10:13:14　　19　purports to be another visit of your mother on 11/6/04, do you

10:13:20　　20　see that?

10:13:20　　21　A.  Yes.

10:13:20　　22　Q.  No procedure is given to her that day; is that correct?

10:13:26　　23　　　　　MR. HAMMERMAN:  I am going to object again, your

10:13:28　　24　Honor.  The document is hearsay and not in evidence.

10:13:30　　25　　　　　THE COURT:  The objection is overruled.

10:13:30   1    THE WITNESS:  No tests given.

10:13:34   2  BY MR. JONES:

10:13:34   3  Q.  And then the very next month, I want to show you what's

10:13:38   4  been marked as 128-3, which purports to be another visit from

10:13:44   5  your mother -- grandmother, on 12/4/04.  No tests given,

10:13:50   6  right?

10:13:52   7  A.  That's correct.

10:13:52   8  Q.  Let me show you 128-4, which purports to be a visit of

10:13:58   9  your mother on 9/13/05.  No tests given; isn't that correct?

10:14:04  10  A.  That's correct.

10:14:04  11  Q.  Let me show you another one, on 128-5, which purports to

10:14:10  12  be a visit of your mother on April 4th, '06, no test given;

10:14:10  13  isn't that correct?

10:14:18  14  A.  Yes.

10:14:18  15    MR. HAMMERMAN:  Your Honor, I would object and ask

10:14:20  16  for a sidebar.

10:14:22  17    THE COURT:  Well, your objection is noted.  You can

10:14:24  18  have a standing objection to all this cross-examination if you

10:14:28  19  wish.

10:14:28  20    MR. HAMMERMAN:  Thank you, your Honor.

10:14:30  21  BY MR. JONES:

10:14:30  22  Q.  I want to show you 128-6, which purports to be another

10:14:36  23  visit of your grandmother on 7/27/06; isn't that correct?

10:14:40  24  A.  Yes.

10:14:40  25  Q.  No tests given.

10:14:44   1       You have to answer audibly so that she can take it

10:14:46   2   down.

10:14:48   3   A.  Yes.

10:14:48   4   Q.  I want to show you another one that's 128-7, which

10:14:54   5   purports to be a visit of your grandmother on 4/30/08.  Do you

10:14:58   6   see that?

10:14:58   7   A.  Yes.

10:15:00   8   Q.  No tests given; is that correct?

10:15:02   9   A.  That's correct.

10:15:02   10  Q.  I want to show you another one on 6/29/08, which purports

10:15:08   11  to be -- I'm sorry, 128-8, which purports to be a visit of

10:15:14   12  your grandmother on 6/29/08.  Do you see that?

10:15:18   13  A.  Yes.

10:15:18   14  Q.  No tests given, right?

10:15:20   15  A.  That's correct.

10:15:20   16  Q.  Also, on 128-9, which purports to be a visit of your

10:15:26   17  grandmother on 8/17/10, no tests given; isn't that correct?

10:15:32   18  A.  That's correct.

10:15:34   19  Q.  Now, you know during all the time that you were doing all

10:15:38   20  this work with the United States of America, did they take the

10:15:44   21  time to show you documents?

10:15:46   22  A.  Take the time to show me documents?

10:15:50   23  Q.  Yes.  All these times that you met with the United States

10:15:52   24  of America, during all these interviews, did they show you

10:15:58   25  documents?  Did you go through documents with these people?

| | | |
|---|---|---|
| 10:16:00 | 1 | A.  Yes, these documents here. |
| 10:16:02 | 2 | Q.  You went through these documents with them? |
| 10:16:04 | 3 | A.  No, just these. |
| 10:16:06 | 4 | Q.  I'm sorry. |
| 10:16:06 | 5 | A.  The charts here. |
| 10:16:08 | 6 | Q.  Oh, just those charts.  All right. |
| 10:16:10 | 7 | You know, you also talked to the FBI about how you |
| 10:16:26 | 8 | knew things were bogus because of your mother going to see Dr. |
| 10:16:32 | 9 | Chhibber.  Do you recall that? |
| 10:16:32 | 10 | A.  No. |
| 10:16:34 | 11 | Q.  Let me show you a couple of documents.  What's your |
| 10:16:40 | 12 | mother's name? |
| 10:16:42 | 13 | A.  Sandra (inaudible). |
| 10:16:42 | 14 | Q.  I want to show you a document that's marked 129-1, which |
| 10:16:46 | 15 | purports to be -- that's your mother's name, right? |
| 10:16:48 | 16 | A.  Yes. |
| 10:16:50 | 17 | Q.  You recognize these as documents of the clinic, don't you? |
| 10:16:52 | 18 | A.  Yes. |
| 10:16:52 | 19 | Q.  And this purports to be a document of your mother visiting |
| 10:16:56 | 20 | Dr. Chhibber on October 2nd of '04; is that correct? |
| 10:16:58 | 21 | A.  Yes. |
| 10:17:00 | 22 | MR. HAMMERMAN:  Your Honor -- |
| 10:17:00 | 23 | BY MR. JONES: |
| 10:17:00 | 24 | Q.  Any tests given on that day? |
| 10:17:02 | 25 | MR. HAMMERMAN:  I am just going to object beyond |

10:17:04   1   direct, relevance and not in evidence.

10:17:12   2        THE COURT:  Since you made those objections, I will

10:17:14   3   say relevant to impeachment.

10:17:16   4   BY MR. JONES:

10:17:16   5   Q.  No tests given, correct?

10:17:18   6   A.  No.

10:17:18   7   Q.  I will show you another one with respect to your mother,

10:17:22   8   129-2, which purports to be a visit of 12/4/04; is that

10:17:28   9   correct?

10:17:28  10   A.  Yes.

10:17:28  11   Q.  No tests given, right?

10:17:30  12   A.  No.

10:17:30  13   Q.  Let's look at another one, which is 129-3, which purports

10:17:36  14   to be a visit of her on 1/8/05.  No tests given, right?

10:17:42  15   A.  No.

10:17:42  16   Q.  Let me show you 129-4, which purports to be a visit of

10:17:50  17   your mother on 1/15/05.  No tests given to her; is that

10:17:50  18   correct?

10:17:56  19   A.  That's correct.

10:17:56  20   Q.  I will show you another one that's 129-5, which purports

10:18:04  21   to be a visit of your mother on 7/15/05.  No tests given;

10:18:04  22   isn't that correct?

10:18:10  23   A.  That's correct.

10:18:10  24   Q.  Showing you one that's marked as 129-6, which purports to

10:18:18  25   be a visit of your mother on 8/31/05.  No tests given; isn't

10:18:18  1  that correct?

10:18:24  2  A.  That's correct.

10:18:24  3  Q.  Let me show you another one that's 129-7, which purports

10:18:34  4  to be a visit of your mother the very next month on 12/7/05.

10:18:40  5  No tests given; is that correct?

10:18:40  6  A.  That's correct.

10:19:10  7       THE COURT:  All right.  Let's take our morning break,

10:19:12  8  members of the jury.  We will take a 15-minute break.

10:19:50  9    (The jury leaves the courtroom.)

10:19:50  10      THE COURT:  Please be seated.  We have several issues

10:19:52  11  raised.  You may step down and out into the hallway, if you

10:19:58  12  wish.  We will be resuming in 15 minutes.

10:19:58  13    (Witness leaves the stand.)

10:20:26  14      THE COURT:  The witness has left the courtroom.

10:20:34  15      Backing up a bit, there were some objections during

10:20:42  16  this witness' direct examination concerning a correlation

10:20:50  17  between the diagnoses on a patient's chart and the tests that

10:20:56  18  were ordered.  I think there were a series of documents that

10:21:04  19  were subject to this objection, and so I did not admit the

10:21:10  20  evidence pending hearing further argument as to the

10:21:16  21  qualifications really of this witness to testify about a

10:21:22  22  correlation between diagnosis and tests ordered.

10:21:28  23      Maybe I missed something, so I'd like to hear from

10:21:30  24  the government first as to an offer of proof as to what she

10:21:36  25  would say --

| | | |
|---|---|---|
| 10:21:38 | 1 | MR. HAMMERMAN:  Yes, your Honor. |
| 10:21:40 | 2 | THE COURT:  -- and what the basis for admissibility |
| 10:21:42 | 3 | is, and I will hear from the defense about their views on it. |
| 10:21:44 | 4 | MR. HAMMERMAN:  Your Honor, what the government was |
| 10:21:46 | 5 | seeking to elicit from this witness and what we believe she |
| 10:21:48 | 6 | would state is as a fact witness, an individual that worked in |
| 10:21:52 | 7 | Dr. Chhibber's office and handled these particular charts and |
| 10:21:56 | 8 | progress notes on a daily basis and was required to examine |
| 10:21:58 | 9 | those charts on a daily basis to effectuate her job, she had |
| 10:22:06 | 10 | to look at the diagnoses and the tests and see what was |
| 10:22:08 | 11 | written. |
| 10:22:10 | 12 | We're only asking her as a fact witness for what she |
| 10:22:12 | 13 | observed.  Did you see any patterns of diagnoses with the |
| 10:22:16 | 14 | tests.  We are not asking her to make any judgment statement |
| 10:22:20 | 15 | whatsoever about the appropriateness of them, just to the |
| 10:22:24 | 16 | extent that there was a pattern.  We believe the witness would |
| 10:22:28 | 17 | say that she saw, with respect to, for example, the PFT, the |
| 10:22:32 | 18 | pulmonary function test, where it requires somebody to blow |
| 10:22:36 | 19 | into a tube to test their lung capacity, we think this witness |
| 10:22:42 | 20 | would say for PFT, we always saw SOB, shortness of breath, |
| 10:22:46 | 21 | that the doctor was, in effect, writing the same diagnoses for |
| 10:22:48 | 22 | the same test being ordered for patient after patient after |
| 10:22:52 | 23 | patient.  We would make no -- we take no testimony from her |
| 10:23:00 | 24 | other than fact lay testimony on what she observed, not making |
| 10:23:00 | 25 | a qualification of whether or not that was an appropriate |

| | |
|---|---|
| 10:23:04 | 1 diagnosis or not. |
| 10:23:06 | 2 The purpose, of course, is that, once again, come |
| 10:23:06 | 3 closing argument, it is the government's intent to ask the |
| 10:23:08 | 4 jury to draw reasonable inferences that, in fact -- that it is |
| 10:23:14 | 5 impossible for, on a given day, 10 people to have the same |
| 10:23:18 | 6 diagnosis and receive the same test because that is an |
| 10:23:20 | 7 unreasonable thing to occur. |
| 10:23:22 | 8 The premise of this testimony is that in the end, the |
| 10:23:26 | 9 jury can use their common sense and draw their reasonable |
| 10:23:28 | 10 inference using circumstantial evidence that, in fact, not all |
| 10:23:32 | 11 patients who have the same diagnosis to receive the same test. |
| 10:23:36 | 12 And we would elicit comparable testimony with EKGs and ICGs, |
| 10:23:42 | 13 just the tests that this particular witness had to administer |
| 10:23:46 | 14 and thus had to look at the charts to review.  All we were |
| 10:23:48 | 15 going to ask is, did you see any patterns between the |
| 10:23:52 | 16 diagnoses associated with the test.  That is it. |
| 10:23:56 | 17 THE COURT:  All right.  Mr. Orman? |
| 10:24:00 | 18 MR. ORMAN:  The argument sounds familiar, Judge. |
| 10:24:02 | 19 This is exactly what we talked about yesterday, as far as I |
| 10:24:06 | 20 can recall.  The government is trying to argue, if I have this |
| 10:24:12 | 21 right, that volume equals wrongdoing.  That sounds like the |
| 10:24:20 | 22 argument. |
| 10:24:22 | 23 On top of that, we are talking about four tests that |
| 10:24:26 | 24 this witness does, four, maybe three, maybe five. |
| 10:24:34 | 25 Let me start again. |

10:24:36    1    I'm also lost with regard to the term "pattern."  If

10:24:42    2    the -- if what the government is trying to elicit is did every

10:24:48    3    time the doctor diagnosed shortness of breath, that a

10:24:56    4    pulmonary function test was given, I don't know that that's in

10:24:58    5    dispute.  It probably would be malpractice not to give the

10:25:02    6    test.

10:25:04    7    From that, they seem to say that there comes a point

10:25:10    8    in time where so many tests are given that it cannot possibly

10:25:14    9    mean that the doctor diagnosed these people with shortness of

10:25:20    10    breath.

10:25:20    11    Suppose, just suppose, he diagnosed it 10 times on a

10:25:26    12    given day and saw 30 patients, which is not that unusual.

10:25:32    13    What does that show?  Does that show what the government is

10:25:36    14    trying to say, that the numbers are so overwhelming that it

10:25:44    15    had to be fraudulent?  I don't think so.  Ten out of 30

10:25:52    16    doesn't have an effect.  And even if it did, there is not --

10:25:56    17    that is not proof that the diagnosis isn't correct.

10:26:00    18    I am trying to think on my feet and trying to figure

10:26:04    19    this out as I go along.  The more I think, the wronger it

10:26:10    20    gets.  Even to get where they're going, they've got to show

10:26:12    21    the total number of patients seen that day.  And -- that's the

10:26:16    22    best I can do.  But it still doesn't get them over the hurdle

10:26:20    23    of whether the tests are unnecessary.

10:26:26    24    MR. HAMMERMAN:  Your Honor, first of all, Mr. Orman

10:26:30    25    is basically trying to argue a closing argument, frankly, to

10:26:34  1  address an evidentiary issue.  There is no rule of evidence

10:26:36  2  that he is citing to your Honor --

10:26:40  3       THE COURT:  Which one are you citing?

10:26:40  4       MR. HAMMERMAN:  We are saying that it's relevant

10:26:42  5  evidence, and it's a fact witness, and we intend to elicit

10:26:46  6  relevant evidence because it is probative, it's informative to

10:26:52  7  the jury, and then we ask the jury to draw reasonable

10:26:54  8  inference from it.  It is just relevant evidence.

10:26:56  9       Mr. Orman is arguing that he does not believe that --

10:27:02  10  he is basically giving a closing argument but he is not citing

10:27:06  11  a rule of evidence saying it's inadmissible evidence.  It's

10:27:12  12  probative of a fact at issue, which is whether or not

10:27:14  13  Dr. Chhibber was putting fake diagnoses to order tests.

10:27:18  14       I can show your Honor one of the exhibits we talked

10:27:20  15  about yesterday, which was an instance in which --

10:27:24  16       THE COURT:  What is the number?

10:27:26  17       MR. HAMMERMAN:  Yes, your Honor.  It is I believe

10:27:30  18  629.

10:27:42  19       THE COURT:  I have it.

10:27:44  20       MR. HAMMERMAN:  If your Honor looks through, these

10:27:46  21  are the type of exhibits that, once again, Mr. Jones was

10:27:48  22  actually now admitting with this witness on cross-examination

10:27:54  23  in the government's case.  It is a patient registration form.

10:27:56  24       THE COURT:  Well, he is cross-examining using for

10:28:00  25  purposes of impeaching statements to the FBI.

| | | |
|---|---|---|
| 10:28:04 | 1 | MR. HAMMERMAN:  Yes, your Honor. |
| 10:28:04 | 2 | THE COURT:  I think.  I am not sure. |
| 10:28:06 | 3 | MR. HAMMERMAN:  The patient registration form, if the |
| 10:28:12 | 4 | progress notes -- if you go to the next page, Mr. Godfrey, |
| 10:28:16 | 5 | Martin, Martin Godfrey, was short of breath; Willie Robertson |
| 10:28:22 | 6 | was short of breath; Aura Brooks Ballard was short of breath; |
| 10:28:28 | 7 | Tara Harris was short of breath; Robert Cochran was short of |
| 10:28:34 | 8 | breath; Christopher Hall was short of breath; Jones, Lee, Lee |
| 10:28:40 | 9 | Jones, short of breath; David -- I'm sorry, Jason Davis, short |
| 10:28:44 | 10 | of breath; Glenn Swilly was short of breath; Paul Glover was |
| 10:28:52 | 11 | short of breath; Edgar Bartholomew, or I can't read the top, |
| 10:29:00 | 12 | Bathsheba, I believe, was short of breath; Mitchum Bathsheba |
| 10:29:06 | 13 | was short of breath; Eugene Mitchell was short of breath; |
| 10:29:10 | 14 | Michael Adams had asthma. |
| 10:29:12 | 15 | So all patients that came in that day were short of |
| 10:29:16 | 16 | breath except for one who had asthma, your Honor.  We will |
| 10:29:18 | 17 | have an expert testify that this would be like somebody going |
| 10:29:22 | 18 | to Vegas -- and I am overstating the case, just so your Honor |
| 10:29:28 | 19 | is aware -- this is like someone going to Vegas playing every |
| 10:29:32 | 20 | day and coming up the big winner.  It doesn't happen. |
| 10:29:36 | 21 | Unless these people showed up at Dr. Chhibber's |
| 10:29:40 | 22 | office after just doing the Hustle Up the Hancock and back, |
| 10:29:42 | 23 | that doesn't happen, unless Dr. Chhibber is falsifying |
| 10:29:46 | 24 | records. |
| 10:29:46 | 25 | All we wish to do with these witnesses, fact |

| | | |
|---|---|---|
| 10:29:48 | 1 | witnesses, is say, Did you see a correlation between tests and |
| 10:29:56 | 2 | diagnoses.  At closing, we will argue that it is an |
| 10:29:58 | 3 | impossibility.  It is an impossibility.  And that these jurors |
| 10:30:02 | 4 | should use their common sense and know because they will know |
| 10:30:06 | 5 | by the end of all of the testimony presented that this is a |
| 10:30:08 | 6 | condition that not everybody walks in off the street wheezing, |
| 10:30:12 | 7 | unable to catch their breath on a given day and that, in fact, |
| 10:30:14 | 8 | they can use their common sense and know that Dr. Chhibber was |
| 10:30:18 | 9 | falsifying diagnoses. |
| 10:30:22 | 10 | That is the reason we seek to admit this evidence, |
| 10:30:24 | 11 | but we don't ask a witness such as Ms. Rhodes to make any |
| 10:30:28 | 12 | expert analysis, interpretation.  We simply want her |
| 10:30:32 | 13 | fact-based observation. |
| 10:30:38 | 14 | THE COURT:  Yes. |
| 10:30:38 | 15 | MR. ORMAN:  Mr. Hammerman just helped me.  It does |
| 10:30:46 | 16 | happen that people go to Vegas and win.  It happens that way. |
| 10:30:52 | 17 | THE COURT:  Not to anybody I know. |
| 10:30:56 | 18 | MR. ORMAN:  Maybe that's the point; not many, but |
| 10:30:58 | 19 | there are a few.  What we have here are maybe three, four |
| 10:31:04 | 20 | selected days where they're saying, We're going to Vegas and |
| 10:31:08 | 21 | getting big wins.  That's in four years, Judge. |
| 10:31:14 | 22 | Now, look at the step that they're making.  It |
| 10:31:16 | 23 | happened in three days; therefore, impliedly, all four years. |
| 10:31:24 | 24 | That's the defect in the reason.  Somebody can go to Vegas and |
| 10:31:28 | 25 | win, but that doesn't mean they win every single time. |

10:31:32    1    MR. HAMMERMAN:  Your Honor, that is a fine closing
10:31:34    2    argument if Mr. Orman wants to make that to the jury that, in
10:31:38    3    fact, Dr. Chhibber was the guy who went to Vegas again and
10:31:40    4    again and again and he was the big winner.  Okay.  That is a
10:31:44    5    closing argument.
10:31:44    6    The question is, can the government make the
10:31:48    7    counter-argument that the jury can use their common sense
10:31:50    8    after learning that this is a serious condition that most
10:31:54    9    people don't have, it means that they were wheezing, they
10:31:56   10    can't catch their breath, they are having trouble breathing,
10:32:00   11    that they can use their common sense to know that this doesn't
10:32:04   12    happen patient after patient after patient after patient, and
10:32:08   13    all we're trying to do is elicit the fact testimony and then
10:32:12   14    let the --
10:32:14   15    THE COURT:  It sounded more like opinion testimony to
10:32:16   16    me, and the questions you were asking, she was saying, Well, a
10:32:20   17    lot or it happened a lot or sometimes or whatever.  It was not
10:32:26   18    an analytical factual-based answer --
10:32:30   19    MR. HAMMERMAN:  And then I will have to --
10:32:32   20    THE COURT:  -- that you were asking her.
10:32:34   21    MR. HAMMERMAN:  I can rephrase my questions, but that
10:32:36   22    is the entire intent of what the government is seeking to do,
10:32:38   23    which is, In your observation, how often did you see these
10:32:42   24    tests, these diagnoses.
10:32:46   25    No -- I'm not asking her to look back at data and

10:32:48  1  analyze it, I'm not asking her whether that was a correct

10:32:52  2  observation or not.  I am simply asking her factually, What

10:32:56  3  did you see.  That's all I'm trying to elicit.  And if I have

10:33:02  4  to rephrase my questions, I obviously will do so.

10:33:04  5       THE COURT:  With a foundation so it's not, What did

10:33:08  6  you see sometimes.  I mean, we are talking about a finite

10:33:10  7  period of time in this case.

10:33:14  8       MR. HAMMERMAN:  I will do a better job, I hope, your

10:33:16  9  Honor, to try to lay a more constrained foundation.

10:33:20  10       THE COURT:  All right.  You certainly can go back

10:33:22  11  into that area on redirect, and depending on what happens, I

10:33:28  12  can't promise you what the ruling will be, a lot of it is how

10:33:32  13  you reach for the information and what her answers are, her

10:33:34  14  foundational answers.  Some of them weren't really good --

10:33:40  15       MR. HAMMERMAN:  Yes, your Honor.

10:33:40  16       THE COURT:  -- establishing foundation.  And, of

10:33:44  17  course, the defense will have an opportunity to recross on the

10:33:48  18  scope -- based on the scope of redirect.

10:33:52  19       Let me ask, Mr. Jones, approximately how much more

10:33:58  20  cross-examination do you have at this juncture?

10:34:02  21       MR. JONES:  Of this witness, Judge, Mr. Orman is

10:34:06  22  going to help me.  Probably, Judge, probably no more than --

10:34:18  23  when I get a chance to talk to my co-counsel, I can promise

10:34:24  24  you this, Judge:  Probably no more than 10 minutes, if that

10:34:26  25  much, Judge.

10:34:26  1      THE COURT:  As for the government's objection to
10:34:30  2  Mr. Jones using the free clinic days' logs and patient records
10:34:42  3  concerning the witness' mother and grandmother, would you like
10:34:46  4  to state for the record the purpose for which you are using
10:34:50  5  those records?
10:34:50  6      MR. JONES:  Yes, Judge.  When -- two things.  For
10:34:56  7  impeachment, Judge.  On the direct exam, Mr. Hammerman
10:35:04  8  elicited from this witness, Well, look, we never gave --
10:35:08  9  there's something -- the doctor would chastise me about giving
10:35:12  10  a PFT because, you know, we couldn't get paid for it.  Well,
10:35:18  11  obviously, that flies in the face of giving -- where people
10:35:24  12  got free tests at the clinic, got the PFTs, got the EKGs, that
10:35:32  13  flies in the face of that testimony.
10:35:34  14      Also, impeachment with respect to her mother and to
10:35:38  15  her grandmother, what she told the bureau was that she knew
10:35:44  16  that this whole thing with Dr. Chhibber was bogus because as
10:35:48  17  she -- with the tests that were given to her grandmother and
10:35:50  18  to her mother.  So, Judge, both of those were impeachment
10:35:56  19  basis.
10:35:58  20      MR. HAMMERMAN:  With respect to the first argument
10:36:00  21  Mr. Jones has made, your Honor, the reason I was objecting on
10:36:04  22  foundation, as Mr. Jones knows, is that although patients came
10:36:08  23  on free clinic days, if they had insurance, they were still
10:36:12  24  billed, and many of these patients did have insurance, and
10:36:14  25  that's why I was asking for foundation whether she knew

10:36:18  1   whether or not -- because Mr. Jones kept saying they got a

10:36:20  2   free PFT.  I don't think this witness knows that.  She doesn't

10:36:24  3   know what was billed or not.  And, in fact, if a patient came

10:36:26  4   on a free clinic --

10:36:28  5           THE COURT:  Well, it's free direct examination.

10:36:30  6           MR. HAMMERMAN:  I understand.  I was just trying to

10:36:32  7   elicit the foundation that she actually didn't know who was

10:36:36  8   and who was not billed.  That's why I was challenging those.

10:36:38  9   And I didn't want to interrupt, and I appreciate the standing

10:36:40 10   objection because I did think that those were improper

10:36:44 11   questions because there was no foundation for whether she knew

10:36:46 12   of the billing or not.  And so I also thought, in that sense,

10:36:50 13   I was trying to hopefully get that foundation laid because I

10:36:54 14   didn't think it's available.  There is no foundation for it,

10:36:56 15   frankly.

10:36:58 16           With respect to the records of the mother and

10:37:04 17   grandmother, your Honor, I have a couple of objections.  The

10:37:08 18   first is Mr. Jones is asking either the witness to read them

10:37:12 19   into the record or is reading them himself when they have not

10:37:14 20   been admitted.  And I understand the purposes of

10:37:18 21   cross-examination, he can ask her, but he's asking her to read

10:37:20 22   records that aren't admitted.  These records have not been

10:37:22 23   marked as defense exhibits, which we'd ask for under Rule 16,

10:37:26 24   and he's effectively --

10:37:28 25           THE COURT:  They are government exhibits.

| | | |
|---|---|---|
| 10:37:28 | 1 | MR. HAMMERMAN: No, they are not, your Honor. They |
| 10:37:30 | 2 | are not. |
| 10:37:30 | 3 | THE COURT: They weren't part of -- |
| 10:37:36 | 4 | MR. HAMMERMAN: The mother and the grandmother were |
| 10:37:38 | 5 | not. They are not in the books that were provided and the |
| 10:37:38 | 6 | information that was provided to us by defense. They are |
| 10:37:40 | 7 | being passed up to me a page at a time. |
| 10:37:42 | 8 | THE COURT: They were part of Government Exhibit 627? |
| 10:37:44 | 9 | MR. HAMMERMAN: No. All the records from the |
| 10:37:46 | 10 | grandmother and for the mother were not, and they were not |
| 10:37:50 | 11 | marked as defense exhibits, they were not provided -- |
| 10:37:54 | 12 | THE COURT: They certainly can be used as |
| 10:37:54 | 13 | impeachment. |
| 10:37:56 | 14 | MR. HAMMERMAN: I agree. I don't contest that. But |
| 10:38:00 | 15 | what Mr. Jones was doing was he was asking the witness to read |
| 10:38:02 | 16 | them, effectively putting them into the record, and that's |
| 10:38:06 | 17 | effectively admitting the document. |
| 10:38:08 | 18 | THE COURT: Well -- |
| 10:38:08 | 19 | MR. HAMMERMAN: And we don't even know what they say |
| 10:38:10 | 20 | in advance. I think it's hearsay, and that's why I was |
| 10:38:14 | 21 | objecting. I'm also stating that I believe that if he is |
| 10:38:18 | 22 | going to read records into -- and effectively admit that in |
| 10:38:24 | 23 | our case, we at least would like to have had them in advance |
| 10:38:28 | 24 | as we requested under Rule 16. |
| 10:38:32 | 25 | And I, of course, didn't want to say any of that in |

| | | |
|---|---|---|
| 10:38:34 | 1 | front of the jury, but those are my objections. |
| 10:38:34 | 2 | MR. JONES:  Judge, I just put these together last |
| 10:38:36 | 3 | night based upon what she said on the stand yesterday. |
| 10:38:38 | 4 | THE COURT:  All right.  Well, the overruling of the |
| 10:38:46 | 5 | objections to using the mother and grandmother's clinic |
| 10:38:54 | 6 | materials for impeachment and reliability in order to |
| 10:39:00 | 7 | establish impeachment or unreliability stands overruled.  But |
| 10:39:08 | 8 | I think, Mr. Jones, when you're showing any witness a |
| 10:39:10 | 9 | document, you must first give the government a reasonable |
| 10:39:14 | 10 | opportunity to look at it, just as you would want when they |
| 10:39:22 | 11 | examine witnesses. |
| 10:39:24 | 12 | All right.  Let's take a 10-minute break. |
| 10:39:26 | 13 | MR. HAMMERMAN:  Your Honor, one last question, and I |
| 10:39:30 | 14 | don't want to keep your Honor now.  The issue that we |
| 10:39:32 | 15 | addressed last night, I believe the defense through their |
| 10:39:34 | 16 | cross-examination of Ms. Rhodes has opened that door.  We can |
| 10:39:36 | 17 | address it with the court at another point in time, but I |
| 10:39:40 | 18 | would like the opportunity to address it. |
| 10:39:40 | 19 | THE COURT:  Okay. |
| 10:39:42 | 20 | (Short break.) |
| 10:50:38 | 21 | (The jury enters the courtroom.) |
| 10:50:38 | 22 | THE COURT:  Please be seated.  Continued |
| 10:50:40 | 23 | cross-examination, Mr. Jones. |
| 10:50:42 | 24 | MR. JONES:  Yes, Judge.  I only have a couple more. |
| 10:51:00 | 25 | May I proceed, Judge? |

| | | |
|---|---|---|
| 10:51:02 | 1 | THE COURT:  Yes. |
| 10:51:02 | 2 | BY MR. JONES: |
| 10:51:02 | 3 | Q.  Ms. Rhodes, I want to go back to one thing.  Mr. Hammerman |
| 10:51:06 | 4 | asked you yesterday about how you had given some tests and |
| 10:51:14 | 5 | were later chastised by Dr. Chhibber.  Do you recall that? |
| 10:51:20 | 6 | A.  Yes. |
| 10:51:20 | 7 | Q.  So I gather, ma'am, that there were occasions that you -- |
| 10:51:28 | 8 | without consulting with Dr. Chhibber, you would order tests; |
| 10:51:32 | 9 | is that correct? |
| 10:51:32 | 10 | A.  That I would order tests? |
| 10:51:36 | 11 | Q.  Yes.  That you would put those procedures to be done. |
| 10:51:40 | 12 | A.  No. |
| 10:51:40 | 13 | Q.  Well, isn't that what you told Mr. Hammerman yesterday, |
| 10:51:44 | 14 | that you had ordered that this particular test be done and |
| 10:51:48 | 15 | that then Dr. Chhibber came to you and told you that it |
| 10:51:52 | 16 | shouldn't have been done? |
| 10:51:52 | 17 | A.  No. |
| 10:51:54 | 18 | Q.  That isn't what you said yesterday? |
| 10:51:56 | 19 | MR. HAMMERMAN:  Asked and answered. |
| 10:51:56 | 20 | THE WITNESS:  No. |
| 10:51:58 | 21 | THE COURT:  Sustained. |
| 10:52:00 | 22 | BY MR. JONES: |
| 10:52:00 | 23 | Q.  That's not -- okay. |
| 10:52:02 | 24 | Were there ever occasions -- let me ask you this. |
| 10:52:04 | 25 | Were there ever occasions that you gave -- you ordered tests |

| | | |
|---|---|---|
| 10:52:08 | 1 | on your own? |
| 10:52:10 | 2 | A.  No, I never ordered tests. |
| 10:52:10 | 3 | Q.  Or that you ever put down that a test should be done on |
| 10:52:16 | 4 | your own? |
| 10:52:16 | 5 | A.  Did I put down that a test should be done? |
| 10:52:22 | 6 | Q.  Yes, that you would put it on the procedure chart without |
| 10:52:30 | 7 | consulting with Dr. Chhibber. |
| 10:52:32 | 8 | A.  Yes, without consulting. |
| 10:52:38 | 9 | Q.  Without consulting, right. |
| 10:52:38 | 10 | And how many people in the office do you know did the |
| 10:52:42 | 11 | exact same thing? |
| 10:52:44 | 12 | A.  The other medical assistants. |
| 10:52:46 | 13 | Q.  And who would that be? |
| 10:52:48 | 14 | A.  Tyanna Holmes. |
| 10:52:50 | 15 | Q.  Tyanna Holmes did it? |
| 10:52:52 | 16 | A.  Uh-huh. |
| 10:52:54 | 17 | Q.  And who else? |
| 10:52:54 | 18 | A.  I really didn't work with any other medical assistants. |
| 10:52:58 | 19 | Q.  All right.  Now, you remembered Mr. Hammerman asked you |
| 10:53:06 | 20 | questions about the doctor ordering tests before he arrived. |
| 10:53:14 | 21 | Do you recall those questions? |
| 10:53:14 | 22 | A.  Yes. |
| 10:53:14 | 23 | Q.  Now, when you interviewed with the FBI on September 16th, |
| 10:53:24 | 24 | 2001, you told the FBI, did you not, that most of the patients |
| 10:53:32 | 25 | who received tests before Dr. Chhibber saw them were |

| | | |
|---|---|---|
| 10:53:34 | 1 | established patients.  That's what you told the FBI; isn't |
| 10:53:34 | 2 | that right? |
| 10:53:38 | 3 | A.  Could you repeat the date again? |
| 10:53:40 | 4 | Q.  The date that you took -- that you told the FBI this was |
| 10:53:46 | 5 | on September 16th, 2011. |
| 10:53:48 | 6 | A.  Okay.  Repeat the question. |
| 10:53:52 | 7 | Q.  Didn't you tell the FBI on September 16th, 2011, that most |
| 10:53:58 | 8 | of the patients who received tests before Dr. Chhibber saw |
| 10:54:02 | 9 | them were established patients?  Isn't that what you told the |
| 10:54:06 | 10 | FBI? |
| 10:54:06 | 11 | A.  Yes, most of them were. |
| 10:54:08 | 12 | Q.  And you said, however, a few patients received tests prior |
| 10:54:12 | 13 | to seeing Dr. Chhibber, but this occurred rarely.  Isn't that |
| 10:54:16 | 14 | what you told the FBI? |
| 10:54:16 | 15 | A.  Yes. |
| 10:54:18 | 16 | Q.  Okay.  You also told the FBI that whenever you performed |
| 10:54:30 | 17 | tests and you would hand them to Dr. Chhibber, that |
| 10:54:34 | 18 | Dr. Chhibber would review those tests; isn't that correct? |
| 10:54:36 | 19 | A.  Yes. |
| 10:54:36 | 20 | Q.  You also told the FBI that without question, |
| 10:54:56 | 21 | Dr. Chhibber's patients loved him; isn't that correct? |
| 10:55:00 | 22 | A.  Yes. |
| 10:55:00 | 23 | MR. HAMMERMAN:  Objection.  Relevance. |
| 10:55:00 | 24 | THE COURT:  Overruled. |
| 10:55:02 | 25 | THE WITNESS:  Yes. |

10:55:02    1  BY MR. JONES:

10:55:04    2  Q.  The truth of the matter is that to the day of your

10:55:08    3  grandmother's death, she loved him?

10:55:10    4  A.  Yes.

10:55:12    5  Q.  Now, one last set of questions that I want to ask you is

10:55:32    6  you mentioned an individual yesterday that you called -- was

10:55:36    7  it Dr. B?

10:55:38    8  A.  Yes.

10:55:38    9  Q.  And is that Mohammed Baig you're talking about?

10:55:46   10  A.  Yes, it is.

10:55:48   11  Q.  Now, you called him Dr. B; is that correct?

10:55:50   12  A.  Yes.

10:55:50   13  Q.  Why do you call him Dr. B?

10:55:52   14  A.  When I was working there, that's what everyone called him.

10:55:58   15  Q.  All right.  Did he refer to himself as a doctor?

10:56:02   16  A.  No.

10:56:04   17  Q.  And -- but everybody called him Dr. B?

10:56:10   18  A.  Yes.

10:56:10   19  Q.  All right.  Now, this Dr. B, did you have an understanding

10:56:16   20  that Dr. B was attempting to solicit some of Dr. Chhibber's

10:56:22   21  patients to purchase medical equipment?

10:56:26   22         MR. HAMMERMAN:  Objection.  Foundation, form of the

10:56:30   23  question.

10:56:30   24         THE COURT:  Rephrase.

10:56:30   25  BY MR. JONES:

10:56:32    1    Q.  This Dr. B, or Mohammed Baig, as we know him, do you know

10:56:38    2    -- do you have any information regarding him soliciting any of

10:56:44    3    Dr. Chhibber's patients to purchase medical equipment?

10:56:48    4    A.  I have some understanding of it, yes.

10:56:52    5    Q.  And did your understanding come from talking with Mr. B.?

10:56:58    6    A.  No.

10:56:58    7    Q.  And where did you get your understanding from?

10:57:02    8    A.  Co-workers and patients.

10:57:12    9    Q.  And which co-worker?

10:57:16    10    A.  We call him Q.

10:57:18    11    Q.  Who?

10:57:18    12    A.  We call him Q.

10:57:20    13    Q.  Did he have a name other than Q?

10:57:20    14    A.  Quentin.

10:57:24    15    Q.  Who was Quentin?

10:57:26    16    A.  He would just do odd jobs around the clinic.

10:57:28    17    Q.  All right.  Did he work there on a regular basis?

10:57:32    18    A.  No.

10:57:34    19    Q.  Did he do clean-up work?

10:57:38    20    A.  Sometimes, yes.

10:57:38    21    Q.  In fact, as I understand it, Dr. Chhibber gave you a job

10:57:46    22    where you earned an extra $400 a month; isn't that right?

10:57:50    23    A.  Yes.

10:57:50    24    Q.  In fact, because he knew you were in need of money and he

10:57:52    25    wanted to help you out, he gave you a cleaning job?

| | | |
|---|---|---|
| 10:57:54 | 1 | MR. HAMMERMAN:  Objection.  Foundation, form of the |
| 10:57:56 | 2 | question. |
| 10:57:56 | 3 | THE COURT:  Overruled. |
| 10:57:58 | 4 | THE WITNESS:  Yes. |
| 10:57:58 | 5 | BY MR. JONES: |
| 10:58:00 | 6 | Q.  He gave you a cleaning job to help you out.  You got $400 |
| 10:58:04 | 7 | a month, didn't you? |
| 10:58:06 | 8 | A.  Yes. |
| 10:58:06 | 9 | Q.  Now, did this Q work with you on this cleaning job? |
| 10:58:10 | 10 | A.  No. |
| 10:58:10 | 11 | Q.  All right. |
| 10:58:14 | 12 | MR. JONES:  One moment, Judge. |
| 10:58:34 | 13 | (Brief pause.) |
| 10:58:34 | 14 | BY MR. JONES: |
| 10:58:34 | 15 | Q.  Just one last question, Ms. Rhodes.  Your mother did have |
| 10:58:38 | 16 | Blue Cross insurance, didn't she? |
| 10:58:40 | 17 | A.  Yes. |
| 10:58:42 | 18 | MR. JONES:  No further questions, Judge. |
| 10:58:48 | 19 | THE COURT:  Recross -- or redirect, rather. |
| 10:58:52 | 20 | - - - |
| 10:58:52 | 21 | TWAHKI RHODES, REDIRECT EXAMINATION |
| 10:58:52 | 22 | BY MR. HAMMERMAN: |
| 10:59:04 | 23 | Q.  Ms. Rhodes, Mr. Jones asked you a lot of questions about |
| 10:59:06 | 24 | those free clinic days.  Do you remember that? |
| 10:59:08 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:59:08 | 1 | Q. He showed you certain charts that were associated with |
| 10:59:12 | 2 | those days. Do you remember those questions? |
| 10:59:14 | 3 | A. Yes. |
| 10:59:14 | 4 | Q. Do you know if patients came to the free clinic days that |
| 10:59:22 | 5 | also came to the clinic on other days? |
| 10:59:26 | 6 | A. Sometimes, yes. |
| 10:59:26 | 7 | Q. And do you know whether some of those patients that came |
| 10:59:32 | 8 | on the free clinic days also had insurance? |
| 10:59:34 | 9 | A. Yes. |
| 10:59:34 | 10 | Q. Did, in fact, patients with insurance come on the free |
| 10:59:38 | 11 | clinic days? |
| 10:59:38 | 12 | A. Sometimes, yes. |
| 10:59:40 | 13 | Q. Did you do the billing for patients that were seen on the |
| 10:59:42 | 14 | free clinic days? |
| 10:59:44 | 15 | A. No. |
| 10:59:44 | 16 | Q. Do you know whether or not all those tests that Mr. Jones |
| 10:59:48 | 17 | showed you were billed or not? |
| 10:59:50 | 18 | A. No, I don't know. |
| 10:59:52 | 19 | Q. Mr. Jones asked you some questions about your mom and |
| 11:00:02 | 20 | whether or not she had insurance. Do you remember that? |
| 11:00:04 | 21 | A. Yes. |
| 11:00:04 | 22 | Q. Did your mom come to the clinic on more occasions than |
| 11:00:08 | 23 | were shown in the documents to you by Mr. Jones? |
| 11:00:12 | 24 | A. Yes. |
| 11:00:12 | 25 | Q. Did your mom receive tests from Dr. Chhibber? |

| | | |
|---|---|---|
| 11:00:18 | 1 | A. Yes, sometimes. |
| 11:00:20 | 2 | Q. Were you present when those tests were administered? |
| 11:00:22 | 3 | A. No. |
| 11:00:24 | 4 | Q. Did your grandmother come Dr. Chhibber's office more often |
| 11:00:30 | 5 | than the notes that were shown to you by Mr. Jones? |
| 11:00:34 | 6 | A. Yes. |
| 11:00:34 | 7 | Q. Did your grandmother receive tests? |
| 11:00:38 | 8 | A. Yes. |
| 11:00:38 | 9 | Q. What kind of tests did your grandmother receive? |
| 11:00:40 | 10 | A. EKGs. |
| 11:00:42 | 11 | Q. Were you present while your grandmother was given EKGs? |
| 11:00:46 | 12 | A. Sometimes. |
| 11:00:46 | 13 | Q. Did she receive more than one EKG? |
| 11:00:48 | 14 | A. Yes. |
| 11:00:48 | 15 | Q. Was your grandmother given other tests? |
| 11:00:54 | 16 | A. A PFT. |
| 11:00:54 | 17 | Q. Were you present when your grandmother received that test? |
| 11:00:56 | 18 | A. Yes. |
| 11:00:56 | 19 | Q. Was your grandmother given more than one EKG? |
| 11:01:00 | 20 | A. More than -- |
| 11:01:04 | 21 | Q. Over the whole time that she saw Dr. Chhibber, was she |
| 11:01:06 | 22 | given multiple EKGs? |
| 11:01:08 | 23 | A. Yes. |
| 11:01:08 | 24 | Q. Was she given multiple PFTs? |
| 11:01:12 | 25 | A. Yes. |

11:01:12  1   Q.  Did she receive other forms of tests?

11:01:16  2   A.  She received the carotid and the echo.

11:01:24  3   Q.  Carotid, you mean that ultrasound of the neck?

11:01:26  4   A.  Yes.

11:01:26  5   Q.  Did she receive multiple carotids?

11:01:30  6   A.  Yes.

11:01:32  7   Q.  You talked about echos.  Is that the echocardiogram?

11:01:40  8   A.  No.

11:01:40  9   Q.  What did you mean by "echo" then?

11:01:42  10  A.  I believe that's -- it was like an ultrasound of the chest

11:01:46  11  or something.

11:01:46  12  Q.  Okay.  Did your grandmother receive ultrasounds of her

11:01:52  13  chest?

11:01:52  14  A.  Yes.

11:01:52  15  Q.  Did she receive multiple ultrasounds of her chest?

11:01:56  16  A.  Yes.

11:01:56  17  Q.  Did your grandmother come to Dr. Chhibber's clinic many

11:02:00  18  more times than those notes that Mr. Jones showed you?

11:02:04  19  A.  Yes.

11:02:04  20  Q.  Mr. Jones asked you some questions just a few moments ago

11:02:22  21  about when you were chastised for performing tests.  Do you

11:02:24  22  remember those questions?

11:02:26  23  A.  Yes.

11:02:26  24  Q.  Why were you chastised by Dr. Chhibber?

11:02:30  25  A.  Those tests were not to be performed on a patient because

| | | |
|---|---|---|
| 11:02:38 | 1 | they were not going to be paid for it. |
| 11:02:38 | 2 | Q. When Mr. Jones asked you about whether you reviewed |
| 11:02:52 | 3 | certain tests, do you remember those questions? |
| 11:02:54 | 4 | A. When I reviewed certain tests? |
| 11:02:58 | 5 | Q. Yes. |
| 11:03:00 | 6 | Well, let me step back. |
| 11:03:00 | 7 | Did you look at -- I am going to ask you questions |
| 11:03:04 | 8 | about those progress notes. Do you remember those progress |
| 11:03:06 | 9 | notes? |
| 11:03:06 | 10 | A. Yes. |
| 11:03:06 | 11 | Q. You said you had seen EKGs listed in progress notes listed |
| 11:03:10 | 12 | almost every day? |
| 11:03:10 | 13 | A. Yes. |
| 11:03:12 | 14 | Q. Same with PFTs? |
| 11:03:12 | 15 | A. Yes. |
| 11:03:12 | 16 | Q. Did you see certain diagnoses associated with EKGs? |
| 11:03:20 | 17 | A. Yes. |
| 11:03:20 | 18 | MR. JONES: Judge, I'm going to object. |
| 11:03:24 | 19 | THE COURT: Sustained as to the form of the question. |
| 11:03:26 | 20 | BY MR. HAMMERMAN: |
| 11:03:28 | 21 | Q. How often did you see EKGs in charts? |
| 11:03:30 | 22 | A. Regularly. |
| 11:03:34 | 23 | Q. And did you see diagnoses on the same progress notes that |
| 11:03:36 | 24 | you would see those EKGs on? |
| 11:03:40 | 25 | A. Yes. |

| | | |
|---|---|---|
| 11:03:40 | 1 | Q.  Did you see any diagnoses more often than others? |
| 11:03:44 | 2 | A.  Yes. |
| 11:03:44 | 3 | Q.  What diagnoses? |
| 11:03:46 | 4 | A.  Chest pain or heart murmur. |
| 11:03:50 | 5 | Q.  What about PFTs; did you see PFTs in charts on a daily |
| 11:03:56 | 6 | basis? |
| 11:03:56 | 7 | A.  Yes. |
| 11:03:56 | 8 | Q.  Did you read the diagnoses sections of those charts that |
| 11:04:02 | 9 | you had the PFTs listed for? |
| 11:04:02 | 10 | A.  Yes. |
| 11:04:04 | 11 | Q.  Did you see any diagnoses associated with those PFTs? |
| 11:04:08 | 12 | A.  Yes. |
| 11:04:08 | 13 | Q.  What? |
| 11:04:10 | 14 |       MR. JONES:  Judge, I object to this witness being |
| 11:04:14 | 15 | able to answer this. |
| 11:04:16 | 16 |       THE COURT:  She is being asked what she saw.  Yes, |
| 11:04:20 | 17 | you may answer. |
| 11:04:20 | 18 |       MR. HAMMERMAN:  Thank you, your Honor. |
| 11:04:22 | 19 | BY MR. HAMMERMAN: |
| 11:04:22 | 20 | Q.  What did you see, Ms. Rhodes? |
| 11:04:24 | 21 | A.  Asthma, shortness of breath. |
| 11:04:40 | 22 | Q.  Did you see the diagnoses that were listed with those |
| 11:04:46 | 23 | echocardiograms? |
| 11:04:48 | 24 |       MR. JONES:  Foundation, Judge. |
| 11:04:50 | 25 |       THE COURT:  Overruled. |

| | | |
|---|---|---|
| 11:04:52 | 1 | THE WITNESS:  I saw diagnosis, but I didn't know what |
| 11:04:56 | 2 | diagnosis usually went with echos.  I didn't pay attention to |
| 11:05:02 | 3 | that too much. |
| 11:05:02 | 4 | BY MR. HAMMERMAN: |
| 11:05:02 | 5 | Q.  Okay.  What about carotid bruit, was that -- I'm sorry, |
| 11:05:06 | 6 | carotid doppler tests.  Would you see those tests in the |
| 11:05:10 | 7 | charts? |
| 11:05:10 | 8 | A.  Yes. |
| 11:05:10 | 9 | Q.  Would you look in the diagnoses section for those same |
| 11:05:16 | 10 | charts? |
| 11:05:16 | 11 | A.  Yes. |
| 11:05:16 | 12 | Q.  Did you see any diagnoses associated with those carotid |
| 11:05:22 | 13 | doppler tests? |
| 11:05:24 | 14 | MR. JONES:  Judge, I am going to have the same |
| 11:05:26 | 15 | foundation objection. |
| 11:05:26 | 16 | THE COURT:  Well, I will sustain the objection as to |
| 11:05:30 | 17 | the form of the question.  It is a leading question. |
| 11:05:36 | 18 | BY MR. HAMMERMAN: |
| 11:05:36 | 19 | Q.  What diagnoses did you see associated with the carotid |
| 11:05:40 | 20 | doppler tests? |
| 11:05:40 | 21 | A.  I would see carotid bruits, but I didn't know what that |
| 11:06:00 | 22 | was. |
| 11:06:00 | 23 | Q.  Mr. Jones asked you some questions about who ordered |
| 11:06:04 | 24 | tests.  Do you remember those questions? |
| 11:06:04 | 25 | A.  Yes. |

11:06:04  1  Q.  You were asked just a few moments ago?

11:06:08  2  A.  Yes.

11:06:08  3  Q.  Asked whether you were ordering tests?

11:06:10  4  A.  Yes.

11:06:10  5  Q.  Who ordered the tests in Dr. Chhibber's office?

11:06:14  6          MR. JONES:  Judge, I object.  This has been gone

11:06:18  7  through.

11:06:18  8          THE COURT:  It's been asked and answered.

11:06:20  9  BY MR. HAMMERMAN:

11:06:20  10  Q.  For the tests that you did, Mr. Jones asked you who you

11:06:26  11  gave those results to, do you remember those questions?

11:06:30  12  A.  Yes.

11:06:32  13  Q.  Who did you give the results to?

11:06:32  14  A.  Dr. Chhibber.

11:06:34  15  Q.  Did Dr. Chhibber ever tell you that you couldn't order

11:06:36  16  tests?

11:06:36  17  A.  That I couldn't order tests?  No.

11:06:42  18  Q.  Yes.  He never had that conversation with you?

11:06:46  19  A.  No.

11:06:46  20  Q.  Were you ordering tests on your own, Ms. Rhodes?

11:06:48  21  A.  No.

11:06:56  22          MR. HAMMERMAN:  No further questions, your Honor.

11:06:56  23          THE COURT:  Recross?

11:06:58  24          MR. JONES:  One second, Judge.

11:07:28  25                          - - -

| | | |
|---|---|---|
| 11:07:28 | 1 | TWAHKI RHODES, RECROSS-EXAMINATION |
| 11:07:28 | 2 | BY MR. JONES: |
| 11:07:30 | 3 | Q.  Just very quickly, when we were talking about your |
| 11:07:32 | 4 | grandmother and multiple tests, Dr. Chhibber saw your |
| 11:07:36 | 5 | grandmother for 15 years, didn't he? |
| 11:07:38 | 6 | A.  Yes. |
| 11:07:38 | 7 | Q.  And even as late -- and he saw your mother for years, |
| 11:07:44 | 8 | hasn't he? |
| 11:07:44 | 9 | A.  Yes. |
| 11:07:52 | 10 | MR. JONES:  I don't have anything further, Judge. |
| 11:07:52 | 11 | THE COURT:  All right.  Thank you.  You are excused. |
| 11:07:52 | 12 | (Witness excused.) |
| 11:07:56 | 13 | THE COURT:  Call your next witness, please. |
| 11:07:58 | 14 | MR. HAMMERMAN:  Yes, your Honor.  The government |
| 11:07:58 | 15 | calls Special Agent Robert Fortt. |
| 11:08:52 | 16 | (Witness sworn.) |
| 11:08:52 | 17 | THE COURT:  Please be seated.  Would you state your |
| 11:08:54 | 18 | full name for us, spelling your last name. |
| 11:08:58 | 19 | THE WITNESS:  My name is Robert Arthur Fortt.  Last |
| 11:09:00 | 20 | name is spelled F-o-r-t-t. |
| 11:09:04 | 21 | - - - |
| 11:09:04 | 22 | ROBERT ARTHUR FORTT, DIRECT EXAMINATION |
| 11:09:04 | 23 | BY MR. HAMMERMAN: |
| 11:09:06 | 24 | Q.  Sir, can you tell the members of the jury what you do for |
| 11:09:08 | 25 | a living. |

11:09:08　1　A.　I am a special agent with the Federal Bureau of

11:09:12　2　Investigation.

11:09:12　3　Q.　And how long have you been with the FBI?

11:09:14　4　A.　Approximately nine and a half years.

11:09:16　5　Q.　Special Agent Fortt, are you assigned to any particular

11:09:18　6　squad with the FBI?

11:09:20　7　A.　I am.

11:09:20　8　Q.　What squad would that be, sir?

11:09:22　9　A.　I work for a gang and drug conspiracy squad in our West RA

11:09:26　10　in Lisle.

11:09:28　11　Q.　What type of crimes do you normally investigate then?

11:09:30　12　A.　I normally investigate gang conspiracy and drug conspiracy

11:09:36　13　crimes in the western suburbs, Sauk Valley area.

11:09:40　14　Q.　At some point, did you become involved in the

11:09:42　15　investigation of Dr. Jaswinder Chhibber?

11:09:46　16　A.　I did.

11:09:46　17　Q.　In what capacity did you become involved in that

11:09:50　18　investigation?

11:09:50　19　A.　I was asked to be an undercover employee in that

11:09:52　20　investigation.

11:09:52　21　Q.　Employee?　What do you mean by that?

11:09:56　22　A.　I was asked to participate in the investigation and

11:10:00　23　represent myself as a patient wanting care at a doctor's

11:10:08　24　office.

11:10:08　25　Q.　And what does it mean to do it in an undercover capacity,

| | | |
|---|---|---|
| 11:10:14 | 1 | though?  What does that entail? |
| 11:10:16 | 2 | A.  To show up and represent myself with an undercover name. |
| 11:10:20 | 3 | I didn't use my true name.  I never announced my true employ. |
| 11:10:28 | 4 | I presented a different name, an undercover name. |
| 11:10:32 | 5 | Q.  Did you agree to, in fact, participate in this |
| 11:10:34 | 6 | investigation? |
| 11:10:34 | 7 | A.  Yes. |
| 11:10:34 | 8 | Q.  Did you have an undercover identity that you used? |
| 11:10:38 | 9 | A.  Yes. |
| 11:10:38 | 10 | Q.  An actual name that you used in connection with this case? |
| 11:10:40 | 11 | A.  Yes, I did. |
| 11:10:42 | 12 | Q.  What was the name that you used? |
| 11:10:44 | 13 | A.  Robert Devonshire. |
| 11:10:46 | 14 | Q.  Did you have identification in that name? |
| 11:10:46 | 15 | A.  Yes. |
| 11:10:48 | 16 | Q.  What kind of identification did you have? |
| 11:10:48 | 17 | A.  I had an Illinois driver's license and a Blue Cross/Blue |
| 11:10:54 | 18 | Shield card. |
| 11:10:54 | 19 | Q.  Did you make an appointment to see Dr. Chhibber? |
| 11:10:56 | 20 | A.  Yes. |
| 11:10:56 | 21 | Q.  Do you recall when? |
| 11:10:58 | 22 | A.  It was in winter of 2010.  I believe it was January. |
| 11:11:02 | 23 | Q.  Did you, in fact, attend that appointment? |
| 11:11:04 | 24 | A.  Yes. |
| 11:11:04 | 25 | Q.  Prior to arriving at Dr. Chhibber's office, did you meet |

11:11:08   1   with other investigating agents?

11:11:08   2   A.  Yes, I did.

11:11:10   3   Q.  Did they give you any instructions?

11:11:12   4   A.  Yes.

11:11:12   5   Q.  What instructions did they give you?

11:11:14   6   A.  To enter the office and to check in, sit down, follow the

11:11:22   7   instructions that I was given, and to represent myself and say

11:11:28   8   that I have an ailment or I have a cold and then sit down and

11:11:32   9   follow instructions.

11:11:34  10   Q.  Were you provided with any equipment?

11:11:36  11   A.  Yes.

11:11:36  12   Q.  What equipment were you provided with?

11:11:38  13   A.  A recording device.

11:11:42  14   Q.  Do you know if your recording device worked that day?

11:11:44  15   A.  I do not.

11:11:46  16   Q.  Have you ever heard a recording of your visit to

11:11:48  17   Dr. Chhibber's office?

11:11:48  18   A.  I have not.

11:11:50  19   Q.  Did you, in fact, then go in and have a meeting or have an

11:11:56  20   appointment at Dr. Chhibber's office?

11:11:56  21   A.  Yes.

11:11:56  22   Q.  Do you recall approximately what time you arrived at his

11:12:00  23   office?

11:12:00  24   A.  It was around 10:00 o'clock in the morning.

11:12:02  25   Q.  Where was the office located at?

11:12:04  1   A.  It was on the South Side of Chicago.

11:12:06  2   Q.  And what did it look like?

11:12:08  3   A.  Brick building, blue awning, had window, doors and windows

11:12:16  4   on the side, and you walked through the main door from the

11:12:20  5   outside, and there were two ways you can go, left or right.

11:12:24  6   On the left was his office.

11:12:24  7   Q.  Now, did you go into the clinic?

11:12:28  8   A.  Yes.

11:12:28  9   Q.  Did you encounter anybody?

11:12:30  10  A.  Yes.

11:12:30  11  Q.  Can you tell the members of the jury what happened when

11:12:32  12  you went into Dr. Chhibber's clinic.

11:12:34  13  A.  I initially went in, walked up to the reception window,

11:12:38  14  and announced who I am, I am there for I think it was a 10:00

11:12:44  15  o'clock appointment.  I was given some paperwork to fill out,

11:12:50  16  take the paperwork, copy my identification that I had, filled

11:12:56  17  out the paperwork, sat down.

11:12:56  18  Q.  Special Agent Fortt, I am going to show you what's been

11:13:00  19  marked as Government Exhibit 395.

11:13:08  20  A.  Okay.

11:13:08  21  Q.  Is that the paperwork that you're talking about?

11:13:10  22  A.  Yes.

11:13:10  23  Q.  Is this -- the name Robert Devonshire, is that the same

11:13:14  24  that you used on that date?

11:13:14  25  A.  Yes.

| | | |
|---|---|---|
| 11:13:20 | 1 | Q. And is that a signature that you placed on this document |
| 11:13:22 | 2 | on that date? |
| 11:13:22 | 3 | A. Yes, it is. |
| 11:13:22 | 4 | Q. Did you also fill out some consent forms? |
| 11:13:26 | 5 | A. Yes. |
| 11:13:26 | 6 | Q. Now, after you filled out this paperwork, can you tell the |
| 11:13:32 | 7 | members of the jury what happened next. |
| 11:13:34 | 8 | A. Filled out the paperwork, sat down in the waiting room |
| 11:13:38 | 9 | there, and I waited. |
| 11:13:40 | 10 | Q. Did you have any conversation with the receptionist at the |
| 11:13:44 | 11 | time that you checked in? |
| 11:13:46 | 12 | A. Very brief conversation, who I was, that I was there for |
| 11:13:50 | 13 | the appointment. She said, Fill out the paperwork. I did so. |
| 11:13:54 | 14 | I sat down. |
| 11:13:54 | 15 | Q. Did you identify yourself as a new or returning patient? |
| 11:13:56 | 16 | A. New patient. |
| 11:13:58 | 17 | Q. Did you present your identification that you had talked |
| 11:14:04 | 18 | about earlier that you would have with you at that time? |
| 11:14:06 | 19 | A. Yes, I did. |
| 11:14:08 | 20 | Q. Once again, what was the identification that you |
| 11:14:10 | 21 | presented? |
| 11:14:12 | 22 | A. Illinois driver's license and a Blue Cross/Blue Shield |
| 11:14:16 | 23 | healthcare card. |
| 11:14:16 | 24 | Q. Is that a copy of the Blue Cross/Blue Shield |
| 11:14:22 | 25 | identification card that you presented right down here? |

11:14:24   1   A.  Yes, it is.

11:14:26   2   Q.  Up here, actually, I'm sorry.  Is that it?

11:14:28   3   A.  Yes.

11:14:28   4   Q.  And is that the driver's license that you presented?

11:14:34   5   A.  Yes, it is.

11:14:34   6   Q.  You said that you sat down after filling this paperwork

11:14:36   7   and you waited?

11:14:38   8   A.  Yes, I did.

11:14:38   9   Q.  Approximately how long did you wait?

11:14:40  10   A.  About an hour.

11:14:42  11   Q.  What happened after an hour?

11:14:46  12   A.  I was called to the reception area, a small little room,

11:14:52  13   in order to do my vitals.

11:14:54  14   Q.  And did somebody take your vitals?

11:14:56  15   A.  Yes.

11:14:56  16   Q.  Do you know the name of the person that did so?

11:15:00  17   A.  I do not.

11:15:00  18   Q.  Can you describe the person?

11:15:02  19   A.  African-American female, maybe about five-seven.  She was

11:15:08  20   wearing a medical assistant kind of clothing.  There were two

11:15:14  21   back there, one doing the reception, the other one taking my

11:15:18  22   vitals.

11:15:20  23   Q.  Now, when you say taking your vitals, what type of things

11:15:22  24   are you talking about?

11:15:24  25   A.  Height, weight, blood pressure, pulse.

| | | |
|---|---|---|
| 11:15:32 | 1 | Q.  What happened -- first of all, how long did taking your |
| 11:15:36 | 2 | vitals take? |
| 11:15:36 | 3 | A.  It couldn't be more than five minutes. |
| 11:15:38 | 4 | Q.  What happened after that? |
| 11:15:38 | 5 | A.  I was asked to stand back up and go sit down in the |
| 11:15:42 | 6 | waiting room. |
| 11:15:44 | 7 | Q.  What did you do? |
| 11:15:44 | 8 | A.  I waited. |
| 11:15:46 | 9 | Q.  At the time that you were then waiting, were there other |
| 11:15:50 | 10 | people in the office? |
| 11:15:50 | 11 | A.  Yes. |
| 11:15:50 | 12 | Q.  Other people -- describe the people that were in the |
| 11:15:54 | 13 | waiting room with you.  What did they look like to you? |
| 11:15:56 | 14 | MR. JONES:  Judge, I object.  It's irrelevant. |
| 11:15:58 | 15 | THE COURT:  Sustained. |
| 11:15:58 | 16 | BY MR. HAMMERMAN: |
| 11:16:04 | 17 | Q.  Were you the only person waiting, Special Agent Fortt? |
| 11:16:06 | 18 | A.  I was not. |
| 11:16:06 | 19 | Q.  How long did you wait after your vitals were taken? |
| 11:16:10 | 20 | A.  About another 45 minutes to an hour. |
| 11:16:14 | 21 | Q.  Where were you sitting in connection to the reception desk |
| 11:16:18 | 22 | in the office -- at Dr. Chhibber's office? |
| 11:16:22 | 23 | A.  I was sitting directly in front of it.  I was closer to |
| 11:16:26 | 24 | that reception desk than I am to the judge right now. |
| 11:16:30 | 25 | Q.  At some point, did you overhear a telephone conversation? |

11:16:32   1   A.  I did.

11:16:34   2   Q.  How did that occur?

11:16:36   3   A.  A telephone call came in, and the receptionist, like I

11:16:42   4   said, was sitting directly behind me just above my head, and I

11:16:46   5   could tell she was speaking with a male --

11:16:50   6        MR. JONES:  Judge, I am going to object.  This is

11:16:52   7   hearsay.

11:16:52   8        THE COURT:  All right.  Put another question to the

11:16:56   9   witness.

11:16:56  10   BY MR. HAMMERMAN:

11:16:58  11   Q.  Could you hear the conversation between the two people?

11:17:02  12   A.  Yes.

11:17:02  13   Q.  You could hear the actual conversation that occurred, or

11:17:06  14   could you just hear a voice on the other end?

11:17:08  15   A.  I could clearly hear the receptionist, and I could hear a

11:17:10  16   voice on the other end.

11:17:12  17   Q.  Are you able to recall the subject matter of what the

11:17:22  18   receptionist was talking about?

11:17:24  19   A.  Yes.

11:17:24  20        MR. JONES:  Objection.  Hearsay and foundation.

11:17:26  21        THE COURT:  Sustained.

11:17:28  22   BY MR. HAMMERMAN:

11:17:32  23   Q.  After that conversation -- well, the woman that was

11:17:36  24   speaking, could you tell if the voice she was speaking to was

11:17:38  25   a male or female voice?

| | | |
|---|---|---|
| 11:17:40 | 1 | MR. JONES:  Objection, Judge. |
| 11:17:42 | 2 | THE COURT:  He may answer that specific question. |
| 11:17:46 | 3 | THE WITNESS:  It was a male's voice. |
| 11:17:48 | 4 | BY MR. HAMMERMAN: |
| 11:17:52 | 5 | Q.  After that telephone call, did anything start to occur in |
| 11:17:56 | 6 | the clinic? |
| 11:17:56 | 7 | A.  After that telephone call, about 15 minutes later, there |
| 11:18:04 | 8 | was another telephone call that occurred. |
| 11:18:06 | 9 | Q.  Were you once again able to hear the side of the |
| 11:18:10 | 10 | conversation from the person that was in the clinic? |
| 11:18:12 | 11 | A.  I was. |
| 11:18:12 | 12 | Q.  Who was speaking on the phone inside the clinic this time? |
| 11:18:18 | 13 | MR. JONES:  Objection, Judge.  This is an attempt to |
| 11:18:20 | 14 | get into hearsay conversations. |
| 11:18:22 | 15 | THE COURT:  Well, we aren't there yet.  The question |
| 11:18:24 | 16 | was who, not what. |
| 11:18:28 | 17 | THE WITNESS:  The person who was speaking on the |
| 11:18:30 | 18 | phone in the clinic was a male subject whom I did not |
| 11:18:34 | 19 | recognize, did not know, but was my assumption -- |
| 11:18:42 | 20 | MR. JONES:  Objection, Judge.  There is no other |
| 11:18:44 | 21 | question. |
| 11:18:44 | 22 | THE COURT:  Anything further is objectionable. |
| 11:18:46 | 23 | BY MR. HAMMERMAN: |
| 11:18:46 | 24 | Q.  You said it was a male subject.  What was the race of the |
| 11:18:48 | 25 | subject, sir? |

| | | |
|---|---|---|
| 11:18:52 | 1 | A. It appeared to me to be an East Indian male. |
| 11:18:54 | 2 | Q. Okay. After that telephone conversation, did anything -- |
| 11:19:00 | 3 | let me ask you one more question about the East Indian male. |
| 11:19:02 | 4 | Was he a younger gentleman or an older gentleman? |
| 11:19:06 | 5 | A. Older. |
| 11:19:06 | 6 | Q. After that conversation, did anything begin to occur in |
| 11:19:10 | 7 | the clinic? |
| 11:19:10 | 8 | A. Yes. |
| 11:19:10 | 9 | Q. What? |
| 11:19:10 | 10 | A. Approximately another 20 minutes later, patients began to |
| 11:19:16 | 11 | be called back to be seen by someone in a different office. |
| 11:19:22 | 12 | Q. And you mean in a different office -- |
| 11:19:24 | 13 | A. Within the clinic. |
| 11:19:26 | 14 | Q. -- in the back? |
| 11:19:26 | 15 | A. In the back area of that clinic. |
| 11:19:30 | 16 | Q. At some point, were you called into the back of the |
| 11:19:32 | 17 | office? |
| 11:19:32 | 18 | A. Yes. |
| 11:19:32 | 19 | Q. Did you go back into one of the examination rooms? |
| 11:19:36 | 20 | A. Yes. |
| 11:19:36 | 21 | Q. Did you encounter anybody? |
| 11:19:38 | 22 | A. Yes. |
| 11:19:38 | 23 | Q. Who did you observe? |
| 11:19:40 | 24 | A. It was a gentleman, older gentleman, appeared to be East |
| 11:19:48 | 25 | Indian or Asian male. He was wearing a brown shirt, brown |

11:19:54  1  pants.  Did not recognize him.  And he began to talk to me
11:19:58  2  about my vitals and what had happened when those vitals were
11:20:02  3  taken.
11:20:02  4  Q.  Did this individual introduce himself to you?
11:20:06  5  A.  No.
11:20:06  6  Q.  I will ask you, Special Agent Fortt, do you recognize the
11:20:12  7  gentleman that's sitting at defense counsel in the beige suit
11:20:16  8  with the red tie?
11:20:16  9  A.  I do not.
11:20:16  10  Q.  Is that the individual that met you in the clinic at that
11:20:20  11  time?
11:20:20  12  A.  No.
11:20:22  13  Q.  The individual that you met in the clinic, what did he ask
11:20:28  14  you to do?
11:20:28  15  A.  He asked me to speak to him and remain in the office
11:20:34  16  because I needed blood pressure pills and I needed an
11:20:40  17  examination.  And I instructed him that I had been there for a
11:20:44  18  long time, that I had an employment interview to do, that I
11:20:50  19  couldn't stay there any longer.  And he said, You need to stay
11:20:54  20  here and I am going to give you some pills and you need to
11:20:56  21  take this test.
11:20:56  22  Q.  Did he tell you that he wanted you to take a test?
11:21:00  23  A.  Yes.
11:21:00  24  Q.  Did you agree?
11:21:02  25  A.  I did not.

11:21:02   1   Q.  At any point during your time in the Cottage Grove

11:21:10   2   Community Medical Clinic, did anyone ever give you a physical?

11:21:14   3   A.  No.

11:21:14   4   Q.  Did anyone ever listen to your breathing?

11:21:16   5   A.  No.

11:21:16   6   Q.  Did anyone ever use a stethoscope to listen to your heart?

11:21:20   7   A.  No.

11:21:20   8   Q.  Did anyone ever listen with a stethoscope to your neck?

11:21:24   9   A.  No.

11:21:24   10  Q.  Did you ever see a stethoscope at any point in time during

11:21:28   11  the time that you were in the Cottage Grove Community Medical

11:21:30   12  Clinic?

11:21:32   13  A.  No.

11:21:32   14  Q.  I want to show you a page of what's been marked as a

11:21:36   15  Government Exhibit 395.  It's been admitted into evidence.

11:21:44   16        Did anyone ever tell you that you needed an

11:21:48   17  echocardiogram and a carotid doppler test?

11:21:52   18  A.  No.

11:21:52   19  Q.  Did anyone ever tell you that when you came back to the

11:21:56   20  clinic for your next visit, that you should receive those two

11:22:00   21  tests?

11:22:00   22  A.  No.

11:22:08   23        MR. HAMMERMAN:  I have no further questions, your

11:22:08   24  Honor.

11:22:08   25        THE COURT:  Cross-examination.

345

| 11:22:10 | 1 | MR. JONES: Thank you, your Honor. |
| 11:22:18 | 2 | - - - |
| 11:22:18 | 3 | ROBERT ARTHUR FORTT, CROSS-EXAMINATION |
| 11:22:18 | 4 | BY MR. JONES: |
| 11:22:20 | 5 | Q. The very first thing, Special Agent, that you say that you |
| 11:22:26 | 6 | went in and you were wired that day? |
| 11:22:30 | 7 | A. Yes. |
| 11:22:32 | 8 | MR. JONES: Hold on one second, Judge. |
| 11:22:32 | 9 | BY MR. JONES: |
| 11:22:40 | 10 | Q. And the reason that Mr. Hammerman is asking you all these |
| 11:22:46 | 11 | questions is because we don't have a recording? |
| 11:22:50 | 12 | MR. HAMMERMAN: Object to the form of the question as |
| 11:22:50 | 13 | to why the government asks questions, your Honor. |
| 11:22:54 | 14 | THE COURT: Sustained as to form. |
| 11:22:56 | 15 | BY MR. JONES: |
| 11:22:56 | 16 | Q. Well, if we had the recording, we would know exactly what |
| 11:23:00 | 17 | was said, would we not? |
| 11:23:02 | 18 | MR. HAMMERMAN: Objection, your Honor. |
| 11:23:02 | 19 | THE COURT: Sustained. |
| 11:23:04 | 20 | BY MR. JONES: |
| 11:23:04 | 21 | Q. There is no recording of your conversation that day, |
| 11:23:08 | 22 | right? |
| 11:23:08 | 23 | A. Not to my knowledge. |
| 11:23:10 | 24 | Q. But, nevertheless, you were wired, right? |
| 11:23:16 | 25 | A. Correct. |

11:23:16  1   Q.  And then, obviously, if you never heard the conversation,

11:23:20  2   did somebody ever tell you that the recording failed?

11:23:22  3        MR. HAMMERMAN:  Objection, your Honor.  Asked and

11:23:24  4   answered, hearsay.

11:23:26  5        THE COURT:  Sustained as to the form of the question.

11:23:28  6   BY MR. JONES:

11:23:28  7   Q.  All right.  Did anybody from the FBI ever tell you that

11:23:34  8   the recording failed to work?

11:23:36  9   A.  No.

11:23:40  10  Q.  Well, as you prepared for your testimony in this courtroom

11:23:46  11  today, it must have dawned on you that you walked into that

11:23:50  12  clinic with a recorder on, right?

11:23:52  13  A.  Yes.

11:23:52  14  Q.  Well, as you prepared for your testimony today, did you

11:23:58  15  ask anybody, Well, hey, guys, where is the recording?

11:24:02  16  A.  No.

11:24:04  17  Q.  It never dawned on you to do that?

11:24:08  18        MR. HAMMERMAN:  Asked and answered.

11:24:10  19        THE COURT:  Sustained as to form.

11:24:12  20  BY MR. JONES:

11:24:12  21  Q.  All right.  But you never asked anybody about it?

11:24:14  22        MR. HAMMERMAN:  Asked and answered.

11:24:18  23        THE COURT:  Sustained.

11:24:18  24  BY MR. JONES:

11:24:20  25  Q.  All right.  Do you know what happened to the recording?

| | | |
|---|---|---|
| 11:24:26 | 1 | A.  I do not. |
| 11:24:28 | 2 | Q.  Where were you wearing this device? |
| 11:24:32 | 3 | MR. HAMMERMAN:  Objection, your Honor.  Relevance. |
| 11:24:34 | 4 | THE COURT:  Overruled. |
| 11:24:34 | 5 | BY MR. JONES: |
| 11:24:34 | 6 | Q.  Where were you wearing this device? |
| 11:24:36 | 7 | A.  It was in my pocket. |
| 11:24:38 | 8 | Q.  In your front pocket? |
| 11:24:40 | 9 | A.  In my pants pocket. |
| 11:24:40 | 10 | Q.  To your knowledge, did you have it on? |
| 11:24:44 | 11 | A.  Yes. |
| 11:24:44 | 12 | Q.  Did you check to see whether it was operative before you |
| 11:24:48 | 13 | walked into that clinic? |
| 11:24:50 | 14 | A.  We checked the lights, and it appeared to be operating. |
| 11:24:54 | 15 | Q.  All right.  Incidentally, were you wearing any other kind |
| 11:24:58 | 16 | of device other than that recorder? |
| 11:25:00 | 17 | A.  No. |
| 11:25:00 | 18 | Q.  You were not wearing a transmitter of any kind?  Do you |
| 11:25:08 | 19 | understand what I mean?  A transmitter sends so other agents |
| 11:25:12 | 20 | could hear what was going on in the clinic? |
| 11:25:14 | 21 | A.  I can't speak to what the other agents are doing. |
| 11:25:16 | 22 | Q.  That wasn't my question.  My question was, were you |
| 11:25:20 | 23 | wearing any other kind of device other than the tape recorder? |
| 11:25:22 | 24 | A.  I do not recall. |
| 11:25:24 | 25 | Q.  You don't recall? |

11:25:26    1   A.  No.

11:25:26    2   Q.  Now, prior to entering -- Mr. Hammerman asked you about

11:25:46    3   instructions that you got prior to entering the clinic.  Okay?

11:25:50    4   Do you recall those?

11:25:50    5   A.  Yes.

11:25:50    6   Q.  Well, when did you -- where were you first recruited for

11:25:56    7   this mission to go inside the clinic?

11:25:58    8   A.  Approximately a month to a month and a half before that.

11:26:04    9   Q.  And who recruited you?

11:26:06   10   A.  Special Agent Anton.

11:26:08   11   Q.  All right.  In fact, that would be special agent -- that

11:26:12   12   was the group leader, Kathy Anton, right?

11:26:18   13   A.  I am not aware of her title at the time as far as group

11:26:20   14   leader or not.  That was who recruited me.

11:26:22   15   Q.  All right.  But you knew she must have been a person of

11:26:26   16   some authority to be able to recruit you; is that correct?

11:26:28   17            MR. HAMMERMAN:  Objection.  Foundation.

11:26:32   18            THE COURT:  Overruled.

11:26:32   19            MR. HAMMERMAN:  Form of the question.

11:26:34   20            THE COURT:  Overruled.

11:26:36   21            THE WITNESS:  I know she was involved in the case.  I

11:26:38   22   don't know what her position was at that particular time.  She

11:26:40   23   was involved in the case.  She asked for my help.

11:26:40   24   BY MR. JONES:

11:26:44   25   Q.  Well, is that how it works in the FBI, that you could just

11:26:46    1    go up to any agent and say, Look, I want -- no matter what

11:26:50    2    squad they were on, that, I want you to work for me?

11:26:52    3    A.  I don't understand your question.

11:26:54    4    Q.  Well, I am trying to get the procedure here.  It doesn't

11:26:58    5    -- it does not work like this, does it, sir, where you could

11:27:00    6    just go to anybody, another agent, no matter what squad they

11:27:04    7    were on, you, and say, I want you to work with me?

11:27:08    8    A.  And your question is, sir?

11:27:12    9    Q.  That's my question.  That does not happen, does it?

11:27:14    10    A.  Yes, it does.

11:27:18    11    Q.  So did you know Ms. Anton before she came to recruit you?

11:27:26    12    A.  Yes, I did.

11:27:28    13    Q.  And you agreed to proceed in this undercover capacity?

11:27:30    14    A.  Yes, I did.

11:27:30    15    Q.  All right.  She gave you instructions.  What instructions

11:27:34    16    did she give you?

11:27:36    17    A.  To enter the medical clinic, to represent myself as a

11:27:42    18    client, if you will, or a patient, to give instruction -- to

11:27:48    19    say that I have an ailment, and to follow the instructions of

11:27:52    20    the people in the clinic.

11:27:52    21    Q.  What ailment were you supposed to have?

11:27:58    22    A.  I said that I had a minor cough.  I think it was a minor

11:28:04    23    cough.

11:28:04    24    Q.  Is that what it was?

11:28:06    25    A.  I think that's what I recall, yeah.

11:28:08  1  Q.  Is that documented anywhere?

11:28:08  2  A.  I would have to look at it.

11:28:12  3  Q.  No, I'm asking, do you know as you sit there right now

11:28:18  4  whether that's documented anywhere?

11:28:18  5  A.  My ailment that I was to announce?

11:28:22  6  Q.  Yes.  Yes.

11:28:24  7  A.  I'm not sure.

11:28:24  8  Q.  In fact, as you sit there, of course, you don't recall

11:28:28  9  seeing any such documentation; is that correct?

11:28:30  10  A.  As to what my ailment was?

11:28:32  11  Q.  Yes.

11:28:32  12  A.  I do not recall, no.

11:28:34  13  Q.  Now, Ms. Anton gave you other instructions, including not

11:28:42  14  to take any blood work; isn't that correct?

11:28:46  15  A.  I do not recall those instructions at all.

11:28:48  16  Q.  You don't recall that?  Do you recall whether Ms. Anton

11:28:54  17  told you that if you had been lucky enough to meet

11:28:58  18  Dr. Chhibber, whether you could engage in asking him any

11:29:00  19  questions?

11:29:02  20  A.  I do not recall.

11:29:04  21  Q.  You know, FBI agents make out reports; is that correct?

11:29:12  22  A.  That is correct.

11:29:12  23  Q.  And one of the reasons that FBI agents make out reports is

11:29:20  24  because if the magic day comes when somebody like Walter Jones

11:29:22  25  has to cross-examine you, you will be able to have some record

| | |
|---|---|
| 11:29:26 | 1 |

of what happened, right?

11:29:26  2        MR. HAMMERMAN:  Object to the form of the question,

11:29:28  3  your Honor.

11:29:28  4        THE COURT:  Sustained.

11:29:30  5  BY MR. JONES:

11:29:30  6  Q.  But is there any record of what Ms. Anton -- the

11:29:38  7  instructions that she gave you?

11:29:40  8  A.  Not to my knowledge.

11:29:50  9  Q.  Now, when you were recruited, did Ms. Anton tell you, of

11:29:52 10  course, that she was looking for African-American agents?

11:29:54 11        MR. HAMMERMAN:  Object to the form of the question.

11:29:56 12        THE COURT:  Overruled.

11:29:56 13        THE WITNESS:  I do recall she was looking for a --

11:30:02 14  particularly for black agents, African-American agents.

11:30:06 15  BY MR. JONES:

11:30:06 16  Q.  All right.  Because she told you that you were going to go

11:30:08 17  into a black neighborhood on Chicago's south side; is that

11:30:12 18  correct?

11:30:12 19  A.  She did not tell me that, no.

11:30:14 20  Q.  Well, she gave you the address, right?

11:30:16 21  A.  Yes.

11:30:16 22  Q.  And you knew, of course, by being -- it didn't take a

11:30:20 23  special agent to know that that's a black neighborhood on the

11:30:24 24  South Side; isn't that right?

11:30:24 25  A.  Well, to be honest with you, I work out in the western

| | | |
|---|---|---|
| 11:30:28 | 1 | suburbs. I am not completely familiar with every single |
| 11:30:30 | 2 | neighborhood, know all the details and the racial makeup of |
| 11:30:34 | 3 | every neighborhood in Chicago. |
| 11:30:34 | 4 | Q. How long have you been in this -- you have been a special |
| 11:30:38 | 5 | agent in Chicago for how long? |
| 11:30:40 | 6 | A. Nine and a half years. |
| 11:30:40 | 7 | Q. And, sir, you are going to sit here and tell us that you |
| 11:30:44 | 8 | don't know that where you were supposed to go was an all |
| 11:30:46 | 9 | African-American neighborhood? |
| 11:30:48 | 10 | MR. HAMMERMAN: Object to the form of the question, |
| 11:30:50 | 11 | your Honor. |
| 11:30:50 | 12 | THE COURT: Sustained. |
| 11:30:50 | 13 | BY MR. JONES: |
| 11:30:50 | 14 | Q. You want us to believe that after being here in Chicago |
| 11:30:54 | 15 | for nine and a half years -- |
| 11:30:54 | 16 | MR. HAMMERMAN: Objection, your Honor. |
| 11:30:56 | 17 | THE COURT: All right. |
| 11:30:56 | 18 | MR. HAMMERMAN: Form of the question, argumentative. |
| 11:30:58 | 19 | THE COURT: It sure sounds that way, Mr. Jones. |
| 11:31:00 | 20 | MR. JONES: All right. |
| 11:31:02 | 21 | BY MR. JONES: |
| 11:31:02 | 22 | Q. When they told you that you were going to 79th Street, |
| 11:31:06 | 23 | just tell me again, you didn't know that was an |
| 11:31:08 | 24 | African-American neighborhood, right? |
| 11:31:10 | 25 | MR. HAMMERMAN: Objection. Asked and answered. |

| | | |
|---|---|---|
| 11:31:10 | 1 | MR. JONES:  I haven't asked it that way, Judge. |
| 11:31:10 | 2 | THE COURT:  Overruled. |
| 11:31:10 | 3 | BY MR. JONES: |
| 11:31:16 | 4 | Q.  You heard the question.  What's the answer? |
| 11:31:16 | 5 | A.  Could you repeat the question? |
| 11:31:16 | 6 | MR. JONES:  Read the question back to him, please. |
| 11:31:20 | 7 | Wait, I will do it. |
| 11:31:22 | 8 | BY MR. JONES: |
| 11:31:22 | 9 | Q.  When -- when you were told that you were going to 79th |
| 11:31:30 | 10 | Street in the city of Chicago, you didn't know you were going |
| 11:31:32 | 11 | to an all African-American neighborhood? |
| 11:31:34 | 12 | A.  Again, I cannot speak to the racial makeup of the town -- |
| 11:31:38 | 13 | Q.  Just answer the question. |
| 11:31:38 | 14 | MR. HAMMERMAN:  Objection, your Honor. |
| 11:31:40 | 15 | THE WITNESS:  No. |
| 11:31:40 | 16 | MR. HAMMERMAN:  The agent should be allowed to answer |
| 11:31:42 | 17 | the question without Mr. Jones instructing him how to do it. |
| 11:31:46 | 18 | THE COURT:  He just answered it. |
| 11:31:46 | 19 | MR. JONES:  He just answered it. |
| 11:31:48 | 20 | BY MR. JONES: |
| 11:31:48 | 21 | Q.  So your answer was no, right?  Your answer was no, right? |
| 11:31:54 | 22 | A.  Correct. |
| 11:31:54 | 23 | Q.  Now, did you know -- Special Agent Anton, when she was |
| 11:32:08 | 24 | telling you that she wanted to recruit you to go in and work |
| 11:32:14 | 25 | in an undercover capacity, did she tell you that -- what the |

| | | |
|---|---|---|
| 11:32:20 | 1 | nature of that investigation was? |
| 11:32:22 | 2 | A.  She gave me a synopsis of it, yes. |
| 11:32:26 | 3 | Q.  And she told you that she wanted you to go meet with |
| 11:32:30 | 4 | Dr. Chhibber, right? |
| 11:32:30 | 5 | A.  She wanted me to go into the clinic, yes. |
| 11:32:34 | 6 | Q.  Because it was the FBI's belief that he was |
| 11:32:40 | 7 | overprescribing tests; is that correct? |
| 11:32:42 | 8 | A.  That's correct. |
| 11:32:42 | 9 | Q.  And she told you these tests, of course, related to the |
| 11:32:48 | 10 | cardiovascular system, did she not? |
| 11:32:50 | 11 | A.  She did not. |
| 11:32:50 | 12 | Q.  Well, what kind of tests did you think that the doctor was |
| 11:32:54 | 13 | performing that the FBI objected to? |
| 11:32:58 | 14 | A.  I wasn't given exactly what tests there were, nor would I |
| 11:33:04 | 15 | assume what a doctor was doing. |
| 11:33:08 | 16 | Q.  So for all you knew, you were going in to have your feet |
| 11:33:10 | 17 | examined? |
| 11:33:12 | 18 | MR. HAMMERMAN:  Object to the form of the question |
| 11:33:12 | 19 | and argumentative, your Honor. |
| 11:33:14 | 20 | THE COURT:  Sustained. |
| 11:33:14 | 21 | BY MR. JONES: |
| 11:33:14 | 22 | Q.  Did you know when you walked into Dr. Chhibber's office |
| 11:33:18 | 23 | that he was going to examine you for your cardiovascular |
| 11:33:22 | 24 | system? |
| 11:33:22 | 25 | A.  I did not know. |

11:33:24  1  Q.  Okay.  And you did not ask?

11:33:26  2  A.  Ask whom?

11:33:30  3  Q.  Ms. Anton.

11:33:32  4  A.  No, she gave me instructions and said, Go in, he is going

11:33:38  5  to prescribe examination, he is going to test you, and

11:33:42  6  represent yourself as a patient.  I wasn't told what kind of

11:33:46  7  examinations to look for or ask for.

11:33:52  8  Q.  So no one ever told you that there was going to be an

11:33:54  9  examination of your cardiovascular system?

11:33:56  10  A.  Not until I was in the medical examination office.

11:34:00  11  Q.  All right.  Did Ms. Anton tell you that she didn't want

11:34:04  12  you to take any blood work?

11:34:04  13  A.  She did not.

11:34:06  14  Q.  Did she give you any information on what kind of ailments

11:34:14  15  you could say that you had?

11:34:18  16  A.  I don't recall.

11:34:20  17  Q.  Now, you admit, sir, that when you went in, they took your

11:34:34  18  vitals; is that correct?

11:34:36  19  A.  That is correct.

11:34:36  20  Q.  They took your weight?

11:34:38  21  A.  Yes.

11:34:38  22  Q.  They took your pulse?

11:34:40  23  A.  Yes.

11:34:40  24  Q.  And are you aware that, sir, that your blood pressure was

11:34:48  25  185/103?

11:34:54   1   A.  Yes.

11:34:54   2   Q.  Do you know how enormously high that is?

11:34:58   3          MR. HAMMERMAN:  Object to the form of the question.

11:35:02   4          THE COURT:  Do you want to strike "enormously" from

11:35:06   5   the question?

11:35:06   6          MR. JONES:  Yes, I guess I could do that, Judge.

11:35:08   7   BY MR. JONES:

11:35:08   8   Q.  Do you know how high that is, sir?

11:35:10   9   A.  I know that it's high.

11:35:12   10  Q.  All right.  In fact, with blood pressure that high, it

11:35:20   11  doesn't come as a surprise to you that somebody might want you

11:35:24   12  to have some form of test, does it?

11:35:26   13  A.  I am not a medical -- I am not schooled in any kind of

11:35:34   14  medical procedures or knowledge, so I can't speak to that.

11:35:38   15  Q.  With blood pressure that high, are you on any kind of

11:35:40   16  blood pressure medication now?

11:35:42   17  A.  I am not.

11:35:42   18  Q.  And I gather the bottom line here is that you never saw

11:36:02   19  Dr. Chhibber; is that correct?

11:36:02   20  A.  That is correct, to my knowledge.

11:36:04   21  Q.  All right.  But, you know, I do have a question to ask

11:36:08   22  you.  You were working that day, right?

11:36:12   23  A.  Yes.

11:36:12   24  Q.  You were being paid by the FBI, right?

11:36:14   25  A.  Yes.

| | | |
|---|---|---|
| 11:36:16 | 1 | Q. And you left the clinic that day before seeing |
| 11:36:20 | 2 | Dr. Chhibber, right? |
| 11:36:22 | 3 | A. That's correct. |
| 11:36:22 | 4 | Q. Did you have somewhere else that was more important for |
| 11:36:24 | 5 | you to go? |
| 11:36:24 | 6 | A. Would you please define "more important"? |
| 11:36:30 | 7 | Q. Well, I'm asking you. Did you have anyplace else that was |
| 11:36:34 | 8 | more important for you to go other than wait for Dr. Chhibber? |
| 11:36:36 | 9 | A. I had other work to do. |
| 11:36:40 | 10 | Q. Is that what -- and so you left, right? |
| 11:36:44 | 11 | A. I did. |
| 11:36:44 | 12 | Q. Did you tell Ms. Anton, Well, Ms. Anton, I'm leaving |
| 11:36:48 | 13 | because I got other work to do? |
| 11:36:48 | 14 | A. Yes. |
| 11:36:54 | 15 | Q. That's how that worked. Well, let me ask you this. Was |
| 11:36:58 | 16 | one of the reasons that you left was because maybe you wanted |
| 11:37:02 | 17 | to see whether Dr. Chhibber would bill you for that visit? |
| 11:37:08 | 18 | Was that one of the reasons that you left? |
| 11:37:10 | 19 | A. No, not at all. |
| 11:37:12 | 20 | Q. Well, you know, of course, that Dr. Chhibber never billed |
| 11:37:16 | 21 | anything for this visit. You know that, don't you, sir? |
| 11:37:18 | 22 | A. I have no way of knowing that. |
| 11:37:20 | 23 | Q. Well, you could have asked your other agents, couldn't |
| 11:37:24 | 24 | you? |
| 11:37:24 | 25 | A. I could have, but -- |

| | | |
|---|---|---|
| 11:37:26 | 1 | Q. And you don't think they would have hid it from you, do |
| 11:37:30 | 2 | you? |
| 11:37:30 | 3 | A. Not to my knowledge. |
| 11:37:42 | 4 | MR. JONES: One second, Judge. |
| 11:38:02 | 5 | BY MR. JONES: |
| 11:38:02 | 6 | Q. Incidentally, when you were in that clinic, you were in |
| 11:38:10 | 7 | constant contact with Ms. Anton, weren't you? |
| 11:38:14 | 8 | A. Not constant contact, no. |
| 11:38:16 | 9 | Q. Well, you were texting back and forth with Ms. Anton, |
| 11:38:22 | 10 | weren't you? |
| 11:38:22 | 11 | A. I was. |
| 11:38:22 | 12 | Q. But, now, you don't have those text messages anymore; is |
| 11:38:22 | 13 | that right? |
| 11:38:28 | 14 | A. I do not. |
| 11:38:28 | 15 | Q. So we don't know what it is that you and Ms. Anton were |
| 11:38:34 | 16 | texting back and forth; is that correct? |
| 11:38:36 | 17 | MR. HAMMERMAN: Objection. There was a motion in |
| 11:38:38 | 18 | limine, your Honor. |
| 11:38:38 | 19 | THE COURT: Sustained. |
| 11:38:42 | 20 | BY MR. JONES: |
| 11:38:44 | 21 | Q. So text messages are gone, right? |
| 11:38:46 | 22 | MR. HAMMERMAN: Objection, your Honor. |
| 11:38:48 | 23 | THE COURT: Overruled. |
| 11:38:48 | 24 | BY MR. JONES: |
| 11:38:50 | 25 | Q. Text message is gone, right? |

359

| | | |
|---|---|---|
| 11:38:52 | 1 | A.  Yes. |
| 11:38:52 | 2 | Q.  They were not maintained for that investigation, were |
| 11:38:56 | 3 | they? |
| 11:38:56 | 4 | A.  Not to my knowledge. |
| 11:38:56 | 5 | Q.  So we don't know what you and Ms. Anton were texting |
| 11:39:00 | 6 | about, do we? |
| 11:39:02 | 7 | MR. HAMMERMAN:  Objection, your Honor. |
| 11:39:02 | 8 | THE COURT:  Sustained. |
| 11:39:06 | 9 | MR. JONES:  I don't have anything further, Judge. |
| 11:39:08 | 10 | THE COURT:  Any redirect? |
| 11:39:10 | 11 | MR. HAMMERMAN:  Yes, your Honor. |
| 11:39:10 | 12 | - - - |
| 11:39:10 | 13 | ROBERT ARTHUR FORTT, REDIRECT EXAMINATION |
| 11:39:10 | 14 | BY MR. HAMMERMAN: |
| 11:39:16 | 15 | Q.  Special Agent Fortt, have you done a fair amount of |
| 11:39:18 | 16 | undercover work in your experience as an FBI agent? |
| 11:39:22 | 17 | A.  A minimum amount. |
| 11:39:24 | 18 | Q.  Based on your experience as an FBI agent, do recording |
| 11:39:26 | 19 | devices sometimes fail? |
| 11:39:28 | 20 | A.  Sometimes, yes. |
| 11:39:28 | 21 | Q.  The blood pressure that Mr. Jones just questioned you |
| 11:39:34 | 22 | about, did anyone ever tell you while you were at the Cottage |
| 11:39:38 | 23 | Grove Community Medical Clinic that they needed to take your |
| 11:39:40 | 24 | blood pressure again to check its accuracy? |
| 11:39:42 | 25 | A.  No. |

| | | |
|---|---|---|
| 11:39:44 | 1 | Q.  Mr. Jones asked you whether somebody with that kind of |
| 11:39:50 | 2 | blood pressure might need some tests and what you knew about |
| 11:39:52 | 3 | that.  Do you remember those questions? |
| 11:39:54 | 4 | A.  Yes. |
| 11:39:54 | 5 | Q.  Did anybody perform an examination on your neck concerning |
| 11:39:58 | 6 | the need for tests? |
| 11:39:58 | 7 | A.  No. |
| 11:40:00 | 8 | Q.  Did anybody perform an examination on your heart -- |
| 11:40:04 | 9 | MR. JONES:  Judge, we object. |
| 11:40:06 | 10 | BY MR. HAMMERMAN: |
| 11:40:08 | 11 | Q.  -- in any of the tests? |
| 11:40:08 | 12 | MR. JONES:  We object. |
| 11:40:08 | 13 | THE COURT:  Overruled. |
| 11:40:10 | 14 | THE WITNESS:  No. |
| 11:40:10 | 15 | MR. HAMMERMAN:  No further questions, your Honor. |
| 11:40:14 | 16 | - - - |
| 11:40:14 | 17 | ROBERT ARTHUR FORTT, RECROSS-EXAMINATION |
| 11:40:14 | 18 | BY MR. JONES: |
| 11:40:14 | 19 | Q.  You know, there is one last thing I can't help but talk |
| 11:40:18 | 20 | about. |
| 11:40:18 | 21 | MR. HAMMERMAN:  Objection, your Honor, as to |
| 11:40:20 | 22 | Mr. Jones testifying again. |
| 11:40:22 | 23 | THE COURT:  I think he is speaking to himself out |
| 11:40:24 | 24 | loud. |
| 11:40:24 | 25 | MR. HAMMERMAN:  I object to that, your Honor. |

| | | |
|---|---|---|
| 11:40:26 | 1 | THE COURT:  Yes.  Sustained. |
| 11:40:28 | 2 | MR. JONES:  My mother used to -- |
| 11:40:28 | 3 | BY MR. JONES: |
| 11:40:34 | 4 | Q.  You say that during the course of your FBI experience that |
| 11:40:36 | 5 | recording devices have been known to fail; is that right? |
| 11:40:40 | 6 | A.  That is correct. |
| 11:40:40 | 7 | Q.  Now, you know, one of the hallmarks of the FBI since the |
| 11:40:44 | 8 | 1930s has been its ability to record conversations, hasn't it? |
| 11:40:50 | 9 | MR. HAMMERMAN:  Objection.  Foundation. |
| 11:40:52 | 10 | MR. JONES:  Judge, he opened the door. |
| 11:40:54 | 11 | THE COURT:  Overruled. |
| 11:40:54 | 12 | BY MR. JONES: |
| 11:40:58 | 13 | Q.  Isn't that right?  That's one of the hallmarks of the FBI |
| 11:41:00 | 14 | was the ability to record conversations, right? |
| 11:41:04 | 15 | A.  I'm not clear on the exact year in which the FBI began its |
| 11:41:08 | 16 | recording, nor am familiar with what happened in the 1930s. |
| 11:41:14 | 17 | Q.  They don't give you -- when they recruit you as an FBI |
| 11:41:20 | 18 | agent, they don't show you the old movies of them recording |
| 11:41:22 | 19 | conversations in the '30s and '40s? |
| 11:41:26 | 20 | MR. HAMMERMAN:  Objection.  Relevancy. |
| 11:41:28 | 21 | THE COURT:  Sustained. |
| 11:41:30 | 22 | BY MR. JONES: |
| 11:41:30 | 23 | Q.  And, incidentally, how many times -- you said you did a |
| 11:41:36 | 24 | minimum number of undercover investigations, so you don't do a |
| 11:41:38 | 25 | whole lot of undercover investigations; is that correct? |

| | | |
|---|---|---|
| 11:41:40 | 1 | A.  That is correct. |
| 11:41:40 | 2 | Q.  And has a recording device ever failed on you before? |
| 11:41:44 | 3 | A.  You have to be more specific in your question. |
| 11:41:48 | 4 | Q.  Well, first of all, I better ask you this because you have |
| 11:41:52 | 5 | done just a minimum number of undercover investigations. |
| 11:41:54 | 6 | MR. HAMMERMAN:  Your Honor, I am objecting -- |
| 11:41:56 | 7 | BY MR. JONES: |
| 11:41:56 | 8 | Q.  Have you ever worn a wire before? |
| 11:41:58 | 9 | MR. HAMMERMAN:  Your Honor, I'm objecting to |
| 11:41:58 | 10 | Mr. Jones' continual testimony before the jury. |
| 11:42:00 | 11 | THE COURT:  Well, just go to the question, Mr. Jones. |
| 11:42:06 | 12 | MR. JONES:  I'm sorry, Judge. |
| 11:42:06 | 13 | BY MR. JONES: |
| 11:42:08 | 14 | Q.  Have you ever worn a recording device before? |
| 11:42:10 | 15 | A.  Yes. |
| 11:42:10 | 16 | Q.  And has any of those recording devices failed? |
| 11:42:14 | 17 | A.  Not previously. |
| 11:42:18 | 18 | Q.  Not previously; is that correct? |
| 11:42:20 | 19 | A.  That is correct. |
| 11:42:22 | 20 | MR. JONES:  I don't have anything further, Judge. |
| 11:42:24 | 21 | THE COURT:  Any further examination? |
| 11:42:28 | 22 | MR. HAMMERMAN:  No, your Honor. |
| 11:42:28 | 23 | THE COURT:  Thank you, sir.  You are excused. |
| 11:42:30 | 24 | THE WITNESS:  You're welcome. |
| 11:42:38 | 25 | MR. HAMMERMAN:  Your Honor, the government will call |

| | | |
|---|---|---|
| 11:42:40 | 1 | Dr. Daniel Herdeman. |
| 11:43:16 | 2 | (Witness sworn.) |
| 11:43:16 | 3 | THE COURT:  Would you state your full name for us and |
| 11:43:18 | 4 | spell your last name. |
| 11:43:20 | 5 | THE WITNESS:  Daniel Herdeman, H-e-r-d-e-m-a-n. |
| 11:43:28 | 6 | - - - |
| 11:43:28 | 7 | DANIEL HERDEMAN, M.D., DIRECT EXAMINATION |
| 11:43:28 | 8 | BY MR. HAMMERMAN: |
| 11:43:28 | 9 | Q.  Good afternoon, Dr. Herdeman.  Can you tell the members of |
| 11:43:30 | 10 | the jury how you're employed, sir. |
| 11:43:32 | 11 | A.  I am an internist at the Swedish American Medical Group in |
| 11:43:36 | 12 | Rockford, Illinois. |
| 11:43:36 | 13 | Q.  What is the Swedish American Medical Group? |
| 11:43:40 | 14 | A.  That's a group of primary care and specialty physicians |
| 11:43:44 | 15 | that provides care for the patients at Swedish American |
| 11:43:48 | 16 | Hospital in the Swedish American Health System. |
| 11:43:50 | 17 | Q.  What is your position there? |
| 11:43:50 | 18 | A.  I am an internist. |
| 11:43:52 | 19 | Q.  What is an internist? |
| 11:43:54 | 20 | A.  An internist is a physician who provides, other than |
| 11:43:58 | 21 | obstetric care, medical care to women and men over the age of |
| 11:44:04 | 22 | 18. |
| 11:44:04 | 23 | Q.  Is that sometimes referred to as just like a general |
| 11:44:08 | 24 | practitioner? |
| 11:44:10 | 25 | A.  Well, no.  It's something that requires three years of |

| | | |
|---|---|---|
| 11:44:12 | 1 | residency training and other aspects to get the qualification |
| 11:44:18 | 2 | of an internist.  A general practitioner really more refers to |
| 11:44:22 | 3 | someone who doesn't have full residency training. |
| 11:44:26 | 4 | Q.  And you have that training? |
| 11:44:26 | 5 | A.  Yes, I do. |
| 11:44:28 | 6 | Q.  What do you do for the Swedish American Medical Group? |
| 11:44:32 | 7 | A.  I treat patients like I described, do non-obstetric care |
| 11:44:40 | 8 | for both men and women over the age of 18. |
| 11:44:42 | 9 | Q.  How long have you been an internal medicine doctor? |
| 11:44:44 | 10 | A.  For 29 years. |
| 11:44:46 | 11 | Q.  Can you generally explain your educational background to |
| 11:44:48 | 12 | the members of the jury. |
| 11:44:50 | 13 | A.  Yes.  After completing my college, I went to the Medical |
| 11:44:52 | 14 | College of Wisconsin from 1976 to 1980.  Then I did a |
| 11:44:58 | 15 | residency in internal medicine at the Medical College of |
| 11:45:02 | 16 | Wisconsin affiliated hospitals in the Milwaukee area between |
| 11:45:06 | 17 | 1980 and 1983. |
| 11:45:08 | 18 | Q.  Dr. Herdeman, do you have any board certifications? |
| 11:45:10 | 19 | A.  Yes, I do. |
| 11:45:12 | 20 | Q.  What does it mean, first of all, to be board certified? |
| 11:45:14 | 21 | A.  It means that you've gotten the proper training in the |
| 11:45:20 | 22 | particular specialty that you're seeking board certification |
| 11:45:22 | 23 | in, and then that you've done other preparations and taken a |
| 11:45:26 | 24 | certifying exam and passed a certifying exam. |
| 11:45:30 | 25 | Q.  What are you board certified in, Dr. Herdeman? |

11:45:34    1    A.   I am board certified in internal medicine.

11:45:36    2    Q.   How many times have you been certified?

11:45:38    3    A.   In 1983, and then in 1994 and 2004, and I am preparing to

11:45:42    4    go through the process again.

11:45:42    5    Q.   Why did you have to be certified on a number of different

11:45:46    6    occasions?

11:45:46    7    A.   I chose voluntarily to be recertified these past two

11:45:52    8    times.  For those who were certified before 1990, it was a

11:45:54    9    lifetime certification, but I elected to go for voluntary

11:46:00   10    recertification.  Everyone certified after 1990 has to be

11:46:06   11    recertified every ten years.

11:46:08   12    Q.   Is an individual allowed to practice medicine without

11:46:10   13    being certified?

11:46:10   14    A.   Yes, all they need is a license to practice.

11:46:12   15    Q.   Why obtain certification?

11:46:16   16    A.   To indicate additional training and experience and

11:46:20   17    expertise.

11:46:20   18    Q.   Is it difficult to obtain certification?

11:46:22   19    A.   Well, again, you're required to get the residency or other

11:46:26   20    subspecialty training, and then you have to take the

11:46:30   21    examination which requires a substantial amount of

11:46:34   22    preparation.

11:46:34   23    Q.   In addition to internal medicine, are there other forms of

11:46:40   24    certification?

11:46:40   25    A.   Yes.  There are, to my understanding, about 140 specialty

| | | |
|---|---|---|
| 11:46:46 | 1 | and subspecialty boards in the United States. |
| 11:46:48 | 2 | Q. Are there subspecialties of internal medicine? |
| 11:46:52 | 3 | A. Yes, there are. For example, there's cardiology and |
| 11:46:54 | 4 | gastroenterology, hematology, oncology, and several others. |
| 11:46:58 | 5 | Q. You gave an example of cardiology. What does that mean? |
| 11:47:02 | 6 | A. That means the study of diseases of the heart. |
| 11:47:04 | 7 | Q. Are you familiar with a specialty that's sometimes |
| 11:47:10 | 8 | referred to as pulmonology? |
| 11:47:12 | 9 | A. Yes. |
| 11:47:12 | 10 | Q. What is that? |
| 11:47:12 | 11 | A. That's the study of diseases of the lung. |
| 11:47:14 | 12 | Q. You mentioned radiology. Now, is that a subspecialty of |
| 11:47:18 | 13 | internal medicine? |
| 11:47:20 | 14 | A. No, that's a separate specialty. |
| 11:47:20 | 15 | Q. Okay. What is radiology? |
| 11:47:22 | 16 | A. Radiology is the application of obtaining imaging studies |
| 11:47:32 | 17 | of mostly the inside of the body and the interpretation of |
| 11:47:36 | 18 | those images, and also there's another subdivision which |
| 11:47:40 | 19 | involves direct intervention and treating those internal |
| 11:47:42 | 20 | organs. |
| 11:47:44 | 21 | Q. Other than internal medicine, do you have any other board |
| 11:47:46 | 22 | certifications? |
| 11:47:46 | 23 | A. No, I don't. |
| 11:47:48 | 24 | Q. Now, you said that you're currently employed by the |
| 11:47:52 | 25 | Swedish American Medical Group? |

11:47:54    1   A.   Yes.

11:47:54    2   Q.   How would you characterize the socioeconomic background of

11:47:56    3   your patient population?

11:47:58    4   A.   I would say that 80 percent we would consider middle

11:48:02    5   class, and the remaining number would be at or near the

11:48:04    6   poverty level.

11:48:06    7   Q.   And how would you describe the racial makeup of the

11:48:08    8   patient population that you currently serve?

11:48:10    9   A.   I would say about 60 to 70 percent are Caucasian, and the

11:48:16   10   remainder are equally Hispanics and African-Americans.

11:48:20   11   Q.   And the age rage, what is the age range of your current

11:48:24   12   patient population?

11:48:24   13   A.   I would say 40 percent or so are over the age of 65,

11:48:28   14   another 30 percent or so are between the ages of 40 and 65,

11:48:32   15   and the remainder would be younger than 40.

11:48:34   16   Q.   Dr. Herdeman, how long have you been employed with the

11:48:36   17   Swedish American Medical Group?

11:48:38   18   A.   Since September of 1998.

11:48:40   19   Q.   How were you employed immediately prior to working for

11:48:44   20   that particular practice?

11:48:44   21   A.   I was also an internist at the Crusader Clinic in

11:48:52   22   Rockford, Illinois.

11:48:52   23   Q.   What is the Crusader Clinic?

11:48:54   24   A.   The Crusader Clinic is the community health center that

11:48:58   25   serves that area.

| | | |
|---|---|---|
| 11:49:00 | 1 | Q.  And how long were you employed there, sir? |
| 11:49:02 | 2 | A.  From September of 1990 until August of 1998. |
| 11:49:08 | 3 | Q.  What did you do at the Crusader Clinic? |
| 11:49:10 | 4 | A.  I worked as an internist, and I was also the medical |
| 11:49:14 | 5 | director there. |
| 11:49:16 | 6 | Q.  What does it mean to be the medical director? |
| 11:49:18 | 7 | A.  I would hire the physicians, I would, to the extent that |
| 11:49:22 | 8 | that's possible, supervise the practice and try to set the |
| 11:49:24 | 9 | tone for the practice, I would schedule the physicians, their |
| 11:49:28 | 10 | various assignments. |
| 11:49:28 | 11 | Q.  How many internists were under your supervision while you |
| 11:49:32 | 12 | were the medical director at the Crusader Clinic? |
| 11:49:34 | 13 | A.  As I recall, there were four other internists, but there |
| 11:49:38 | 14 | were also some family physicians and pediatricians that I was |
| 11:49:42 | 15 | also medical directing. |
| 11:49:44 | 16 | Q.  And how many total doctors then did you oversee at a time? |
| 11:49:46 | 17 | A.  I think during the time I was there, a minimum of eight |
| 11:49:50 | 18 | and a maximum of 13. |
| 11:49:52 | 19 | Q.  How would you describe the socioeconomic background of the |
| 11:49:54 | 20 | patients that you served at the Crusader Clinic? |
| 11:49:58 | 21 | A.  The patients at community health centers, it's kind of a |
| 11:50:02 | 22 | safety net institution, so they're primarily at or below the |
| 11:50:04 | 23 | poverty level. |
| 11:50:06 | 24 | Q.  Do many of those patients not have insurance? |
| 11:50:10 | 25 | A.  Those that do have insurance almost always have Medicaid. |

11:50:14  1  Q.  And then the remainder do not?

11:50:16  2  A.  Do not.

11:50:16  3  Q.  What is the -- what was the kind of racial makeup of the

11:50:20  4  patient population that you served at the Crusader Clinic?

11:50:24  5  A.  At Crusader Clinic, I would say it was perhaps 40 or 50

11:50:30  6  percent Caucasian, and then the Hispanics were moving into

11:50:34  7  Winnebago County in large numbers at that time, so certainly

11:50:38  8  near the end of the time I was practicing there, half of the

11:50:42  9  remainder -- maybe about two thirds of the remainder were

11:50:44  10  African-Americans and two-thirds of the remainder were

11:50:48  11  Hispanic.

11:50:48  12  Q.  And what was the age range of the population you served?

11:50:50  13  A.  There, maybe fewer over 65, perhaps 10 or 15 percent over

11:50:54  14  the age of 65, and the bulk, perhaps 60 percent, between 35

11:51:02  15  and 65, and the remainder younger than 35.

11:51:06  16  Q.  How were you employed prior to working for the Crusader

11:51:08  17  Clinic?

11:51:08  18  A.  Prior to the Crusader Clinic, I worked at the Upper Hudson

11:51:14  19  Primary Care Consortium in Glens Falls, New York.  That was an

11:51:20  20  organization that was a community health center, but it also

11:51:22  21  provided urgent care for patients with a particular type of

11:51:28  22  Blue Cross/Blue Shield insurance plan in Upstate New York.

11:51:32  23  Q.  And how long were you employed at that Upstate New York

11:51:34  24  clinic?

11:51:34  25  A.  From 1988 until 1990.

| | |
|---|---|
| 11:51:38 | 1 |
| 11:51:40 | 2 |
| 11:51:50 | 3 |
| 11:51:54 | 4 |
| 11:51:58 | 5 |

1  Q.  What kind of practice really was that?

2  A.  We had working class folks in Glens Falls, New York, from

3  October until May, and then in addition to that clientele,

4  there were quite a few tourists that would come through the

5  area in the summer months.

6  Q.  What was your position there, sir?

7  A.  I was an internist as well, and I also served as the

8  medical director for the Health Maintenance Organization.

9  Q.  And was your role as a medical director of that Health

10  Maintenance Organization similar in ways to the --

11  A.  There I did less direct supervising of the physicians.  It

12  was more of  considering physicians' clients, it was client

13  service for the physicians.

14  Q.  How were you employed prior to working in the Upstate New

15  York clinic that you just referred to?

16  A.  I worked at Su Clinica Familiar in Harlingen, Texas, from

17  finishing my residency in 1983 until 1988.

18  Q.  What was your position there, Dr. Herdeman?

19  A.  I, again, was a practicing internist, and I also was the

20  medical director at Su Clinica.

21  Q.  What did you do as the medical director at that facility?

22  A.  The things I mentioned before as a medical director at the

23  Crusader Clinic in Rockford, but I also was the coordinator

24  and supervisor for the First Joint Commission Accreditation

25  for Su Clinica.

11:53:06  1  Q.  And what was the patient population like at that clinic in

11:53:12  2  Harlingen, Texas?

11:53:12  3  A.  Once again, the majority were at or below the poverty line

11:53:16  4  and uninsured, and there the overwhelming majority of the

11:53:20  5  clients were Hispanic; many only spoke Spanish.

11:53:24  6  Q.  And how long were you employed there, Dr. Herdeman?

11:53:28  7  A.  From 1983 until 1988.

11:53:30  8  Q.  During the period of time that you have been practicing

11:53:34  9  internal medicine as an internist, have you maintained any

11:53:38  10  appointments or positions?

11:53:40  11  A.  Let's see.  I am a member of the American College of

11:53:44  12  Physicians, I am a fellow of the American College of

11:53:46  13  Physicians, I currently am on the board of directors of the

11:53:48  14  Physician Care Network, which is the independent practice

11:53:54  15  association which administers the HMO Illinois insurance

11:53:58  16  product in Rockford, Illinois.  I am also on hospital

11:54:02  17  committees.

11:54:02  18  Q.  Well, let's start where you ended.  What kind of hospital

11:54:06  19  committees are you on?

11:54:06  20  A.  I am on the Quality Assurance Committee for the Adult

11:54:10  21  Medicine Department.  I am also on the board of the Swedish

11:54:18  22  American Medical Group, the Quality Improvement Committee, I

11:54:20  23  am also on the Compensation Committee for the Swedish American

11:54:24  24  Medical Group.

11:54:24  25  Q.  Once again, that's a group of internists?

| | | |
|---|---|---|
| 11:54:26 | 1 | A. Well, the Swedish American Medical Group has internists, |
| 11:54:32 | 2 | but it also has family physicians and pediatricians and some |
| 11:54:34 | 3 | other subspecialty physicians also. |
| 11:54:36 | 4 | Q. And your oversight as a member of that committee would |
| 11:54:42 | 5 | deal with all of those physicians? |
| 11:54:44 | 6 | A. Yes, the oversight on the quality improvement. |
| 11:54:46 | 7 | Q. How long have you been a fellow at the American Medical |
| 11:54:50 | 8 | College of Physicians? |
| 11:54:50 | 9 | A. Since 1999. |
| 11:54:52 | 10 | Q. How long have you been a member? |
| 11:54:52 | 11 | A. Since 1981, I think. |
| 11:54:54 | 12 | Q. What does it mean to be a fellow? |
| 11:54:56 | 13 | A. It means that you have been a citizen of the Internal |
| 11:55:02 | 14 | Medicine Committee and you have been recommended by two |
| 11:55:08 | 15 | current fellows of the American College and that your |
| 11:55:10 | 16 | application has been reviewed and accepted to fellowship. |
| 11:55:14 | 17 | Q. Do you have any associations with any educational |
| 11:55:18 | 18 | institutions? |
| 11:55:18 | 19 | A. While I was in Texas, I was a clinical instructor with the |
| 11:55:22 | 20 | University of Texas medical branch in Galveston, and from 1990 |
| 11:55:28 | 21 | until recently, I was also a clinical instructor at the |
| 11:55:32 | 22 | University of Illinois medical branch in Rockford. |
| 11:55:36 | 23 | Q. And were those positions associated with your work in |
| 11:55:38 | 24 | internal medicine? |
| 11:55:40 | 25 | A. Yes. |

11:55:40   1   Q. Since completing your residency, have you partaken in any

11:55:46   2   continuing education programs?

11:55:48   3   A. Yes, I have been taking the medical knowledge

11:55:50   4   self-assessment program that's sponsored by the American

11:55:54   5   College of Physicians that's done every three years. I have

11:55:58   6   done that every three years since 1983.

11:56:00   7   Q. Do you regularly read any professional journals or

11:56:04   8   publications that are germane to the practice you are engaged

11:56:06   9   in?

11:56:06   10   A. Yes. I subscribe to the New England Journal of Medicine

11:56:12   11   and the Anals of Internal Medicine, and as most physicians

11:56:16   12   are, I get journals sent to me regularly unsolicited.

11:56:20   13   Q. Dr. Herdeman, in addition to your medical practice, do you

11:56:24   14   do any consulting?

11:56:24   15   A. I have worked as a consultant for Wisconsin Physician

11:56:28   16   Service or WPS.

11:56:30   17   Q. What have you done in your role as a consultant?

11:56:32   18   A. I have reviewed medical records for appropriateness and

11:56:36   19   proper billing.

11:56:38   20   Q. Are you required to review other physicians' patient

11:56:40   21   charts in that role?

11:56:40   22   A. Yes, I am.

11:56:44   23   Q. Are you required to analyze their medical findings and

11:56:46   24   diagnoses and the services provided in that role?

11:56:50   25   A. Yes, I am.

| | | |
|---|---|---|
| 11:56:50 | 1 | Q. Have you been consulted on a number of different cases? |
| 11:56:54 | 2 | A. Yes. |
| 11:56:54 | 3 | Q. Have you been paid for those services? |
| 11:56:56 | 4 | A. Yes. |
| 11:56:56 | 5 | Q. Have you in fact been retained by the government in this |
| 11:57:00 | 6 | case? |
| 11:57:00 | 7 | A. Yes. |
| 11:57:00 | 8 | Q. Are you being paid for your services in this case? |
| 11:57:04 | 9 | A. Yes. |
| 11:57:04 | 10 | Q. Were you paid in connection with your trial preparation? |
| 11:57:08 | 11 | A. Yes. |
| 11:57:08 | 12 | Q. And are you in fact going to be paid for your trial |
| 11:57:12 | 13 | testimony today? |
| 11:57:12 | 14 | A. Yes. |
| 11:57:14 | 15 | Q. What is the rate which you're being paid by the government |
| 11:57:16 | 16 | in connection with your retention in this case? |
| 11:57:22 | 17 | A. $300 an hour. |
| 11:57:24 | 18 | Q. Approximately how much have you been paid to date? |
| 11:57:26 | 19 | A. $1800. |
| 11:57:28 | 20 | Q. Have you done additional work since you have been paid |
| 11:57:30 | 21 | that amount? |
| 11:57:32 | 22 | A. Yes. |
| 11:57:32 | 23 | Q. Do you expect to be paid for the additional work that you |
| 11:57:34 | 24 | have done? |
| 11:57:34 | 25 | A. Yes. |

| | | |
|---|---|---|
| 11:57:34 | 1 | Q. Dr. Herdeman, as a physician, do you have interaction with |
| 11:57:40 | 2 | healthcare benefit groups? |
| 11:57:42 | 3 | A. Yes. |
| 11:57:42 | 4 | Q. And when I say healthcare benefit programs, do you |
| 11:57:44 | 5 | understand that to be insurance? |
| 11:57:46 | 6 | A. Yes, I do. |
| 11:57:46 | 7 | Q. What kind of interaction do you have in your practice with |
| 11:57:50 | 8 | insurance? |
| 11:57:52 | 9 | A. I have billed insurance companies for the services I |
| 11:57:54 | 10 | render. |
| 11:57:56 | 11 | Q. In your role as a physician, are you familiar with Blue |
| 11:58:00 | 12 | Cross/Blue Shield of Illinois? |
| 11:58:00 | 13 | A. Yes. |
| 11:58:00 | 14 | Q. What is Blue Cross/Blue Shield of Illinois? |
| 11:58:04 | 15 | A. It's the insurance company that provides benefits for a |
| 11:58:08 | 16 | large proportion of people who live in Illinois. |
| 11:58:12 | 17 | Q. Are you aware of whether a physician has to have any |
| 11:58:14 | 18 | particular type of formal relationship to submit claims for |
| 11:58:18 | 19 | treatment to Blue Cross/Blue Shield of Illinois for services |
| 11:58:22 | 20 | provided to people that are insured by that insurance company? |
| 11:58:26 | 21 | A. Yes, they do. |
| 11:58:26 | 22 | Q. What type of relationship does a physician have to have? |
| 11:58:28 | 23 | A. Well, he has a provider agreement with whatever insurance |
| 11:58:34 | 24 | benefit the company happens to be involved, and they are |
| 11:58:38 | 25 | issued -- they have to submit their credentials, and they have |

11:58:40  1   to be issued a billing number.

11:58:42  2   Q.  Are you a Blue Cross/Blue Shield provider?

11:58:44  3   A.  Yes.

11:58:44  4   Q.  How long have you been a Blue Cross/Blue Shield provider?

11:58:48  5   A.  Since I arrived in Illinois in 1990.

11:58:50  6   Q.  Are you generally aware of how Blue Cross/Blue Shield --

11:58:56  7   how claims are submitted to Blue Cross/Blue Shield for

11:58:58  8   payment?

11:58:58  9   A.  Yes, I am.

11:58:58  10  Q.  Are you familiar with the insurance coverage program

11:59:04  11  called Medicare?

11:59:04  12  A.  Yes, I am.

11:59:04  13  Q.  What is Medicare?

11:59:06  14  A.  Medicare is the government sponsored insurance program

11:59:08  15  that provides benefits for retired -- for people over age 65

11:59:12  16  and for the disabled.

11:59:12  17  Q.  Are you aware whether a physician has to have a particular

11:59:16  18  type of formal relationship with Medicare to submit claims for

11:59:20  19  treatment for patients that are covered by that insurance

11:59:22  20  program?

11:59:22  21  A.  Yes, they do.

11:59:24  22  Q.  What type of relationship?

11:59:24  23  A.  A similar relationship to the one I mentioned to the other

11:59:28  24  insurance companies.  They submit their credentials and their

11:59:32  25  identification and their licensing information, and they're

| | | |
|---|---|---|
| 11:59:34 | 1 | issued a billing number. |
| 11:59:36 | 2 | Q.  Are you a Medicare provider? |
| 11:59:36 | 3 | A.  Yes, I am. |
| 11:59:38 | 4 | Q.  How long have you been a provider for patients in the |
| 11:59:40 | 5 | Medicare program? |
| 11:59:42 | 6 | A.  Since 1983. |
| 11:59:44 | 7 | Q.  Are you once again generally aware of how claims are |
| 11:59:48 | 8 | submitted to Medicare? |
| 11:59:48 | 9 | A.  Yes, I am. |
| 11:59:52 | 10 | Q.  Are you familiar, Dr. Herdeman, through your role as an |
| 11:59:56 | 11 | internist with a diagnostic test generally referred to as an |
| 12:00:00 | 12 | echocardiogram? |
| 12:00:02 | 13 | A.  Yes, I am. |
| 12:00:04 | 14 | Q.  How are you familiar with that test? |
| 12:00:06 | 15 | A.  Because I ordered it for my patients and I read those |
| 12:00:10 | 16 | reports and acted on it appropriately. |
| 12:00:12 | 17 | Q.  Roughly speaking, what's an echocardiogram? |
| 12:00:16 | 18 | A.  It's an ultrasound test of the heart to study the |
| 12:00:18 | 19 | structure and function of the heart. |
| 12:00:18 | 20 | Q.  Are you aware of the purposes for which that test is |
| 12:00:20 | 21 | utilized? |
| 12:00:22 | 22 | A.  Yes, I am. |
| 12:00:24 | 23 | Q.  Are you aware of the symptoms and conditions that would |
| 12:00:26 | 24 | justify the use of that test? |
| 12:00:28 | 25 | A.  Yes, I am. |

12:00:28  1  Q.  Is it a test that you have in fact ordered for your

12:00:30  2  patients during the time that you have been practicing

12:00:32  3  medicine?

12:00:32  4  A.  Yes, it is.

12:00:34  5  Q.  Are you familiar with a diagnostic test referred to as an

12:00:36  6  electrocardiogram?

12:00:38  7  A.  Yes, I am.

12:00:38  8  Q.  How are you familiar with an --

12:00:40  9  A.  Because I ordered that for my patients as well.

12:00:42  10  Q.  Okay.  And just generally speaking, what is an

12:00:44  11  electrocardiogram?

12:00:46  12  A.  It's a study to get the electrical impulses of the heart,

12:00:52  13  once again to note its structure and function.

12:00:56  14  Q.  Are you aware of the purposes for which that test is

12:00:58  15  utilized?

12:00:58  16  A.  Yes, I am.

12:01:00  17  Q.  Are you aware of the symptoms and conditions that would

12:01:02  18  justify the use of that test?

12:01:04  19  A.  Yes, I am.

12:01:04  20  Q.  Is it a test that you've prescribed for your patients?

12:01:06  21  A.  Yes, I have.

12:01:06  22  Q.  Is it a test that you've administered?

12:01:08  23  A.  Yes, I have.

12:01:10  24  Q.  Are you familiar with what -- excuse me, Dr. Herdeman.

12:01:14  25  Are you familiar with a diagnostic test referred to as a

| | | |
|---|---|---|
| 12:01:18 | 1 | duplex scan extracranial arteries? |
| 12:01:22 | 2 | A.  Yes, I am. |
| 12:01:22 | 3 | Q.  How are you familiar with that? |
| 12:01:24 | 4 | A.  Because I asked for that to be done on selected patients. |
| 12:01:26 | 5 | Q.  Are you aware of the purpose for which this test is done? |
| 12:01:28 | 6 | A.  Yes. |
| 12:01:30 | 7 | Q.  Are you aware of the symptoms and conditions that would |
| 12:01:32 | 8 | justify the use of this test? |
| 12:01:32 | 9 | A.  Yes, I am. |
| 12:01:32 | 10 | Q.  Is it a test that you have in fact prescribed for |
| 12:01:36 | 11 | patients? |
| 12:01:36 | 12 | A.  Yes, I have ordered it. |
| 12:01:38 | 13 | Q.  Are you familiar with the diagnostic test referred to as |
| 12:01:42 | 14 | the transcranial Doppler study? |
| 12:01:44 | 15 | A.  Yes. |
| 12:01:44 | 16 | Q.  How are you familiar? |
| 12:01:44 | 17 | A.  I have become aware of the technique involved to do it.  I |
| 12:01:48 | 18 | have not needed to order that test. |
| 12:01:48 | 19 | Q.  You have never ordered that test? |
| 12:01:50 | 20 | A.  No. |
| 12:01:50 | 21 | Q.  Are you generally aware of what the purpose of the test |
| 12:01:54 | 22 | is? |
| 12:01:54 | 23 | A.  I understand it's to study the circulation of internal |
| 12:02:00 | 24 | arteries in the brain. |
| 12:02:00 | 25 | Q.  Why have you not ordered that test? |

| | |
|---|---|
| 12:02:02 | 1 |
| 12:02:04 | 2 |
| 12:02:08 | 3 |
| 12:02:10 | 4 |
| 12:02:12 | 5 |
| 12:02:14 | 6 |
| 12:02:16 | 7 |
| 12:02:16 | 8 |
| 12:02:20 | 9 |
| 12:02:20 | 10 |
| 12:02:22 | 11 |
| 12:02:24 | 12 |
| 12:02:26 | 13 |
| 12:02:26 | 14 |
| 12:02:28 | 15 |
| 12:02:30 | 16 |
| 12:02:32 | 17 |
| 12:02:34 | 18 |
| 12:02:34 | 19 |
| 12:02:38 | 20 |
| 12:02:38 | 21 |
| 12:02:38 | 22 |
| 12:02:42 | 23 |
| 12:02:44 | 24 |
| 12:02:46 | 25 |

A.  Because I haven't needed to.

Q.  Are you familiar with the diagnostic test referred to as a pulmonary function test, sometimes called a PFT?

A.  Yes, I am.

Q.  How are you familiar with what a PFT is?

A.  Because I have ordered it for my patients in the appropriate setting.

Q.  Are you aware of the purpose for this test?

A.  Yes, I am.

Q.  What is the purpose of a PFT?

A.  It's to study the function of the lungs.

Q.  Is it a test that you have ordered for patients?

A.  Yes, I have.

Q.  Are you aware of the symptoms and conditions that would justify the use of this test?

A.  Yes, I am.

Q.  Is it a test that you have in fact prescribed?

A.  Yes, I have.

Q.  Are you familiar with what is referred to as a nerve conduction test?

A.  Yes, I am.

Q.  How are you familiar with what a nerve conduction test is, Dr. Herdeman?

A.  Through my training, and I ordered that as well for my patients when they needed it.

| | | |
|---|---|---|
| 12:02:48 | 1 | Q.  Are you aware of the purpose for which that test is |
| 12:02:50 | 2 | utilized? |
| 12:02:50 | 3 | A.  Yes. |
| 12:02:50 | 4 | Q.  Are you aware of the symptoms and conditions that justify |
| 12:02:54 | 5 | using that test? |
| 12:02:54 | 6 | A.  Yes. |
| 12:02:54 | 7 | Q.  Is it a test that you prescribe for patients on occasion? |
| 12:02:56 | 8 | A.  Yes, I do. |
| 12:02:58 | 9 | Q.  Have you administered the test? |
| 12:02:58 | 10 | A.  No. |
| 12:03:00 | 11 | Q.  Is it a test that you have asked others to administer for |
| 12:03:04 | 12 | you? |
| 12:03:04 | 13 | A.  Yes. |
| 12:03:04 | 14 | Q.  Dr. Herdeman, through your medical training and years of |
| 12:03:08 | 15 | practice, are you generally familiar with the medical |
| 12:03:10 | 16 | conditions and symptoms that would justify the ordering of |
| 12:03:12 | 17 | some of these tests that we have just talked about? |
| 12:03:14 | 18 | A.  Yes. |
| 12:03:16 | 19 | Q.  Are you familiar with a condition that's called a heart |
| 12:03:18 | 20 | murmur? |
| 12:03:18 | 21 | A.  Yes. |
| 12:03:18 | 22 | Q.  Do you know how to check for a heart murmur? |
| 12:03:20 | 23 | A.  Yes. |
| 12:03:20 | 24 | Q.  Do you know how to detect a heart murmur? |
| 12:03:22 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:03:22 | 1 | Q. Are you familiar with the condition called carotid bruit? |
| 12:03:26 | 2 | A. Yes. |
| 12:03:26 | 3 | Q. Do you know how to check for carotid bruit? |
| 12:03:30 | 4 | A. Yes. |
| 12:03:30 | 5 | Q. Do you know how to detect carotid bruit? |
| 12:03:34 | 6 | A. Yes. |
| 12:03:34 | 7 | Q. Heart murmurs, carotid bruits, are those conditions that |
| 12:03:38 | 8 | you look for when examining patients? |
| 12:03:40 | 9 | A. Yes. |
| 12:03:40 | 10 | Q. Is that something that you do on a regular basis in your |
| 12:03:44 | 11 | practice? |
| 12:03:44 | 12 | A. Yes. |
| 12:03:44 | 13 | Q. Dr. Herdeman, in your years of experience as an internist |
| 12:03:48 | 14 | and as a medical director, as well as your work for WPS as a |
| 12:03:54 | 15 | consultant, are you familiar with the methods by which |
| 12:03:54 | 16 | physicians are trained to record their examinations of |
| 12:03:54 | 17 | patients? |
| 12:03:58 | 18 | A. Yes. |
| 12:03:58 | 19 | Q. Have you in fact reviewed other physicians' charts to |
| 12:04:00 | 20 | assess whether or not their diagnoses are appropriate -- I'm |
| 12:04:04 | 21 | sorry -- their procedures are appropriate given the diagnosis |
| 12:04:08 | 22 | that they have done? |
| 12:04:08 | 23 | A. Yes. |
| 12:04:08 | 24 | Q. In doing that, have you had to review other physicians' |
| 12:04:12 | 25 | charts? |

12:04:12  1    A.  Yes.

12:04:12  2    Q.  Have you been retained as a consultant for that purpose?

12:04:14  3    A.  Yes.

12:04:16  4          MR. HAMMERMAN:  Your Honor, at this time, the

12:04:18  5    government would seek to qualify Dr. Herdeman as an expert

12:04:22  6    witness in the field of internal medicine, in particular, the

12:04:26  7    appropriate application of diagnostic tests to examine and

12:04:32  8    diagnose primary care patients.

12:04:34  9          THE COURT:  That came out so fast.  I got some of it.

12:04:36  10   You wish to have Dr. Herdeman qualified as an expert witness

12:04:40  11   in the field of internal medicine and?

12:04:42  12         MR. HAMMERMAN:  In particular, the appropriate

12:04:44  13   application of diagnostic tests to examine and diagnose

12:04:48  14   primary care patients.

12:04:50  15         THE COURT:  You know, I don't take shorthand.

12:04:52  16         MR. HAMMERMAN:  I apologize, your Honor.

12:04:54  17         THE COURT:  On the application of?

12:04:56  18         MR. HAMMERMAN:  Diagnostic tests to examine and

12:04:58  19   diagnose patients.

12:05:12  20         THE COURT:  All right.  Let me ask counsel for Dr.

12:05:18  21   Chhibber, any objection to the qualification of Dr. Herdeman

12:05:22  22   to testify as an expert witness on the subjects of internal

12:05:28  23   medicine, and in particular, the application of diagnostic

12:05:36  24   tests and examination and diagnosis of patients?

12:05:42  25         MR. ORMAN:  As to internal medicine, no objection.

12:05:50    1    As to his expertise as to giving of tests, we'd like to

12:05:56    2    reserve that subject to cross.

12:05:58    3            THE COURT:  All right.  He may offer his opinions

12:06:04    4    based on his expertise in the field of internal medicine and

12:06:12    5    diagnosis.

12:06:14    6            All right.  It's time for us to take our lunch break.

12:06:18    7    Because I have to hear an emergency motion in another case, we

12:06:24    8    won't resume until 1:15 this afternoon.  You're excused for

12:06:28    9    lunch.

12:07:00   10      (The jury leaves the courtroom.)

12:07:00   11            THE COURT:  Doctor, you must return at 1:15.  Thank

12:07:02   12    you.

           13      (Whereupon, the trial was adjourned at 12:05 p.m. until 1:15

           14    p.m. of this same day and date.)

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

385

IN THE UNITED STATES DISTRICT COURT<br>
NORTHERN DISTRICT OF ILLINOIS<br>
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. 11 CR 119 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JASWINDER RAI CHHIBBER, | ) | Chicago, Illinois |
| | ) | March 2, 2012 |
| Defendant. | ) | 1:15 o'clock p.m. |

TRIAL TRANSCRIPT OF PROCEEDINGS<br>
BEFORE THE HONORABLE SUZANNE B. CONLON, AND A JURY<br>
VOLUME 2-B

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | HON. PATRICK FITZGERALD<br>United States Attorney<br>BY:  MR. SAMUEL B. COLE<br>     MR. JOEL M. HAMMERMAN<br>219 S. Dearborn St., Suite 500<br>Chicago, Illinois  60604 |
| For the Defendant: | PUGH, JONES & JOHNSON, P.C.<br>BY:  MR. WALTER JONES, JR.<br>     MR. JONATHAN B. CIFONELLI<br>180 North LaSalle Street, Suite 3400<br>Chicago, IL  60601<br>(312) 768-7800 |
| | LAW OFFICE OF ROBERT ORMAN<br>BY:  MR. ROBERT ORMAN<br>One North LaSalle Street, Suite 1775<br>Chicago, IL  60602<br>(312) 372-0515 |
| Court Reporter: | MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR<br>Official Court Reporter<br>219 S. Dearborn Street, Suite 1854-B<br>Chicago, Illinois  60604<br>(312) 435-5639 |

1    (The following proceedings were had in open court in the
01:14:38    2    presence and hearing of the jury:)
01:14:38    3         THE COURT:  Would you take the stand again, Doctor.
01:14:40    4         You are still under oath, but would you restate your
01:14:42    5    full name for the court reporter and the jury.
01:14:46    6         THE WITNESS:  My name is Daniel Herdeman.
01:14:48    7         THE COURT:  Please be seated.
01:14:52    8                                  - - -
01:14:52    9         DANIEL HERDEMAN, DIRECT EXAMINATION CONTINUED
01:14:52    10   BY MR. HAMMERMAN:
01:14:54    11   Q.  Good afternoon, Dr. Herdeman.
01:14:56    12   A.  Good afternoon.
01:14:58    13   Q.  You previously indicated in your testimony this morning
01:15:00    14   that you're familiar with a diagnostic test referred to as an
01:15:06    15   echocardiogram?
01:15:08    16   A.  Yes.
01:15:08    17   Q.  Can you tell the jury what it is and how it works?
01:15:10    18   A.  It's an ultrasound test of the heart.  Jelly is applied
01:15:14    19   over the chest where the heart is and an ultrasound wand is
01:15:20    20   moved over in particular angles in order to get pictures of
01:15:22    21   the valves of the heart, the heart muscle, and the chambers of
01:15:24    22   the heart.
01:15:24    23   Q.  What is it used for?
01:15:24    24   A.  It's used to detect the structure and function of the
01:15:28    25   heart.

01:15:28   1   Q.  Are you familiar with what's sometimes referred to as an
01:15:32   2   obstetrics ultrasound?
01:15:34   3   A.  Yes.
01:15:34   4   Q.  How is that similar or dissimilar?
01:15:36   5   A.  Well, the technique is the same in that the same jelly is
01:15:40   6   applied to different parts of the body, and then similar wands
01:15:46   7   are used in order to obtain the images.
01:15:50   8   Q.  And who should administer this type of test?
01:15:52   9   A.  Someone who is trained to do that examination.
01:15:54  10   Q.  What kind of training should such an individual have?
01:15:58  11   A.  The kind that someone would get in a radiology school
01:16:04  12   perhaps, trained technicians.
01:16:06  13   Q.  Is it a test that you would administer?
01:16:08  14   A.  No, it's not.
01:16:08  15   Q.  Why not?
01:16:08  16   A.  Because I am not trained.
01:16:10  17   Q.  Is it, nevertheless, a type of test, the purpose of which
01:16:16  18   you would order for your patients?
01:16:16  19   A.  Yes, it is.
01:16:18  20   Q.  Is it a general diagnostic test routinely used for
01:16:22  21   monitoring patients?
01:16:24  22   A.  Not a general patient, no.
01:16:26  23   Q.  Is it a test that's ordered by physicians without prior
01:16:32  24   examination of a patient?
01:16:32  25   A.  No, it's not.

| | | |
|---|---|---|
| 01:16:32 | 1 | Q. Why not? |
| 01:16:34 | 2 | A. Because you wouldn't know whether it's necessary to do the |
| 01:16:36 | 3 | test. |
| 01:16:38 | 4 | Q. Well, what types of conditions would justify the test? |
| 01:16:42 | 5 | What would make it necessary? |
| 01:16:42 | 6 | A. I do it most often for a patient who has a common heart |
| 01:16:50 | 7 | rhythm disturbance called atrial defibrillation that's often |
| 01:16:58 | 8 | attributed with defects or changes in size of certain parts of |
| 01:17:00 | 9 | the heart or perhaps problems with the valve. I would also |
| 01:17:02 | 10 | use it for someone who had a heart murmur that I thought was |
| 01:17:08 | 11 | really due to a structural abnormality of the heart. I also |
| 01:17:10 | 12 | often get it in patients who have heart failure to assess |
| 01:17:16 | 13 | whether they, in fact, do have heart failure. |
| 01:17:18 | 14 | Q. Are there other symptomatologies that you would order an |
| 01:17:22 | 15 | echocardiogram for other than what you mentioned? |
| 01:17:26 | 16 | A. No. |
| 01:17:26 | 17 | Q. Absent certain types of conditions or symptoms that you've |
| 01:17:30 | 18 | mentioned, is this a test you would order? |
| 01:17:32 | 19 | A. No. |
| 01:17:32 | 20 | Q. Why not? |
| 01:17:34 | 21 | A. It wouldn't be necessary. |
| 01:17:36 | 22 | Q. Do you know if insurance like Blue Cross/Blue Shield for |
| 01:17:42 | 23 | which you are a provider will pay for a medically unnecessary |
| 01:17:46 | 24 | test? |
| 01:17:46 | 25 | A. No. |

01:17:46  1   Q.  What about Medicare, will they pay for a medically

01:17:50  2   unnecessary test?

01:17:50  3   A.  No, they won't.

01:17:52  4   Q.  Will they pay for tests that aren't actually administered?

01:17:54  5   A.  They will pay for tests that are administered.

01:17:56  6   Q.  What if they are not administered, will Blue Cross pay for

01:18:00  7   that?

01:18:00  8   A.  No.

01:18:00  9   Q.  What about Medicare?

01:18:02  10  A.  No.

01:18:02  11  Q.  In your experience, what's the frequency that one would

01:18:04  12  expect to see the use of an echocardiogram ordered as a

01:18:10  13  general internal medicine doctor like yourself?

01:18:12  14          MR. ORMAN:  Objection, your Honor.  Foundation.  The

01:18:14  15  witness can talk about his practice, and that's it.

01:18:18  16          THE COURT:  All right.  Would you rephrase, please.

01:18:20  17          MR. HAMMERMAN:  Absolutely, your Honor.

01:18:22  18  BY MR. HAMMERMAN:

01:18:22  19  Q.  Dr. Herdeman, you have been practicing internal medicine

01:18:26  20  for 30 years?

01:18:28  21  A.  Close to 30 years.

01:18:28  22  Q.  And you have worked in practice groups for almost that

01:18:30  23  entire time?

01:18:32  24  A.  Yes.

01:18:32  25  Q.  As a medical director, have you overseen other internists?

01:18:36   1   A.  Yes.

01:18:36   2   Q.  Based on your training and your experience, what's the

01:18:38   3   frequency in which one would expect to see an echocardiogram

01:18:42   4   ordered by an internal medicine doctor?

01:18:42   5   A.  In the kind of practices that I have been in, one or two a

01:18:46   6   month.

01:18:46   7   Q.  Is that a test that you'd expect to see a greater need for

01:18:52   8   in a younger or older population?

01:18:54   9   A.  In an older population.  They are more likely to have

01:18:58   10  heart failure or atrial fibrillation.

01:19:06   11  Q.  If you were treating a primarily older population, would

01:19:06   12  you expect to see a dramatic rise in the need for

01:19:08   13  echocardiograms?

01:19:08   14  A.  I have a primarily older population now, and that's about

01:19:12   15  how often I order the test.

01:19:12   16  Q.  One or two times a month?

01:19:14   17  A.  One or two times a month.

01:19:16   18  Q.  Is this a test that you would expect to need to order with

01:19:20   19  greater frequency in an economically disadvantaged population?

01:19:28   20  A.  People in economically disadvantaged situations are more

01:19:32   21  likely to be ill than people who are better off, so there

01:19:36   22  would be some marginal increase.

01:19:36   23  Q.  You would see a marginal increase.

01:19:36   24        Well, when you worked for the Crusader Clinic, did

01:19:42   25  you say that was an economically disadvantaged population?

| | | |
|---|---|---|
| 01:19:42 | 1 | A.  Yes. |
| 01:19:42 | 2 | Q.  And what was the name again of the clinic that you worked |
| 01:19:44 | 3 | at in Texas? |
| 01:19:46 | 4 | A.  Su Clinica Familiar. |
| 01:19:48 | 5 | Q.  Was that also an economically disadvantaged patient |
| 01:19:52 | 6 | population? |
| 01:19:52 | 7 | A.  Yes, it was. |
| 01:19:52 | 8 | Q.  And combined in your experience at both those locations, |
| 01:19:56 | 9 | how many years did you work at the two? |
| 01:19:58 | 10 | A.  In the community health centers, that would be '83 to '98. |
| 01:20:04 | 11 | That's 15 years. |
| 01:20:04 | 12 | Q.  In those 15 years where you were serving an economically |
| 01:20:08 | 13 | disadvantaged patient population, how often would you order an |
| 01:20:14 | 14 | echocardiogram? |
| 01:20:14 | 15 | A.  My recollection is somewhat similar. |
| 01:20:16 | 16 | Q.  Dr. Herdeman, is an echocardiogram a test that's usually |
| 01:20:24 | 17 | performed in an internist's office? |
| 01:20:26 | 18 | A.  No, it's not. |
| 01:20:28 | 19 | Q.  Why not? |
| 01:20:28 | 20 | A.  Because most internists don't have the training, the |
| 01:20:36 | 21 | technicians, and probably wouldn't give the test often enough |
| 01:20:38 | 22 | in their office to justify doing the test there. |
| 01:20:40 | 23 | Q.  Is there an economic need for a patient population to need |
| 01:20:44 | 24 | to have that test available in an internist's clinic? |
| 01:20:50 | 25 | A.  Not to my knowledge.  In all the other practices I have |

| | | |
|---|---|---|
| 01:20:54 | 1 | had, I have always referred those examinations to the |
| 01:20:56 | 2 | hospital. |
| 01:20:56 | 3 | Q. Who, in your opinion, should review the results of an |
| 01:21:04 | 4 | echocardiogram? |
| 01:21:04 | 5 | A. A properly trained cardiologist. |
| 01:21:06 | 6 | Q. Would you consider yourself qualified to perform an |
| 01:21:08 | 7 | echocardiogram test? |
| 01:21:10 | 8 | A. No. |
| 01:21:10 | 9 | Q. Would you consider yourself as a 30-year practitioner |
| 01:21:16 | 10 | qualified to review the results of an echocardiogram test? |
| 01:21:20 | 11 | A. I can read the report; I can't interpret the images. |
| 01:21:22 | 12 | Q. What does that mean? What's the difference between the |
| 01:21:26 | 13 | two? |
| 01:21:26 | 14 | A. Well, the properly trained and qualified person looks at |
| 01:21:30 | 15 | the images and provides their interpretation and a report is |
| 01:21:34 | 16 | sent out to the people who are involved in that patient's |
| 01:21:36 | 17 | care. |
| 01:21:38 | 18 | Q. Do you know of other internal medicine doctors -- let me |
| 01:21:42 | 19 | ask you this. I changed my question. I apologize. |
| 01:21:46 | 20 | When those reports need to be generated and the |
| 01:21:52 | 21 | patients you referred for an echocardiogram received such a |
| 01:21:56 | 22 | test, who did you refer them to to have the data read and a |
| 01:22:00 | 23 | report generated? |
| 01:22:02 | 24 | A. Again, I refer the patients that I want echocardiograms |
| 01:22:04 | 25 | for to the hospital. There are several cardiologists who have |

01:22:08  1  the proper qualifications and training who can interpret the

01:22:12  2  images.  We actually ask which one of the main practices is

01:22:18  3  intended to interpret each echocardiogram.

01:22:20  4  Q.  Would you want someone who wasn't a board certified

01:22:24  5  cardiologist reviewing and interpreting echocardiograms for

01:22:28  6  your patients?

01:22:30  7  A.  I certainly wouldn't want anyone who isn't properly

01:22:32  8  trained in the technique and that I am confident has that

01:22:36  9  expertise, and board certification, I think, is a good

01:22:42  10  indication that that's the case.

01:22:44  11  Q.  In your patients, is that who you'd send?

01:22:46  12  A.  Yes.

01:22:46  13  Q.  You previously indicated that you're familiar with a

01:22:52  14  diagnostic test referred to as an electrocardiogram; is that

01:22:52  15  right?

01:22:56  16  A.  Yes, I am.

01:22:56  17  Q.  Are there shorthand names for electrocardiograms?

01:23:00  18  A.  There's EKG; that's electro, and K is cardio, but it's the

01:23:06  19  German word that I don't recall exactly right now, and G for

01:23:10  20  gram.  And ECG is electro, C for cardio, and G for gram.

01:23:16  21  Q.  Is an EKG and ECG the same thing?

01:23:20  22  A.  Yes.

01:23:20  23  Q.  They are just used interchangeably?

01:23:22  24  A.  Yes.

01:23:22  25  Q.  Can you tell the members of the jury what an EKG is?

01:23:26    1    A.   An EKG is a study where electrodes are placed on various

01:23:30    2    parts of the body in order to record the electrical impulses

01:23:34    3    from the heart to determine its structure and function.

01:23:36    4    Q.   How is that test administered?

01:23:36    5    A.   Leads are attached to each arm, each leg, and to six

01:23:42    6    places across the chest, and then a machine is turned on, and

01:23:44    7    the electrical impulses are recorded on a rolling piece of

01:23:50    8    graph paper.

01:23:50    9    Q.   And how is a patient to be positioned when they are going

01:23:56   10    to receive that particular test?

01:23:58   11    A.   Lying down.

01:24:00   12    Q.   Why lying down?

01:24:00   13    A.   It's the standard position.  It's the reference position.

01:24:06   14    Q.   Who should administer an EKG?

01:24:08   15    A.   Someone who has the proper training in where to attach the

01:24:16   16    electrodes and how to operate the machine.  It's often done by

01:24:20   17    office medical assistants who have had that proper training.

01:24:24   18    Q.   Is it a test that you yourself have administered from time

01:24:26   19    to time?

01:24:26   20    A.   Not in a while, but in my early training, yes.

01:24:30   21    Q.   Is it a diagnostic test routinely used for prophylactic

01:24:34   22    monitoring in a doctor's office?

01:24:36   23    A.   No.

01:24:36   24    Q.   Is it a test that's used for general health screening in a

01:24:40   25    doctor's office?

01:24:42    1    A.  No, with the exception of the Welcome to Medicare Visit.

01:24:46    2    That's a program that was started I think in 2010 where people

01:24:50    3    who are new to the Medicare program are offered a health

01:24:56    4    screening at their doctor, which includes things like general

01:24:58    5    history, a depression screening, and also an

01:25:02    6    electrocardiogram.

01:25:04    7    Q.  How many Welcome to Medicare EKGs does Medicare pay for?

01:25:12    8    A.  Once in your experience with Medicare.

01:25:14    9    Q.  In your experience, do you know of any other insurance

01:25:16    10    companies that provide a welcome to the insurance program EKG?

01:25:20    11    A.  No.

01:25:20    12    Q.  How many Welcome to Medicare EKGs will Medicare pay for in

01:25:22    13    your experience?

01:25:24    14    A.  One.

01:25:24    15    Q.  Is it a test, to your knowledge, that's authorized by Blue

01:25:28    16    Cross/Blue Shield Illinois to be used as part of its quality

01:25:30    17    management recommendations?

01:25:32    18    A.  Not generally.

01:25:36    19    Q.  Is it a test that in your experience a physician would

01:25:40    20    order without a prior examination of a patient?

01:25:42    21    A.  No.

01:25:44    22    Q.  Why not?

01:25:44    23    A.  One doesn't know if it's necessary.

01:25:48    24    Q.  Well, what are the types of conditions or symptoms that

01:25:50    25    would justify ordering that test, Dr. Herdeman?

01:25:54  1  A.  If someone has chest pain, and I would suspect that

01:25:56  2  they're either having angina or something that might lead up

01:26:02  3  to a heart attack, or after having a heart attack, they would

01:26:08  4  certainly get an EKG.  If someone has high blood pressure and

01:26:10  5  I either want to know or suspect that their heart muscle has

01:26:14  6  been involved, I would get an EKG.  If they have a heart

01:26:20  7  rhythm disturbance, I would get an EKG.  If I suspect that

01:26:22  8  they have certain heart valve abnormalities, I would get an

01:26:26  9  EKG.

01:26:26  10  Q.  What about a heart murmur, are you familiar with what that

01:26:30  11  is?

01:26:30  12  A.  Right.

01:26:30  13  Q.  Would that be something that might cause you to order an

01:26:32  14  EKG?

01:26:32  15  A.  It might.

01:26:34  16  Q.  We talked a little bit about the Medicare, Welcome to

01:26:44  17  Medicare EKG.

01:26:44  18  A.  Yes.

01:26:44  19  Q.  In your experience, how old are patients generally when

01:26:48  20  they become part of the Medicare program?

01:26:50  21  A.  Most are 65.  The other portion of the Medicare population

01:26:52  22  are people who are declared disabled.

01:26:54  23  Q.  What's the frequency that you would expect or -- let me

01:27:00  24  rephrase it.

01:27:00  25  What's the frequency with which you've seen in your

01:27:04  1    30 years of experience as a practicing internal medicine
01:27:06  2    doctor and overseeing other internal medicine doctors that you
01:27:10  3    have seen the need to prescribe an EKG in your practice?
01:27:12  4    A.   I am sure I get one a week.   Then again, there are times
01:27:20  5    when more people with chest pain may come through and there
01:27:24  6    may be more.   There may be other times when I am seeing
01:27:28  7    primarily patients that I have seen before and I have gotten
01:27:30  8    whatever diagnostic testing I need, and even if they have high
01:27:34  9    blood pressure, I wouldn't do an EKG.
01:27:36  10   Q.   What's the percentage of your total patients that you
01:27:38  11   think you've ordered EKGs for?
01:27:40  12   A.   I would estimate one to two a week.
01:27:44  13   Q.   And as a percentage of overall patient population, what
01:27:48  14   might that be?
01:27:48  15   A.   Let's see.   Two percent, maybe.
01:27:58  16   Q.   I'm sorry?
01:27:58  17   A.   Two to three percent, two to five percent.
01:28:04  18   Q.   Would you expect to see the need for this test with a
01:28:08  19   greater degree of frequency in an economically disadvantaged
01:28:10  20   population?
01:28:10  21   A.   Once again, economically disadvantaged patients are more
01:28:12  22   likely to be ill than people who aren't, so there would be a
01:28:14  23   marginal increase, yes.
01:28:16  24   Q.   When you worked in the two underprivileged clinics that
01:28:18  25   you worked in for 15 years, how often were you ordering EKGs?

01:28:22  1  A.  I don't have the statistics, but my impression would be
01:28:26  2  similar to what I just stated.
01:28:28  3  Q.  Is an internist qualified to review the results of an EKG?
01:28:34  4  A.  Yes.
01:28:36  5        MR. ORMAN:  Objection, your Honor.  We have to know
01:28:38  6  who the internist is.
01:28:40  7        THE COURT:  Overruled.
01:28:42  8        THE WITNESS:  Internists during their training do
01:28:44  9  spend a portion of their time being taught how to interpret
01:28:50 10  EKGs and in fact interpreting EKGs.
01:28:50 11  BY MR. HAMMERMAN:
01:28:54 12  Q.  Are you familiar, Dr. Herdeman, with what is sometimes
01:28:58 13  referred to as a bioimpedance (inaudible) cardiovascular
01:29:02 14  analysis?
01:29:02 15  A.  I am aware of what the test is.
01:29:04 16  Q.  Have you researched it in connection with your medical
01:29:10 17  practice?
01:29:10 18  A.  During the start of my training, there was a bioimpedance
01:29:16 19  test used to determine if people had blood clots in their
01:29:20 20  legs.  That technique is really obsolete because there are
01:29:24 21  easier, better, more accurate tests to determine whether
01:29:26 22  there's blood clots in the legs now.  My understanding is the
01:29:32 23  particular test you're referring to is a bioimpedance study of
01:29:36 24  the chest which is meant to study certain structure and
01:29:38 25  function of the heart.

01:29:40  1  Q.  Is that a test that you find yourself prescribing for your

01:29:44  2  patients?

01:29:44  3  A.  I have never ordered it.  I have not worked with

01:29:50  4  physicians that I am aware of who have ordered it.  I have

01:29:52  5  never seen an interpretation of that test sent to me from any

01:29:56  6  one of my consultants.

01:29:58  7  Q.  Would you be surprised to learn of an internist's frequent

01:30:08  8  use of that test?

01:30:08  9  A.  I don't use it myself.

01:30:10  10  Q.  And you've said that in your experience, have you ever

01:30:12  11  seen any of your colleagues use it?

01:30:14  12  A.  No, I haven't.

01:30:14  13  Q.  You previously indicated that you're familiar with a

01:30:18  14  diagnostic test referred to as a duplex scan of extracranial

01:30:22  15  arteries?

01:30:22  16  A.  Yes.

01:30:24  17  Q.  What is that, Dr. Herdeman?

01:30:26  18  A.  That's another ultrasound test to examine the arteries

01:30:28  19  that lead from the neck up to the brain.  Its primary area of

01:30:34  20  study is the carotid arteries in the front of the neck, but

01:30:36  21  there are times that it's also used to study the arteries in

01:30:40  22  the back of the neck as well.

01:30:40  23  Q.  Is that sometimes referred to as a carotid Doppler test?

01:30:46  24  A.  When it's examining the arteries in the front of the neck,

01:30:48  25  yes.

| | | |
|---|---|---|
| 01:30:48 | 1 | Q. What is that test used for, Dr. Herdeman? |
| 01:30:52 | 2 | A. It's used to tell whether there is a kink or blockage in |
| 01:30:58 | 3 | the carotid arteries. |
| 01:30:58 | 4 | Q. How is that test administered? |
| 01:31:00 | 5 | A. Ultrasound jelly is applied over the neck and an |
| 01:31:06 | 6 | ultrasound wand is applied. The Doppler aspect of it is meant |
| 01:31:08 | 7 | to study the velocity of the blood as it flows through the |
| 01:31:14 | 8 | vein. |
| 01:31:14 | 9 | Q. What do you mean by that? |
| 01:31:16 | 10 | A. I am going to presume that everyone has heard the term |
| 01:31:18 | 11 | Doppler effect before. That's where when the siren is coming |
| 01:31:22 | 12 | closer to you, you start to hear a higher note, and as the |
| 01:31:26 | 13 | siren is receding from you, you hear a lower note. That |
| 01:31:30 | 14 | applies not only to the sound waves you can hear, it applies |
| 01:31:34 | 15 | to ultrasound waves as well, and they can use that effect in |
| 01:31:38 | 16 | order to determine blood flow through the neck and the |
| 01:31:42 | 17 | velocity of the blood flow in the neck. |
| 01:31:44 | 18 | Q. Again, what is this test used for? |
| 01:31:46 | 19 | A. It's meant to find out if someone has a kink in the artery |
| 01:31:50 | 20 | involved or if they have a blockage in the artery involved. |
| 01:31:52 | 21 | Q. Who should administer this particular type of test? |
| 01:31:54 | 22 | A. Someone who has the training. |
| 01:31:58 | 23 | Q. Have you personally administered this test before? |
| 01:32:00 | 24 | A. No, I haven't. |
| 01:32:00 | 25 | Q. Why not? |

01:32:02  1   A.  Because I don't have the training.

01:32:02  2   Q.  Is it a test that is performed by someone with some degree

01:32:06  3   of specialty?

01:32:08  4   A.  Yes.  It's similar to -- you were asking about the

01:32:12  5   echocardiogram.  It would be someone who has that sort of

01:32:16  6   training as it applies to that particular technique.

01:32:20  7   Q.  Is this carotid Doppler test a test that's used for

01:32:26  8   general monitoring purposes by an internist?

01:32:30  9   A.  No.

01:32:30  10  Q.  Is it a test that would be ordered by an internist without

01:32:34  11  a prior examination of a patient?

01:32:36  12  A.  No.

01:32:36  13  Q.  Why not?

01:32:38  14  A.  Because you wouldn't know if it's necessary to be done.

01:32:42  15  Q.  Well, what types of symptoms or conditions would justify

01:32:44  16  the test?

01:32:44  17  A.  The most common set of symptoms would be something called

01:32:50  18  the TIA or transient ischemic attack.  That's where someone

01:32:56  19  temporarily can't see out of one eye or can't move one hand or

01:33:00  20  one arm or one leg, or perhaps temporarily has difficulty

01:33:02  21  speaking or difficulty walking, and these symptoms disappear

01:33:08  22  anywhere from, say, 30 seconds to a couple minutes.  And even

01:33:12  23  though they may be entirely restored to full function, you

01:33:16  24  might expect that they are having a transient ischemic attack

01:33:20  25  because there's some particle that's breaking off from a

01:33:24   1   blockage in their neck, and you'd want to find out if that's

01:33:26   2   the case.

01:33:28   3          Another -- the other more common or -- I shouldn't

01:33:34   4   say as common.  The other most likely instance where someone

01:33:36   5   would get a carotid ultrasound is if one heard what's called a

01:33:44   6   bruit.

01:33:44   7   Q.  How do you -- first of all, I want to ask you some

01:33:48   8   questions about bruit.  How do you spell bruit?

01:33:52   9   A.  B-r-u-i-t.  It's a French term and it means noise.

01:33:54   10  Q.  What is carotid bruit?

01:33:58   11  A.  That's a noise or a sound in the neck caused by the

01:34:00   12  turbulent flow of the flood through either a kink in that

01:34:06   13  artery or a blockage in that artery.

01:34:08   14  Q.  As an internist, is that something that you check for on a

01:34:12   15  patient?

01:34:12   16  A.  Yes.

01:34:12   17  Q.  How do you check for it?

01:34:14   18  A.  You apply a stethoscope over the area where the sound

01:34:16   19  would be produced.  It's in the front of the neck.

01:34:20   20  Q.  Is it a condition that you're then able to hear?

01:34:22   21  A.  Yes.

01:34:22   22  Q.  What does it sound like?

01:34:24   23  A.  Shh, shh, shh.

01:34:26   24  Q.  Is that a condition that if you detect it is of concern?

01:34:30   25  A.  Yes.

| | | |
|---|---|---|
| 01:34:30 | 1 | Q.  Why is that? |
| 01:34:32 | 2 | A.  Because, again, it might indicate that there is a kink or |
| 01:34:36 | 3 | a blockage in the front of the neck that may indicate that |
| 01:34:38 | 4 | someone may have a transient ischemic attack or more seriously |
| 01:34:44 | 5 | a not transient ischemic attack or stroke. |
| 01:34:46 | 6 | Q.  A stroke? |
| 01:34:46 | 7 | A.  Right. |
| 01:34:48 | 8 | Q.  Is it a test that you have ordered before? |
| 01:34:50 | 9 | A.  Yes. |
| 01:34:50 | 10 | Q.  How often in your practice have you had that test ordered |
| 01:34:56 | 11 | for patients? |
| 01:34:56 | 12 | A.  My impression would be once or twice a month; 10 to 15 a |
| 01:35:02 | 13 | year. |
| 01:35:02 | 14 | Q.  I'm sorry? |
| 01:35:04 | 15 | A.  10 to 15 a year. |
| 01:35:06 | 16 | Q.  And is that the same type of rate at which you've seen |
| 01:35:12 | 17 | this condition while you have been working at the Swedish |
| 01:35:14 | 18 | American Group? |
| 01:35:16 | 19 | A.  Yes. |
| 01:35:16 | 20 | Q.  As well as when you worked with the disadvantaged |
| 01:35:18 | 21 | populations that you worked with in both Texas and at the |
| 01:35:20 | 22 | Crusader Clinic? |
| 01:35:22 | 23 | A.  To my recollection. |
| 01:35:22 | 24 | Q.  When you need to have this carotid Doppler test done, do |
| 01:35:32 | 25 | you do that test? |

01:35:32  1  A.  No, I don't.

01:35:32  2  Q.  Where do you send your patients to have it done?

01:35:34  3  A.  I refer my patients to the Swedish American Hospital where

01:35:38  4  they have the people with the requisite training to perform it

01:35:44  5  and interpret it.

01:35:44  6  Q.  When you say the requisite training to interpret it, what,

01:35:46  7  in your experience, is the requisite training that is

01:35:48  8  necessary to interpret carotid Doppler examinations?

01:35:52  9  A.  The tests that I referred in the 30 years that -- the 29

01:35:58  10  years I have been practicing have always been interpreted by

01:36:04  11  radiologists.

01:36:04  12  Q.  What about vascular surgeons?

01:36:06  13  A.  They also spend a fair amount of time getting that

01:36:12  14  training as well.  We often work with a vascular surgeon or do

01:36:16  15  work with a vascular surgeon on someone who does have a

01:36:20  16  blockage in the artery in their neck.  My particular practice

01:36:24  17  has always been to send the patient to the hospital, and the

01:36:26  18  report is sent to the vascular surgeon as well.  I know that

01:36:30  19  in Rockford there are vascular surgeons also who have the

01:36:34  20  equipment and will interpret their own.

01:36:36  21  Q.  As a board certified internist for 30 years, would you

01:36:38  22  feel competent to review the results of a carotid Doppler

01:36:42  23  test?

01:36:44  24  A.  I'd read the report.  I wouldn't look at the images.

01:36:46  25  Q.  Would you want to review the data that came off the actual

| | | |
|---|---|---|
| 01:36:50 | 1 | test and determine and write up a report interpreting that |
| 01:36:52 | 2 | data? |
| 01:36:54 | 3 | A.  Well, I wouldn't do that, but, again, the report is sent |
| 01:36:58 | 4 | to me. |
| 01:36:58 | 5 | Q.  You previously indicated that you're familiar with the |
| 01:37:02 | 6 | diagnostic test referred to as a transcranial Doppler study of |
| 01:37:06 | 7 | the intercranial arteries. |
| 01:37:08 | 8 | A.  I am somewhat familiar with it, but I have not ordered it. |
| 01:37:12 | 9 | Q.  What is it? |
| 01:37:12 | 10 | A.  It's a test where -- another ultrasound test where the |
| 01:37:18 | 11 | jelly and the wand are applied in various positions around the |
| 01:37:20 | 12 | head in order not to study these large arteries in the neck |
| 01:37:24 | 13 | but the smaller arteries in the brain. |
| 01:37:26 | 14 | Q.  Do you have an understanding of what it's used for? |
| 01:37:30 | 15 | A.  My understanding is that it's used in patients who |
| 01:37:34 | 16 | actually have already had a stroke to see their circulation |
| 01:37:38 | 17 | inside the brain. |
| 01:37:38 | 18 | Q.  Is this a test that you have administered before? |
| 01:37:42 | 19 | A.  No, it's not. |
| 01:37:42 | 20 | Q.  A test that you've ordered before? |
| 01:37:44 | 21 | A.  No, it's not. |
| 01:37:44 | 22 | Q.  Why not? |
| 01:37:44 | 23 | A.  I haven't needed it. |
| 01:37:46 | 24 | Q.  Is it a test that one would expect to see in an internal |
| 01:37:50 | 25 | medicine doctor's office? |

01:37:50  1  A.  No, it's not.

01:37:52  2  Q.  You previously indicated that you're familiar with the

01:37:56  3  diagnostic test referred to as a pulmonary function test or

01:38:00  4  PFT?

01:38:00  5  A.  Yes.

01:38:00  6  Q.  What is a pulmonary function test?

01:38:04  7  A.  It's a test that's intended to find out how the lungs are

01:38:06  8  working.  In the simplest and most common iteration of it,

01:38:12  9  someone blows into something like a vacuum cleaner hose after

01:38:16  10  they have inflated their lungs completely, and they blow out

01:38:18  11  as hard as they can, and it determines how much air you blow

01:38:22  12  out and how fast you blow it out.

01:38:22  13  Q.  What is it used for?  What is the test ordered for?

01:38:28  14  A.  Well, I would use it in someone who had asthma and I was

01:38:34  15  not satisfied with the therapy or if I had some doubt about

01:38:40  16  their diagnosis of asthma.  It's also used for a condition

01:38:44  17  called chronic obstructive pulmonary disease, which is a

01:38:48  18  variant -- it's a disease like asthma, but has different

01:38:54  19  causes than asthma.  There are also much less common diseases

01:39:00  20  where it's important to find how well someone's lungs are

01:39:04  21  functioning, how much air is able to get in, how much air is

01:39:08  22  able to get out.  Pulmonary fibrosis is one, sarcoidosis is

01:39:14  23  one, but those are much less common than common obstructive

01:39:20  24  pulmonary disease.

01:39:20  25  Q.  What is common obstructive pulmonary disease?

01:39:26  1  A.  Conducting the air into the lungs, you have, of course, a
01:39:28  2  big tube from your throat into the main branches into each
01:39:32  3  lung, and those airways branch further and further and further
01:39:38  4  until they get into the tiny sacs that exchange the good air
01:39:42  5  for the bad air.  These smaller airways have muscles around
01:39:50  6  them so they can control the velocity that the air can get in
01:39:54  7  and out of your lungs.  And in something like chronic
01:39:56  8  obstructive pulmonary disease, something has happened to those
01:40:02  9  smaller conducting tubes so that it's much harder for the air
01:40:06  10  to get out than it would be in a healthy person.
01:40:08  11  Q.  Who should administer a PFT?
01:40:10  12  A.  Someone who is trained in the technique.  There are
01:40:14  13  complex machines that determine a variety of physiologic
01:40:20  14  measurements and supermachines that are sometimes used in
01:40:24  15  doctor's offices.  In the doctor's office version, again,
01:40:28  16  similar to an electrocardiogram with a little bit more
01:40:32  17  sophistication, someone properly trained in using a machine
01:40:36  18  like that would administer the test.
01:40:38  19  Q.  Is it a test that you've administered in the past?
01:40:40  20  A.  No, I haven't.
01:40:40  21  Q.  Is it a test that you've ordered for your patients in the
01:40:42  22  past?
01:40:44  23  A.  Yes, I have.
01:40:44  24  Q.  Is it a test that is used for general monitoring of
01:40:48  25  patients?

01:40:48    1    A.  No.

01:40:48    2    Q.  Is it a test that would be ordered by a physician without

01:40:52    3    a prior examination of a patient?

01:40:54    4    A.  No.

01:40:54    5    Q.  Is it a test that is used for general health screening?

01:40:58    6    A.  No.

01:40:58    7    Q.  Why not?

01:40:58    8    A.  One wouldn't know whether it's necessary.

01:41:02    9    Q.  Well, what are the types of symptoms or conditions that

01:41:04   10    would justify ordering this test for a patient?

01:41:08   11    A.  Someone who has difficulty breathing when you wouldn't

01:41:12   12    expect it.  If, you know, I am getting up to the courtroom

01:41:16   13    here from the lunchroom, I decided to take the stairs, so I

01:41:20   14    was out of breath after I walked up ten flights of stairs,

01:41:22   15    that's not surprising for someone like myself to have that

01:41:24   16    problem.  If I could not get up one flight of stairs before I

01:41:28   17    had to stop and catch my breath, that's difficulty breathing

01:41:32   18    or shortness of breath that I think would require further

01:41:36   19    evaluation.

01:41:36   20         Some people have difficulty like that at rest.  Some

01:41:40   21    people have that kind of difficulty only in certain

01:41:42   22    atmospheric conditions; for example, when it's cloudy out or

01:41:46   23    when they're in dusty environments or something like that.

01:41:48   24    Q.  So when you say "at rest," those kinds of symptoms at

01:41:54   25    rest, what do you mean by that?

01:41:54   1   A.  As I am now, seated, someone who is not mobile.

01:41:58   2   Q.  Absent those symptoms or conditions, would you order a

01:42:04   3   pulmonary function test?

01:42:04   4   A.  No.

01:42:06   5   Q.  Is it a test that you would require of a patient every

01:42:08   6   month?

01:42:08   7   A.  No.

01:42:10   8   Q.  What's the frequency that you have seen that test ordered

01:42:16   9   in your practice over the last 30 years?

01:42:18   10   A.  I would say that's 10 to 12 a year, one a month perhaps in

01:42:26   11   my personal practice, and, again, in the colleagues that I am

01:42:30   12   aware of, that seems to be about the case as well.

01:42:32   13   Q.  Is it a test that you would expect to see greater need for

01:42:34   14   in a younger or older population?

01:42:36   15   A.  Older people are more likely to have the chronic

01:42:40   16   obstructive pulmonary disease, younger people are more likely

01:42:44   17   to have the asthma, so my impression would be it ought to be a

01:42:50   18   push there.

01:42:50   19   Q.  Is it a test that you would expect to see with any greater

01:42:58   20   degree of frequency in an economically disadvantaged

01:43:02   21   population?

01:43:02   22   A.  Again, economically disadvantaged patients are more likely

01:43:08   23   to be ill than non-economically disadvantaged patients.

01:43:12   24   Q.  When you worked at the Crusader Clinic, when you worked

01:43:16   25   down in Texas, how often did you find the need to order a

01:43:20　1　patient to go and get a pulmonary function test?

01:43:22　2　A.　No more than two a month.

01:43:24　3　Q.　Do you consider yourself qualified to read the results

01:43:30　4　generated, not the report, but the results generated by a

01:43:34　5　pulmonary function test?

01:43:36　6　A.　I know what the tracings look like, but, again, I depend

01:43:38　7　on an interpretation from an expert.

01:43:40　8　Q.　Well, what kind of expert would you want to interpret

01:43:44　9　those tracings?

01:43:44　10　A.　We mentioned them before, the pulmonary medicine doctors

01:43:52　11　or the pulmonologists.

01:43:52　12　Q.　Dr. Herdeman, are you familiar with the diagnostic test

01:43:58　13　referred to as a thoracic impedence cardiography test or an

01:44:02　14　ICG?

01:44:02　15　A.　We talked about that earlier this afternoon.

01:44:04　16　Q.　And once again, is that a test that you would expect to

01:44:08　17　see administered often?

01:44:08　18　A.　No.

01:44:10　19　Q.　Are you familiar with a test referred to as a nerve

01:44:14　20　conduction test?

01:44:16　21　A.　Yes.

01:44:16　22　Q.　What is a nerve conduction test?

01:44:18　23　A.　A nerve conduction test is used to study the amplitude and

01:44:22　24　the speed of impulses in a peripheral nerve.　A peripheral

01:44:28　25　nerve is a nerve after it's come out of the spinal cord and

01:44:32   1   into one of the limbs.

01:44:34   2   Q.  What is that test used for?

01:44:36   3   A.  It's used to study whether the pain someone is feeling is

01:44:40   4   from a diseased nerve, it's used to find whether the weakness

01:44:44   5   someone is experiencing in one their limbs is due to a

01:44:46   6   diseased nerve.

01:44:48   7   Q.  How is that test administered?

01:44:50   8   A.  Electrodes are inserted at two points along the nerve path

01:44:54   9   and an impulse is generated and the amplitude and velocity of

01:45:00  10   the nerve impulse are studied.

01:45:02  11   Q.  I'm sorry.  I did not mean to interrupt you.

01:45:04  12        What type of electrodes are used?  How does it

01:45:08  13   administer it?

01:45:08  14   A.  Well, needles are punctured in the skin close to the nerve

01:45:12  15   so that that that impulse can be recorded.

01:45:14  16   Q.  Is that -- who should administer this type of test where

01:45:20  17   you are puncturing needles into people's nerves?

01:45:22  18   A.  A properly trained technician.

01:45:24  19   Q.  Is it a test that's routinely used for general monitoring

01:45:28  20   of patients?

01:45:28  21   A.  No.

01:45:28  22   Q.  Is it a test that's used by a physician without a prior

01:45:30  23   examination of a patient?

01:45:30  24   A.  No.

01:45:32  25   Q.  Why not?

01:45:32  1  A.  One doesn't know if it's necessary.

01:45:34  2  Q.  Well, what are the symptoms or conditions that would

01:45:38  3  justify the application of that test?

01:45:38  4  A.  The most common reason that I have gotten tests like this

01:45:44  5  is for something called carpal tunnel syndrome where there's

01:45:48  6  numbness in a certain part of the hand.  The therapy for that

01:45:50  7  may involve doing an operation to release the flexor

01:45:56  8  retinaculum or the tendon over that particular nerve, and it's

01:46:00  9  something you wouldn't do lightly.  You would want to make

01:46:02  10  sure that in fact that nerve is damaged.  And even if someone

01:46:06  11  has the typical symptoms, the consultants that I work with

01:46:12  12  wouldn't do the surgery without establishing that there was

01:46:14  13  evidence of damage to that nerve.  It might --

01:46:18  14  Q.  I'm sorry.

01:46:18  15  A.  It might also be used in someone who has pain in their arm

01:46:24  16  due to pressure from one of the intervertebral or the disk

01:46:32  17  between the bones in the neck.  It might also be used in

01:46:36  18  someone who has a much rarer disease like myasthenia gravis or

01:46:42  19  Lou Gehrig disease.

01:46:42  20  Q.  Absent one of those conditions, though, is this a test you

01:46:46  21  would order?

01:46:46  22  A.  Absent something like that, no.

01:46:48  23  Q.  How often do you order these nerve conduction tests in

01:46:54  24  your practice?

01:46:54  25  A.  That would be well under one a month; five to eight a

01:47:00   1   year.

01:47:00   2   Q.  And is this a painful test for a patient?

01:47:02   3   A.  Well, again, it involves inserting needles, so there would

01:47:06   4   be some degree of discomfort involved.

01:47:08   5   Q.  Who should review the tests of a nerve conduction test?

01:47:12   6   A.  A neurologist.

01:47:14   7   Q.  Would you yourself want to review the test results before

01:47:18   8   a report was written?

01:47:20   9   A.  I read the report.  I don't interpret the tracings.

01:47:22  10   Q.  Dr. Herdeman, are you generally familiar with what is

01:47:26  11   referred to as a CPT code?

01:47:28  12   A.  Yes.

01:47:30  13   Q.  What does CPT stand for?

01:47:32  14   A.  Current procedural terminology.

01:47:34  15   Q.  What are CPT codes?

01:47:36  16   A.  Those are five digit codes that are meant to use or to

01:47:40  17   apply all the myriad kinds of medical services one could get

01:47:46  18   in a uniform manner so that physicians and other healthcare

01:47:50  19   organizations are doing the same thing, charging for the same

01:47:56  20   service.

01:47:58  21   Q.  What is the role of the CPT code in insurance billing?

01:48:02  22   A.  The CPT code is what someone submits to an insurance

01:48:08  23   company in order to get paid for that particular service, and

01:48:12  24   every insurance company has a rate book regarding what they

01:48:16  25   will pay for each particular CPT code service.

01:48:20  1   Q.  And are those codes published?

01:48:22  2   A.  Yes, they are.

01:48:24  3   Q.  In what format, sir?

01:48:26  4   A.  I get it in the book form.  I understand it's also

01:48:28  5   published electronically.

01:48:30  6   Q.  Dr. Herdeman, I am going to show you what's been marked as

01:48:36  7   Government Exhibit 700, 701, 702, and 703.  I will start with

01:49:12  8   701, 2, and 3.  Now I will hand you 700.

01:49:32  9   A.  Thank you.

01:49:32 10   Q.  Dr. Herdeman, have you seen those types of books before?

01:49:36 11   A.  Yes.

01:49:36 12   Q.  What are Government Exhibits 700, 701, 702, and 703?

01:49:42 13   A.  These are the CPT manuals for the years 2007 through 2010.

01:49:46 14   Q.  Who are those published by?

01:49:48 15   A.  The American Medical Association.

01:49:50 16   Q.  And once again, those are used for billing purposes?

01:49:52 17   A.  Yes.

01:49:54 18        MR. HAMMERMAN:  Your Honor, at this point in time,

01:49:56 19   the government would seek to admit what's been marked as

01:50:00 20   Government Exhibit 700, 701, 702, and 703.

01:50:02 21        THE COURT:  Any objection?

01:50:04 22        MR. ORMAN:  No.

01:50:04 23        THE COURT:  Government Exhibits 700 through 703 are

01:50:10 24   admitted.

01:50:10 25     (Above-mentioned exhibits were received in evidence.)

01:50:22  1    THE COURT:  Does it include 704, or is that something
01:50:24  2  else?
01:50:26  3    MR. HAMMERMAN:  That's something else, your Honor.
01:50:26  4    THE COURT:  All right.
01:50:28  5  BY MR. HAMMERMAN:
01:50:28  6  Q.  These books that we now admitted into evidence, for
01:50:36  7  example, a CPT code for 7000 -- 2007, these are used in the
01:50:42  8  billing process?
01:50:42  9  A.  Yes.
01:50:42 10  Q.  Do you do your own billing, Dr. Herdeman?
01:50:46 11  A.  No, no.
01:50:46 12  Q.  Why not?
01:50:46 13  A.  It would interfere with my doing my other duties.
01:50:50 14  Q.  Do you hire what's referred to as a biller to do that?
01:50:54 15  A.  Right.
01:50:54 16  Q.  What is the role of a biller?
01:50:56 17  A.  A biller collects the information regarding what I claim
01:51:00 18  that a patient has seen me for, what diseases or other
01:51:04 19  conditions they might have, along with the services that I
01:51:06 20  render matches those on -- I think it's not actually a slang
01:51:12 21  term, but it's referred to as a superbill, and that is
01:51:16 22  submitted either on paper or electronically to the insurance
01:51:20 23  company that will pay the bill.
01:51:22 24  Q.  In your experience, is it important that the CPT code
01:51:28 25  accurately reflect the service that you've provided?

01:51:30  1   A.  Yes.

01:51:30  2   Q.  And do these books that sit in front of you, do they have,

01:51:34  3   in fact, codes for virtually every procedure that you as a

01:51:40  4   physician perform?

01:51:40  5   A.  Yes.

01:51:40  6   Q.  Is it those codes that relate to the insurance companies

01:51:46  7   what you have done on the patients for whom you are billing?

01:51:50  8   A.  Yes.

01:51:50  9   Q.  Dr. Herdeman, are you familiar with what's referred to as

01:51:54  10  an ICD-9 code?

01:51:58  11  A.  Yes.

01:51:58  12  Q.  What are ICD-9 codes?

01:52:04  13  A.  That's the International Classification of Disease Manual,

01:52:06  14  and that matches the condition that a patient might have with

01:52:12  15  a particular number.  These are different from the CPT codes.

01:52:16  16  These usually involve a decimal point and have anywhere from

01:52:22  17  three to five numbers involved.

01:52:24  18  Q.  And you said it's for a condition.  What do you mean by a

01:52:26  19  condition?

01:52:26  20  A.  Well, let's say, for example, someone decided that it was

01:52:32  21  time they just had to get a checkup and see what was the

01:52:34  22  matter with them, the kind of condition they have, let's hope

01:52:40  23  they are not ill at all, but they would be getting a routine

01:52:44  24  physical exam, and the code for that is V-70.0, and there's a

01:52:52  25  variety.  If someone is getting ready to be a day care worker

01:52:54  1   or run a day care in their home, they need a certain kind of

01:52:58  2   state certification, so they need an exam for legal purposes.

01:53:02  3   That's V-701.1, or some similar number.  And there are a

01:53:06  4   variety of codes that have the V in front that are not related

01:53:12  5   to disease, but if someone has high blood pressure, for

01:53:16  6   example, that code is 401.1.

01:53:20  7   Q.  Without quizzing you on the codes, Dr. Herdeman, is it

01:53:24  8   fair to say that the ICD-9 code books contain the codes for

01:53:24  9   most, not all, of the conditions and diseases that physicians

01:53:32  10  need for which they then need to render service for?

01:53:34  11  A.  And even if it's not in there, they always have a

01:53:36  12  miscellaneous category.

01:53:38  13  Q.  What are ICD-9 codes used for in the medical services

01:53:44  14  billing process?

01:53:46  15  A.  For the service that I am billing, it's done for a

01:53:50  16  particular purpose.  If I am submitting the IC- -- the CPT

01:53:56  17  code for a routine physical or preventative visit, I would

01:54:00  18  match that with that V-7.0 code that I mentioned before.  If

01:54:06  19  they come in because they are coughing and bringing up mucous

01:54:08  20  and I think they have bronchitis, I list the ICD-9 code for

01:54:12  21  bronchitis and then list the service that I think I rendered

01:54:16  22  to them next to that.

01:54:16  23  Q.  Are ICD-9 codes maintained in any particular book or

01:54:24  24  catalog?

01:54:24  25  A.  There's an ICD-9 manual, yes.

| | | |
|---|---|---|
| 01:54:28 | 1 | Q.  I am going to show you, Dr. Herdeman, what's been marked |
| 01:54:32 | 2 | as Government Exhibit 704, 705, 706, and 707. |
| 01:54:58 | 3 | Have you had a chance to review those particular |
| 01:55:04 | 4 | exhibits, Dr. Herdeman? |
| 01:55:04 | 5 | A.  These look like the ICD-9 manuals for the years 2007 |
| 01:55:12 | 6 | through 2010. |
| 01:55:12 | 7 | Q.  Are those the type of manuals that you rely on or that |
| 01:55:16 | 8 | physicians rely on for purposes of coding their diagnosis and |
| 01:55:20 | 9 | conditions in patients? |
| 01:55:22 | 10 | A.  Yes. |
| 01:55:22 | 11 | MR. HAMMERMAN:  At this point in time, your Honor, |
| 01:55:24 | 12 | the government would seek to admit what's been marked as |
| 01:55:28 | 13 | Government Exhibit 704, 705, 706, and 707. |
| 01:55:32 | 14 | MR. ORMAN:  No objection. |
| 01:55:32 | 15 | THE COURT:  Government Exhibit 704 through and |
| 01:55:36 | 16 | including 707 are admitted. |
| 01:55:38 | 17 | (Above-mentioned exhibits were received in evidence.) |
| 01:55:38 | 18 | MR. HAMMERMAN:  Thank you, your Honor. |
| 01:55:40 | 19 | BY MR. HAMMERMAN: |
| 01:56:30 | 20 | Q.  Dr. Herdeman, I am going to show you what's been marked as |
| 01:56:34 | 21 | Government Exhibit 800.  Have you seen this exhibit before, |
| 01:56:54 | 22 | Dr. Herdeman? |
| 01:56:54 | 23 | A.  Yes, I have. |
| 01:56:54 | 24 | Q.  What is reflected on page 1 of Government Exhibit 800? |
| 01:56:58 | 25 | A.  These are -- it looks like about eight CPT codes, nine CPT |

01:57:10    1    codes.

01:57:10    2    Q.  And looking on page 2, what's on page 2 of Government

01:57:14    3    Exhibit 800?

01:57:14    4    A.  This is eight ICD-9 codes.

01:57:18    5    Q.  Have you checked the codes associated with these

01:57:26    6    particular CPT codes and these particular ICD-9 codes with the

01:57:32    7    conditions and the services prior to your testimony today?

01:57:34    8    A.  I have seen these.  Now, let's see.  I can imagine, for

01:57:40    9    example, chest pain is something that would go with

01:57:44   10    electrocardiogram.

01:57:44   11    Q.  I'm sorry, Dr. Herdeman.  I might have been unclear.

01:57:48   12            Have you checked the CPT codes associated with the

01:57:50   13    tests that are listed and the ICD-9 codes for the conditions

01:57:54   14    that are listed?  Are those the correct codes?

01:57:56   15    A.  I'm sorry, yes.  On each page, yes.  To my knowledge,

01:58:02   16    780.2 is syncope and collapse.

01:58:04   17            MR. HAMMERMAN:  At this point in time, the government

01:58:06   18    would seek to admit what's been marked as Government Exhibit

01:58:08   19    800.

01:58:10   20            MR. ORMAN:  Objection.

01:58:10   21            THE COURT:  All right.  The ruling is deferred on

01:58:14   22    800.

01:58:14   23    BY MR. HAMMERMAN:

01:58:22   24    Q.  Dr. Herdeman, those CPT 9 books -- I'm sorry -- those CPT

01:58:30   25    code books and those ICD-9 books, are they -- for the general

01:58:34  1   layman, are these books easy for a person to pick up and

01:58:38  2   review?

01:58:38  3   A.  No, they are not.

01:58:40  4   Q.  Is this something that people in the medical services

01:58:46  5   industry use in their profession?

01:58:48  6   A.  It is.

01:58:48  7   Q.  Do they contain all of the CPT 9 (sic) codes for -- I'm

01:58:52  8   holding an ICD-9 code -- for example, Government Exhibit 707

01:58:58  9   or 706 -- are all of those ICD-9 codes the same as in

01:59:04  10  Government Exhibit 800?

01:59:04  11  A.  Yes, these numbers on the blue page here.

01:59:10  12  Q.  Would it be difficult for a layman to look through this

01:59:14  13  entire volume and try to find those particular conditions and

01:59:16  14  those particular ICD-9 codes?

01:59:18  15          MR. ORMAN:  Objection.  No foundation as to a layman.

01:59:22  16          THE COURT:  Sustained.

01:59:24  17  BY MR. HAMMERMAN:

01:59:24  18  Q.  As a physician, do you find it difficult to go through

01:59:28  19  some of these books and find all of these conditions and

01:59:30  20  codes?

01:59:30  21  A.  Well, in an attempt to make it easier for people to refer

01:59:34  22  to the book, they list it alphabetically and they are also

01:59:38  23  listed serially by number.  Now, there's the 100 section, the

01:59:46  24  200 section.  But even with that being the case, there are

01:59:50  25  many nuances that might make it hard to cross-reference one

01:59:52  1  section to another.

01:59:54  2  Q.  And once again, you have checked the CPT code with the

01:59:58  3  tests and ICD-9 codes with conditions that are in Government

02:00:04  4  Exhibit 800?

02:00:04  5  A.  Yes.

02:00:04  6  Q.  Okay.  Dr. Herdeman, I am going to hand you now a stack of

02:00:14  7  patient files that have already been admitted into evidence.

02:00:22  8         THE COURT:  Would you identify for the record what

02:00:24  9  you handed him.

02:00:24  10        MR. HAMMERMAN:  Yes, your Honor.  It's Government

02:00:26  11  Exhibit 310, 320, 330, 340, 350, 360, 370, and 395.  I might

02:01:00  12  have misspoken, so I want to correct myself, if possible, your

02:01:02  13  Honor.  It's 310, 320, 330, 340, 350, 360, and 370.

02:01:28  14  BY MR. HAMMERMAN:

02:01:28  15  Q.  Now, Dr. Herdeman, I want to ask you some questions about

02:01:32  16  some of these exhibits.  They have already been introduced

02:01:36  17  into evidence.  I am going to start with Government Exhibit

02:01:38  18  320.  It's a patient file in the name of Terrell Cole, and ask

02:01:44  19  you to turn to the page entitled CGCM Patient Progress Report.

02:01:50  20  Do you see that?  It might have a bright sticker like this on

02:01:58  21  it.

02:02:00  22  A.  It's marked 2/23/10, dated 2/23/10?

02:02:06  23  Q.  Yes.

02:02:08  24         Are you generally familiar with what is referred to

02:02:10  25  in the medical field as a progress note?

02:02:12  1   A.  Yes, I am.

02:02:12  2   Q.  What is a progress note?

02:02:14  3   A.  It's a notation that's supposed to contain the essence of

02:02:20  4   your interview with the patient, the significant listing of

02:02:24  5   what their symptoms might be and also the significant portions

02:02:28  6   of their examination that would lead you to the conclusion

02:02:32  7   that they had a particular diagnosis and required a particular

02:02:36  8   kind of treatment.

02:02:36  9   Q.  Why are progress notes important?

02:02:40  10  A.  So that I know what I have done and can refer to it later,

02:02:44  11  anyone that I am working with can know what I have done and

02:02:46  12  refer to it later, and any other party who might have interest

02:02:50  13  in what I have done can refer to it later as well.

02:02:52  14  Q.  In your training and experience, are progress notes

02:02:56  15  relevant to insurance billing and coverage?

02:02:58  16  A.  Yes, they are.

02:02:58  17  Q.  In what way?

02:03:02  18  A.  So that what has been thought of and done by the physician

02:03:04  19  is what, in fact, has been billed for.

02:03:08  20  Q.  In your opinion, is it important for patient charts to

02:03:14  21  accurately reflect their medical condition and the services

02:03:18  22  provided to them?

02:03:18  23  A.  Yes.

02:03:20  24  Q.  Why is that?

02:03:20  25  A.  So that they're accurately diagnosed and properly treated.

| | | |
|---|---|---|
| 02:03:24 | 1 | Q.  Is it important for insurance purposes for patient |
| 02:03:30 | 2 | progress notes to accurately reflect the conditions of a |
| 02:03:34 | 3 | patient and the services provided to them? |
| 02:03:36 | 4 | A.  Yes. |
| 02:03:38 | 5 | Q.  Why is that? |
| 02:03:40 | 6 | A.  Once again, so that the proper service is ordered and the |
| 02:03:44 | 7 | proper service is billed for and paid for. |
| 02:03:46 | 8 | Q.  If you look at the progress note in Government Exhibit |
| 02:03:52 | 9 | 320, the progress note for a patient whose name is listed as |
| 02:03:58 | 10 | Terrell Cole, you will see that there was an EKG listed in the |
| 02:04:02 | 11 | testing section.  Do you see that, Dr. Herdeman? |
| 02:04:04 | 12 | A.  Yes, I do. |
| 02:04:04 | 13 | Q.  Earlier in your testimony, you mentioned that a heart |
| 02:04:08 | 14 | murmur was one of the conditions that you thought could |
| 02:04:10 | 15 | justify a patient receiving an EKG; is that right? |
| 02:04:14 | 16 | A.  Yes. |
| 02:04:14 | 17 | Q.  What is a heart murmur? |
| 02:04:18 | 18 | A.  A heart murmur, again, is a noise produced by turbulent |
| 02:04:22 | 19 | flow through the valves in the heart. |
| 02:04:24 | 20 | Q.  Are there different kinds of heart murmurs? |
| 02:04:26 | 21 | A.  It depends on what valve is involved and what part of the |
| 02:04:30 | 22 | heart cycle is involved, and according to the broader |
| 02:04:36 | 23 | characteristics of what's the matter with the heart valve, it |
| 02:04:40 | 24 | might be early or later, it might be louder or quieter. |
| 02:04:44 | 25 | Q.  Are there, in fact, different kinds? |

02:04:46  1   A.  Yeah.

02:04:46  2   Q.  Do physicians have a system for categorizing the type of
02:04:50  3   heart murmurs that exist?

02:04:52  4   A.  Yes, they do.

02:04:54  5   Q.  Can you describe for the jury the different types of heart
02:04:58  6   murmurs that there are?

02:04:58  7   A.  Okay.  Well, there are two cycles of the heart, the part
02:05:06  8   of the cycle where it's relaxing and allowing the blood to get
02:05:10  9   into the heart, that's called diastole, and the part of the
02:05:10  10  cycle where the heart is contracting and pushing the blood out
02:05:16  11  of the heart, that's called systole.  A heart murmur can occur
02:05:18  12  in either one of those times of the heart cycle, and then we
02:05:30  13  speculate which one of the two or where the defect in the
02:05:34  14  heart might be according to where we hear the murmur and what
02:05:40  15  part of the heart cycle it occurs.

02:05:42  16        We also rate it according to how loud the murmur
02:05:46  17  might be.  It's on a grade of 1 to 6.  Grade 1 is barely
02:05:52  18  audible or might be audible to some examiners and not others.
02:05:56  19  Grade 6 is a murmur that you could hear without even having to
02:06:00  20  use a stethoscope at all.

02:06:00  21  Q.  Is there a heart murmur noted on Terrell Cole's chart?

02:06:06  22  A.  Yes, there is.

02:06:06  23  Q.  Is that here in the diagnosis section?

02:06:08  24  A.  Yes.

02:06:08  25  Q.  Is there also another portion of the progress note where

| | | |
|---|---|---|
| 02:06:14 | 1 | the heart murmur is noted? |
| 02:06:16 | 2 | A.  Down on the bottom in the diagnosis section. |
| 02:06:20 | 3 | Q.  Other than that, is there another place in which a murmur |
| 02:06:22 | 4 | is noted in the chart? |
| 02:06:24 | 5 | A.  I don't see it here. |
| 02:06:28 | 6 | Q.  Is there a portion of the chart in which the type of |
| 02:06:32 | 7 | murmur is noted and rated? |
| 02:06:36 | 8 | A.  Yes, that should be in the physical examination section. |
| 02:06:38 | 9 | Q.  And let's start with looking at the chart as a whole.  Do |
| 02:06:44 | 10 | you see in the top there is a section that says Chief |
| 02:06:46 | 11 | Complaint?  What is usually put in a progress note under the |
| 02:06:48 | 12 | section that says Chief Complaint? |
| 02:06:50 | 13 | A.  Well, the chief complaint would be why the patient tells |
| 02:06:54 | 14 | you they're coming in. |
| 02:06:56 | 15 | Q.  What type of information should a physician put in the |
| 02:06:58 | 16 | chief complaint section of a progress note? |
| 02:07:00 | 17 | A.  Usually that's very brief.  It's headache, chest pain, |
| 02:07:06 | 18 | runny nose, something similar. |
| 02:07:08 | 19 | Q.  Then there is a section here that's listing things like |
| 02:07:12 | 20 | height, weight, BP.  Do you see that? |
| 02:07:16 | 21 | A.  Yes. |
| 02:07:16 | 22 | Q.  What's that information usually? |
| 02:07:18 | 23 | A.  That's vital statistics.  In this particular format, I see |
| 02:07:22 | 24 | they ask whether the patient is a smoker, and then I would |
| 02:07:28 | 25 | presume that hyphen after exam means that everything to the |

02:07:32  1   right there is part of their general exam, and HT for height,

02:07:36  2   and certainly that number appears to be a height, weight,

02:07:42  3   blood pressure is BP, pulse is pulse rate, RR would be

02:07:44  4   respiratory rate, TEMP is temperature, 98.7, that's a normal

02:07:52  5   temperature, and SPO2 is something to indicate what they call

02:07:56  6   oxygen saturation, how much of the hemoglobin in your blood

02:08:00  7   stream is saturated with oxygen.

02:08:02  8   Q.   Then looking to the left-hand side of the progress note,

02:08:06  9   there is a series of rows with titles like HEE and T neck,

02:08:12  10  cardiovascular.  Can you explain to the members of the jury

02:08:14  11  going down each row what those portions of the progress note

02:08:18  12  are for?

02:08:20  13  A.   The top line is head, eye, ear, nose and throat, and that

02:08:24  14  would be everything from the chin on up would be reported

02:08:28  15  under that section.  Neck would involve everything from the

02:08:32  16  top of the neck to the bottom of the neck.  Cardiovascular

02:08:36  17  would refer to the heart and the vessels around the heart.

02:08:40  18  Respiratory would be the part of the examination involving the

02:08:44  19  lungs.  Abdomen would be part of the examination involving the

02:08:50  20  abdominal organs.  Local motor is location, movement.  I

02:08:54  21  suppose here it would refer to the limbs and how the limbs

02:08:56  22  move.  Rectal would be regarding examining the rectum,

02:09:04  23  genitalia.  And neurologic would be the other aspects of the

02:09:08  24  nerve system including parts called the cranial nerves, how

02:09:12  25  those affect your eyes, your ears, your facial movements, your

02:09:18   1   sense of balance perhaps, your vision, those sorts of things.

02:09:20   2   Q.  Now, you mentioned before that there is a heart murmur

02:09:24   3   noted on this chart.  Do you see that?

02:09:26   4   A.  Yes.  Yes, I do.

02:09:26   5   Q.  There's also some notations in the cardiovascular section.

02:09:30   6   Do you see those, Dr. Herdeman?

02:09:32   7   A.  Well, that's where the heart murmur is listed.

02:09:34   8   Q.  Well, what is noted there -- what is your understanding of

02:09:38   9   that notation in Terrell Cole's chart?

02:09:40  10   A.  Well, what I presume is the case here is the RR means

02:09:46  11   regular rhythm.

02:09:46  12   Q.  What does that mean, Dr. Herdeman?

02:09:50  13   A.  That means the heart is beating the way your watch does.

02:09:56  14   There is an equal measure between each heartbeat.  It's a

02:09:56  15   regular rhythm.  And the Roman numeral two with a slash and

02:10:02  16   what I presume is a Roman numeral six means that he is rating

02:10:08  17   this heart murmur he is hearing as a grade two over six.  I

02:10:14  18   think what that would mean to me is that any person with a

02:10:18  19   functioning stethoscope would be able to hear this murmur, but

02:10:22  20   they would need the stethoscope to be able to hear it.

02:10:22  21        The ESM, I'm presuming, means ejection systolic

02:10:26  22   murmur, meaning that this is something caused by the ejection

02:10:36  23   of blood from what's called blood ventricle or the right

02:10:40  24   through the pulmonic or aortic valve either to the lungs or to

02:10:40  25   the rest of the body, and it's happening during the systolic

| | | |
|---|---|---|
| 02:10:44 | 1 | portion of the heart cycle. |
| 02:10:46 | 2 | Q.  If a patient has a heart murmur at one point in time, is |
| 02:10:48 | 3 | that a condition that you would expect to detect at a later |
| 02:10:52 | 4 | point in time when examining the patient? |
| 02:10:54 | 5 | A.  It would depend.  There are some heart murmurs that I |
| 02:10:58 | 6 | would expect to disappear.  There are others that I would |
| 02:11:02 | 7 | expect to be there always. |
| 02:11:02 | 8 | Q.  What's the difference? |
| 02:11:04 | 9 | A.  Heart murmurs can occur for what you call physiologic |
| 02:11:12 | 10 | reasons as well as because there's structural damage to the |
| 02:11:14 | 11 | heart.  An example is a pregnant woman.  A pregnant woman's |
| 02:11:18 | 12 | blood volume increases by more than 50 percent while she is |
| 02:11:22 | 13 | pregnant.  There is so much blood flowing through her heart |
| 02:11:28 | 14 | that it's very, very common to hear an ejection systolic |
| 02:11:32 | 15 | murmur in a pregnant woman; and if she didn't have it before |
| 02:11:36 | 16 | she was pregnant, you wouldn't expect her to have it after she |
| 02:11:40 | 17 | was no longer pregnant. |
| 02:11:40 | 18 | Q.  If you detected a heart murmur in an otherwise normal |
| 02:11:44 | 19 | looking, healthy young male, would you extend your physical |
| 02:11:50 | 20 | examination of that patient on the discovery of a heart |
| 02:11:52 | 21 | murmur? |
| 02:11:52 | 22 | A.  Well, yes, I would. |
| 02:11:54 | 23 | Q.  How would you extend your examination and what would you |
| 02:11:58 | 24 | do? |
| 02:11:58 | 25 | A.  First I would ask other questions.  I would ask if they |

02:12:02  1  were told they had a heart murmur before.  That's important

02:12:06  2  information to know.  Then I would ask them things -- one of

02:12:08  3  the things I don't see on this note is something referred to

02:12:10  4  as a review assistance where you ask questions about their

02:12:18  5  various physiologic symptoms.  So I would ask, do you have

02:12:22  6  trouble getting upstairs, are there other situations when you

02:12:26  7  run out of breath and you don't expect to, have you ever

02:12:28  8  fainted spontaneously and weren't aware why that might be?

02:12:34  9  Also, I would in the examination portion, I would perhaps have

02:12:40  10  them assume various postures.  I might have them roll over to

02:12:42  11  their left, I might have them sit up and hold their breath, I

02:12:46  12  might have them squat, listening to their heart while they are

02:12:50  13  performing those maneuvers to see if the murmur changes at

02:12:54  14  all.

02:12:54  15  Q.  Why would that be important -- let's take those kind of

02:12:58  16  two sections one at a time.

02:13:02  17         Why would it be important for you to ask all those

02:13:04  18  questions about the background and history of the physical

02:13:06  19  condition of the patient if you detected this heart murmur?

02:13:08  20  A.  First of all, if they told me they felt fine and they

02:13:12  21  jogged three miles every other day and they don't have chest

02:13:16  22  pain and they haven't fainted, I would be much more likely to

02:13:20  23  presume that it's a physiologic murmur and perhaps not truly a

02:13:26  24  sign of disease.  If during my physical examination, I rolled

02:13:30  25  them over on their right --

02:13:34    1   Q.  I want to take those in two parts before you get to the

02:13:36    2   additional physical.

02:13:38    3           Do you think, though, that it's important to ask

02:13:40    4   those questions of a patient, whether or not they have

02:13:44    5   experienced what you described as kind of an inability to

02:13:48    6   breathe or fainting, are those important things to ask?

02:13:54    7   A.  Absolutely.

02:13:54    8   Q.  Are the answers to those questions important to note in

02:13:56    9   the patient's chart?

02:13:58   10   A.  Yes, they are.

02:13:58   11   Q.  Why?

02:13:58   12   A.  Once again, to note the seriousness of the condition, to

02:14:02   13   remind me that those symptoms are there, and to let anyone

02:14:06   14   else who needs to examine the record, like any of my

02:14:10   15   consultants, that these conditions exist, that those symptoms

02:14:16   16   exist under the circumstances listed.

02:14:16   17   Q.  You also mentioned that you would perform additional

02:14:22   18   physical examination of a patient?

02:14:22   19   A.  Yes.

02:14:24   20   Q.  Rolling them over, listening to them in different

02:14:26   21   positions with, I presume, a stethoscope?

02:14:28   22   A.  Yes.

02:14:28   23   Q.  Why is that important, why would you do that?

02:14:30   24   A.  The murmur may change its characteristics.  It may

02:14:34   25   disappear, it may become louder, it may become quieter, it may

02:14:40    1    become longer or it may become shorter, and all of those

02:14:44    2    things help indicate to me where, if there is a heart problem,

02:14:48    3    where it might be.

02:14:50    4    Q.  And would you, if you detected a grade 2 over 6 ESM heart

02:14:56    5    murmur, want to go ahead and perform that examination?

02:14:58    6    A.  Well, I'd certainly start by asking the initial questions

02:15:04    7    you talked about, whether they feel any symptoms that might be

02:15:08    8    indicative if they have a heart defect.  And with a murmur

02:15:16    9    like this, if they didn't indicate any history of the murmur

02:15:20    10   or didn't indicate any illness or didn't tell me that it had

02:15:24    11   already been established and diagnosed, I may not really need

02:15:30    12   to do anything else at all.

02:15:30    13   Q.  If you were to perform any of those additional physical

02:15:34    14   examinations, though, is that something you'd want to note in

02:15:36    15   your chart?

02:15:36    16   A.  Well, something that's often listed while we're training

02:15:40    17   is if it isn't written down, it didn't happen.  If I did it

02:15:44    18   and didn't put it down, there would be no record that it

02:15:46    19   actually occurred.

02:15:46    20   Q.  Why is it important to write it down, though?

02:15:50    21   A.  Once again to -- to document to me the findings I had at

02:15:54    22   the time, to document to any of my consultants or any other

02:15:58    23   people caring for this patient that he, in fact, had these

02:16:02    24   physical findings.

02:16:04    25   Q.  Dr. Herdeman, if a patient had a heart murmur, is that a

02:16:06 1 condition that you would then discuss with the patient?

02:16:08 2 A. Yes.

02:16:08 3 Q. Would you ever describe a heart murmur as a perfect

02:16:18 4 sounding condition?

02:16:20 5 A. No.

02:16:20 6 Q. Dr. Herdeman, if you turn further in the chart, you will

02:16:32 7 see that Terrell Cole -- there is a report in Terrell Cole's

02:16:36 8 chart for what appears to be an EKG. Do you see that? It

02:16:48 9 might also be on the screen to your right, if that's helpful.

02:16:50 10 A. It's not in the chart anymore.

02:16:56 11 Yes, I see it here.

02:16:58 12 Q. Okay. You mentioned before that these are tests that you

02:17:00 13 are able to read; is that right?

02:17:00 14 A. Yes.

02:17:02 15 Q. Are you able to read this EKG?

02:17:04 16 A. Yes.

02:17:04 17 Q. Do you see at the top of the EKG there is an indication

02:17:08 18 that says, Abnormal ECG?

02:17:12 19 A. Yes.

02:17:12 20 Q. Are you able, looking at this report, to see what is

02:17:20 21 reflected as abnormal?

02:17:22 22 A. Yes. Well, first of all, you will notice that at the top,

02:17:24 23 the computer that reads this actually generates a report, so

02:17:28 24 this is a computer-generated report to start with. Then the

02:17:32 25 abnormality they're referring to in greater detail up there is

02:17:38  1   in what are called V reads, the electrodes that are attached

02:17:44  2   across the chest, there is a certain form that we would expect

02:17:46  3   to see in these spikes.  And in most situations, this first

02:17:54  4   spike called an R waive gets bigger with each passing number

02:17:58  5   from V1 through V5 and possibly through V6.

02:18:04  6          In this case, you can see that there is a little

02:18:06  7   spike at V1, a little bigger spike in V2, but it's not very

02:18:12  8   much bigger, and actually a smaller spike at V3, which is not

02:18:14  9   an expected finding.  And you can see in this report, they

02:18:20  10  suggest that it is a possible anterior infarction or heart

02:18:28  11  attack of the front part of the heart.

02:18:30  12  Q.  It's a possible heart attack in the front part of the

02:18:34  13  heart?

02:18:34  14  A.  That's what the computer interpreted it.

02:18:36  15  Q.  Is that something that would concern a treating physician?

02:18:40  16  A.  It would.  And there are times what we find doesn't match

02:18:46  17  what we expect find.  And, for example, Mr. Cole is 30 or 31.

02:18:56  18  At the time, he was right around 30 when he had this

02:18:58  19  examination.  A heart attack is a very unusual thing to happen

02:19:02  20  to someone who is only 30 years old, so I would want to find

02:19:04  21  out if he has ever been told he had a heart attack or

02:19:08  22  remembered anything in his past that might indicate he might

02:19:10  23  have had a heart attack even if he didn't seek medical

02:19:14  24  attention for it.

02:19:14  25  Q.  Now, other than a heart attack, is there any other cause

02:19:18  1  that could have resulted in this particular type of

02:19:22  2  abnormality being reported in the EKG printout?

02:19:26  3  A.  There are a couple.  One is that although we all have

02:19:30  4  hearts, they are not situated in our chest the same way.  One

02:19:34  5  heart might be turned a little bit more forward, one heart

02:19:36  6  might be turned out a little bit or a little bit more to the

02:19:40  7  right or a little bit more to the left, so the position of the

02:19:42  8  heart might be different enough that these blips would be

02:19:48  9  different.

02:19:48  10       Also, it depends on where the leads are placed or

02:19:52  11  where the electrodes are placed on the chest.  Sometimes a

02:19:58  12  limited movement of where you put the electrode might result

02:20:04  13  in a substantially different tracing.

02:20:06  14  Q.  So if a medical assistant had improperly applied the

02:20:10  15  leads, that could also perhaps result in this type of --

02:20:14  16  A.  I wouldn't even call it necessarily improper.  Many

02:20:18  17  conscientious people doing things exactly as they have been

02:20:20  18  trained put the lead in a particular place, and it might -- it

02:20:24  19  isn't necessarily a mistake on their part.  There is enough

02:20:28  20  give and take on something like this that something similar to

02:20:32  21  this might happen.

02:20:34  22  Q.  Let me ask you this, Dr. Herdeman.  If you had an EKG

02:20:38  23  report that was the possible result of electrodes placed in

02:20:42  24  the position that didn't read correctly or a heart attack, is

02:20:48  25  that something that you'd want to further inquire about as a

02:20:50 1 treating physician?

02:20:52 2 A.  Yes.

02:20:52 3 Q.  What would you do, Dr. Herdeman?

02:20:56 4 A.  One of the first things I would ask is, have you ever had

02:21:02 5 an electrocardiogram before, and if you did, where is it and

02:21:06 6 perhaps we would get a copy prepared.

02:21:06 7 Q.  How quickly are these reports generated?

02:21:08 8 A.  They are just like a Kodak.  They are immediately

02:21:12 9 available.

02:21:12 10 Q.  And if you saw this kind of test result for one of your

02:21:18 11 patients, what kind of additional action might you take at

02:21:20 12 that time?

02:21:20 13 A.  Well, I would ask him about previous electrocardiograms

02:21:28 14 and try to find out if that was the case.  If he satisfied me

02:21:30 15 that he really is not at risk of having a heart attack or

02:21:34 16 didn't have a heart attack, I may ask him to come back in a

02:21:38 17 month and maybe we will do the electrocardiogram again to see

02:21:44 18 if that abnormality is still there.

02:21:44 19 Q.  What if a patient had a heart murmur and this kind of EKG

02:21:46 20 abnormality, what would you do in that situation?

02:21:50 21 A.  As I said, I would ask those questions and try to

02:21:54 22 determine the acuity of the situation to know when or if

02:22:00 23 another examination should be performed.

02:22:02 24 Q.  Would you characterize a patient with a heart murmur and

02:22:04 25 this kind of EKG reading as having a heart that's in perfect

| | | |
|---|---|---|
| 02:22:12 | 1 | operating condition? |
| 02:22:12 | 2 | A. I couldn't tell from this, no. |
| 02:22:14 | 3 | Q. Would you at least want to do some further testing? |
| 02:22:16 | 4 | A. Yes. |
| 02:22:16 | 5 | Q. And would you want further inquiry from your patient? |
| 02:22:18 | 6 | A. Right. That's where it would all start. |
| 02:22:20 | 7 | Q. Dr. Herdeman, I want you to turn to what's been marked as |
| 02:22:24 | 8 | Government Exhibit 340, which is the patient chart for Tiffany |
| 02:22:28 | 9 | Shirley-Terrell. Do you see that? |
| 02:22:42 | 10 | A. Yes. |
| 02:22:42 | 11 | Q. Can you please turn to the page that's been marked as |
| 02:22:46 | 12 | Patient Progress Report. |
| 02:22:46 | 13 | A. Is it dated March 4th, 2009? |
| 02:22:50 | 14 | Q. Correct. It's also up on the screen, if that makes life |
| 02:22:56 | 15 | any easier. |
| 02:22:56 | 16 | A. Thank you. |
| 02:22:56 | 17 | Q. Dr. Herdeman, do you see the diagnoses on this chart? |
| 02:23:02 | 18 | A. On the bottom, yes. |
| 02:23:04 | 19 | Q. What are the list of diagnoses? |
| 02:23:06 | 20 | A. Number one appears to be heart murmur; number two appears |
| 02:23:10 | 21 | to be chest pain; number three, carotid bruit; number four, |
| 02:23:16 | 22 | dizziness; number five is chest pain listed again; and number |
| 02:23:20 | 23 | six is SOB, which I think means shortness of breath. |
| 02:23:24 | 24 | Q. Dr. Herdeman, once again, I would like to start with the |
| 02:23:46 | 25 | first of those diagnoses, the heart murmur. Do you see that? |

| | | |
|---|---|---|
| 02:23:48 | 1 | A.  Yes. |

02:23:48   2   Q.  Going through this particular progress note once again,

02:23:52   3   are you able to see what type of heart murmur was recorded by

02:23:58   4   the physician that filled out this chart?

02:23:58   5   A.  Yes.  Again, it's under cardiovascular.  There is the R

02:24:04   6   and R, RR, which, I presume, means regular rate, and then the

02:24:08   7   rate two over six, or quiet heart murmur I presume, in the

02:24:14   8   ejection systolic part of the heart cycle.

02:24:16   9   Q.  Is this the exact same type of heart murmur that we just

02:24:20   10   saw for Terrell Cole?

02:24:22   11   A.  Yes, it is.

02:24:22   12   Q.  If we could move to diagnosis number two.  Do you see here

02:24:32   13   it says, Chest pain?

02:24:34   14   A.  Yes.

02:24:34   15   Q.  What does it mean when you see a diagnosis of chest pain

02:24:38   16   in a patient's medical chart?

02:24:40   17   A.  Well, that they're having pain in their chest, and since

02:24:44   18   there's lots of things in the chest, you would need quite a

02:24:50   19   bit further detail to have an idea what the chest pain is due

02:24:54   20   to.

02:24:56   21   Q.  What do you mean by that?

02:24:56   22   A.  Well, you would ask when they feel it, if they could

02:25:00   23   describe the sensation, what part of their chest hurts, how

02:25:04   24   long it lasts, what they do to make it worse, what they do to

02:25:08   25   make it better.

| | | |
|---|---|---|
| 02:25:08 | 1 | Q.  If a patient complained of chest pain, are those the types |
| 02:25:12 | 2 | of questions you would ask the patient? |
| 02:25:14 | 3 | A.  Yes. |
| 02:25:14 | 4 | Q.  Why is it important to ask those questions? |
| 02:25:20 | 5 | A.  To give you a much better idea of what might be the cause |
| 02:25:22 | 6 | of the chest pain.  Some causes of chest pain may not be life |
| 02:25:28 | 7 | threatening or perhaps not truly a detriment to their health |
| 02:25:32 | 8 | at all and we would expect them to resolve without any further |
| 02:25:40 | 9 | evaluation or treatment.  Other causes of chest pain could be |
| 02:25:42 | 10 | life threatening. |
| 02:25:44 | 11 | Q.  Would you want to record the answers to those types of |
| 02:25:48 | 12 | questions you asked the patient in their chart? |
| 02:25:50 | 13 | A.  Yes. |
| 02:25:50 | 14 | Q.  Why? |
| 02:25:50 | 15 | A.  Because it's vital for me to know what the response to |
| 02:25:54 | 16 | those questions was and how it made sense for me to do the |
| 02:25:58 | 17 | further evaluations that I needed to do on that patient. |
| 02:26:02 | 18 | Q.  Based on the answers to the type of questions that you |
| 02:26:04 | 19 | just told the jury, are there different types of tests and |
| 02:26:08 | 20 | procedures that you would recommend performing for a patient? |
| 02:26:12 | 21 | A.  Yes. |
| 02:26:12 | 22 | Q.  Is a diagnosis of chest pain a potentially serious |
| 02:26:18 | 23 | diagnosis for a patient? |
| 02:26:20 | 24 | A.  Yes.  If it's due to an impending heart attack, it could |
| 02:26:26 | 25 | be fatal. |

| | | |
|---|---|---|
| 02:26:26 | 1 | Q.  Do you see, in your review of the patient progress note |
| 02:26:32 | 2 | for Tiffany Shirley-Terrell, any reference to further inquiry |
| 02:26:40 | 3 | as to the type of chest pain that she was experiencing? |
| 02:26:40 | 4 | A.  I don't see any reference to pain at all.  In the second |
| 02:26:44 | 5 | remark under Chief Complaint, it does indicate that she has |
| 02:26:46 | 6 | asthma, and I am not sure what comes after that.  I think in |
| 02:26:52 | 7 | studying it, it may be the therapy that she's using for that, |
| 02:26:58 | 8 | the medicine that she's using, but I don't really see anything |
| 02:27:00 | 9 | that indicates a character or location or timing of the pain |
| 02:27:04 | 10 | at all. |
| 02:27:04 | 11 | Q.  And that is, as you said, something that you would want to |
| 02:27:08 | 12 | ask and note? |
| 02:27:08 | 13 | A.  Right. |
| 02:27:08 | 14 | Q.  What type of tests would a physician -- let me rephrase |
| 02:27:22 | 15 | that. |
| 02:27:22 | 16 |       What type of tests would a treating internal medicine |
| 02:27:22 | 17 | doctor want to refer a patient suffering from chest pain to, |
| 02:27:26 | 18 | what type of tests are available? |
| 02:27:26 | 19 | A.  Well, let's take something that's maybe disturbing but |
| 02:27:30 | 20 | perhaps not serious.  If they say they have heartburn and it |
| 02:27:32 | 21 | comes especially shortly after they eat or after they eat |
| 02:27:36 | 22 | certain foods and it resolves when they take an antacid |
| 02:27:42 | 23 | tablet, I figure they are very likely to have some kind of |
| 02:27:46 | 24 | stomach or esophageal condition.  Especially if it's somebody |
| 02:27:50 | 25 | born on November 21st, 1980, I may not do any other evaluation |

02:27:56   1   at that point.  I might treat and find out how they are doing,

02:28:00   2   and then decide after a trial of therapy whether they need any

02:28:04   3   other further evaluation.

02:28:04   4        If they are a 60-year-old man who says he has

02:28:10   5   pressure in his chest and came to me because last night he

02:28:12   6   woke up at 2:00 in the morning and it was like a bear was

02:28:12   7   standing on his chest, I consider that likely to be an

02:28:16   8   indication that he has angina, which is due to not enough

02:28:20   9   blood getting to the heart.  The first thing I would do is I

02:28:24   10  would give an electrocardiogram on that patient.

02:28:26   11  Q.  Are there other tests like chest x-rays?

02:28:32   12  A.  If they had a cough or some kind -- if they told me they

02:28:36   13  fell in the washroom and bumped their dryer and their chest

02:28:42   14  hurts on the side and I suspect they might have a broken rib,

02:28:44   15  that patient would certainly need a chest x-ray.

02:28:48   16  Q.  Is it fair to say that the different types of tests

02:28:52   17  available are determined by the different types of conditions

02:28:54   18  a patient reports?

02:28:56   19  A.  Yes.

02:28:56   20  Q.  And those are the types of conditions that a doctor should

02:29:00   21  ask a patient?

02:29:00   22  A.  They should ask those questions, they should note the type

02:29:02   23  of patient that's having the complaint.  You would evaluate a

02:29:04   24  30-year-old different than a 60-year-old, for example.

02:29:08   25  Q.  And should all of those questions and answers be listed in

02:29:10   1   the chart?

02:29:10   2   A.  Yes.

02:29:12   3   Q.  Go to the next of the conditions, carotid bruit.  Do you

02:29:22   4   see that?

02:29:22   5   A.  Yes, I do.

02:29:22   6   Q.  You talked a little bit earlier about carotid bruit being

02:29:28   7   a swishing sound?

02:29:28   8   A.  Yes.

02:29:28   9   Q.  That's a potentially serious condition, carotid bruit?

02:29:28  10   A.  As we talked about before, it could be an indication of

02:29:32  11   the transient ischemic attack, which is, let's say, a partial

02:29:34  12   or incomplete stroke, or it could be an indication of an

02:29:38  13   impending complete stroke where someone is not going to be

02:29:40  14   able to talk or not going to be able to see or move.

02:29:44  15   Q.  Once again, are those questions that you would ask a

02:29:48  16   patient, whether or not they suffered from any of those

02:29:50  17   symptoms?

02:29:50  18   A.  Yes.

02:29:50  19   Q.  Would you note that in the patient's chart?

02:29:52  20   A.  Yes.

02:29:54  21   Q.  In addition to noting that, is there a section of the

02:29:58  22   chart that actually reflects the portion of the body where you

02:30:00  23   listen for a carotid bruit?

02:30:06  24   A.  I presume in this format, it would be under the neck

02:30:10  25   section.

02:30:10    1   Q.   And there is a neck section; is that right?

02:30:12    2   A.   Yes.

02:30:12    3   Q.   What does it say under the neck section of this particular

02:30:14    4   patient's chart?

02:30:14    5   A.   I am presuming it says supple.

02:30:18    6   Q.   What does it mean for a neck to be supple?

02:30:20    7   A.   That the neck moves easily in any direction.

02:30:22    8   Q.   Is there a way in which to categorize or characterize

02:30:28    9   carotid bruit?

02:30:30   10   A.   Usually we indicate whether it's present or it's not

02:30:32   11   present.

02:30:32   12   Q.   Do you also indicate -- is there more than one particular

02:30:34   13   artery in the neck that it could be at?

02:30:38   14   A.   There are two carotid arteries, so we would indicate the

02:30:42   15   location, the right or left or both.

02:30:44   16   Q.   Is it important to note what side of the neck the carotid

02:30:48   17   bruit is on?

02:30:48   18   A.   Yes, it is.

02:30:48   19   Q.   Why?

02:30:50   20   A.   So that the study matches your examination.

02:30:52   21   Q.   Well, would it also be important for further review or

02:30:56   22   later review?

02:30:58   23   A.   If I am going -- well, as is going to happen, presuming

02:31:06   24   this patient comes back to see me in a month or two months, I

02:31:10   25   would check to see if it's still there and note whether it

02:31:12    1   appears where it didn't appear before.

02:31:14    2   Q.  So is it important to note where the carotid bruit is

02:31:20    3   detected?

02:31:26    4   A.  Right.

02:31:26    5   Q.  Is there any such notation that you can see anywhere in

02:31:30    6   this chart describing the carotid bruit or noting where it was

02:31:34    7   detected?

02:31:34    8   A.  The only place I see carotid bruit written is down under

02:31:38    9   the treatment sign there under number two.  I don't see

02:31:44   10   anything in the neck section indicating carotid bruit.

02:31:46   11   Q.  Is a determination that a neck is supple in any way

02:31:52   12   helpful in diagnosing or tracking carotid bruit?

02:31:58   13   A.  No.

02:32:00   14   Q.  Dr. Herdeman, would you be concerned if you had a

02:32:02   15   28-year-old patient and you had heard carotid bruit in her

02:32:10   16   neck?

02:32:10   17   A.  It's highly unusual.

02:32:12   18   Q.  Would it concern you?

02:32:14   19   A.  Yes.

02:32:14   20   Q.  Why?

02:32:14   21   A.  Again, it's not a very common physical finding to start

02:32:18   22   with, and it's one we would expect to find, when we find it,

02:32:22   23   in someone who is over 60 years of age.  To find that in

02:32:26   24   someone who is not even yet 30, that would be a very unusual

02:32:30   25   finding.

02:32:30  1   Q.  Would you want to discuss that with the patient?

02:32:32  2   A.  I would, again, as with the heart murmur, ask whether she

02:32:38  3   had someone tell her that she had a carotid bruit before, I'd

02:32:42  4   also ask her if she had any symptoms of a transient ischemic

02:32:46  5   attack.

02:32:46  6   Q.  So you would want to discuss it?

02:32:48  7   A.  Right.

02:32:50  8   Q.  You see that there is in this chart a report of a carotid

02:32:58  9   Doppler test being run.  Do you see that?

02:33:00  10  A.  Yes, I do.

02:33:00  11  Q.  What did that test reveal?

02:33:04  12  A.  Well, it says a mild plaque seen bilaterally, which means

02:33:10  13  on both sides, both arteries, 30 to 35 percent diameter

02:33:16  14  reduction, carotid bulb was seen and shown unremarkable

02:33:20  15  bifurcation of internal and external carotid arteries.

02:33:24  16  Q.  Would you discuss these results with a patient?

02:33:26  17  A.  Yes.

02:33:26  18  Q.  Why?

02:33:26  19  A.  I consider it my responsibility.  I would presume that

02:33:32  20  it's something that she had to note taking the time to do, I

02:33:38  21  presume she would be curious about it, and it would be

02:33:42  22  important for her to know what the result is.

02:33:44  23  Q.  I want to go back to that progress note.  The next

02:33:46  24  condition, dizziness.  What is dizziness to an internal

02:33:50  25  medicine doctor?

02:33:50    1    A.   The first task is to find out what it means in any
02:33:56    2    particular case.
02:33:58    3    Q.   Can dizzy mean more than one thing?
02:34:02    4    A.   We use dizziness to describe a few source of sensations.
02:34:04    5    Q.   Like what?
02:34:06    6    A.   One is more precisely called vertigo.  And when you are a
02:34:08    7    kid, you get on the chair and spin around and it feels like
02:34:12    8    the world is still spinning, that's one very precise cause of
02:34:16    9    vertigo, and that's almost always caused by some disease or
02:34:18   10    abnormality in the inner ear.
02:34:22   11          And a much more difficult to describe, I guess, and
02:34:28   12    to characterize is of all the rest of dizziness.  In someone
02:34:34   13    who is 85 years old for example, their eyes don't work right,
02:34:38   14    their legs don't work right, their blood doesn't flow to their
02:34:40   15    head the way it used to, their vascular reflexes aren't what
02:34:42   16    they used to be, and they might notice that when they are
02:34:46   17    moving in a particular direction or getting up from a chair,
02:34:48   18    they just don't feel right.  They feel like they might be
02:34:52   19    ready to fall or they can't quite catch their bearings, and we
02:34:56   20    might describe something like that as dizziness also.
02:35:00   21    Q.   Would it be important for you to determine what type of
02:35:02   22    dizziness a patient was suffering from?
02:35:02   23    A.   Yes.
02:35:02   24    Q.   Would it be important to note that in the chart?
02:35:06   25    A.   Yes.

| | | |
|---|---|---|
| 02:35:06 | 1 | Q.  Once again, why? |
| 02:35:06 | 2 | A.  To distinguish the various possibilities, where the |
| 02:35:12 | 3 | disease might be, and whether it needs any further evaluation |
| 02:35:16 | 4 | or treatment. |
| 02:35:16 | 5 | Q.  Without giving examples, just as a general matter based on |
| 02:35:20 | 6 | the different types of dizziness that a patient could be |
| 02:35:24 | 7 | experiencing, are there different types of tests that could or |
| 02:35:26 | 8 | should be run? |
| 02:35:26 | 9 | A.  Right. |
| 02:35:28 | 10 | Q.  Is that a yes? |
| 02:35:28 | 11 | A.  Yes. |
| 02:35:28 | 12 | Q.  Would you want to note those different types of dizziness |
| 02:35:32 | 13 | in the chart if you had a patient that was complaining of some |
| 02:35:36 | 14 | form of dizziness? |
| 02:35:48 | 15 | A.  Yes. |
| 02:35:48 | 16 | Q.  Do you see any indication in this particular progress note |
| 02:35:50 | 17 | of any indication of dizziness at all other than the term |
| 02:35:50 | 18 | being used? |
| 02:35:50 | 19 | A.  The places where I would expect to find that would be |
| 02:35:54 | 20 | under local motor, which might describe how she moves, and |
| 02:35:58 | 21 | also under neurological, which would point out things like |
| 02:36:00 | 22 | whether the room was spinning or whether she had trouble |
| 02:36:04 | 23 | maintaining her balance.  I don't see those sorts of notations |
| 02:36:06 | 24 | here. |
| 02:36:06 | 25 | Q.  Is a migraine a form of dizziness? |

| | | |
|---|---|---|
| 02:36:10 | 1 | A.  No, it's not. |
| 02:36:10 | 2 | Q.  You see that there is another notation of chest pain, |
| 02:36:20 | 3 | same? |
| 02:36:20 | 4 | A.  Number five, yes. |
| 02:36:24 | 5 | Q.  Right. |
| 02:36:26 | 6 | Before we go onto the next condition on the chart, I |
| 02:36:28 | 7 | want to ask you about another test that was run and is |
| 02:36:32 | 8 | reflected in the chart.  Do you see a test there for an |
| 02:36:38 | 9 | echocardiogram? |
| 02:36:40 | 10 | A.  Yes, I do. |
| 02:36:40 | 11 | Q.  Is this one of the tests that you mentioned before that |
| 02:36:44 | 12 | might be important for purposes of determining what the cause |
| 02:36:50 | 13 | of chest pain was that was present, possibly? |
| 02:36:54 | 14 | A.  Not so much pain in this case, but the structure and |
| 02:36:56 | 15 | function of the heart. |
| 02:36:56 | 16 | Q.  Fair enough. |
| 02:36:58 | 17 | Does this report -- you can see at the top here, it |
| 02:37:06 | 18 | says, Echocardiogram Doppler echo and color flow mapping |
| 02:37:14 | 19 | report.  Is this a report that appears to have a summary of |
| 02:37:16 | 20 | the echocardiogram that was done? |
| 02:37:18 | 21 | A.  Yes, it does. |
| 02:37:18 | 22 | Q.  Without going through each line and the thickness of each |
| 02:37:20 | 23 | wall, et cetera, I want to ask you a question about the |
| 02:37:24 | 24 | summary of findings. |
| 02:37:24 | 25 | A.  Yes. |

02:37:24  1   Q.  Is there a finding here that seems inconsistent with the

02:37:30  2   test that was done?

02:37:30  3   A.  I would point to number five.  It says no intracranial

02:37:38  4   shunts.

02:37:38  5   Q.  Why is that abnormal to find in an echocardiogram report?

02:37:44  6   A.  Well, intracranial means inside the head.  My

02:37:46  7   presumption --

02:37:46  8   Q.  Dr. Herdeman, what is a shunt?

02:37:50  9   A.  It's a flow of fluid outside its usual course or in a

02:37:56  10  direction it doesn't usually go.

02:37:58  11  Q.  An echocardiogram is a report that looks at an ultrasound

02:38:04  12  of the heart?

02:38:06  13  A.  Yes.

02:38:06  14  Q.  Would you ever, ever see an intracranial, in her head,

02:38:12  15  flow of blood through an echocardiogram of the heart?

02:38:16  16  A.  No.  My presumption here is that they meant to say

02:38:24  17  intracardiac.

02:38:24  18  Q.  Does it say that?

02:38:24  19  A.  No, it doesn't.

02:38:26  20  Q.  Let's go back to the progress note.  You will see a

02:38:34  21  notation for SOB.  Do you see that?

02:38:34  22  A.  Yes.

02:38:36  23  Q.  Are you familiar with the term shortness of breath?

02:38:38  24  A.  We have discussed it.

02:38:38  25  Q.  What is shortness of breath, Dr. Herdeman?

02:38:40    1    A.  It's difficulty breathing, and there are -- after you walk

02:38:44    2    up ten flights of stairs, you would expect to be short of

02:38:48    3    breath.

02:38:48    4    Q.  And you're right, we went over that before.  Is that

02:38:52    5    something you would expect to see, shortness of breath, in a

02:38:54    6    healthy 28 year old?

02:38:56    7    A.  No.

02:38:56    8    Q.  Would it concern you if a healthy 28 year old was short of

02:39:00    9    breath?

02:39:02    10   A.  Yes, it would.

02:39:02    11   Q.  Is there a difference between being short of breath and

02:39:06    12   having asthma?

02:39:06    13   A.  If you have asthma, if it's not controlled, you would be

02:39:10    14   short of breath.

02:39:12    15   Q.  So if you're currently suffering at the time from

02:39:14    16   asthma-related symptoms, it might be consistent, is that

02:39:18    17   another way of saying that?

02:39:18    18   A.  That's correct.

02:39:18    19   Q.  If you are not suffering from asthma-related symptoms,

02:39:22    20   would that be something you would characterize as short of

02:39:26    21   breath?

02:39:26    22   A.  If during our interview, I was told that I went to take a

02:39:30    23   run yesterday and I usually run three laps without any trouble

02:39:34    24   and now I could only get one, I would probably point out that

02:39:40    25   they had exercise-induced shortness of breath.  I don't see

| | | |
|---|---|---|
| 02:39:42 | 1 | that. |
| 02:39:44 | 2 | Q.  Do you see that anywhere in this chart, Dr. Herdeman? |
| 02:39:46 | 3 | A.  No, I don't. |
| 02:39:46 | 4 | Q.  Is there anything in here other than the reference to |
| 02:39:50 | 5 | asthma referring to shortness of breath? |
| 02:39:52 | 6 | A.  No. |
| 02:39:52 | 7 | Q.  If a patient was short of breath, is that a condition that |
| 02:40:04 | 8 | could justify additional testing? |
| 02:40:06 | 9 | A.  Yes. |
| 02:40:06 | 10 | Q.  What type of testing? |
| 02:40:08 | 11 | A.  The thing to figure out then is what's the cause of the |
| 02:40:12 | 12 | shortness of breath.  Is it because the lungs aren't working |
| 02:40:14 | 13 | right or is it because the heart is not working right, and |
| 02:40:16 | 14 | based on my further interview with the patient, I would decide |
| 02:40:24 | 15 | which sort of test needed to be done. |
| 02:40:26 | 16 | Q.  Would you ask those questions? |
| 02:40:30 | 17 | A.  Yes. |
| 02:40:30 | 18 | Q.  Would you note it in the chart? |
| 02:40:30 | 19 | A.  Yes. |
| 02:40:32 | 20 | Q.  Let me ask you this, Dr. Herdeman.  If you saw a patient |
| 02:40:36 | 21 | who had a heart murmur, was suffering from chest pain, who had |
| 02:40:38 | 22 | carotid bruit, who was dizzy, who had chest pain, who was |
| 02:40:42 | 23 | short of breath and was 28 years old, would you characterize |
| 02:40:46 | 24 | that patient as being in good health? |
| 02:40:48 | 25 | A.  No. |

02:40:48  1   Q.  Would you say that that patient has no conditions that
02:40:54  2   could affect the patient's ability to serve in a doctor's
02:40:58  3   office or in a medical setting?
02:41:00  4   A.  It would depend on what their duties are.  If they have a
02:41:04  5   desk job, I suppose they could do it.  If they had to
02:41:10  6   physically exert themselves, it does not appear that they
02:41:12  7   would qualify for that.
02:41:14  8   Q.  I'd like to turn to what's been marked as Government
02:41:26  9   Exhibit 350.  It's the patient chart for Cierra Thompson.  Do
02:41:38  10  you see that, Dr. Herdeman?
02:41:42  11  A.  I have her chart here.
02:41:46  12  Q.  Can you turn to the progress report that's dated 12/14/09.
02:42:00  13  A.  Yes.
02:42:00  14  Q.  I want to turn first to the top section, the chief
02:42:14  15  complaint section.  You will see there is a notation at the
02:42:16  16  top.  I would rather have you pronounce it correctly than me
02:42:22  17  incorrectly.
02:42:22  18  A.  Bartholin cyst.
02:42:22  19  Q.  What is a bartholin cyst?
02:42:26  20  A.  A bartholin gland in the vulva that's meant to lubricate
02:42:26  21  that area, and it can get stopped up, and the fluid can
02:42:32  22  accumulate there, and you can develop an infection there that
02:42:36  23  gets large and painful.
02:42:36  24  Q.  And you also see a reference in the diagnosis section down
02:42:44  25  here for a pararectal abscess.  Do you see that on the screen?

| | | |
|---|---|---|
| 02:42:52 | 1 | A. Yes, it's number five. |
| 02:42:52 | 2 | Q. Right. |
| 02:42:54 | 3 | Can you tell the members of the jury what a |
| 02:42:56 | 4 | pararectal abscess is? |
| 02:42:56 | 5 | A. A pararectal abscess is a boil in the rectal area. |
| 02:43:02 | 6 | Q. Now, I'd also like to refer you back to the top of the |
| 02:43:06 | 7 | note. There is a reference again that looks -- it might be |
| 02:43:10 | 8 | rectal up here, and then there is something that says here |
| 02:43:14 | 9 | exam MRSA, do you see that? |
| 02:43:22 | 10 | MR. ORMAN: We object to counsel reading the chart, |
| 02:43:24 | 11 | especially when he is reading it into the record. |
| 02:43:28 | 12 | THE COURT: Sustained. |
| 02:43:30 | 13 | BY MR. HAMMERMAN: |
| 02:43:30 | 14 | Q. Let me ask you to turn to the progress note in the same |
| 02:43:42 | 15 | chart for January 7th of 2010. Do you see that? |
| 02:43:48 | 16 | A. January 7th, 2010. |
| 02:43:52 | 17 | Q. Yes. It's about three weeks later? |
| 02:43:56 | 18 | A. Yes. |
| 02:43:56 | 19 | Q. Do you see a reference here? |
| 02:44:04 | 20 | A. On the third line. |
| 02:44:06 | 21 | Q. What is that? |
| 02:44:06 | 22 | A. MRSA, I would presume methicillin resistant staph aureus. |
| 02:44:12 | 23 | Q. What does that mean? |
| 02:44:14 | 24 | A. Staph aureus is a germ that can cause serious infections, |
| 02:44:20 | 25 | very damaging infections. The standard medication to treat |

02:44:24  1   that is methicillin or a derivative of methicillin.  There is

02:44:32  2   a growing array of these bacteria now that don't respond to

02:44:36  3   those types of drugs, and that's called methicillin resistant

02:44:42  4   staph.

02:44:42  5   Q.  Let's take that into two parts and put it into English.

02:44:46  6        What is the condition itself in layman's terms?

02:44:48  7   A.  It's an infection with a dangerous germ.

02:44:50  8   Q.  And you were talking about the way to treat it is through

02:44:54  9   what?

02:44:54  10  A.  By giving antibiotics.  The standard antibiotics would be

02:45:04  11  methicillin sensitive staph, and this is -- well, this is a

02:45:08  12  germ that doesn't -- is not sensitive to the usual antibiotics

02:45:14  13  used for its treatment.

02:45:16  14  Q.  Is there a risk of MRSA located in the rectal region of

02:45:24  15  generally attacking a person's heart?

02:45:26  16  A.  It wouldn't be expected.

02:45:30  17  Q.  It's not a common concern?

02:45:34  18  A.  Well, if the complaint is that they have pain in their

02:45:36  19  rectum and they have a fever, they need treatment of their

02:45:40  20  rectal area, not their heart, unless they have symptoms to

02:45:46  21  indicate they have symptoms that are attributable to the

02:45:48  22  heart.

02:45:50  23  Q.  Now, is it possible for an infection anywhere on the body

02:45:52  24  to infect the blood?

02:45:54  25  A.  Yes, it is.

02:45:54　1　Q.　And could that therefore also have an effect on the heart?

02:45:56　2　A.　It could.

02:45:58　3　Q.　Would that be a serious condition?

02:46:00　4　A.　That would be a serious condition.

02:46:00　5　Q.　If an infection had spread through the bloodstream to the

02:46:06　6　heart, would you expect to see any conditions in the patient

02:46:08　7　that would cause you concern?  What would you be asking a

02:46:12　8　patient about?

02:46:12　9　A.　Well, I would be asking them if they recorded their

02:46:16　10　temperature and had they had fevers before and how high it

02:46:22　11　got, whether they had the symptoms of fever, like recurring

02:46:24　12　sweats and chills, I would ask them things that are a

02:46:30　13　reference to the heart, like are they short of breath, do they

02:46:34　14　have chest pain.  There are other phenomenon that are involved

02:46:38　15　with a more advanced infection of the heart as it affects

02:46:42　16　other parts of the body.

02:46:44　17　Q.　For example, what would be the things, if you had a blood

02:46:46　18　infection that was attacking the heart, that you might see in

02:46:48　19　a patient?

02:46:50　20　A.　Well, again, they would have the fever, I would listen to

02:46:54　21　their heart to see if they had a heart murmur.  In more

02:46:56　22　advanced cases, they would get little flecks of the infection

02:47:02　23　going to other parts of their body.  They could have stroke or

02:47:04　24　TIA symptoms, they could have visual difficulties, they could

02:47:08　25　have what are called splinter hemorrhages in the fingernails.

02:47:14  1  Q.  What does that mean?

02:47:14  2  A.  That means that these little bits have broken off from the

02:47:18  3  part that's infected and migrated, and sometimes they get into

02:47:24  4  the fingernails and you can see streaks on the fingernail.

02:47:26  5  Q.  Now, Dr. Herdeman, there's three progress notes in

02:47:30  6  Ms. Thompson's chart, right?

02:47:32  7  A.  Let's see.

02:47:34  8  Q.  One on December 14th, one on January 7th, and one on

02:47:44  9  11-something.  It's a little hard to see.  Do you see those?

02:47:46  10 A.  You will have to show me the last one.  That doesn't

02:47:50  11 appear --

02:47:50  12 Q.  Look on the screen.  Do you see it?

02:47:54  13 A.  It's 11/30.

02:47:56  14 Q.  Yes.  And you reviewed Ms. Thompson's chart before today;

02:47:56  15 is that right?

02:48:02  16 A.  Yes.

02:48:02  17 Q.  Did you see any reference in going through that chart

02:48:04  18 about questions of bleeding fingernails or spots in the back

02:48:08  19 of the eyes or other cysts popping up other places or

02:48:12  20 prolonged fever, any of those things that you just talked

02:48:14  21 about?

02:48:14  22 A.  No.  No, I didn't.

02:48:16  23 Q.  Going back to the December 14th, do you see the other

02:48:46  24 diagnoses that are are listed there?

02:48:48  25 A.  Yes, I do.

| | | |
|---|---|---|
| 02:48:48 | 1 | Q. There is a cellulitis or something of that nature? |
| 02:48:54 | 2 | A. Yes. |
| 02:48:54 | 3 | Q. What is that, Dr. Herdeman? |
| 02:48:54 | 4 | A. That's an infection of the skin. |
| 02:48:56 | 5 | Q. Do you see other conditions listed here, a heart murmur |
| 02:49:02 | 6 | and shortness of breath? |
| 02:49:04 | 7 | A. I see the heart murmur. |
| 02:49:04 | 8 | Q. Looking back to that center section, what does it say in |
| 02:49:08 | 9 | the cardiovascular section? |
| 02:49:08 | 10 | A. It's got the RR, and I presume that means regular rate. |
| 02:49:14 | 11 | Q. What's the grade of this particular heart murmur? |
| 02:49:16 | 12 | A. I don't see it here. |
| 02:49:18 | 13 | Q. Is grading a heart murmur important for treatment? |
| 02:49:22 | 14 | A. Grading the heart murmur and knowing what part of the |
| 02:49:26 | 15 | heart cycle it's in, that's important for further evaluation |
| 02:49:30 | 16 | and treatment. |
| 02:49:32 | 17 | Q. We talked -- you testified, I should say, earlier today |
| 02:49:46 | 18 | about some of the questions you would ask for shortness of |
| 02:49:48 | 19 | breath and for a heart murmur, additional questions. |
| 02:49:52 | 20 | Reviewing Ms. Thompson's chart, do you see any reference to |
| 02:49:56 | 21 | any of those types of inquiries? |
| 02:49:56 | 22 | A. No, I don't. |
| 02:49:58 | 23 | Q. Ms. Thompson was seen -- well, there is a progress note |
| 02:50:14 | 24 | for three weeks later.  Do you see that? |
| 02:50:16 | 25 | A. On 1/7/10? |

457

02:50:20    1    Q.  Yes.

02:50:20    2    A.  Okay.

02:50:22    3    Q.  Is there a reference there to a heart murmur --

02:50:22    4    A.  No, there is not.

02:50:24    5    Q.  -- in the diagnoses?

02:50:24    6    A.  I don't see it under the cardiovascular section of the

02:50:28    7    exam and it is not listed here in the diagnoses.

02:50:32    8    Q.  What about on the 11/30 date?

02:50:42    9    A.  That's up on the screen now?

02:50:44   10    Q.  Yes.

02:50:46   11         Once again, do you see another reference to heart

02:50:50   12    murmur?

02:50:50   13    A.  No, I don't.

02:50:52   14    Q.  Anything in the cardiovascular section?

02:50:56   15    A.  Just I presume that's abbreviated RR there.

02:51:02   16    Q.  Going back to that December 14th day, do you see that

02:51:06   17    there was some tests that were issued, in particular, an echo;

02:51:12   18    do you see that?

02:51:12   19    A.  Yes.

02:51:12   20    Q.  Would you consider an unrated, otherwise unreferenced

02:51:32   21    heart murmur a condition for which you would immediately order

02:51:34   22    an echocardiogram?

02:51:36   23    A.  As I mentioned, I would ask the questions and I would list

02:51:44   24    what the characteristics of the murmur are.  I don't have

02:51:48   25    information to base anything off of this note.

| | | |
|---|---|---|
| 02:51:50 | 1 | Q. Did you note that there was a report for an echocardiogram |
| 02:52:02 | 2 | contained in Ms. Thompson's chart for that December 14th day? |
| 02:52:06 | 3 | A. It's on the screen now. Yes. |
| 02:52:08 | 4 | Q. Have you reviewed that report before? |
| 02:52:10 | 5 | A. Yes. |
| 02:52:10 | 6 | Q. Is there anything of note, adverse health condition noted |
| 02:52:18 | 7 | in that health report? |
| 02:52:18 | 8 | A. It says normal 2-D echo, and then it lists normal |
| 02:52:42 | 9 | findings. |
| 02:52:46 | 10 | Q. Going to the -- I'm sorry -- the January 7, 2010, progress |
| 02:53:02 | 11 | note for Ms. Thompson, do you see there that there is a |
| 02:53:04 | 12 | notation for -- in the diagnosis section for abdominal pain? |
| 02:53:12 | 13 | A. Yes. |
| 02:53:12 | 14 | Q. Is abdominal pain a potentially significant complaint, |
| 02:53:16 | 15 | Dr. Herdeman? |
| 02:53:18 | 16 | A. It can be. |
| 02:53:20 | 17 | Q. Why is that? |
| 02:53:20 | 18 | A. It could be due to a very serious condition, a |
| 02:53:24 | 19 | life-threatening condition, it's also a very common condition |
| 02:53:28 | 20 | that may be transient and not really require special |
| 02:53:30 | 21 | evaluation or treatment. |
| 02:53:32 | 22 | Q. Would you want to ask questions once again to make a |
| 02:53:34 | 23 | determination of which of those potential types of conditions |
| 02:53:38 | 24 | exist? |
| 02:53:38 | 25 | A. Yes. |

02:53:38   1   Q.  Would you want to note any answers to those questions in

02:53:44   2   the chart?

02:53:44   3   A.  Yes.

02:53:44   4   Q.  Would you consider an abdominal ultrasound a prerequisite

02:53:50   5   for anybody that complained of any sort of abdominal pain?

02:53:54   6   A.  No.

02:53:54   7   Q.  Why not?

02:53:56   8   A.  Because it's meant to diagnose certain particular

02:54:00   9   conditions.  If you don't consider those conditions as likely

02:54:04  10   enough to be present, then you wouldn't get that diagnostic

02:54:08  11   test.

02:54:08  12   Q.  What kind of questions would you have to ask to determine

02:54:12  13   whether or not someone needed an abdominal ultrasound?

02:54:14  14   A.  Location of the pain, characteristics of the pain, what

02:54:18  15   makes it better, what makes it worse.

02:54:20  16   Q.  Do you see any of that in this chart?

02:54:22  17   A.  No, I don't.

02:54:22  18   Q.  There is, however, a report from an abdominal ultrasound

02:54:26  19   on January 7th of 2010, right?

02:54:28  20   A.  That's on the screen now?

02:54:32  21   Q.  Yes.

02:54:32  22   A.  Yes, I see it.

02:54:34  23   Q.  Anything of note reported in that abdominal ultrasound?

02:54:36  24   A.  It just says that tiny gallstones seen at the wall of the

02:54:42  25   gallbladder.

02:54:44   1   Q.   What does that mean?

02:54:44   2   A.   That means that a stone has formed in the gallbladder and

02:54:48   3   that it's small.

02:54:48   4   Q.   Other than that notation, is there anything of import

02:54:52   5   found in this report?

02:54:54   6   A.   It indicates that all the organs that have been examined

02:54:58   7   are of the size you would expect and appear not to be

02:55:02   8   diseased.

02:55:02   9   Q.   Is this a typically thorough report that you see for

02:55:04  10   things like an abdominal ultrasound?

02:55:06  11   A.   The ones I see are usually a few more words involved.   I

02:55:12  12   am not seeing -- you know, the formats that I am used to also

02:55:18  13   talk about the liver and the size of the liver and whether

02:55:22  14   there are any liver abnormalities.   Even though it's not

02:55:26  15   usually a part of the field for this kind of examination,

02:55:28  16   sometimes they will remark about the aorta.   I guess the thing

02:55:34  17   that's not talked about in here that I usually see is

02:55:38  18   something regarding the liver, and in these, also if people

02:55:42  19   are built right, you can remark on their pancreas as well, and

02:55:50  20   I don't see that remarked about here.

02:55:54  21   Q.   Dr. Herdeman, can you turn to Government Exhibit 310.

02:56:12  22   It's a patient chart that's already been admitted into

02:56:14  23   evidence in the name of Louis Teague.   Do you see that?

02:56:18  24   A.   Yes, I do.

02:56:18  25   Q.   I will ask you to turn to the progress note for Louis

02:56:40  1   Teague.

02:56:40  2   A.  Yes.

02:56:40  3   Q.  If you turn to the diagnosis section, you see four

02:56:42  4   indications there, right?

02:56:42  5   A.  Yes.

02:56:44  6   Q.  What are the four indications?  Can you show the jury what

02:56:46  7   those are?

02:56:46  8   A.  Number one I think is hypertension, which is high blood

02:56:48  9   pressure; number two is pruritus, which means itching; number

02:56:54  10  three is, I think, dry skin, which is self-explanatory; and

02:56:58  11  number four again I think is SOB, shortness of breath.

02:57:02  12  Q.  If you look up at the chief complaint section, what do you

02:57:04  13  see there?

02:57:04  14  A.  I recognize body itching.  I am not sure about the next

02:57:14  15  two words.  The next word bath and ampersand, and then I am

02:57:20  16  not sure what the next word is, and then it looks like -- I

02:57:24  17  think it's two months.  So he's had -- whatever itching

02:57:26  18  symptom he's had, it's been present for two months.

02:57:30  19  Q.  What about the hypertension, I want to ask about that.  Is

02:57:38  20  there any other reference that references hypertension?

02:57:40  21  A.  He certainly has a high blood pressure reading here.  You

02:57:42  22  will notice in that line with the vital statistics, the BP is

02:57:48  23  155/90.  Now, hypertension is persistently elevated blood

02:57:54  24  pressure higher than either 140 systolic, which is --

02:58:00  25          MR. ORMAN:  Objection, your Honor.  There is no

| | |
|---|---|
| 02:58:00 | 1 |
| 02:58:02 | 2 |
| 02:58:04 | 3 |
| 02:58:04 | 4 |
| 02:58:06 | 5 |
| 02:58:08 | 6 |
| 02:58:12 | 7 |
| 02:58:16 | 8 |
| 02:58:20 | 9 |
| 02:58:20 | 10 |
| 02:58:22 | 11 |
| 02:58:22 | 12 |
| 02:58:24 | 13 |
| 02:58:32 | 14 |
| 02:58:34 | 15 |
| 02:58:40 | 16 |
| 02:58:42 | 17 |
| 02:59:10 | 18 |
| 02:59:10 | 19 |
| 02:59:12 | 20 |
| 02:59:18 | 21 |
| 02:59:20 | 22 |
| 02:59:24 | 23 |
| 02:59:28 | 24 |
| 02:59:34 | 25 |

question pending.

THE COURT:  Do you want to put a question to the witness.

BY MR. HAMMERMAN:

Q.  What is hypertension, Dr. Herdeman?

A.  Hypertension is persistently elevated blood pressure.

Q.  Is a blood pressure reading, a single blood pressure reading at one point in time significant for or the equivalent of a diagnosis of hypertension?

A.  No, it's not.

Q.  What's the difference?

A.  At this moment in time, he has a blood pressure that's higher than the established norm.  I would have to see other readings over a length of time before I would consider him actually having hypertension that needed treatment.

MR. HAMMERMAN:  Can I have a moment, your Honor?

THE COURT:  Yes.

  (Brief pause.)

MR. HAMMERMAN:  Thank you, your Honor.

BY MR. HAMMERMAN:

Q.  What would you need to do, Dr. Herdeman, to determine whether or not a high blood pressure reading was, in fact, hypertension of a persistent condition?

A.  In this case, I would give Mr. Teague a card with today's blood pressure on it and I would ask him to at least twice a

02:59:36  1  month, if not a little more frequently, get his blood pressure

02:59:40  2  measured, get it measured in his home after he's come home

02:59:44  3  from work and had a chance to relax for a while, or when he's

02:59:46  4  gotten up in the morning and is relaxed before his day has

02:59:50  5  started.  It's very common, and they call it the white coat

02:59:56  6  syndrome.  Someone walks into a doctor's or dentist's office

03:00:00  7  and their blood pressure is many points higher than it would

03:00:02  8  be under other circumstances.  I would point this out, that

03:00:06  9  his blood pressure is high, and I would ask him to record it

03:00:08  10  several more times and bring it back to me.

03:00:10  11  Q.  Would you give him an echocardiogram?

03:00:14  12  A.  Not unless there were other circumstances as I testified.

03:00:16  13  Q.  Would you give him an EKG right away?

03:00:20  14  A.  Probably not, but I can understand someone else perhaps

03:00:24  15  doing that.

03:00:24  16  Q.  You'll also see there is a notation of shortness of

03:00:30  17  breath, right?

03:00:30  18  A.  Yes.

03:00:30  19  Q.  Any notation there on the type of shortness of breath, any

03:00:34  20  indication about what the actual patient was complaining about

03:00:36  21  and the type of test that should be run to address it?

03:00:40  22  A.  No, I don't see that.  Another thing I actually don't

03:00:42  23  see --

03:00:44  24          MR. ORMAN:  Objection, your Honor.

03:00:44  25          THE COURT:  Sustained.

| | | |
|---|---|---|
| 03:00:44 | 1 | BY MR. HAMMERMAN: |
| 03:00:46 | 2 | Q.  Dr. Herdeman, you have to wait for me to ask a question |
| 03:00:48 | 3 | before you answer it. |
| 03:00:50 | 4 | Do you also see there is a notation here for a PFT? |
| 03:00:54 | 5 | A.  Yes, I do. |
| 03:00:54 | 6 | Q.  And an EKG? |
| 03:00:54 | 7 | A.  Yes. |
| 03:00:56 | 8 | Q.  And if you look through that chart, you will see that |
| 03:00:58 | 9 | there was also this echocardiogram done.  Do you see that |
| 03:01:02 | 10 | report? |
| 03:01:02 | 11 | A.  Yes, I do. |
| 03:01:02 | 12 | Q.  On that date? |
| 03:01:04 | 13 | A.  Yes. |
| 03:01:04 | 14 | Q.  Anything noted of interest in the findings of the |
| 03:01:12 | 15 | echocardiogram? |
| 03:01:14 | 16 | A.  Well, I see the first four seem to indicate again a normal |
| 03:01:18 | 17 | heart, and then number five we see that notation about no |
| 03:01:22 | 18 | intracranial shunts. |
| 03:01:24 | 19 | Q.  Once again, would you ever see the blood flow in the head |
| 03:01:28 | 20 | of an echocardiogram? |
| 03:01:30 | 21 | MR. ORMAN:  Objection, your Honor.  Asked and |
| 03:01:32 | 22 | answered.  He began the question, once again. |
| 03:01:34 | 23 | THE COURT:  Sustained. |
| 03:01:34 | 24 | BY MR. HAMMERMAN: |
| 03:01:38 | 25 | Q.  Other than that intracranial shunt, is the findings of |

03:01:42  1   this report -- generally, how would you describe them?

03:01:44  2   A.  Normal.

03:01:46  3   Q.  Going back to the progress note, Dr. Herdeman, in your

03:02:08  4   opinion, is a SOB reference and a hypertension reference in a

03:02:18  5   patient chart sufficient justification to order, in your

03:02:20  6   opinion, an echocardiogram, a pulmonary function test, and

03:02:24  7   EKG?

03:02:26  8   A.  I would ask other questions before making that

03:02:28  9   determination, and I don't see other questions asked here.

03:02:32  10  Q.  Based on the information that is in this chart, was that a

03:02:36  11  reasonable test?

03:02:38  12  A.  I can't tell if it's necessary here.

03:02:48  13      THE COURT:  Members of the jury, we are going to take

03:02:50  14  our afternoon break now.  You are excused.

03:02:54  15    (Short break.)

03:02:54  16    (The following proceedings were had in open court in the

03:15:50  17  presence and hearing of the jury:)

03:15:50  18      THE COURT:  I'm sorry.  I just learned from the clerk

03:16:14  19  that something happened with the refreshment order.  I am

03:16:18  20  really sorry.  I am sure she will tell me when they arrive.

03:16:22  21      Any further direct examination?

03:16:24  22      MR. HAMMERMAN:  Yes, your Honor.

03:16:26  23      THE COURT:  Go ahead.

03:16:26  24      MR. HAMMERMAN:  Thank you, your Honor.

03:16:28  25  BY MR. HAMMERMAN:

03:16:30　　1　Q.  Dr. Herdeman, I want you to turn now to the patient chart

03:16:34　　2　that was marked as 370, which is the patient chart of Ryan

03:16:38　　3　Johnson.  Do you see that, sir?

03:16:40　　4　A.  Yes.

03:16:40　　5　Q.  I'd ask you to turn to the progress note within that

03:16:46　　6　chart.

03:16:46　　7　A.  7/16/10.

03:16:48　　8　Q.  Do you see it?

03:16:50　　9　A.  Yes.

03:16:50　 10　Q.  Once again, let's just start with the test ordered.  There

03:16:56　 11　is a GHP, echo, and echocardiogram.  Do you have an

03:17:00　 12　understanding what a GHP is, sir?

03:17:02　 13　A.  No, I don't.

03:17:02　 14　Q.  Have you heard of the term general health panel?

03:17:06　 15　　　　　　MR. ORMAN:  Objection, your Honor.

03:17:08　 16　　　　　　THE COURT:  Sustained.

03:17:08　 17　BY MR. HAMMERMAN:

03:17:14　 18　Q.  Let's go to the diagnosis section.  There is an echo and

03:17:20　 19　an EKG.  Do you see that there are four diagnoses listed

03:17:24　 20　there?

03:17:24　 21　A.  Yes, I do.

03:17:26　 22　Q.  Murmur, insomnia, anxiety, and fatigue?

03:17:30　 23　A.  Yes.

03:17:30　 24　Q.  Dr. Herdeman, would an EKG or echocardiogram be an

03:17:36　 25　appropriate test for anxiety?

03:17:36    1    A.  No.

03:17:36    2    Q.  Would it be an appropriate test for fatigue?

03:17:38    3    A.  Possibly.

03:17:40    4    Q.  In what situation?

03:17:42    5    A.  Under what circumstances does the fatigue occur.  If I

03:17:48    6    thought that they were fatigued due to an abnormality of the

03:17:54    7    heart, I might order an echocardiogram.

03:17:58    8    Q.  Would you have to ask additional questions?

03:18:00    9    A.  Yes.

03:18:00   10    Q.  Would you have to make additional inquiry?

03:18:00   11    A.  Yes.

03:18:00   12    Q.  Would you list that in the chart?

03:18:00   13    A.  Yes.

03:18:02   14    Q.  Do you see any notations to reference any of those

03:18:04   15    conditions in this progress note?

03:18:06   16    A.  This is the first time I have seen this chart, so --

03:18:24   17    something on the job.  It seems things that I can interpret

03:18:32   18    from this are the anxiety.

03:18:34   19          MR. ORMAN:  Objection, your Honor.  There is no

03:18:34   20    question pending.

03:18:36   21          THE COURT:  Sustained.  Would you put a specific

03:18:38   22    question to the witness, please.

03:18:40   23    BY MR. HAMMERMAN:

03:18:40   24    Q.  Do you see any of the questions of the type you would

03:18:44   25    inquire about the type of fatigue that would justify an EKG

| | | |
|---|---|---|
| 03:18:48 | 1 | and echocardiogram, Dr. Herdeman? |
| 03:18:50 | 2 | A.  No. |
| 03:18:52 | 3 | Q.  All right.  Going onto the heart murmur that's listed in |
| 03:18:56 | 4 | the diagnosis section, do you see that? |
| 03:18:56 | 5 | A.  Yes, I do. |
| 03:18:58 | 6 | Q.  Do you also see a reference to the murmur in the |
| 03:19:00 | 7 | cardiovascular section of the progress note? |
| 03:19:04 | 8 | A.  Yes. |
| 03:19:04 | 9 | Q.  What is the type of murmur? |
| 03:19:08 | 10 | A.  It's, once again, a 2 quiet over 6.  It looks like ESM, |
| 03:19:16 | 11 | ejection systolic murmur. |
| 03:19:16 | 12 | Q.  Is that the same type of murmur that was reflected in the |
| 03:19:20 | 13 | chart for Mr. Cole and the chart for Ms. Terrell? |
| 03:19:22 | 14 | A.  Correct. |
| 03:19:22 | 15 | Q.  If you can turn now to the patient chart for Alan Vaval, |
| 03:19:58 | 16 | which is Government Exhibit 360.  Do you see the chart? |
| 03:20:08 | 17 | A.  Yes. |
| 03:20:08 | 18 | Q.  Can you find the progress note dated September 19th, 2008? |
| 03:20:16 | 19 | A.  Yes. |
| 03:20:16 | 20 | Q.  The conditions, once again, or the diagnoses I should say, |
| 03:20:30 | 21 | heart murmur, chest pain, shortness of breath, carotid bruit, |
| 03:20:34 | 22 | dizziness, and then what are these next two? |
| 03:20:40 | 23 | A.  Urethritis and penile discharge. |
| 03:20:42 | 24 | Q.  What is urethritis? |
| 03:20:44 | 25 | A.  That's an inflammation in the urethra. |

03:20:48    1    Q.  Putting those two aside, do you see any other description

03:20:52    2    of the type of chest pain, the shortness of breath, the

03:20:54    3    location of the carotid bruit, anything about the dizziness

03:20:58    4    anywhere on this chart?

03:21:00    5    A.  No, I don't.

03:21:02    6    Q.  Looking at the type of murmur that's listed there, what

03:21:06    7    kind of murmur is that, Dr. Herdeman?

03:21:10    8    A.  I think, once again, you see the Roman numeral 2 over the

03:21:16    9    Roman numeral 6 and ESM, so the same type of murmur you see in

03:21:20   10    the other two patients.

03:21:20   11    Q.  The same in the chart for Cole, Terrell and Ryan Johnson?

03:21:26   12    A.  Yes.

03:21:26   13    Q.  You can see that there were tests ordered, an

03:21:30   14    echocardiogram, a carotid Doppler; do you see that?

03:21:32   15    A.  Yes.

03:21:32   16    Q.  Turning to the carotid Doppler examination, reading that

03:21:38   17    report, is there anything in there that you read to be out of

03:21:40   18    place?  Does it --

03:21:48   19    A.  It indicates everything is normal.

03:21:50   20    Q.  Going to the echocardiogram report in the same chart, the

03:21:56   21    summary of findings, anything that's out of place?

03:21:58   22    A.  Just once again, the reference to no intracranial shunts.

03:22:12   23    Q.  Without going back to the intracranial shunt, any disease

03:22:18   24    referenced in this particular --

03:22:20   25    A.  No.

| | | |
|---|---|---|
| 03:22:22 | 1 | Q.  I'm sorry? |
| 03:22:22 | 2 | A.  No, there is not. |
| 03:22:24 | 3 | Q.  There's another progress note in Mr. Vaval's chart for a |
| 03:22:38 | 4 | month later.  Do you see that? |
| 03:22:40 | 5 | A.  10/24/08, yes. |
| 03:22:46 | 6 | Q.  Yes. |
| 03:22:46 | 7 | You will see that in the diagnosis section there is |
| 03:22:50 | 8 | abdominal pain, there's -- can you read number two here? |
| 03:22:54 | 9 | A.  I think that's hematuria. |
| 03:22:56 | 10 | Q.  What is that? |
| 03:22:58 | 11 | A.  Blood in the urine. |
| 03:22:58 | 12 | Q.  What's number three? |
| 03:23:00 | 13 | A.  URI. |
| 03:23:00 | 14 | Q.  What's that stand for? |
| 03:23:02 | 15 | A.  That's upper respiratory infection. |
| 03:23:04 | 16 | Q.  And number four? |
| 03:23:04 | 17 | A.  SOB, shortness of breath. |
| 03:23:06 | 18 | Q.  Is there any further reference of any -- to describe the |
| 03:23:12 | 19 | upper respiratory infection or the shortness breath, its |
| 03:23:16 | 20 | condition, what it is? |
| 03:23:18 | 21 | A.  No, I don't see anything. |
| 03:23:18 | 22 | Q.  You do see that there is some tests that are listed, do |
| 03:23:24 | 23 | you not see that? |
| 03:23:26 | 24 | A.  Yes. |
| 03:23:26 | 25 | Q.  A PFT? |

| | | |
|---|---|---|
| 03:23:26 | 1 | A. Yes. |
| 03:23:26 | 2 | Q. An ICG? |
| 03:23:28 | 3 | A. Yes. |
| 03:23:28 | 4 | Q. Would you order these tests without further information |
| 03:23:36 | 5 | about the actual condition of the patient? |
| 03:23:38 | 6 | A. No. |
| 03:23:38 | 7 | Q. In that last progress note -- |
| 03:24:02 | 8 | A. The previous one? |
| 03:24:02 | 9 | Q. Yes.  There was the two progress notes, the one for 9/19 |
| 03:24:08 | 10 | and the other one for 10/24.  Do you see that? |
| 03:24:14 | 11 | A. Right. |
| 03:24:14 | 12 | Q. Is there anything in this progress note that reflects the |
| 03:24:16 | 13 | detection of that same heart murmur that was found three weeks |
| 03:24:20 | 14 | earlier? |
| 03:24:22 | 15 | A. No. |
| 03:24:22 | 16 | Q. In neither the diagnosis section or in the examination |
| 03:24:26 | 17 | section? |
| 03:24:26 | 18 | A. No, I don't see anything. |
| 03:24:28 | 19 | Q. Can you turn to what's been marked as Government Exhibit |
| 03:24:34 | 20 | 330, which is the patient chart for Brian O'Neal.  Do you see |
| 03:24:44 | 21 | that, Dr. Herdeman? |
| 03:24:44 | 22 | A. Yes, sir. |
| 03:24:46 | 23 | Q. Can you turn to the section that has the progress note in |
| 03:25:02 | 24 | it? |
| 03:25:02 | 25 | A. Yes. |

03:25:02  1    Q.  The conditions here, once again, hypertension, heart

03:25:08  2    murmur, carotid bruit and syncope; do you see that?

03:25:12  3    A.  Yes, I do.

03:25:12  4    Q.  Is there anything listed in the chief complaint section on

03:25:20  5    this progress note under the term chief complaint?

03:25:24  6    A.  No, I don't see anything that alludes to any of these

03:25:30  7    conditions.

03:25:30  8    Q.  Well, what is syncope, Dr. Herdeman?

03:25:34  9    A.  Syncope is losing consciousness, fainting.

03:25:40  10   Q.  Fainting?

03:25:40  11   A.  Right.

03:25:40  12   Q.  Is that a potentially serious condition?

03:25:44  13   A.  Yes, it is.

03:25:46  14   Q.  If a patient informed you that he was experiencing

03:25:48  15   fainting spells, would that concern you?

03:25:50  16   A.  Yes.

03:25:50  17   Q.  Why?

03:25:50  18   A.  Because it could be an indication of a life-threatening

03:25:54  19   condition and it may be correctable.

03:25:56  20   Q.  Would you make further inquiries?

03:25:58  21   A.  Yes.

03:25:58  22   Q.  What type of inquiries would you make?

03:26:02  23   A.  I would try to find out how often it's happened, what are

03:26:06  24   the circumstances under which it's happened, if he is aware

03:26:08  25   how long he was unconscious, I would want to know if he was

03:26:12  1  injured when he had these episodes.

03:26:14  2  Q.  Would you record those conditions in the chart?

03:26:18  3  A.  Yes.

03:26:20  4  Q.  You will see that Mr. O'Neal references an echo was done,

03:26:32  5  a carotid was done, an EKG was done for Brian O'Neal?

03:26:40  6  A.  Yes.

03:26:40  7  Q.  Looking at the results of the echo, do you see the

03:26:46  8  results?

03:26:46  9  A.  Yes, I do.

03:26:48  10  Q.  The summary of findings, anything out of place?

03:26:50  11  A.  Well, again, the no intracranial shunts remark would be

03:26:58  12  hard to understand.

03:26:58  13  Q.  Putting that aside, anything else out of place?

03:27:02  14  A.  Here it shows that he has a mild extra layer of muscle on

03:27:06  15  the heart, or LVH means left ventricular hypertrophy.

03:27:14  16  Q.  And going to the carotid Doppler, do you see anything of

03:27:18  17  note?

03:27:18  18  A.  No, I don't.

03:27:24  19  Q.  I want to go back to the progress note very briefly,

03:27:28  20  Dr. Herdeman.  There is a heart murmur that's noted in the

03:27:34  21  Section 2 or diagnosis number two.  Do you see that?

03:27:38  22  A.  Yes.

03:27:38  23  Q.  What kind of heart murmur is that?

03:27:40  24  A.  I see again the Roman numeral 2 over Roman numeral 6 and

03:27:46  25  ESM, as with the other types of murmurs.

03:27:50　1　Q.　Is that the same type of murmur that Cole, Terrell,

03:27:52　2　Johnson, and Vaval had?

03:27:54　3　A.　Yes.

03:27:56　4　Q.　Same exact location and same exact sound?

03:28:00　5　A.　He doesn't so much remark on the location, but he does

03:28:02　6　remark on the cycle of the heart and intensity.　Yes, it's

03:28:06　7　similar as in the other patients.

03:28:06　8　Q.　Let me ask you this, looking at Brian O'Neal's chart, you

03:28:10　9　see an individual who has hypertension, carotid bruit,

03:28:16　10　syncope, and a heart murmur and there is a test done and there

03:28:20　11　are no adverse findings.　If those tests came back, would you

03:28:24　12　still want to further examine the patient?

03:28:26　13　A.　After I had seen the tests?

03:28:28　14　Q.　Yes.

03:28:28　15　A.　Yes.

03:28:30　16　Q.　Why?

03:28:32　17　A.　I would want to see whether he has had the symptoms again,

03:28:36　18　I would also want to see these measurements that he had gotten

03:28:38　19　on the first visit, how they matched the next visit as well.

03:28:44　20　Q.　Would you call the patient back in for additional

03:28:46　21　examination if these tests were inconclusive with respect to

03:28:50　22　the terms and conditions?

03:28:52　23　A.　Yes.

03:28:52　24　Q.　Going back to Louis Teague, if you had a patient who was

03:29:02　25　suffering from shortness of breath and hypertension and the

03:29:06   1   echo that was done did not report any adverse findings, would

03:29:10   2   you want to still follow up to do further examination about

03:29:14   3   the shortness of breath?

03:29:14   4   A.  Yes, sometime in the future.

03:29:16   5   Q.  Going back to Mr. Vaval's chart, if you had a patient who

03:29:56   6   was suffering with dizziness, shortness of breath, chest pain

03:30:02   7   and a heart murmur, carotid bruit, would you be concerned

03:30:04   8   about that patient's health?

03:30:08   9   A.  Yes.

03:30:08   10  Q.  If the tests had come back with no adverse findings, would

03:30:12   11  you still be concerned about the patient's health?

03:30:14   12  A.  I would want to hear from them again.

03:30:16   13  Q.  Why?

03:30:16   14  A.  To find out whether they had the symptoms yet still or if

03:30:22   15  they resolved.

03:30:22   16  Q.  Talking about a shortness of breath diagnosis that we have

03:30:28   17  seen in some of these charts, you said before that that's not

03:30:30   18  a condition you see often?

03:30:32   19  A.  I'm sorry?

03:30:32   20  Q.  I think you testified this morning it's not a condition

03:30:34   21  you see often?

03:30:36   22  A.  Shortness of breath?

03:30:40   23  Q.  Yes.

03:30:40   24  A.  I can't tell you the precise number.  Once a day, maybe.

03:30:44   25  Q.  Would it be unusual to see that condition appearing in

03:30:50  1  patient after patient after patient on the same day?

03:30:52  2  A.  I can't recall if that's happened.

03:30:56  3  Q.  Would you be surprised if ten patients on the same day had

03:31:04  4  that condition?

03:31:06  5  A.  Yes.

03:31:06  6        MR. ORMAN:  Objection, your Honor.

03:31:06  7        THE COURT:  Sustained.  The answer is stricken.

03:31:08  8  BY MR. HAMMERMAN:

03:31:20  9  Q.  Dr. Herdeman, I want to show you what's been entered into

03:31:22  10  evidence as Government Exhibit 395.  I will just put it up on

03:31:32  11  the ELMO.

03:31:38  12        This is a patient chart in the name of Robert

03:31:46  13  Devonshire.  Can you see that?

03:31:48  14  A.  Yes.

03:31:50  15  Q.  It's a little hard to see there.  Do you see it now?

03:31:52  16  A.  I see it.

03:31:54  17  Q.  If you look at the progress note in Robert Devonshire's

03:32:06  18  chart, the only information that you can see is what,

03:32:10  19  Dr. Herdeman?

03:32:10  20  A.  I see his identifying information, the date of the

03:32:12  21  examination, the top line is his vital statistics, and then I

03:32:22  22  see nothing under the examination section and nothing under

03:32:28  23  the diagnosis section, but I see the notations for an echo,

03:32:32  24  which I presume means echocardiogram and carotid, which I

03:32:36  25  guess would be carotid ultrasound.

| | | |
|---|---|---|
| 03:32:38 | 1 | Q. Can you imagine a circumstance where you would order an |
| 03:32:40 | 2 | echocardiogram and a carotid Doppler examination for a |
| 03:32:46 | 3 | patient's future visit who had not actually been examined by a |
| 03:32:50 | 4 | physician? |
| 03:32:50 | 5 | A. No. |
| 03:32:54 | 6 | MR. HAMMERMAN: May I have a moment, your Honor? |
| 03:32:56 | 7 | THE COURT: Yes. |
| 03:33:04 | 8 | MR. HAMMERMAN: No further questions, your Honor. |
| 03:33:06 | 9 | THE COURT: Cross-examination. |
| 03:33:10 | 10 | MR. ORMAN: One moment, your Honor. |
| 03:33:12 | 11 | THE COURT: Yes. |
| 03:33:38 | 12 | - - - |
| 03:33:38 | 13 | DANIEL HERDEMAN, M.D., CROSS-EXAMINATION |
| 03:33:38 | 14 | BY MR. ORMAN: |
| 03:33:44 | 15 | Q. Good afternoon, Doctor. |
| 03:33:46 | 16 | A. Good afternoon. |
| 03:33:46 | 17 | Q. Please focus on the time period from yesterday noon until |
| 03:33:52 | 18 | the moment you walked into this courtroom. Did you discuss |
| 03:33:56 | 19 | this case with anyone? |
| 03:33:58 | 20 | A. Yes, I did. |
| 03:34:00 | 21 | Q. With whom? |
| 03:34:04 | 22 | A. Mr. Heffernan (sic). |
| 03:34:10 | 23 | Q. I'm sorry. I didn't hear you. |
| 03:34:10 | 24 | A. Mr. Heffernan. |
| 03:34:12 | 25 | Q. Who is that? |

03:34:14  1   A.  The attorney that was just conducting the previous
03:34:16  2   examination.
03:34:16  3   Q.  Mr. Hammerman?
03:34:18  4   A.  I'm sorry, Hammerman.
03:34:20  5   Q.  When did you talk to him?
03:34:22  6   A.  About 8:00 o'clock.
03:34:24  7   Q.  Last night?
03:34:24  8   A.  Last night.
03:34:26  9   Q.  Who called who?
03:34:28  10  A.  He called me.
03:34:28  11  Q.  How long did the call last?
03:34:32  12  A.  45 minutes.
03:34:36  13  Q.  Do you know if that phone call was recorded via
03:34:44  14  handwritten notes?
03:34:46  15  A.  No, I don't.
03:34:52  16      MR. ORMAN:  Your Honor, let the record reflect that
03:34:54  17  we haven't seen the 302 from that interview.
03:34:56  18      MR. HAMMERMAN:  Objection, your Honor.
03:34:58  19      THE COURT:  We will discuss that later.
03:35:00  20  BY MR. ORMAN:
03:35:02  21  Q.  Did the topic of MRSA come up in that conversation?
03:35:06  22  A.  Yes.
03:35:08  23  Q.  That was in connection with a patient named Cierra
03:35:22  24  Thompson; is that correct?
03:35:22  25  A.  Yes.

03:35:22   1   Q.  Who mentioned MRSA first?

03:35:26   2   A.  To be honest, I don't recall.

03:35:30   3   Q.  Well, isn't it correct to say that you had no idea that

03:35:36   4   MRSA arose in Cierra Thompson's care and treatment until you

03:35:46   5   had that phone call last night at 8:00 p.m.?

03:35:48   6   A.  I had Ms. Thompson's records for quite a while as a matter

03:35:54   7   of fact and I had seen that notation when they were first

03:36:00   8   introduced to me.

03:36:00   9   Q.  You had discussed her situation with our brothers from the

03:36:06   10   U.S. Attorney's Office on several occasions; is that correct?

03:36:10   11   A.  We discussed Ms. Thompson.

03:36:12   12   Q.  And isn't it true, Doctor, that no place was the mention

03:36:18   13   of MRSA made in any document with respect to your

03:36:24   14   conversations with the government?

03:36:24   15   A.  I haven't seen documents with respect to my conversations.

03:36:30   16   Q.  Well, will you take my word for it that it was not there?

03:36:34   17          MR. HAMMERMAN:  Objection, your Honor.

03:36:34   18          THE COURT:  Sustained.

03:36:36   19   BY MR. ORMAN:

03:36:38   20   Q.  What else did you discuss with Mr. Hammerman?

03:36:42   21   A.  I recall talking about Mr. Vaval and where I needed to be

03:36:50   22   today at what time.

03:36:50   23   Q.  And all of that took 45 minutes, Doctor?

03:36:54   24   A.  Yes.

03:36:56   25   Q.  So it took you 45 minutes to discuss MRSA, which you claim

03:37:04  1  you knew about, and in that 45 minutes, you set a time where

03:37:08  2  you had to be and you discussed Mr. Vaval; is that right?

03:37:12  3            MR. HAMMERMAN:  Objection.  Asked and answered.

03:37:14  4            THE COURT:  Overruled.

03:37:16  5  BY MR. ORMAN:

03:37:16  6  Q.  Is that right?

03:37:18  7  A.  We may have discussed some other things.  I don't have a

03:37:22  8  transcript of that conversation, but I know we discussed the

03:37:26  9  matters that we have already talked about.

03:37:26  10  Q.  If you can bear with me and discuss these tests just a

03:37:42  11  little while longer, I do have a few questions for you.

03:37:44  12            NCV test, nerve conductions?

03:37:50  13  A.  Yes.

03:37:50  14  Q.  As I understand it, you believe an NCV test is done by

03:37:58  15  sticking needles in the arm?

03:38:00  16  A.  Along the course of the nerve, yes.

03:38:02  17  Q.  Have you ever seen an NCV test done, Doctor?

03:38:06  18  A.  No.  I have had patients describe it to me, though.

03:38:10  19  Q.  Oh, so you really don't know how an NCV test is done?

03:38:16  20            MR. HAMMERMAN:  Objection.  Argumentative.

03:38:16  21  BY MR. ORMAN:

03:38:16  22  Q.  Correct?

03:38:18  23            THE COURT:  Overruled.

03:38:20  24            THE WITNESS:  I know what the purpose of it is and

03:38:22  25  the general performance of it and I have had patients describe

03:38:26  1   it to me.

03:38:28  2   BY MR. ORMAN:

03:38:32  3   Q.  What is an EMG?

03:38:32  4   A.  Electromyogram.

03:38:34  5   Q.  That's a nerve test, too, isn't it?

03:38:36  6   A.  Right.

03:38:38  7   Q.  Do you know whether needles are inserted in the arm for an

03:38:48  8   EMG?

03:38:48  9   A.  When I order the nerve conduction study, it's done with an

03:38:52  10  EMG.

03:38:52  11  Q.  Let's try it again.

03:38:54  12          Do you know whether needles are inserted in the arm

03:38:56  13  for an EMG?

03:38:58  14  A.  That's my assumption.

03:39:00  15  Q.  So you don't know the difference between the way an NCV is

03:39:06  16  done and an EMG is done?

03:39:08  17  A.  No.

03:39:08  18  Q.  Is that correct?

03:39:10  19          That is correct?

03:39:12  20  A.  That's correct.

03:39:12  21  Q.  All right.  Now, let's talk about this transcranial

03:39:26  22  Doppler test.  Are you with me so far?

03:39:32  23  A.  I am with you so far.

03:39:32  24  Q.  All right.  Now, you didn't know what that was before this

03:39:36  25  case began; isn't that true, Doctor?

482

03:39:40    1   A.  That's right.

03:39:40    2   Q.  And when you heard about it, what you did is you went out

03:39:48    3   and you researched what that test involved in our most

03:39:54    4   prestigious medical --

03:39:56    5          MR. HAMMERMAN:  Objection, your Honor.  Form of the

03:39:56    6   question.

03:39:58    7          THE COURT:  Overruled.  Do you want to start again?

03:40:02    8          MR. ORMAN:  I will try.

03:40:04    9   BY MR. ORMAN:

03:40:04   10   Q.  When you heard the phrase transcranial Doppler, you went

03:40:10   11   out and researched in our most prestigious medical journals as

03:40:18   12   to what was involved with that test; is that correct?

03:40:20   13   A.  I consulted the Mayo Clinic proceedings.

03:40:24   14   Q.  What you did is you looked it up in Wikipedia?

03:40:30   15   A.  No, I didn't.

03:40:30   16   Q.  You never said that to the government?

03:40:32   17   A.  We may have had a discussion where I mentioned that that

03:40:36   18   is a listing on Wikipedia, but I looked at it in the Mayo

03:40:42   19   Clinic proceedings as well, also on the computer.

03:40:44   20   Q.  Doctor, you looked it up in Wikipedia; isn't that true?

03:40:48   21          MR. HAMMERMAN:  Objection, asked and answered.

03:40:50   22          THE COURT:  No, it wasn't.

03:40:52   23          THE WITNESS:  I saw it in Wikipedia, but I saw it in

03:40:56   24   the Mayo Clinic proceedings.

03:40:56   25   BY MR. ORMAN:

03:41:02  1  Q.  Now, you haven't seen the indictment in this case, have

03:41:06  2  you?

03:41:06  3  A.  I don't think that that was shared with me.

03:41:12  4        MR. ORMAN:  Can we have the answer read?

03:41:14  5        THE WITNESS:  I don't recall seeing the indictment.

03:41:16  6  BY MR. ORMAN:

03:41:16  7  Q.  You never asked the government for a copy of the

03:41:20  8  indictment, did you?

03:41:22  9  A.  No, I didn't.

03:41:22  10  Q.  They never gave it to you, correct?

03:41:26  11  A.  I didn't ask for it.

03:41:26  12  Q.  So you don't know whether this transcranial Doppler test

03:41:34  13  is in the indictment or not, true?

03:41:34  14        MR. HAMMERMAN:  Objection, your Honor.

03:41:36  15        THE COURT:  Sustained.

03:41:38  16  BY MR. ORMAN:

03:41:42  17  Q.  As I understand it, Doctor, you don't know how to read a

03:41:46  18  carotid test, you don't know how to read an echo, and you

03:41:50  19  don't know how to read a PFT, correct?

03:41:54  20  A.  I haven't had the training in those techniques.

03:41:56  21  Q.  The only test that you know how to read is an EKG; is that

03:42:04  22  correct?

03:42:04  23  A.  I know how to read a variety of tests, but I do know how

03:42:08  24  to read an EKG.

03:42:08  25  Q.  All right.  Now, somewhere you got the idea that an EKG

03:42:16  1   has to be done laying down, correct?

03:42:20  2   A.  That's the standard position and the position that we use

03:42:34  3   to compare.

03:42:36  4   Q.  Do you read the Journal of Electrocardiology?

03:42:46  5   A.  No.

03:42:46  6   Q.  Ever heard of it?

03:42:48  7   A.  No, not until this minute.

03:42:50  8   Q.  Are you aware of any studies that compare an EKG lying

03:42:56  9   down versus sitting up?

03:42:58  10  A.  No.

03:43:00  11       MR. HAMMERMAN:  Your Honor, I am going to object to

03:43:00  12  the line of questioning.  He's already stated he doesn't read

03:43:04  13  it, so he wouldn't be aware of the studies.

03:43:06  14       THE COURT:  Overruled.

03:43:06  15  BY MR. ORMAN:

03:43:08  16  Q.  Doctor, the basis for your statement that an EKG is done

03:43:14  17  lying down is that's the way you do it, correct?

03:43:18  18  A.  That's the way I do it, it's the way I've done it when I

03:43:22  19  was trained, it's the way it's been done for every one of the

03:43:26  20  patients I have asked for an electrocardiogram to be done on,

03:43:34  21  it's the protocol, it's the way it's done for all patients in

03:43:34  22  hospitals that I have been treating patients for the time

03:43:34  23  during my career.  It's been done that way in all the offices

03:43:38  24  that I worked in during that time also.

03:43:40  25  Q.  And because of all that, you believe it's the only way it

03:43:44   1   can be done, correct?

03:43:46   2   A.  I know that echocardiogram leads are placed on someone

03:43:52   3   during a stress test, so during a stress test, someone, of

03:43:54   4   course, has to be standing up and exercising for that.  But

03:43:58   5   you don't compare the EKG done on a stress test to a resting

03:44:02   6   EKG.  And, again, my experience has always been that the

03:44:06   7   resting EKG is done lying down.

03:44:08   8   Q.  Tell me every reason you can think of why you can't do an

03:44:12   9   EKG sitting up.

03:44:12   10  A.  I can't tell you a reason why it couldn't be done in any

03:44:18   11  other position, but the standard is that it's done lying down.

03:44:20   12  Q.  The standard according to whom, you?

03:44:24   13  A.  The experience of all the patients that I have treated and

03:44:28   14  all the places that I have worked.

03:44:30   15  Q.  And is it your testimony that you can never order a PFT,

03:44:44   16  that's a pulmonary function test, before seeing the patient?

03:44:50   17  A.  I don't order tests before I know why I'm ordering them,

03:44:56   18  and I find out why I'm ordering them by talking to the

03:44:58   19  patients.

03:45:00   20  Q.  Let's try it again.

03:45:00   21       Are you saying that under no circumstances ever can a

03:45:06   22  PFT be done before seeing the patient?

03:45:10   23  A.  I am saying I have never done that.

03:45:14   24  Q.  Only you.

03:45:16   25       Now --

03:45:16　1　　　　　MR. HAMMERMAN:  Objection, your Honor.  Mr. Orman

03:45:18　2　should not testify.

03:45:24　3　BY MR. ORMAN:

03:45:26　4　Q.  Do you know the name Thomas A. O'Connor?

03:45:30　5　A.  I think he is a physician involved in testimony I gave ten

03:45:40　6　years ago.

03:45:40　7　Q.  You were testifying against him at that time, weren't you?

03:45:48　8　A.  Yes.

03:45:48　9　Q.  And it was a similar situation as here.  You were

03:45:50　10　contending that he was doing unnecessary tests; is that right?

03:45:56　11　A.  Unnecessary tests and billing for something that he didn't

03:45:58　12　actually do.

03:46:00　13　Q.  And that is the consulting work that you do; that is,

03:46:06　14　going wherever and giving that kind of testimony; is that

03:46:10　15　correct?

03:46:10　16　A.  I have done that once in I think -- wasn't it 2002, sir?

03:46:14　17　Q.  And that was it?

03:46:16　18　A.  Yes.

03:46:16　19　Q.  And is that the legal consulting that you were referring

03:46:20　20　to?

03:46:20　21　A.  I have also reviewed records for WPS as well.

03:46:24　22　Q.  And that's to determine whether tests are excessive?

03:46:26　23　A.  They would ask my opinion on whether tests billed for were

03:46:32　24　done.

03:46:32　25　Q.  Now, you executed a declaration involving Thomas O'Connor.

03:46:42  1  Do you recall that?

03:46:42  2  A.  You'd have to refresh my memory.

03:46:46  3  Q.  Would you like to see it?

03:46:46  4  A.  Sure.

03:46:48  5  Q.  And that is Defendant's Exhibit 148, and I am concerned

03:46:56  6  about paragraph 48 at page 30 at the bottom.

03:47:10  7        MR. HAMMERMAN:  Your Honor, the government hasn't

03:47:12  8  been provided with a copy of this exhibit.  We'd just like to

03:47:16  9  see one, please.

03:47:18  10        MR. ORMAN:  That is incorrect, your Honor.  We gave

03:47:20  11  them all these exhibits.  I am happy to give him another one.

03:47:30  12  I will tender it to him in a minute, your Honor.

03:47:34  13  BY MR. ORMAN:

03:47:36  14  Q.  Have you read the paragraph I referred to?

03:47:38  15  A.  Yes.

03:47:40  16  Q.  I just want to know if you've read it.

03:47:42  17        MR. HAMMERMAN:  Your Honor, I would ask that we be

03:47:44  18  provided a copy of whatever he is tendering to the witness.

03:47:58  19        MR. ORMAN:  I'm sorry, your Honor.  The government

03:48:00  20  gave that to us.  That's their document.

03:48:02  21        MR. HAMMERMAN:  Your Honor, may we have a sidebar,

03:48:04  22  please?

03:48:04  23        THE COURT:  Not at this time, no.  You can bring it

03:48:08  24  up after the jury leaves.

03:48:14  25  BY MR. ORMAN:

03:48:14   1   Q.  And you understood your declaration, that that was like
03:48:16   2   being under oath, correct?
03:48:18   3   A.  Right.
03:48:18   4   Q.  And in that declaration, you said that usually, emphasis
03:48:24   5   on usually, you see -- you do the PFT after seeing the
03:48:30   6   patient, true?
03:48:30   7   A.  Right.
03:48:32   8   Q.  Now, I'd like to talk a little bit about what you have
03:48:42   9   done and haven't done.  Have you ever been to 79th Street on
03:48:50  10   the South Side of Chicago?
03:48:52  11   A.  Yes.
03:48:52  12   Q.  How many times?
03:48:54  13   A.  Once.
03:48:54  14   Q.  For how long?
03:48:56  15   A.  Three hours.
03:48:58  16   Q.  You have never practiced medicine there, have you?
03:49:02  17   A.  No.
03:49:02  18   Q.  You're aware that the population there is essentially all
03:49:10  19   African-American?
03:49:12  20   A.  Yes.
03:49:12  21   Q.  You have never practiced in an area which is essentially
03:49:20  22   all African-American; is that true?
03:49:24  23   A.  Not all African-American.
03:49:26  24   Q.  It's true?
03:49:28  25   A.  Right.

03:49:28 1 Q. And you have never practiced at a storefront medical
03:49:34 2 center, have you?
03:49:36 3 A. No, I have not.
03:49:36 4 Q. And you have never practiced at a facility where patients
03:49:44 5 line up in the morning, 10, 20, 30, like a Van Halen concert
03:49:52 6 waiting to get in, have you, Doctor?
03:49:54 7 MR. HAMMERMAN: Your Honor, object to the form of the
03:49:56 8 question.
03:49:56 9 THE COURT: You may restate it.
03:50:00 10 BY MR. ORMAN:
03:50:04 11 Q. You have never practiced medicine in a storefront facility
03:50:12 12 where people line up at 9:00 o'clock in the morning, 10, 20,
03:50:18 13 30, seeking medical treatment, have you?
03:50:20 14 A. Well, I have to admit I didn't count the people who were
03:50:26 15 at the door when I stepped in to Su Clinica Familar or stepped
03:50:30 16 into Crusader Clinic, but I know many of them brought their
03:50:34 17 lunch.
03:50:34 18 Q. And there's only so many hours in a day to see all of
03:50:40 19 those patients; isn't that correct, Doctor?
03:50:42 20 A. There's only 24 hours in a day, yes. There's only so many
03:50:48 21 hours to see them.
03:50:48 22 Q. And the more patients you see or are in line, the less
03:50:54 23 time you can devote to those patients, all of whom need
03:51:00 24 medical care?
03:51:02 25 MR. HAMMERMAN: Object to the form of the question,

03:51:04    1    your Honor.

03:51:04    2    BY MR. ORMAN:

03:51:04    3    Q.  True?

03:51:06    4             THE COURT:  Overruled.

03:51:06    5             THE WITNESS:  The time needs to be devoted that needs

03:51:10    6    to be devoted.

03:51:10    7    BY MR. ORMAN:

03:51:10    8    Q.  Is that a yes?

03:51:12    9    A.  No, that means that a patient needs to be properly

03:51:16   10    questioned and examined no matter how many patients are

03:51:18   11    waiting.

03:51:18   12    Q.  So you will just make them wait.  That's what you would

03:51:26   13    do?

03:51:26   14    A.  Well, I examine my patients and I interview my patients.

03:51:34   15    Q.  And what do you say to the patients who you can't get to,

03:51:36   16    come back another day?

03:51:38   17    A.  Sometimes I say that.  Sometimes I will refer them to

03:51:42   18    other facilities.

03:51:42   19    Q.  Doctor, I want to talk about murmurs.  Now, there's

03:51:52   20    different kinds of murmurs, yes?

03:51:54   21    A.  Yes.

03:51:54   22    Q.  There's a transient murmur, true?

03:52:00   23    A.  True.

03:52:00   24    Q.  And there is a murmur that is reoccurring, yes?

03:52:04   25    A.  Yes.

491

03:52:04   1   Q.  Let's talk about transient murmurs.  That's a one-time

03:52:10   2   murmur?

03:52:10   3   A.  Or it may come and go.  It may be present sometimes and

03:52:14   4   not at others.

03:52:16   5   Q.  And murmurs can be caused by people being nervous; isn't

03:52:20   6   that true?

03:52:20   7   A.  That's a possibility.

03:52:22   8   Q.  Is that a yes?

03:52:28   9   A.  If they have an increased blood flow through the heart,

03:52:30  10   they might have a heart murmur.

03:52:32  11   Q.  And blood pressure can go up as a result of nerves, yes?

03:52:38  12   A.  Yes.

03:52:38  13   Q.  Now, in your preparation for this case, have you checked

03:52:46  14   to see the percentages --

03:52:52  15        MR. ORMAN:  May I withdraw, your Honor?

03:52:54  16        THE COURT:  Yes.

03:52:54  17   BY MR. ORMAN:

03:52:54  18   Q.  In your preparation for this case, have you researched the

03:53:00  19   percentage of people that have heart murmurs in any journal?

03:53:08  20   A.  No.

03:53:10  21   Q.  So you have no idea what that number would be?

03:53:12  22   A.  Of people who have -- what type of heart murmur?

03:53:16  23   Q.  Any kind.

03:53:16  24   A.  I don't have a precise number.

03:53:20  25   Q.  Do you remember your discussion of Shirley-Terrell?

03:53:50  1  A.  We have just been talking about her this afternoon.

03:53:52  2  Q.  Yes.  Didn't you say that given her symptoms and

03:53:58  3  diagnosis, her medical tests seem appropriate?

03:54:02  4  A.  I would have to refer to her record again.

03:54:08  5  Q.  I am not talking about the record, Doctor.  I am talking

03:54:10  6  about your conversations with the government.  Do you remember

03:54:14  7  that?

03:54:14  8  A.  You will have to refresh my memory again.

03:54:16  9  Q.  Well, if you will bear with me, I'd like to hand you all

03:54:24  10  the statements that I do have.  What I have just handed you is

03:54:44  11  several interviews -- the recordings of several interviews

03:54:48  12  that you had with the government.

03:54:50  13        Now, do you see an interview that was conducted on

03:54:56  14  October 11th, that's in 2011?  And the day I'm referring to

03:55:06  15  would be at the bottom.

03:55:26  16  A.  I have something from October 4, something from October

03:55:32  17  16th, October 12, is that the one?

03:55:36  18        October 11th.  What page number, sir?  It's the third

03:55:52  19  page in, Shirley-Terrell?

03:55:54  20  Q.  Yes.

03:55:56  21  A.  Okay.

03:55:56  22  Q.  Let me see if I can find what I am looking for here.

03:56:04  23        Okay.  Do you see the very bottom page of your

03:56:10  24  October 11th, 2011, interview, do you see the last paragraph?

03:56:18  25  Do you see that?

03:56:20   1   A.  Right.

03:56:20   2   Q.  That's what you told the government?

03:56:22   3           MR. HAMMERMAN:  Objection, your Honor.  This is

03:56:26   4   improper impeachment, improper refreshing of recollection.

03:56:32   5           THE COURT:  You may rephrase the question and cure

03:56:34   6   the problem.

03:56:34   7           MR. ORMAN:  Yes.

03:56:36   8   BY MR. ORMAN:

03:56:36   9   Q.  Did you tell the government when you were interviewed on

03:56:40   10  October 11th of 2001 that given the symptoms and diagnoses for

03:56:46   11  Shirley-Terrell, the medical tests provided by Chhibber seem

03:56:52   12  appropriate?  Did you say that to the government?

03:56:54   13  A.  What I said was that someone who had a heart murmur, who

03:57:00   14  had chest pain, who had a carotid bruit, who had dizziness and

03:57:06   15  I interviewed them, and my concern was that these symptoms

03:57:10   16  were there and that they indicated a state of disease that

03:57:14   17  needed evaluation, I would get those tests.

03:57:18   18  Q.  Doctor, did you say to the government that given the

03:57:22   19  symptoms and diagnoses for Shirley-Terrell, the medical tests

03:57:26   20  provided by Chhibber seemed appropriate?

03:57:28   21          MR. HAMMERMAN:  Objection.  Asked and answered.

03:57:30   22          THE COURT:  It was not answered.

03:57:34   23          MR. ORMAN:  It was not.

03:57:36   24          THE WITNESS:  Well, I don't know if this is a

03:57:38   25  verbatim transcription of every word that was said there, but

03:57:42   1   this is what's on the paper.

03:57:44   2   BY MR. ORMAN:

03:57:44   3   Q.  Did the government get it right or wrong?

03:57:46   4   A.  Well, I remember discussing with the government exactly

03:57:52   5   the things that I have given in my testimony here and that I

03:57:56   6   have just stated to you.

03:57:58   7   Q.  Now, did you also tell the government that Shirley-Terrell

03:58:04   8   was not in good health?  Do you recall?

03:58:16   9   A.  No.  Can you point it out to me?

03:58:20   10  Q.  If you go to the second to the last paragraph, counting

03:58:44   11  down 1, 2, 3 -- 4 lines.

03:58:46   12  A.  Is this on page 3?

03:58:50   13  Q.  That interview, same page.  We are talking about the

03:58:54   14  10/11/2011 interview.  Did you make that statement to the

03:59:00   15  government that she was not in good health?

03:59:04   16  A.  Yes.

03:59:10   17  Q.  Now, did the government provide you with any records for

03:59:20   18  Shirley-Terrell, other than her chart with -- reflecting her

03:59:30   19  treatment with Dr. Chhibber?

03:59:30   20  A.  I have only seen the records, most of the records that we

03:59:36   21  reviewed this afternoon.

03:59:36   22  Q.  Then you wouldn't know that Shirley-Terrell had a history

03:59:42   23  of asthma attacks, true?

03:59:44   24       MR. HAMMERMAN:  Objection, your Honor.  The witness

03:59:46   25  just stated that that's all he's looked at.

| | | |
|---|---|---|
| 03:59:48 | 1 | THE COURT:  Overruled. |
| 03:59:50 | 2 | THE WITNESS:  I have only reviewed the medical record |
| 03:59:54 | 3 | that I have seen. |
| 03:59:56 | 4 | BY MR. ORMAN: |
| 03:59:58 | 5 | Q.  Would a history of asthma attacks justify an SOB, |
| 04:00:00 | 6 | shortness of breath? |
| 04:00:02 | 7 | A.  If she said she was short of breath during her interview, |
| 04:00:10 | 8 | yes.  If she did not say that, no. |
| 04:00:12 | 9 | Q.  Many times patients don't even realize they're having a |
| 04:00:18 | 10 | problem breathing; is that correct? |
| 04:00:20 | 11 | A.  I have to depend on them to tell me if they have trouble |
| 04:00:26 | 12 | breathing. |
| 04:00:26 | 13 | Q.  Can't you depend upon your own observations? |
| 04:00:30 | 14 | A.  Yes. |
| 04:00:30 | 15 | Q.  You know that a pulmonary function test was done on |
| 04:00:48 | 16 | Shirley-Terrell at Dr. Chhibber's office, true? |
| 04:00:52 | 17 | A.  I see he ordered it on the 4th of March, and, yes, I see a |
| 04:01:06 | 18 | pulmonary function test here. |
| 04:01:08 | 19 | Q.  You can't tell us whether the results of that test were |
| 04:01:14 | 20 | normal or not because you can't read them, correct? |
| 04:01:20 | 21 | A.  I wouldn't depend on my reading for a final determination, |
| 04:01:24 | 22 | but I recognize the tracings and I can read the report here. |
| 04:01:28 | 23 | Q.  You can't tell us if that chart -- that test was abnormal |
| 04:01:36 | 24 | because you can't read it, true? |
| 04:01:38 | 25 | A.  Well, I read the report and it points out that it's |

04:01:42  1   abnormal.

04:01:42  2   Q.  I am talking about the tracings.

04:01:46  3   A.  Well, I can tell that her flow volumes and her flow

04:01:52  4   velocity aren't the standard.

04:01:52  5   Q.  And as a matter of fact, they are about 50 percent of

04:01:56  6   standard; is that correct, or you don't know?

04:02:08  7   A.  You will notice, if you have the chart there, that her

04:02:12  8   forced air capacity is 31 percent of predicted and so forth.

04:02:18  9   Q.  So a test is ordered, pulmonary function test.  Are you

04:02:24  10  with me so far?

04:02:26  11  A.  Right.

04:02:26  12  Q.  Result comes back abnormal.  The mere fact that that test

04:02:36  13  was abnormal means that the test was appropriate, true?

04:02:44  14  A.  No, it doesn't.

04:02:46  15  Q.  The fact that it comes back abnormal is helpful to the

04:02:54  16  physician, true?

04:02:54  17  A.  I agree.

04:02:54  18  Q.  You wouldn't have done that test, would you?

04:02:58  19  A.  There is no way for me to tell.  I didn't examine and

04:03:04  20  didn't interview Ms. Thompson on that date.

04:03:06  21  Q.  Well, Doctor, if you didn't do that test, there is no way

04:03:10  22  in this world that you would know that she had a breathing

04:03:14  23  problem, can we agree on that?

04:03:16  24  A.  If she didn't tell me she didn't have one and I didn't

04:03:22  25  notice any abnormalities on my exam, I wouldn't.

04:03:26 1   Q.  I would like to go to the Defendant's Exhibit 310, Louis
04:03:40 2   Teague.  Tell me when you are there.
04:03:46 3   A.  Yes, sir.
04:03:46 4   Q.  All right.  Now, Louis Teague had an EKG, echo, and a PFT.
04:04:04 5   Can we agree on that?
04:04:06 6   A.  I see he's ordered all those, and I see the echo
04:04:12 7   interpretation, and I see an echocardiogram, and I see a PFT,
04:04:22 8   yes.
04:04:22 9   Q.  And you would not have ordered the EKG without seeing the
04:04:30 10  patient first, true?
04:04:32 11  A.  That's true.
04:04:34 12  Q.  But the EKG was abnormal, yes?
04:04:38 13  A.  Yes.
04:04:38 14  Q.  And the PFT, that was abnormal too, wasn't it?
04:04:46 15  A.  Well, here it says interpretation normal, but it shouldn't
04:04:54 16  be used for comparison with previous or subsequent.
04:04:56 17  Q.  That's what it says.  How are PFTs determined?  In other
04:05:02 18  words, what personal characteristics do you put into the
04:05:08 19  machine in order to get a readout?  Do you know?
04:05:12 20  A.  Yes.
04:05:12 21  Q.  What?
04:05:12 22  A.  You record how much they exhale and how fast they exhale.
04:05:20 23  Q.  Maybe I asked a confusing question.  Let's do it this way.
04:05:24 24  PFTs are based on height and age, correct?
04:05:30 25  A.  There may be some difference in what we would expect from

04:05:34  1    someone because of their height and age, but what we measure

04:05:38  2    is how much they exhale and how fast they're exhaling.

04:05:42  3    Q.  In interpreting the results, you focus on the patient's

04:05:48  4    height and the patient's weight and you input that information

04:05:52  5    into the machine?

04:05:52  6    A.  We do, but we focus on how much they are breathing and how

04:05:56  7    fast they are breathing.

04:05:56  8    Q.  And if somebody gives you the wrong age like Louis Teague

04:06:04  9    did --

04:06:04  10        MR. HAMMERMAN:  Objection, your Honor.  Facts not in

04:06:06  11   evidence.

04:06:06  12        MR. ORMAN:  I will withdraw the question, your Honor.

04:06:08  13        THE COURT:  All right.

04:06:10  14   BY MR. ORMAN:

04:06:10  15   Q.  If somebody gives the wrong age, that will affect the

04:06:14  16   results, correct?

04:06:14  17   A.  It might affect the interpretation, but the result is a

04:06:18  18   result of how they perform on the test.

04:06:20  19   Q.  Okay.  Tell me this.  How would you, Dr. Herdeman, go

04:06:28  20   about redetermining Louis Teague's PFT results when you find

04:06:38  21   out a different match?  What would you do?

04:06:40  22   A.  I may ask him to take the test over again or there may be

04:06:44  23   an algorithm that I am not precisely familiar with the details

04:06:48  24   of that might address the results somewhat.

04:06:50  25   Q.  Isn't there an algorithm on Johns Hopkins' website for

| | | |
|---|---|---|
| 04:06:58 | 1 | calculating and redoing PFTs? |
| 04:07:00 | 2 | A. I don't know. |
| 04:07:00 | 3 | Q. You have never done that, have you? |
| 04:07:02 | 4 | A. Never done that. |
| 04:07:04 | 5 | Q. So you wouldn't know -- I will withdraw the question, |
| 04:07:06 | 6 | Judge. |
| 04:07:08 | 7 | Now, is it your testimony that the echocardiogram |
| 04:07:20 | 8 | conducted on Louis Teague was inappropriate? |
| 04:07:22 | 9 | A. I can't tell if it's appropriate or not from the |
| 04:07:28 | 10 | information I have here. |
| 04:07:30 | 11 | Q. What does appropriate mean, Doctor? |
| 04:07:38 | 12 | A. Proper. |
| 04:07:38 | 13 | Q. Proper for whom? |
| 04:07:40 | 14 | A. Proper that it should be done on the person who is getting |
| 04:07:46 | 15 | it done. |
| 04:07:46 | 16 | Q. Would it make a difference if the echocardiogram was not |
| 04:07:52 | 17 | billed to anybody, that means it was free? |
| 04:07:56 | 18 | A. Yes. |
| 04:07:56 | 19 | Q. What would be the difference, Doctor? |
| 04:07:58 | 20 | A. Maybe I am not understanding. It doesn't make any |
| 04:08:06 | 21 | difference whether it's being paid for or not. It's done or |
| 04:08:08 | 22 | it's not done for the right reason. |
| 04:08:10 | 23 | Q. So if Dr. Chhibber does an EKG on Louis Teague and doesn't |
| 04:08:22 | 24 | bill for it, you know, it's his cost, he pays his technicians |
| 04:08:26 | 25 | to do it and doesn't charge the insurance company, the test is |

04:08:28  1   still improper?

04:08:30  2   A.  Are you talking about an EKG or an echocardiogram?

04:08:32  3   Q.  If I said EKG, I screwed it up.  Let me start again.

04:08:36  4        Dr. Chhibber does an echo, an echocardiogram on Louis

04:08:44  5   Teague, he doesn't charge the insurance company, he pays his

04:08:48  6   technician to do it, and according to you, Dr. Herdeman,

04:08:58  7   that's still improper, is that what you're saying?

04:09:00  8   A.  I am saying that whether it's paid for or not or who pays

04:09:04  9   for it, it's to be done for the proper reason.  It doesn't

04:09:08  10  make any difference who pays for it or whether it's paid for

04:09:10  11  or not.

04:09:12  12  Q.  Can we talk about Terrell Cole?  That's Exhibit 340.

04:09:46  13  A.  Yes, sir.

04:09:46  14  Q.  Terrell Cole did not have an echocardiogram, true?

04:09:56  15  A.  I don't see it ordered, no.

04:10:04  16  Q.  Didn't have a pulmonary function test?

04:10:08  17  A.  No.

04:10:08  18  Q.  Didn't have a carotid Doppler?

04:10:18  19  A.  No.

04:10:18  20  Q.  He had only one test, true?

04:10:22  21  A.  It looks like he had an EKG and some blood tests.

04:10:26  22  Q.  Why do you say he had some blood tests?

04:10:32  23  A.  Well, I guess because -- perhaps you can help interpret

04:10:36  24  this for me.  It says diabetes is at panel?

04:10:42  25  Q.  Do you know what a diabetes panel is?

04:10:44  1  A.  That is not a term that I am familiar with.  I don't know
04:10:48  2  -- I can't really read that notation there, but it's under the
04:10:50  3  listing where he put the EKG, so I presume he asked that
04:10:54  4  something else be done.
04:10:54  5  Q.  I still have to go back to this.  You've never heard the
04:10:58  6  phrase diabetes panel?
04:11:02  7  A.  That's not a test that I order.
04:11:04  8  Q.  Is it one test or is it multiple tests?
04:11:06  9  A.  I don't know.
04:11:08  10  Q.  Do you read laboratory reports?
04:11:12  11  A.  Quite a few of them as a matter of fact.
04:11:14  12  Q.  And do you see a place on laboratory reports that say
04:11:22  13  diabetes panel?
04:11:22  14  A.  No, I don't.
04:11:24  15  Q.  You've never seen that?
04:11:24  16  A.  No.
04:11:26  17  Q.  Terrell Cole's EKG, according to you, is abnormal?
04:11:38  18  A.  Yes.
04:11:40  19  Q.  And you raise the possibility that it could be some sort
04:11:44  20  of artifact, as well as an abnormal reading?
04:11:46  21  A.  Yes, I do.
04:11:48  22  Q.  But if he had two other EKGs that year and all of them
04:11:54  23  reflected the identical spike, does that reduce the
04:12:00  24  possibility of an artifact?
04:12:02  25  A.  Yes, it does.

04:12:04  1  Q.  Does it eliminate it?

04:12:06  2  A.  It would be convincing evidence for me, yes.

04:12:10  3  Q.  An abnormal EKG could mean heart damage, correct?

04:12:18  4  A.  Yes.  Absolutely.

04:12:20  5  Q.  Terrell Cole was 250 pounds, yes?

04:12:28  6  A.  He was 253 or 248, 253.

04:12:34  7  Q.  And he has an elevated blood pressure?

04:12:38  8  A.  He has an elevated blood pressure reading here, yes, he

04:12:40  9  does.

04:12:40  10  Q.  And when you reviewed his record, you knew he had an

04:12:48  11  abnormal EKG, yes?

04:12:52  12  A.  Yes.  When I reviewed the records, I did.

04:12:56  13  Q.  And knowing all that, high blood pressure, overweight, bad

04:13:04  14  EKG, you would still not order that EKG anyway, true?

04:13:10  15  A.  That can't be said.  I really don't have the information I

04:13:16  16  need here.  You alluded to it yourself that he has had EKGs

04:13:20  17  done before that we could compare to.  I can't tell that from

04:13:24  18  the document I have here.  I don't see any other blood

04:13:26  19  pressure readings to compare to.  I don't know if this is a

04:13:30  20  single reading or what the rest of his history might be.

04:13:40  21  Q.  Did you ever tell the government that you would not have

04:13:42  22  ordered an EKG for Terrell Cole?

04:13:44  23  A.  I can't recall that.  You can refresh my memory, if that's

04:13:46  24  what I told them.

04:13:46  25  Q.  Could you please go to your interview with the government.

04:14:02  1  That's the October 11th, 2011, interview.  Please go to page

04:14:16  2  10 in the lower right-hand corner.  Please tell me when you're

04:14:20  3  there.

04:14:30  4       Are you there?

04:14:32  5  A.  No.

04:14:32  6  Q.  Say when.

04:14:34  7  A.  Here we go.  Which paragraph?

04:14:36  8  Q.  Count up one, two, three from the bottom where it says,

04:14:44  9  "Discovery of a heart murmur."  Do you see that?

04:14:48  10  A.  It's the second paragraph from the bottom, correct?

04:15:12  11  Q.  Two and a half from the bottom.

04:15:14  12  A.  The presence of a regular --

04:15:16  13       MR. HAMMERMAN:  Objection, your Honor.  I would ask

04:15:16  14  the witness not to read the document that he is trying to find

04:15:20  15  the location of.

04:15:22  16       THE COURT:  All right.  Let's wait for a question.

04:15:24  17  BY MR. ORMAN:

04:15:24  18  Q.  Do you see the paragraph beginning with the phrase,

04:15:28  19  "Discovery of a heart murmur"?

04:15:32  20  A.  Yes.

04:15:38  21  Q.  All right.  Do you see where it says, "In the case of

04:15:46  22  Cole" --

04:15:48  23       MR. HAMMERMAN:  Objection, your Honor.

04:15:50  24       THE COURT:  Overruled.  He has not completed his

04:15:54  25  question.

504

04:15:56  1   BY MR. ORMAN:

04:15:56  2   Q.  Do you see where it says, "In the case of Cole, Herdeman

04:16:06  3   opined that high body mass index and high blood pressure is

04:16:10  4   listed on Cole's chart could be additional cause to order an

04:16:16  5   EKG.  However, Herdeman doubted that he would have ordered the

04:16:24  6   EKG if Cole were his patient."  Do you see that?

04:16:30  7   A.  I see that.

04:16:32  8   Q.  You wouldn't have ordered an EKG for Terrell Cole no

04:16:36  9   matter what, true?

04:16:38  10  A.  No, that's not --

04:16:40  11  Q.  You wouldn't have ordered a PFT for Shirley-Terrell no

04:16:44  12  matter what, true?

04:16:46  13  A.  No.

04:16:46  14  Q.  Does that explain why you order one or two of these tests

04:16:52  15  a week?  You just don't do it?

04:16:54  16  A.  I do it when it justifies.

04:16:58  17  Q.  And doing things your way means that you miss a lot of

04:17:08  18  defective conditions in patients, true?

04:17:08  19  A.  I don't know.

04:17:10  20  Q.  That's because you don't do the tests, Doctor.  That's why

04:17:14  21  you don't know.

04:17:16  22          MR. HAMMERMAN:  Objection.

04:17:18  23          THE COURT:  Sustained.

04:17:18  24  BY MR. ORMAN:

04:17:18  25  Q.  True?

04:17:20　1　　　　　MR. HAMMERMAN:  I'd ask that the comments be

04:17:20　2　stricken.

04:17:22　3　　　　　THE COURT:  They are stricken.

04:17:24　4　BY MR. ORMAN:

04:17:40　5　Q.  Do you happen to have Exhibit 330 with you?  That's Ryan

04:17:48　6　O'Neal.

04:18:02　7　A.  Ryan O'Neal?

04:18:04　8　Q.  Yes.  Are you now looking at --

04:18:36　9　A.  Yes, sir.

04:18:38　10　Q.  -- the echocardiogram report of Ryan O'Neal?

04:18:42　11　A.  Yes, I am.

04:18:42　12　Q.  Now, you previously noted item 6, mild LVH.  Do you see

04:18:50　13　that?

04:18:50　14　A.  Yes.

04:18:52　15　Q.  And we can both agree that LVH means left ventricular

04:19:06　16　hypertrophy?

04:19:06　17　A.  That's true.

04:19:08　18　Q.  The largest chamber?

04:19:08　19　A.  That's correct.

04:19:10　20　Q.  Strongest chamber?

04:19:14　21　A.  Correct.

04:19:14　22　Q.  A muscle that's pumping blood all the time?

04:19:16　23　A.  That's what it's doing.

04:19:18　24　Q.  Pumping important blood to where?

04:19:20　25　A.  It goes out of the heart into the rest of the body; the

04:19:24    1   brain, to the vital organs, to the arms, to the legs.

04:19:26    2   Q.  Now, there comes a time when a lot of people, where you

04:19:34    3   get a blockage of stream -- that is, blood flow to the brain

04:19:38    4   and to the best of body -- sometimes called plaque, true?

04:19:42    5   A.  Plaque can form in your arteries, correct.

04:19:48    6   Q.  And when plaque forms, the diameter of the lumen or of the

04:19:54    7   artery, if you want to use that term, constricts, true?

04:19:58    8   A.  That's correct.

04:19:58    9   Q.  And that creates a pressure on the left ventricle, and it

04:20:04   10   has to pump harder and harder and harder to get the blood

04:20:10   11   where it's supposed to go, right?

04:20:10   12   A.  Well, really what causes --

04:20:14   13   Q.  Is that right, Doctor?

04:20:14   14   A.  That's not the artery -- that's not the kind of blockage

04:20:18   15   that makes your blood pressure go up.  It's the resistance

04:20:22   16   vessels which are not part of the kinds of large arteries that

04:20:26   17   I think you're referring to.

04:20:26   18   Q.  So it sounds like what I said was right?  You just don't

04:20:32   19   want to tell me it was right?

04:20:34   20          MR. HAMMERMAN:  Objection, your Honor.

04:20:36   21          THE WITNESS:  No.

04:20:36   22          THE COURT:  All right.  I am sure that question was

04:20:40   23   withdrawn.

04:20:42   24          MR. ORMAN:  Yes, Judge.  Can I withdraw the question?

04:20:44   25          THE COURT:  Yes.

507

| | | |
|---|---|---|
| 04:20:46 | 1 | MR. ORMAN:  Thank you. |
| 04:20:46 | 2 | BY MR. ORMAN: |
| 04:20:48 | 3 | Q.  When there is resistance, the heart becomes -- because |
| 04:20:52 | 4 | it's a muscle, just like every muscle, it starts getting |
| 04:20:56 | 5 | larger and larger, true? |
| 04:20:58 | 6 | A.  That's correct. |
| 04:20:58 | 7 | Q.  The ventricle becomes larger and larger, yes? |
| 04:21:02 | 8 | A.  That's correct. |
| 04:21:04 | 9 | Q.  So mild LVH could result in a serious condition, true? |
| 04:21:14 | 10 | A.  Yes. |
| 04:21:14 | 11 | Q.  Now, the government has in its possession all of the |
| 04:21:22 | 12 | medical records of Brian O'Neal? |
| 04:21:24 | 13 | MR. HAMMERMAN:  Objection, your Honor.  First of all, |
| 04:21:30 | 14 | that's testimony.  There's been no foundation laid, and this |
| 04:21:32 | 15 | is improper. |
| 04:21:32 | 16 | THE COURT:  All right.  He has withdrawn it.  He is |
| 04:21:36 | 17 | going to ask another question. |
| 04:21:36 | 18 | BY MR. ORMAN: |
| 04:21:40 | 19 | Q.  All right.  The government gave you the medical records of |
| 04:21:42 | 20 | Ryan O'Neal, didn't they? |
| 04:21:44 | 21 | A.  This medical record, yes. |
| 04:21:46 | 22 | Q.  They gave you a partial medical history, too, Doctor? |
| 04:21:48 | 23 | MR. HAMMERMAN:  Objection, your Honor.  Once again, |
| 04:21:50 | 24 | that kind of argumentative characterization is improper. |
| 04:21:54 | 25 | THE COURT:  Overruled. |

04:21:58    1          THE WITNESS:  This medical record is all I have,
04:22:02    2    that's correct.
04:22:06    3    BY MR. ORMAN:
04:22:06    4    Q.  Are you telling me that the government never gave you his
04:22:08    5    medical records?
04:22:08    6    A.  I have this medical record.
04:22:12    7    Q.  Didn't you receive a letter on September 13 of 2011 signed
04:22:34    8    by one of the assistant U.S. attorneys enclosing a whole bunch
04:22:38    9    of documents directed to you?
04:22:40   10    A.  Right.  It was on a disk, yes, correct.
04:22:44   11    Q.  On a disk, a DVD?
04:22:46   12    A.  That's correct.
04:22:46   13    Q.  Did you ever look at what was on that DVD?
04:22:50   14    A.  Yes, I did.
04:22:50   15    Q.  And did you see several patient files of Brian O'Neal?
04:23:00   16    A.  Yes, I did get a file on Brian O'Neal, correct.
04:23:02   17    Q.  Beyond what you're looking at now?
04:23:06   18    A.  I don't have it on my person right now.  I can't tell you
04:23:12   19    how much more or less.  I can tell you that I certainly saw
04:23:16   20    what's here.
04:23:18   21    Q.  What about his prior medical exams, you don't recall
04:23:22   22    seeing this?
04:23:22   23    A.  I don't recall seeing it, no.
04:23:24   24    Q.  Then you wouldn't know about his prior medical condition?
04:23:28   25    A.  I saw what I saw.  That's all.

| | | |
|---|---|---|
| 04:23:30 | 1 | Q.  You wouldn't know if he had severe cardiac problems, would |
| 04:23:34 | 2 | you? |
| 04:23:34 | 3 | MR. HAMMERMAN:  Objection, your Honor. |
| 04:23:36 | 4 | THE COURT:  Overruled. |
| 04:23:38 | 5 | THE WITNESS:  Well, what I would expect if he had |
| 04:23:40 | 6 | severe cardiac problems is that even on the note that I saw, |
| 04:23:44 | 7 | it would indicate that he had severe cardiac problems.  I |
| 04:23:48 | 8 | don't see that here. |
| 04:23:50 | 9 | BY MR. ORMAN: |
| 04:23:50 | 10 | Q.  Doctor, you don't know whether he had severe cardiac |
| 04:23:54 | 11 | problems or not, correct? |
| 04:23:54 | 12 | A.  That's right.  I certainly can't tell from this. |
| 04:23:58 | 13 | Q.  You wouldn't -- I will withdraw that, your Honor. |
| 04:24:06 | 14 | I would like to talk about Alan Vaval.  That's |
| 04:24:26 | 15 | Exhibit 360. |
| 04:24:36 | 16 | A.  Yes, sir. |
| 04:24:36 | 17 | Q.  You read his chart? |
| 04:24:38 | 18 | A.  I have his record here, and to my recollection, that's |
| 04:24:40 | 19 | what I received from the department. |
| 04:24:42 | 20 | Q.  Did you read his labs; that is, his laboratory results? |
| 04:24:48 | 21 | A.  I made notation of them at the time.  I can't tell you |
| 04:24:54 | 22 | what the results are now without reviewing them. |
| 04:24:56 | 23 | Q.  Then you don't recall a reading -- |
| 04:25:06 | 24 | A.  I'm sorry. |
| 04:25:06 | 25 | Q.  You don't recall right now without reading the chart a |

| | | |
|---|---|---|
| 04:25:12 | 1 | reading for amylase? |
| 04:25:14 | 2 | A.  No. |
| 04:25:16 | 3 | Q.  Would you tell the jury what amylase is? |
| 04:25:18 | 4 | A.  Amylase is an enzyme.  An enzyme is a chemical that's used |
| 04:25:22 | 5 | for various purposes to make your body work.  Amylase is |
| 04:25:26 | 6 | intended to help digest your carbohydrates.  There's amylase |
| 04:25:32 | 7 | in your carotid glands and amylase in your pancreas. |
| 04:25:36 | 8 | Q.  And primarily in the pancreas, true? |
| 04:25:40 | 9 | A.  Yes. |
| 04:25:40 | 10 | Q.  And when you see an elevated amylase reading, that |
| 04:25:48 | 11 | indicates insult to the pancreas? |
| 04:25:54 | 12 | A.  Pancreas or the carotid. |
| 04:25:56 | 13 | Q.  And insult means that the pancreas has been struck and |
| 04:26:04 | 14 | some cells have been broken and the amylase leaks out into the |
| 04:26:08 | 15 | bloodstream, true? |
| 04:26:10 | 16 | A.  That's correct. |
| 04:26:10 | 17 | Q.  And that's an indication of pancreatitis? |
| 04:26:18 | 18 | A.  It may be.  It may be an indication of mumps also. |
| 04:26:24 | 19 | Q.  And pancreatitis is one of the most painful conditions |
| 04:26:30 | 20 | that a person can suffer from, true? |
| 04:26:30 | 21 | A.  It can be very painful. |
| 04:26:32 | 22 | Q.  And it can cause abdominal pain? |
| 04:26:34 | 23 | A.  Yes, it can. |
| 04:26:36 | 24 | Q.  And that's what Alan Vaval was diagnosed with? |
| 04:26:40 | 25 | A.  It's listed as a diagnosis, but, again, it's very |

04:26:48  1  difficult to tell that he might have pancreatitis by reading

04:26:52  2  this note.

04:26:52  3  Q.  But certainly an elevated amylase is consistent with

04:26:58  4  abdominal pain, true?

04:27:00  5  A.  If someone had abdominal pain, I wouldn't be surprised if

04:27:04  6  they had a high amylase.

04:27:08  7  Q.  Let me just go back Cierra Thompson, because I want to get

04:27:18  8  you out of here today so you don't have to come back.  She had

04:27:32  9  MRSA?

04:27:32  10  A.  Yes.

04:27:32  11  Q.  MRSA causes a flesh eating condition, true?

04:27:36  12  A.  I'm sorry?

04:27:38  13  Q.  Causes a flesh eating condition?

04:27:40  14  A.  That's one of the more dramatic phrases for it.

04:27:42  15  Q.  And it's serious?

04:27:44  16  A.  Yes, it's serious.

04:27:46  17  Q.  Now, when she came to see Dr. Chhibber, he prescribed

04:27:52  18  certain antibiotics, true?

04:27:54  19  A.  Yes.  Yes, he did.

04:27:56  20  Q.  Doxycycline?

04:28:00  21  A.  Let me make sure I am accurate.  It looks like doxycycline

04:28:08  22  is listed, and there are some --

04:28:10  23  Q.  Flagyl?

04:28:12  24  A.  I'm sorry?

04:28:14  25  Q.  Flagyl?

04:28:14   1    A.  Yes, that's what I see here.

04:28:16   2    Q.  All right.  And another one at the top that begins with C,

04:28:20   3    which I have forgotten about?

04:28:22   4    A.  Clindamycin.

04:28:24   5    Q.  Would you have prescribed those antibiotics for Cierra

04:28:30   6    Thompson if she came to you?

04:28:30   7    A.  I probably would have chosen two of them.

04:28:36   8    Q.  Which two?

04:28:36   9    A.  Probably the doxycycline and the Flagyl.

04:28:42  10    Q.  The lab report -- may I strike that, your Honor.

04:28:50  11         Let's just talk about the chronology for Cierra

04:28:54  12    Thompson.  The night of December 13, 2009, she went to the

04:29:02  13    emergency room.  Were you aware of that?

04:29:08  14    A.  Now I am.

04:29:12  15    Q.  She had a boil on a private part of her body, yes?

04:29:18  16    A.  Yes.

04:29:18  17    Q.  Her temperature was elevated, yes?

04:29:22  18    A.  I can see that it's elevated here.  I don't know about the

04:29:26  19    13th.

04:29:28  20    Q.  And what they did, that emergency room at West Suburban

04:29:36  21    Hospital, is they ruptured the boil and extracted the exudate

04:29:42  22    from the boil, true?

04:29:42  23         MR. HAMMERMAN:  Objection, your Honor.  There is no

04:29:44  24    foundation for what this witness knows what happened at a

04:29:48  25    hospital.

| | | |
|---|---|---|
| 04:29:48 | 1 | THE COURT:  Overruled, and please don't testify for |
| 04:29:50 | 2 | the witness. |
| 04:29:54 | 3 | THE WITNESS:  I don't know what happened before she |
| 04:29:58 | 4 | arrived except there is, as I recall, an indication that she |
| 04:30:02 | 5 | had sought emergency care, but I have no record of what was |
| 04:30:04 | 6 | done in the hospital. |
| 04:30:06 | 7 | BY MR. ORMAN: |
| 04:30:08 | 8 | Q.  The government didn't give you her hospital records in the |
| 04:30:12 | 9 | last two or three days? |
| 04:30:14 | 10 | A.  No.  I'm sorry? |
| 04:30:18 | 11 | Q.  In the last two or three days? |
| 04:30:20 | 12 | A.  Her hospital record? |
| 04:30:22 | 13 | Q.  Yes. |
| 04:30:22 | 14 | A.  No. |
| 04:30:22 | 15 | Q.  Did you see the lab report from West Suburban? |
| 04:30:30 | 16 | A.  This is it? |
| 04:30:32 | 17 | Q.  In the chart. |
| 04:30:34 | 18 | A.  There is no lab report in this chart. |
| 04:30:42 | 19 | Q.  There better be a lab report in that chart.  I saw it. |
| 04:30:46 | 20 | Please look. |
| 04:30:46 | 21 | MR. HAMMERMAN:  Objection, your Honor. |
| 04:30:46 | 22 | THE WITNESS:  It's not under Lab Report.  If it's |
| 04:30:50 | 23 | anyplace -- |
| 04:30:52 | 24 | BY MR. ORMAN: |
| 04:30:52 | 25 | Q.  Let me just do this, Doctor.  The lab report I just handed |

| | | |
|---|---|---|
| 04:30:56 | 1 | you is dated when, the one I just handed you? |
| 04:31:02 | 2 | A.  Let me just look at this. |
| 04:31:04 | 3 | Q.  Okay. |
| 04:31:06 | 4 | A.  Yes. |
| 04:31:08 | 5 | Q.  What was it dated? |
| 04:31:10 | 6 | A.  The date here is 12/13/09. |
| 04:31:12 | 7 | Q.  That's when she first came into the hospital? |
| 04:31:16 | 8 | A.  If you're telling me that's the case. |
| 04:31:20 | 9 | Q.  Let me just -- Dr. Chhibber's giving the patient |
| 04:31:34 | 10 | doxycycline killed the MRSA because it went away, yes? |
| 04:31:40 | 11 | A.  One more time.  This note here was the day before she went |
| 04:31:56 | 12 | to see Dr. Chhibber. |
| 04:31:58 | 13 | Q.  Let me just -- there's always a possibility that the MRSA |
| 04:32:28 | 14 | could have spread to Cierra Thompson's heart? |
| 04:32:36 | 15 | A.  That's one of those there's always a possibility of many |
| 04:32:38 | 16 | things could happen.  It's not likely. |
| 04:32:40 | 17 | Q.  What's wrong with doing an echocardiogram to make sure |
| 04:32:48 | 18 | that Cierra Thompson's heart was still intact?  What's wrong |
| 04:32:54 | 19 | with that? |
| 04:32:54 | 20 | A.  It's not -- she doesn't present the signs and symptoms |
| 04:33:02 | 21 | that would indicate she should have an echocardiogram. |
| 04:33:06 | 22 | Q.  So you would be willing to take the chance that the |
| 04:33:12 | 23 | bacteria did not spread to her heart because you thought that |
| 04:33:16 | 24 | test was unnecessary, is that what you're saying? |
| 04:33:20 | 25 | A.  Well, I wouldn't -- if Ms. Thompson or another young lady |

04:33:26  1  with the same array of complaints came to me and I did my

04:33:28  2  evaluation and I thought she had a bartholin cyst that needed

04:33:36  3  lancing and needed antibiotic treatment and if she didn't have

04:33:36  4  the signs and symptoms of bacterial endocarditis, I wouldn't

04:33:42  5  get an echocardiogram.

04:33:44  6          MR. ORMAN:  I don't have any questions.

04:33:44  7          MR. JONES:  Wait a minute.  Can I talk to counsel?

04:34:18  8          MR. ORMAN:  No more questions, Judge.

04:34:20  9          THE COURT:  Any redirect?

04:34:20  10         MR. HAMMERMAN:  Very brief, your Honor.

04:34:22  11                   - - -

04:34:22  12       DANIEL HERDEMAN, M.D., REDIRECT EXAMINATION

04:34:22  13 BY MR. HAMMERMAN:

04:34:34  14 Q.  Mr. Orman asked you a few questions, Dr. Herdeman, about

04:34:40  15 whether or not in a conversation with representatives of the

04:34:42  16 government you would have made a comment about whether or not

04:34:46  17 Tiffany Shirley-Terrell was a healthy or unhealthy person; is

04:34:46  18 that right?

04:34:50  19 A.  Yes.

04:34:50  20 Q.  Do you remember Mr. Orman's questions?

04:34:54  21 A.  Not precisely.  Rephrase it for me.

04:34:58  22 Q.  Do you remember he showed you a report of an interview and

04:35:02  23 asked you if you had told the government in a conversation

04:35:04  24 that you thought Tiffany Shirley-Terrell was unhealthy?

04:35:08  25 A.  Yes.

| | | |
|---|---|---|
| 04:35:08 | 1 | Q.  Do you remember those questions? |
| 04:35:08 | 2 | A.  Okay. |
| 04:35:08 | 3 | Q.  Dr. Herdeman, do you remember the questions? |
| 04:35:12 | 4 | A.  Okay, yes. |
| 04:35:20 | 5 | Q.  Would you call someone who had a heart murmur, chest pain, |
| 04:35:24 | 6 | carotid bruit, dizziness, chest pain and was short of breath |
| 04:35:28 | 7 | an unhealthy person -- |
| 04:35:30 | 8 | A.  Yes. |
| 04:35:30 | 9 | Q.  -- if that was true? |
| 04:35:32 | 10 | A.  If that was true, yes. |
| 04:35:34 | 11 | Q.  You did not examine, though, Tiffany Shirley, correct? |
| 04:35:44 | 12 | A.  No, I never met Ms. Shirley. |
| 04:35:48 | 13 | Q.  Mr. Orman asked you some questions about the charts for |
| 04:35:54 | 14 | Alan Vaval, and he mentioned a condition that mentioned the |
| 04:36:00 | 15 | pancreas and an elevated level of -- and I don't want to |
| 04:36:04 | 16 | mispronounce it -- |
| 04:36:06 | 17 | A.  Amylase. |
| 04:36:06 | 18 | Q.  -- amylase. |
| 04:36:08 | 19 | A.  And I did finally find the notation, yes. |
| 04:36:10 | 20 | Q.  That condition was found in a blood exam, correct? |
| 04:36:14 | 21 | A.  Yes. |
| 04:36:14 | 22 | Q.  Does an echocardiogram detect for elevated levels of |
| 04:36:28 | 23 | amylase? |
| 04:36:28 | 24 | A.  No. |
| 04:36:28 | 25 | Q.  Does a carotid Doppler exam detect elevated levels of |

517

| | | |
|---|---|---|
| 04:36:30 | 1 | amylase? |
| 04:36:30 | 2 | A. No. |
| 04:36:30 | 3 | Q. Does it PFT test detect elevated levels of amylase? |
| 04:36:38 | 4 | A. No. |
| 04:36:38 | 5 | Q. Does an ICG test detect elevated levels of amylase? |
| 04:36:44 | 6 | A. No. |
| 04:36:44 | 7 | MR. HAMMERMAN: No further questions, your Honor. |
| 04:36:46 | 8 | THE COURT: All right. |
| 04:36:46 | 9 | THE WITNESS: Anything further of this witness? |
| 04:36:48 | 10 | MR. ORMAN: No, Judge. |
| 04:36:50 | 11 | THE COURT: Doctor, thank you. You are excused. |
| 04:36:54 | 12 | Ladies and gentlemen, you have put in a couple days |
| 04:36:54 | 13 | of hard work. We are going to adjourn the trial and resume |
| 04:37:06 | 14 | the trial at 9:00 o'clock. I hope you have a nice weekend, |
| 04:37:10 | 15 | but please don't discuss the case with anyone. Thank you. |
| 04:37:32 | 16 | |
| 04:37:34 | 17 | (The jury leaves the courtroom.) |
| 04:37:34 | 18 | THE COURT: All right. There was a deferred ruling |
| 04:37:42 | 19 | on Government Exhibit 800, and what I would suggest, because I |
| 04:37:48 | 20 | have lawyers who have been waiting in another case to see me, |
| 04:37:52 | 21 | what I would suggest is if the court reporter is available |
| 04:37:56 | 22 | about 5 to 9:00, that you come in and we can just -- I will |
| 04:38:02 | 23 | hear the basis for the objection and whatever else might be |
| 04:38:08 | 24 | related to Government Exhibit 800. I don't believe we |
| 04:38:14 | 25 | reserved ruling on anything else. |

04:38:18　1　　　　　MR. HAMMERMAN:　There was one other issue, your

04:38:20　2　Honor, and that was when Mr. Orman began his cross-examination

04:38:22　3　of Dr. Herdeman, he asked questions that were effectively

04:38:26　4　allegations that the government has not turned over

04:38:28　5　information.　This appears to be a reoccurring theme in

04:38:32　6　defense counsel's questioning of our witnesses, and, your

04:38:34　7　Honor, I am very troubled by that because I know that at 8:19

04:38:38　8　this morning the report of that interview was provided to

04:38:42　9　counsel by email.　It was generated last night and sent out

04:38:46　10　first thing this morning.　That's, of course, how Mr. Orman

04:38:48　11　knew that this conversation had actually occurred, and yet he

04:38:52　12　asked questions about why there weren't reports turned over in

04:38:54　13　front of the jury in an effort to embarrass and cast

04:38:58　14　accusation against the government, which we believe were not

04:39:02　15　only unfair but untrue and totally inappropriate in front of

04:39:04　16　the jury, and this has now occurred on a couple of occasions,

04:39:10　17　and we strongly object to those type of representations in

04:39:14　18　questioning our witnesses.

04:39:14　19　　　　　THE COURT:　Mr. Orman.

04:39:16　20　　　　　MR. ORMAN:　He may be right.　I didn't see it, Judge.

04:39:18　21　I was on my way over here at 8:19 this morning, never got the

04:39:24　22　email.

04:39:24　23　　　　　THE COURT:　All right.　I'd ask that you not -- do

04:39:28　24　not -- and I address this to all the lawyers in the case;

04:39:32　25　there are a bunch of you -- not to refer to discovery issues.

04:39:38  1  The government has been citing motions in limine in the jury's

04:39:44  2  presence, and I don't know whether any of them understand

04:39:50  3  Latin, but that's not a good thing.  That's not a good thing.

04:39:56  4  Don't do that.

04:39:56  5      MR. HAMMERMAN:  I will cease doing that.

04:39:58  6      THE COURT:  I did not grant any motions in limine, so

04:40:02  7  don't be citing motions in limine.

04:40:04  8      MR. HAMMERMAN:  Your Honor, I apologize that that was

04:40:06  9  an improper way to phrase the objection.  I just wanted to

04:40:10  10  reference this was an objection that had been raised to the

04:40:14  11  court previously.

04:40:16  12      THE COURT:  And deferred until trial.

04:40:18  13      MR. HAMMERMAN:  Right.

04:40:20  14      THE COURT:  And deferred until trial.  In my memory

04:40:22  15  bank, a lot of motions were filed in this case, and I haven't

04:40:24  16  committed them to memory.

04:40:28  17      All right.  Well, work hard this weekend.

04:40:32  18      Who are the government witnesses Monday morning?

04:40:36  19      MR. COLE:  Faith Washington will be the first

04:40:38  20  witness.  She is an employee of the defendant.  Cierra

04:40:46  21  Thompson I expect to be called also sometime Monday.

04:40:50  22      THE COURT:  All right.

04:41:08  23    (The trial was adjourned at 4:40 p.m. on March 2, 2012,

04:41:16  24  until 9:00 a.m. on March 5, 2012.)

04:41:16  25