520

1   IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3
UNITED STATES OF AMERICA,              )    Docket No. 11 CR 119
4                                      )
                    Plaintiff,         )
5                                      )
            vs.                        )
6                                      )
JASWINDER RAI CHHIBBER,                )    Chicago, Illinois
7                                      )    March 5, 2012
                    Defendant.         )    9:00 o'clock a.m.
8
            TRIAL TRANSCRIPT OF PROCEEDINGS
9   BEFORE THE HONORABLE SUZANNE B. CONLON, AND A JURY
                    VOLUME 3-A
10
APPEARANCES:
11

12  For the Plaintiff:      HON. PATRICK FITZGERALD
                            United States Attorney
13                          BY:  MR. SAMUEL B. COLE
                                 MR. JOEL M. HAMMERMAN
14                          219 S. Dearborn St., Suite 500
                            Chicago, Illinois  60604
15

16  For the Defendant:      PUGH, JONES & JOHNSON, P.C.
                            BY:  MR. WALTER JONES, JR.
17                               MR. JONATHAN B. CIFONELLI
                            180 North LaSalle Street, Suite 3400
18                          Chicago, IL  60601
                            (312) 768-7800
19

20                          LAW OFFICE OF ROBERT ORMAN
                            BY:  MR. ROBERT ORMAN
21                          One North LaSalle Street, Suite 1775
                            Chicago, IL  60602
22                          (312) 372-0515

23
Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 1854-B
25                          Chicago, Illinois  60604
                            (312) 435-5639

521

1  <u>I N D E X</u>

2

DESCRIPTION                                                    PAGE

3

4
    FAITH WASHINGTON, DIRECT EXAMINATION                       531
5   BY MR. HAMMERMAN:

6
    FAITH WASHINGTON, CROSS-EXAMINATION                        563
7   BY MR. JONES:

8
    FAITH WASHINGTON, REDIRECT EXAMINATION                     571
9   BY MR. COLE:

10
    ALAN VAVAL, DIRECT EXAMINATION                             572
11  BY MR. COLE:

12
    ALAN VAVAL, CROSS-EXAMINATION                              585
13  BY MR. JONES:

14
    ALAN VAVAL, REDIRECT EXAMINATION                           595
15  BY MR. COLE:

16
    CIERRA THOMPSON, DIRECT EXAMINATION                        598
17  BY MR. COLE:

18
    CIERRA THOMPSON, CROSS-EXAMINATION                         612
19  BY MR. JONES:

20
    CIERRA THOMPSON, REDIRECT EXAMINATION                      619
21  BY MR. COLE:

22
    FAHAD QASIM, DIRECT EXAMINATION                            620
23  BY MR. HAMMERMAN:

24
    FAHAD QASIM, DIRECT EXAMINATION CONTINUED                  651
25  BY MR. HAMMERMAN:

522

FAHAD QASIM, CROSS-EXAMINATION                          692
BY MR. ORMAN:

FAHAD QASIM, REDIRECT EXAMINATION                       736
BY MR. HAMMERMAN:

FAHAD QASIM, RECROSS-EXAMINATION                        741
BY MR. ORMAN:

DENA HOPKINS, DIRECT EXAMINATION                        743
BY MR. HAMMERMAN:

DENA HOPKINS, CROSS-EXAMINATION                         771
BY MR. JONES:

1  (The following proceedings were had in open court outside

08:52:52  2  the presence and hearing of the jury:)

08:52:52  3       THE CLERK:  11 CR 119-1, USA v. Jaswinder Rai

08:53:02  4  Chhibber, trial.

08:53:06  5       MR. HAMMERMAN:  Good morning, your Honor; Joel

08:53:06  6  Hammerman and Sam Cole on behalf of the United States.

08:53:08  7       THE COURT:  Good morning.

08:53:10  8       MR. CIFONELLI:  Good morning, your Honor; Jonathan

08:53:14  9  Cifonelli on behalf of the defendant.  If I could have a

08:53:18  10  moment to get the rest of counsel.

08:53:20  11       THE COURT:  Yes.

08:54:00  12    (Brief pause.)

08:54:00  13       MR. JONES:  Good morning, your Honor.  Your Honor, I

08:54:02  14  am hoping that Mr. Orman will show in the next 30 seconds.

08:54:06  15       THE COURT:  Okay.  We are a little early.  I wanted

08:54:10  16  to get this issue over Government's Exhibit 800 cleared up

08:54:20  17  before we resume.  I do have one short status report at 9:00,

08:54:28  18  so if we can take care of this.

08:54:30  19       MR. JONES:  I hope so because that is definitely

08:54:32  20  Mr. Orman's issue.

08:54:32  21       THE COURT:  All right.  Do you have your first

08:54:34  22  witness here?

08:54:36  23       MR. HAMMERMAN:  We are ready to proceed, your Honor.

08:54:38  24       MR. JONES:  Who is the first witness?

08:54:38  25       MR. HAMMERMAN:  I believe it's Faith Washington.

| | | |
|---|---|---|
| 08:54:42 | 1 | MR. JONES:  Okay.  Well, that's fine.  But, |
| 08:54:42 | 2 | hopefully, Judge, he'll show in a minute. |
| 08:56:56 | 3 | All right, Judge.  I found him. |
| 08:56:58 | 4 | THE COURT:  Good for you, Mr. Jones. |
| 08:57:08 | 5 | Good morning. |
| 08:57:08 | 6 | MR. ORMAN:  Good morning, your Honor. |
| 08:57:12 | 7 | THE COURT:  Mr. Orman, we are convening a little |
| 08:57:16 | 8 | early to discuss the admissibility of Government Exhibit 800. |
| 08:57:20 | 9 | I reserved ruling on it during the expert's testimony. |
| 08:57:30 | 10 | Could you explain the basis of your objection to 800? |
| 08:57:36 | 11 | It's entitled the Chhibber tests. |
| 08:57:46 | 12 | MR. ORMAN:  It's this, Judge.  There are tests on |
| 08:57:50 | 13 | this exhibit which are not part of the indictment; therefore, |
| 08:57:56 | 14 | they shouldn't have been on the exhibit to begin with.  It's |
| 08:58:00 | 15 | prejudicial. |
| 08:58:02 | 16 | THE COURT:  Have you discussed this directly with |
| 08:58:06 | 17 | counsel for the United States? |
| 08:58:10 | 18 | MR. ORMAN:  No. |
| 08:58:10 | 19 | THE COURT:  Would you identify the tests you say |
| 08:58:20 | 20 | exceed the indictment. |
| 08:58:22 | 21 | MR. ORMAN:  Okay.  The transcranial Doppler is not |
| 08:58:26 | 22 | part of the indictment, Judge, and the bioimpedance thoracic |
| 08:58:36 | 23 | electrical test is not part of the indictment; |
| 08:58:46 | 24 | b-i-o-i-m-p-e-d-a-n-c-e, thoracic electrical isn't part of the |
| 08:58:52 | 25 | indictment. |

08:58:52  1    THE COURT:  So you object to the inclusion of those

08:58:56  2  two items on Government Exhibit 800?

08:59:00  3    MR. ORMAN:  Let me make this stipulation.  Anything

08:59:02  4  that is not in the indictment goes out, anything that's in the

08:59:06  5  indictment stays in.

08:59:08  6    THE COURT:  Well, I need more, more specific and less

08:59:14  7  vague.

08:59:18  8    MR. ORMAN:  Also nerve conduction tests are not in

08:59:22  9  the indictment, Judge.

08:59:24  10    THE COURT:  Is that on the first page?

08:59:26  11    MR. ORMAN:  Yes, it is.

08:59:28  12    THE COURT:  Yes, I see it.  Okay.  Anything else?

08:59:36  13    MR. ORMAN:  That's it.  And it may be that

08:59:38  14  bioimpedance is in the indictment, Judge.  I may be wrong on

08:59:40  15  that.  But for sure, nerve conduction is not in and

08:59:42  16  transcranial Doppler is not in.

08:59:44  17    THE COURT:  Okay.

08:59:46  18    MR. HAMMERMAN:  May I address, your Honor?

08:59:48  19    THE COURT:  Yes.

08:59:50  20    MR. HAMMERMAN:  As your Honor knows, the government

08:59:54  21  charges the scheme in this case in which the defendant is

08:59:54  22  charged with conducting unnecessary tests and justifying those

08:59:56  23  tests with nonexistent diagnoses that he put in patient

09:00:00  24  charts.

09:00:02  25    The reason that these tests and these diagnoses are

09:00:04    1    in Government Exhibit 800 is that these are the most prolific

09:00:10    2    tests used by the defendant, and it was the government's

09:00:12    3    intent to show that these are the tests that he continued to

09:00:14    4    order for patients again and again and again, and these tests,

09:00:20    5    these conditions are included within the scope of the

09:00:22    6    indictment.

09:00:22    7             Mr. Orman has taken the position that unless each

09:00:26    8    individual count executing the scheme includes one of these

09:00:30    9    particular tests, then we didn't charge it.  We strongly

09:00:32   10    disagree with that, that the scheme is broader than the seven

09:00:36   11    patients that are identified in the executions of the scheme.

09:00:40   12    Your Honor has already heard testimony that this was a pattern

09:00:44   13    and practice of Dr. Chhibber to order these tests again and

09:00:48   14    again and again with these false diagnoses for more than, of

09:00:52   15    course, these seven particular patients.  Our employee

09:00:58   16    witnesses will testify to that fact.  We have had some do it

09:01:00   17    already.  We will have more do it.  We will, of course, have

09:01:04   18    patient testimony to show that all of these tests, all of

09:01:06   19    these conditions were ordered in excess, or thrown into

09:01:10   20    billing claims is a better way to put it, in excess by

09:01:14   21    Dr. Chhibber and, in fact, were false and fictitious, and

09:01:18   22    that's the reason they are included in this chart.

09:01:20   23             And we will present additional evidence to show that

09:01:20   24    these tests of which Mr. Orman is complaining, for example,

09:01:24   25    nerve conduction test was one of those tests that Dr. Chhibber

09:01:28   1   ordered unnecessarily.

09:01:30   2          THE COURT:  What do the numbers signify in the

09:01:34   3   left-hand column?

09:01:34   4          MR. HAMMERMAN:  Those, your Honor, on the tests are

09:01:38   5   the CPT codes.  The reason that we have these exhibits is so

09:01:44   6   those -- I believe we introduced eight large books that will,

09:01:48   7   of course, go back to the jury so the jury doesn't have to use

09:01:52   8   those somewhat technical manuals to try to find the codes that

09:01:54   9   associate with the tests because it's those numbers that show

09:01:58  10   up in the actual claim forms that are submitted to insurers.

09:02:02  11   It's the way in which in this industry everyone tracks the

09:02:06  12   conditions and the tests, by the ICD-9 codes and the CPT

09:02:12  13   codes.

09:02:18  14          THE COURT:  Are you offering this as a summary chart?

09:02:20  15          MR. HAMMERMAN:  It is, your Honor, a summary chart.

09:02:22  16   It's also that Dr. Herdeman, our expert, pointed out that

09:02:26  17   these were -- he checked these CPT codes and these ICD-9 codes

09:02:32  18   on this exhibit so that the jurors aren't required to search

09:02:36  19   through what would really be almost a foot and a half or two

09:02:40  20   feet, linear feet, of books to find these individual line

09:02:46  21   items in very complex manuals.  So they contain that

09:02:50  22   information from those books.

09:02:56  23          THE COURT:  And on the second page of the exhibit

09:03:04  24   there is a diagnoses synopsis.

09:03:08  25          MR. HAMMERMAN:  It's syncope and collapse, dizziness,

09:03:12  1    shortness of breath.  These are, once again, the conditions

09:03:14  2    that Dr. Chhibber falsely put in the patient charts and

09:03:18  3    presented to insurers to justify the tests that were medically

09:03:22  4    unnecessary.  Insurers will not pay for certain procedures

09:03:26  5    unless there is some precondition that would justify the

09:03:30  6    diagnostic test being used by Dr. Chhibber.  These were the

09:03:32  7    false diagnoses contained in those claims and written in the

09:03:36  8    charts.

09:03:36  9         And the ICD-9 codes are the same type of codes as

09:03:40  10   those on the first page.  They identify a sickness or

09:03:44  11   condition that a patient might have by a numeric number for

09:03:48  12   each individual type of sickness or condition.

09:03:56  13        THE COURT:  Mr. Orman, do you have a comment?

09:03:58  14        MR. ORMAN:  Your Honor, there is no objection to

09:04:00  15   page 2.

09:04:00  16        As to the two items I have identified on page 1, they

09:04:04  17   had their shot.  They had their expert on.  Their expert did

09:04:08  18   not connect any test, any of -- either of the two tests, with

09:04:14  19   any patient, not only did -- that the government is calling in

09:04:20  20   this case, but with any patient that the defendant ever saw.

09:04:26  21        So these are totally superfluous, Judge, and they are

09:04:32  22   misleading because the jurors could think there is something

09:04:36  23   wrong here.  There is no testimony whatsoever to support

09:04:38  24   putting those two tests on this page.

09:04:42  25        THE COURT:  So you're withdrawing your objection to

09:04:48 1 bioimpedance thoracic electrical?

09:04:50 2 MR. ORMAN: Yeah. Yes.

09:04:56 3 THE COURT: Well, can you revise Government Exhibit

09:05:02 4 800 to eliminate transcranial Doppler and nerve conduction

09:05:08 5 test?

09:05:08 6 MR. HAMMERMAN: We can do that, your Honor. We do

09:05:12 7 believe that the testimony that will be -- the expert's

09:05:16 8 testimony did tie these together, and we do believe there will

09:05:18 9 be additional testimony that these particular tests, the

09:05:22 10 transcranial Doppler, for example, was never ever performed at

09:05:26 11 Dr. Chhibber's office, yet he billed for it excessively.

09:05:28 12 We will call today one of the ultrasound technicians

09:05:32 13 who worked for Dr. Chhibber who will say that was a test that

09:05:34 14 was just never done in his office, and yet the billing records

09:05:36 15 show that Dr. Chhibber billed for it excessively, not even

09:05:40 16 just in remote occasions; it is an excessive billing code that

09:05:44 17 was used. And it was never done at that office. And so we

09:05:48 18 will have additional witnesses that will tie this together.

09:05:50 19 THE COURT: All right. So renew your motion for

09:05:56 20 admission of Government Exhibit 800, page 1, after you

09:06:04 21 presented that testimony. I guess we could call page 2

09:06:12 22 Government Exhibit 800-B for the record.

09:06:20 23 Government Exhibit 800-B is admitted.

09:06:24 24 (Above-mentioned exhibit was received in evidence.)

09:06:24 25 MR. HAMMERMAN: Yes, your Honor. And the government

09:06:26  1   will revise page 1 in case the court finds that we are unable

09:06:28  2   to tie them together, and we will have a revised revision

09:06:36  3   made.

09:06:36  4        And, your Honor, I think our office brought up two

09:06:38  5   other small motions to your Honor this morning.  I don't think

09:06:40  6   either one needs to be addressed before court today because

09:06:44  7   they don't address matters before the court today, but I

09:06:46  8   wanted to make sure that the court had --

09:06:48  9        THE COURT:  The one was an agreed motion to

09:06:50  10  substitute a witness.

09:06:50  11       MR. HAMMERMAN:  Yes.

09:06:52  12       THE COURT:  And that agreed motion is granted.

09:06:54  13  William F -- how do you pronounce it?

09:07:00  14       MR. HAMMERMAN:  I have no idea, your Honor.

09:07:00  15       THE COURT:  For the court reporter's sake, it's

09:07:04  16  I-o-b-s-t, is substituted for Lynn Langdon, L-a-n-g-d-o-n.

09:07:16  17  That motion is granted.

09:07:20  18       All right.  We are going to hear the status now.  The

09:07:24  19  jury is all here.  They were all here early this morning.

09:07:28  20  They are a very good jury.

09:07:30  21       MR. ORMAN:  Thank you, your Honor.

09:07:30  22    (Short break.)

09:07:30  23    (The following proceedings were had in open court in the

09:19:18  24  presence and hearing of the jury:)

09:19:18  25       THE COURT:  Good morning, ladies and gentlemen.

09:19:20   1   Please be seated.

09:19:34   2     (Witness sworn.)

09:19:34   3          THE COURT:  Please be seated.  Would you tell us your

09:19:38   4   full name and spell your last name.

09:19:40   5          THE WITNESS:  My full name is Faith Washington, last

09:19:42   6   name W-a-s-h-i-n-g-t-o-n.

09:19:48   7                              - - -

09:19:48   8          FAITH WASHINGTON, DIRECT EXAMINATION

09:19:48   9   BY MR. HAMMERMAN:

09:19:50   10  Q.  Ms. Washington, where do you work?

09:19:50   11  A.  I work at South Suburban Hospital in Hazel Crest,

09:19:54   12  Illinois.

09:19:54   13  Q.  How long have you worked there?

09:19:56   14  A.  Approximately a little over a year.

09:19:58   15  Q.  What do you do?

09:19:58   16  A.  I am a neurophysiologist.

09:20:02   17  Q.  What does that mean?

09:20:02   18  A.  I do EEG studies and nerve conduction.

09:20:04   19  Q.  Can you tell the jury your medical training, please.

09:20:08   20  A.  I went to school at East-West University in 2009, 2010,

09:20:16   21  for actually two years, and I got training there for neuro

09:20:24   22  tech -- I have a neuro tech certificate and associate's in

09:20:28   23  liberal arts.

09:20:28   24  Q.  When did you graduate from East-West University?

09:20:34   25  A.  I graduated in 2009.

| | | |
|---|---|---|
| 09:20:34 | 1 | Q. When did you get the neuro tech certificate? |
| 09:20:38 | 2 | A. June 2010. |
| 09:20:46 | 3 | June 2009. |
| 09:20:46 | 4 | Q. Are you familiar with the defendant in this case, |
| 09:20:50 | 5 | Dr. Jaswinder Chhibber? |
| 09:20:50 | 6 | A. Yes, I am. |
| 09:20:52 | 7 | Q. How is that? |
| 09:20:52 | 8 | A. I worked for him for a year. |
| 09:20:54 | 9 | Q. When did you work for him? |
| 09:20:56 | 10 | A. I started October 2010. |
| 09:21:06 | 11 | No, I'm sorry. I am kind of nervous. I started |
| 09:21:10 | 12 | October 2009. |
| 09:21:14 | 13 | Q. And when did you stop working for the defendant? |
| 09:21:16 | 14 | A. I stopped working for him a year later, October 2010. |
| 09:21:24 | 15 | Q. Now, when you first started working for the defendant, can |
| 09:21:32 | 16 | you describe how it is that you met him. |
| 09:21:34 | 17 | A. I was on a job search. I would just go out and give my |
| 09:21:38 | 18 | resume out, and I ran into one of his friends, and he referred |
| 09:21:44 | 19 | me over to him. |
| 09:21:44 | 20 | Q. Can you describe what happened in your first conversation |
| 09:21:48 | 21 | with the defendant? |
| 09:21:50 | 22 | A. He -- |
| 09:21:50 | 23 | MR. JONES: Can I have the foundation, Judge? |
| 09:21:52 | 24 | THE COURT: Yes. Would you lay the foundation, |
| 09:21:54 | 25 | please. |

09:21:56  1  BY MR. COLE:

09:21:56  2  Q.  Approximately when was the first time you had a

09:21:58  3  conversation with the defendant?

09:21:58  4  A.  It was I believe in October.

09:22:04  5  Q.  Of 2009?

09:22:04  6  A.  Yes.

09:22:06  7  Q.  And where was this conversation?

09:22:06  8  A.  It was in his office, at his clinic on 79th and Cottage.

09:22:14  9  Q.  Can you describe for the jury what was said in that first

09:22:20  10  conversation.

09:22:20  11  A.  He asked me about my training, and he also said he was

09:22:30  12  looking for someone like me, and he also said -- we discussed

09:22:38  13  a salary and a position.

09:22:40  14  Q.  And what was the salary discussed?

09:22:44  15  A.  He told me $16 an hour, and I would work for like a

09:22:52  16  training period from October until January.

09:22:54  17  Q.  And how much would you be paid during that training

09:22:58  18  period?

09:22:58  19  A.  I wasn't paid anything.

09:23:00  20  Q.  Did you talk about what it is that you would do for the

09:23:04  21  defendant?

09:23:04  22  A.  I'm sorry.  Can you rephrase that?

09:23:06  23  Q.  Did you discuss what kind of work you would do at the

09:23:10  24  defendant's clinic?

09:23:12  25  A.  I was supposed to be the nerve conduction tech.

09:23:16  1  Q.  Did you discuss any other work you would do?

09:23:18  2  A.  No.

09:23:18  3  Q.  And what kind of training up to that point had you had in

09:23:24  4  nerve conduction studies?

09:23:24  5  A.  I had a little bit at school, we talked about it, but I

09:23:30  6  hadn't had any hands-on experience.

09:23:30  7  Q.  Did you talk about whether or not you would perform other

09:23:38  8  types of tests, like EKGs, at the defendant's clinic?

09:23:42  9  A.  No.

09:23:42  10  Q.  Now, did you start -- when you started working, can you

09:23:50  11  describe -- I guess my first question is, when did you start

09:23:54  12  working for the defendant?

09:23:58  13  A.  I started working January 2010 on staff.

09:24:00  14  Q.  And you had been training there previously; is that

09:24:04  15  correct?

09:24:04  16  A.  I was training from October until January.

09:24:06  17  Q.  How many days a week did you train?

09:24:08  18  A.  I believe about one day.

09:24:12  19  Q.  Can you describe -- one day per week?

09:24:16  20  A.  Yes, one day a week.

09:24:16  21  Q.  Can you describe for the jury what you would do during

09:24:20  22  that one day a week of training.

09:24:20  23  A.  I was to learn how to do the nerve conduction, and I also

09:24:26  24  started doing like the front desk.  I would go up to the front

09:24:32  25  desk, and they would kind of cross-train me on the EKG and ICG

09:24:38    1   and PFT.

09:24:38    2   Q. So when you say you started training on nerve conduction,

09:24:42    3   can you describe that more for the jury. What is it that you

09:24:44    4   actually did?

09:24:46    5   A. The doctor -- one of the doctors came in, and he trained

09:24:50    6   me. And the nerve conduction study is just the electrical

09:24:54    7   shock to the nerve, and you have to calculate the velocity as

09:25:00    8   well as measure the distance between the point of stimulation

09:25:04    9   and the nerve.

09:25:04   10   Q. So what did your training consist of?

09:25:10   11   A. The doctor trained me for like 15 minutes, and that's all

09:25:16   12   I can recall, him training me for about 15 minutes, and we did

09:25:22   13   about two or three sessions.

09:25:22   14   Q. So after this 15 minutes of training, what other training

09:25:28   15   did you have during that period before you started getting

09:25:32   16   paid in January?

09:25:32   17   A. The cross-training of the ICG, EKG, and PFT.

09:25:36   18   Q. Who did the cross-training for you?

09:25:40   19   A. The employees.

09:25:42   20   Q. Who in particular?

09:25:44   21   A. Twahki and Tyanna.

09:25:48   22   Q. Had you been training in school on PFTs?

09:25:52   23   A. No.

09:25:52   24   Q. What about EKGs?

09:25:54   25   A. No.

| | | |
|---|---|---|
| 09:25:54 | 1 | Q.  Did you get trained on an AVI test while you were in that |
| 09:25:58 | 2 | training period in the clinic? |
| 09:26:00 | 3 | A.  No. |
| 09:26:00 | 4 | Oh, I'm sorry.  Rephrase that? |
| 09:26:02 | 5 | Q.  While you were in that training time at the clinic, did |
| 09:26:04 | 6 | you get training on an AVI test? |
| 09:26:08 | 7 | A.  Yes. |
| 09:26:08 | 8 | Q.  How about at school, had you been trained on that? |
| 09:26:10 | 9 | A.  No. |
| 09:26:10 | 10 | Q.  Who trained you on the AVI test? |
| 09:26:14 | 11 | A.  Tyanna and Twahki. |
| 09:26:16 | 12 | Q.  Can you describe what the training consisted of by Tyanna |
| 09:26:22 | 13 | and Twahki. |
| 09:26:22 | 14 | A.  They told me to wrap a cuff around the arm, and it was |
| 09:26:26 | 15 | kind of like an echo machine where you -- it's like a Doppler, |
| 09:26:28 | 16 | and you take the gel and find the pulse.  And then you will |
| 09:26:32 | 17 | pump up the machine, it's like an arm cuff, blood pressure |
| 09:26:38 | 18 | cuff, pump it up, and wait until you don't have pulse anymore, |
| 09:26:44 | 19 | and then you would release it. |
| 09:26:44 | 20 | Q.  What is that for?  What test is that? |
| 09:26:48 | 21 | A.  That's for circulation. |
| 09:26:48 | 22 | Q.  And what test are you describing, what was it called? |
| 09:26:52 | 23 | A.  AVI. |
| 09:26:52 | 24 | Q.  What about PFT, can you describe the training you receive |
| 09:26:56 | 25 | in a PFT test. |

09:26:58  1   A.  They told me to have the patient blow into a device, and

09:27:02  2   you just blow until you don't hear the beep anymore.

09:27:08  3   Q.  How long did that training last?

09:27:10  4   A.  Probably about a minute.

09:27:10  5   Q.  What about EKG training, who trained you on an EKG?

09:27:14  6   A.  Tyanna and Twahki.

09:27:16  7   Q.  Can you describe that training for the jury.

09:27:20  8   A.  You would place the electrodes on the chest, as well as

09:27:24  9   the left and the right side, and a little bit under like the

09:27:32  10  belly button are the two electrodes.

09:27:34  11  Q.  How long did that training last?

09:27:36  12  A.  That lasted for about 10 minutes, but I had a couple of

09:27:40  13  sessions of training with that.

09:27:42  14  Q.  So each session lasted approximately 10 minutes?

09:27:48  15  A.  No.

09:27:48  16  Q.  Total?

09:27:48  17  A.  They would like come in and watch you do it, and probably

09:27:54  18  about two or three times, and then I had the hang of it.

09:27:58  19  Q.  Now, did you actually perform EKGs in the defendant's

09:28:02  20  office?

09:28:02  21  A.  Yes.

09:28:02  22  Q.  What position was the patient in when you performed the

09:28:06  23  EKG?

09:28:06  24  A.  The patient would sit in a chair like I'm sitting in right

09:28:12  25  now.

09:28:12   1   Q.  Are there any patients where the defendant told to you
09:28:14   2   perform EKGs differently than that?
09:28:16   3   A.  Yes.
09:28:16   4   Q.  Can you describe that for the jury, please.
09:28:18   5   A.  It was one patient in particular, I can't remember his
09:28:22   6   name, but I was instructed to lay the patient down, and we
09:28:30   7   performed the EKG.
09:28:32   8   Q.  Who instructed you to do that?
09:28:34   9   A.  Dr. Chhibber.
09:28:34   10  Q.  Did he tell you why?
09:28:34   11  A.  No.
09:28:36   12  Q.  Can you describe what part of your training Dr. Chhibber
09:28:40   13  played in nerve conduction tests?
09:28:44   14  A.  None.
09:28:44   15  Q.  Can you describe what part of your training Dr. Chhibber
09:28:48   16  played in AVI tests?
09:28:50   17  A.  None.
09:28:52   18  Q.  Can you describe what part of your training Dr. Chhibber
09:28:54   19  played in PFT tests?
09:28:58   20  A.  None.
09:28:58   21  Q.  What about EKG tests?
09:29:00   22  A.  None.
09:29:00   23  Q.  Can you describe how often the defendant observed you
09:29:04   24  perform nerve conduction studies, AVIs, PFTs, and EKGs.
09:29:08   25  A.  I can remember Dr. Chhibber coming in the room and talking

09:29:12 1  to the patient while I would do a nerve conduction study; but

09:29:14 2  other than that, I don't recall him being in the room watching

09:29:20 3  me perform the test.

09:29:20 4  Q. How many times did Dr. Chhibber come in the room when you

09:29:24 5  performed nerve conduction studies?

09:29:24 6  A. Maybe about three or four times.

09:29:26 7  Q. Now, how frequently did he ask you questions about test

09:29:32 8  results for tests you performed?

09:29:34 9  A. None.

09:29:36 10  Q. How frequently did the defendant ask you to redo a test?

09:29:38 11  A. That one time I explained before about the EKG.

09:29:42 12  Q. Did he tell you why he was asking you to redo the test?

09:29:46 13  A. No.

09:29:48 14  Q. Now, we talked about nerve conduction studies. Were those

09:29:54 15  painful tests?

09:29:54 16  A. They are very painful.

09:29:56 17  Q. Do the patients ever leave?

09:29:58 18  A. Yes.

09:29:58 19  Q. How often?

09:30:00 20  A. The patients would leave maybe -- I can't say how often

09:30:06 21  because they would leave. If they had the study before and

09:30:12 22  they probably wouldn't understand why they were getting it

09:30:14 23  again, so some of them would leave, and some of them would

09:30:16 24  leave after the first stimulation.

09:30:18 25  Q. How many stimulations were they supposed to have?

09:30:20  1   A.  They were supposed to have -- I usually tested three

09:30:26  2   nerves in the upper extremities.

09:30:30  3          THE COURT:  Excuse me.  Is there a cell phone on?

09:30:34  4          A JUROR:  I'm sorry.

09:30:36  5          THE COURT:  Please make sure cell phones are off.

09:30:40  6          A JUROR:  Sorry.

09:30:42  7          THE COURT:  It's best to leave them in the jury room.

09:30:46  8   BY MR. COLE:

09:30:48  9   Q.  How long did nerve conduction studies take to perform

09:30:50  10  while you were working in the defendant's clinic?

09:30:52  11  A.  About 10 minutes.

09:30:54  12  Q.  How often would you perform nerve conduction studies?

09:30:58  13  A.  I would perform maybe about -- depending on what day it

09:31:02  14  is, probably about five or six nerve conduction studies a day.

09:31:08  15  Q.  Is this including your training time, or is this starting

09:31:14  16  once you were working in January of 2010 for $16 an hour?

09:31:20  17  A.  It started after -- it started in January 2010.

09:31:22  18  Q.  Can you describe for the jury how your job changed in

09:31:26  19  January 2010.

09:31:28  20  A.  I was instructed to do the EKGs, the ICGs, the PFTs, I was

09:31:36  21  also filing, and I was also asked to lay them down while I

09:31:44  22  clean out the basement.

09:31:46  23  Q.  We will talk about that a little bit later.  In terms of

09:31:50  24  your nerve conduction studies, you say you performed them now?

09:31:54  25  A.  Yes.

09:31:54    1    Q.  Where is that now?

09:31:54    2    A.  South Suburban Hospital.

09:31:56    3    Q.  How long did your studies take to perform currently?

09:31:58    4    A.  The upper extremities, it takes about 20 to 30 minutes.

09:32:04    5    Q.  Can you describe the differences in how you perform tests

09:32:08    6    now.

09:32:08    7            MR. JONES:  Judge, I am going to object to the

09:32:12    8    relevance of this.

09:32:14    9            THE COURT:  Would you read back the question, please.

09:32:26   10      (Record read.)

09:32:28   11            THE COURT:  Sustained.  Sustained.

09:32:30   12    BY MR. COLE:

09:32:30   13    Q.  When you were performing nerve conduction studies in

09:32:32   14    Dr. Chhibber's clinic, how confident were you that you were

09:32:36   15    performing them correctly?

09:32:38   16            MR. JONES:  Judge, I am going to object to this.

09:32:40   17            THE COURT:  Sustained.

09:32:42   18    BY MR. COLE:

09:32:42   19    Q.  Did you ever tell Dr. Chhibber anything about how

09:32:44   20    confident you were in performing nerve conduction studies?

09:32:48   21            MR. JONES:  Judge, I object again.

09:32:50   22            THE COURT:  You will need a foundation.

09:32:52   23    BY MR. COLE:

09:32:56   24    Q.  At some point, did you have any conversation with the

09:32:58   25    defendant about performing nerve conduction studies?

09:33:02  1  A.  Yes.

09:33:02  2  Q.  Approximately when was this?

09:33:04  3  A.  This is when I first started.  I asked him about --

09:33:10  4        MR. JONES:  Judge, we still don't have this

09:33:12  5  foundation.  Who was present, when was this?

09:33:14  6        THE COURT:  Yes, I don't think counsel was finished

09:33:18  7  with the foundation.

09:33:18  8        MR. JONES:  All right.

09:33:20  9  BY MR. COLE:

09:33:20  10  Q.  Approximately how many conversations did you have with the

09:33:22  11  defendant?

09:33:22  12  A.  About two.

09:33:24  13  Q.  Where were these conversations?

09:33:26  14  A.  When I first started, and also after I started, maybe

09:33:32  15  about a month or so in.

09:33:34  16  Q.  Who was present for these conversations?

09:33:36  17  A.  Me and Dr. Chhibber.

09:33:38  18  Q.  Can you describe these conversations for the jury, please.

09:33:42  19  A.  I asked him if I can go to a training, I believe the

09:33:46  20  training was in Detroit, and I was told that the funds were

09:33:52  21  not available to send me there.

09:33:52  22  Q.  Did you tell him why you wanted to go to this training?

09:33:54  23  A.  Yes.

09:33:56  24  Q.  Why is that?

09:33:56  25  A.  I was not so comfortable working the nerve conduction

09:34:02  1  machine, and I thought I needed more training.

09:34:04  2  Q.  Approximately what time were you supposed to arrive in the

09:34:08  3  clinic every morning?

09:34:10  4  A.  I was supposed to be there at 10:00.

09:34:12  5  Q.  How many patients were already waiting in the defendant's

09:34:18  6  clinic when you arrived?

09:34:18  7  A.  There were several patients, anywhere from one to maybe 10

09:34:24  8  patients.

09:34:24  9  Q.  And how often were you -- was the defendant already at the

09:34:28  10  clinic when you arrived there?

09:34:30  11  A.  Very few times.

09:34:32  12  Q.  What time would the defendant typically arrive at the

09:34:36  13  clinic?

09:34:36  14  A.  Anywhere from 11:00 to 1:00.

09:34:38  15  Q.  Prior to the time the defendant arrived at the clinic,

09:34:44  16  what would the patients be doing?

09:34:46  17  A.  Complaining.

09:34:46  18  Q.  What were they complaining about?

09:34:48  19      MR. JONES:  Judge, I am going to object to the

09:34:50  20  relevance.

09:34:50  21      THE COURT:  Sustained.

09:34:52  22  BY MR. COLE:

09:34:52  23  Q.  Now, would you personally administer any tests on patients

09:34:56  24  prior to the time the defendant arrived at the clinic?

09:35:00  25  A.  Yes.

| | | |
|---|---|---|
| 09:35:00 | 1 | Q.  How would this come about? |
| 09:35:02 | 2 | A.  I was told by Tyanna or Twahki. |
| 09:35:10 | 3 | Q.  What would they tell you? |
| 09:35:14 | 4 | MR. JONES:  Judge, I'm going to object to hearsay. |
| 09:35:16 | 5 | THE COURT:  Would you lay a foundation, please. |
| 09:35:18 | 6 | BY MR. COLE: |
| 09:35:18 | 7 | Q.  Approximately how many times did you talk to Tyanna or |
| 09:35:22 | 8 | Twahki prior to the defendant arriving at the clinic about |
| 09:35:26 | 9 | tests being performed? |
| 09:35:28 | 10 | A.  We would all be in the front office, and the patients |
| 09:35:30 | 11 | would be there, and sometimes Dr. Chhibber would call and |
| 09:35:34 | 12 | say -- |
| 09:35:36 | 13 | MR. JONES:  Judge, this isn't an answer to the |
| 09:35:38 | 14 | question. |
| 09:35:38 | 15 | THE COURT:  All right.  Yes.  Proceed with another |
| 09:35:42 | 16 | question.  That might solve the problem. |
| 09:35:44 | 17 | BY MR. COLE: |
| 09:35:46 | 18 | Q.  So where would you have conversations with Tyanna and |
| 09:35:50 | 19 | Twahki about this? |
| 09:35:50 | 20 | A.  The front office. |
| 09:35:52 | 21 | Q.  And approximately what time would these conversations take |
| 09:35:54 | 22 | place? |
| 09:35:54 | 23 | A.  The morning before Dr. Chhibber arrived. |
| 09:35:58 | 24 | Q.  And how many times a week would you have conversations |
| 09:36:04 | 25 | like this? |

| | | |
|---|---|---|
| 09:36:04 | 1 | A.  Every time I come in and the doctor is not there. |
| 09:36:10 | 2 | Q.  Can you describe these conversations for the jury. |
| 09:36:14 | 3 | MR. JONES:  Judge, I am going to object as hearsay. |
| 09:36:16 | 4 | THE COURT:  Sustained. |
| 09:36:16 | 5 | BY MR. COLE: |
| 09:36:20 | 6 | Q.  Did you ever talk to the defendant on the phone in the |
| 09:36:22 | 7 | morning? |
| 09:36:22 | 8 | A.  Yes. |
| 09:36:24 | 9 | Q.  When was that? |
| 09:36:26 | 10 | A.  This -- I didn't talk to him often, but I think about two |
| 09:36:30 | 11 | or three times or so. |
| 09:36:32 | 12 | Q.  Where were you when you talked to the defendant? |
| 09:36:34 | 13 | A.  The front office. |
| 09:36:36 | 14 | Q.  Can you describe these conversations for the jury. |
| 09:36:38 | 15 | MR. JONES:  Judge, she says three or four times.  Can |
| 09:36:42 | 16 | I have a foundation?  When were these three or four times? |
| 09:36:44 | 17 | BY MR. COLE: |
| 09:36:46 | 18 | Q.  When were these three or four times? |
| 09:36:46 | 19 | A.  The morning when I came in.  I can't pinpoint the date, |
| 09:36:52 | 20 | but it would be in the morning. |
| 09:36:54 | 21 | MR. JONES:  Judge, of course, if she can't pinpoint |
| 09:36:58 | 22 | the date, I still need something further. |
| 09:37:00 | 23 | MR. COLE:  I haven't even asked another question, |
| 09:37:02 | 24 | your Honor. |
| 09:37:02 | 25 | THE COURT:  Ask another one. |

BY MR. COLE:

Q.  Were these towards the time when you first started working at the clinic, towards the middle, towards the end?

A.  They were kind of spreaded (sic) out.  I think more of after I got a little familiar with answering the phones, I would then answer the phone maybe toward the middle.

Q.  Can you describe these conversations for the jury.

A.  Dr. Chhibber would ask what patients are in the office, I would read off the clipboard, and he would tell me what tests to perform.

Q.  Would he ask you any questions about the patients?

A.  No.

Q.  Would he ask you why patients were at the clinic?

A.  No.

Q.  Or the patient's symptoms?

A.  No.

Q.  What would you do after you had these conversations with the defendant?

A.  I would write down what he said and then perform the test.

Q.  What kind of test did he ask you to perform?

A.  ICG, EKG, PFT, or AVI, or nerve conduction.

Q.  After you had conversations with Twahki and Tyanna, what did you do?

A.  I performed the tests.

Q.  What kind of tests?

09:38:12 1    A.  The same tests that I just explained earlier:  ICG, EKG,
09:38:16 2    PFT, nerve conduction, and AVI.
09:38:20 3    Q.  Did patients ever ask you why they were getting these
09:38:22 4    tests?
09:38:22 5              MR. JONES:  Judge, I object.
09:38:24 6              THE COURT:  Sustained.
09:38:26 7    BY MR. COLE:
09:38:30 8    Q.  Were you the only person in the office to perform nerve
09:38:32 9    conduction studies?
09:38:34 10   A.  Yes.
09:38:34 11   Q.  How often would you perform nerve conduction studies on
09:38:38 12   patients with public aid, on public aid, like Medicaid?
09:38:42 13   A.  Maybe about one or two times, I can say.
09:38:46 14   Q.  How about patients on private insurance, like Medicare?
09:38:54 15   A.  Those were most of the patients.
09:38:56 16   Q.  Now, at some point when you were working at the
09:38:58 17   defendant's clinic, did he ever talk to you about reviewing
09:39:02 18   old patient charts?
09:39:02 19   A.  I'm sorry.  Can you give me more details?
09:39:08 20             MR. JONES:  I'm sorry.  Judge, I couldn't hear.
09:39:10 21             THE COURT:  You are going to have to speak up.  Maybe
09:39:12 22   if you re-ask the question.
09:39:14 23   BY MR. COLE:
09:39:16 24   Q.  Did you ever talk to the defendant about you going back
09:39:18 25   and reviewing old patient charts?

09:39:20    1    A.   Yes.

09:39:20    2    Q.   When did that conversation take place?

09:39:24    3    A.   This took place about maybe the summer of 2010.

09:39:30    4    Q.   Where did this conversation take place?

09:39:32    5    A.   It took place in his office, or maybe if I was in a file

09:39:38    6    room, he would come in there and tell me about the charts.

09:39:42    7    Q.   Who was present for these conversations?

09:39:46    8    A.   Mainly me and Dr. Chhibber, or sometimes Tyanna and Twahki

09:39:54    9    would be there too.

09:39:56   10    Q.   Can you describe these conversations for the jury, please.

09:40:02   11    A.   For the chart, I was supposed to go back to the chart and

09:40:06   12    see what tests were missing and then put like a sticky note

09:40:08   13    and give it to one of the other doctors.

09:40:10   14    Q.   Now, which charts were you supposed to go back to?

09:40:14   15    A.   We had like a pallet of charts on the floor, and we also

09:40:20   16    had the charts that were in the file area, pretty much all the

09:40:26   17    charts from A going all the way to Z.

09:40:28   18    Q.   Did he give you a particular time period he wanted you to

09:40:32   19    focus on?

09:40:32   20    A.   He told me to make sure it was done.  I wasn't -- I didn't

09:40:36   21    really have a time period, but he told me to make sure that I

09:40:40   22    do the charts and as quickly as possible.

09:40:42   23    Q.   And did he give you a particular time period of the

09:40:46   24    patient charts, the dates of the visits of the patient charts

09:40:52   25    you were to focus on?

09:40:52  1  A.  I was supposed to have -- put the dates in chronological

09:40:58  2  order.  So if something was missing from January and I was

09:41:04  3  given a sheet for January, I would have to put it in

09:41:08  4  chronological order.  After I did the sticky note, wrote down

09:41:12  5  the missing date, and put the chart aside, then they would

09:41:18  6  give me the paperwork back, and I would have to file it in

09:41:22  7  chronological order.

09:41:22  8  Q.  So let's just focus on you looking through the patient

09:41:26  9  charts.  Were you looking at the entire patient chart from the

09:41:28  10  first time the patient saw the defendant all the way up to the

09:41:32  11  present?

09:41:32  12  A.  Yes.

09:41:32  13  Q.  For were there particular tests you were looking for?

09:41:38  14  A.  Yes.

09:41:38  15  Q.  What were those tests?

09:41:40  16  A.  Ultrasound.

09:41:40  17  Q.  What kind of ultrasounds?

09:41:42  18  A.  Any type of ultrasound, carotid artery or heart or

09:41:46  19  anything like that.

09:41:48  20  Q.  Now, what kind of documentation were you looking to see

09:41:54  21  that was missing?

09:41:54  22  A.  I think it was like the result sheet with the numbers on

09:41:56  23  it.

09:41:58  24      MR. JONES:  Judge, I am going to have to object.

09:42:00  25  She's guessing.

09:42:02  1      THE COURT:  Sustained.

09:42:04  2  BY MR. COLE:

09:42:04  3  Q.  Do you recall what type of sheet missing information you

09:42:08  4  were looking for?

09:42:10  5  A.  It was the sheet with the numbers on it.

09:42:12  6  Q.  Was it a typed sheet or a handwritten sheet?

09:42:16  7  A.  It was a typed sheet.

09:42:16  8  Q.  Now, if you found a chart that was missing a sheet, what

09:42:22  9  would you do?

09:42:22  10  A.  I would take a sticky and place the date of the missing

09:42:30  11  sheet on it and put it on the front of the chart along with

09:42:36  12  the date.

09:42:36  13  Q.  What would you do with the charts then?

09:42:40  14  A.  I would set them to the side, the charts that I finished

09:42:42  15  already, I would set them to the side, and someone would come

09:42:46  16  and take it back to the other doctor, or sometimes I would

09:42:48  17  take it back there.

09:42:50  18  Q.  When you say "other doctor," who are you referring to?

09:42:52  19  A.  Dr. Baig.

09:42:56  20  Q.  Now, did you ever see the person you referred to as

09:43:08  21  Dr. Baig do anything with these charts?

09:43:10  22  A.  Yes.

09:43:10  23  Q.  When did you see this?

09:43:10  24  A.  I saw this quite often.  When I started giving the charts

09:43:16  25  to him or someone would take it back there, if I walked past,

09:43:20  1  I would see him -- he had a template that he would use, and he

09:43:24  2  would change the numbers and correct the chart so I can put

09:43:32  3  the paperwork back in the correct date.

09:43:34  4  Q.  So you say he had a template.  What does that mean?  Where

09:43:38  5  was this template?

09:43:38  6  A.  The template was on the computer.

09:43:40  7  Q.  How would you see this?

09:43:40  8  A.  When I walked past.

09:43:42  9  Q.  Where was this computer?

09:43:44  10  A.  This computer was in the back area, so out of the patient

09:43:52  11  area.  There was another room off to the back where the coats

09:43:56  12  were, and I would he see him typing, and he would also be

09:44:00  13  complaining.

09:44:00  14  Q.  Approximately how many hours a week did you personally

09:44:06  15  spend reviewing these old patient charts?

09:44:08  16  A.  Toward the time -- towards the end of my employment there,

09:44:14  17  I would spend about -- maybe about more than half of the day

09:44:20  18  doing charts.

09:44:20  19  Q.  What about in the beginning?

09:44:22  20  A.  The beginning, when I first started, I would just file the

09:44:26  21  charts and file the old tests, but toward the end, I started

09:44:30  22  reviewing the charts.

09:44:34  23  Q.  Now, you indicated that you saw Mr. Baig with a template

09:44:38  24  that he was changing.  Do you know what date he would put on

09:44:42  25  the sheets?

09:44:42  1   A.  The date --

09:44:42  2        MR. JONES:  Judge, I am going to object, unless there

09:44:44  3   is a foundation laid here.

09:44:46  4        THE COURT:  Sustained.

09:44:48  5   BY MR. COLE:

09:44:50  6   Q.  Did you ever see Mr. Baig put dates on these sheets he was

09:44:56  7   typing up?

09:44:58  8   A.  I didn't see him put dates on there.  I know that when --

09:45:02  9        MR. JONES:  Judge, I object.  This is speculation.

09:45:06  10        THE COURT:  All right.

09:45:06  11  BY MR. COLE:

09:45:06  12  Q.  Did you see him -- the sheets that he printed out?

09:45:08  13  A.  Yes, I did.

09:45:10  14  Q.  When did you see this?

09:45:10  15  A.  When it was time for me to file the charts away again, I

09:45:16  16  had the date that matched the date that I put on the sticky.

09:45:20  17  Q.  So the date that was on the result sheet was the date of

09:45:26  18  the missing information; is that correct?

09:45:28  19  A.  Yes.

09:45:28  20  Q.  It wasn't the current date?

09:45:30  21  A.  No.

09:45:30  22  Q.  Approximately how many weeks or months or years prior

09:45:36  23  could the date have been?

09:45:36  24  A.  I can recall putting --

09:45:40  25        MR. JONES:  Judge, Judge, this is asking for

09:45:42　1　speculation.

09:45:44　2　　　　　THE COURT:  Would you rephrase?

09:45:46　3　　　　　MR. COLE:  Yes.  Let me rephrase.

09:45:48　4　BY MR. COLE:

09:45:48　5　Q.  What was the farthest back you saw a date that Mr. Baig

09:45:52　6　had printed out on a sheet?

09:45:54　7　A.  I believe it was about 2008.

09:45:58　8　Q.  And that was -- and you saw this new 2008 sheet in 2010

09:46:06　9　when you were working for him; is that right?

09:46:08　10　A.  Yes.

09:46:08　11　Q.  And would it be frequently to see dates that were several

09:46:12　12　years earlier?

09:46:12　13　　　　　MR. JONES:  Judge, I object to the form of that

09:46:14　14　question.

09:46:14　15　BY MR. COLE:

09:46:16　16　Q.  How frequently would you see dates that were earlier by a

09:46:20　17　couple years?

09:46:20　18　　　　　MR. JONES:  Judge, he puts his own answer in.

09:46:24　19　　　　　THE COURT:  Correct.  Sustained.

09:46:24　20　BY MR. COLE:

09:46:26　21　Q.  Just describe in general the dates that you saw on these

09:46:28　22　charts.

09:46:28　23　A.  I would see the dates maybe starting from 2008, depending

09:46:34　24　on what is missing, all the way up until current.

09:46:38　25　Q.  Approximately how many printouts, result printouts, did

09:46:46  1   you see Mr. Baig do?

09:46:46  2   A.  I seen him do a lot of printouts.

09:46:50  3          MR. JONES:  Judge, I object to that answer.

09:46:52  4          THE COURT:  It may stand.

09:46:56  5   BY MR. COLE:

09:46:58  6   Q.  Can you be more specific when you say "a lot"?

09:47:02  7   A.  Every chart that I placed on the floor to be taken to

09:47:06  8   Dr. Baig, the chart was corrected.

09:47:08  9          MR. JONES:  Judge, I object.  That doesn't answer the

09:47:10 10   question.

09:47:10 11          MR. COLE:  I think it does answer the question.

09:47:12 12          THE COURT:  All right.  The answer stands.

09:47:14 13   BY MR. COLE:

09:47:16 14   Q.  Approximately how many charts were this?

09:47:16 15   A.  It was a pile as high as my waist sometimes.

09:47:22 16   Q.  Now, you said that you then would file the sheet that

09:47:36 17   Mr. Baig had created; is that right?

09:47:38 18   A.  Yes.

09:47:38 19   Q.  Would there be anyone's signatures on these sheets?

09:47:40 20   A.  Yes.

09:47:40 21   Q.  Whose signature?

09:47:42 22   A.  Dr. Chhibber.

09:47:44 23   Q.  How often would Dr. Chhibber's signature appear on these

09:47:48 24   sheets?

09:47:48 25   A.  When I filed it away, his signature was on there every

09:47:52  1   time.

09:47:52  2   Q.  How do you know it was his signature?

09:47:56  3   A.  Because I saw him sign before.

09:47:58  4   Q.  Did you ever work in the front desk?

09:48:02  5   A.  Yes.

09:48:02  6   Q.  What did you do?

09:48:04  7   A.  I would answer the phone and sometimes take the charts to

09:48:08  8   Dr. Chhibber's office and call the next patient or have a

09:48:12  9   patient sign in.

09:48:14  10  Q.  Did you ever take copays from patients?

09:48:22  11  A.  No.

09:48:22  12  Q.  Why not?

09:48:22  13  A.  I can recall on maybe about one time, one or two times,

09:48:28  14  because the patient would be an immigrant, and you would have

09:48:32  15  to --

09:48:32  16      MR. JONES:  Judge, this doesn't answer the question.

09:48:34  17  I think his question was really --

09:48:36  18      THE COURT:  All right.  Would you put another

09:48:38  19  question.

09:48:38  20  BY MR. COLE:

09:48:40  21  Q.  Why did you not collect copays from patients?

09:48:46  22  A.  I was told not to.

09:48:46  23  Q.  Who told you?

09:48:48  24  A.  I was told by Tyanna.

09:48:50  25  Q.  When did this conversation --

| | | |
|---|---|---|
| 09:48:50 | 1 | MR. JONES:  Judge, I object.  That's hearsay. |
| 09:48:52 | 2 | MR. COLE:  Not for the truth, your Honor. |
| 09:48:54 | 3 | THE COURT:  Sustained. |
| 09:48:54 | 4 | BY MR. COLE: |
| 09:49:00 | 5 | Q.  Did patients ever ask you about copayments? |
| 09:49:02 | 6 | A.  No. |
| 09:49:04 | 7 | Q.  Now, at some point, did you become aware of a law |
| 09:49:12 | 8 | enforcement investigation into the defendant's clinic? |
| 09:49:16 | 9 | A.  Yes. |
| 09:49:16 | 10 | Q.  When was that? |
| 09:49:16 | 11 | A.  This was the summer of 2010. |
| 09:49:18 | 12 | Q.  How is it that you first became aware of this? |
| 09:49:22 | 13 | A.  I was informed by Twahki. |
| 09:49:28 | 14 | Q.  Did you ever have any conversations with the defendant |
| 09:49:30 | 15 | about this? |
| 09:49:30 | 16 | A.  No. |
| 09:49:30 | 17 | Q.  Now, did the defendant give you any instructions about |
| 09:49:36 | 18 | handling phone calls from people asking questions about the |
| 09:49:40 | 19 | clinic? |
| 09:49:40 | 20 | A.  Yes. |
| 09:49:42 | 21 | Q.  When -- |
| 09:49:42 | 22 | MR. JONES:  Excuse me.  Judge, I didn't hear the |
| 09:49:44 | 23 | question. |
| 09:49:44 | 24 | THE COURT:  All right.  I will ask the court reporter |
| 09:49:48 | 25 | to read back the question. |

09:49:54   1   (Record read.)

09:49:58   2        THE WITNESS:  Yes.

09:49:58   3   BY MR. COLE:

09:49:58   4   Q.  When did this conversation take place?

09:50:00   5   A.  This took place after Twahki informed me about the

09:50:04   6   investigation.

09:50:04   7   Q.  Where did this conversation take place?

09:50:06   8   A.  It took place -- I was in the front office, and I was

09:50:10   9   informed not to answer any questions about the clinic.

09:50:14   10  Q.  Who informed you of this?

09:50:14   11  A.  Dr. Chhibber.

09:50:16   12  Q.  Who else was with you?

09:50:18   13  A.  Me and Tyanna and Twahki was in the front office.

09:50:22   14  Q.  Now, at some point, did you notice a change in the

09:50:26   15  frequency you were being asked to perform tests?

09:50:28   16  A.  Yes.

09:50:28   17  Q.  When was that?

09:50:30   18  A.  This was after the fact that I was informed about the

09:50:36   19  investigation.

09:50:36   20  Q.  Can you describe for the jury the change in the frequency

09:50:42   21  that you personally were asked to order tests, to perform

09:50:44   22  tests.

09:50:46   23  A.  I noticed that the tests were not being performed as

09:50:50   24  often, and the patients would say --

09:50:54   25        MR. JONES:  Judge, I am going to object to any

09:50:56   1   hearsay.

09:50:56   2          THE COURT:  All right.  Anything after often is

09:51:00   3   stricken.

09:51:00   4   BY MR. COLE:

09:51:00   5   Q.  Just focusing on what you personally did, what tests were

09:51:04   6   you performing less often?

09:51:06   7   A.  The nerve conduction, EKG, ICG, and PFT, and AVI.

09:51:12   8   Q.  Can you describe approximately the extent of this change.

09:51:16   9   A.  Can you be a little more detailed?

09:51:20  10   Q.  How dramatic was this decrease in the number of tests you

09:51:24  11   were asked to perform?

09:51:24  12   A.  I would say probably 50 percent.  It was cut in half.

09:51:28  13   Q.  When did you leave the defendant's employment?

09:51:38  14   A.  It was October 2010.

09:51:40  15   Q.  Why did you leave?

09:51:40  16   A.  I left because the investigative authorities came in and

09:51:48  17   -- into the office, and they were looking for Tyanna, and I

09:51:54  18   was afraid, and I was uncomfortable.

09:51:56  19   Q.  Did you talk to the defendant before you left?

09:51:58  20   A.  No.

09:51:58  21   Q.  Have you talked to him since you left?

09:52:04  22   A.  Yes.

09:52:04  23   Q.  When was this?

09:52:06  24   A.  This was 2011 in January in regards to a W-2.

09:52:12  25   Q.  Where did this conversation take place?

09:52:16  1   A.  In the office.

09:52:18  2   Q.  Who was present?

09:52:20  3   A.  Tyanna was in the front office, and Dr. Chhibber and I

09:52:26  4   were in his office in the front room, the first room, the

09:52:32  5   patient's room.

09:52:32  6   Q.  Can you describe for the jury that conversation with the

09:52:36  7   defendant.

09:52:36  8   A.  I asked him about the W-2s, and also he asked me if I

09:52:44  9   wanted to come back and work with him.

09:52:46  10  Q.  What did you tell him?

09:52:48  11  A.  I told him I would think about it and get back to him.

09:52:50  12  Q.  Have you gotten back to him?

09:52:52  13  A.  No.

09:52:52  14  Q.  I am going to show you several exhibits, Government

09:53:00  15  Exhibit 624, 625, 627, 630, 631, and 632.

09:53:06  16        MR. JONES:  Excuse me.  Let me just see them for a

09:53:10  17  second.

09:53:10  18        THE COURT:  Have these exhibits been introduced in

09:53:12  19  evidence before?

09:53:14  20        MR. COLE:  624, 625, 627 are in evidence.  The other

09:53:18  21  three are not in evidence, and I won't publish any information

09:53:20  22  about them.

09:53:22  23        THE COURT:  All right.

09:53:26  24  BY MR. COLE:

09:53:58  25  Q.  Looking at the second page of Exhibit 624, it's going to

09:54:04    1    be on the screen in front of you.  This is in evidence.

09:54:18    2        Focusing on the diagnosis section at the bottom and

09:54:20    3    the clear box on the right side as well, do you recognize the

09:54:24    4    handwriting on this?

09:54:26    5    A.  Yes.

09:54:26    6    Q.  Whose handwriting is it?

09:54:28    7    A.  Dr. Chhibber.

09:54:28    8    Q.  Okay.  Next page of that same exhibit, focusing on the

09:54:34    9    diagnosis section on the bottom, whose handwriting is that?

09:54:38   10    A.  Dr. Chhibber.

09:54:38   11    Q.  Okay.  Focusing on the diagnosis section on the bottom,

09:54:42   12    whose handwriting?

09:54:44   13    A.  Dr. Chhibber.

09:54:44   14    Q.  Diagnosis section, whose handwriting is on there?

09:54:48   15    A.  Dr. Chhibber.

09:54:48   16    Q.  Diagnosis section and also the section in the box on the

09:54:54   17    right, whose handwriting is that?

09:54:54   18    A.  Dr. Chhibber.

09:54:56   19    Q.  Same with this one?

09:55:00   20    A.  Yes.

09:55:00   21    Q.  Is Dr. Chhibber's handwriting on this?

09:55:04   22    A.  No.

09:55:04   23    Q.  Next page?

09:55:08   24    A.  No.

09:55:08   25    Q.  Whose handwriting?

| | | |
|---|---|---|
| 09:55:10 | 1 | A.  Dr. Chhibber. |
| 09:55:16 | 2 | Dr. Chhibber. |
| 09:55:16 | 3 | Dr. Chhibber. |
| 09:55:20 | 4 | Dr. Chhibber. |
| 09:55:22 | 5 | Dr. Chhibber. |
| 09:55:24 | 6 | Dr. Chhibber. |
| 09:55:26 | 7 | MR. JONES:  I gather that -- is this the same |
| 09:55:28 | 8 | question regarding just the diagnosis box? |
| 09:55:32 | 9 | MR. COLE:  We can ask about everything in particular, |
| 09:55:34 | 10 | but I want you to focus on the diagnosis box at the bottom and |
| 09:55:38 | 11 | that white box on the right side, in the middle. |
| 09:55:48 | 12 | BY MR. COLE: |
| 09:55:48 | 13 | Q.  Could you look through the rest of the Government |
| 09:55:52 | 14 | Exhibit 624 and also 625, 627, and the other three that are in |
| 09:55:56 | 15 | front of you as well, just thumb through them and look to see |
| 09:56:00 | 16 | if you recognize Dr. Chhibber's handwriting.  Those exhibits |
| 09:56:02 | 17 | right there:  624, 625, 637, 630, 631, and 632. |
| 09:57:08 | 18 | If you find any that aren't the defendant's, pull |
| 09:57:10 | 19 | them out. |
| 09:59:52 | 20 | Are you finished looking through them? |
| 09:59:56 | 21 | A.  Yes. |
| 09:59:56 | 22 | Q.  Are those in the handwriting of the defendant? |
| 09:59:58 | 23 | A.  Some portions of them are and other ones have -- |
| 10:00:04 | 24 | Q.  You pulled out a couple? |
| 10:00:04 | 25 | A.  Yes. |

10:00:06   1   Q.  Can I take a look at them?

10:00:24   2        Other than the four pages that you handed to me, are

10:00:28   3   the rest of them in the defendant's handwriting?

10:00:30   4   A.  Yes.

10:00:30   5   Q.  And even the ones you handed to me, are there some -- are

10:00:34   6   you referring to the investigation box on the right?

10:00:38   7   A.  Yes.

10:00:38   8   Q.  Where some parts of them are in the defendant's

10:00:40   9   handwriting; is that right?

10:00:42  10   A.  Yes.

10:00:42  11   Q.  And some are not?

10:00:44  12        MR. JONES:  Judge, if we are going to do this, we

10:00:46  13   need numbers on them.  This is like in a vacuum.

10:00:48  14        THE COURT:  Yes, and not leading questions.

10:00:50  15   BY MR. COLE:

10:00:50  16   Q.  In terms of the diagnosis section, are they all in the

10:00:56  17   defendant's handwriting at the bottom?

10:00:58  18        MR. JONES:  Judge, we still need numbers.  I don't

10:01:02  19   know what exhibit he's talking about.

10:01:06  20        MR. COLE:  They're all in defendant's handwriting.

10:01:06  21        THE COURT:  Show Mr. Jones what you are showing the

10:01:08  22   witness for the record so he can be totally clear what

10:01:20  23   documents these are.

10:01:46  24   BY MR. COLE:

10:01:54  25   Q.  All the diagnoses sections are in the defendant's

| | | |
|---|---|---|
| 10:01:56 | 1 | handwriting; is that correct? |
| 10:01:58 | 2 | A.  Yes. |
| 10:01:58 | 3 | MR. COLE:  I have no further questions, your Honor. |
| 10:02:00 | 4 | THE COURT:  Cross-examination. |
| 10:02:02 | 5 | MR. JONES:  Thank you, Judge. |
| 10:02:02 | 6 | - - - |
| 10:02:02 | 7 | FAITH WASHINGTON, CROSS-EXAMINATION |
| 10:02:02 | 8 | BY MR. JONES: |
| 10:02:28 | 9 | Q.  Ms. Washington, I want to talk to you about this basement. |
| 10:02:32 | 10 | You said there came a time when the doctor asked you to help |
| 10:02:36 | 11 | out with files in the basement; is that correct? |
| 10:02:38 | 12 | A.  Yes. |
| 10:02:38 | 13 | Q.  And that was sometime during the summer of 2010; is that |
| 10:02:38 | 14 | right? |
| 10:02:44 | 15 | A.  Yes. |
| 10:02:44 | 16 | Q.  And that basement we are talking about, that basement was |
| 10:02:50 | 17 | a total mess, wasn't it? |
| 10:02:54 | 18 | A.  Yes. |
| 10:02:54 | 19 | Q.  It had files everywhere, did it not? |
| 10:02:58 | 20 | A.  Yes. |
| 10:02:58 | 21 | Q.  And what you were asked to do was to go through and look |
| 10:03:06 | 22 | through all of those files and try to put documents together; |
| 10:03:08 | 23 | isn't that true? |
| 10:03:10 | 24 | A.  No. |
| 10:03:10 | 25 | Q.  Are you saying that the only documents that you were asked |

| | | |
|---|---|---|
| 10:03:14 | 1 | to try and put something together were just ultrasound |
| 10:03:18 | 2 | documents? |
| 10:03:18 | 3 | A. No. |
| 10:03:20 | 4 | Q. Well, what other kind of documents did you work on? |
| 10:03:22 | 5 | A. I was asked to bring the boxes upstairs so we could sort |
| 10:03:28 | 6 | through them. |
| 10:03:28 | 7 | Q. And these boxes contained -- they were a variety of |
| 10:03:34 | 8 | different kinds of charts and files, were they not? |
| 10:03:36 | 9 | A. Yes. |
| 10:03:38 | 10 | Q. They didn't all result -- they weren't all about just |
| 10:03:42 | 11 | ultrasounds, were they? |
| 10:03:44 | 12 | A. No. |
| 10:03:44 | 13 | Q. In fact, you knew, did you not, that during the summer |
| 10:03:50 | 14 | of 2010, the doctor was making preparations to move his |
| 10:03:54 | 15 | office? You knew that, didn't you? |
| 10:03:56 | 16 | A. Yes. |
| 10:03:56 | 17 | Q. All right. And that people were trying to get these boxes |
| 10:04:02 | 18 | organized; isn't that correct? |
| 10:04:06 | 19 | A. No. |
| 10:04:06 | 20 | Q. Well, didn't you tell the FBI that a person named Mr. Q, |
| 10:04:14 | 21 | you remember that? |
| 10:04:14 | 22 | A. Yes. |
| 10:04:14 | 23 | Q. You told the FBI that Mr. Q helped complete the clean-up. |
| 10:04:20 | 24 | Isn't that what you told the FBI? |
| 10:04:24 | 25 | A. No. |

| | | |
|---|---|---|
| 10:04:24 | 1 | Q.  You were interviewed by the FBI on September 30th, 2011; |
| 10:04:24 | 2 | is that correct? |
| 10:04:52 | 3 | A.  I believe that date is correct. |
| 10:04:54 | 4 | Q.  And I am going to ask you, didn't you tell the FBI on that |
| 10:04:58 | 5 | day that Holmes' uncle, known to Washington as Q, was hired to |
| 10:05:04 | 6 | complete the job?  Isn't that what you told the FBI? |
| 10:05:08 | 7 | A.  Not complete the job, but he was there to bring up the |
| 10:05:10 | 8 | boxes that were heavy. |
| 10:05:12 | 9 | Q.  No, I'm asking you a very specific question.  Didn't you |
| 10:05:16 | 10 | tell the FBI -- |
| 10:05:16 | 11 | MR. COLE:  Objection, your Honor. |
| 10:05:18 | 12 | THE COURT:  Overruled. |
| 10:05:18 | 13 | BY MR. JONES: |
| 10:05:20 | 14 | Q.  Didn't you tell the FBI that he was there to complete the |
| 10:05:22 | 15 | job? |
| 10:05:24 | 16 | A.  I can't recall. |
| 10:05:24 | 17 | Q.  And, incidentally, this Mr. Q, he wasn't any kind of |
| 10:05:40 | 18 | trained technician, was he? |
| 10:05:42 | 19 | A.  No. |
| 10:05:42 | 20 | Q.  He was a clean-up guy, wasn't he? |
| 10:05:44 | 21 | A.  Yes. |
| 10:05:44 | 22 | Q.  Now, with respect to records that you were helping to do |
| 10:05:52 | 23 | the organization, you have no way of knowing the records that |
| 10:05:58 | 24 | you say were not there, you have no way of knowing whether |
| 10:06:00 | 25 | those records were just misfiled; isn't that right? |

10:06:06  1  A.  I don't understand what you're asking.

10:06:08  2  Q.  You have no way of knowing, do you, ma'am, whether the

10:06:12  3  records that were missing existed at one time?

10:06:18  4       Do you understand my question?

10:06:20  5  A.  No, I don't.

10:06:22  6  Q.  You have no way of knowing, these records that you say you

10:06:26  7  put the stickies on because they were missing; isn't that

10:06:30  8  right?

10:06:30  9  A.  Yes.

10:06:30  10  Q.  You have no way of knowing whether that record really

10:06:34  11  existed at one time, do you?

10:06:36  12  A.  No.

10:06:38  13  Q.  Now, with respect to ordering tests, you told the FBI that

10:07:06  14  there would be occasions where tests were ordered without

10:07:10  15  Dr. Chhibber's permission; isn't that correct?

10:07:22  16  A.  Can you rephrase that?

10:07:22  17  Q.  Yes.  I think you told the FBI that there were occasions,

10:07:28  18  for instance, that Twahki and Tyanna told you to do a test; is

10:07:28  19  that right?

10:07:40  20  A.  Yes.

10:07:40  21  Q.  And they hadn't talked to the doctor.  They said they

10:07:42  22  would say to you, Well, we think this is what the doctor would

10:07:46  23  want.  Isn't that what you told the FBI?

10:07:48  24  A.  Yes.

10:07:48  25  Q.  And as far as ordering Dr. Chhibber asking people to --

10:08:56    1    ordering tests over the telephone, you told the FBI on

10:09:00    2    November 12th, 2010, that it was your belief that Dr. Chhibber

10:09:06    3    only ordered tests for the patients he knew well; isn't that

10:09:10    4    what you told the FBI?

10:09:12    5    A.  Yes.

10:09:12    6    Q.  Now, you say that there came a time in your mind when you

10:09:28    7    were doing less tests; is that correct?

10:09:32    8    A.  Sorry.  What type of tests?

10:09:32    9    Q.  You said there came a time when you felt that you were

10:09:36    10   doing fewer tests; is that correct?

10:09:38    11   A.  Yes.

10:09:38    12   Q.  Now, during all the times that you met with the

10:09:42    13   government, did you ever put together a pile of documents and

10:09:46    14   say, Hey, look, this is what I was doing before, this is what

10:09:50    15   I was doing after?  Did you ever do that?

10:09:54    16   A.  Put together a pile of documents?

10:09:56    17   Q.  Yeah.  Did the government ever show you a pile of

10:09:58    18   documents and ask you to put -- do the pile that you say I was

10:10:02    19   doing before, and here is what I was doing later?  Did the

10:10:04    20   government ever ask you to do that?

10:10:08    21   A.  What kind of documents are you referring to?

10:10:10    22   Q.  Did the government ever ask you to make a comparison

10:10:14    23   between the time when you said you were doing more tests and

10:10:16    24   the time later where you say you were doing less tests?  Did

10:10:22    25   the government ever ask you to do that?

10:10:24    1    A.  I don't understand what you're asking me, sir.

10:10:26    2    Q.  Let me see if I can break this down to you.

10:10:30    3         You say there was a time when you were doing more

10:10:32    4    tests; is that correct?

10:10:32    5    A.  Yes.

10:10:32    6    Q.  Then you said there was a time when you were doing less

10:10:36    7    tests, right?

10:10:38    8    A.  Yes.

10:10:38    9    Q.  Did the government ever ask you compile documents that

10:10:42   10    would demonstrate this to us?  Did they ever ask you to do

10:10:46   11    that?

10:10:46   12    A.  No.

10:10:48   13    Q.  You say that there came a time when you were scared by the

10:10:54   14    FBI, right?

10:10:56   15    A.  Not scared by them.

10:10:58   16    Q.  Well, you felt uncomfortable?

10:11:00   17    A.  Yes.

10:11:00   18    Q.  And you said there comes a time when it became known that

10:11:06   19    an investigation was going on; is that right?

10:11:06   20    A.  Yes.

10:11:10   21    Q.  Well, the FBI, you admit they are an intimidating force,

10:11:18   22    are they not?

10:11:18   23              MR. COLE:  Objection, your Honor.

10:11:20   24              THE COURT:  Sustained.

10:11:20   25    BY MR. JONES:

| | | |
|---|---|---|
| 10:11:22 | 1 | Q. Well, when the -- when people knew that there was an |
| 10:11:26 | 2 | investigation going on, there were less clients, weren't |
| 10:11:28 | 3 | there? |
| 10:11:28 | 4 | A. No. |
| 10:11:30 | 5 | Q. Your answer is no? |
| 10:11:32 | 6 | A. My answer is no. |
| 10:11:34 | 7 | Q. And do you base that -- that's your generalized feeling, |
| 10:11:40 | 8 | or have you done some document test or document comparison? |
| 10:11:46 | 9 | Is that -- your answer is based upon your generalized |
| 10:11:50 | 10 | feeling that there were still the same amount of patients? |
| 10:11:54 | 11 | A. Yes, there were. In the very beginning -- |
| 10:12:00 | 12 | Q. No, I don't have any question pending. |
| 10:12:02 | 13 | I do have this question for you. Your mother's name |
| 10:12:16 | 14 | is Lula (phonetic) Washington; is that correct? |
| 10:12:18 | 15 | A. Yes. |
| 10:12:18 | 16 | Q. And I want you to remember that you are under oath. Did |
| 10:12:24 | 17 | there come a time when you observed -- |
| 10:12:26 | 18 | MR. COLE: Objection, your Honor. |
| 10:12:28 | 19 | THE COURT: Overruled. |
| 10:12:28 | 20 | BY MR. JONES: |
| 10:12:30 | 21 | Q. I want you to remember you are under oath. Did there come |
| 10:12:32 | 22 | a time when you presented your mother to treatment to |
| 10:12:36 | 23 | Dr. Chhibber under a phony name and a phony Medicare card? |
| 10:12:42 | 24 | A. Yes. |
| 10:12:42 | 25 | Q. Uh-huh. So having done that little trick with a phony |

10:12:54　1　Medicare card and presenting your mother under a phony name,

10:13:00　2　when the FBI came, it wasn't that you were scared that

10:13:04　3　Dr. Chhibber had committed fraud.  You knew you had committed

10:13:08　4　fraud; isn't that true?

10:13:10　5　A.　No.

10:13:10　6　Q.　Well, you don't think it's fraud to present someone under

10:13:16　7　a fraudulent name and a phony Medicare card?

10:13:18　8　A.　Yes.

10:13:20　9　Q.　So when you heard that the FBI walked in that door, you

10:13:28　10　didn't even come back to get your clothes, did you?

10:13:30　11　A.　I can't recall if I left anything.

10:13:34　12　Q.　The truth of the matter is, when you heard that the FBI

10:13:38　13　was at the door, you said, Feet, don't fail me now; isn't that

10:13:42　14　what you did?

10:13:42　15　A.　No.

10:13:42　16　Q.　And, incidentally, during all this time that you worked

10:13:54　17　with the government and you were so helpful with the

10:13:58　18　government, did you tell the government that you had committed

10:14:00　19　fraud?

10:14:02　20　A.　No.

10:14:02　21　Q.　Because knowing that you had committed fraud, you wanted

10:14:08　22　to be on the government's team, didn't you?

10:14:10　23　A.　No.

10:14:12　24　Q.　Because you knew it was the United States of America that

10:14:16　25　could put you in jail for the count of fraud you committed;

| | | |
|---|---|---|
| 10:14:20 | 1 | isn't that true? |
| 10:14:20 | 2 | A.  No. |
| 10:14:20 | 3 | Q.  And, incidentally, when you committed this little fraud |
| 10:14:28 | 4 | that you did, you had some cohorts at the office.  Tyanna |
| 10:14:34 | 5 | helped you commit this fraud, didn't she? |
| 10:14:36 | 6 | A.  No. |
| 10:14:36 | 7 | Q.  Didn't Tyanna help present the fraudulent ID at the |
| 10:14:42 | 8 | reception desk so that you could pull this little stunt off? |
| 10:14:46 | 9 | A.  No, she was unaware. |
| 10:14:48 | 10 | Q.  Was it Twahki that helped you pull this little fraud off? |
| 10:14:54 | 11 | A.  No, she was not aware. |
| 10:14:56 | 12 | Q.  You did this little fraud all on your own? |
| 10:14:58 | 13 | A.  Yes, I did. |
| 10:15:00 | 14 | Q.  What other little pieces of fraud did you commit? |
| 10:15:04 | 15 | A.  None. |
| 10:15:06 | 16 | MR. COLE:  Objection, your Honor. |
| 10:15:06 | 17 | THE COURT:  Sustained. |
| 10:15:06 | 18 | MR. JONES:  One moment, your Honor. |
| 10:15:06 | 19 | (Brief pause.) |
| 10:15:48 | 20 | MR. JONES:  Judge, I don't have anything else for |
| 10:15:50 | 21 | this witness. |
| 10:15:50 | 22 | THE COURT:  Any redirect? |
| 10:15:54 | 23 | - - - |
| 10:15:54 | 24 | FAITH WASHINGTON, REDIRECT EXAMINATION |
| 10:15:54 | 25 | BY MR. COLE: |

| | | |
|---|---|---|
| 10:15:56 | 1 | Q.  Remember when you were asked questions about the number of |
| 10:15:58 | 2 | procedures that you administered without the defendant's |
| 10:16:00 | 3 | permission? |
| 10:16:02 | 4 | A.  Yes. |
| 10:16:02 | 5 | Q.  Did Dr. Chhibber ever tell you afterwards that you |
| 10:16:04 | 6 | shouldn't have performed the test? |
| 10:16:08 | 7 | A.  No. |
| 10:16:08 | 8 | Q.  Did he ever tell you not to do that? |
| 10:16:08 | 9 | A.  No. |
| 10:16:08 | 10 | Q.  Now, in your answering questions today, you understand |
| 10:16:14 | 11 | that you have been under oath the entire time? |
| 10:16:16 | 12 | A.  Yes, I do. |
| 10:16:18 | 13 | MR. COLE:  No other questions. |
| 10:16:20 | 14 | THE COURT:  Anything further? |
| 10:16:20 | 15 | MR. JONES:  No.  I've had enough, Judge. |
| 10:16:24 | 16 | THE COURT:  Ms. Washington, you are excused. |
| 10:16:40 | 17 | (Witness excused.) |
| 10:16:40 | 18 | MR. COLE:  The government calls Alan Vaval. |
| 10:17:08 | 19 | (Witness sworn.) |
| 10:17:08 | 20 | THE COURT:  Please be seated and tell us your full |
| 10:17:12 | 21 | name, spelling your last name. |
| 10:17:12 | 22 | THE WITNESS:  Alan Vaval, V-a-v-a-l. |
| 10:17:18 | 23 | - - - |
| 10:17:18 | 24 | ALAN VAVAL, DIRECT EXAMINATION |
| 10:17:18 | 25 | BY MR. COLE: |

10:17:20  1   Q.  Mr. Vaval, are you a student?

10:17:22  2   A.  Yes, I am.

10:17:24  3   Q.  Where?

10:17:24  4   A.  Western University Illinois.

10:17:26  5   Q.  What's your major?

10:17:26  6   A.  Law enforcement.

10:17:28  7   Q.  When do you think you are going to graduate?

10:17:30  8   A.  2013, May of 2013.

10:17:32  9   Q.  Are you enrolled full time right now?

10:17:34  10  A.  Yes, I am.

10:17:36  11  Q.  Do you also work?

10:17:38  12  A.  Yes, I do.

10:17:38  13  Q.  Can you describe that for the jury.

10:17:40  14  A.  I'm a football film person.

10:17:44  15  Q.  What does that mean?

10:17:46  16  A.  I film the games and the practices of the football

10:17:56  17  players.

10:17:56  18  Q.  Are you on one of those scissor lifts?

10:17:58  19  A.  Usually in the press box.

10:18:00  20  Q.  How many hours a week do you work?

10:18:02  21  A.  Twenty.

10:18:04  22  Q.  How long have you been at Western?

10:18:08  23  A.  I have been there for three semesters.

10:18:10  24  Q.  And did you go to school before that?

10:18:12  25  A.  Yes, I did.

10:18:14  1   Q.  Where was that?

10:18:16  2   A.  I went to South Suburban College.

10:18:18  3   Q.  And did you get a degree from South Suburban College?

10:18:22  4   A.  I got a criminal justice degree, associate's degree.

10:18:28  5   Q.  When was that?

10:18:28  6   A.  2007.

10:18:28  7   Q.  Now, between the time you finished up at South Suburban

10:18:32  8   and you started at Western, what did you do?

10:18:34  9   A.  I worked at a car dealership called CarMax.

10:18:38  10  Q.  What years did you work at CarMax?

10:18:40  11  A.  From 2007 to 2011.

10:18:44  12  Q.  Can you describe for the jury what you did at CarMax?

10:18:46  13  A.  At CarMax, I was a detailer.  I made sure the interior and

10:18:52  14  exterior of the cars were in perfect condition.

10:18:54  15  Q.  Did you work full time or part time?

10:18:58  16  A.  Full time.

10:18:58  17  Q.  Did you have any benefits?

10:18:58  18  A.  Yes, I did.

10:19:00  19  Q.  What kind of benefits did you have?

10:19:00  20  A.  I had medical and dental benefits.

10:19:04  21  Q.  Who was your medical insurance through?

10:19:06  22  A.  Blue Cross/Blue Shield.

10:19:08  23  Q.  Now, are you familiar with the defendant in this case,

10:19:10  24  Dr. Jaswinder Chhibber?

10:19:18  25  A.  Yes, I am.

| | | |
|---|---|---|
| 10:19:20 | 1 | Q. How are you familiar with him? |
| 10:19:20 | 2 | A. I went to his clinic. |
| 10:19:22 | 3 | Q. Do you remember when, approximately, was the first time |
| 10:19:24 | 4 | you went to his clinic? |
| 10:19:24 | 5 | A. Fall of '08, as I remember. |
| 10:19:26 | 6 | Q. Approximately how many times have you been to his clinic? |
| 10:19:28 | 7 | A. Two times. |
| 10:19:30 | 8 | Q. How did you get to the clinic the times you went there? |
| 10:19:36 | 9 | A. I drove both times. |
| 10:19:36 | 10 | Q. How did you choose this clinic? |
| 10:19:40 | 11 | A. Through a reference from a friend. |
| 10:19:42 | 12 | Q. Now, I want you to think of the first time you went to his |
| 10:19:48 | 13 | clinic. Tell the jury why you went there. |
| 10:19:50 | 14 | A. The first time I went to the clinic, I was there for STD |
| 10:19:54 | 15 | checkup. |
| 10:19:54 | 16 | Q. Why did you want to go get an STD checkup? |
| 10:20:00 | 17 | A. I had a sexual experience with a girl unprotected, so I |
| 10:20:06 | 18 | wanted to have a checkup. I was nervous and curious about my |
| 10:20:10 | 19 | health. |
| 10:20:10 | 20 | Q. Were you experiencing any symptoms you were worried about? |
| 10:20:14 | 21 | A. No symptoms. |
| 10:20:16 | 22 | Q. And had you previously received any STD education? |
| 10:20:18 | 23 | A. Yes, at South Suburban College. |
| 10:20:20 | 24 | Q. When was this? |
| 10:20:22 | 25 | A. 2007. |

10:20:24  1  Q.  And as part of this education, did they tell you anything

10:20:28  2  about STD testing?

10:20:30  3  A.  They told me to just get tested every year, if possible.

10:20:34  4  Q.  And had you been tested for STDs previously to seeing the

10:20:44  5  defendant?

10:20:44  6  A.  Yes.

10:20:44  7  Q.  When was that?

10:20:44  8  A.  I would guess 2007.

10:20:46  9  Q.  Have you been to the defendant's clinic since 2008?

10:20:50  10  A.  No.

10:20:52  11  Q.  In any of your visits to the defendant, did you ever

10:20:56  12  complain of chest pain?

10:20:58  13  A.  No, I haven't.

10:20:58  14  Q.  Did you ever complain of shortness of breath?

10:21:00  15  A.  No.

10:21:00  16  Q.  In any of your visits, did you ever complain of dizziness?

10:21:04  17  A.  No.

10:21:04  18  Q.  Did you ever complain of abdominal pain?

10:21:08  19  A.  No.

10:21:08  20  Q.  Did you ever tell the defendant -- I'm sorry.

10:21:14  21      Did the defendant ever tell you that he was worried

10:21:16  22  that you were at a risk for stroke because he heard a sound

10:21:18  23  when listening to the blood flow through the arteries of your

10:21:24  24  neck?

10:21:24  25  A.  No.

10:21:24    1   Q. Now, focusing on your first visit with the defendant, can

10:21:30    2   you describe what happened when you first walked into his

10:21:34    3   clinic.

10:21:34    4   A. When I first walked into his clinic, I went to the

10:21:38    5   reception desk. The receptionist asked what I was here for.

10:21:42    6   I was like, STD checkup. She made me sign in. Then she gave

10:21:46    7   me insurance forms.

10:21:48    8       I sat down, filled out the insurance forms, turned it

10:21:52    9   back in to her. She said to sit in the lobby and wait until

10:21:56   10   somebody comes to get you.

10:21:56   11   Q. Let me show you what's been marked as Government

10:22:00   12   Exhibit 360, page 16. Do you recognize that?

10:22:06   13   A. Yes.

10:22:06   14   Q. What is that?

10:22:10   15   A. My insurance card.

10:22:12   16   Q. And is that a copy of the card you gave the defendant?

10:22:16   17   A. Yes.

10:22:16   18   Q. Now, if you look at the top right of that card, if you can

10:22:22   19   focus on that, can you see what it says?

10:22:24   20   A. Blue Cross/Blue Shield.

10:22:26   21   Q. And right below that?

10:22:28   22   A. Members costs?

10:22:38   23   Q. Yes. And under "copay," do you see what that says?

10:22:40   24   A. $20.

10:22:40   25   Q. Let me show you what's marked as Government Exhibit 360,

| | | |
|---|---|---|
| 10:22:44 | 1 | page 23.  Do you recognize this? |
| 10:22:48 | 2 | A.  Yes. |
| 10:22:50 | 3 | Q.  What is that? |
| 10:22:52 | 4 | A.  The registration form for the clinic. |
| 10:22:56 | 5 | Q.  Is that your signature at the bottom? |
| 10:22:58 | 6 | A.  Yes, it is. |
| 10:22:58 | 7 | Q.  Now, you see the middle section says, Insurance |
| 10:23:02 | 8 | information.  Do you see that? |
| 10:23:04 | 9 | A.  Yes. |
| 10:23:04 | 10 | Q.  But that's crossed out, right? |
| 10:23:06 | 11 | A.  Right. |
| 10:23:06 | 12 | Q.  But you did give them your insurance card, right? |
| 10:23:10 | 13 | A.  Yes. |
| 10:23:10 | 14 | Q.  So after filling out these forms, what happened next? |
| 10:23:14 | 15 | A.  I stayed in the waiting room for like a couple of hours. |
| 10:23:20 | 16 | Q.  A couple of hours? |
| 10:23:24 | 17 | A.  Yes. |
| 10:23:24 | 18 | Q.  Then what happened? |
| 10:23:24 | 19 | A.  Then a nurse came to get me and brought me to a patient |
| 10:23:28 | 20 | room.  She took my vitals.  After she took my vitals, another |
| 10:23:34 | 21 | nurse walked me to the back and told me to pee in a cup, and |
| 10:23:36 | 22 | she brought me back to this room and took my blood. |
| 10:23:42 | 23 | Q.  Can you describe what vitals they took? |
| 10:23:44 | 24 | A.  They took -- listened to my heart.  They also put the |
| 10:23:52 | 25 | stethoscope on my stomach, told me to breathe in, breathe out, |

10:23:58  1   put it in my back, breathe in, breathe out.  They did the air

10:24:02  2   check and took my height and weight.

10:24:04  3   Q.  Can you describe the nurse that did these vitals?

10:24:10  4          Male or female?

10:24:12  5   A.  It was a female.

10:24:14  6   Q.  Do you remember anything about her other than that?

10:24:16  7   A.  She had long hair, really dark-skinned.

10:24:22  8   Q.  So after she took your vitals, what happened next?

10:24:26  9   A.  She told me to go back into the waiting room and wait for

10:24:30  10  Dr. Chhibber.

10:24:30  11  Q.  How long did you wait?

10:24:32  12  A.  For a couple of minutes.

10:24:36  13  Q.  Then what happened --

10:24:38  14  A.  Fifteen minutes.

10:24:40  15  Q.  What happened next?

10:24:40  16  A.  He came with my file in his hand and told me to come back

10:24:46  17  into the patient room.

10:24:46  18  Q.  Let me stop you.  Who came?

10:24:48  19  A.  Dr. Chhibber.

10:24:50  20          He asked me why I was here for.  And I was like, STD

10:24:54  21  checkup.

10:24:54  22  Q.  Let me just stop you.  Where did he ask you these

10:24:56  23  questions?

10:24:56  24  A.  In the patient room.

10:24:58  25  Q.  And so describe for the jury what happened when you first

10:25:00  1  got back to the patient room.

10:25:02  2  A.  We walked in.  I sat on the table, patient table.  He then

10:25:12  3  looked at my file and asked me what was I here for.  And I was

10:25:16  4  like, STD checkup.  He took my vitals again.  And then --

10:25:22  5  Q.  When you say he took your vitals, what do you mean?

10:25:26  6  A.  Checked my breathing, checked my heart, listened to my

10:25:32  7  heart, and that was it.

10:25:36  8  Q.  Did he ask you any questions about your history?

10:25:38  9  A.  Yes, he asked me did I ever have asthma.

10:25:42  10  Q.  What did you tell him?

10:25:44  11  A.  I said as a young child I did, but now as an adult, I

10:25:48  12  don't have it.

10:25:50  13  Q.  What else did he ask you?

10:25:50  14  A.  He asked me do I have any pain, having chest pain.

10:26:00  15  Q.  What did you tell him?

10:26:00  16  A.  I said no.  Have I ever been dizzy?  I said no.

10:26:08  17  Q.  Ask you anything about --

10:26:10  18      MR. JONES:  Judge, I am going to object.  He can

10:26:12  19  relate the conversation.

10:26:12  20      THE COURT:  Yes.  Don't lead him, in other words.

10:26:20  21  BY MR. COLE:

10:26:20  22  Q.  Did he ask you anything pertinent in relation to your

10:26:24  23  sexually transmitted disease testing?

10:26:28  24  A.  No.

10:26:28  25  Q.  You said that he listened to your heart with a

| | | |
|---|---|---|
| 10:26:30 | 1 | stethoscope? |
| 10:26:30 | 2 | A.  Yes. |
| 10:26:30 | 3 | Q.  What position were you in when he listened to your heart? |
| 10:26:34 | 4 | A.  I was sitting on the patient's table. |
| 10:26:36 | 5 | Q.  Did he ask you to lie down? |
| 10:26:38 | 6 | A.  No. |
| 10:26:38 | 7 | Q.  Did he ask you to roll over on the left side or the right |
| 10:26:42 | 8 | side? |
| 10:26:42 | 9 | A.  No. |
| 10:26:42 | 10 | Q.  Did he ask you to get down off the table and squat down? |
| 10:26:50 | 11 | A.  No. |
| 10:26:50 | 12 | Q.  Did the defendant make any comments about your heart? |
| 10:26:52 | 13 | A.  All he said was that I had an irregular heartbeat, |
| 10:26:58 | 14 | something about maybe a murmur. |
| 10:27:00 | 15 | Q.  Now, you talked to law enforcement about your visit with |
| 10:27:04 | 16 | the defendant approximately four times; is that fair? |
| 10:27:08 | 17 | A.  Yes.  Yes. |
| 10:27:08 | 18 | Q.  The first time you ever mentioned that the defendant said |
| 10:27:12 | 19 | you had a murmur was over the weekend; is that right? |
| 10:27:12 | 20 | A.  Yes. |
| 10:27:20 | 21 | Q.  Now, did the defendant tell you he was going to give you |
| 10:27:22 | 22 | any tests? |
| 10:27:24 | 23 | A.  He told me I was going to get a health test. |
| 10:27:32 | 24 | Q.  Did he tell you what kind of health test it was? |
| 10:27:34 | 25 | A.  He didn't really say.  It was just to check my health. |

| | | |
|---|---|---|
| 10:27:42 | 1 | That's what he said. |
| 10:27:44 | 2 | Q. Did he say there was something he was worried about he |
| 10:27:48 | 3 | wanted to check up on? |
| 10:27:50 | 4 | MR. JONES: Judge -- |
| 10:27:50 | 5 | THE COURT: Sustained. |
| 10:27:52 | 6 | BY MR. COLE: |
| 10:27:52 | 7 | Q. Did he give you any more particular reason as to why he -- |
| 10:27:54 | 8 | MR. JONES: Judge, this is what I object to. |
| 10:27:56 | 9 | THE COURT: Sustained. Sustained. |
| 10:27:58 | 10 | BY MR. COLE: |
| 10:27:58 | 11 | Q. Let me show you what's been marked as Government Exhibit |
| 10:28:02 | 12 | 360, page 32. Now, focusing on the bottom left, did the |
| 10:28:14 | 13 | defendant ever tell you he was writing down in your chart that |
| 10:28:18 | 14 | you were suffering from chest pain? |
| 10:28:20 | 15 | A. No, he just asked the questions did I have chest pain, and |
| 10:28:26 | 16 | I saw him write down on a piece of paper. |
| 10:28:28 | 17 | Q. Did he ever tell you he was writing down that you were |
| 10:28:32 | 18 | suffering from carotid bruit, or a sound in your neck? |
| 10:28:36 | 19 | A. No. |
| 10:28:36 | 20 | Q. Did he ever tell you that he was writing down that you |
| 10:28:38 | 21 | were suffering from dizziness? |
| 10:28:40 | 22 | A. No. |
| 10:28:40 | 23 | Q. Did he ever tell you that he was writing down that you had |
| 10:28:46 | 24 | penile discharge? |
| 10:28:46 | 25 | A. No. |

10:28:48   1   Q.  Now, in the two to three times you went to see the

10:28:56   2   defendant, what tests do you remember being performed on you?

10:29:00   3          MR. JONES:  Judge, I object to the two or three

10:29:02   4   times.  The witness has only said twice.

10:29:04   5   BY MR. COLE:

10:29:04   6   Q.  I'm sorry.  In the two times you remember seeing the

10:29:08   7   defendant, what tests, if ever, do you remember the defendant

10:29:10   8   performing on you?

10:29:10   9   A.  The EKG and ultrasound.

10:29:16   10   Q.  What kind of ultrasound?

10:29:16   11   A.  To check my heart and to check my abdominal area.

10:29:24   12   Q.  Now, when you say "EKG," what do you mean by that?

10:29:32   13   A.  He put some leads on my chest and was checking my

10:29:36   14   heartbeat.

10:29:38   15   Q.  Now, you previously said that the defendant -- you never

10:29:44   16   told the defendant you were suffering from abdominal pain.

10:29:46   17   Did the defendant tell you why you received an abdominal

10:29:50   18   ultrasound?

10:29:50   19   A.  No.  He said he was just doing a checkup.

10:30:12   20          MR. COLE:  No further questions, your Honor.

10:30:14   21          THE COURT:  We are going to take our morning break.

10:30:16   22   Fifteen minutes.  The jury is excused.

10:30:18   23     (The jury exits the courtroom.)

10:30:54   24          THE COURT:  Sir, you may step down during the break,

10:30:58   25   but please return at quarter to 11:00.  We are going to resume

10:31:02    1    then.

10:31:02    2      (The witness leaves the stand.)

10:31:04    3            THE COURT:  I was just -- I guess about 10 minutes

10:31:06    4    ago, my courtroom deputy handed me it looks like copies that

10:31:14    5    are unstamped, so I don't know when she received them, but

10:31:20    6    they have today's date as the filing date.  It's a motion for

10:31:26    7    evidentiary hearing regarding circumstances of destruction of

10:31:32    8    potentially exculpatory evidence, and the copy she gave he has

10:31:38    9    a lot of blanked out information, and it refers to an exhibit

10:31:44    10   that's not attached.

10:31:50    11           MR. JONES:  Judge --

10:31:50    12           THE COURT:  If there is a motion, I don't need a

10:31:52    13   redacted version.

10:31:56    14           MR. JONES:  I understand.  We did that out of an

10:31:58    15   abundance of caution because of this protective order thing.

10:32:04    16   But if I could hand up to the judge the real motion without

10:32:08    17   all of that.

10:32:08    18           MR. HAMMERMAN:  Judge, we also request an unredacted

10:32:10    19   full copy.

10:32:12    20           MR. JONES:  Okay.

10:32:12    21           THE COURT:  You will have a real 15-minute break.

10:32:16    22           MR. JONES:  Thank you, Judge.

10:32:18    23     (Short break.)

10:48:00    24     (The jury enters the courtroom.)

10:48:00    25           THE COURT:  Sir, you are still under oath.  Would you

| | | |
|---|---|---|
| 10:48:04 | 1 | restate your full name for the jury and the court reporter. |
| 10:48:08 | 2 | THE WITNESS:  Alan Vaval. |
| 10:48:14 | 3 | THE COURT:  Cross-examination. |
| 10:48:14 | 4 | MR. JONES:  Thank you, your Honor. |
| 10:48:14 | 5 | - - - |
| 10:48:14 | 6 | ALAN VAVAL, CROSS-EXAMINATION |
| 10:48:14 | 7 | BY MR. JONES: |
| 10:48:18 | 8 | Q.  Mr. Vaval, would it be safe to say that since the FBI |
| 10:48:22 | 9 | first approached you in June of 2011 about your visits to |
| 10:48:30 | 10 | Dr. Chhibber that were three years before that, that you have |
| 10:48:34 | 11 | had a great deal of difficulty remembering what happened |
| 10:48:38 | 12 | during those two visits to Dr. Chhibber? |
| 10:48:40 | 13 | A.  Yes. |
| 10:48:42 | 14 | Q.  In fact, would it be fair to say to you that the |
| 10:48:48 | 15 | government has interviewed you on four separate occasions? |
| 10:48:48 | 16 | Isn't that correct? |
| 10:48:54 | 17 | A.  Yes. |
| 10:48:54 | 18 | Q.  And that on those four separate occasions, you have given |
| 10:48:58 | 19 | a different version of the story on each of those four |
| 10:49:02 | 20 | separate occasions, haven't you? |
| 10:49:04 | 21 | A.  No. |
| 10:49:04 | 22 | Q.  Well, let me see if I can help you. |
| 10:49:10 | 23 | You were first approached by the government and |
| 10:49:14 | 24 | interviewed on June 9th, 2011; is that correct? |
| 10:49:18 | 25 | A.  Correct. |

| | |
|---|---|
| 10:49:18 | 1 |
| 10:49:28 | 2 |
| 10:49:34 | 3 |
| 10:49:36 | 4 |
| 10:49:40 | 5 |
| 10:50:00 | 6 |
| 10:50:06 | 7 |
| 10:50:10 | 8 |
| 10:50:10 | 9 |
| 10:50:14 | 10 |
| 10:50:16 | 11 |
| 10:50:20 | 12 |
| 10:50:22 | 13 |
| 10:50:26 | 14 |
| 10:50:28 | 15 |
| 10:50:28 | 16 |
| 10:50:34 | 17 |
| 10:50:36 | 18 |
| 10:50:38 | 19 |
| 10:50:38 | 20 |
| 10:50:42 | 21 |
| 10:50:44 | 22 |
| 10:50:46 | 23 |
| 10:50:50 | 24 |
| 10:50:50 | 25 |

Q.  And when you were interviewed on 2011, you told the FBI that it was Dr. Chhibber who performed the ultrasound test on you.  That's what you told the FBI, right?

A.  No.

Q.  Well, let me -- I'm going to ask you, again, on 6/9/2011, did you tell the FBI, Vaval recalled that Dr. Chhibber was the one who performed the ultrasound?  Is that what you told the FBI?

A.  I told them it was two guys in the office that performed the ultrasound.

Q.  All right.  So what you're saying, you don't remember telling them that; is that what you said?

A.  No, I am saying I didn't tell them that.

Q.  Oh, you say you didn't tell them that?

A.  No.

Q.  Let me show you what's been marked as Exhibit 1 for this date and time and let me just --

        MR. COLE:  Objection, your Honor.  Improper impeachment.

        THE COURT:  All right.  Without the fanfare.

        MR. JONES:  I'm sorry, Judge.

BY MR. JONES:

Q.  All right.  Can I show you this exhibit and ask, does that refresh your recollection?

A.  No, sir.

587

10:51:00  1   Q.  It doesn't.  All right.

10:51:02  2        Let me ask you some more questions.  When the FBI

10:51:06  3   interviewed you on 6/9/2011, you were also certain, you told

10:51:16  4   the FBI that you -- on no occasion that you certainly did not

10:51:20  5   receive an ultrasound of the neck.  You told the FBI that, did

10:51:26  6   you not?

10:51:26  7   A.  Yes.

10:51:30  8   Q.  And you further told the FBI -- in fact, you insisted to

10:51:34  9   the FBI that Dr. Chhibber never listened to your heart.  Isn't

10:51:40  10  that what you told the FBI on 6/9/2011?

10:51:44  11  A.  No, I told them that he took my vitals.  That's listening

10:51:52  12  to the heart.

10:51:52  13  Q.  Well, here, let me ask you this.  Did you tell the FBI

10:51:56  14  that, Further, Vaval stated that Dr. Chhibber never listens to

10:52:00  15  Vaval's heartbeat?  Isn't that what you told the FBI when you

10:52:06  16  first talked to them?

10:52:08  17        MR. COLE:  Objection, your Honor.  Improper.

10:52:10  18        THE COURT:  Overruled.

10:52:10  19  BY MR. JONES:

10:52:10  20  Q.  You can answer the question.

10:52:12  21  A.  No, sir.

10:52:16  22  Q.  All right.  Now, the next time you were interviewed by the

10:52:26  23  FBI was approximately four months later on October 9th, 2011.

10:52:34  24  Do you recall that?

10:52:36  25  A.  Yes.

10:52:36  1  Q.  And, once again, on that second interview, which was four

10:52:42  2  months later, you still insisted to the FBI that it was

10:52:46  3  Dr. Chhibber who had performed the ultrasound test on you; is

10:52:46  4  that correct?

10:52:54  5  A.  No, sir.  That was the second visit --

10:52:56  6  Q.  Just -- my question is, do you recall telling the FBI on

10:53:00  7  October 9th, 2011, that it was Dr. Chhibber who gave you the

10:53:06  8  ultrasound test?

10:53:06  9  A.  No.

10:53:10  10  Q.  All right.  And do you recall telling the FBI that

10:53:18  11  Dr. Chhibber was an Indian or Pakistani with black-gray hair,

10:53:30  12  glasses, and approximately five-eleven inches tall?  Do you

10:53:34  13  remember telling them that?

10:53:36  14  A.  Yes.

10:53:36  15  Q.  I'm sorry?

10:53:38  16  A.  Yes.

10:53:38  17  Q.  All right.  And do you recall telling the FBI that with

10:53:48  18  respect to your second visit to Dr. Chhibber's office, that

10:53:54  19  you never had any blood work or urine tests done on that

10:53:58  20  second visit?  Do you recall telling the FBI that?

10:54:00  21  A.  Yes, I recall that.

10:54:02  22  Q.  All right.  And you recall telling the FBI that -- at

10:54:10  23  first you told the FBI that you didn't have any other

10:54:12  24  diagnostic tests.  Do you recall that?

10:54:14  25  A.  No, sir.

10:54:18   1   Q.  And do you recall then changing your mind and saying,
10:54:22   2   well, maybe two doctors might have given you a test with some
10:54:26   3   leads on?  Do you recall that?
10:54:26   4   A.  Yes, I recall that.
10:54:28   5   Q.  All right.  And you recall on this second visit that, once
10:54:42   6   again, you insisted that Dr. Chhibber had never even listened
10:54:48   7   to your heart?  Do you recall telling them that on October
10:54:54   8   9th, 2011?
10:54:56   9   A.  No.
10:54:56  10   Q.  You don't recall?
10:54:58  11   A.  No.
10:54:58  12   Q.  All right.  And I -- just for the record, I want to make
10:55:06  13   this Exhibit 2 for the day.  I just want you to read from what
10:55:14  14   purports to be the interview of 10/9/2011.  I want you to read
10:55:20  15   the third paragraph and read that and ask does that refresh
10:55:22  16   your recollection about what you told the FBI?
10:55:24  17   A.  No, it's not.
10:55:32  18   Q.  All right.  That's fine.
10:55:34  19        And in this same interview on October 9th, 2011, do
10:55:48  20   you recall telling the FBI that at no time did Dr. Chhibber
10:55:52  21   ever tell you that you had a heart murmur?  Do you recall
10:55:56  22   telling them?
10:55:56  23   A.  I recall telling them that, yes, sir.
10:56:02  24   Q.  Then do you recall that on the very next day, October
10:56:10  25   10th, 2011, that you -- the very next day you had an interview

10:56:16  1  with the FBI.  Do you recall that?

10:56:18  2  A.  Yeah.

10:56:18  3  Q.  They called you on the telephone.  Do you recall that?

10:56:22  4  A.  Yes.

10:56:22  5  Q.  And they said, Mr. Vaval, we want to go over those answers

10:56:30  6  again.  Do you remember that?

10:56:30  7  A.  Yes.

10:56:30  8  Q.  All right.  And that when this time when they called you

10:56:38  9  over the telephone, you said that, well, you now recall that

10:56:42  10  you had blood work done on both days.  Do you recall now

10:56:46  11  telling the FBI that on the 10th?

10:56:48  12  A.  No.

10:56:48  13  Q.  Do you recall on this day also that it was this day that

10:57:04  14  you told the FBI, you know, I can't recall whether I had two

10:57:08  15  or three visits with Dr. Chhibber?  That's what you told the

10:57:12  16  FBI on this day, October 10th, 2011; isn't that correct?

10:57:18  17  A.  Yes.

10:57:18  18  Q.  All right.  And you told them that the third visit might

10:57:28  19  have even occurred one year after the second.  Isn't that what

10:57:32  20  you told the FBI?

10:57:34  21  A.  No.

10:57:34  22  Q.  Well, let me show you what I will call Exhibit 3 for this

10:57:44  23  day and just ask you to take a look at the last paragraph of

10:57:48  24  what purports to be the FBI 302.  Do you see -- read the last

10:57:54  25  paragraph.  Does that refresh your recollection at all?

```
10:57:56   1   A.  Yes.  Yeah.
10:58:02   2   Q.  So that is what you told the FBI; is that correct?
10:58:06   3   A.  Two or three visits?
10:58:08   4   Q.  Yes?
10:58:08   5   A.  Yes.
10:58:08   6   Q.  And that the third visit could have been one year after
10:58:12   7   the second; is that correct?
10:58:12   8   A.  That would have been the same year.
10:58:14   9   Q.  I'm just saying isn't this what you told the FBI on this
10:58:20  10   day?
10:58:20  11   A.  Yes.
10:58:20  12   Q.  All right.  Now, after all of those interviews with the
10:58:36  13   FBI, the FBI -- the prosecutor finally interviews you this
10:58:44  14   past Saturday; is that correct?
10:58:46  15   A.  Yes.
10:58:46  16   Q.  And for the very first time this past Saturday, you now
10:58:52  17   recall that Dr. Chhibber did mention to you that you had a
10:58:56  18   heart murmur; is that correct?
10:58:58  19   A.  Yes.
10:58:58  20   Q.  In fact, I believe you also related to the government that
10:59:10  21   your mother had a heart murmur; is that correct?
10:59:12  22   A.  Yes.
10:59:12  23   Q.  Now, in fact, I want to show you something.  It's in
10:59:18  24   evidence, and it's your chart, and it would be -- so that the
10:59:38  25   government knows -- I want to show you portions of
```

10:59:54    1   Government's 360, and I want to talk to you about the doctor's

10:59:56    2   discussion with you regarding your heart murmur. I want to

10:59:58    3   show you this page from your chart, and you see that there is

11:00:02    4   a diagram on that page?

11:00:04    5   A. Yes.

11:00:06    6   Q. Now, I want you to recall this. Isn't it a fact that when

11:00:10    7   you came for your second visit, that Dr. Chhibber used that

11:00:18    8   diagram to explain to you the workings of the heart? Do you

11:00:22    9   recall that?

11:00:22   10   A. I don't recall.

11:00:26   11   Q. Do you recall him using that diagram to attempt to explain

11:00:32   12   to you what your heart murmur was all about?

11:00:34   13   A. No, sir.

11:00:34   14   Q. All right. Now, it's your testimony that you don't recall

11:00:58   15   talking to Dr. Chhibber about chest pains; is that correct?

11:01:04   16   A. Yes.

11:01:04   17   Q. Now, do you recall that on October 16th, 2004, that you

11:01:12   18   had been admitted to the emergency room of Trinity Hospital

11:01:14   19   for chest pains? Do you remember that?

11:01:16   20   A. Yeah.

11:01:18   21   Q. Okay. So you recall that; is that correct?

11:01:20   22   A. Yeah.

11:01:22   23   Q. And, of course, that was before you met Dr. Chhibber; is

11:01:28   24   that correct?

11:01:28   25   A. Correct.

| | | |
|---|---|---|
| 11:01:28 | 1 | Q.  And do you recall there came a time after you saw |
| 11:01:34 | 2 | Dr. Chhibber that you again were admitted on April 6th, 2010, |
| 11:01:42 | 3 | to the emergency room of Trinity Hospital for chest pains?  Do |
| 11:01:46 | 4 | you recall that? |
| 11:01:46 | 5 | A.  Yes. |
| 11:01:48 | 6 | Q.  In fact, I just want to show you -- this is part of our |
| 11:02:04 | 7 | Exhibit 137-7.  I want to show you part of those records.  And |
| 11:02:14 | 8 | I will have you identify this.  Those records -- in fact, you |
| 11:02:20 | 9 | remember that day.  And on 137.6 (sic), that's you, Alan |
| 11:02:30 | 10 | Vaval, being admitted to Trinity; is that correct? |
| 11:02:32 | 11 | A.  Yes. |
| 11:02:32 | 12 | Q.  And on the very next exhibit -- |
| 11:02:36 | 13 | THE COURT:  Could you keep your voice up, please, so |
| 11:02:38 | 14 | everybody can hear you. |
| 11:02:40 | 15 | THE WITNESS:  Yes. |
| 11:02:42 | 16 | MR. JONES:  Judge, I got worried.  I thought you were |
| 11:02:46 | 17 | talking about me. |
| 11:02:48 | 18 | THE COURT:  No. |
| 11:02:48 | 19 | BY MR. JONES: |
| 11:02:48 | 20 | Q.  On the very next exhibit that's part of this file, there |
| 11:02:52 | 21 | is a history of patient illness.  Do you see that? |
| 11:02:56 | 22 | A.  Yes. |
| 11:02:56 | 23 | Q.  And what it says is, The patient is 25-year-old male who |
| 11:03:02 | 24 | presents with chest pain. |
| 11:03:04 | 25 | Do you see that? |

11:03:04  1  A.  Yes.

11:03:04  2  Q.  All right.  You are aware, of course, sir, that -- here,

11:03:40  3  let me strike that.

11:03:40  4       Part of the record, now I'm going to show you 137-9,

11:04:30  5  under the patient's chief complaint, do you see that?

11:04:36  6  A.  Yes.

11:04:36  7  Q.  And your record says, it says, Neck and chest pain and a

11:04:40  8  little hard to breathe since Sunday.

11:04:42  9       Do you recall that?

11:04:42  10  A.  Yes.

11:04:42  11  Q.  Now, are you aware, sir, that when you went in on this day

11:04:48  12  in April of 2010, that they gave you an EKG?

11:04:52  13  A.  Yes, sir.

11:04:52  14  Q.  I want to show you what's been marked in your chart as

11:04:58  15  137-22.  And you see that that EKG --

11:05:04  16       MR. COLE:  Objection.  Relevance, your Honor.

11:05:06  17       THE COURT:  Overruled.

11:05:06  18  BY MR. JONES:

11:05:06  19  Q.  You see that that EKG says that you had an abnormal EKG.

11:05:10  20  Do you see that?

11:05:12  21  A.  Yes.

11:05:12  22  Q.  And it also uses the word that you had an acute AMI.  Are

11:05:22  23  you aware, sir, that that's a mild heart attack?

11:05:24  24       MR. COLE:  Objection, your Honor.  Hearsay.

11:05:26  25       THE WITNESS:  No.

| | | |
|---|---|---|
| 11:05:26 | 1 | THE COURT:  Overruled. |
| 11:05:26 | 2 | BY MR. JONES: |
| 11:05:28 | 3 | Q.  Are you aware that acute AMI means mild heart attack? |
| 11:05:34 | 4 | A.  No, I'm not. |
| 11:05:34 | 5 | Q.  Now, regarding abdominal pain, you say that you don't |
| 11:05:48 | 6 | recall telling the doctor that you had abdominal pain; is that |
| 11:05:54 | 7 | correct? |
| 11:05:54 | 8 | A.  Correct. |
| 11:05:54 | 9 | Q.  And are you aware that your test results for the time that |
| 11:06:00 | 10 | you visited Dr. Chhibber indicate that what they have that |
| 11:06:04 | 11 | your amylase count was twice that of the normal amylase count, |
| 11:06:10 | 12 | are you aware of that? |
| 11:06:10 | 13 | A.  No, sir. |
| 11:06:12 | 14 | Q.  And that what that means is that's indicative of |
| 11:06:18 | 15 | pancreitis (sic) and abdominal stomach pain, are you aware of |
| 11:06:22 | 16 | that? |
| 11:06:22 | 17 | A.  No, sir. |
| 11:06:30 | 18 | MR. JONES:  One moment, Judge. |
| 11:06:38 | 19 | I don't have anything else, your Honor. |
| 11:06:38 | 20 | THE COURT:  Redirect. |
| 11:06:44 | 21 | - - - |
| 11:06:44 | 22 | ALAN VAVAL, REDIRECT EXAMINATION |
| 11:06:44 | 23 | BY MR. COLE: |
| 11:06:52 | 24 | Q.  Remember when you were asked questions about being |
| 11:06:54 | 25 | admitted to Trinity Hospital? |

11:06:56    1    A.  Yes.

11:06:56    2    Q.  Shows the emergency room?

11:06:56    3    A.  Yes.

11:06:56    4    Q.  And the record said, Chest pain?

11:06:58    5    A.  Yes.

11:06:58    6    Q.  What was going on with you that day?

11:07:00    7    A.  I had bronchitis.

11:07:04    8    Q.  Did it hurt when you were breathing?

11:07:06    9    A.  Yeah.

11:07:06   10    Q.  Now, you were asked questions about an abnormal EKG that

11:07:14   11    you got at the hospital on that date.  Do you remember those

11:07:16   12    questions?

11:07:18   13    A.  Yeah.

11:07:18   14    Q.  Now, are you aware that you received four EKG printouts in

11:07:24   15    a row?  Were you aware of that?

11:07:26   16    A.  Yes.

11:07:26   17    Q.  And did you know the last three of them are you aware were

11:07:34   18    normal?

11:07:34   19    A.  Yes.

11:07:34   20    Q.  Were you aware of that?

11:07:38   21    A.  Yes.

11:07:38   22    Q.  Did you have bronchitis when you went to see the defendant

11:07:48   23    in 2008?

11:07:48   24    A.  No.

11:07:48   25    Q.  You were having trouble breathing?

| | | |
|---|---|---|
| 11:07:52 | 1 | A.  No. |
| 11:07:52 | 2 | Q.  Now, you were asked questions about different facts you |
| 11:08:02 | 3 | were able to recall when talking to the government in various |
| 11:08:06 | 4 | interviews.  Do you remember those questions? |
| 11:08:08 | 5 | A.  Yes. |
| 11:08:08 | 6 | Q.  Did you ever tell the government that you had told the |
| 11:08:10 | 7 | defendant you were suffering from chest pain? |
| 11:08:12 | 8 | A.  No. |
| 11:08:12 | 9 | Q.  Did you ever tell the government that you told the |
| 11:08:16 | 10 | defendant you were suffering from shortness of breath? |
| 11:08:18 | 11 | A.  No. |
| 11:08:18 | 12 | Q.  Did you ever tell the government that you had told the |
| 11:08:22 | 13 | defendant during your visit at his clinic that you had been |
| 11:08:26 | 14 | dizzy? |
| 11:08:26 | 15 | A.  No. |
| 11:08:28 | 16 | Q.  Did you ever tell the government that when you went to his |
| 11:08:30 | 17 | clinic, you had abdominal pain? |
| 11:08:32 | 18 | A.  No. |
| 11:08:32 | 19 | Q.  Did the defendant ever tell you that he was concerned that |
| 11:08:48 | 20 | you were having a heart attack? |
| 11:08:50 | 21 | A.  No. |
| 11:08:50 | 22 | Q.  Did he ever treat you for a heart attack? |
| 11:08:52 | 23 | A.  No. |
| 11:08:52 | 24 | Q.  Did he ever make you concerned that there was something |
| 11:08:58 | 25 | wrong with your heart other than what he had told you about |

| | | |
|---|---|---|
| 11:09:00 | 1 | your heart rhythm? |
| 11:09:02 | 2 | A.  No. |
| 11:09:04 | 3 | MR. COLE:  No other questions, your Honor. |
| 11:09:08 | 4 | THE COURT:  Anything further? |
| 11:09:08 | 5 | MR. JONES:  One second, Judge. |
| 11:09:10 | 6 | Judge, I don't have anything further. |
| 11:09:12 | 7 | THE COURT:  All right.  Thank you.  You may be |
| 11:09:14 | 8 | excused. |
| 11:09:16 | 9 | (Witness excused.) |
| 11:09:16 | 10 | MR. COLE:  Your Honor, the government calls Cierra |
| 11:09:20 | 11 | Thompson. |
| 11:09:56 | 12 | (Witness sworn.) |
| 11:09:56 | 13 | THE COURT:  Please be seated.  Would you tell us your |
| 11:09:58 | 14 | full name, spelling both your first and your last name. |
| 11:10:02 | 15 | THE WITNESS:  My name is Cierra Thompson; Cierra is |
| 11:10:06 | 16 | C-i-e-r-r-a, Thompson is T-h-o-m-p-s-o-n. |
| 11:10:12 | 17 | THE COURT:  Thank you. |
| 11:10:14 | 18 | - - - |
| 11:10:14 | 19 | CIERRA THOMPSON, DIRECT EXAMINATION |
| 11:10:14 | 20 | BY MR. COLE: |
| 11:10:16 | 21 | Q.  Ms. Thompson, where do you work? |
| 11:10:18 | 22 | A.  U.S. Cellular. |
| 11:10:20 | 23 | Q.  What do you do for them? |
| 11:10:22 | 24 | A.  I am a technical support specialist. |
| 11:10:26 | 25 | Q.  What does that mean? |

| | | |
|---|---|---|
| 11:10:26 | 1 | A.  I pretty much troubleshoot smart phone devices and |
| 11:10:32 | 2 | wireless modems. |
| 11:10:32 | 3 | Q.  How long have you worked there? |
| 11:10:34 | 4 | A.  Four years. |
| 11:10:34 | 5 | Q.  Can you describe for the jury your educational background. |
| 11:10:40 | 6 | A.  I graduated high school in 2006 from Simon, and over the |
| 11:10:44 | 7 | course, I have done some college. |
| 11:10:44 | 8 | Q.  Do you have insurance through your job at U.S. Cellular? |
| 11:10:48 | 9 | A.  Yes. |
| 11:10:48 | 10 | Q.  What kind of medical insurance do you have? |
| 11:10:50 | 11 | A.  Blue Cross/Blue Shield. |
| 11:10:52 | 12 | Q.  And did you have medical insurance the entire time you |
| 11:10:56 | 13 | worked there? |
| 11:10:56 | 14 | A.  Yes. |
| 11:10:56 | 15 | Q.  Are you familiar with the defendant in this case, |
| 11:11:00 | 16 | Dr. Chhibber? |
| 11:11:00 | 17 | A.  Yes, I am. |
| 11:11:00 | 18 | Q.  How are you familiar with him? |
| 11:11:02 | 19 | A.  I was referred to him for a visit for a follow-up after I |
| 11:11:12 | 20 | went to the emergency room. |
| 11:11:14 | 21 | Q.  When was this? |
| 11:11:16 | 22 | A.  In December of 2009. |
| 11:11:18 | 23 | Q.  Can you describe for the jury why it was that you went to |
| 11:11:22 | 24 | the emergency room that day. |
| 11:11:24 | 25 | A.  I had an abscess like on the back of my leg towards my |

11:11:32    1    buttocks.  I went to the emergency room because I couldn't

11:11:34    2    really walk.  They drained it, and then they told me to follow

11:11:38    3    up with the doctor.

11:11:42    4    Q.  When you left the hospital that day, did they give you

11:11:44    5    some instructions on what to do?

11:11:46    6    A.  Yeah, to follow up with the doctor.

11:11:48    7    Q.  Let me show you what's marked as Government Exhibit 350,

11:11:52    8    page 31.  Do you recognize this?

11:11:56    9    A.  Yes.

11:11:56    10    Q.  What is that?

11:11:58    11    A.  It's my discharge papers from West Suburban Hospital.

11:12:02    12    Q.  And did you bring this with you when you went to see the

11:12:04    13    defendant?

11:12:04    14    A.  Yes.

11:12:04    15    Q.  And you went to see the defendant, you went the following

11:12:08    16    day, you said?

11:12:08    17    A.  I went on Monday.

11:12:10    18    Q.  And did you have an appointment?

11:12:14    19    A.  No, it was -- Mondays are walk-in.

11:12:18    20    Q.  Did you bring this sheet with you when you went to see the

11:12:20    21    defendant?

11:12:20    22    A.  Yes.

11:12:20    23    Q.  How did you get to the defendant's office?

11:12:24    24    A.  I was referred to the defendant by my fiancee's mother at

11:12:34    25    the time, and she drove us there.

11:12:36  1  Q.  Describe what happened when you first got to the

11:12:40  2  defendant's clinic.

11:12:42  3  A.  As far as I can remember, when I first got in, I had to

11:12:46  4  sign in.  Then the assistants gave me some registration papers

11:12:52  5  to fill out.

11:12:52  6  Q.  What type of papers did you fill out?

11:13:00  7  A.  Basic information asking my name, where I stayed, my

11:13:06  8  insurance information.

11:13:06  9  Q.  Let me show you what's marked as Government Exhibit 350,

11:13:12  10  page 27.  Do you recognize that?

11:13:14  11  A.  Yes.

11:13:14  12  Q.  What is that?

11:13:16  13  A.  The registration forms.

11:13:18  14  Q.  Is that your signature at the bottom?

11:13:20  15  A.  Yes, it is.

11:13:20  16  Q.  And is this one of the forms you filled out when you first

11:13:24  17  got to the clinic?

11:13:24  18  A.  Yes.

11:13:24  19  Q.  Let me show you page 29 of that exhibit.  Do you recognize

11:13:30  20  that?

11:13:30  21  A.  Yes, I do.

11:13:32  22  Q.  Is that your signature at the bottom?

11:13:34  23  A.  Yes, it is.

11:13:34  24  Q.  What is that?

11:13:34  25  A.  What is the paper?

11:13:40    1   Q.  Yes.

11:13:40    2   A.  It's a confidentiality.

11:13:42    3   Q.  Is that one of the forms you filled out when you first got

11:13:46    4   to his clinic?

11:13:46    5   A.  Right.

11:13:46    6   Q.  What about Government Exhibit 350, page 30?  Same thing?

11:13:50    7   A.  Correct.

11:13:52    8   Q.  Your signature?

11:13:52    9   A.  Yes, it is.

11:13:52   10   Q.  Let me show you page 28.  Look at the top of the form.  Do

11:14:02   11   you see it says, Authorization form?

11:14:06   12   A.  Yes.

11:14:06   13   Q.  Is that one of those forms you filled out when you first

11:14:10   14   got there?

11:14:10   15   A.  Yes.

11:14:10   16   Q.  Your signature at the bottom?

11:14:12   17   A.  That is my signature.

11:14:12   18   Q.  I see there's nothing checked on the form.  Did they

11:14:16   19   explain any of these medical procedures to you before they

11:14:18   20   asked you to sign this form?

11:14:20   21   A.  No, I was -- honestly, I just signed the papers.  I

11:14:24   22   thought it was regular paperwork when you first go to the

11:14:28   23   doctor for the first time, so I didn't look at it in detail.

11:14:32   24   Q.  Whose names is circled at the top?

11:14:36   25   A.  Dr. Chhibber's.

| | | |
|---|---|---|
| 11:14:36 | 1 | Q. After you filled out these forms, what happened next? |
| 11:14:40 | 2 | A. I returned them to the assistants, and I sat down and |
| 11:14:44 | 3 | waited. I went back to the waiting room. |
| 11:14:46 | 4 | Q. Approximately how long did you wait? |
| 11:14:48 | 5 | A. I don't know for sure how long it was. Probably about |
| 11:14:54 | 6 | five to ten minutes. |
| 11:14:54 | 7 | Q. Then what happened? |
| 11:14:58 | 8 | A. I was called in to another room so that they can take my |
| 11:15:04 | 9 | vital information, check my blood pressure, my weight, and my |
| 11:15:08 | 10 | height. |
| 11:15:08 | 11 | Q. Do you remember who did this? |
| 11:15:12 | 12 | A. I don't remember which of the two assistants this was. I |
| 11:15:18 | 13 | don't remember which two assistants it was, but... |
| 11:15:24 | 14 | Q. Was it a male or female? |
| 11:15:26 | 15 | A. They were both female. |
| 11:15:28 | 16 | Q. Now, after you had your vitals taken, what happened next? |
| 11:15:32 | 17 | A. I went back into the waiting room to wait on Dr. Chhibber. |
| 11:15:38 | 18 | Q. How long did you wait? |
| 11:15:38 | 19 | A. I don't know the exact amount of minutes. |
| 11:15:44 | 20 | Q. What happened next? |
| 11:15:46 | 21 | A. I was called in to Dr. Chhibber's -- one of the offices to |
| 11:15:50 | 22 | speak with Dr. Chhibber. |
| 11:15:50 | 23 | Q. Can you describe what happened when you went back to the |
| 11:15:54 | 24 | office. |
| 11:15:54 | 25 | A. Again, I don't really remember too many details, but I can |

11:16:02  1  remember I told him why I had come, I told him I had the

11:16:06  2  discharge papers I had gotten from the emergency room.

11:16:08  3  Q.  Did he ask you anything about your boil?

11:16:12  4  A.  He -- I don't remember the exact questions that he asked.

11:16:18  5  I do know that I had to unrobe, so they gave me the sheet

11:16:26  6  thing to unrobe so that he could take a look at it.

11:16:32  7  Q.  Did he examine you on the top half of your body?

11:16:34  8  A.  No.

11:16:36  9  Q.  Did he listen to your heart?

11:16:36  10  A.  I don't recall if he listened to my heart.

11:16:40  11  Q.  Did he ever ask you if you were having trouble breathing?

11:16:44  12  A.  No.

11:16:44  13  Q.  Did you tell him you were having trouble breathing?

11:16:48  14  A.  No, sir.

11:16:48  15  Q.  Did you tell him you were having trouble catching your

11:16:54  16  breath?

11:16:54  17  A.  No.

11:16:54  18  Q.  Were you having trouble breathing at that time?

11:16:58  19  A.  No, sir.

11:16:58  20  Q.  How do you remember that?

11:17:00  21  A.  Because my sole purpose for going to Dr. Chhibber's office

11:17:06  22  was to follow up on the abscess that I had at the emergency

11:17:10  23  room.  I had no other symptoms.

11:17:12  24  Q.  Now, when you were examined, did the defendant ever tell

11:17:16  25  you that you had a heart murmur?

11:17:18  1   A.  No, sir.

11:17:18  2   Q.  Did he tell you there was any problem with your heart?

11:17:22  3   A.  No, sir.

11:17:22  4   Q.  Did he ask you if some other physician had made you

11:17:26  5   concerned that you had a heart murmur?

11:17:28  6   A.  No, sir.

11:17:28  7   Q.  Did he ask you if you had ever received heart tests

11:17:32  8   because of a heart murmur?

11:17:32  9   A.  No, sir.

11:17:32  10  Q.  Now, if defendant told you that you had a heart murmur, is

11:17:36  11  that something you would be concerned about?

11:17:38  12  A.  Yes.

11:17:38  13  Q.  Is that something you would remember?

11:17:40  14  A.  That's something I would remember.

11:17:42  15  Q.  Let me show you what's been marked as Government Exhibit

11:17:44  16  350, page 35.  On the top, it says, Progress note, and on the

11:17:50  17  top right, it says 12/14/2009.  Does that sound about the

11:17:56  18  correct date when you saw the defendant?

11:17:56  19  A.  As long as it was a Monday, that's pretty much what I

11:18:00  20  remember, Monday.

11:18:02  21  Q.  So in the middle left there is a diagnosis section.  Do

11:18:16  22  you see next to No. 3 where it says, Heart murmur?

11:18:20  23  A.  Yes.

11:18:20  24  Q.  Did the defendant tell you he was writing heart murmur in

11:18:22  25  your chart?

11:18:24   1   A.  No.

11:18:24   2   Q.  No. 4, do you see it says be SOB, shortness of breath?  Do

11:18:30   3   you see that?

11:18:30   4   A.  Yes.

11:18:32   5   Q.  Did the defendant ever tell you he was writing shortness

11:18:36   6   of breath in your chart?

11:18:38   7   A.  No.

11:18:38   8   Q.  Now, did the defendant tell you that he wanted you to

11:18:44   9   undergo some testing?

11:18:44  10   A.  I don't remember the exact conversation, but I did have to

11:18:50  11   get an echo.

11:18:52  12   Q.  What was your understanding of why you were getting an

11:18:56  13   echo?

11:18:56  14   A.  As far as I remember, there was no understanding.  I did

11:19:00  15   think that it was a little weird because what I had come in

11:19:04  16   for I didn't think really had anything to do with my heart.

11:19:08  17   So I was caught off guard that I had to take it, but I didn't

11:19:14  18   question it.

11:19:14  19   Q.  Well, did the defendant ever tell you that he was worried

11:19:18  20   that your abscess might be attacking your heart?

11:19:22  21   A.  No.

11:19:22  22   Q.  Did he ever tell you that he was worried that your abscess

11:19:24  23   could kill you?

11:19:26  24   A.  No.

11:19:26  25   Q.  Now, let me show you what's been marked as Government

| | | |
|---|---|---|
| 11:19:32 | 1 | Exhibit 350, page 18.  This is another authorization form.  Do |
| 11:19:40 | 2 | you see that? |
| 11:19:40 | 3 | A.  Yes. |
| 11:19:40 | 4 | Q.  This one has a check mark in one of the boxes.  What's |
| 11:19:48 | 5 | checked? |
| 11:19:48 | 6 | A.  Ultrasound abdomen. |
| 11:19:52 | 7 | Q.  So did you, in fact, agree to get an echocardiogram that |
| 11:20:10 | 8 | day? |
| 11:20:10 | 9 | A.  Yes, I did. |
| 11:20:10 | 10 | Q.  Can you describe for the jury what happened. |
| 11:20:12 | 11 | A.  I really don't remember too much in detail, but I do |
| 11:20:18 | 12 | remember going to another room that had the equipment and them |
| 11:20:20 | 13 | taking the echo of my chest area. |
| 11:20:24 | 14 | Q.  Now, can you describe the person who gave you the |
| 11:20:30 | 15 | echocardiogram? |
| 11:20:30 | 16 | A.  No, I don't remember the details or if I was -- I don't |
| 11:20:38 | 17 | remember who gave me. |
| 11:20:38 | 18 | Q.  Did you ever get the results of that echocardiogram? |
| 11:20:40 | 19 | A.  Never got any results. |
| 11:20:42 | 20 | Q.  After you took that test, what happened next? |
| 11:20:46 | 21 | A.  I went back to Dr. Chhibber's first office where I had |
| 11:20:56 | 22 | seen Dr. Chhibber in. |
| 11:20:56 | 23 | Q.  And then what happened? |
| 11:20:58 | 24 | A.  He gave me my notes for work, return to work notice, and |
| 11:21:14 | 25 | that's what I can remember. |

11:21:16   1          THE COURT:  I'm sorry.  I can't hear you.

11:21:16   2          THE WITNESS:  He gave me my return work -- return to

11:21:20   3  work notice, and that's all that I can remember.  And I had to

11:21:24   4  make another follow-up appointment.

11:21:28   5  BY MR. COLE:

11:21:30   6  Q.  And did he say he wanted you to come back to the clinic?

11:21:32   7  A.  Yes.

11:21:32   8  Q.  Approximately when?

11:21:32   9  A.  I don't remember the exact date.

11:21:36  10  Q.  Were you asked to pay any money?

11:21:40  11  A.  No.

11:21:40  12  Q.  That day when you left the clinic?

11:21:42  13  A.  I didn't pay any money.

11:21:44  14  Q.  Did he ever bill you for any services that day?

11:21:48  15  A.  I got my bills from my insurance company, but from his

11:21:52  16  office separately, no.

11:21:54  17  Q.  Is that an EOB, an explanation of benefits form?

11:22:00  18  A.  Yes.

11:22:00  19  Q.  Now, let me show you a different authorization form.  Do

11:22:18  20  you see the date is 12/15?  Do you see that?

11:22:20  21  A.  Yes.

11:22:22  22  Q.  Now, there is a check approximately next to the box that

11:22:26  23  says echo.  Do you see that?

11:22:28  24  A.  Um-hmm.

11:22:28  25  Q.  Is this your signature at the bottom?

11:22:30  1  A.  It looks like my signature, yes.

11:22:42  2  Q.  When approximately did you sign this form?  During your

11:22:44  3  visit with the defendant?

11:22:46  4  A.  I do remember signing a form with this information on

11:22:50  5  there, but as far as them checking one of the boxes, I don't

11:22:56  6  recall.

11:22:56  7  Q.  And you see at the very bottom right above where you

11:23:02  8  signed, it says, I agree to cover all charges not covered by a

11:23:06  9  third-party payer.

11:23:08  10       Do you see that?

11:23:08  11  A.  Yes.

11:23:10  12  Q.  But they never asked you to pay anything, correct?

11:23:12  13  A.  Correct.

11:23:12  14  Q.  Now, did you, in fact, return to the clinic sometime

11:23:52  15  later?

11:23:54  16  A.  Yes, I did.

11:23:54  17  Q.  Can you describe what happened on that next visit.

11:23:58  18  A.  I don't really remember the details of the second visit.

11:24:02  19  It was a follow-up to the first visit.  I know that I was

11:24:06  20  going to make sure they didn't have to drain anything from the

11:24:10  21  abscess.

11:24:10  22  Q.  Were you complaining of other symptoms on that day?

11:24:18  23  A.  The only -- I did.  I was having -- I had been for a while

11:24:24  24  having abdominal pains, and I did mention it.

11:24:28  25  Q.  Let me show you what's marked as Government Exhibit 350,

11:24:32 1 page 33.  In the top right, it appears to be -- it's dated

11:24:42 2 January 7th, 2010.  Do you see that?

11:24:44 3 A.  Yes, I do.

11:24:44 4 Q.  Is that approximately the date you saw the defendant the

11:24:46 5 second time?

11:24:48 6 A.  I don't remember the date exactly.

11:24:50 7 Q.  It's several weeks after your first visit.  Does that time

11:24:54 8 frame seem about right?

11:24:58 9 A.  Right.

11:24:58 10 Q.  Now, No. 2 under the diagnosis section, it says, Abdominal

11:25:06 11 pain.

11:25:06 12   Do you see that?

11:25:06 13 A.  Yes, I do.

11:25:08 14 Q.  And you were complaining of abdominal pain that day,

11:25:12 15 right?

11:25:12 16 A.  Right.

11:25:12 17 Q.  Now, No. 3 looks like it says, Hematuria.

11:25:16 18   Do you see that?

11:25:18 19 A.  Yes.

11:25:18 20 Q.  Did you ever tell the defendant you had blood in your

11:25:22 21 urine?

11:25:22 22 A.  No, I did not.

11:25:24 23 Q.  Did the defendant ever tell you he was concerned about

11:25:26 24 that?

11:25:26 25 A.  No.

11:25:26  1  Q.  Do you see on the middle right section it says, Complete
11:25:36  2  US abdomen.
11:25:38  3          Do you see that?
11:25:38  4  A.  Yes, I do.
11:25:38  5  Q.  Did you receive an abdominal ultrasound that day?
11:25:42  6  A.  I don't recall receiving an ultrasound that day.
11:25:46  7  Q.  Well, do you have any kids?
11:25:48  8  A.  Yes, I do.
11:25:48  9  Q.  Had you ever received ultrasound examinations before?
11:25:52  10  A.  Numerous.
11:25:52  11  Q.  On January 7th, 2010, do you remember getting an
11:26:02  12  ultrasound --
11:26:02  13          MR. JONES:  I am going to object, Judge.
11:26:04  14          THE COURT:  Sustained.
11:26:04  15  BY MR. COLE:
11:26:06  16  Q.  Well, let me show you what's marked as Government Exhibit
11:26:08  17  350, page 8.  Do you see on the top where it says, Abdominal
11:26:16  18  ultrasound?
11:26:16  19  A.  Yes, I do.
11:26:16  20  Q.  And if you can blow up the impression paragraph.  Do you
11:26:26  21  see where it says, Tiny gallstones seen in the wall of
11:26:32  22  bladder?
11:26:32  23          Do you see that?
11:26:32  24  A.  Yes, I do.
11:26:32  25  Q.  Did he ever tell you you had a gallstone?

11:26:38  1  A.  No.

11:26:38  2  Q.  When you left the defendant's clinic after that second

11:26:40  3  visit, were you ever asked to pay anything?

11:26:42  4  A.  No.

11:26:42  5  Q.  Did the defendant ever discuss this ultrasound with you?

11:26:48  6  A.  I never got the results.  I don't recall the ultrasound

11:26:54  7  from the test, if I did have one, at Dr. Chhibber's office.  I

11:26:58  8  never got the results of it.

11:27:02  9          MR. COLE:  No other questions, your Honor.

11:27:04  10          THE COURT:  Cross-examination.

11:27:04  11          MR. JONES:  Thank you, your Honor.

11:27:06  12                          - - -

11:27:06  13          CIERRA THOMPSON, CROSS-EXAMINATION

11:27:06  14  BY MR. JONES:

11:27:32  15  Q.  Ms. Thompson, your chart indicates that your first visit

11:27:36  16  to Dr. Chhibber was on 12/14/2009, and I gather that was the

11:27:44  17  day after you had been in the emergency room; is that correct?

11:27:46  18  A.  I am not sure it was the exact day afterward, but I do

11:27:52  19  know that it was on Monday.

11:27:52  20  Q.  Okay.  And the reason you went to Dr. Chhibber was because

11:28:00  21  you had been pretty sick that weekend; isn't that right?

11:28:02  22  A.  That is correct.

11:28:04  23  Q.  In fact, you know, you were so sick you could barely walk;

11:28:10  24  is that correct?

11:28:10  25  A.  That's correct.

11:28:10  1  Q.  And when you got to the emergency room, they had to do

11:28:18  2  some treatment on you with respect to a cyst; is that correct?

11:28:24  3  A.  Yes.

11:28:24  4  Q.  Do you recall that you were very sick, you had a fever

11:28:28  5  that weekend?

11:28:28  6  A.  I don't recall a fever.

11:28:30  7  Q.  All right.  When you say you don't recall, is it possible

11:28:36  8  you had a fever that weekend?

11:28:36  9  A.  The only problem that I had that weekend was the cyst.

11:28:42  10  Q.  Now, what the doctors did at the West Suburban was they

11:28:50  11  drained the cyst that evening; is that correct?

11:28:56  12  A.  Yes.

11:28:56  13  Q.  And then they had to -- because they drained it, they had

11:29:02  14  to pack in some material into the cyst.  Do you recall that?

11:29:06  15  A.  Yes.

11:29:06  16  Q.  All right.  And do you recall, of course, that the abscess

11:29:14  17  was rather large, about the size of a ping-pong ball?

11:29:20  18  A.  I don't really remember the size.  It wasn't extremely

11:29:30  19  large, but ping-pong ball is probably too big.

11:29:36  20  Q.  Okay.  All right.  I want to be fair.  But it was large?

11:29:40  21  A.  It was big.

11:29:42  22  Q.  And one of the things they did at the hospital was they

11:29:48  23  took a culture of the abscess that they drained.  Do you

11:29:54  24  recall that?

11:29:54  25  A.  Yes.

11:29:54  1  Q.  All right.  And then they gave you -- because you were in

11:30:00  2  such pain, they gave you a shot of Toradol.  Do you remember

11:30:04  3  that?

11:30:06  4  A.  I don't remember.

11:30:06  5  Q.  All right.  Do you remember getting a shot of a painkiller

11:30:08  6  at all?

11:30:10  7  A.  It was possible.

11:30:12  8  Q.  All right.

11:30:12  9  A.  I just don't recall.

11:30:14  10  Q.  And then what they told you to do, they said, Well, look,

11:30:18  11  you need to follow up and you need to see your family doctor

11:30:22  12  the following day.  Do you recall that?

11:30:22  13  A.  They told me to follow up with my doctor.

11:30:26  14  Q.  And that's what you did.  That's when you came over to see

11:30:30  15  Dr. Chhibber, whether -- it was as soon as possible, that's

11:30:34  16  correct?  Would that be fair to say?

11:30:36  17  A.  Yes.

11:30:36  18  Q.  All right.  And when you got in to see Dr. Chhibber, you

11:30:44  19  were still in pain, were you not?

11:30:46  20  A.  No, not as much pain as I was.

11:30:48  21  Q.  Not as much pain.  All right.

11:30:52  22       And you recall that what Dr. Chhibber had to do is he

11:30:58  23  had to unpack the abscess that had been packed.  Do you recall

11:31:04  24  that?

11:31:04  25  A.  No, I don't recall it.

11:31:06  1   Q.  Do you recall that he also, as he was examining you,

11:31:10  2   telling you that not only had he found in addition to

11:31:18  3   inflammation of the skin was another abscess that was near the

11:31:22  4   anus?  Do you remember that?

11:31:24  5   A.  No, he pretty much just told me that where the abscess

11:31:26  6   was, the diagnosis that the emergency room had gave me was

11:31:32  7   incorrect.

11:31:32  8   Q.  All right.  And you don't recall him telling you that what

11:31:38  9   he found was another abscess, do you?

11:31:40 10   A.  No, he didn't tell me that.

11:31:42 11   Q.  Now, do you recall him saying something to you about a

11:31:46 12   perirectal abscess?

11:31:50 13   A.  Yes, that's what he told me that's what it was.

11:31:52 14   Q.  And he drained that perirectal abscess himself?

11:31:56 15   A.  No.

11:31:58 16   Q.  Now, are you aware as you sit here today that

11:32:02 17   Dr. Chhibber's treatment of you related to a disease called

11:32:06 18   MRSA?

11:32:06 19   A.  When I went to the emergency room, I did get a letter that

11:32:18 20   I had to pick up, and it did state that I had MRSA, but he

11:32:24 21   also told me that that wasn't true.

11:32:26 22   Q.  Well, let me just show you the letter that you got.  If I

11:32:34 23   could have that blown up.  It's in evidence.  Because you took

11:32:36 24   this letter to Dr. Chhibber, right?

11:32:38 25   A.  That is correct.

| | |
|---|---|
| 11:32:40 | 1 |
| 11:32:54 | 2 |
| 11:33:04 | 3 |
| 11:33:10 | 4 |
| 11:33:16 | 5 |
| 11:33:22 | 6 |
| 11:33:26 | 7 |
| 11:33:28 | 8 |
| 11:33:30 | 9 |
| 11:33:34 | 10 |
| 11:33:34 | 11 |
| 11:33:36 | 12 |
| 11:33:38 | 13 |
| 11:33:40 | 14 |
| 11:33:46 | 15 |
| 11:33:48 | 16 |
| 11:33:48 | 17 |
| 11:33:54 | 18 |
| 11:33:58 | 19 |
| 11:33:58 | 20 |
| 11:34:02 | 21 |
| 11:34:02 | 22 |
| 11:34:04 | 23 |
| 11:34:06 | 24 |
| 11:34:06 | 25 |

Q. All right. And you see what this document in evidence says that what you have is -- where it says, Culture, methicillin-resistant staph, this is a multiple drug-resistant organism, refer to inspection control policies for isolation precautions.

So that's what they found that you had, right, ma'am? That's the test result?

A. The abscess.

Q. No, what I just read to you was the test result, wasn't it, ma'am?

A. That was from West Suburban.

Q. Right. That's what you had. You understand that that's the disease that you had?

A. That's what the test results said at West Suburban, and when I went to Dr. Chhibber's office, he said I didn't have that.

Q. Are you aware that the drugs that Dr. Chhibber gave you, the three antibiotics, saved your life?

MR. COLE: Objection, your Honor. Relevance.

THE COURT: Overruled.

BY MR. JONES:

Q. Are you aware that the three antibiotics that he gave you for this saved your life?

A. No, I am not.

Q. Now, you know, the prosecutor asked you about the

11:34:18  1    echocardiogram.  You recall that you have had a couple

11:34:24  2    interviews with the government.  Do you recall being

11:34:26  3    interviewed on October 1st, 2011, by the government?

11:34:30  4    A.  I do recall.

11:34:30  5    Q.  And when you were interviewed by the government on 2011,

11:34:34  6    didn't you tell the government that, Dr. Chhibber provided her

11:34:40  7    with an explanation as to the necessity of the echocardiogram?

11:34:44  8    You told the government that, didn't you, ma'am?

11:34:46  9    A.  It is possible that I did tell them that he gave me an

11:34:50  10   explanation.  However, I do not recall getting an explanation

11:34:54  11   about the echo.

11:34:56  12   Q.  But -- and then you also tell them that when you told the

11:35:02  13   government was that day, Thompson does not recall the

11:35:06  14   explanation but recalls not understanding it.

11:35:08  15        Isn't that what you told the government?

11:35:12  16   A.  That is true, I didn't understand why exactly I was

11:35:16  17   getting an echocardiogram.

11:35:18  18   Q.  But you didn't understand the explanation that the doctor

11:35:20  19   was giving you.  That's what you told the government, right?

11:35:24  20   A.  I don't recall giving an explanation from Dr. Chhibber

11:35:30  21   about the echo.

11:35:30  22   Q.  All right.  If I could show you something, ma'am, I am

11:35:34  23   going to call it Exhibit 1 for use today, which purports to be

11:35:42  24   the memo of October 1st, 2001, and I am just going to ask you

11:35:46  25   to read this and see if that refreshes your recollection of

| | | |
|---|---|---|
| 11:35:50 | 1 | what you told the FBI. |
| 11:35:56 | 2 | A.  Is it green? |
| 11:35:58 | 3 | Q.  If you think it's green, that's fine. |
| 11:36:00 | 4 | A.  Thompson -- |
| 11:36:02 | 5 | Q.  Just read it to yourself and see if that refreshes your |
| 11:36:04 | 6 | recollection of what you told the FBI that day. |
| 11:36:14 | 7 | A.  Okay. |
| 11:36:16 | 8 | Q.  Now, does that refresh your recollection that you told the |
| 11:36:18 | 9 | FBI that day that Dr. Chhibber tried to explain to you what |
| 11:36:22 | 10 | the echo was, but you didn't understand it? |
| 11:36:26 | 11 | A.  In October, my memory of the visit that I had with |
| 11:36:32 | 12 | Dr. Chhibber would have been a lot fresher than it is now.  I |
| 11:36:36 | 13 | don't recall him giving me an explanation about the echo.  I |
| 11:36:42 | 14 | do know that it was strange to me because I didn't understand |
| 11:36:46 | 15 | what it had to do with relation to why I came to him for. |
| 11:36:48 | 16 | Q.  Let me just ask you this then.  When you gave this |
| 11:36:52 | 17 | explanation to the government on October 1st, 2011, that was a |
| 11:36:56 | 18 | lot closer to the events than even today; isn't that true? |
| 11:37:00 | 19 | A.  That is correct. |
| 11:37:00 | 20 | Q.  And when you went back on -- you went back on a couple of |
| 11:37:10 | 21 | repeat visits to Dr. Chhibber; is that correct? |
| 11:37:12 | 22 | A.  Yes. |
| 11:37:14 | 23 | Q.  And that's the only echo that you got from Dr. Chhibber; |
| 11:37:26 | 24 | isn't that right? |
| 11:37:26 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 11:37:26 | 1 | MR. JONES:  One moment, Judge. |
| 11:38:12 | 2 | (Brief pause.) |
| 11:38:34 | 3 | MR. JONES:  I just have one more question. |
| 11:38:36 | 4 | BY MR. JONES: |
| 11:38:36 | 5 | Q.  When you picked up this note at South Suburban, you were |
| 11:38:40 | 6 | not able to give this to Dr. Chhibber until your second visit; |
| 11:38:44 | 7 | isn't that true? |
| 11:38:44 | 8 | A.  West Suburban? |
| 11:38:46 | 9 | Q.  Yes, when you picked up this information regarding the |
| 11:38:50 | 10 | infection that you had from West Suburban, you have already |
| 11:38:54 | 11 | told us you gave that to Dr. Chhibber; is that correct? |
| 11:38:56 | 12 | A.  Yes, I did. |
| 11:38:56 | 13 | Q.  But you were not able to give that to him until your |
| 11:39:00 | 14 | second visit with Dr. Chhibber; is that correct? |
| 11:39:04 | 15 | A.  It is possible. |
| 11:39:08 | 16 | Q.  That's right.  That's right. |
| 11:39:10 | 17 | MR. JONES:  That's all, Judge. |
| 11:39:14 | 18 | THE COURT:  Redirect? |
| 11:39:14 | 19 | - - - |
| 11:39:14 | 20 | CIERRA THOMPSON, REDIRECT EXAMINATION |
| 11:39:14 | 21 | BY MR. COLE: |
| 11:39:16 | 22 | Q.  Do you remember you were just asked some questions about |
| 11:39:18 | 23 | what Dr. Chhibber told you about why he was wanting an |
| 11:39:22 | 24 | echocardiogram?  Do you remember that? |
| 11:39:24 | 25 | A.  Correct. |

| | | |
|---|---|---|
| 11:39:24 | 1 | Q. Did Dr. Chhibber ever tell you he was running an |
| 11:39:26 | 2 | echocardiogram because he was worried about a heart murmur? |
| 11:39:30 | 3 | A. No. |
| 11:39:32 | 4 | MR. COLE: No other questions, Judge. |
| 11:39:34 | 5 | THE COURT: All right. Thank you. You are excused. |
| 11:40:00 | 6 | (Witness excused.) |
| 11:40:00 | 7 | MR. HAMMERMAN: Your Honor, the government calls |
| 11:40:04 | 8 | Fahad Qasim. |
| 11:40:26 | 9 | (Witness sworn.) |
| 11:40:26 | 10 | THE COURT: Would you tell us your first name and |
| 11:40:28 | 11 | spell your last and name. |
| 11:40:30 | 12 | THE WITNESS: My name is Fahad Qasim, first name is |
| 11:40:34 | 13 | spelled F-a-h-a-d, last name is Q-a-s-i-m. |
| 11:40:38 | 14 | THE COURT: Thank you. |
| 11:40:50 | 15 | - - - |
| 11:40:50 | 16 | FAHAD QASIM, DIRECT EXAMINATION |
| 11:40:50 | 17 | BY MR. HAMMERMAN: |
| 11:40:52 | 18 | Q. Good morning, Mr. Qasim. Can you tell the members of the |
| 11:40:54 | 19 | jury where you live, sir? |
| 11:40:56 | 20 | A. I live in the western suburbs. |
| 11:40:58 | 21 | Q. Tell them how old you are. |
| 11:41:00 | 22 | A. I am 27 years old. |
| 11:41:00 | 23 | Q. Can you tell them how you are currently employed? |
| 11:41:04 | 24 | A. I do ultrasound work. |
| 11:41:06 | 25 | Q. How long have you been doing ultrasound work? |

| | | |
|---|---|---|
| 11:41:10 | 1 | A.  Just over three years now. |
| 11:41:12 | 2 | Q.  Okay.  Do you know an individual by the name of |
| 11:41:18 | 3 | Dr. Jaswinder Chhibber? |
| 11:41:18 | 4 | A.  Yes. |
| 11:41:18 | 5 | Q.  How do you know Dr. Chhibber? |
| 11:41:20 | 6 | A.  I was employed by him. |
| 11:41:22 | 7 | Q.  How long were you employed by Dr. Chhibber? |
| 11:41:24 | 8 | A.  About two years. |
| 11:41:26 | 9 | Q.  From approximately when to when were you employed by Dr. |
| 11:41:30 | 10 | Chhibber? |
| 11:41:30 | 11 | A.  From November of 2008 until about November/December of |
| 11:41:38 | 12 | 2010. |
| 11:41:38 | 13 | Q.  Can you tell the members of the jury, Mr. Qasim, your |
| 11:41:42 | 14 | educational background. |
| 11:41:44 | 15 | A.  Yes, I have a bachelor's degree from University of |
| 11:41:48 | 16 | Illinois, Chicago, in biology, and after I graduated, I was |
| 11:41:52 | 17 | trained and received certification for ultrasound. |
| 11:41:54 | 18 | Q.  When did you obtain those certifications that you just |
| 11:42:02 | 19 | mentioned? |
| 11:42:02 | 20 | A.  In 2009. |
| 11:42:06 | 21 | Q.  What certifications did you obtain? |
| 11:42:08 | 22 | A.  I have two.  One is for ultrasound of the heart, and that |
| 11:42:14 | 23 | certification was called registered cardiac diagnostics, and |
| 11:42:22 | 24 | the second one I have certifies me as a registered vascular |
| 11:42:26 | 25 | technician, which is ultrasounds for blood vessels throughout |

11:42:30　　1　the body.

11:42:32　　2　Q.　And from what association or institution did you obtain

11:42:36　　3　these certificates?

11:42:36　　4　A.　The main governing body in ultrasound is ARDMS, the

11:42:42　　5　American Registry of Diagnostic and Medical Sonography.

11:42:48　　6　Q.　What did you do to obtain that certification?

11:42:50　　7　A.　I had to pass three exams.

11:42:54　　8　Q.　Mr. Qasim, can you explain to the members of the jury how

11:42:56　　9　you came to work for Dr. Chhibber?

11:42:58　　10　A.　Yes.　A family friend of mine was friends with Mr. Baig,

11:43:08　　11　who was a technician working for Dr. Chhibber at the time, and

11:43:12　　12　she connected us.

11:43:14　　13　Q.　How did that lead you to actually come to work for

11:43:18　　14　Dr. Chhibber?

11:43:18　　15　A.　She gave me his phone number.

11:43:20　　16　Q.　You say "his phone number."　Whose phone number are you

11:43:24　　17　talking about?

11:43:24　　18　A.　Mr. Baig's.

11:43:26　　19　Q.　Did you contact Mr. Baig?

11:43:26　　20　A.　I contacted Mr. Baig.　He told me to come into one of the

11:43:32　　21　clinics.　I went in with my resume and was pretty much hired

11:43:36　　22　on the spot.

11:43:38　　23　Q.　What was your understanding of Mr. Baig's relationship

11:43:40　　24　with Dr. Chhibber at that time?

11:43:40　　25　A.　At that time I thought he was the ultrasound tech, and he

11:43:46  1   kind of managed all the work, all the ultrasounds.

11:43:50  2   Q.  You said you were hired on the spot?

11:43:52  3   A.  Yes.

11:43:52  4   Q.  With whom did you interview?

11:43:54  5   A.  With Mr. Baig.

11:43:56  6   Q.  Did you interview with Dr. Chhibber at that time?

11:43:58  7   A.  No.

11:44:00  8   Q.  Did you understand yourself to be employed by Dr. Chhibber

11:44:02  9   or Mr. Baig?

11:44:04  10  A.  I understood to be employed by Dr. Chhibber, but I would

11:44:10  11  report to Mr. Baig.

11:44:12  12  Q.  When you first started working for Dr. Chhibber, at what

11:44:16  13  locations did you work?

11:44:18  14  A.  At first I worked at his south side clinic, Cottage Grove

11:44:24  15  Community Medical at 642 East 79th Street, in Chicago, and

11:44:28  16  there was also another clinic.  It's like Cicero or Berwyn.

11:44:34  17  It was on Cermak near Harlem.

11:44:38  18  Q.  What was the name of the clinic that was located on the

11:44:40  19  south side of Chicago?

11:44:40  20  A.  Cottage Grove Community Medical.

11:44:42  21  Q.  When you first began working for Dr. Chhibber, where did

11:44:46  22  you spend the majority of your time?

11:44:48  23  A.  The majority was at the Cottage Grove clinic.

11:44:52  24  Q.  Did your workplace assignment change at some point in

11:44:56  25  time?

11:44:56  1   A.  Yes.

11:44:56  2   Q.  Approximately when did it change?

11:44:56  3   A.  About a year into my work, I would mainly start going to a

11:45:06  4   third clinic in Hanover Park, which Dr. Joshi would see

11:45:12  5   patients.

11:45:12  6   Q.  Did you, after that first year, return at all to the south

11:45:16  7   side clinic?

11:45:16  8   A.  Yes.

11:45:16  9   Q.  How often?

11:45:18  10  A.  About once a week on Wednesdays.

11:45:22  11  Q.  And on the days that you worked at the south side clinic

11:45:24  12  in that second year of your employment, with what physician

11:45:28  13  did you work?

11:45:30  14  A.  It was Dr. Joshi, seeing Dr. Chhibber's patients.

11:45:34  15  Q.  What day of the week was that?

11:45:36  16  A.  That was on Wednesdays.

11:45:38  17  Q.  And during that second year when you worked with Dr.

11:45:40  18  Joshi, was Dr. Chhibber present at the clinic on those days?

11:45:44  19  A.  No.

11:45:46  20  Q.  How were you paid during the first year that you worked

11:45:48  21  for Dr. Chhibber?

11:45:48  22  A.  I would report my hours to Mr. Baig, and my understanding

11:45:56  23  was he would give those to Dr. Chhibber, and he would pay Mr.

11:46:00  24  Baig and Mr. Baig would pay me.

11:46:02  25  Q.  And how much were you paid?

11:46:02  1  A.  I started at $25 an hour.

11:46:06  2  Q.  And the second year, how were you paid?

11:46:08  3  A.  I was paid directly from Dr. Chhibber.

11:46:10  4  Q.  And how much were you paid by Dr. Chhibber?

11:46:14  5  A.  I believe at some point, I asked him for a raise to 30 or

11:46:20  6  35, but I am not completely certain.

11:46:26  7  Q.  And the change that did come about, do you have an

11:46:30  8  understanding of how the change in pay came about?

11:46:32  9  A.  Yes.

11:46:32  10  Q.  And what's that understanding?

11:46:32  11  A.  I think I contacted him about it over the phone or by

11:46:38  12  text.

11:46:38  13  Q.  And when you say "him" --

11:46:40  14  A.  Dr. Chhibber.

11:46:40  15  Q.  -- whom are you referring?

11:46:40  16  A.  Dr. Chhibber.

11:46:42  17  Q.  Focusing on the 79th Street clinic, during the time that

11:46:46  18  you worked there during your first year of employment, who ran

11:46:50  19  that clinic?

11:46:50  20  A.  Dr. Chhibber.

11:46:50  21  Q.  Whose patients were seen at that clinic?

11:46:54  22  A.  Dr. Chhibber's.

11:46:54  23  Q.  When you first started working for Dr. Chhibber at that

11:46:58  24  clinic, how many days a week did you work at the 79th Street

11:47:00  25  clinic?

11:47:02  1   A.  It was about three days a week.

11:47:02  2   Q.  And what days were those?

11:47:04  3   A.  I think it was Tuesday, Thursday, and Friday.

11:47:06  4   Q.  I want to ask you a series of questions about that first

11:47:18  5   year of your employment with Dr. Chhibber when you were

11:47:20  6   spending the majority of your time at the south side clinic.

11:47:22  7        Can you tell the members of the jury the type of work

11:47:26  8   that you performed there?

11:47:26  9   A.  I did different types of ultrasounds for the body.  I did

11:47:32  10  echos, which are ultrasounds for the heart; I did carotid

11:47:38  11  Dopplers, which are ultrasounds for the blood vessels running

11:47:44  12  up the neck to the brain; I did lower extremity for the legs,

11:47:48  13  arteries in the veins; and I did abdominal ultrasounds for the

11:47:52  14  liver, pancreas, gallbladder, did some glands, thyroid glands;

11:47:58  15  all types of ultrasounds.

11:48:00  16  Q.  Did you ever do transcranial Doppler exams, ultrasounds of

11:48:04  17  the blood vessels inside of the brain?

11:48:06  18  A.  No.

11:48:06  19  Q.  All of the other tests that you mentioned, are those all

11:48:12  20  various forms of ultrasounds?

11:48:14  21  A.  Yes.

11:48:14  22  Q.  How -- in laymen's terms if you will, how are these

11:48:26  23  ultrasounds performed, what do you actually do?

11:48:28  24  A.  It's essentially the same way you would do an ultrasound

11:48:36  25  for a pregnant woman.  It's just a different part of the body.

| | | |
|---|---|---|
| 11:48:38 | 1 | Q. What is involved? |
| 11:48:40 | 2 | A. We take a machine, an ultrasound machine, take a probe, |
| 11:48:44 | 3 | apply the gel on the probe, and place that on various places |
| 11:48:48 | 4 | on the body to get an image. |
| 11:48:50 | 5 | Q. What type of data do you record and how do you record it |
| 11:48:56 | 6 | when performing one of these ultrasounds? |
| 11:48:58 | 7 | A. There is like 2-D measurements where we actually freeze |
| 11:49:06 | 8 | the screen and take the measurements of what we see there. |
| 11:49:08 | 9 | Q. When you say 2-D, what do you mean by 2-D? |
| 11:49:12 | 10 | A. Two dimensional. It's like of one point of the body. |
| 11:49:16 | 11 | There's also Doppler measurements where we measure the speed |
| 11:49:20 | 12 | of blood flow. And those are, I guess, the two types of |
| 11:49:24 | 13 | measurements that we take, but there's many measurements. |
| 11:49:26 | 14 | Q. When you say 2-D, are you referring to a photograph or a |
| 11:49:30 | 15 | picture? |
| 11:49:32 | 16 | A. Yes. |
| 11:49:32 | 17 | Q. What does an ultrasound actually do; what do you review |
| 11:49:34 | 18 | and how do you record it? |
| 11:49:36 | 19 | A. An ultrasound sends a sound beam into the body, and that |
| 11:49:42 | 20 | sound beam reflects off different structures inside the body. |
| 11:49:46 | 21 | And depending on when that sound beam reflects back to the |
| 11:49:50 | 22 | probe, we get an image of inside the body, and with that we |
| 11:49:54 | 23 | can take measurements of different sizes of structures and |
| 11:49:58 | 24 | stuff like that. |
| 11:50:00 | 25 | Q. Using an echocardiogram as an example, what type of data |

11:50:04  1  do you collect when taking an echocardiogram?

11:50:06  2  A.  I would measure the different -- the thickness of the

11:50:12  3  different muscles in the heart, I would take measurements of

11:50:20  4  kind of like a graph of the valve motions, I would take

11:50:24  5  Doppler measurements of how fast the blood would be flowing

11:50:28  6  through different valves in the heart.

11:50:30  7  Q.  How do you record the findings that you take from one of

11:50:34  8  these exams?

11:50:34  9  A.  The machine would print out like screen shots, like still

11:50:40  10  photographs of whatever I would see on the screen.  It also

11:50:44  11  had a VHS recorder on it.  That's for the echos for the heart.

11:50:50  12  We record motion.  Most of the other exams are just still

11:50:54  13  images.  So we get still images, we get VHS recordings, and we

11:51:02  14  get printouts of the images and make tech sheets.

11:51:04  15  Q.  And would you record similar types of information when

11:51:08  16  performing carotid Doppler exams?

11:51:12  17  A.  Yes.

11:51:12  18  Q.  What about abdominal ultrasounds?

11:51:14  19  A.  Yes, the measurements are all of them.

11:51:16  20  Q.  Now, what would you do -- how would you actually, first of

11:51:20  21  all, record the information, what type of -- let me rephrase

11:51:24  22  that.

11:51:24  23       How would you actually record the information?  Is

11:51:26  24  there a sheet, a chart?

11:51:28  25  A.  We had a tech sheet.  There is a different sheet for each

11:51:34   1   type of ultrasound, and it was just kind of like a preliminary

11:51:38   2   report where we would write the measurements we obtained and

11:51:44   3   some patient history and some findings, if we found anything

11:51:48   4   significant.  We'd write those out by hand, but usually attach

11:51:50   5   the images to the report, and it would be sent to the doctor.

11:51:54   6   Q.   Would you write a final report summarizing the health of a

11:51:58   7   patient?

11:51:58   8   A.   No, not a final report; just kind of like a preliminary

11:52:04   9   report.

11:52:04  10   Q.   Whose job is it to write the final analysis of the work

11:52:06  11   that you do?

11:52:08  12   A.   The doctor's.

11:52:08  13   Q.   Now, when you worked at Dr. Chhibber's office during that

11:52:12  14   first year of your employment, what would you do with the

11:52:16  15   information that you recorded?

11:52:16  16   A.   I would usually take the still images that I printed out

11:52:24  17   and I would attach those to the tech sheet that I wrote out

11:52:28  18   with all my results and I'd make a copy of the tech sheet, and

11:52:32  19   put one copy in the chart for the record, and the original

11:52:36  20   images that I printed out and the original handwritten tech

11:52:42  21   sheet that I wrote out, I would place that on a shelf or a bin

11:52:46  22   for the doctor.

11:52:50  23   Q.   At some point during the period of time that you worked

11:52:56  24   for Dr. Chhibber, did you have some concerns about the work

11:53:02  25   that you were doing there?

11:53:02  1  A.  Yes.

11:53:04  2  Q.  Did you take any action based on those concerns?

11:53:06  3  A.  Yes.

11:53:06  4  Q.  What did you do, Mr. Qasim?

11:53:10  5  A.  I filed a complaint with Blue Cross/Blue Shield and

11:53:14  6  Medicare.

11:53:14  7  Q.  How did you do that?

11:53:16  8  A.  For Blue Cross/Blue Shield, it was online.  They had a web

11:53:24  9  page for possible fraud complaints.  And Medicare, I believe I

11:53:30  10  did it over the phone.

11:53:30  11  Q.  What was the basis of your concern that you contacted Blue

11:53:38  12  Cross/Blue Shield?

11:53:38  13  A.  I felt a lot of the tests were being repeated on patients

11:53:50  14  over and over again, and I would look at the charts, and I

11:53:56  15  would see the diagnoses for the patient that day, what

11:54:02  16  symptoms they were feeling, why they were there, and a lot of

11:54:06  17  times I would ask the patients --

11:54:08  18       MR. ORMAN:  Objection to what he asked the patients.

11:54:10  19       THE COURT:  Sustained.

11:54:14  20  BY MR. HAMMERMAN:

11:54:14  21  Q.  Without getting into those conversations yet, Mr. Qasim,

11:54:20  22  based on those concerns, did you relate those same concerns to

11:54:24  23  people whom you spoke with at Blue Cross/Blue Shield?

11:54:26  24  A.  Yes.

11:54:26  25  Q.  Following your conversations with Blue Cross, were you

| | | |
|---|---|---|
| 11:54:30 | 1 | contacted by somebody? |
| 11:54:30 | 2 | A.  Yes. |
| 11:54:30 | 3 | Q.  By whom? |
| 11:54:32 | 4 | A.  Some type of investigative official that worked at Blue |
| 11:54:38 | 5 | Cross/Blue Shield. |
| 11:54:38 | 6 | Q.  And following your conversation with that individual, were |
| 11:54:42 | 7 | you referred to yet another -- were you referred to law |
| 11:54:48 | 8 | enforcement? |
| 11:54:48 | 9 | A.  Yes. |
| 11:54:48 | 10 | Q.  To whom were you referred? |
| 11:54:50 | 11 | A.  To the FBI. |
| 11:54:50 | 12 | Q.  Were you contacted by somebody from the FBI? |
| 11:54:54 | 13 | A.  Yes, I was contacted by Agent Kathryn Anton. |
| 11:54:58 | 14 | Q.  Do you recall approximately when you were contacted by |
| 11:55:04 | 15 | this FBI agent? |
| 11:55:04 | 16 | A.  It was late summer or early fall of 2009. |
| 11:55:10 | 17 | Q.  2009? |
| 11:55:10 | 18 | A.  Yes. |
| 11:55:20 | 19 | MR. HAMMERMAN:  Can I have a moment, your Honor? |
| 11:55:22 | 20 | THE COURT:  Yes. |
| 11:55:22 | 21 | BY MR. HAMMERMAN: |
| 11:55:36 | 22 | Q.  Mr. Qasim, did you subsequently meet with this FBI agent? |
| 11:55:40 | 23 | A.  Yes. |
| 11:55:40 | 24 | Q.  And when did that occur? |
| 11:55:42 | 25 | A.  That was in the fall of 2009. |

| | | |
|---|---|---|
| 11:55:46 | 1 | Q. Did the FBI agent make any requests of you? |
| 11:55:48 | 2 | A. At first it was just more so conversations about what I |
| 11:55:58 | 3 | thought was going on, what I thought was fraud. |
| 11:56:02 | 4 | Q. And did the FBI agent ask for your ongoing cooperation? |
| 11:56:06 | 5 | A. Yes. |
| 11:56:06 | 6 | Q. Did you in fact begin to cooperate with this FBI agent's |
| 11:56:12 | 7 | investigation? |
| 11:56:12 | 8 | A. Yes. |
| 11:56:12 | 9 | Q. In what way did you cooperate? |
| 11:56:16 | 10 | A. I provided them with information on what I saw, what I |
| 11:56:22 | 11 | thought was going on, and I also provided them with documents |
| 11:56:28 | 12 | from the clinic. |
| 11:56:28 | 13 | Q. Did the FBI ask you to act as a source of information? |
| 11:56:30 | 14 | A. Yes. |
| 11:56:30 | 15 | Q. Did you agree? |
| 11:56:32 | 16 | A. Yes. |
| 11:56:32 | 17 | Q. What did you understand that to entail? |
| 11:56:34 | 18 | A. Just to let them know what was going on, what I thought |
| 11:56:40 | 19 | was fraud. |
| 11:56:42 | 20 | Q. Did the FBI agent with whom you were working talk to you |
| 11:56:48 | 21 | about your role as a source? |
| 11:56:50 | 22 | A. Yes. |
| 11:56:50 | 23 | Q. What did you understand your role to be? |
| 11:56:52 | 24 | A. Mainly to provide information to them about what I saw. |
| 11:56:58 | 25 | Q. Did you continue working for Dr. Chhibber after becoming |

| | | |
|---|---|---|
| 11:57:04 | 1 | an FBI source? |
| 11:57:04 | 2 | A. Yes. |
| 11:57:04 | 3 | Q. Did you continue to provide information to the FBI? |
| 11:57:08 | 4 | A. Yes. |
| 11:57:08 | 5 | Q. What type of information? |
| 11:57:10 | 6 | A. Information about like how many tests were being performed |
| 11:57:20 | 7 | there or what I thought was wrongdoing, stuff like that. |
| 11:57:24 | 8 | Q. Now, at some point, Mr. Qasim, did you not also file a |
| 11:57:32 | 9 | lawsuit in connection with the work that you had done at |
| 11:57:34 | 10 | Dr. Chhibber's office? |
| 11:57:36 | 11 | A. Yes. |
| 11:57:36 | 12 | Q. What type of lawsuit had you filed? |
| 11:57:38 | 13 | A. It's a qui tam lawsuit. |
| 11:57:44 | 14 | Q. Did you have an understanding of what type of lawsuit a |
| 11:57:46 | 15 | qui tam lawsuit is? |
| 11:57:48 | 16 | A. Yes. |
| 11:57:48 | 17 | Q. Can you tell the members of the jury what your |
| 11:57:50 | 18 | understanding of what a qui tam lawsuit is? |
| 11:57:54 | 19 | A. When an individual brings fraud to the attention of the |
| 11:58:02 | 20 | government, if that person is convicted of fraud based on what |
| 11:58:10 | 21 | you told them, you can sue that individual on behalf of the |
| 11:58:14 | 22 | United States government. |
| 11:58:18 | 23 | Q. Have you filed a lawsuit on behalf of the United States |
| 11:58:20 | 24 | government? |
| 11:58:20 | 25 | A. Yes. |

| | | |
|---|---|---|
| 11:58:20 | 1 | Q.  Do you have an economic interest in that lawsuit? |
| 11:58:24 | 2 | A.  Yes. |
| 11:58:24 | 3 | Q.  When did you file that qui tam lawsuit? |
| 11:58:30 | 4 | A.  It was, I believe, July of 2011. |
| 11:58:36 | 5 | Q.  Do you know if it was before or after Dr. Chhibber was |
| 11:58:38 | 6 | charged in connection with this case? |
| 11:58:40 | 7 | A.  It was after. |
| 11:58:40 | 8 | Q.  When did you begin the process of investigating the |
| 11:58:46 | 9 | ability to file a qui tam lawsuit in connection with this |
| 11:58:50 | 10 | case? |
| 11:58:52 | 11 | A.  I believe it was in March, about March of 2011, about a |
| 11:58:56 | 12 | month or so after he was charged. |
| 11:58:58 | 13 | Q.  I want to go back to the work that you did for |
| 11:59:02 | 14 | Dr. Chhibber.  I want to focus once again on that one year |
| 11:59:08 | 15 | while you were working at the south side clinic. |
| 11:59:10 | 16 | While you worked at Dr. Chhibber's Cottage Grove |
| 11:59:14 | 17 | Community Medical Clinic, who was responsible for determining |
| 11:59:16 | 18 | what tests were to be run on patients? |
| 11:59:18 | 19 | A.  Dr. Chhibber. |
| 11:59:20 | 20 | Q.  To your knowledge, on the days that Dr. Chhibber was |
| 11:59:24 | 21 | there, was anyone else authorized to order tests on patients? |
| 11:59:28 | 22 | A.  No. |
| 11:59:28 | 23 | Q.  Did you work with any other ultrasound techs at |
| 11:59:34 | 24 | Dr. Chhibber's office during your period of employment there? |
| 11:59:36 | 25 | A.  Yes, Mr. Baig. |

11:59:38    1    Q.  When you say that you worked with Mr. Baig, did you work

11:59:44    2    on the same days or generally on different days?

11:59:48    3    A.  We generally worked on different days.

11:59:50    4    Q.  When you were working at the clinic, did you perform all

11:59:54    5    of the ultrasounds that you have already testified about

11:59:56    6    earlier this morning?

11:59:58    7    A.  Yes.

11:59:58    8    Q.  How would you know when to perform those ultrasounds?

12:00:02    9    A.  Either Dr. Chhibber or his medical assistants working

12:00:08   10    there would hand me the patient charts.  Each visit, a

12:00:14   11    progress form is filled out for the patient, and there is one

12:00:18   12    section on the progress form that lists the tests to be done

12:00:22   13    on the patient that day.

12:00:28   14    Q.  I am going to show you a chart that's been marked as

12:00:34   15    Government Exhibit 340.  I will show a page from that

12:01:06   16    Government Exhibit 340 up on the screen.

12:01:22   17          First of all, have you seen this chart before?

12:01:24   18    A.  Yes, I have.

12:01:24   19    Q.  And do you recognize this form of progress note that's

12:01:28   20    contained within that chart?

12:01:30   21    A.  Yes.

12:01:30   22    Q.  Looking at this particular progress note, can you explain

12:01:36   23    to the members of the jury how you would know what tests to

12:01:38   24    perform?

12:01:38   25    A.  There is a box towards the right of the page, right in the

12:01:44    1    middle without the lines, and that has a list of not only

12:01:50    2    ultrasounds ordered but also EKG, PFT, the ones in the top, I

12:01:56    3    believe that's a blood draw.  So those are all the exams or

12:02:00    4    tests ordered on that patient that day.

12:02:02    5    Q.  When you worked at Dr. Chhibber's office, did you see

12:02:06    6    progress notes like the particular document that's on the

12:02:08    7    screen right now?

12:02:10    8    A.  Yes.

12:02:10    9    Q.  And did you review those types of progress notes?

12:02:12   10    A.  Yes.

12:02:12   11    Q.  For what purpose?

12:02:14   12    A.  To see what tests were ordered.

12:02:18   13    Q.  Now, looking at this particular progress note, is there a

12:02:22   14    test here that if you saw it, you would actually perform?

12:02:26   15    A.  Yes.

12:02:26   16    Q.  What test would you perform?

12:02:26   17    A.  An echo and carotid.

12:02:30   18    Q.  And where do you see carotid?

12:02:32   19    A.  There is a bracket that says 1.

12:02:38   20    Q.  Is that it right there?

12:02:40   21    A.  Yes.

12:02:40   22    Q.  Right below echo?

12:02:42   23    A.  Yes.

12:02:42   24    Q.  Now, once you were going to perform these tests, where in

12:02:48   25    Dr. Chhibber's office would these tests occur?

12:02:52  1  A.  We had a separate room for ultrasound.  It was room 2.

12:02:56  2  Q.  Can you generally explain the process to the members of

12:03:00  3  the jury on how you would meet a patient and perform, by means

12:03:04  4  of example, an echocardiogram?

12:03:12  5  A.  I would get the chart, I would see what tests were

12:03:16  6  ordered, and I would go out -- usually they were waiting in

12:03:18  7  the waiting room, or if they were getting blood drawn, I would

12:03:20  8  go out to the waiting room and call them and bring them back

12:03:24  9  to room 2, the ultrasound room.

12:03:24  10  Q.  What would happen once they came back to the ultrasound

12:03:28  11  room?

12:03:28  12  A.  I would introduce myself, I would let them know what test

12:03:32  13  they were going to be given, and if needed, have them put a

12:03:42  14  gown on and perform the test.

12:03:44  15  Q.  Now, in performing the various tests that you performed on

12:03:46  16  patients at Dr. Chhibber's office, did you review any portion

12:03:48  17  of the patient's progress note other than the section listing

12:03:52  18  the test to be performed?

12:03:54  19  A.  Yes.

12:03:54  20  Q.  First of all, what other sections did you review?

12:03:58  21  A.  Towards the bottom third of the page of the diagnoses, the

12:04:06  22  symptoms the patient was giving that day.  That's it.

12:04:08  23  Q.  And for what purpose would you review this diagnoses

12:04:12  24  section?

12:04:12  25  A.  That's the patient history relevant to the exam.  I would

12:04:18   1   go over it with the patient. At times I would fill symptoms

12:04:28   2   in on the tech sheet. I didn't always do that, but I was

12:04:30   3   trained to go over patient history. That included the

12:04:34   4   diagnoses for that day.

12:04:34   5   Q. How often would you go over these diagnoses sections with

12:04:40   6   the patients you were about to perform tests on?

12:04:42   7   A. Pretty often. Very often I would say.

12:04:44   8   Q. Did you notice any pattern in the diagnoses you saw in

12:04:48   9   connection with the tests that you had to perform?

12:04:50  10   A. Yes.

12:04:50  11   Q. Using as an example an echocardiogram, did you see any

12:04:56  12   patterns in the diagnoses that you saw in the charts for the

12:04:58  13   echocardiograms you were to perform?

12:05:02  14   A. Yes.

12:05:02  15   Q. What patterns did you see?

12:05:04  16   A. I saw many of the same diagnoses used often, such as

12:05:12  17   murmur or chest pains or shortness of breath or hypertension.

12:05:16  18   Q. What about with carotid Doppler examinations, did you

12:05:20  19   review the diagnoses sections for the carotid Doppler exams

12:05:26  20   that you performed?

12:05:26  21   A. Yes.

12:05:26  22   Q. Did you, in reviewing those diagnoses sections, see any

12:05:30  23   patterns in connection with the diagnoses that you read and

12:05:32  24   the tests that you performed?

12:05:34  25   A. Yes.

12:05:34  1  Q.  What type of patterns did you see for the carotid Doppler

12:05:40  2  examinations?

12:05:40  3  A.  It was, again, a similar bunch of diagnoses that would

12:05:48  4  appear very often, such as dizziness and bruit.

12:05:54  5  Q.  What was the last one?

12:05:54  6  A.  Bruit.

12:05:54  7  Q.  What about abdominal pain -- I'm sorry, abdominal

12:05:58  8  ultrasounds?  Did you see any patterns in the diagnoses

12:06:04  9  section for the abdominal ultrasounds that you performed?

12:06:08  10  A.  Yes.

12:06:08  11  Q.  What patterns did you see in connection with those tests?

12:06:10  12  A.  Very often I would see abdominal pain.

12:06:16  13  Q.  Now, Mr. Qasim, just so it's clear, you are not a doctor,

12:06:20  14  correct?

12:06:20  15  A.  Correct.

12:06:20  16  Q.  Did you ever perform a physical exam on any of these

12:06:24  17  patients?

12:06:24  18  A.  No.

12:06:24  19  Q.  Were you present when Dr. Chhibber performed his physical

12:06:28  20  exam on patients?

12:06:28  21  A.  No.

12:06:28  22  Q.  When you reviewed these diagnoses sections, you said that

12:06:38  23  you did so for what purpose?

12:06:38  24  A.  When I began ultrasound, I was trained to go over patient

12:06:46  25  history with the patient and record some history for the tech

12:06:52 1  sheet that we provided for the specialists that would

12:06:56 2  interpret the study.

12:06:58 3  Q.  What do you mean by that?  The patients had usually

12:07:02 4  already been seen by a doctor, correct?

12:07:04 5  A.  Correct.

12:07:04 6  Q.  Would you, nevertheless, write your own patient history

12:07:08 7  about some of the patients that you were then testing?

12:07:10 8  A.  Yes.

12:07:10 9  Q.  Where would you do that?

12:07:14 10  A.  On the tech sheet.

12:07:16 11  Q.  And what type of questions would you ask to fill out those

12:07:24 12  tech sheets?

12:07:24 13  A.  If they've ever had any heart trouble, if they have ever

12:07:28 14  had any surgeries; just general history questions.

12:07:30 15  Q.  Would you ask those questions at the same time that you

12:07:34 16  were reviewing Dr. Chhibber's progress notes for the same

12:07:38 17  patients?

12:07:38 18  A.  Yes.

12:07:38 19  Q.  Did you ever -- did patients ever describe to you

12:07:44 20  conditions that were different than those contained in the

12:07:48 21  progress notes?

12:07:50 22       MR. ORMAN:  I am going to object to what patients

12:07:52 23  said.

12:07:52 24       MR. HAMMERMAN:  803(4), your Honor.

12:07:56 25       THE COURT:  We are going to take our lunch recess

12:08:00    1    now, members of the jury. We will resume at 1:15. You are

12:08:04    2    excused until 1:15.

12:08:04    3      (The jury leaves the courtroom.)

12:08:04    4      (The following proceedings were had in open court outside

12:08:40    5    the presence and hearing of the jury:)

12:08:40    6          THE COURT: Please be seated.

12:08:40    7          The witness may step down. Would you return to the

12:08:42    8    stand at 1:15, please.

12:08:46    9          THE WITNESS: Sure.

12:08:50   10          THE COURT: Before we took our morning recess, I was

12:08:52   11    handed some papers I think by mistake. I am not sure who

12:09:00   12    handed them up, but there are just some multiple copies of the

12:09:06   13    electronic filing of the defendant's pending motion for an

12:09:10   14    evidentiary hearing, and then there are multiple copies of the

12:09:16   15    notice of motion for the defendant's motion. I am going to

12:09:20   16    hand them back down, and you can sort out who they belong to.

12:09:28   17          I did -- I was handed at some point a copy of --

12:09:34   18    received an unredacted copy of the defendant's motion for an

12:09:38   19    evidentiary hearing, as I assume the government did as well.

12:09:42   20          MR. HAMMERMAN: We received it shortly before your

12:09:44   21    Honor did.

12:09:44   22          THE COURT: Yes. Could I ask, if necessary, is the

12:09:56   23    FBI agent available? I think her name is Anton, is it Kathryn

12:10:06   24    Anton?

12:10:06   25          MR. HAMMERMAN: Yes, your Honor.

12:10:10    1    THE COURT:  Is she available to appear as a witness

12:10:14    2  to the hearing?

12:10:14    3    MR. HAMMERMAN:  Yes, we just would have to contact

12:10:16    4  her and make sure she is available when the court requires.

12:10:20    5    THE COURT:  Are the factual representations in the

12:10:24    6  motion contested; that is, that Ms. Anton deleted email

12:10:36    7  communications with the present witness?

12:10:38    8    MR. HAMMERMAN:  Yes, your Honor, although I think the

12:10:42    9  way they are described in the motion is not necessarily an

12:10:44    10  entirely full picture.  Ms. Anton downloaded emails that she

12:10:50    11  had with the witness to the case file, and they were added to

12:10:54    12  the case file when she eventually moved squads from the squad

12:11:00    13  that she was on, which was a healthcare fraud squad, to where

12:11:04    14  she is currently assigned.  At the time that she did that, she

12:11:08    15  had already downloaded what she thought were pertinent emails

12:11:12    16  and then deleted the rest of her remaining emails.

12:11:16    17    We obtained emails from the witness who is currently

12:11:18    18  on the stand that showed that there was some additional

12:11:20    19  communication.  I have not done a full audit of what, but

12:11:24    20  there was some additional communication with the agent.  Some

12:11:26    21  of it was not substantive.  I know that.  We disclosed all of

12:11:30    22  that additional email correspondence to the defense.  We then

12:11:34    23  asked --

12:11:36    24    THE COURT:  When?

12:11:36    25    MR. HAMMERMAN:  Immediately.  This was months ago.

12:11:40  1    We then also at one point sought to do a search of

12:11:44  2  the witness' -- he allowed us to search his email account for

12:11:48  3  any reference to communication with the special agent, any

12:11:54  4  additional emails, and there were some more non-substantive

12:11:58  5  email correspondence.  We obtained that.  We turned it over.

12:12:00  6    We then -- and this was I will only call it a

12:12:02  7  difficult and arduous process -- sought to determine whether

12:12:08  8  any backup systems from the FBI were available to check to see

12:12:14  9  if we could somehow -- if there had been any emails saved

12:12:16  10  between the special agent and the witness.  That search was

12:12:20  11  done.  There were no available emails from the time period at

12:12:26  12  which these communications had occurred, and so the FBI was

12:12:30  13  unable, based on their representations to us, to further

12:12:34  14  supplement any emails that Ms. Anton had put to the case file

12:12:40  15  about her communications with this witness.

12:12:44  16    MR. ORMAN:  I want to get away from emails for a

12:12:46  17  moment, your Honor.  The letter that was attached to the

12:12:48  18  motion -- and I think you have it -- not only references

12:12:54  19  emails, but it references text messages as well.

12:12:58  20    MR. HAMMERMAN:  I can address that also, if your

12:13:00  21  Honor wishes.

12:13:00  22    MR. ORMAN:  Before we -- this is my issue.  We have

12:13:04  23  never seen those text messages, we never knew about them, and

12:13:10  24  now we learn for the first time that they have been deleted,

12:13:14  25  not only by wherever Ms. Anton stored them, but by this

12:13:22   1   witness who has deleted them as well.  We did get an

12:13:26   2   indication that these texts are non-substantive.  You know,

12:13:32   3   it's been my experience that you don't delete non-substantive

12:13:38   4   texts, especially when you're working for the FBI.

12:13:42   5        Let's go back to the emails.  I have had some

12:13:46   6   experience -- this is my concern.  I am not accusing anybody

12:13:50   7   of anything.  But you just don't hit a delete button and make

12:13:54   8   an email disappear.  It is there and it will remain on the

12:14:00   9   disk and be retrievable unless something more is required.

12:14:06   10  Now, that's my experience.  I've dealt with this.  You know,

12:14:10   11  in the early days of email, you know, people would delete

12:14:14   12  them, hit the delete button, and then some expert would come

12:14:18   13  in and pull them all out, and whoever was involved would be

12:14:22   14  all embarrassed because of what the email said.  We have all

12:14:24   15  been through that.  Emails are not so easily deleted, Judge.

12:14:30   16       Now, we had -- this is the chronology.  We had an

12:14:34   17  initial submission of emails early on in the case, the first

12:14:38   18  discovery submissions.  That was all there were until a few

12:14:46   19  months ago as counsel indicated.  But those emails that they

12:14:50   20  gave us a few months ago did not come from the FBI or from the

12:14:56   21  Attorney General's office.  They came from Mr. Fahad's

12:15:04   22  lawsuit.  You remember he said he filed a qui tam lawsuit.  He

12:15:08   23  attached those emails to the lawsuit, and that's what they

12:15:12   24  gave us, his copies, not theirs.  So they were probably gone

12:15:18   25  before that because otherwise they should have given them to

645

| | | |
|---|---|---|
| 12:15:22 | 1 | us. |
| 12:15:24 | 2 | Then they go back to Mr. Fahad and they say, give us |
| 12:15:30 | 3 | more of your emails, and he does a search, and they give them |
| 12:15:34 | 4 | to us.  Still no explanation on the texts, Judge. |
| 12:15:40 | 5 | I don't accept that they are non-substantive; that |
| 12:15:44 | 6 | is, setting meetings, arranging whatever there is to arrange, |
| 12:15:50 | 7 | phone calls.  That's substantive.  That may change everything. |
| 12:15:56 | 8 | That will tell us who talked to whom when.  We have to get |
| 12:16:04 | 9 | this straightened out, Judge. |
| 12:16:06 | 10 | THE COURT:  Well, I am curious.  When a |
| 12:16:12 | 11 | representation is made that these were non-substantive emails, |
| 12:16:16 | 12 | what were they? |
| 12:16:18 | 13 | MR. HAMMERMAN:  Well, with respect to the texts that |
| 12:16:22 | 14 | are at issue, because that's the representation that we have, |
| 12:16:26 | 15 | that they were non-substantive, and so I want to clarify the |
| 12:16:28 | 16 | two. |
| 12:16:28 | 17 | THE COURT:  What does that mean? |
| 12:16:30 | 18 | MR. HAMMERMAN:  My understanding from speaking with |
| 12:16:32 | 19 | the agent and with the witness -- |
| 12:16:32 | 20 | THE COURT:  Were they social friends or something? |
| 12:16:34 | 21 | MR. HAMMERMAN:  No, your Honor.  What I mean by |
| 12:16:40 | 22 | non-substantive -- and if that was an inarticulate way of |
| 12:16:44 | 23 | phrasing it, I apologize to the court. |
| 12:16:46 | 24 | THE COURT:  It doesn't tell me much. |
| 12:16:48 | 25 | MR. HAMMERMAN:  It was for purpose of arranging |

| | | |
|---|---|---|
| 12:16:50 | 1 | meetings and arranging further contact. It wasn't substantive |
| 12:16:50 | 2 | in the sense that it didn't describe ongoing activities, for |
| 12:16:56 | 3 | example, at that clinic. I asked both the agent and this |
| 12:16:58 | 4 | witness, you know, what was the nature of the texting. It was |
| 12:17:02 | 5 | more coordination in manner. And so that is what I meant by |
| 12:17:08 | 6 | non-substantive, that they were coordinating texts between |
| 12:17:12 | 7 | these two individuals, and that is what both of them have told |
| 12:17:16 | 8 | me in my conversations with them. |
| 12:17:20 | 9 | THE COURT: What remedy are you seeking, Mr. Orman? |
| 12:17:22 | 10 | MR. ORMAN: Right now the remedy in plain English is |
| 12:17:28 | 11 | to find out how this happened, who knew what, when they knew |
| 12:17:34 | 12 | it, and what the context of these texts and emails are. And |
| 12:17:38 | 13 | if it should turn out that these things were deleted perhaps |
| 12:17:48 | 14 | intentionally, the appropriate remedy under those |
| 12:17:50 | 15 | circumstances would be to dismiss the indictment. If we have |
| 12:17:56 | 16 | -- the only way we can figure this out is an evidentiary |
| 12:18:00 | 17 | hearing, Judge. |
| 12:18:06 | 18 | THE COURT: I see Special Agent -- |
| 12:18:12 | 19 | MR. HAMMERMAN: Anton. |
| 12:18:12 | 20 | THE COURT: -- Anton is not on the government's |
| 12:18:14 | 21 | witness list. |
| 12:18:16 | 22 | MR. HAMMERMAN: That is correct, your Honor. |
| 12:18:16 | 23 | MR. ORMAN: She is on ours, Judge. |
| 12:18:30 | 24 | THE COURT: Is this an area that you intend to |
| 12:18:32 | 25 | examine her about -- |

12:18:34  1      MR. ORMAN:  Yes.

12:18:34  2      THE COURT:  -- in terms of communication with a

12:18:36  3  witness?

12:18:36  4      MR. ORMAN:  Yes.

12:18:40  5      MR. HAMMERMAN:  Your Honor, we filed a motion

12:18:40  6  suggesting that that would actually be improper, that if the

12:18:44  7  sole purpose of defense counsel in calling a witness is to in

12:18:50  8  a sense try to embarrass the witness or impeach the witness,

12:18:54  9  the Seventh Circuit has been very clear that that is an

12:18:58  10  improper purpose in which to call a witness and should be not

12:19:00  11  allowed by the court, but instead, counsel should have to

12:19:06  12  proffer to the court the non-impeaching purpose for which

12:19:10  13  they're actually calling the witness, because if it's solely

12:19:12  14  to impeach the credibility of a witness who does not otherwise

12:19:16  15  offer useful testimony to the defense, there is no purpose in

12:19:18  16  which to call the witness because the government is not

12:19:20  17  relying on that witness in its case in chief, so there is no

12:19:22  18  value in impeaching her credibility since her credibility is

12:19:26  19  not put at issue because she is not a witness for the

12:19:30  20  government.

12:19:34  21      MR. ORMAN:  Judge, it sounds to me like documents

12:19:36  22  have disappeared and they don't want us to talk about it.  I

12:19:40  23  think that's what he just said.

12:19:42  24      MR. HAMMERMAN:  I don't think it would be appropriate

12:19:42  25  to talk about them, as Mr. Orman puts it, in front of the jury

648

12:19:46  1   solely for the purpose of embarrassing the agent.

12:19:48  2        THE COURT:  Just a moment.  You said Ms. Anton

12:19:56  3   deleted emails but first downloaded them, or she made a

12:20:02  4   decision as to what was substantive or not?

12:20:06  5        MR. HAMMERMAN:  I believe that that would be a fair

12:20:08  6   representation, your Honor.  She downloaded those emails or

12:20:12  7   printed and then put into the file those emails that she

12:20:14  8   believed were appropriately maintained.  We learned that those

12:20:16  9   were not the entirety of the correspondence with this witness,

12:20:22  10  and then we have sought in the manner I have described for the

12:20:24  11  court to try to recreate the wheel, if you will, by trying to

12:20:28  12  get those emails from any source that we could.  We have been

12:20:32  13  able to supplement the emails that were originally put to the

12:20:36  14  file through these other sources.

12:20:38  15       We cannot make a representation to the court that

12:20:40  16  that is everything.  In the same respect, we don't know if, in

12:20:42  17  fact, it isn't.  It could be that we have now provided defense

12:20:46  18  counsel with everything.  We simply, based on what we

12:20:48  19  understand to be the limitations of the FBI, cannot make a

12:20:52  20  representation to the court that this is everything.

12:20:58  21       THE COURT:  Well, I do think Ms. Anton needs to

12:21:02  22  clarify.

12:21:04  23       MR. ORMAN:  I'd like to make a point, Judge.

12:21:06  24       THE COURT:  You certainly are free to cross-examine

12:21:08  25  this witness about the extent of his contacts with Ms. Anton.

12:21:18   1      MR. ORMAN:  I just want to put this on the record, if

12:21:20   2   I may, Judge.  I have gone out of my way in this case to avoid

12:21:24   3   any embarrassment of any government witness or agent, and

12:21:30   4   counsel will verify that.  They would come to me and say,

12:21:34   5   don't embarrass this witness about this, don't embarrass this

12:21:38   6   witness about that, and I agreed, I believe, in every

12:21:42   7   instance.  You can ask him; they will tell you.  This is not

12:21:44   8   an attempt to embarrass anybody.  We don't do that.

12:21:50   9      THE COURT:  Well, you might consider a stipulation,

12:21:52  10   too.

12:21:56  11      MR. HAMMERMAN:  We can talk to defense counsel about

12:21:58  12   that.

12:22:00  13      THE COURT:  All right.

12:22:04  14      MR. HAMMERMAN:  Thank you, your Honor.

12:22:06  15      MR. COLE:  Thank you.

12:22:08  16    (The trial was adjourned at 12:20 p.m. until 1:15 p.m. of

12:22:14  17   this same day and date.)

18

19

20

21

22

23

24

25

1    IN THE UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

3

4
     UNITED STATES OF AMERICA,          )    Docket No. 11 CR 119
5                                       )
                         Plaintiff,     )
6                                       )
              vs.                       )
7                                       )
     JASWINDER RAI CHHIBBER,            )    Chicago, Illinois
8                                       )    March 5, 2012
                         Defendant.     )    1:15 o'clock p.m.
9
              TRIAL TRANSCRIPT OF PROCEEDINGS
10   BEFORE THE HONORABLE SUZANNE B. CONLON, AND A JURY
                    VOLUME 3-B
11

12   APPEARANCES:

13   For the Plaintiff:      HON. PATRICK FITZGERALD
                             United States Attorney
14                           BY:  MR. SAMUEL B. COLE
                                  MR. JOEL M. HAMMERMAN
15                           219 S. Dearborn St., Suite 500
                             Chicago, Illinois  60604
16

17   For the Defendant:      PUGH, JONES & JOHNSON, P.C.
                             BY:  MR. WALTER JONES, JR.
18                           180 North LaSalle Street, Suite 3400
                             Chicago, IL  60601
19                           (312) 768-7800

20                           LAW OFFICE OF ROBERT ORMAN
                             BY:  MR. ROBERT ORMAN
21                           One North LaSalle Street, Suite 1775
                             Chicago, IL  60602
22                           (312) 372-0515

23
24   Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
                             219 S. Dearborn Street, Suite 1854-B
25                           Chicago, Illinois  60604
                             (312) 435-5639

01:16:08   1   (The following proceedings were had in open court in the

01:16:08   2   presence and hearing of the jury:)

01:16:08   3          THE COURT:  Sir, you are still under oath.  Would you

01:16:12   4   restate your full name for the record.

01:16:14   5          THE WITNESS:  Fahad Qasim.

01:16:18   6          MR. HAMMERMAN:  May I proceed, your Honor?

01:16:20   7          THE COURT:  Yes.

01:16:22   8                              - - -

01:16:22   9          FAHAD QASIM, DIRECT EXAMINATION CONTINUED

01:16:22   10  BY MR. HAMMERMAN:

01:16:22   11  Q.  Mr. Qasim, before we broke for lunch, I think we were

01:16:22   12  talking about the time in which you sit down with the patient

01:16:22   13  immediately preceding the scans that you were going to

01:16:32   14  perform.  Do you remember those questions?

01:16:32   15  A.  Yes.

01:16:34   16  Q.  You said that one of the things that you do at the time

01:16:36   17  that you are questioning a patient was filling out a form; is

01:16:36   18  that right?

01:16:38   19  A.  Yes.

01:16:38   20  Q.  What type of information would you put in that form?

01:16:42   21  A.  The patient's name, ordering physician, date, gender,

01:16:48   22  sometimes their history, and then...

01:16:54   23  Q.  Let me stop you for a second.  When you say "their

01:16:56   24  history," what do you mean by their history?

01:16:58   25  A.  If they have ever had a history of high blood pressure or

01:17:04  1  chest pains or shortness of breath, if they note they have a

01:17:06  2  murmur, any surgeries they may have had.

01:17:10  3  Q.  Why would that information be important to your testing

01:17:14  4  procedure, why is that necessary?

01:17:16  5  A.  As far as I understood, it was just relating the test to

01:17:24  6  the patient's history and giving that to whatever physician

01:17:30  7  was going to take -- look at the test and write his findings.

01:17:34  8  Q.  When you asked patients that information, was it your

01:17:38  9  understanding that that information could be relayed to a

01:17:42  10  future physician for interpreting the results?

01:17:46  11  A.  Yes.

01:17:46  12  Q.  Did you have conversations with patients about the

01:17:56  13  information that you were reading in Dr. Chhibber's history

01:18:00  14  and diagnoses sections of the progress notes?

01:18:04  15  A.  Yes.

01:18:04  16  Q.  Did patients ever contest the information that you were

01:18:08  17  questioning them about?

01:18:10  18          MR. ORMAN:  Objection, your Honor.

01:18:10  19          THE COURT:  Sustained.

01:18:14  20  BY MR. HAMMERMAN:

01:18:16  21  Q.  Do you remember, Mr. Qasim, any specific conversations

01:18:20  22  with any particular patients about what was in their charts

01:18:24  23  and what you were questioning them about for purposes of

01:18:28  24  performing your tests?

01:18:30  25  A.  Yes.

01:18:30  1  Q.  Do you remember by way of example any names of any

01:18:34  2  patients with whom you had these types of conversations?

01:18:36  3  A.  Yes, there was one patient that came in quite frequently.

01:18:40  4  Q.  What was the patient's name?

01:18:42  5  A.  His name was Melvin Rogers.

01:18:44  6  Q.  And when you say he "came in quite frequently" -- let me

01:18:48  7  try that again.

01:18:48  8  When you say he "came in quite frequently," did you

01:18:52  9  see this patient quite frequently?

01:18:54  10  A.  Yes.

01:18:54  11  Q.  For what purpose?

01:18:56  12  A.  Different types of ultrasounds.

01:18:58  13  Q.  Did you perform multiple ultrasounds on this patient?

01:19:04  14  A.  Yes.

01:19:04  15  Q.  Do you remember any conversations with this patient about

01:19:08  16  his history and diagnoses?

01:19:10  17  A.  Yes.

01:19:10  18  Q.  Do you remember with this Melvin Rogers, whether that was

01:19:16  19  one of your initial meetings with him or subsequent, do you

01:19:18  20  remember when in --

01:19:20  21  A.  It was early on in my employment, the first few months.

01:19:22  22  Q.  And do you remember the type of information you asked him?

01:19:26  23  A.  Yes.

01:19:26  24  Q.  What type of information did you ask Melvin Rogers?

01:19:30  25  MR. ORMAN:  Objection, your Honor.

01:19:32  1      THE COURT:  Sustained.  Hearsay.

01:19:34  2  BY MR. HAMMERMAN:

01:19:48  3  Q.  During the first year that you worked with Dr. Chhibber at

01:19:50  4  the Cottage Grove Community Medical Clinic, how many tests

01:19:54  5  were you performing on average in a day, Mr. Qasim?

01:20:02  6  A.  I'd say from 10 to 25, maybe more.

01:20:04  7  Q.  And, again, what type of tests were these?

01:20:08  8  A.  They were echos, carotids, abdominal ultrasounds, others.

01:20:12  9  Q.  How long does it take you to perform one of these

01:20:16  10  ultrasound tests normally if done correctly by you?

01:20:20  11  A.  15 to 20 minutes.

01:20:22  12  Q.  Would that also include 15 to 20 minutes to do an

01:20:26  13  echocardiogram?

01:20:26  14  A.  Yes.

01:20:28  15  Q.  Would it also take 15 to 20 minutes to do a carotid

01:20:32  16  Doppler test?

01:20:32  17  A.  Yes.

01:20:32  18  Q.  15 to 20 minutes to do an abdominal ultrasound?

01:20:36  19  A.  Yes.

01:20:36  20  Q.  When you worked for Dr. Chhibber at the Cottage Grove

01:20:40  21  Community Medical Clinic, were you able to take 15 to 20

01:20:42  22  minutes to perform these tests?

01:20:44  23  A.  No.

01:20:44  24  Q.  Why not?

01:20:44  25  A.  It's too many patients, too many exams for one person to

01:20:50  1   do in one day.

01:20:50  2   Q.  Did you ever have any conversations with Dr. Chhibber

01:20:56  3   regarding the length of time that you should take in

01:20:58  4   performing these various tests?

01:21:00  5   A.  I never had conversations with him.  There were a few

01:21:06  6   times where --

01:21:10  7          THE COURT:  All right.  The answer is no then.

01:21:12  8   BY MR. HAMMERMAN:

01:21:12  9   Q.  Did you have any interaction with him regarding the length

01:21:14  10  of time it took you to perform these tests?

01:21:16  11  A.  Yes.

01:21:16  12  Q.  And in how many instances can you recall where you had

01:21:22  13  these types of interactions?

01:21:22  14  A.  Two, maybe three times.

01:21:24  15  Q.  All right.  Let's take the first one.

01:21:26  16          Do you remember, first of all, when in the term of

01:21:30  17  your employment that occurred?

01:21:30  18  A.  Yes.

01:21:32  19  Q.  When did it occur?

01:21:34  20  A.  Very early on, like the first two months I was working

01:21:38  21  there.

01:21:38  22  Q.  Where did this -- first of all, was it a meeting?  Let me

01:21:44  23  rephrase that.

01:21:44  24          How did this occurrence -- who was involved in this

01:21:48  25  occurrence?

01:21:48  1  A.  I was seeing a patient and Dr. Chhibber came in and spoke

01:21:54  2  with me.

01:21:54  3  Q.  Was anyone else present besides you, Dr. Chhibber, and the

01:21:58  4  patient?

01:21:58  5  A.  No.

01:21:58  6  Q.  Do you remember what you were doing with the patient at

01:22:00  7  the time that Dr. Chhibber came in?

01:22:00  8  A.  Yes.

01:22:02  9  Q.  What were you doing?

01:22:02  10  A.  I was performing an echo.

01:22:06  11  Q.  Okay.  And where did this occurrence where Dr. Chhibber

01:22:10  12  came in when you were performing the echo actually take place?

01:22:14  13  A.  The ultrasound room at the Cottage Grove clinic.

01:22:18  14  Q.  All right.  When Dr. Chhibber came into this particular

01:22:20  15  test, did he say anything to you?

01:22:22  16  A.  Yes.

01:22:22  17  Q.  What did he say to you?

01:22:24  18  A.  I was in the middle of my test and he came in and looked

01:22:30  19  at the screen for a moment and patted me on the back and said,

01:22:34  20  That should be enough.

01:22:36  21  Q.  That should be what?

01:22:36  22  A.  That should be enough.

01:22:38  23  Q.  Were you done performing the echocardiogram of that

01:22:42  24  patient at that time?

01:22:42  25  A.  No, I wasn't.

01:22:44　1　Q. What did you do when Dr. Chhibber patted you on the back

01:22:48　2　and said that is enough?

01:22:50　3　A. I took maybe just one more minute to get a couple of more

01:22:56　4　measurements for my report and I ended the exam.

01:22:58　5　Q. Was this the only time in which Dr. Chhibber had an

01:23:02　6　interaction with you that was similar to the one we have just

01:23:04　7　discussed?

01:23:04　8　A. No.

01:23:06　9　Q. Did it happen on a subsequent occurrence?

01:23:08　10　A. Yes.

01:23:08　11　Q. In relation to the occurrence that you just relayed to the

01:23:12　12　jury, when did that transpire?

01:23:16　13　A. Maybe in the month following.

01:23:20　14　Q. Okay. And what were you doing at that time?

01:23:22　15　A. At that time I believe I was also doing an echo.

01:23:26　16　Q. And where were you doing this echo?

01:23:30　17　A. The ultrasound room at Cottage Grove.

01:23:38　18　Q. Who was present?

01:23:40　19　A. Myself, the patient, and Dr. Chhibber.

01:23:42　20　Q. Can you explain to the members of the jury what happened

01:23:44　21　when Dr. Chhibber came into the room?

01:23:44　22　A. He came into the room and looked at the screen for a

01:23:48　23　moment and asked me how much time was left, he told me there

01:23:50　24　was a couple of patients waiting, told me the names, which I

01:23:54　25　don't recall, and kind of hinted at just hurrying up.

| | | |
|---|---|---|
| 01:24:00 | 1 | Q.  What did you do after this second occurrence? |
| 01:24:02 | 2 | A.  Again, I just took like the essential measurements I |
| 01:24:10 | 3 | needed, like the bear minimum, so I could fill out my report |
| 01:24:14 | 4 | page and finish the exam. |
| 01:24:16 | 5 | Q.  Were you done actually performing the exam at that time? |
| 01:24:20 | 6 | A.  No. |
| 01:24:22 | 7 | Q.  On either of these occurrences, did Dr. Chhibber ask you |
| 01:24:24 | 8 | the status of the test you were performing before telling you |
| 01:24:26 | 9 | that that was good enough? |
| 01:24:28 | 10 | A.  No. |
| 01:24:30 | 11 | Q.  Did he ask you how much longer you needed to complete your |
| 01:24:32 | 12 | examination before telling you that this was good enough? |
| 01:24:34 | 13 | A.  No. |
| 01:24:36 | 14 | Q.  Did he ask you about your findings, what data you had |
| 01:24:40 | 15 | retrieved before telling you that this is good enough? |
| 01:24:42 | 16 | A.  No. |
| 01:24:42 | 17 | Q.  Did he ask you to look at any of the pictures that you had |
| 01:24:46 | 18 | taken during those exams before telling you that it was good |
| 01:24:50 | 19 | enough? |
| 01:24:50 | 20 | A.  No. |
| 01:24:50 | 21 | Q.  Did he ask to look at any of the video that you had taken |
| 01:24:54 | 22 | during those echocardiograms before telling you it was good |
| 01:24:58 | 23 | enough? |
| 01:24:58 | 24 | A.  No. |
| 01:24:58 | 25 | Q.  Did he say anything to you or ask -- let me rephrase that. |

| | | |
|---|---|---|
| 01:25:04 | 1 | Did he ask to speak or consult with you on anything |
| 01:25:06 | 2 | before telling you that what you had already done was good |
| 01:25:10 | 3 | enough? |
| 01:25:10 | 4 | A.  No. |
| 01:25:10 | 5 | Q.  Following these interactions, did your methodology of |
| 01:25:18 | 6 | testing patients at the Cottage Grove Community Medical Clinic |
| 01:25:22 | 7 | change in any way? |
| 01:25:24 | 8 | A.  Yes. |
| 01:25:24 | 9 | Q.  How did it change? |
| 01:25:24 | 10 | A.  I shortened them pretty drastically. |
| 01:25:28 | 11 | Q.  I'm sorry? |
| 01:25:30 | 12 | A.  I shortened my exam time pretty drastically. |
| 01:25:34 | 13 | Q.  Aggressively. |
| 01:25:34 | 14 | A.  Drastically. |
| 01:25:34 | 15 | Q.  You have to speak up and into the microphone, please. |
| 01:25:38 | 16 | What do you mean when you say you sped things up, |
| 01:25:42 | 17 | what does that mean? |
| 01:25:44 | 18 | A.  Well, say, with echocardiograms, we record videos, videos |
| 01:25:50 | 19 | of the heart beating in different points at different angles. |
| 01:25:56 | 20 | In a normal exam, I take -- you know, spend a few minutes on |
| 01:26:02 | 21 | each plane getting a good image of the heart muscle pumping. |
| 01:26:10 | 22 | When I kind of changed my exams to keep up with Dr. |
| 01:26:12 | 23 | Chhibber's pace, you know, I took very little, almost no |
| 01:26:18 | 24 | video.  There was a lot of times where we didn't even have |
| 01:26:20 | 25 | blank tapes. |

01:26:22 1    MR. ORMAN:  Objection, your Honor.  No question

01:26:24 2    pending.

01:26:26 3    THE COURT:  Sustained.

01:26:26 4    BY MR. HAMMERMAN:

01:26:26 5    Q.  You're saying you wouldn't take videos.  Was there

01:26:28 6    anything else you did to expedite your testing?

01:26:30 7    A.  Yes, I would take less still images, less printouts.

01:26:36 8    Q.  How fast could you, using this expedited methodology,

01:26:42 9    actually perform an ultrasound in Dr. Chhibber's office?

01:26:46 10   A.  I would say three to five minutes.

01:26:48 11   Q.  Well, Mr. Qasim, how could you record all the information

01:26:52 12   that you needed in just three to five minutes?

01:26:54 13   A.  I would just get the measurements required to fill out the

01:26:58 14   tech sheet.

01:27:00 15   Q.  What do you mean by that?

01:27:00 16   A.  There is a preliminary report form that we fill out where

01:27:06 17   we attach our images and send that to the reading doctor, and

01:27:14 18   that has different measurements for different exams.  Carotid

01:27:18 19   has a few measurements that we write down, echo has a few more

01:27:26 20   measurements than that.

01:27:26 21   Q.  If you had taken longer to do these tests, would you have

01:27:28 22   obtained different or additional information?

01:27:30 23   A.  Yes.

01:27:32 24   MR. ORMAN:  Objection.  Calls for speculation, Judge.

01:27:34 25   THE COURT:  Sustained.

BY MR. HAMMERMAN:

Q. If you had taken additional time to take the tests, what else would you have done?

A. I would have taken more measurements, more Doppler measurements, I would have taken more images, I would have recorded more video clips, I would have taken more imaging planes.

Q. Is that the way that you were instructed on how to do these tests when you went to school for it?

A. Yes.

Q. Now, what would you do with the reports that you did generate or the data that you did generate once you had performed an ultrasound test?

A. I would fill out the tech sheet, I would write all my measurements down. If there were any findings, I would mark those down as well, I would make a copy of the tech sheet and put one in the chart, and the original images, I would staple those to the tech sheet that I wrote out and then put that on the shelf for the doctor to see.

Q. Did your process of putting one of these copies in the chart and one of them on the shelf for the doctor change at some point in time?

A. Yes.

Q. Approximately how long into that first year that you were working for Dr. Chhibber did it change?

01:28:44  1   A.  Close to a year.

01:28:46  2   Q.  And how did it change?

01:28:46  3   A.  I started including -- instead of making a separate copy

01:28:54  4   of my tech sheet, I would just staple the printouts that I got

01:29:00  5   from the machine and staple that to the sheet and put

01:29:04  6   everything in the chart instead of separating them.

01:29:06  7   Q.  Is there a reason that you changed your methodology?

01:29:10  8   A.  Just to speed things up.  No one minded.  No one ever said

01:29:18  9   anything, so I thought it was okay.

01:29:20  10  Q.  Well, did Dr. Chhibber ever talk to you that you weren't

01:29:22  11  leaving him a second copy to review?

01:29:24  12  A.  No.

01:29:24  13  Q.  How would you describe the work product that you were

01:29:32  14  generating on behalf of Dr. Chhibber's clients at the Cottage

01:29:36  15  Grove Community Medical Clinic?

01:29:36  16          MR. ORMAN:  Object to the question, your Honor.

01:29:38  17          THE COURT:  Sustained.

01:29:40  18  BY MR. HAMMERMAN:

01:29:42  19  Q.  Did you ever have any conversations with Dr. Chhibber

01:29:44  20  regarding the form or the substance of the reports that you

01:29:46  21  generated?

01:29:48  22  A.  No.

01:29:48  23  Q.  Did Dr. Chhibber ever ask to discuss your readings with

01:29:52  24  you?

01:29:52  25  A.  No.

01:29:54  1  Q.  Did he ever ask you for the imagery that you had generated
01:29:58  2  during your ultrasound exams to discuss them with you?
01:30:02  3  A.  No.
01:30:02  4  Q.  Did Dr. Chhibber ever comment and observe your
01:30:04  5  examinations from start to finish to see how you were
01:30:08  6  performing your tests?
01:30:08  7  A.  No.
01:30:08  8  Q.  Did he ever have any questions for you about your data or
01:30:12  9  your findings?
01:30:14  10  A.  No.
01:30:14  11  Q.  Now, you've talked a little bit today about recording
01:30:20  12  information on a tech sheet.  Can you just explain what a tech
01:30:24  13  sheet is for the jury.
01:30:24  14  A.  Sure.  It's a form where we write the patient's name, the
01:30:30  15  date, the test ordered.  Each different type of test has a
01:30:34  16  different tech sheet.  It has spaces to write measurements you
01:30:42  17  would normally record during that exam.
01:30:44  18  Q.  Did you ever write -- do you know if -- let me rephrase
01:30:48  19  that.
01:30:50  20       Do you know if the final reports interpreting your
01:30:52  21  data were generated at the Cottage Grove Community Medical
01:30:58  22  Clinic?
01:30:58  23  A.  I knew -- I saw them being generated.
01:31:02  24  Q.  Well, first of all, whose responsibility was it to
01:31:06  25  generate those final reports?

01:31:06   1   A.  Dr. Chhibber.

01:31:08   2   Q.  Do you know if Dr. Chhibber performed that task?

01:31:10   3   A.  I believe he didn't.

01:31:12   4   Q.  He did or did not?

01:31:14   5   A.  I believe he did not.

01:31:16   6   Q.  Do you have an idea of who did actually generate the final

01:31:22   7   reports that you said were done?

01:31:24   8   A.  Yes.

01:31:24   9   Q.  Who?

01:31:24   10  A.  Mr. Baig.

01:31:26   11  Q.  Who is Mr. Baig again?

01:31:28   12  A.  Mr. Baig is the other ultrasound tech that worked with

01:31:32   13  Dr. Chhibber.

01:31:32   14  Q.  Do you have an understanding of when Mr. Baig performed

01:31:36   15  those final reports or wrote those final reports?

01:31:38   16  A.  Yes.

01:31:40   17  Q.  When did that occur?

01:31:40   18  A.  That occurred early 2010.

01:31:46   19  Q.  Do you know the circumstances pursuant to which Mr. Baig

01:31:50   20  began writing those reports?

01:31:52   21  A.  Why he began writing the reports?

01:31:56   22  Q.  Yes.

01:31:58   23  A.  To my understanding, they weren't being interpreted by any

01:32:02   24  physicians.  I never saw them going out, and, you know, an

01:32:08   25  exam I would do a few months before would still be sitting on

01:32:12   1    a shelf a few months later.  At some point, they wanted to

01:32:16   2    get --

01:32:16   3          MR. ORMAN:  Objection, your Honor.  No question

01:32:18   4    pending.

01:32:18   5          THE COURT:  Sustained.

01:32:20   6    BY MR. HAMMERMAN:

01:32:22   7    Q.  How old were some of the exams that you had done that were

01:32:28   8    then being turned into reports by Mr. Baig?

01:32:30   9    A.  Up to years, a few years, even before I was working there.

01:32:34   10    Q.  You previously stated that you performed multiple tests a

01:32:40   11    day for Dr. Chhibber?

01:32:42   12    A.  Yes.

01:32:42   13    Q.  Did you ever perform multiple exams on the same patient

01:32:48   14    during a single office visit?

01:32:50   15    A.  Yes.

01:32:50   16    Q.  Did that happen irregularly, regularly, frequently?

01:32:56   17    A.  Very frequently.

01:32:56   18    Q.  Did you ever perform ultrasound tests on patients who had

01:33:04   19    already received ultrasound tests on previous visits to the

01:33:08   20    clinic?

01:33:08   21    A.  Yes.

01:33:08   22    Q.  How would you know that they had been in for an ultrasound

01:33:14   23    test previously?

01:33:14   24    A.  Either I looked at their chart and I saw older studies or

01:33:22   25    I did that myself before.

01:33:22   1   Q.  Did patients question you about the tests they were

01:33:26   2   receiving and why they were receiving them?

01:33:26   3           MR. ORMAN:  Objection, your Honor.

01:33:28   4           THE COURT:  Sustained.

01:33:30   5   BY MR. HAMMERMAN:

01:33:32   6   Q.  Mr. Qasim, did you ever perform ultrasound tests on

01:33:36   7   patients before they were seen by Dr. Chhibber at the clinic?

01:33:40   8   A.  Yes.

01:33:40   9   Q.  First of all, how often did this occur?

01:33:42   10  A.  It occurred fairly regularly, maybe half the time.

01:33:46   11  Q.  And under what circumstances were you seeing patients to

01:33:50   12  perform ultrasound exams before they were seen by

01:33:54   13  Dr. Chhibber?

01:33:54   14  A.  Meaning how did I do that?

01:33:58   15  Q.  How did that come about?

01:34:02   16  A.  When I would come into the clinic, it was usually before

01:34:04   17  the doctor was there.

01:34:06   18  Q.  What time did the clinic open?

01:34:08   19  A.  I believe at 9:00 a.m.

01:34:10   20  Q.  What time would the patients arrive at the clinic?

01:34:12   21  A.  Shortly after it opened.

01:34:12   22  Q.  What time would Dr. Chhibber arrive?

01:34:16   23  A.  It was really different every day.  Sometimes 11:00,

01:34:18   24  sometimes 12:00, sometimes 1:00.

01:34:20   25  Q.  What would happen to the patients between the time that

01:34:24 1  the clinic opened and the time that Dr. Chhibber arrived?

01:34:26 2  A.  They would just be waiting in the waiting area.

01:34:30 3  Q.  Did you ever perform tests on patients before Dr. Chhibber

01:34:32 4  arrived when he was not yet in the office?

01:34:34 5  A.  Yes.

01:34:36 6  Q.  Did you obtain any form of authorization before you

01:34:40 7  performed those tests?

01:34:42 8  A.  Sometimes I spoke to Dr. Chhibber and I told him what

01:34:48 9  patients were there.

01:34:48 10  Q.  Let me ask you about that.  You say you spoke to

01:34:50 11  Dr. Chhibber.  How did you speak to Dr. Chhibber?

01:34:54 12          MR. ORMAN:  Objection, foundation.

01:34:54 13          THE COURT:  Would you lay the foundation, please.

01:34:58 14  BY MR. HAMMERMAN:

01:35:00 15  Q.  How often would you be in contact with Dr. Chhibber prior

01:35:02 16  to him arriving at the office?

01:35:04 17  A.  At least once a week.

01:35:06 18  Q.  Okay.  And when you had these forms of contact, what was

01:35:10 19  the way in which you spoke to him?

01:35:12 20  A.  He would call either my cell phone or call the clinic.

01:35:16 21  Q.  And what would you discuss during those calls?

01:35:20 22  A.  I would let him know what patients were there and when was

01:35:26 23  the last time they had any type of ultrasound done and

01:35:28 24  periodically what insurance they had.

01:35:30 25  Q.  Did Dr. Chhibber ask you about the patient's prior

01:35:36  1  diagnoses during these telephone calls?

01:35:38  2  A.  No.

01:35:38  3  Q.  Did he ask you about any patient physical complaints when

01:35:42  4  they came into the office during these telephone calls?

01:35:46  5  A.  No, he didn't.

01:35:46  6  Q.  Based on those conversations, did you perform ultrasound

01:35:54  7  tests?

01:35:54  8  A.  Yes.

01:35:54  9  Q.  What types of ultrasound tests?

01:35:56  10  A.  Echos, carotids, abdomens.

01:35:58  11  Q.  Did you ever perform ultrasound tests before Dr. Chhibber

01:36:04  12  came in the office without having authorization from

01:36:06  13  Dr. Chhibber?

01:36:06  14  A.  Sometimes he would speak to the medical assistants and go

01:36:14  15  over it with them, but on my own or through anyone else, no.

01:36:18  16  Q.  Well, did you ever perform a test without thinking that

01:36:20  17  you had obtained authorization to do it?

01:36:22  18  A.  No.

01:36:22  19  Q.  I want to go over a patient chart with you in particular.

01:36:26  20  I think I handed it up to you before.  It should still be in

01:36:30  21  front of you.  Government Exhibit 340, do you have that up

01:36:32  22  there?

01:36:32  23  A.  It's not up here anymore.

01:36:36  24  Q.  I apologize.  I thought it was on the witness stand.

01:37:02  25          First of all, Mr. Qasim, have you seen that chart

01:37:08  1  before?

01:37:08  2  A.  Yes.

01:37:08  3  Q.  I'd like to go first to the progress note.  I think there

01:37:10  4  is a little red flag on it.

01:37:12  5  A.  Okay.

01:37:12  6  Q.  It should also be up on the screen here.

01:37:22  7       That's the same progress note that we looked at

01:37:24  8  before lunch today.  Do you recognize it?

01:37:26  9  A.  Yes.

01:37:28  10  Q.  You noted before that there were two ultrasound tests

01:37:32  11  noted in the testing section on that chart; is that right?

01:37:36  12  A.  Yes.

01:37:36  13  Q.  What were those tests?

01:37:38  14  A.  An echo and a carotid.

01:37:38  15  Q.  Do you know who performed those tests?

01:37:40  16  A.  If the tech sheet is in here, I could tell you.  The date

01:37:48  17  is 3/4.  The tech sheet says 3/4/09, and it's my handwriting,

01:37:54  18  so I did it.

01:37:54  19  Q.  You recognize your handwriting on the tech sheets?

01:37:56  20  A.  Yes.

01:37:58  21  Q.  Is there a tech sheet for both the echocardiogram and the

01:38:02  22  carotid Doppler?

01:38:04  23  A.  Yes.

01:38:04  24  Q.  I'd like to turn first to the tech sheet for the

01:38:10  25  echocardiogram.

01:38:12  1   A.  Okay.

01:38:12  2   Q.  Is that it right there on the screen?

01:38:20  3   A.  Yes.

01:38:20  4   Q.  Let's look at the top half of that particular page for a

01:38:24  5   second.  Do you see there it has information about the

01:38:30  6   patient?

01:38:30  7   A.  Um-hmm.

01:38:32  8   Q.  The name, et cetera?

01:38:32  9   A.  Yes.

01:38:32  10  Q.  Do you recognize that handwriting?

01:38:34  11  A.  That's my handwriting.

01:38:36  12  Q.  All right.  There's also a patient history section.  Do

01:38:40  13  you see that?

01:38:40  14  A.  Yes.

01:38:40  15  Q.  When you were talking before about filling out a patient

01:38:42  16  history, is that the area in which you would do it?

01:38:46  17  A.  Yes.

01:38:46  18  Q.  Did you do it with respect to this patient?

01:38:48  19  A.  No, I didn't.

01:38:48  20  Q.  Is there any reason that you would or would not record a

01:38:52  21  patient's history?

01:38:52  22  A.  Not specifically.  Sometimes I did and sometimes I didn't.

01:38:58  23  Sometimes I spoke about it but didn't record it.

01:39:00  24  Q.  Then going down to the middle section of this particular

01:39:04  25  tech sheet, I will highlight it here for you, do you see that?

01:39:14  1   A.  Yes.

01:39:14  2   Q.  There are a lot of what I will refer to as technical

01:39:18  3   jargon and then some lines for measurements.  Do you see that?

01:39:20  4   A.  Yes.

01:39:20  5   Q.  During your exam, is this the tech sheet that you would

01:39:24  6   fill out for an echocardiogram?

01:39:26  7   A.  Yes.

01:39:26  8   Q.  Let's go now to the carotid Doppler tech sheet.  Do you

01:39:42  9   recognize that?

01:39:42  10  A.  Yes.

01:39:42  11  Q.  Once again, whose handwriting is this?

01:39:44  12  A.  That is mostly my handwriting.

01:39:48  13  Q.  Okay.  Looking at the top section, is that once again a

01:39:52  14  tech sheet for a carotid Doppler of Tiffany Shirley?

01:39:58  15  A.  Yes.

01:39:58  16  Q.  And if you go back -- once again, the information that is

01:40:28  17  in the carotid Doppler section on the lower half of the page,

01:40:32  18  do you see that?

01:40:32  19  A.  Yes.

01:40:32  20  Q.  Without getting into the technical jargon of what all of

01:40:36  21  these letters stand for, is this where you record your

01:40:42  22  measurements as you did an examination?

01:40:44  23  A.  Yes.

01:40:44  24  Q.  There is a section below there that says Impressions.

01:40:48  25  What is Impressions?

| | | |
|---|---|---|
| 01:40:50 | 1 | A. There we would write if we found any pathology, disease. |
| 01:40:54 | 2 | Q. And a blank impression section, what is the import of |
| 01:40:58 | 3 | that? |
| 01:40:58 | 4 | A. It's normal. |
| 01:41:00 | 5 | Q. Now, going back into the chart, do you see any reports |
| 01:41:06 | 6 | that were generated in connection with these two tests that |
| 01:41:12 | 7 | you performed? And we will throw the first one on the screen |
| 01:41:16 | 8 | which is the report for the echocardiogram. |
| 01:41:18 | 9 | A. Yes, I do see two final reports. |
| 01:41:22 | 10 | Q. First of all, did you generate these reports? |
| 01:41:24 | 11 | A. No. |
| 01:41:26 | 12 | Q. Are these the reports before that you were talking about |
| 01:41:28 | 13 | being generated by somebody else in the office? |
| 01:41:30 | 14 | A. Yes. |
| 01:41:30 | 15 | Q. Once again, who is the person that you saw generating |
| 01:41:32 | 16 | these reports? |
| 01:41:34 | 17 | A. Mr. Baig. |
| 01:41:34 | 18 | Q. Is this the kind of final report summarizing the |
| 01:41:40 | 19 | echocardiogram that was done with Tiffany Shirley? |
| 01:41:44 | 20 | A. Yes. |
| 01:41:44 | 21 | Q. Looking at the echocardiogram report and the |
| 01:41:56 | 22 | echocardiogram section that you filled out in your tech sheet, |
| 01:42:02 | 23 | do you see any inconsistencies? |
| 01:42:06 | 24 | A. The IV septal wall thickness measurement is wrong. |
| 01:42:06 | 25 | Q. I'm sorry. Could you state that again? |

01:42:24   1   A.  The IV septal wall thickness measurement is not correct on

01:42:24   2   the report.

01:42:24   3   Q.  How is it different than your findings?

01:42:28   4   A.  The one I obtained that I wrote was 0.992 centimeters.  In

01:42:36   5   the report, it says 1.2 centimeters.

01:42:40   6   Q.  I am showing your findings right here up on the screen

01:42:46   7   again.  Where is that that you're talking about?

01:42:48   8   A.  There are septal -- just above where it says, Noted

01:42:48   9   valvular insufficiencies --

01:42:48  10   Q.  Yes.

01:43:04  11   A.  -- it's the third one from the top.

01:43:04  12          MR. ORMAN:  I object to this, your Honor.

01:43:06  13          THE COURT:  Sustained.

01:43:08  14   BY MR. HAMMERMAN:

01:43:08  15   Q.  Tell the jury the things that are different between this

01:43:10  16   report and your findings.

01:43:12  17   A.  The IV septal wall thickness measurements do not match.

01:43:16  18   Q.  Okay.  How are they different?

01:43:18  19   A.  The measurement that I took was 0.992, and in the final

01:43:22  20   report, it's 1.2.

01:43:26  21   Q.  Okay.

01:43:26  22   A.  The aortic root diameter measurement that I took was 2.42

01:43:34  23   and the report is 3.5.  It doesn't look like I took an aortic

01:43:42  24   valve excursion measurement opening, and there is a valve

01:43:48  25   opening measurement here of a range of 1.5 to 2.6.

| | | |
|---|---|---|
| 01:43:54 | 1 | Q.  So you're saying -- I am putting it back up on the screen. |
| 01:43:58 | 2 | You are saying that there is actually a section where you |
| 01:44:00 | 3 | didn't fill out the information like here, is that what you |
| 01:44:04 | 4 | are referring to? |
| 01:44:06 | 5 | A.  Right there, yeah. |
| 01:44:06 | 6 | Q.  And there is a reading in the report? |
| 01:44:08 | 7 | A.  Yes. |
| 01:44:08 | 8 | Q.  Is that the reading right there? |
| 01:44:12 | 9 | A.  Yes. |
| 01:44:14 | 10 | Q.  What other things are different? |
| 01:44:20 | 11 | A.  There is a measurement that I wrote for MV excursion. |
| 01:44:36 | 12 | Q.  What's that? |
| 01:44:36 | 13 | A.  I wrote 10.05.  On the final report, it says 1.6 to 2.8 |
| 01:44:42 | 14 | centimeters. |
| 01:44:44 | 15 | Q.  Are these measurements that you take and fill out on a |
| 01:44:46 | 16 | tech sheet as part of an echocardiogram exam important? |
| 01:44:50 | 17 | A.  Yes. |
| 01:44:50 | 18 | Q.  Why? |
| 01:44:52 | 19 | A.  Because these are the measurements that go into the final |
| 01:44:56 | 20 | report and they are the findings of the patient that are |
| 01:45:00 | 21 | reviewed later compared to subsequent studies, stuff like |
| 01:45:04 | 22 | that. |
| 01:45:04 | 23 | Q.  Is this report, the echocardiogram, the final report |
| 01:45:08 | 24 | that's under the name of Dr. Chhibber that's maintained in her |
| 01:45:10 | 25 | patient chart, an accurate representation of your findings |

01:45:16  1  during the examination of Ms. Tiffany Shirley-Terrell?

01:45:22  2  A.  There are some inaccuracies.

01:45:24  3  Q.  Let me ask you another -- there are some inaccuracies is

01:45:28  4  what you said?

01:45:28  5  A.  Yes.

01:45:28  6  Q.  I want to ask you another question about one of the

01:45:30  7  summary of findings on that report.  Do you see that?  There

01:45:38  8  are six noted final summaries findings, but there's only a 1,

01:45:44  9  2, 3, 5, and 6.  I want to ask you about number five.  Do you

01:45:48  10  see where it says, No intracranial shunt noted?

01:45:50  11       MR. ORMAN:  I want to object to the relevancy of

01:45:52  12  this, your Honor.

01:45:52  13       THE COURT:  Sustained.

01:45:52  14  BY MR. HAMMERMAN:

01:45:54  15  Q.  Let me ask you this, Mr. Qasim.  Did you ever, while

01:45:56  16  taking an echocardiogram, take any measurements or do any kind

01:46:00  17  of examination of a person's head?

01:46:04  18  A.  No.  This --

01:46:10  19       MR. ORMAN:  Objection.

01:46:12  20       THE COURT:  Sustained.

01:46:12  21       MR. HAMMERMAN:  You have to wait until I ask you a

01:46:14  22  question, Mr. Qasim.

01:46:16  23  BY MR. HAMMERMAN:

01:46:16  24  Q.  I want to now refer you to the carotid Doppler exam.  If I

01:46:24  25  can, Mr. Qasim, I want to grab the original from you for this.

01:46:28    1       Have you reviewed the tech sheet that you did for
01:46:30    2   this carotid Doppler examination?
01:46:36    3   A.  Yes.
01:46:36    4   Q.  Are there any inconsistencies between this tech sheet and
01:46:40    5   your report?  And you reviewed this previously, correct?
01:46:42    6   A.  Yes, I have.
01:46:44    7   Q.  Are there any inconsistencies between the two?
01:46:46    8       MR. ORMAN:  Object to the relevance on this, too.
01:46:48    9       THE COURT:  Sustained.
01:46:48   10   BY MR. HAMMERMAN:
01:46:48   11   Q.  Let me ask you this, Mr. Qasim.  I just want to show you
01:46:52   12   your section here.  This is your tech sheet, right, this is
01:46:56   13   the exam you filled out for Ms. Tiffany Shirley-Terrell?
01:47:02   14   A.  Yes.
01:47:02   15   Q.  Is that all of your handwriting?
01:47:04   16   A.  No.
01:47:04   17   Q.  What part is not your handwriting?
01:47:06   18   A.  Towards the bottom where it says RT CCA as well as --
01:47:16   19   Q.  That section here?
01:47:18   20   A.  Yes, that's not my writing.
01:47:20   21   Q.  Is that also different here for the LT ECA?
01:47:24   22   A.  Yes.
01:47:24   23   Q.  You can see that there is a handwriting or the original
01:47:28   24   there says WNL.  What does that stand for?
01:47:32   25       MR. ORMAN:  Object to relevancy, your Honor.

| | | |
|---|---|---|
| 01:47:34 | 1 | THE COURT: Sustained. |
| 01:47:36 | 2 | BY MR. HAMMERMAN: |
| 01:47:36 | 3 | Q. Is that your handwriting that replaced or put in the |
| 01:47:40 | 4 | values there in pencil? |
| 01:47:40 | 5 | A. No. |
| 01:47:40 | 6 | Q. Did you take those measurements of Ms. Tiffany |
| 01:47:44 | 7 | Shirley-Terrell? |
| 01:47:46 | 8 | A. No. |
| 01:47:46 | 9 | Q. How do you know that? |
| 01:47:46 | 10 | A. I would have recorded it on the tech sheet. |
| 01:47:50 | 11 | Q. Did you record them? |
| 01:47:52 | 12 | A. No. |
| 01:47:52 | 13 | Q. Did they end up in the final report, however? |
| 01:47:58 | 14 | A. Can you put the final report up? I believe they did. |
| 01:48:00 | 15 | Q. Absolutely. |
| 01:48:02 | 16 | Do you see them there? |
| 01:48:04 | 17 | A. Yes. |
| 01:48:04 | 18 | Q. Do you see those recordings for those two figures that you |
| 01:48:10 | 19 | did not record in your examination? |
| 01:48:12 | 20 | A. Yes. |
| 01:48:12 | 21 | Q. The right ECA and left ECA, was that data obtained during |
| 01:48:24 | 22 | your examination of Ms. Tiffany Shirley-Terrell? |
| 01:48:32 | 23 | A. No. |
| 01:48:32 | 24 | Q. Mr. Qasim, I am going to hand you what's been marked as |
| 01:48:52 | 25 | Government Exhibit 620. Have you seen this exhibit before, |

01:48:54   1   sir?

01:48:54   2   A. Yes.

01:48:54   3   Q. What is this exhibit?

01:48:56   4   A. These are the logs that the ultrasound techs would fill

01:49:02   5   out for the patients that we saw and what exams we performed

01:49:06   6   for them.

01:49:06   7   Q. First of all, let's start with what you mean by logs.

01:49:08   8   What do you mean the logs that we filled out?

01:49:10   9   A. Just a form with their name, and we would check off what

01:49:18  10   exam.

01:49:18  11   Q. What information is contained within these logs?

01:49:22  12   A. Name and list of procedures.

01:49:24  13   Q. How were they filled out, what kind of regularity?

01:49:26  14   A. Every day that ultrasounds were performed.

01:49:30  15   Q. Who would fill out these logs?

01:49:32  16   A. Myself and Mr. Baig.

01:49:34  17   Q. Is this something that you did as a normal part of your

01:49:38  18   job?

01:49:38  19   A. Yes. It wasn't from day one, but a couple of months into

01:49:42  20   it, it was.

01:49:42  21   Q. Did you fill out these particular charts at or about the

01:49:58  22   time you saw the patients?

01:50:00  23   A. Yes.

01:50:00  24   Q. Does the information that is reflected in the charts

01:50:02  25   reflect the patient that you saw?

01:50:04  1  A.  Yes.

01:50:04  2  Q.  Does it reflect the procedures that you performed?

01:50:06  3  A.  Yes.

01:50:06  4  Q.  Were these records maintained in the Cottage Grove

01:50:14  5  Community Medical Clinic?

01:50:14  6  A.  Yes.

01:50:14  7  Q.  Where?

01:50:14  8  A.  In the ultrasound room.

01:50:14  9  Q.  Were they maintained on a daily basis?

01:50:16  10  A.  Yes.

01:50:16  11  Q.  Were the logs maintained?

01:50:18  12  A.  Yes.

01:50:18  13  Q.  Was it maintained in the ordinary course of your

01:50:20  14  employment at the Cottage Grove Community Medical Clinic?

01:50:22  15       MR. HAMMERMAN:  Your Honor, at this point in time,

01:50:24  16  the government would seek to move what's been marked as

01:50:26  17  Government Exhibit 620.

01:50:28  18       THE COURT:  Any objection?

01:50:30  19       MR. ORMAN:  Yes, to the extent that this witness did

01:50:32  20  not fill out any of these pages.

01:50:34  21       THE COURT:  All right.  I will hear argument later on

01:50:36  22  Government Exhibit 620.

01:50:40  23  BY MR. HAMMERMAN:

01:50:46  24  Q.  Looking through this particular exhibit -- do you have it

01:50:52  25  in front of you?  What is reflected -- let's just go to page 2

01:51:02   1   of the exhibit.

01:51:02   2   A.   Page 2?

01:51:04   3   Q.   Yes.

01:51:04   4   A.   Okay.

01:51:04   5   Q.   What's reflected on that page?  Is there patient names?

01:51:12   6   A.   Date, patient names, studies performed.

01:51:16   7   Q.   How would you mark what studies you performed?

01:51:20   8        MR. ORMAN:  Objection, your Honor.  He's got to

01:51:22   9   establish that did he this.

01:51:24   10        MR. HAMMERMAN:  I am happy to do that, your Honor.

01:51:26   11        THE COURT:  All right.

01:51:28   12   BY MR. HAMMERMAN:

01:51:28   13   Q.   Mr. Qasim, looking at page 2, do you see the first patient

01:51:32   14   name there?

01:51:32   15   A.   Yes.

01:51:32   16   Q.   I will give you initials so as not to read it into the

01:51:36   17   record.  DM, do you see that?

01:51:36   18   A.   Yes.

01:51:36   19   Q.   First of all, do you recognize the handwriting for all the

01:51:40   20   names that are listed on the left-hand side of the procedure

01:51:42   21   log?

01:51:42   22   A.   Yes.

01:51:42   23   Q.   Whose handwriting is that?

01:51:42   24   A.   That's my handwriting.

01:51:44   25   Q.   Do you see all the Xs that are underneath all the

01:51:46  1  different kinds of exams that were performed on that day?

01:51:50  2  A.  Yes.

01:51:50  3  Q.  Do you recognize who made those Xs?

01:51:52  4  A.  Yes.

01:51:52  5  Q.  Who made the Xs?

01:51:52  6  A.  I did.

01:51:54  7  Q.  How many patients were seen in the ultrasound room that

01:52:02  8  day by you, sir?

01:52:04  9  A.  11.

01:52:06  10  Q.  Of those 11 patients, how many of them got a carotid

01:52:10  11  Doppler examination on that day?

01:52:12  12  A.  Six.

01:52:16  13  Q.  And what day is this?

01:52:16  14  A.  January 13th, 2009.

01:52:20  15  Q.  Six people out of the 11 got a carotid Doppler?

01:52:24  16  A.  Yes.

01:52:24  17  Q.  How many of those same people also got an echocardiogram?

01:52:26  18  A.  All six.

01:52:30  19  Q.  Did people other than those getting the carotid Dopplers

01:52:36  20  also get echocardiograms, were there additional

01:52:40  21  echocardiograms done?

01:52:40  22  A.  Yes.

01:52:40  23  Q.  How many people also got echocardiograms?

01:52:44  24  A.  Two.

01:52:44  25  Q.  So is that a total of eight people that got

682

| 01:52:48 | 1 | echocardiograms that day? |
| 01:52:50 | 2 | A.  Yes. |
| 01:52:50 | 3 | Q.  Did people receive other tests on those days? |
| 01:52:52 | 4 | A.  Yes. |
| 01:52:52 | 5 | Q.  What other tests did you perform on that day? |
| 01:52:58 | 6 | A.  Two arterial Dopplers for the legs, one abdomen, and one |
| 01:53:04 | 7 | thyroid. |
| 01:53:04 | 8 | Q.  18 tests you did that day? |
| 01:53:12 | 9 | THE COURT:  Now you're referring to Government |
| 01:53:16 | 10 | Exhibit 620? |
| 01:53:18 | 11 | MR. HAMMERMAN:  Yes, your Honor. |
| 01:53:18 | 12 | THE COURT:  What page? |
| 01:53:20 | 13 | MR. HAMMERMAN:  Page 2. |
| 01:53:28 | 14 | May I continue, your Honor? |
| 01:53:30 | 15 | THE COURT:  Yes. |
| 01:53:30 | 16 | BY MR. HAMMERMAN: |
| 01:53:30 | 17 | Q.  Go back to page 1, Mr. Qasim.  Do you recognize the |
| 01:53:34 | 18 | handwriting on page 1? |
| 01:53:34 | 19 | A.  Yes. |
| 01:53:36 | 20 | Q.  Whose handwriting is it? |
| 01:53:38 | 21 | A.  Mine. |
| 01:53:38 | 22 | Q.  Do you recognize all the checks that were put on that |
| 01:53:42 | 23 | procedure log for that day? |
| 01:53:42 | 24 | A.  Yes. |
| 01:53:44 | 25 | Q.  Who wrote the checks? |

01:53:46  1   A.  The Xs, I did.

01:53:48  2   Q.  The Xs, I apologize.

01:53:50  3        Did you write all those Xs?

01:53:52  4   A.  Yes.

01:53:52  5   Q.  How many patients were seen in the ultrasound examination

01:53:58  6   room on January 14th, 2008?

01:54:00  7   A.  Seven.

01:54:02  8   Q.  How many of those seven patients got carotid Dopplers?

01:54:12  9   A.  Six.

01:54:12  10  Q.  How many of those patients also got echocardiograms?

01:54:14  11  A.  Four.

01:54:16  12  Q.  Were any other tests performed that day?

01:54:18  13  A.  Yes, three abdominal ultrasounds.

01:54:22  14  Q.  How many patients got carotid Dopplers, echocardiograms,

01:54:26  15  abdominal ultrasounds all at the same time on that same day?

01:54:28  16  A.  Two.

01:54:30  17  Q.  Mr. Qasim, can you go forward to January 13th, 2009.

01:54:48  18  Actually, I think I already asked you about that.  I

01:54:52  19  apologize.

01:54:52  20        January 27th of 2009, do you see that page?

01:55:00  21  A.  Yes.

01:55:00  22  Q.  Do you recognize the handwriting?

01:55:00  23  A.  It's mine.

01:55:02  24  Q.  Do you recognize the Xs in the boxes?

01:55:06  25  A.  Yes.

01:55:06  1    Q.  Who did that?

01:55:08  2    A.  I did.

01:55:08  3    Q.  Did you write down the names of patients when they came to

01:55:12  4    be seen in the ultrasound tech examination room that day?

01:55:14  5    A.  Yes.

01:55:16  6    Q.  Did you do so as one after the other came in?

01:55:18  7    A.  Yes.

01:55:18  8    Q.  How did you decide what boxes to check on that log that

01:55:24  9    day?

01:55:24  10   A.  Based on what tests were ordered in the charts.

01:55:26  11   Q.  Did you perform all the tests that were reflected on this

01:55:30  12   procedure log?

01:55:30  13   A.  Yes.

01:55:30  14   Q.  How many patients received a carotid Doppler -- first of

01:55:32  15   all, how many patients came in on that day, into the

01:55:36  16   ultrasound tech examination room?

01:55:38  17   A.  Nine.

01:55:40  18   Q.  How many of those nine people received a carotid Doppler?

01:55:42  19   A.  Six.

01:55:46  20   Q.  And how many of those six patients also received an

01:55:50  21   echocardiogram?

01:55:50  22   A.  All six.

01:55:54  23   Q.  Did additional patients also get echocardiograms that

01:55:56  24   didn't get carotid dopplers?

01:55:58  25   A.  Yes.

01:55:58    1    Q.  Did you do any other forms of ultrasounds on that day?

01:56:02    2    A.  Yes, five abdominal ultrasounds.

01:56:06    3    Q.  Did you do any arterial legs that day?

01:56:12    4    A.  One arterial.

01:56:14    5    Q.  How many people got carotid Dopplers, echocardiograms, and

01:56:16    6    abdominal ultrasounds all on the same day of January 27th,

01:56:20    7    2009?

01:56:20    8    A.  Three.

01:56:22    9    Q.  If you go to February 10th of 2009, do you recognize the

01:56:36   10    handwriting?

01:56:36   11    A.  It's my handwriting.

01:56:40   12    Q.  Do you recognize the checks or the marks that are in those

01:56:42   13    boxes?

01:56:42   14    A.  Yes, I did that.

01:56:44   15    Q.  Did you fill out this form?

01:56:44   16    A.  Yes.

01:56:46   17    Q.  Did you fill out the name -- how did you fill out the

01:56:50   18    names?

01:56:50   19    A.  Before I started the study, I would write their name down

01:56:54   20    and the procedure.

01:56:58   21    Q.  When you say "their name down," whose name?

01:57:00   22    A.  The patient.

01:57:00   23    Q.  The checks or the marks, the Xs, that are in all the

01:57:02   24    boxes, what do those reflect, Mr. Qasim?

01:57:06   25    A.  The exams performed on them.

01:57:06  1   Q.  How many people were seen in the ultrasound tech's exam

01:57:12  2   room on that day?

01:57:14  3   A.  Ten.

01:57:16  4   Q.  And how many of those ten people got carotid Dopplers?

01:57:20  5   A.  Six.

01:57:24  6   Q.  How many of those six people also got echocardiograms?

01:57:30  7   A.  Six.

01:57:32  8   Q.  Did you do additional echocardiograms that day?

01:57:34  9   A.  Yes.

01:57:36  10  Q.  Did you do arterial leg ultrasounds that day?

01:57:40  11  A.  Yes.

01:57:40  12  Q.  Do you have patients that received an echocardiogram, an

01:57:44  13  abdominal, and a pelvic ultrasound all on the same day?

01:57:48  14  A.  Yes.

01:57:50  15  Q.  Turn to March 4th of 2009.  Do you see it?

01:58:06  16  A.  Yes.

01:58:08  17  Q.  How many patients were seen that day?

01:58:08  18  A.  Eight.

01:58:12  19  Q.  Who saw those patients?

01:58:14  20  A.  I did.

01:58:16  21  Q.  How do you know you saw the patients?

01:58:18  22  A.  This is in my handwriting.

01:58:22  23  Q.  How many people got carotids that day?

01:58:32  24  A.  All eight.

01:58:32  25  Q.  How many of the people that got carotids also got

01:58:34  1  echocardiograms?

01:58:36  2  A.  Seven.

01:58:36  3  Q.  Can you turn to January 11th of 2009.  I'm sorry.  I meant

01:58:42  4  February 11th of 2009.  Do you see that date?

01:58:46  5  A.  Let me look.  Yes.

01:58:48  6  Q.  Now, there were less patients seen in the ultrasound

01:58:56  7  tech's examination room that day; is that correct?

01:58:58  8  A.  Yes.

01:58:58  9  Q.  How many people were seen that day?

01:59:02  10  A.  Three.

01:59:04  11  Q.  Were there days in which you performed ultrasounds at the

01:59:08  12  Cottage Grove Community Medical Clinic in which you saw less

01:59:10  13  patients?

01:59:12  14  A.  Yes.

01:59:12  15  Q.  What days of the week were those generally when you saw

01:59:14  16  less patients?

01:59:14  17  A.  On Wednesdays.

01:59:16  18  Q.  Why would you see less patients on Wednesdays?

01:59:18  19  A.  Dr. Joshi would be seeing Dr. Chhibber's patients on the

01:59:24  20  south side.

01:59:24  21  Q.  Do you know if February 11th of 2009 was a Wednesday?

01:59:26  22  A.  I don't know for certain.  I don't have a calendar.

01:59:30  23  Q.  Would a calendar help you?

01:59:34  24  A.  Sure.

01:59:36  25  Q.  I am going to --

01:59:38  1    MR. ORMAN:  Stipulated, your Honor.

01:59:40  2    THE COURT:  All right.

01:59:40  3    MR. HAMMERMAN:  Stipulating that that's a Wednesday,

01:59:42  4  great.

01:59:42  5    THE COURT:  Stipulated means that there's no dispute.

01:59:46  6  BY MR. HAMMERMAN:

01:59:54  7  Q.  You could go to St. Patrick's day, March 17th, 2009.  Do

02:00:10  8  you see the procedure log for that day, Mr. Qasim?

02:00:12  9  A.  Yes.

02:00:12  10 Q.  Is that your handwriting?

02:00:14  11 A.  No.

02:00:14  12 Q.  Do you recognize the handwriting?

02:00:16  13 A.  Yes.

02:00:16  14 Q.  How do you recognize the handwriting?

02:00:18  15 A.  That's Mr. Baig's handwriting.

02:00:18  16 Q.  How do you recognize his handwriting?

02:00:20  17 A.  I have seen it many, many times.

02:00:22  18 Q.  Were the procedure logs to be maintained only by you or

02:00:26  19 any ultrasound tech that was working at the Cottage Grove

02:00:30  20 Community Medical Clinic?

02:00:32  21 A.  Yes.

02:00:32  22 Q.  Who was supposed to maintain this, both you and Mr. Baig,

02:00:36  23 or just you?

02:00:38  24 A.  The ultrasound tech working that day.

02:00:40  25 Q.  Did Mr. Baig mark the tests that he did differently than

02:00:44   1   you?

02:00:44   2         MR. ORMAN:  Objection.  Foundation, your Honor.

02:00:46   3         THE COURT:  Sustained.

02:00:46   4   BY MR. HAMMERMAN:

02:00:48   5   Q.  Would you review the procedure logs that were done by

02:00:52   6   Mr. Baig?

02:00:52   7   A.  Sometimes.

02:00:54   8   Q.  Have you reviewed them in the past?

02:00:56   9   A.  Yes.

02:00:56   10  Q.  Do you recognize how Mr. Baig would check the procedures

02:01:00   11  he did?

02:01:00   12  A.  Yes.

02:01:00   13  Q.  Was there a protocol on how you were to mark on these

02:01:04   14  forms what tests were done?

02:01:06   15  A.  Yes.

02:01:06   16  Q.  How were you supposed to mark the tests done as an

02:01:10   17  ultrasound tech working at the Cottage Grove Community Medical

02:01:14   18  Clinic?

02:01:14   19  A.  Mark the name, and in the same row, check off what exam

02:01:20   20  was performed.

02:01:20   21  Q.  Can you tell by looking at the procedure log tell the

02:01:24   22  members of the jury how many different procedures were done on

02:01:26   23  March 17th of 2009?

02:01:28   24  A.  18 procedures total.

02:01:36   25  Q.  How many carotids were done that day by the echo tech

02:01:42  1  working at the Cottage Grove Community Health Clinic?

02:01:44  2  A.  Eight.

02:01:46  3  Q.  How many of those eight people also got echocardiograms?

02:01:48  4  A.  All eight.

02:01:52  5  Q.  Were there other tests done that day?

02:01:54  6  A.  Two abdomens and a thyroid.

02:01:58  7  Q.  Are they marked by these various check marks that you see?

02:02:02  8  A.  Yes.

02:02:02  9  Q.  Do you recognize those as being Mr. Baig's check marks?

02:02:04  10  A.  Yes.

02:02:06  11  Q.  Mr. Qasim, March 20, it's a pretty thick exam -- thick

02:02:16  12  exhibit, I should say.

02:02:18  13  A.  Yes.

02:02:18  14  Q.  And every page, is that reflective of the exams that were

02:02:24  15  done on that day?

02:02:24  16  A.  Yes.

02:02:24  17  Q.  Do you recognize the handwriting throughout Government

02:02:26  18  Exhibit 620?

02:02:28  19  A.  Yes.

02:02:28  20  Q.  Are these either forms that you filled out or Mr. Baig

02:02:32  21  filled out?

02:02:32  22  A.  Yes.

02:02:32  23  Q.  Were these forms that were kept at the Cottage Grove

02:02:38  24  Community Health Clinic in the ordinary course of business?

02:02:38  25  A.  Yes.

02:02:38  1  Q.  Were they filled out at or about the time the patients

02:02:42  2  were seen?

02:02:44  3  A.  Yes.

02:02:44  4  Q.  If you look at those procedure logs, they have the names

02:02:52  5  of various tests, some of which we talked about in the last

02:02:56  6  10, 15 minutes, echocardiograms, carotid Dopplers.  Do you

02:03:00  7  also see tests like PFTs and EKGs?

02:03:08  8  A.  Yes.

02:03:08  9  Q.  Are there any checks underneath those boxes?

02:03:12  10  A.  No.

02:03:12  11  Q.  Why not?

02:03:12  12  A.  The medical assistants did those studies, and us

02:03:16  13  ultrasound techs just marked off what ultrasounds we did.

02:03:20  14  Q.  Even though there are other types of tests listed in these

02:03:22  15  procedure logs, were these procedure logs solely to record

02:03:28  16  ultrasounds?

02:03:28  17  A.  Yes.

02:03:28  18  Q.  Is that what you recorded in here?

02:03:30  19  A.  Yes.

02:03:30  20  Q.  There are a number of days where you see the little X

02:03:34  21  marks that you have where there's -- for example, if you go to

02:03:40  22  July 22nd, 2009, do you see it?

02:04:00  23  A.  July 22nd, 2009?

02:04:02  24  Q.  Yes.

02:04:02  25  A.  Yes.

| | | |
|---|---|---|
| 02:04:04 | 1 | Q. How many total patients were seen that day? |
| 02:04:06 | 2 | A. Three patients. |
| 02:04:08 | 3 | Q. How many total exams were done on those three patients? |
| 02:04:10 | 4 | A. Three tests. |
| 02:04:12 | 5 | Q. So three total tests were done that day? |
| 02:04:14 | 6 | A. Yes. |
| 02:04:14 | 7 | Q. Do you know whether July 22nd, 2009, what day of the week |
| 02:04:18 | 8 | that was? |
| 02:04:20 | 9 | A. Wednesday. |
| 02:04:20 | 10 | Q. Did Dr. Chhibber work on Wednesdays? |
| 02:04:34 | 11 | A. Not at the south side clinic. |
| 02:04:38 | 12 | MR. HAMMERMAN: May I have one moment, your Honor? |
| 02:04:40 | 13 | THE COURT: Yes. |
| 02:04:54 | 14 | MR. HAMMERMAN: Your Honor, based on the additional |
| 02:04:56 | 15 | testimony, the government would move to admit Government |
| 02:05:00 | 16 | Exhibit 620. |
| 02:05:00 | 17 | THE COURT: Denied. Reserved. |
| 02:05:02 | 18 | MR. HAMMERMAN: Then I have no further questions at |
| 02:05:02 | 19 | this time. |
| 02:05:06 | 20 | THE COURT: Cross-examination. |
| 02:05:06 | 21 | - - - |
| 02:05:06 | 22 | FAHAD QASIM, CROSS-EXAMINATION |
| 02:05:06 | 23 | BY MR. ORMAN: |
| 02:05:26 | 24 | Q. Mr. Qasim, do you have this stack of documents that you've |
| 02:05:34 | 25 | just testified to in front of you? |

| 02:05:36 | 1 | A. Yes. |

02:05:36  1  A.  Yes.

02:05:36  2  Q.  That's Government's Exhibit 620?

02:05:42  3  A.  Yes.

02:05:42  4  Q.  Look at the first page.

02:05:44  5  A.  Okay.

02:05:46  6  Q.  Now, you see a circle around one particular X that you

02:05:52  7  made?

02:05:52  8  A.  Yes.

02:05:54  9  Q.  Do you know what that means?

02:05:56  10  A.  I don't remember.

02:05:58  11  Q.  That means the test was free --

02:06:02  12       MR. HAMMERMAN:  Objection, your Honor.  Mr. Orman is

02:06:04  13  testifying.

02:06:04  14       MR. ORMAN:  Can I finish the question, your Honor?

02:06:06  15       THE COURT:  Yes, you may finish the question.

02:06:08  16  BY MR. ORMAN:

02:06:08  17  Q.  You understand that that circle means that the test was

02:06:10  18  free; isn't that right?

02:06:12  19  A.  I never heard that before.

02:06:16  20  Q.  And if you will look at the next page in this log, you see

02:06:22  21  circles around the Xs that you made, true?

02:06:24  22  A.  I do see those circles.

02:06:28  23  Q.  And you don't know what those mean?

02:06:32  24  A.  These weren't here originally, no.

02:06:34  25  Q.  And there are circles on almost every page as you go

02:06:42  1  through these documents; is that true?

02:06:46  2  A.  Yes.

02:06:48  3  Q.  And you have no idea what those circles mean?

02:06:52  4  A.  The entire time I was there, I never saw the circles nor

02:06:56  5  the checks or the Xs on the side, so these were done at some

02:07:02  6  point afterwards.

02:07:02  7  Q.  Just bear with me for a second.  I have a lot of paper in

02:07:08  8  front of me.

02:07:10  9      Now, on the days that you did these tests -- let me

02:07:22  10  strike that, if I may, your Honor.

02:07:24  11      Go to the first page of the group.  How many patients

02:07:28  12  were in the clinic that day?

02:07:30  13  A.  I don't know.

02:07:32  14  Q.  It could be 20?

02:07:34  15  A.  Sure.

02:07:34  16  Q.  It could be 30?

02:07:36  17  A.  Sure.

02:07:36  18      MR. HAMMERMAN:  Objection.  Calls for speculation.

02:07:38  19  The witness already said he doesn't know.

02:07:40  20      THE COURT:  Overruled.

02:07:40  21  BY MR. ORMAN:

02:07:42  22  Q.  And as a matter of fact, with regard to every single day

02:07:46  23  referenced in these exhibits, you have no idea how many

02:07:52  24  patients were present on each particular day?

02:07:56  25  A.  Not on those specific days.

02:07:56  1   Q.  And it's fair to say that patients came to the clinic who

02:08:04  2   did not get tests on any given day; is that true?

02:08:08  3   A.  Yes.

02:08:08  4   Q.  Didn't get carotid Dopplers, true?

02:08:12  5   A.  True.

02:08:14  6   Q.  Didn't get echocardiograms; is that true?

02:08:18  7   A.  Sure.

02:08:20  8   Q.  Could you go to the date March 27, '09, in Government's

02:08:36  9   Exhibit 620.  Tell me when you're there.

02:08:38  10  A.  March 27, 2009.

02:08:44  11  Q.  Are you there?

02:08:48  12  A.  I'm here, yeah.

02:08:48  13  Q.  All right.  You see the big circle on the document?

02:08:52  14  A.  Yes.

02:08:54  15  Q.  And do you see the notation, Not billed?

02:08:56  16  A.  I see it.

02:08:58  17  Q.  And if you turn to the next page, March 31st, '09, do you

02:09:04  18  see circles on that page as well?

02:09:06  19  A.  Yes.

02:09:06  20  Q.  And you see the notation, Patient not billed?

02:09:10  21  A.  Yes.

02:09:12  22  Q.  You don't know which of these patients were billed or not

02:09:20  23  billed, do you?

02:09:20  24  A.  This log is only for exams performed, not for billing.

02:09:26  25  Q.  Let me try again.

| | | |
|---|---|---|
| 02:09:28 | 1 | A. Sure. |
| 02:09:28 | 2 | Q. You have no idea which patients were billed or not billed, |
| 02:09:32 | 3 | true? |
| 02:09:32 | 4 | A. True. |
| 02:09:32 | 5 | Q. And of all those patients, you didn't examine any of them? |
| 02:09:44 | 6 | A. The ones in my handwriting. |
| 02:09:46 | 7 | Q. Medically examine them as a doctor? |
| 02:09:48 | 8 | A. No, I didn't. |
| 02:09:50 | 9 | Q. So you would have no idea of how they appeared? |
| 02:09:56 | 10 | A. Other than the symptoms and our conversation, no. |
| 02:10:00 | 11 | Q. Let's talk about your lawsuit. How much money do you |
| 02:10:12 | 12 | want? |
| 02:10:12 | 13 | A. I don't want any money, but if -- |
| 02:10:18 | 14 | Q. You filed a lawsuit. |
| 02:10:18 | 15 | A. Can I finish? |
| 02:10:20 | 16 | Q. I'm sorry. Let me re-ask the question. |
| 02:10:22 | 17 | You filed a lawsuit for money, true? |
| 02:10:24 | 18 | A. True. |
| 02:10:24 | 19 | Q. How much do you want in that lawsuit? |
| 02:10:28 | 20 | A. I don't have a desire for any money. When I reported |
| 02:10:36 | 21 | Dr. Chhibber, I had no desire. I don't have any expectations. |
| 02:10:42 | 22 | I am not expecting anything. |
| 02:10:42 | 23 | Q. Is it your testimony that you will decline any money that |
| 02:10:48 | 24 | a jury awards you in that case? |
| 02:10:50 | 25 | A. No. I don't have any expectations of any money even |

| | | |
|---|---|---|
| 02:10:56 | 1 | though I am filing a lawsuit. |
| 02:10:58 | 2 | MR. ORMAN: Move to strike, your Honor. |
| 02:11:00 | 3 | THE COURT: Sustained. The statement is stricken. |
| 02:11:02 | 4 | BY MR. ORMAN: |
| 02:11:04 | 5 | Q. Do you want $500,000 in that lawsuit? |
| 02:11:06 | 6 | A. If that's what I'm entitled to, then sure. |
| 02:11:10 | 7 | Q. How much are you entitled to? |
| 02:11:12 | 8 | A. I don't know. |
| 02:11:12 | 9 | Q. Give me a number. |
| 02:11:16 | 10 | MR. HAMMERMAN: Objection. Argumentative. |
| 02:11:16 | 11 | THE COURT: Sustained. |
| 02:11:20 | 12 | BY MR. ORMAN: |
| 02:11:22 | 13 | Q. Where is -- let me strike that, your Honor. |
| 02:11:24 | 14 | Did you talk to the government this weekend? |
| 02:11:28 | 15 | A. Yes. |
| 02:11:28 | 16 | Q. Did you tell them that if Dr. Chhibber was found not |
| 02:11:34 | 17 | guilty, you would not recover in your lawsuit? |
| 02:11:40 | 18 | A. That's my understanding, yes. |
| 02:11:42 | 19 | Q. So it's important to you that Dr. Chhibber is found |
| 02:11:48 | 20 | guilty, true? |
| 02:11:50 | 21 | A. For the purposes of justice, not for capital gain, yes. |
| 02:11:58 | 22 | Q. For justice? |
| 02:12:00 | 23 | A. Yes. |
| 02:12:00 | 24 | Q. So are you waiving today any claim you have for money -- |
| 02:12:06 | 25 | A. I am not. |

02:12:06  1  Q.  -- in the qui tam lawsuit because of justice?

02:12:10  2  A.  I am not.

02:12:10  3         MR. HAMMERMAN:  Objection.  Asked and answered.

02:12:12  4         THE COURT:  He's answered.

02:12:14  5  BY MR. ORMAN:

02:12:16  6  Q.  Do you have an address for Wesleyan Hospital?

02:12:22  7  A.  No.

02:12:22  8  Q.  Ever heard of Wesleyan Hospital?

02:12:24  9  A.  Yes.

02:12:24  10  Q.  You worked there, didn't you?

02:12:26  11  A.  No.

02:12:28  12  Q.  You first decided that you were going to file a qui tam

02:12:40  13  lawsuit back in March of 2009, true?

02:12:44  14  A.  I did not become aware of the whistleblower laws until

02:12:58  15  very close to his conviction, so I think it was actually the

02:13:06  16  end of 2010.

02:13:06  17  Q.  Well, in March of the year 2009, and I want to do this

02:13:14  18  chronologically, you went on the Blue Cross website, and you

02:13:22  19  filled out a complaint against Dr. Chhibber?

02:13:24  20  A.  Yes.

02:13:24  21  Q.  I am going to hand you what I have marked as Defendant's

02:13:36  22  Exhibit 142.  Now, do you recognize Exhibit 142?

02:13:52  23  A.  Yes.

02:13:56  24  Q.  This is what the technical people call a screen shot?  Do

02:14:04  25  you know what that is?

02:14:04  1    A.  A screen shot?

02:14:06  2    Q.  Screen, s-c-r-e-e-n, shot.

02:14:10  3    A.  I know what a screen shot is, yes.

02:14:14  4    Q.  And this is a screen shot?

02:14:14  5    A.  It looks like a report.  If you want to call it a screen

02:14:18  6    shot, yes.

02:14:18  7    Q.  Is this a true and accurate copy of the website from Blue

02:14:26  8    Cross/Blue Shield?

02:14:26  9    A.  It looks like it.

02:14:28  10           MR. HAMMERMAN:  Objection.  Foundation.

02:14:30  11   BY MR. ORMAN:

02:14:30  12   Q.  That you filled out?

02:14:32  13           THE COURT:  Overruled.

02:14:32  14           THE WITNESS:  It looks like it.

02:14:34  15   BY MR. ORMAN:

02:14:34  16   Q.  And Exhibit -- Defendant's Exhibit 142 is a true and

02:14:40  17   correct copy of the complaint you first filed with Blue

02:14:46  18   Cross/Blue Shield in March of 2009; is that correct?

02:14:50  19   A.  Yes.

02:14:50  20   Q.  By April of 2009, nothing was happening with regard to

02:14:56  21   your complaint, true?

02:14:58  22   A.  I don't remember the exact date.  I was contacted by Blue

02:15:08  23   Cross, but it was shortly thereafter.

02:15:12  24   Q.  As a matter of fact, nothing was happening with regard to

02:15:14  25   your complaint all the way up to July of 2009; is that

700

02:15:24  1  correct?

02:15:24  2  A.  That sounds correct.

02:15:26  3  Q.  So what you did was you went on the Blue Cross website and

02:15:32  4  filed a complaint under someone else's name, true?

02:15:36  5  A.  Yes.

02:15:38  6  Q.  You used -- you falsified Dena Hopkins' name on a

02:15:44  7  complaint to Blue Cross, correct?

02:15:46  8  A.  Yes, I did.  Yes.

02:15:46  9  Q.  Let me hand you Exhibit 143, defendant's exhibit.  Is

02:16:00  10  Defendant's Exhibit 143 a true and correct copy of your

02:16:06  11  falsified complaint to Blue Cross using Dena Hopkins' name?

02:16:10  12  A.  Yes.

02:16:10  13  Q.  And you filed that complaint because things weren't going

02:16:22  14  fast enough for you.  You wanted an investigation, and you

02:16:26  15  wanted Blue Cross to do it, true?

02:16:28  16  A.  I would have liked to see that, yes.

02:16:30  17  Q.  That's why you lied to Blue Cross, yes?

02:16:34  18  A.  I don't consider myself a liar, but I did want them to

02:16:42  19  contact Dena Hopkins.

02:16:44  20  Q.  Well, on August 13th of 2009, an investigator from Blue

02:17:06  21  Cross came out to talk to you; is that correct?

02:17:08  22  A.  I believe I only spoke on the phone with Blue Cross.

02:17:14  23  Q.  Do you know the name Sandra Kendrick?

02:17:18  24  A.  Yes.

02:17:18  25  Q.  She was an investigator for Blue Cross?

| | | |
|---|---|---|
| 02:17:24 | 1 | A.  Yes. |
| 02:17:24 | 2 | Q.  And she talked to you about your complaint? |
| 02:17:30 | 3 | A.  Yes. |
| 02:17:30 | 4 | Q.  That was an interview? |
| 02:17:34 | 5 | A.  It was a conversation. |
| 02:17:38 | 6 | Q.  Phone? |
| 02:17:38 | 7 | A.  Yes. |
| 02:17:38 | 8 | Q.  And in that interview, you told Sandra Kendrick that you |
| 02:18:06 | 9 | work once a week for Wesleyan Hospital; is that correct? |
| 02:18:10 | 10 | A.  No. |
| 02:18:12 | 11 | Q.  She's wrong if she says that; is that your testimony? |
| 02:18:16 | 12 | A.  I worked with -- |
| 02:18:20 | 13 | Q.  Is that your testimony, sir? |
| 02:18:22 | 14 | A.  Yes.  She misunderstood something. |
| 02:18:26 | 15 | Q.  And you also told Sandra Kendrick that there was another |
| 02:18:34 | 16 | sonographer at the 79th Street clinic who is no longer |
| 02:18:40 | 17 | employed there?  You told her that? |
| 02:18:44 | 18 | A.  I don't remember that conversation. |
| 02:18:44 | 19 | Q.  A sonographer is someone like you? |
| 02:18:50 | 20 | A.  Right. |
| 02:18:50 | 21 | Q.  That's your title.  A sonographer reads echos.  If Sandra |
| 02:18:58 | 22 | Kendrick -- if you told Sandra Kendrick that there is no other |
| 02:19:04 | 23 | sonographer employed at the 79th Street clinic, that would be |
| 02:19:10 | 24 | wrong? |
| 02:19:12 | 25 | A.  That would be wrong.  Mr. Baig -- |

| | | |
|---|---|---|
| 02:19:16 | 1 | Q. Mohammed Baig worked there too. |
| 02:19:20 | 2 | Let me show you Sandra Kendrick's -- |
| 02:19:24 | 3 | MR. HAMMERMAN: Object, your Honor. I don't know if |
| 02:19:24 | 4 | that's a question. Once again, Mr. Orman is testifying. |
| 02:19:28 | 5 | THE COURT: Well, the objection is improper. |
| 02:19:36 | 6 | Overruled. |
| 02:19:36 | 7 | BY MR. ORMAN: |
| 02:19:36 | 8 | Q. Let me he show you Sandra Kendrick's report. Remember, |
| 02:19:40 | 9 | she is the person from Blue Cross who is going to do the |
| 02:19:44 | 10 | investigation. And that has been marked as Defendant's |
| 02:19:48 | 11 | Exhibit 35. Please take a look. |
| 02:20:00 | 12 | Could you look at the first full paragraph in the |
| 02:20:04 | 13 | second page of Sandra Kendrick's report with respect to her |
| 02:20:08 | 14 | interviewing you. Do you see where it says that there was |
| 02:20:16 | 15 | another sonographer who was also working at JRC Medical |
| 02:20:24 | 16 | Associates but is no longer employed by the center? Do you |
| 02:20:26 | 17 | see that? |
| 02:20:28 | 18 | A. Yes. |
| 02:20:28 | 19 | MR. HAMMERMAN: Objection. Hearsay. |
| 02:20:30 | 20 | THE COURT: Overruled. |
| 02:20:30 | 21 | BY MR. ORMAN: |
| 02:20:30 | 22 | Q. Now do you remember that you told that to Sandra Kendrick? |
| 02:20:34 | 23 | A. I know there was another ultrasound tech working there |
| 02:20:38 | 24 | before me who was no longer working there when I began, so I |
| 02:20:42 | 25 | may have been talking about that. |

02:20:44    1  Q.  Sir, do you remember telling that to Sandra Kendrick?

02:20:46    2  A.  I don't remember telling her this.  I don't remember our

02:20:50    3  conversation in its entirety.

02:20:52    4  Q.  If you go to the next paragraph, please take a look at it.

02:21:02    5  A.  Okay.

02:21:02    6  Q.  Do you see a reference to Wesleyan Hospital?

02:21:04    7  A.  This is in reference to Westlake Hospital.  She wrote this

02:21:10    8  wrong.

02:21:10    9  Q.  Oh, she wrote it wrong.  I see.

02:21:14   10      Well, did she --

02:21:14   11      MR. HAMMERMAN:  Objection, your Honor.

02:21:16   12      THE COURT:  All right.  No comments.

02:21:22   13  BY MR. ORMAN:

02:21:22   14  Q.  Did you tell Sandra Kendrick that Medicare had done an

02:21:26   15  audit on Dr. Chhibber's medical center?

02:21:30   16  A.  I may have.  I don't remember the conversation.

02:21:36   17  Q.  Please go to the last paragraph of Defendant's Exhibit 35.

02:21:44   18  A.  The same page, last paragraph?

02:21:46   19  Q.  Yes, page 2.

02:22:08   20  A.  Okay.

02:22:08   21  Q.  You told Sandra Kendrick that Medicare had already done an

02:22:16   22  audit on Dr. Chhibber's center.  You said that to her, didn't

02:22:22   23  you?

02:22:22   24  A.  Yes.

02:22:22   25      MR. HAMMERMAN:  Objection, your Honor.

704

| | | |
|---|---|---|
| 02:22:24 | 1 | THE COURT:  Overruled. |
| 02:22:24 | 2 | BY MR. ORMAN: |
| 02:22:26 | 3 | Q.  You lied when you said that; isn't that correct? |
| 02:22:30 | 4 | A.  What -- |
| 02:22:30 | 5 | Q.  Did you lie? |
| 02:22:32 | 6 | A.  No.  Whatever I said was something I heard.  I didn't say |
| 02:22:36 | 7 | that I was there for the audit myself. |
| 02:22:38 | 8 | Q.  Oh, somebody told you that there was an audit? |
| 02:22:42 | 9 | A.  Yes. |
| 02:22:42 | 10 | Q.  Who? |
| 02:22:44 | 11 | A.  I believe it was Mr. Baig. |
| 02:22:46 | 12 | Q.  Who? |
| 02:22:48 | 13 | A.  Mr. Baig. |
| 02:22:48 | 14 | Q.  Do you know? |
| 02:22:50 | 15 | A.  I believe it's Mr. Baig.  That's who I spoke to most. |
| 02:22:54 | 16 | Q.  You now know that there was no audit, no Medicare audit, |
| 02:23:00 | 17 | true? |
| 02:23:02 | 18 | A.  If you're telling me that there was no audit, then okay. |
| 02:23:04 | 19 | Q.  And -- |
| 02:23:10 | 20 | A.  I don't know.  I wasn't there. |
| 02:23:12 | 21 | Q.  -- you also told Sandra Kendrick from Blue Cross that |
| 02:23:18 | 22 | Dr. Chhibber took two or three days and doctored the patients' |
| 02:23:24 | 23 | files in preparation of this audit?  You told that to the |
| 02:23:26 | 24 | investigator from Blue Cross? |
| 02:23:30 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 02:23:30 | 1 | Q.  And that's not true either, is it, sir? |
| 02:23:34 | 2 | A.  I remember I had -- |
| 02:23:36 | 3 | Q.  Is it true?  That's all I want to know. |
| 02:23:40 | 4 | A.  Well, if you are saying there is no audit, then it must |
| 02:23:44 | 5 | not be true.  But what I remember is that one day the clinic |
| 02:23:46 | 6 | was closed, a few weeks later, Mr. Baig, and maybe the nurses, |
| 02:23:50 | 7 | said they were going through all the charts -- yeah, Tyanna, |
| 02:23:54 | 8 | one of the nurses, they said they closed the clinic down and |
| 02:23:58 | 9 | went through the charts and made sure everything was okay for |
| 02:24:00 | 10 | an audit.  Now, whether that audit came or not, I don't know, |
| 02:24:04 | 11 | but I know there was some prep with the charts. |
| 02:24:06 | 12 | Q.  So you don't know personally whether anything you told |
| 02:24:10 | 13 | Sandra Kendrick was true; is that correct? |
| 02:24:14 | 14 | A.  Not anything.  There's certain things I saw myself and |
| 02:24:20 | 15 | other things that I heard.  I conveyed both of those to her. |
| 02:24:24 | 16 | Q.  Let's go to the last page of Defendant's Exhibit 35. |
| 02:24:38 | 17 | Sandra Kendrick came back and she talked to you on August 21st |
| 02:24:44 | 18 | of 2009, true? |
| 02:24:46 | 19 | A.  If it's on record, then she must have, yeah.  I don't |
| 02:24:52 | 20 | remember the exact dates we spoke. |
| 02:24:54 | 21 | Q.  Was that contact by phone or face to face? |
| 02:24:56 | 22 | A.  It must have been my phone. |
| 02:24:58 | 23 | Q.  Why do you say that? |
| 02:24:58 | 24 | A.  I don't remember meeting her. |
| 02:25:00 | 25 | Q.  Did you tell Sandra Kendrick that Dr. Chhibber is aware |

02:25:12    1  Blue Cross/Blue Shield will be coming to do an audit soon?

02:25:18    2  Did you tell that to Sandra Kendrick?

02:25:22    3  A.  I think I might have mentioned it, yeah.

02:25:24    4  Q.  There was no Blue Cross audit, was there, sir?

02:25:30    5  A.  I don't know.

02:25:30    6  Q.  Did you ever see Blue Cross come in and audit the 79th

02:25:34    7  Street clinic when you were there?

02:25:34    8  A.  No.

02:25:34    9  Q.  Did you ever see Medicare come in and audit the 79th

02:25:42   10  Street clinic when you were there?

02:25:42   11  A.  No.

02:25:44   12  Q.  You also sold Sandra Kendrick that Dr. Chhibber is

02:25:48   13  attempting to clean up his charts somehow.  You told her that,

02:25:56   14  didn't you?

02:25:56   15  A.  I believe I did.

02:25:56   16  Q.  In preparation for the audit?

02:26:00   17  A.  Yes.

02:26:00   18  Q.  In preparation for the audit that never happened?

02:26:04   19  A.  If you say there was no audit, there was no audit.

02:26:12   20  Q.  Now, things got quiet after July of 2009, and you became

02:26:20   21  impatient because the government and Blue Cross were not out

02:26:28   22  there doing the work that you wanted them to do so you could

02:26:32   23  file your lawsuit, true?

02:26:34   24  A.  I was becoming impatient but not because of the lawsuit.

02:26:44   25  I was becoming impatient because I really didn't like some of

02:26:48    1   the ways Dr. Chhibber was treating his patients.

02:26:50    2   Q. So what you did was you went to the Illinois Inspector

02:26:54    3   General online, true?

02:26:54    4   A. No, I don't think --

02:27:00    5   Q. What you did was you filed another false complaint in the

02:27:04    6   name of Dena Hopkins with the Illinois Inspector General,

02:27:08    7   didn't you do that?

02:27:10    8   A. I don't remember going on any Inspector General --

02:27:14    9   Q. Well, here, let me see if I can refresh your recollection.

02:27:34   10   I want to see if this refreshes your recollection.

02:27:40   11   Defendant's Exhibit 44 is a complaint or is an email of a

02:27:46   12   complaint with the Illinois Inspector General?

02:27:50   13   A. I don't recall this.

02:28:06   14   Q. Well, do you see the name Dena Hopkins in the middle of

02:28:14   15   the document?

02:28:14   16   A. Yes.

02:28:14   17   Q. And Dena is spelled D-e-n-a-a. Do you see that?

02:28:20   18   A. I see that.

02:28:20   19   Q. She must have misspelled her own name. Does it appear

02:28:24   20   that way to you?

02:28:24   21   A. Yes.

02:28:24   22   Q. You filed this, didn't you?

02:28:26   23   A. No, I don't recall this.

02:28:28   24   Q. You didn't or you don't recall?

02:28:28   25   A. If I don't recall, I can't say I did it. I don't remember

02:28:32  1  this.

02:28:32  2  Q.  Let me hand you Defendant's Exhibit 45.  Defendant's

02:28:54  3  Exhibit 45 is a similar complaint filed with the Illinois

02:28:58  4  Inspector General.  Do you see that?

02:29:02  5  A.  Okay.

02:29:04  6  Q.  And it says, Fraud suspected?

02:29:06  7  A.  Okay.

02:29:06  8  Q.  Filed on the same day that Dena Hopkins' so-called

02:29:18  9  complaint was filed that's Defendant's Exhibit 44?

02:29:20  10  MR. HAMMERMAN:  Object to the form of the question,

02:29:22  11  your Honor.

02:29:22  12  THE COURT:  Yes.  Would you restate it, please.

02:29:24  13  BY MR. ORMAN:

02:29:24  14  Q.  What date is Exhibit 45 filed on, sir?

02:29:28  15  A.  December 14th, 2009.

02:29:30  16  Q.  What time?

02:29:30  17  A.  1:45 p.m.

02:29:34  18  Q.  And Exhibit 44 is filed on the same day?

02:29:38  19  A.  December 14th, 2009.

02:29:40  20  Q.  At 1:38 p.m.?

02:29:44  21  A.  Yes.

02:29:44  22  Q.  Two reports seven minutes apart.  You did both of them,

02:29:50  23  didn't you?

02:29:50  24  MR. HAMMERMAN:  I object to the form of the question.

02:29:52  25  THE COURT:  Overruled.

02:29:52    1   BY MR. ORMAN:

02:29:54    2   Q.  You did both of them?

02:29:54    3   A.  I don't remember doing these.  I do remember doing one

02:29:58    4   with Blue Cross/Blue Shield.  I don't remember these.  That

02:30:04    5   was a long time ago.

02:30:04    6   Q.  Now, you indicated that patients would get the same test

02:30:32    7   time after time after time, yes?

02:30:38    8   A.  Yes.

02:30:38    9   Q.  Time after time after time meaning, what, every six

02:30:46   10   months, every year, every two years?  What was it, sir?

02:30:50   11   A.  In general, I'd say maybe every three to six months.

02:30:56   12   Q.  What's wrong with that?

02:31:00   13          MR. HAMMERMAN:  Objection.  Foundation.

02:31:02   14          MR. ORMAN:  I will withdraw the question, your Honor.

02:31:04   15   BY MR. ORMAN:

02:31:04   16   Q.  Please tell me the name of five patients that got the same

02:31:08   17   test every three months.

02:31:14   18   A.  I can name Melvin Rogers got many tests repeated.  I can

02:31:20   19   say Jones had many tests repeated.

02:31:24   20          If you give me a minute to look at these logs, I

02:31:28   21   could get you more names.

02:31:30   22   Q.  I'd really like to get you out of here, if I could.

02:31:34   23          You can't tell me -- or do you know if the condition

02:31:38   24   of Melvin Rogers required tests every three months?

02:31:46   25          You aren't a doctor, true?

02:31:48  1  A.  No, I'm not.

02:31:50  2        MR. HAMMERMAN:  Objection, your Honor.

02:31:52  3        MR. ORMAN:  I will withdraw the question and start

02:31:54  4  again.

02:31:54  5  BY MR. ORMAN:

02:31:54  6  Q.  You are not a doctor?

02:31:54  7  A.  No.

02:31:56  8  Q.  You can't determine whether the tests to Melvin Rogers

02:32:04  9  were necessary or not, can you?

02:32:06  10  A.  No, I cannot.

02:32:06  11  Q.  Now I want to talk about the forms that you -- that were

02:32:20  12  addressed in your direct.  You talked about an initial report,

02:32:24  13  you called it a tech report?

02:32:26  14  A.  Yes.

02:32:26  15  Q.  And then you talked about a final report, true?

02:32:28  16  A.  Yes.

02:32:30  17  Q.  Can you please tell me what requires a final report to be

02:32:34  18  done?  In other words, are you aware of any procedural law or

02:32:40  19  any other practice that requires a final report to be done?

02:32:42  20  A.  The way I understand it is one physician orders a test,

02:32:52  21  the tech does the test, writes a report along with the study

02:32:56  22  itself, and that goes to a cardiologist, who is specialized in

02:33:04  23  hearts, or goes to a radiologist, who specializes in most of

02:33:08  24  the other ultrasounds, like abdomens, carotid, lower

02:33:14  25  extremity, thyroids, and they are specialists who have been

02:33:16 | 1 | trained to look over these reports and interpret them and then

02:33:22 | 2 | send a final report back to the ordering physician.  That's my

02:33:26 | 3 | understanding.

02:33:26 | 4 | Q.  That's your understanding.  Let me ask the question again.

02:33:30 | 5 | What requires a final report to be done at all?

02:33:34 | 6 | A.  You have to look at the original study.

02:33:38 | 7 | Q.  What requires it, sir?  What law, what principle, what

02:33:46 | 8 | authority requires it?

02:33:48 | 9 | MR. HAMMERMAN:  Objection.

02:33:50 | 10 | THE COURT:  Overruled.

02:33:50 | 11 | THE WITNESS:  Medicare.

02:33:50 | 12 | BY MR. ORMAN:

02:33:54 | 13 | Q.  Are you guessing, or do you know what you're talking

02:33:54 | 14 | about?

02:33:56 | 15 | A.  I believe --

02:33:56 | 16 | Q.  Are you guessing, or do you know what you're talking

02:34:02 | 17 | about?  If you're guessing, just tell me.

02:34:04 | 18 | A.  I haven't read the Medicare handbook --

02:34:06 | 19 | Q.  Then you don't know, do you?

02:34:08 | 20 | A.  -- but I believe that studies --

02:34:08 | 21 | MR. ORMAN:  Move to strike.

02:34:10 | 22 | THE WITNESS:  -- have to go to cardiologists and --

02:34:10 | 23 | THE COURT:  Just a moment.  There is a motion

02:34:12 | 24 | pending.

02:34:14 | 25 | The motion to strike is granted.  Put another

02:34:16  1  question to the witness.

02:34:18  2  BY MR. ORMAN:

02:34:18  3  Q.  Now, most of the places that you're familiar with send

02:34:24  4  tests out to be read, true?

02:34:26  5  A.  Yes.

02:34:28  6  Q.  For example, if you do the testing, yes?  Yes?

02:34:34  7  A.  Yes.

02:34:34  8  Q.  Sometimes you go to patients' homes and do the tests?

02:34:38  9  A.  Yes.

02:34:38  10  Q.  And other doctors do testing in their office or no?

02:34:46  11  A.  Yes.

02:34:46  12  Q.  Many doctors don't do testing in their office, do they?

02:34:52  13  A.  I imagine not.

02:34:54  14  Q.  Those doctors send whatever the people out to be tested in

02:35:00  15  a facility that can do the tests?

02:35:02  16  A.  Yes.

02:35:02  17  Q.  And those are the facilities that send reports back to the

02:35:06  18  doctor?

02:35:08  19  A.  Yes.

02:35:08  20  Q.  Dr. Chhibber's practice isn't like that, is it?

02:35:12  21  A.  No.

02:35:14  22  Q.  Dr. Chhibber does tests in-house?

02:35:20  23  A.  Yes.

02:35:20  24  Q.  And he generates what you call a tech report?

02:35:24  25  A.  A final report.

| | | |
|---|---|---|
| 02:35:26 | 1 | Q. A tech report, yes? That's what you do? |
| 02:35:30 | 2 | A. That's what I do, yeah. |
| 02:35:32 | 3 | Q. What requires anything else -- anything further to be done |
| 02:35:38 | 4 | for those facilities that do tests in-house? |
| 02:35:44 | 5 | A. I'm not positive of what the requirements are. |
| 02:35:48 | 6 | Q. Now, you mentioned a Mohammed Baig, true? |
| 02:36:02 | 7 | A. Yes. |
| 02:36:02 | 8 | Q. And you are familiar with a company called Spectrum; is |
| 02:36:02 | 9 | that right? |
| 02:36:10 | 10 | A. Yes. |
| 02:36:10 | 11 | Q. That's a diagnostic company? |
| 02:36:14 | 12 | A. Yes. |
| 02:36:14 | 13 | Q. You work for them? |
| 02:36:16 | 14 | A. Yes. |
| 02:36:18 | 15 | Q. There came a point in time when Mohammed Baig told you |
| 02:36:28 | 16 | that Spectrum was defrauding Medicare and Blue Cross; is that |
| 02:36:32 | 17 | correct? |
| 02:36:32 | 18 | A. There came a time -- one time where Mr. Baig told me |
| 02:36:40 | 19 | working with Spectrum could be risky because of kickbacks. |
| 02:36:48 | 20 | Q. When was that? |
| 02:36:50 | 21 | A. I would say late 2009, when I first started with them. |
| 02:36:58 | 22 | Q. And when Mr. Baig told you that Spectrum may have been |
| 02:37:08 | 23 | defrauding Medicare, did you keep your eyes open to see if |
| 02:37:12 | 24 | that was true? |
| 02:37:14 | 25 | A. What he told me was -- |

02:37:18  1   Q.  Did you keep your eyes open to see if that was true?

02:37:22  2   A.  Yes.

02:37:22  3   Q.  And you noticed or observed that doctors were ordering a

02:37:36  4   large number of tests for Spectrum patients; is that correct?

02:37:42  5   A.  Yes.

02:37:42  6   Q.  Just as many as Dr. Chhibber was, yes?

02:37:48  7   A.  I won't say that.

02:37:54  8   Q.  Pretty close?

02:37:54  9   A.  No, I wouldn't say that, no.

02:37:56  10  Q.  An extraordinary number of tests, yes?

02:37:58  11  A.  Well, with them --

02:38:00  12        MR. HAMMERMAN:  Objection, your Honor.  Relevancy.

02:38:02  13        THE COURT:  Overruled.

02:38:04  14        THE WITNESS:  With them, maybe I would see three,

02:38:06  15  four patients a day.  With Dr. Chhibber, I'd see a lot more.

02:38:10  16  BY MR. ORMAN:

02:38:12  17  Q.  Well, this weekend you spent some time with the

02:38:16  18  government's attorneys, didn't you?

02:38:18  19  A.  Yes.

02:38:20  20  Q.  They showed you a letter, true?

02:38:24  21  A.  Do you want to refresh me?

02:38:28  22  Q.  Yes.  A letter written by Mohammed Baig?

02:38:34  23  A.  A letter?

02:38:34  24  Q.  Let me hand you a document which counsel just gave me.

02:38:40  25        MR. HAMMERMAN:  Objection, your Honor.

715

| | | |
|---|---|---|
| 02:38:40 | 1 | MR. ORMAN:  Can I hand it? |
| 02:38:42 | 2 | MR. HAMMERMAN:  Objection to the form of this |
| 02:38:44 | 3 | question. |
| 02:38:44 | 4 | MR. ORMAN:  No question. |
| 02:38:46 | 5 | THE COURT:  Restate it.  Restate it as a question |
| 02:38:52 | 6 | rather than making a comment about it. |
| 02:38:54 | 7 | BY MR. ORMAN: |
| 02:38:54 | 8 | Q.  I would like to hand you a document that the government |
| 02:38:56 | 9 | just handed me. |
| 02:39:10 | 10 | Did you see that document this weekend? |
| 02:39:12 | 11 | A.  No. |
| 02:39:12 | 12 | Q.  Did you discuss its contents with the government? |
| 02:39:18 | 13 | A.  No. |
| 02:39:20 | 14 | Q.  Please take a look at it. |
| 02:39:20 | 15 | A.  I can read the first line and tell you no. |
| 02:39:22 | 16 | Q.  Did you discuss this weekend whether Spectrum was |
| 02:39:28 | 17 | committing Medicare fraud or Blue Cross fraud with the |
| 02:39:32 | 18 | government? |
| 02:39:32 | 19 | A.  I know I discussed it with them and my concerns with what |
| 02:39:48 | 20 | Mr. Baig told me.  I don't know if it was this weekend.  I |
| 02:39:50 | 21 | have never seen this document. |
| 02:39:52 | 22 | Q.  Please take a look towards the bottom. |
| 02:39:54 | 23 | A.  Okay. |
| 02:39:54 | 24 | Q.  Do you see where Mr. Baig is accusing you of doing |
| 02:40:02 | 25 | excessive testing? |

| | | |
|---|---|---|
| 02:40:02 | 1 | MR. HAMMERMAN:  Object to the form of the question. |
| 02:40:04 | 2 | Object to the relevancy too. |
| 02:40:06 | 3 | THE COURT:  Sustained. |
| 02:40:06 | 4 | BY MR. ORMAN: |
| 02:40:12 | 5 | Q.  Who is the doctor that you work for? |
| 02:40:14 | 6 | A.  I work with a diagnostic testing facility.  I don't work |
| 02:40:18 | 7 | for a doctor. |
| 02:40:18 | 8 | Q.  I see. |
| 02:40:22 | 9 | Now, we have gone through all of the charts that were |
| 02:40:30 | 10 | in the Government's Exhibit 620.  Did you see any chart that |
| 02:40:42 | 11 | indicated that you did tests on 25 people in a day?  You can |
| 02:40:50 | 12 | take a look. |
| 02:40:52 | 13 | A.  Let me look. |
| 02:41:12 | 14 | Not 25 patients, but definitely 25 exams. |
| 02:41:16 | 15 | Q.  I am talking about 25 people who got tests in any one day. |
| 02:41:24 | 16 | Did you see that? |
| 02:41:24 | 17 | A.  I don't think so. |
| 02:41:26 | 18 | Q.  Now, do you know who Kathryn Anton is? |
| 02:41:36 | 19 | A.  Yes. |
| 02:41:36 | 20 | Q.  Who is she? |
| 02:41:40 | 21 | A.  She's an FBI agent. |
| 02:41:42 | 22 | Q.  She was your connection to the FBI? |
| 02:41:48 | 23 | A.  The first one, yes. |
| 02:41:50 | 24 | Q.  And you were acting as an undercover agent for the FBI? |
| 02:41:56 | 25 | A.  Not an agent, but I was cooperating with them. |

717

02:41:58    1    Q.  You were an informant?

02:42:00    2    A.  Yes.

02:42:00    3    Q.  And you wanted to become an informant so you could kind of

02:42:06    4    push the FBI into doing the kind of work that would help your

02:42:12    5    lawsuit?

02:42:16    6    A.  No.

02:42:16    7    Q.  You did it for justice?

02:42:16    8    A.  Yes.

02:42:18    9    Q.  Yeah.

02:42:20   10    A.  Like I said, I saw him mistreating a patient, and I think

02:42:24   11    right after that, I reported him, and it wasn't because of

02:42:28   12    money.  And I didn't know about qui tam until much later.

02:42:32   13               MR. ORMAN:  Your Honor?

02:42:32   14               THE COURT:  There is no question pending before you.

02:42:36   15    BY MR. ORMAN:

02:42:48   16    Q.  I'm going to hand you what I have marked as Defendant's

02:42:50   17    Exhibit 76.  Could you please look through Defendant's

02:42:58   18    Exhibit 76.

02:43:20   19               Can you tell me what that exhibit is?

02:43:20   20    A.  One moment.

02:43:40   21               These are emails between Kathy and I.

02:43:46   22    Q.  Could you look at the second page of this exhibit, which

02:44:06   23    is really a group exhibit, and if you look at the lower

02:44:12   24    right-hand corner, there is a notation JC2-137.

02:44:18   25    A.  Um-hmm.

| | | |
|---|---|---|
| 02:44:18 | 1 | Q. You're there? |
| 02:44:20 | 2 | A. I see it. |
| 02:44:20 | 3 | Q. There is an email and a response. And, now, this is |
| 02:44:34 | 4 | September 2nd of 2009. Do you see that? |
| 02:44:36 | 5 | A. Yes. |
| 02:44:42 | 6 | Q. There is an email from you to Kathy Anton, and there is a |
| 02:44:48 | 7 | response from her, true? |
| 02:44:48 | 8 | A. True. |
| 02:44:50 | 9 | Q. And what you did in your email is that you faxed over to |
| 02:44:58 | 10 | her several procedures from Dr. Chhibber's office, true? |
| 02:45:06 | 11 | A. True. |
| 02:45:06 | 12 | Q. You stole them? |
| 02:45:08 | 13 | A. I wouldn't consider that stealing, no. |
| 02:45:10 | 14 | Q. Would you consider that an invasion of anybody's property |
| 02:45:14 | 15 | -- privacy? |
| 02:45:16 | 16 | A. No. |
| 02:45:16 | 17 | Q. Did the procedure logs have names of patients? |
| 02:45:18 | 18 | A. Yes. |
| 02:45:20 | 19 | Q. Did those procedure logs which you faxed to Kathy Anton, |
| 02:45:26 | 20 | did they have procedures that were performed on specified |
| 02:45:30 | 21 | patients? |
| 02:45:30 | 22 | A. Yes. |
| 02:45:30 | 23 | Q. You don't consider that a violation of anyone's privacy? |
| 02:45:36 | 24 | A. I considered myself -- |
| 02:45:40 | 25 | Q. Can you answer the question yes or no? |

| | | |
|---|---|---|
| 02:45:42 | 1 | A. Not in a criminal investigation, no. |
| 02:45:44 | 2 | Q. You were a criminal investigator? |
| 02:45:46 | 3 | A. No, I was helping investigate a criminal. |
| 02:45:50 | 4 | Q. I see. |
| 02:45:52 | 5 | And what was Kathy Anton's response to your sending |
| 02:45:54 | 6 | these procedure logs to her? |
| 02:45:58 | 7 | MR. HAMMERMAN: Objection. Relevance. |
| 02:45:58 | 8 | THE COURT: Overruled. |
| 02:46:00 | 9 | THE WITNESS: Got it, you rock, thanks. |
| 02:46:06 | 10 | BY MR. ORMAN: |
| 02:46:06 | 11 | Q. I didn't hear you. Could you say it louder? |
| 02:46:08 | 12 | A. Got it, you rock, thanks. |
| 02:46:10 | 13 | Q. You rock? |
| 02:46:12 | 14 | How did you get the procedure logs? |
| 02:46:16 | 15 | A. I had them in my ultrasound room. |
| 02:46:18 | 16 | Q. So you -- you had them where? |
| 02:46:20 | 17 | A. The procedure logs were filled out and kept in the |
| 02:46:28 | 18 | ultrasound room. |
| 02:46:28 | 19 | Q. So what you did was you walked into the ultrasound room, |
| 02:46:32 | 20 | you grabbed a handful of these reports, yes? |
| 02:46:36 | 21 | A. Yes. |
| 02:46:36 | 22 | Q. About how thick, an inch, 2 inches? |
| 02:46:38 | 23 | A. It was fairly thick; inch and a half, maybe. |
| 02:46:42 | 24 | Q. And you faxed them to Kathy Anton? |
| 02:46:44 | 25 | A. Yes. |

| | | |
|---|---|---|
| 02:46:44 | 1 | Q.  Whose fax machine did you use? |
| 02:46:48 | 2 | A.  Dr. Chhibber's. |
| 02:46:48 | 3 | Q.  Could you go to the email dated December 20, 2009.  That |
| 02:47:18 | 4 | would be JC2-143 on the bottom right.  Tell me when you're |
| 02:47:26 | 5 | there. |
| 02:47:26 | 6 | A.  I'm there. |
| 02:47:26 | 7 | Q.  Are you there? |
| 02:47:52 | 8 | A.  I'm there. |
| 02:47:52 | 9 | Q.  This is an email that you sent to Kathryn Anton? |
| 02:47:56 | 10 | A.  Yes. |
| 02:47:58 | 11 | Q.  And in this email, you're telling her how to conduct her |
| 02:48:04 | 12 | undercover investigation; isn't that right? |
| 02:48:08 | 13 | A.  Yes. |
| 02:48:08 | 14 | Q.  You told her, No blood draws, correct? |
| 02:48:18 | 15 | A.  The -- |
| 02:48:18 | 16 | Q.  Did you tell her that? |
| 02:48:20 | 17 | A.  Yes. |
| 02:48:20 | 18 | Q.  And you told her that for a reason, yes? |
| 02:48:24 | 19 | A.  Yes, the agent -- |
| 02:48:26 | 20 | Q.  And the reason was that if blood draws were done, it might |
| 02:48:34 | 21 | show that some of the diagnoses performed by the doctor on the |
| 02:48:42 | 22 | undercover agents were correct?  Isn't that why you told |
| 02:48:46 | 23 | Kathryn Anton no needles? |
| 02:48:48 | 24 | MR. HAMMERMAN:  Objection.  Foundation, calls for |
| 02:48:50 | 25 | speculation. |

02:48:52  1       THE COURT:  Overruled.

02:48:52  2       THE WITNESS:  Findings in blood draws are not the

02:48:58  3  diagnoses we would write -- or Dr. Chhibber would write on the

02:49:00  4  chart, so they are not related.

02:49:04  5  BY MR. ORMAN:

02:49:04  6  Q.  We have a jury sitting here.

02:49:06  7       THE COURT:  All right.  No comments to the witness.

02:49:08  8  Just questions.

02:49:10  9  BY MR. ORMAN:

02:49:10  10  Q.  You'd agree with me that the clearest, easiest thing for

02:49:14  11  the jury to follow is a yes-or-no answer?

02:49:18  12  A.  Yes.

02:49:18  13  Q.  Now, you also told Kathryn Anton in your December 20,

02:49:28  14  2009, email that she should send the agents in with an itchy

02:49:34  15  arm?

02:49:36  16  A.  Yes.

02:49:36  17  Q.  To set the doctor up, correct?

02:49:38  18  A.  Yes.

02:49:38  19  Q.  Now, you are aware that doctors do not rely entirely on

02:49:48  20  what patients tell them.  You know that?

02:49:50  21  A.  Sure.

02:49:50  22  Q.  Doctors observe the patient, doctors test the patient, and

02:50:02  23  many times, doctors observe things that patients do not tell

02:50:08  24  them, true?

02:50:08  25  A.  Sure.

02:50:10 1 Q. That's why doctors are doctors, because they are trained

02:50:16 2 to do that, yes?

02:50:16 3 A. Yes.

02:50:16 4 Q. You are not trained to do that, are you?

02:50:18 5 A. No.

02:50:18 6 Q. Could you go to page JC2-144 in Defendant's Group

02:50:42 7 Exhibit 76.

02:50:44 8 A. JC2-144?

02:50:46 9 Q. Yes.

02:50:46 10 A. Okay.

02:50:48 11 Q. Two e-mails on this page?

02:50:50 12 A. Yes.

02:50:50 13 Q. The bottom email is dated January 21st, 2010?

02:50:58 14 A. Yes.

02:50:58 15 Q. This is from you to Kathryn Anton, yes?

02:51:04 16 A. Yes.

02:51:04 17 Q. And you tell her that you were messing around on the

02:51:10 18 computer at Hanover Park?

02:51:12 19 A. Yes.

02:51:12 20 Q. And you found a list of witnesses?

02:51:16 21 A. I found a patient list.

02:51:16 22 Q. A patient list about how thick?

02:51:20 23 A. It was in a cell file, so I'd say more than 10 pages.

02:51:30 24 Q. What you did was send Kathryn Anton the name, the address,

02:51:36 25 the Social Security number, and other identifying information

02:51:40  1  for every single patient that Dr. Chhibber had; isn't that

02:51:44  2  what you did?

02:51:46  3  A.  Yes.

02:51:46  4  Q.  And you did that so that you could recover money in the

02:51:52  5  lawsuit you were planning to file?

02:51:54  6  A.  No.

02:51:54  7  Q.  Could you go to page 145, JC2-145, the very next page.

02:52:16  8  Now, this is an email that you sent to Kathryn Anton on

02:52:22  9  January 21, 2010, correct?

02:52:26  10  A.  Correct.

02:52:26  11  Q.  And in the first sentence, you say, I was just wondering

02:52:34  12  out of sheer curiosity if you had any success going to the

02:52:40  13  South Side clinic yet.

02:52:44  14        That's what you said?

02:52:44  15  A.  Yes.

02:52:44  16  Q.  And you told her it was out of sheer curiosity.  And money

02:52:50  17  played into that too, didn't it?

02:52:52  18  A.  No.  At this time, I was not aware of any whistleblower

02:52:58  19  laws.

02:52:58  20        MR. ORMAN:  Move to strike.

02:53:02  21        THE COURT:  Everything after no is stricken.

02:53:04  22        MR. ORMAN:  All right.

02:53:04  23  BY MR. ORMAN:

02:53:06  24  Q.  Then you go on to implicate Dr. Joshi, who works for

02:53:12  25  Dr. Chhibber, yes?

02:53:12  1  A.  I did mention him at one time.

02:53:16  2  Q.  You say -- told Kathy Anton that you hate to say it, but

02:53:22  3  Joshi has been ordering a lot here at the Hanover Park clinic

02:53:30  4  as well lately, yes?

02:53:32  5  A.  Yes.

02:53:32  6  Q.  You were looking to file a lawsuit against Dr. Joshi too

02:53:36  7  by now?

02:53:36  8  A.  No.

02:53:40  9  Q.  You were doing it for justice?

02:53:42  10  A.  Yes.

02:53:42  11  Q.  I'm going to hand you what I have marked as Defendant's

02:54:06  12  Exhibit 144.  That is an email?

02:54:20  13  A.  Yes.

02:54:20  14  Q.  An email from you to Kathryn Anton?

02:54:26  15  A.  Yes.

02:54:26  16  Q.  What date?

02:54:26  17  A.  May 27th, 2011.

02:54:30  18  Q.  You say to Kathryn Anton that she's no longer working on

02:54:40  19  the case?

02:54:42  20  A.  Yes.

02:54:46  21  Q.  How did you know that?

02:54:48  22  A.  Because she connected me to a couple of other agents who

02:54:54  23  from then I spoke to them instead of Kathy.

02:54:56  24  Q.  How did she connect you to a couple other agents?  Was it

02:55:04  25  by phone?

02:55:04  1  A.  No, we met in person.

02:55:06  2  Q.  Where?

02:55:08  3  A.  We met at various locations, usually in coffee shops,

02:55:12  4  sometimes a McDonald's down the street from the Hanover Park

02:55:16  5  clinic.

02:55:18  6  Q.  I am only interested in the time that you met with Kathy

02:55:20  7  Anton and she told you that she was no longer on the case.

02:55:26  8  Where did you meet?

02:55:28  9  A.  I believe that was outside a coffee shop in Naperville.

02:55:36  10  Q.  What coffee shop?

02:55:38  11  A.  It was a Starbucks.

02:55:38  12  Q.  How long was the meeting?

02:55:40  13  A.  Maybe five or 10 minutes.

02:55:42  14  Q.  Was anyone else present?

02:55:46  15  A.  Another agent.

02:55:46  16  Q.  Who was the other agent?

02:55:48  17  A.  I don't recall his name at the moment.

02:55:56  18  Q.  Can you tell me what Kathy Anton said to you, what you

02:56:04  19  said to her, and what the other agents said, if anything.

02:56:08  20  Just give me a second so I can write this down.

02:56:12  21       Go ahead.

02:56:14  22       MR. HAMMERMAN:  Objection.  Hearsay.

02:56:14  23       THE COURT:  Overruled.

02:56:18  24       THE WITNESS:  Can you repeat the question?

02:56:24  25       MR. ORMAN:  Your Honor, can the court reporter?

| | | |
|---|---|---|
| 02:56:30 | 1 | THE COURT:  Yes. |
| 02:56:30 | 2 | MR. ORMAN:  I will restate the question. |
| 02:56:32 | 3 | BY MR. ORMAN: |
| 02:56:32 | 4 | Q.  Let's go back to Naperville.  Let's go back to a coffee |
| 02:56:36 | 5 | shop.  Starbucks? |
| 02:56:38 | 6 | A.  Yes. |
| 02:56:38 | 7 | Q.  Sound right? |
| 02:56:38 | 8 | A.  Yes. |
| 02:56:38 | 9 | Q.  When was this meeting? |
| 02:56:46 | 10 | A.  It was sometime -- I'm guessing late 2009, early 2010. |
| 02:56:54 | 11 | Q.  Can you do better than to guess? |
| 02:56:58 | 12 | A.  No. |
| 02:56:58 | 13 | Q.  Well, let's see if we can figure it out.  Was it before |
| 02:57:04 | 14 | you sent this email? |
| 02:57:06 | 15 | A.  This email, yes. |
| 02:57:08 | 16 | Q.  Was it before you faxed all those documents to Kathryn |
| 02:57:16 | 17 | Anton? |
| 02:57:16 | 18 | A.  That was after. |
| 02:57:22 | 19 | Q.  So that would put that meeting sometime between January |
| 02:57:30 | 20 | of 2010 to roughly May of 2010? |
| 02:57:34 | 21 | A.  I faxed those September of 2009, and it was shortly after |
| 02:57:56 | 22 | that. |
| 02:57:56 | 23 | Q.  So it would have been in 2009, maybe December?  Does that |
| 02:58:06 | 24 | sound correct? |
| 02:58:06 | 25 | A.  After September 2009, early 2010. |

| | | |
|---|---|---|
| 02:58:08 | 1 | Q. All right. That would have been late December early |
| 02:58:16 | 2 | January 2009 to 2010, correct? |
| 02:58:18 | 3 | A. Towards the -- after September 2009, so October, November, |
| 02:58:26 | 4 | December 2009, perhaps January, February, March 2010. |
| 02:58:28 | 5 | Q. Well, you must have been stunned when she told you that, |
| 02:58:32 | 6 | right? The person you had been dealing with, the person you |
| 02:58:36 | 7 | had been sending documents to, the person who you were relying |
| 02:58:40 | 8 | on to help you do your private lawsuit is now leaving the |
| 02:58:46 | 9 | case? |
| 02:58:46 | 10 | MR. HAMMERMAN: Objection to the form of the |
| 02:58:48 | 11 | question. |
| 02:58:48 | 12 | THE COURT: Sustained. |
| 02:58:48 | 13 | BY MR. ORMAN: |
| 02:58:48 | 14 | Q. What did Kathy Anton tell you as to why she was leaving |
| 02:58:54 | 15 | the case? |
| 02:58:54 | 16 | A. I remember she told me one time her specialty was |
| 02:59:02 | 17 | something related to hostage negotiation, so I think she had |
| 02:59:08 | 18 | other projects she was assigned to. |
| 02:59:10 | 19 | Q. I appreciate what you think. I just want to know what she |
| 02:59:22 | 20 | told you. And if you don't remember, tell me. |
| 02:59:24 | 21 | A. She told me -- I mean, if you want me to recall her exact |
| 02:59:32 | 22 | words, I can't. |
| 02:59:32 | 23 | Q. Do your best. |
| 02:59:34 | 24 | A. She said she wasn't going to be working with me on the |
| 02:59:36 | 25 | case anymore, and she -- Steven Bond, that was his name, she |

02:59:42　　1　introduced me to Steven.  I spoke to Steven for a while.

02:59:46　　2　Steven, I believe, brought in Ashley, another FBI agent.  And

02:59:50　　3　Ashley brought around Ed, another FBI agent.

02:59:54　　4　Q.  Was Ashley in the coffee shop in Naperville when you had

02:59:58　　5　this conversation?

02:59:58　　6　A.  No.

02:59:58　　7　Q.  Was -- we know Steve was, yes?

03:00:04　　8　A.  I believe that was Steven, yeah.

03:00:06　　9　Q.  Now, was anybody taking notes of that meeting?

03:00:08　　10　A.  They would always take notes.  I don't remember which ones

03:00:20　　11　specifically.

03:00:20　　12　Q.  Was there a time you can recall where notes of the meeting

03:00:26　　13　with the FBI was not recorded?  That means no notes.

03:00:30　　14　A.  Yes.

03:00:38　　15　Q.  When?

03:00:38　　16　A.  You know what?  I can't recall specifically.  I can't

03:00:52　　17　recall specifically.

03:00:52　　18　Q.  So we know that Kathy told you she was leaving the case?

03:01:00　　19　A.  Yes.

03:01:00　　20　Q.  You asked her why?

03:01:04　　21　A.  No.

03:01:04　　22　Q.  Did Steve tell you why she was leaving the case?

03:01:12　　23　　　　　　MR. HAMMERMAN:  Objection, your Honor.  Relevance.

03:01:14　　24　　　　　　THE COURT:  Sustained.

03:01:16　　25　BY MR. ORMAN:

03:01:18　1　Q.　Now, you were communicating with Kathryn Anton by email?

03:01:26　2　A.　By email, sometimes text messages, over the phone.

03:01:34　3　Q.　Those text messages between you and Kathy, 10 or 15, does

03:01:42　4　that sound about right?

03:01:42　5　A.　Yes.

03:01:44　6　Q.　Did you bring those -- copies of those text messages with

03:01:48　7　you today?

03:01:50　8　A.　No.

03:01:50　9　Q.　There is a reason for that, isn't there?

03:02:00　10　　　　MR. HAMMERMAN:　Object to the form of the question,

03:02:02　11　your Honor.

03:02:02　12　　　　THE COURT:　Just ask a question.

03:02:02　13　BY MR. ORMAN:

03:02:04　14　Q.　You didn't bring those text messages between you and Kathy

03:02:10　15　with you today because they were destroyed, correct?

03:02:14　16　A.　They were deleted, yeah.

03:02:18　17　Q.　You deleted them?

03:02:20　18　A.　Yes.

03:02:20　19　Q.　You didn't delete your emails, true?

03:02:22　20　A.　True.

03:02:24　21　Q.　But you chose to delete the text messages?

03:02:32　22　A.　Correct.

03:02:36　23　　　　MR. ORMAN:　Can I have a moment, your Honor?

03:02:38　24　　　　THE COURT:　Yes.　We will take our afternoon break

03:02:40　25　now.　Members of the jury, 15 minutes.

| | | |
|---|---|---|
| 03:02:42 | 1 | (Short break.) |
| 03:32:48 | 2 | (The jury enters the courtroom.) |
| 03:32:48 | 3 | THE COURT:  Please be seated. |
| 03:32:58 | 4 | BY MR. ORMAN: |
| 03:33:02 | 5 | Q.  Mr. Qasim, when you sent the procedure logs to the FBI, |
| 03:33:12 | 6 | did anybody come back to you and say, you can't do that? |
| 03:33:16 | 7 | A.  At some point, Kathy -- at some point after that, Kathy |
| 03:33:24 | 8 | told me to hold off on sending any more documents to them. |
| 03:33:26 | 9 | Q.  At what point was that? |
| 03:33:28 | 10 | A.  It was shortly after that. |
| 03:33:32 | 11 | Q.  Shortly after what? |
| 03:33:34 | 12 | A.  After I faxed the procedure logs. |
| 03:33:38 | 13 | Q.  And then you sent a file on Jimmy Carillo?  That's |
| 03:33:46 | 14 | C-a-r-i-l-l-o. |
| 03:33:48 | 15 | A.  Yes. |
| 03:33:48 | 16 | Q.  And that was after she told you not to send any more |
| 03:33:52 | 17 | documents? |
| 03:33:54 | 18 | A.  Once she told me, I did not send any more.  So whatever I |
| 03:34:00 | 19 | sent over, I sent before she told me. |
| 03:34:02 | 20 | Q.  So you sent a file to her for a Christina Solis; is that |
| 03:34:12 | 21 | correct? |
| 03:34:12 | 22 | A.  Yes. |
| 03:34:12 | 23 | Q.  And then you sent the entire list of Dr. Chhibber's |
| 03:34:16 | 24 | patients? |
| 03:34:18 | 25 | A.  Yes. |

03:34:18   1   Q. All right. So after you sent the Jimmy Carillo file,

03:34:28   2   nobody told you to stop sending documents, true?

03:34:30   3   A. I can't tell you exactly what they -- they told me not to

03:34:40   4   send any more.

03:34:42   5   Q. We can agree that you sent at least four sets of patient

03:34:48   6   documents at separate times to the FBI, correct?

03:34:52   7         MR. HAMMERMAN: Object to the form of the question,

03:34:52   8   your Honor.

03:34:52   9         THE COURT: Overruled.

03:34:56  10         THE WITNESS: Yes.

03:34:56  11   BY MR. ORMAN:

03:34:58  12   Q. And it took four sets for somebody to tell you that you

03:35:02  13   shouldn't send documents, correct?

03:35:06  14   A. After that, yes.

03:35:08  15   Q. Nobody told you to stop sending documents after the first

03:35:12  16   submission?

03:35:12  17         MR. HAMMERMAN: Objection, your Honor.

03:35:14  18         THE COURT: Sustained.

03:35:16  19   BY MR. ORMAN:

03:35:24  20   Q. We put up on the big screen a chart with some numbers that

03:35:30  21   were changed. Do you recall that?

03:35:32  22   A. With some numbers that were changed?

03:35:34  23   Q. Yes.

03:35:36  24   A. On the logs?

03:35:38  25   Q. Do you recall that, where counsel asked you there was a

03:35:42   1   number here and then there was a number written next to it and

03:35:44   2   that's not your handwriting?

03:35:46   3   A.  Yes.

03:35:48   4   Q.  You understand that somebody went back, reread the

03:35:52   5   underlying data, and corrected what you did?

03:35:56   6   A.  I don't --

03:35:58   7           MR. HAMMERMAN:  Objection.  Foundation.

03:36:02   8           THE COURT:  Overruled.

03:36:04   9           THE WITNESS:  I don't believe that I would have taken

03:36:10  10   the measurements and not written them in the report.  I did

03:36:14  11   develop a habit of not taking the ECA measurements to keep up

03:36:18  12   with the demand of the patients I needed to get done.

03:36:22  13   BY MR. ORMAN:

03:36:22  14   Q.  Let me go back to my question.

03:36:24  15   A.  Okay.

03:36:24  16   Q.  There came a point in time that in Shirley-Terrell's

03:36:30  17   chart, you wrote some numbers on what you called the tech

03:36:32  18   report?

03:36:34  19   A.  Yes.

03:36:34  20   Q.  Later on, somebody added some numbers alongside yours?

03:36:38  21   A.  Yes.

03:36:38  22   Q.  That was a correction, wasn't it?

03:36:40  23   A.  I don't think it was a true correction.  I would have

03:36:48  24   written it.  Somebody corrected it, yes.

03:36:50  25   Q.  Was it?

| | | |
|---|---|---|
| 03:36:50 | 1 | A.  It was not. |
| 03:36:52 | 2 | Q.  You think somebody was altering the records on her chart? |
| 03:36:56 | 3 | Is that what you're saying? |
| 03:36:58 | 4 | A.  Yes. |
| 03:36:58 | 5 | Q.  You keep a tape of the echocardiograms? |
| 03:37:06 | 6 | A.  Yes. |
| 03:37:06 | 7 | Q.  You keep a tape of the ultrasounds? |
| 03:37:08 | 8 | A.  No, only of the echocardiograms. |
| 03:37:10 | 9 | Q.  Somebody could go to the echos and reread what you saw? |
| 03:37:14 | 10 | A.  The echos, yes, but the question -- |
| 03:37:16 | 11 | Q.  And if somebody did -- |
| 03:37:18 | 12 | MR. HAMMERMAN:  Objection, your Honor.  The witness |
| 03:37:24 | 13 | was not done answering. |
| 03:37:24 | 14 | MR. ORMAN:  The witness was making a speech, your |
| 03:37:26 | 15 | Honor. |
| 03:37:26 | 16 | THE COURT:  That comment is stricken.  Put another |
| 03:37:30 | 17 | question to the witness.  The objection is overruled. |
| 03:37:32 | 18 | BY MR. ORMAN: |
| 03:37:34 | 19 | Q.  Somebody could have gone to the tape, reread what you did, |
| 03:37:36 | 20 | and made a correction on the document, correct? |
| 03:37:38 | 21 | A.  Yes. |
| 03:37:38 | 22 | Q.  I'd like to get your schedule correct.  I want to focus on |
| 03:37:56 | 23 | the year 2010. |
| 03:37:56 | 24 | A.  Okay. |
| 03:37:56 | 25 | Q.  Now, in 2010, you were regularly scheduled to work one day |

734

03:38:02  1  a week?

03:38:10  2  A.  In 2010, I believe for the most part, I worked three days:

03:38:14  3  Two at Hanover Park, one in Cottage Grove.

03:38:22  4  Q.  You said you believed.  Are you sure?

03:38:26  5  A.  The schedule changed often, so I can't -- the schedule

03:38:28  6  wasn't set.  Some days I would cover here, some days I would

03:38:32  7  cover here.  But for the most part, I worked two days at

03:38:36  8  Hanover Park, Monday and Thursday, and one day on the South

03:38:40  9  Side, Wednesday.

03:38:40  10 Q.  Would your payroll stubs give any indication of how many

03:38:44  11 days you worked per week at Hanover Park?

03:38:48  12 A.  We didn't get payroll stubs.

03:38:50  13 Q.  Would your 1099s reflect that?

03:38:54  14 A.  No, not specifically that location, no.

03:38:58  15 Q.  I want to be clear on who your employer was in the year

03:39:06  16 2009.  Do you know?

03:39:10  17 A.  Yeah, Dr. Chhibber.

03:39:12  18 Q.  Did Dr. Chhibber ever write you a check in 2009?

03:39:16  19 A.  No.

03:39:16  20 Q.  Did Mohammed Baig write you checks in 2009?

03:39:24  21 A.  Yes.

03:39:24  22 Q.  And did you pay taxes on the money that you received from

03:39:30  23 Mohammed Baig in the year 2009?

03:39:32  24         MR. HAMMERMAN:  Objection.

03:39:34  25         THE COURT:  Overruled.

03:39:34    1          THE WITNESS:  No, I didn't.

03:39:40    2   BY MR. ORMAN:

03:39:42    3   Q.  When was the last time you had contact with Kathryn Anton?

03:39:50    4   A.  We pulled up an email that I sent to her in May 2011, so I

03:40:04    5   suppose that's it.

03:40:04    6   Q.  Did you talk to Kathryn Anton since the day that email was

03:40:10    7   sent?

03:40:10    8   A.  If she replied, that would have been the only

03:40:16    9   communication.

03:40:16   10   Q.  Let's put aside what's sent online.  Did you talk on the

03:40:20   11   telephone --

03:40:22   12   A.  No.

03:40:22   13   Q.  -- to Kathryn Anton since May of, what was it, 2010?

03:40:26   14   A.  2011.  No.

03:40:28   15   Q.  2011?

03:40:28   16   A.  No, I didn't.

03:40:28   17   Q.  Did you talk to Kathryn Anton face to face since May

03:40:34   18   of 2011?

03:40:36   19   A.  No.

03:40:36   20   Q.  Did you talk to Steven Bond since May of 2011?

03:40:46   21   A.  No.

03:40:50   22   Q.  Did you text Steven Bond since May of 2011?

03:40:56   23   A.  I don't believe so.

03:41:00   24   Q.  Did you text Kathryn Anton since May of 2011?

03:41:06   25   A.  I don't believe so.

| | | |
|---|---|---|
| 03:41:12 | 1 | Q. I didn't hear the answer. |
| 03:41:14 | 2 | A. I don't believe so, no. |
| 03:41:14 | 3 | Q. Did Kathryn Anton text you since May of 2011? |
| 03:41:18 | 4 | A. I don't believe so. |
| 03:41:22 | 5 | Q. Your email address is doctorfahad? |
| 03:41:30 | 6 | MR. HAMMERMAN: Objection, your Honor. I don't |
| 03:41:30 | 7 | believe it's important to read his email into the record. |
| 03:41:32 | 8 | THE COURT: Is this pertaining to an exhibit? |
| 03:41:34 | 9 | MR. ORMAN: I am asking his email address only, |
| 03:41:38 | 10 | Judge. |
| 03:41:38 | 11 | THE COURT: All right. The objection is overruled. |
| 03:41:40 | 12 | BY MR. ORMAN: |
| 03:41:42 | 13 | Q. Is doctorfahad, correct? |
| 03:41:44 | 14 | A. Doctorfahadq. |
| 03:41:48 | 15 | Q. And you are not a doctor? |
| 03:41:50 | 16 | A. No. |
| 03:41:52 | 17 | MR. ORMAN: May I have a moment, your Honor? |
| 03:41:54 | 18 | THE COURT: Yes. |
| 03:41:56 | 19 | MR. ORMAN: That's enough. |
| 03:41:58 | 20 | THE COURT: All right. Any redirect? |
| 03:42:04 | 21 | MR. HAMMERMAN: Briefly, your Honor. |
| 03:42:04 | 22 | - - - |
| 03:42:04 | 23 | FAHAD QASIM, REDIRECT EXAMINATION |
| 03:42:04 | 24 | BY MR. HAMMERMAN: |
| 03:42:14 | 25 | Q. Mr. Qasim, Mr. Orman asked you a series of questions |

03:42:18  1  regarding conversations that you had with Sandra Kendrick at

03:42:24  2  Blue Cross/Blue Shield.  Do you remember those questions?

03:42:24  3  A.  Yes.

03:42:26  4  Q.  He asked you about audit and what was recorded when.  Do

03:42:30  5  you remember those questions?

03:42:30  6  A.  Yes.

03:42:32  7  Q.  Did you not tell Ms. Kendrick that in your conversations

03:42:36  8  with her, that you were aware of an audit at a Berwyn location

03:42:42  9  that had been audited?

03:42:42  10  A.  Yes.

03:42:42  11  Q.  Did you in sum and substance also tell Ms. Kendrick --

03:42:46  12        THE COURT:  Leading.  You are leading the witness.

03:42:52  13        MR. HAMMERMAN:  Yes, your Honor.

03:42:52  14  BY MR. HAMMERMAN:

03:42:52  15  Q.  In your -- do you recall what you told her about your

03:42:56  16  understanding of whether there had been or had not been an

03:42:58  17  audit at the Cottage Grove location?  Do you remember the

03:43:04  18  exact things you told Ms. Kendrick?

03:43:08  19  A.  Yes.

03:43:08  20  Q.  You do remember.  Okay.  What did you tell Ms. Kendrick

03:43:12  21  about your understanding of whether there had been an audit?

03:43:14  22  A.  I told her that Chhibber became aware of a potential audit

03:43:24  23  that was going to happen, and he closed down the clinic for a

03:43:28  24  day, a couple days, and himself and I think Tyanna and the

03:43:38  25  medical assistants went through the charts and made sure they

| | | |
|---|---|---|
| 03:43:42 | 1 | were ready for an audit. |
| 03:43:44 | 2 | Q. So in your communication with Ms. Kendrick, you informed |
| 03:43:48 | 3 | her that you became aware that an audit was expected, not one |
| 03:43:50 | 4 | that actually had occurred; is that right? |
| 03:43:54 | 5 | A. I was letting her know of the preparation for the audit. |
| 03:43:58 | 6 | I'm not sure if I told her it happened or not, but I did tell |
| 03:44:04 | 7 | her about the preparation for it. |
| 03:44:04 | 8 | Q. Mr. Orman asked you some questions regarding Melvin |
| 03:44:12 | 9 | Rogers. Do you remember those questions? |
| 03:44:12 | 10 | A. Yes. |
| 03:44:12 | 11 | Q. And he asked you whether or not you were qualified to |
| 03:44:16 | 12 | determine whether the tests were necessary or not, right? |
| 03:44:20 | 13 | A. Correct. |
| 03:44:22 | 14 | Q. Do you have an understanding or do you have an opinion of |
| 03:44:24 | 15 | whether the tests you were performing were necessary? |
| 03:44:26 | 16 | A. Yes. |
| 03:44:26 | 17 | Q. What's your opinion of whether your tests -- |
| 03:44:28 | 18 | MR. ORMAN: Objection, your Honor. Not qualified. |
| 03:44:30 | 19 | THE COURT: Sustained. |
| 03:44:32 | 20 | BY MR. HAMMERMAN: |
| 03:44:32 | 21 | Q. Mr. Orman asked you some questions whether Medicare or -- |
| 03:44:42 | 22 | let me rephrase that. |
| 03:44:42 | 23 | Mr. Orman asked you some questions about your |
| 03:44:46 | 24 | understanding of what tests were required or not required of |
| 03:44:50 | 25 | the regulations. Do you remember those questions? |

03:44:52  1   A.  Yes.

03:44:52  2        MR. ORMAN:  Objection, your Honor.  That wasn't the

03:44:54  3   question that I asked.

03:44:58  4        MR. HAMMERMAN:  I can rephrase, your Honor, if it's

03:44:58  5   helpful.

03:45:00  6        THE COURT:  That would solve the problem.

03:45:00  7   BY MR. HAMMERMAN:

03:45:00  8   Q.  Do you remember being asked questions by Mr. Orman

03:45:04  9   regarding your knowledge or lack of knowledge on the precise

03:45:08  10  legal requirements of whether reports need to be written or

03:45:12  11  not?  Do you remember those questions?

03:45:14  12  A.  Yes.

03:45:14  13  Q.  Let me ask you this, Mr. Qasim.  Did there come a time at

03:45:22  14  the Cottage Grove Community Medical Clinic where reports were

03:45:24  15  being written long after the actual tests that you performed

03:45:28  16  had been done?

03:45:30  17  A.  Yes.

03:45:30  18        MR. ORMAN:  Objection.  Asked and answered on direct.

03:45:32  19        THE COURT:  Overruled.

03:45:32  20  BY MR. HAMMERMAN:

03:45:34  21  Q.  Who was writing those reports?

03:45:36  22  A.  Mr. Baig.

03:45:38  23  Q.  Do you have an understanding of who required those reports

03:45:40  24  to be written?

03:45:42  25  A.  Yes.

03:45:42  1  Q.  Who required that those reports be written long after the

03:45:46  2  exams?

03:45:46  3  A.  They are required to be written --

03:45:50  4       MR. ORMAN:  Objection, your Honor.  Needs a

03:45:50  5  foundation.

03:45:50  6       THE COURT:  Sustained.

03:45:52  7  BY MR. HAMMERMAN:

03:45:54  8  Q.  Do you know why Mr. Baig was writing those reports,

03:45:58  9  Mr. Qasim?

03:45:58  10      MR. ORMAN:  Objection.  Foundation.

03:46:00  11      THE COURT:  Sustained.

03:46:00  12  BY MR. HAMMERMAN:

03:46:04  13  Q.  Did you ever have any conversations with Dr. Chhibber on

03:46:06  14  why those reports were being written by Mr. Baig?

03:46:10  15  A.  No.

03:46:10  16  Q.  Did you have any conversations with Mr. Baig on why those

03:46:14  17  reports were being written long after the fact?

03:46:16  18  A.  Yes.

03:46:16  19  Q.  Finally, there were a couple questions that Mr. Orman

03:46:28  20  asked you about who paid you and what kind of tax documents

03:46:32  21  you got.  Do you remember those questions?

03:46:34  22  A.  Yes.

03:46:34  23  Q.  Let me ask you this.  In 2009 when you were working at the

03:46:44  24  Cottage Grove Community Medical Clinic, who was your boss?

03:46:46  25  A.  I understood to be employed by Dr. Chhibber, but I

741

03:46:50   1   reported to Mr. Baig.

03:46:50   2   Q.  Who, to your understanding, called the shots at the

03:46:58   3   Cottage Grove Community Medical Clinic?

03:46:58   4   A.  Dr. Chhibber.

03:46:58   5   Q.  Who was the doctor that made determinations on patient

03:47:02   6   care at the Cottage Grove Community Medical Clinic?

03:47:02   7   A.  Dr. Chhibber.

03:47:04   8            MR. ORMAN:  Objection.  Beyond the scope.

03:47:06   9            THE COURT:  Sustained.

03:47:06  10   BY MR. HAMMERMAN:

03:47:06  11   Q.  Who did you take your direction from while working there

03:47:08  12   in 2009, Mr. Qasim?

03:47:12  13            THE COURT:  That was covered in direct examination.

03:47:14  14            MR. HAMMERMAN:  I have no further questions, your

03:47:16  15   Honor.

03:47:16  16            THE COURT:  Anything further?

03:47:16  17            MR. ORMAN:  Yes, your Honor.

03:47:18  18                         - - -

03:47:18  19            FAHAD QASIM, RECROSS-EXAMINATION

03:47:18  20   BY MR. ORMAN:

03:47:24  21   Q.  I'd just like to get this audit stuff straightened out.

03:47:30  22            You talked to Sandra Kendrick about three audits; is

03:47:36  23   that correct?

03:47:36  24   A.  I believe I spoke to her about a Berwyn and a South Side

03:47:40  25   audit.

03:47:40  1  Q.  You told her there had been an audit of Dr. Chhibber's
03:47:44  2  practice at the Berwyn clinic, correct?
03:47:56  3  A.  I remember speaking to her about an audit in Berwyn.
03:48:02  4  Q.  Do you know whether --
03:48:04  5  A.  I don't remember if I said it was coming, I don't remember
03:48:06  6  if it already happened, but I remember talking about it.
03:48:10  7  Q.  Coming -- or going to happen, do you know whether there
03:48:16  8  was ever an audit at the Berwyn clinic by Medicare?
03:48:18  9  A.  I was never there to witness it myself.
03:48:22  10  Q.  So you don't know?
03:48:22  11  A.  No.
03:48:22  12  Q.  Now, you told Sandra Kendrick that there was a Medicare
03:48:30  13  audit at 79th Street a few months ago, didn't you?
03:48:36  14  A.  In 2009.
03:48:38  15  Q.  That's what you told her?
03:48:40  16  A.  Yes.
03:48:40  17  Q.  And you don't know whether that audit ever happened or
03:48:44  18  not?
03:48:46  19  A.  I say I don't know because other people told me, not --
03:48:50  20        MR. ORMAN:  Objection, your Honor.
03:48:50  21        THE COURT:  Sustained.
03:48:52  22  BY MR. ORMAN:
03:48:52  23  Q.  And you told Sandra Kendrick that there was a Blue Cross
03:48:56  24  audit coming in the future at 79th Street, true?
03:49:00  25  A.  Yes.

| | | |
|---|---|---|
| 03:49:00 | 1 | Q. And you don't know whether there was ever such an audit or |
| 03:49:04 | 2 | not? |
| 03:49:04 | 3 | A. True. |
| 03:49:04 | 4 | MR. ORMAN: No more questions. |
| 03:49:08 | 5 | THE COURT: Any redirect? |
| 03:49:10 | 6 | MR. HAMMERMAN: None, your Honor. |
| 03:49:10 | 7 | THE COURT: All right. You are excused. |
| 03:49:16 | 8 | (Witness excused.) |
| 03:49:16 | 9 | MR. COLE: The government called Dena Hopkins. |
| 03:49:46 | 10 | (Witness sworn.) |
| 03:49:46 | 11 | THE COURT: Please be seated and state your full |
| 03:49:48 | 12 | name. |
| 03:49:48 | 13 | THE WITNESS: Dena Hopkins. |
| 03:49:54 | 14 | THE COURT: How do you spell your first name? |
| 03:49:56 | 15 | THE WITNESS: D-e-n-a. |
| 03:49:58 | 16 | THE COURT: Thank you. |
| 03:50:00 | 17 | - - - |
| 03:50:00 | 18 | DENA HOPKINS, DIRECT EXAMINATION |
| 03:50:00 | 19 | BY MR. HAMMERMAN: |
| 03:50:00 | 20 | Q. Ms. Hopkins, can you please start off by telling the jury |
| 03:50:04 | 21 | your educational background. |
| 03:50:06 | 22 | A. I went to South Shore High School. I graduated in '92. |
| 03:50:10 | 23 | After high school, I went to Illinois School of Health Careers |
| 03:50:16 | 24 | in '98. |
| 03:50:16 | 25 | Q. And did you graduate or receive a certificate from the |

744

03:50:20   1   Illinois School of Health Careers?

03:50:22   2   A.   I did.   I received a certificate for medical assistant.

03:50:26   3   Q.   Any other certificates?

03:50:28   4   A.   No.

03:50:28   5   Q.   Any training in phlebotomy?

03:50:34   6   A.   Yes.

03:50:34   7   Q.   Is that part of that certificate that you received?

03:50:36   8   A.   Yes.

03:50:36   9   Q.   Where do you live, and who do you live with?

03:50:42   10   A.   I live on 7554 South Constance, and I live with my mom,

03:50:46   11   father, and three children.

03:50:46   12   Q.   Are you employed?

03:50:48   13   A.   Yes.

03:50:48   14   Q.   Can you tell the jury where you work.

03:50:52   15   A.   Fortune Group and Home Day Care.

03:50:56   16   Q.   What do you do there?

03:50:56   17   A.   I help -- I am an assistant substitute with the children.

03:50:58   18   Q.   How long have you worked there?

03:51:00   19   A.   Going on three years.

03:51:02   20   Q.   What was your last job in the medical field?

03:51:08   21   A.   It was at Cottage Grove Medical.

03:51:12   22   Q.   Before I talk to you about your work with the defendant, I

03:51:16   23   want to talk to you about some legal trouble that you had in

03:51:18   24   the past.

03:51:20   25         Have you ever been convicted of a crime?

03:51:20   1   A. Yes.

03:51:22   2   Q. When was that?

03:51:22   3   A. That was in -- it had to be in 2000, maybe like 2000.

03:51:30   4   Q. And what was that crime?

03:51:30   5   A. Felony forgery.

03:51:32   6   Q. Did you receive a sentence?

03:51:36   7   A. Yes, one year's probation.

03:51:38   8   Q. And what was it that you forged?

03:51:42   9   A. Childcare checks.

03:51:44   10   Q. Who were the checks made out to?

03:51:46   11   A. My best friend, Frank Smith.

03:51:48   12   Q. I want to talk to you about your work with the defendant.

03:51:50   13   How did you meet the defendant?

03:51:56   14   A. Actually, I met him when I was at 7906 South Crandon,

03:52:02   15   Shore Side, Shore Side Professional Building.

03:52:04   16   Q. What were you doing there?

03:52:06   17   A. My mom is a medical assistant for Dr. Twant (phonetic).

03:52:12   18   Q. How did you come to work for the defendant?

03:52:16   19   A. My friend, Timothy Oakstreet (phonetic), told me he was

03:52:20   20   looking for a medical assistant, and she introduced us.

03:52:22   21   Q. Why did you leave the job you currently had to go with the

03:52:26   22   defendant?

03:52:26   23   A. I just wanted a new job.

03:52:30   24   Q. Were you asked to leave?

03:52:30   25   A. Yes.

03:52:30  1  Q.  What time period did you work for the defendant?

03:52:34  2  A.  Three years.

03:52:36  3  Q.  And when was that?

03:52:38  4  A.  August of 2006, and I left in -- I was terminated in 2009.

03:52:48  5  Q.  How much was he paying you during this time?

03:52:52  6  A.  $10.

03:52:54  7  Q.  An hour?

03:52:56  8  A.  Yeah, an hour.

03:52:56  9  Q.  Can you describe for the jury what you did for the

03:53:00  10  defendant.

03:53:00  11  A.  I was a medical assistant, slash, phlebotomy.  I also did

03:53:06  12  nerve conduction testing, I did bone density testing, I did

03:53:12  13  the ABI testing.  I also ordered supplies for him and also did

03:53:16  14  front work, office work.

03:53:18  15  Q.  And as time went on in your employment with the defendant,

03:53:20  16  did you get a promotion of some sort?

03:53:22  17  A.  Yes, I was office manager.

03:53:24  18  Q.  When did you become office manager?

03:53:26  19  A.  Right after Paula Garza left.  I am not sure of the dates

03:53:32  20  and the year, but right after she left.

03:53:34  21  Q.  So prior to the time you became an office manager, tell

03:53:38  22  the jury in particular what it was that you did as a medical

03:53:42  23  assistant.

03:53:44  24  A.  I did PFTs, I did EKGs, I drew blood, I took vital signs,

03:53:52  25  I did some of the work, the front office work, answered the

03:53:54  1  telephone.

03:53:56  2  Q.  What about bone density tests?

03:53:58  3  A.  Bone density tests, yes.

03:54:00  4  Q.  ABI tests?

03:54:02  5  A.  Yes.

03:54:02  6  Q.  Let's talk about EKG test.  Did you have training in EKGs

03:54:08  7  when you were in school?

03:54:08  8  A.  Yes.

03:54:08  9  Q.  What kind of training did you receive in EKGs while you

03:54:14  10  were working for the defendant in his clinic?

03:54:16  11  A.  One of the other workers explained to me how to do the

03:54:20  12  testing.

03:54:22  13  Q.  How often would you administer EKG tests while working for

03:54:26  14  the defendant?

03:54:26  15  A.  Basically every day.  Every day.

03:54:30  16  Q.  Who was the other worker who trained you?

03:54:32  17  A.  LaTonya Miller.

03:54:34  18  Q.  Approximately how many would you do every day?

03:54:38  19  A.  Maybe at least 10, 10 a day.

03:54:44  20  Q.  Where in the office were these EKGs administered?

03:54:48  21  A.  In the exam rooms.

03:54:50  22  Q.  Now, what kind of a report is generated once you completed

03:54:56  23  an EKG test?

03:54:58  24  A.  There is a standard size paper report once you are done.

03:55:02  25  Q.  And what would you do with this report?

03:55:04  1   A.  Put it in the chart.

03:55:06  2   Q.  And what would happen to the charts at the end of the day?

03:55:10  3   A.  At the end of the day, you get the charts together, and we

03:55:14  4   set them on the back -- on his desk.

03:55:16  5   Q.  Now, how often would you see the defendant looking at EKG

03:55:20  6   reports?

03:55:22  7   A.  Not often.

03:55:22  8   Q.  Now, during the three years that you worked there,

03:55:28  9   approximately how many times did the defendant ask you about

03:55:30  10  the results of an EKG test?

03:55:32  11  A.  Not often.

03:55:34  12  Q.  When you say "not often," what does that mean?

03:55:36  13  A.  Maybe once or twice.

03:55:40  14  Q.  During the entire three years you worked there?

03:55:42  15  A.  Yes.

03:55:42  16  Q.  Let's talk about bone density tests.  Can you describe to

03:55:46  17  the jury what a bone density test is.

03:55:48  18  A.  Actually, it's a machine that the patient lays there, and

03:55:56  19  you get under the scan, and you have to place the lights to

03:55:58  20  the places that you need to be scanned, and you set the

03:56:04  21  machine, and it scans the whole body.

03:56:06  22          MR. JONES:  Judge, the only reason I object, there is

03:56:08  23  no bone density in the indictment.

03:56:10  24          THE COURT:  Overruled.

03:56:12  25  BY MR. COLE:

03:56:14 1 Q. Were you trained on performing bone density tests at
03:56:20 2 school?
03:56:20 3 A. No.
03:56:20 4 Q. Did you receive training when you were at defendant's
03:56:24 5 clinic in performing a bone density test?
03:56:26 6 A. Yes.
03:56:26 7 Q. Can you describe for the jury the training in the machine?
03:56:30 8 A. The manufacturers of the machine, they came for about an
03:56:34 9 hour to teach me how to do the test.
03:56:34 10 Q. What other training did you receive at the defendant's
03:56:38 11 clinic in bone density tests?
03:56:42 12 A. None.
03:56:42 13 Q. Now, were you aware of whether the defendant was offering
03:56:44 14 bone density tests at the clinic prior to the time that you
03:56:48 15 were trained on that machine?
03:56:50 16 A. I'm sorry. Can you repeat that?
03:56:52 17 Q. So prior to the time you were trained on the machine, had
03:56:54 18 the clinic been offering those tests?
03:56:56 19 A. No.
03:56:58 20 Q. Who took the training with you?
03:57:00 21 A. Just me.
03:57:02 22 Q. Did the defendant participate in the training at all?
03:57:06 23 A. No.
03:57:06 24 Q. Where in the test -- in the office were bone density tests
03:57:12 25 performed?

03:57:14    1    A.  In an exam room.

03:57:14    2    Q.  Now, how confident in your ability to perform a bone

03:57:20    3    density test were you after receiving your training?

03:57:22    4            MR. JONES:  Judge, I am going to object.

03:57:24    5            THE COURT:  Overruled.

03:57:26    6            THE WITNESS:  I wasn't at all.

03:57:26    7    BY MR. COLE:

03:57:28    8    Q.  Why not?

03:57:28    9    A.  Because I didn't know what I was doing.  I didn't know

03:57:32    10   what I was doing.

03:57:32    11   Q.  Did you ever tell that to the defendant?

03:57:38    12   A.  Yes.

03:57:38    13   Q.  When?

03:57:38    14   A.  Right after I tried to do it, and I couldn't do it right,

03:57:42    15   and I told him I didn't know exactly what I was doing.

03:57:44    16   Q.  Where in the office did this conversation take place?

03:57:46    17   A.  In the back where he usually sits.

03:57:48    18   Q.  Was anyone else there?

03:57:50    19   A.  No.

03:57:50    20   Q.  What did the defendant tell you?

03:57:52    21           MR. JONES:  Excuse me.  Is this foundation only?

03:57:54    22   Time period?  When was this?

03:57:56    23   BY MR. COLE:

03:57:58    24   Q.  When in your time at the defendant's clinic did you

03:58:00    25   receive this training?

03:58:00  1  A.  I'm not positive.  I'm not sure.

03:58:04  2  Q.  Had you been there a long time, or was it towards the

03:58:08  3  beginning of the time?

03:58:08  4  A.  No, I had been there a while.  I had been there.

03:58:10  5  Q.  Had you become the office manager yet?

03:58:14  6  A.  Yes.

03:58:14  7  Q.  Approximately when did you become office manager?

03:58:16  8  A.  I'm not sure of the time period.

03:58:22  9  Q.  Approximately how long were you office manager before you

03:58:24  10  left the defendant's employment?

03:58:26  11  A.  Maybe about a year.

03:58:28  12  Q.  So this was in the last year of your employment with the

03:58:30  13  defendant?

03:58:30  14  A.  Yes.

03:58:30  15  Q.  What did the defendant tell you after you told him about

03:58:34  16  your concerns about performing the bone density tests?

03:58:36  17  A.  He said that once I kept doing it, I should be all right.

03:58:40  18  Q.  Now, what type of printout or results did the bone density

03:58:48  19  test machine give?

03:58:48  20  A.  A standard size paper printout.

03:58:50  21  Q.  And what did you do with these printouts?

03:58:52  22  A.  Once I was done with it, I placed them in the chart.

03:58:56  23  Q.  And then what did you do with the chart?

03:58:58  24  A.  Once the patient was done with the chart, set it on the

03:59:02  25  back desk where he is, where he sits.

| | | |
|---|---|---|
| 03:59:04 | 1 | Q.  Approximately how many times a week would you perform bone |
| 03:59:10 | 2 | density tests? |
| 03:59:10 | 3 | A.  I know it's every -- it was every day, every day. |
| 03:59:14 | 4 | Q.  How many times a day? |
| 03:59:16 | 5 | A.  Maybe about three to four times a day. |
| 03:59:22 | 6 | Q.  Now, how often did you see the defendant review the bone |
| 03:59:24 | 7 | density test results? |
| 03:59:24 | 8 | A.  Not -- I didn't see it often at all. |
| 03:59:28 | 9 | Q.  How often would the defendant ask you questions about your |
| 03:59:32 | 10 | bone density testing? |
| 03:59:32 | 11 | A.  He didn't. |
| 03:59:34 | 12 | Q.  Never? |
| 03:59:34 | 13 | A.  No. |
| 03:59:36 | 14 | Q.  Let's talk about ABI tests.  Did you perform ABI tests at |
| 03:59:42 | 15 | the defendant's clinic? |
| 03:59:44 | 16 | A.  Yes. |
| 03:59:44 | 17 | MR. JONES:  Judge, the only reason I am objecting |
| 03:59:46 | 18 | again, not in the indictment. |
| 03:59:48 | 19 | THE COURT:  Overruled. |
| 03:59:50 | 20 | BY MR. COLE: |
| 03:59:50 | 21 | Q.  Were you trained on ABI tests at school? |
| 03:59:52 | 22 | A.  No. |
| 03:59:52 | 23 | Q.  Were you trained on ABI tests while working for the |
| 03:59:58 | 24 | defendant? |
| 03:59:58 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 03:59:58 | 1 | Q. Can you please describe that training for the jury. |
| 04:00:02 | 2 | A. I was trained by the manufacturer of the machine for about |
| 04:00:08 | 3 | an hour. |
| 04:00:08 | 4 | Q. Approximately when did this training take place? |
| 04:00:10 | 5 | A. I am not sure. |
| 04:00:16 | 6 | Q. Do you remember if you were the office manager at that |
| 04:00:20 | 7 | time? |
| 04:00:20 | 8 | A. Yes. |
| 04:00:20 | 9 | Q. You were already office manager? |
| 04:00:20 | 10 | A. Yes. |
| 04:00:22 | 11 | Q. Okay. And you said the person who brought in the machine |
| 04:00:26 | 12 | gave you one hour of training. Who was with you in this |
| 04:00:28 | 13 | training? |
| 04:00:28 | 14 | A. Just me. |
| 04:00:30 | 15 | Q. What role did the defendant play in that training? |
| 04:00:36 | 16 | A. None. |
| 04:00:38 | 17 | Q. Can you describe for the jury what an ABI test is. |
| 04:00:46 | 18 | A. Actually, it's a machine where you put leads on the ankles |
| 04:00:50 | 19 | and on the arms, and it's basically for arterial blood -- I am |
| 04:01:00 | 20 | really not that confident at all. |
| 04:01:02 | 21 | Q. Well, did you tell the defendant -- |
| 04:01:06 | 22 | MR. ORMAN: Your Honor, could you have the witness |
| 04:01:08 | 23 | speak up? |
| 04:01:08 | 24 | THE COURT: Yes. Keep your voice up so everybody |
| 04:01:12 | 25 | even in the back of the courtroom can hear you. |

04:01:12  1  BY MR. COLE:

04:01:16  2  Q.  Did you tell the defendant about your concern about your

04:01:20  3  confidence in performing these tests?

04:01:22  4  A.  No.

04:01:22  5  Q.  Why not?

04:01:24  6       MR. JONES:  Wait a minute, Judge.  I am going to

04:01:26  7  object to her speculation.

04:01:26  8       THE COURT:  Sustained.

04:01:28  9  BY MR. COLE:

04:01:28  10  Q.  Now, what type of printout or result did the ABI test

04:01:34  11  machine give?

04:01:34  12  A.  It gave you a strip.  It was a strip of paper.

04:01:38  13  Q.  And what would you do with this strip?

04:01:40  14  A.  Once I am done with the testing, I put it in the chart and

04:01:42  15  placed it on the desk of the doctor.

04:01:44  16  Q.  Now, how often would you perform ABI testing at the

04:01:52  17  defendant's clinic?

04:01:52  18  A.  Every day.

04:01:54  19  Q.  How many times a day?

04:01:54  20  A.  Two to three times a day.

04:01:56  21  Q.  Were you aware of whether anyone at defendant's clinic was

04:02:02  22  performing ABI testing prior to when you were trained?

04:02:06  23  A.  No.

04:02:06  24  Q.  Let me ask you a better question.  Did the defendant's

04:02:12  25  clinic offer ABI tests prior to your training?

04:02:14    1   A.  No.

04:02:14    2   Q.  So when you got trained, it was the first time the machine

04:02:18    3   had come to the office; is that right?

04:02:20    4   A.  Yes.

04:02:20    5   Q.  How often would the defendant ask you about the results of

04:02:24    6   the ABI tests?

04:02:26    7   A.  Not often.

04:02:26    8   Q.  When you say "not often," how many times?

04:02:30    9   A.  Maybe once or twice.

04:02:32   10   Q.  Now, would patients ever ask you why they were getting ABI

04:02:38   11   tests?

04:02:38   12           MR. JONES:  Judge, we object.

04:02:40   13           THE COURT:  Sustained.

04:02:42   14   BY MR. COLE:

04:02:42   15   Q.  Let's talk about PFT tests.  Were you trained on PFT tests

04:02:48   16   at school?

04:02:48   17   A.  No.

04:02:48   18   Q.  What training did you receive on PFT testing once you

04:02:52   19   began working for the defendant?

04:02:54   20   A.  Once I got to the office, one of the co-workers trained me

04:02:58   21   to do PFT testing.

04:03:00   22   Q.  Do you know when approximately that was?

04:03:02   23   A.  As soon as I started working there.  The machine was there

04:03:04   24   when I got there.

04:03:06   25   Q.  Who was it who trained you?

04:03:08  1   A.  It was LaTonya Miller.

04:03:10  2   Q.  Now, after receiving the training, how confident were you

04:03:14  3   in performing the PFT test?

04:03:16  4   A.  Very confident.

04:03:16  5   Q.  Why so confident?

04:03:18  6   A.  It was pretty straightforward.  It was a very easy test to

04:03:22  7   give.

04:03:22  8   Q.  What would you have to do to give that test?

04:03:24  9   A.  You just take the machine, you put all the information for

04:03:30  10  the patient.  Once it's ready, you hit enter, the patient has

04:03:34  11  to take a deep breath, blow, and that's it.  You put it on the

04:03:40  12  thing and a report comes out.

04:03:42  13  Q.  Now, what did you do with the report that came out of the

04:03:44  14  machine?

04:03:44  15  A.  I put it in the chart.

04:03:46  16  Q.  Now, how often would you perform PFT testing at

04:03:50  17  defendant's clinic?

04:03:50  18  A.  Every day.

04:03:50  19  Q.  Approximately how many times a day?

04:03:52  20  A.  Each patient.

04:03:56  21  Q.  Every single patient that came into the clinic?

04:03:58  22  A.  Yes.

04:03:58  23  Q.  Now, how often did you see the defendant review the

04:04:06  24  results of the PFT tests?

04:04:06  25  A.  I didn't see a doctor.

04:04:08   1   Q. How often would he ask you questions about the results of

04:04:12   2   the PFT tests?

04:04:12   3   A. He didn't ask.

04:04:14   4   Q. Now, let's talk about nerve conduction studies. Did you

04:04:18   5   perform nerve conduction studies when you were with the

04:04:22   6   defendant?

04:04:22   7   A. Yes.

04:04:22   8         MR. JONES: Judge, standing objection as to those

04:04:24   9   that are not in the indictment.

04:04:26   10         THE COURT: Overruled. Standing overruled.

04:04:32   11   BY MR. COLE:

04:04:32   12   Q. Can you describe for the jury what a nerve conduction

04:04:34   13   study is.

04:04:34   14   A. A nerve conduction test is a machine where you put the

04:04:40   15   patients up, put their information in, you give them -- you

04:04:46   16   hit start, and it sends a shock through the patients' bodies.

04:04:50   17   Q. What was the patient's reaction to the shock?

04:04:52   18         MR. JONES: Judge, I object.

04:04:54   19         THE COURT: Sustained.

04:04:56   20   BY MR. COLE:

04:04:58   21   Q. Were you trained on nerve conduction studies when you were

04:05:00   22   at school?

04:05:00   23   A. No.

04:05:00   24   Q. Now, what training did you receive in giving nerve

04:05:04   25   conduction studies when you worked at the defendant's clinic?

04:05:08  1  A.  I got trained from Paula Garza.

04:05:10  2  Q.  Approximately how long did the training last?

04:05:12  3  A.  Maybe 30 minutes at the most.

04:05:18  4  Q.  Can you describe this training for the jury?

04:05:20  5  A.  What she did was she had the patient sit there, had me

04:05:26  6  come in the room, and she took me step by step on how to place

04:05:30  7  the sensors onto the patient for the nerve conduction.

04:05:32  8  Q.  How long did it take to administer this nerve conduction

04:05:36  9  test?

04:05:36  10  A.  Twenty minutes at the most.

04:05:36  11  Q.  Now, what type of printout results did this nerve

04:05:40  12  conduction test give?

04:05:42  13  A.  Standardized paper.

04:05:44  14  Q.  Now, what did you do with the test results?

04:05:46  15  A.  Once you are done with it, you put it in the chart.

04:05:48  16  Q.  What would you do with the chart?

04:05:50  17  A.  Put it on the back desk.

04:05:52  18  Q.  Now, how often would you perform nerve conduction tests at

04:05:56  19  defendant's clinic?

04:05:58  20  A.  That was given every couple -- not every day, but maybe

04:06:04  21  once or twice a week.

04:06:06  22  Q.  Now how often did you see the defendant review the results

04:06:10  23  of nerve conduction studies?

04:06:12  24  A.  I didn't see him.

04:06:12  25  Q.  How often would the defendant ask you about nerve

| | | |
|---|---|---|
| 04:06:16 | 1 | conduction study results? |
| 04:06:18 | 2 | A. He didn't. |
| 04:06:20 | 3 | Q. Would patients ever ask you why they were getting these |
| 04:06:24 | 4 | tests? |
| 04:06:24 | 5 | MR. JONES: Objection, your Honor. |
| 04:06:24 | 6 | THE COURT: Sustained. |
| 04:06:26 | 7 | BY MR. COLE: |
| 04:06:26 | 8 | Q. Did you ever inform patients of the results of these |
| 04:06:28 | 9 | tests? |
| 04:06:30 | 10 | MR. JONES: Objection, your Honor. |
| 04:06:30 | 11 | THE WITNESS: No. |
| 04:06:30 | 12 | THE COURT: Sustained. Don't answer a question when |
| 04:06:34 | 13 | counsel stands to object. |
| 04:06:36 | 14 | BY MR. COLE: |
| 04:06:38 | 15 | Q. Did you personally ever inform patients about the results |
| 04:06:40 | 16 | of these tests? |
| 04:06:42 | 17 | MR. JONES: Objection -- |
| 04:06:42 | 18 | THE COURT: This whole line of questioning is |
| 04:06:44 | 19 | hearsay. Sustained to this line of questioning. |
| 04:06:48 | 20 | BY MR. COLE: |
| 04:06:48 | 21 | Q. Now, at some point, you said you became the office |
| 04:06:52 | 22 | manager; is that correct? |
| 04:06:52 | 23 | A. Yes. |
| 04:06:54 | 24 | Q. Can you describe how your duties changed? |
| 04:06:58 | 25 | A. I became the office manager. I ordered supplies for the |

04:07:04    1   office.  I still did my duties as blood drawing, bone density,

04:07:10    2   ABI testing.  I copied charts if an attorney needed it.  I

04:07:18    3   copied charts and sent them out.  That's what I did.

04:07:20    4   Q.  Did you do any billing work for the defendant when you

04:07:22    5   became office manager?

04:07:24    6   A.  Yes.

04:07:24    7   Q.  Who had done the billing work prior to you doing it?

04:07:26    8   A.  LaTonya.

04:07:28    9   Q.  Can you please describe for the jury how you did the

04:07:30   10   billing work.

04:07:32   11   A.  What I did was I took the bills that I got from the chart

04:07:38   12   of the --

04:07:38   13   Q.  Let me stop you.  What's a superbill?

04:07:40   14   A.  A superbill is a standardized sheet of paper where all the

04:07:46   15   procedure codes and ICD-9 codes are.  And once you get the

04:07:50   16   superbill with the chart, he has you check off what's the

04:07:54   17   procedure code and what's the diagnosis at the bottom.

04:07:56   18   Q.  Let me stop you for a moment.  You said "he has you check

04:07:58   19   off."  Who are you referring to?

04:08:00   20   A.  Dr. Chhibber.

04:08:00   21   Q.  So the sheet you were looking at you called a superbill

04:08:04   22   has information on it listing the procedure codes?

04:08:06   23   A.  Yes.

04:08:08   24   Q.  And the diagnosis codes?

04:08:08   25   A.  Yes.

| | | |
|---|---|---|
| 04:08:08 | 1 | Q. And some indication by the defendant about what procedure |
| 04:08:12 | 2 | and what diagnosis should be billed, correct? |
| 04:08:14 | 3 | A. Yes. |
| 04:08:14 | 4 | Q. Once you took this information off the superbill, what did |
| 04:08:18 | 5 | you do? |
| 04:08:18 | 6 | A. We placed it into our computer system, we put it in the |
| 04:08:24 | 7 | computer, and we got our superbills together for the day. We |
| 04:08:28 | 8 | got them together, put them in an envelope, sent them off |
| 04:08:30 | 9 | through UPS to his biller, Jay Tolia. |
| 04:08:38 | 10 | Q. Now, in the course of doing the billing, you view patient |
| 04:08:46 | 11 | after patient's superbill; is that correct? |
| 04:08:48 | 12 | A. Yes. |
| 04:08:48 | 13 | Q. Is that true for basically every patient that went through |
| 04:08:52 | 14 | his clinic when you were the office manager? |
| 04:08:54 | 15 | A. Yes. |
| 04:08:54 | 16 | Q. Did you notice any pattern of diagnoses on the superbill |
| 04:08:58 | 17 | that went along with people who received pulmonary function |
| 04:09:02 | 18 | tests? |
| 04:09:02 | 19 | A. Yes. |
| 04:09:04 | 20 | MR. JONES: Judge, I am going to object. |
| 04:09:04 | 21 | THE COURT: Sustained. |
| 04:09:06 | 22 | BY MR. COLE: |
| 04:09:10 | 23 | Q. Now, generally speaking, what time did you arrive at the |
| 04:09:16 | 24 | clinic each morning? |
| 04:09:18 | 25 | A. 9:00 o'clock. |

04:09:18  1  Q.  What about the defendant?

04:09:20  2  A.  Somewhere around noon or 1:00.

04:09:24  3  Q.  What time was the first scheduled patient appointment?

04:09:26  4  A.  9:00 o'clock.

04:09:28  5  Q.  Now, approximately how many patients were waiting to see

04:09:34  6  the defendant by the time he arrived?

04:09:36  7  A.  About seven to eight.

04:09:38  8  Q.  Did you ever speak to the defendant over the phone about

04:09:40  9  tests he wanted to order on patients prior to his arrival at

04:09:44  10  the clinic?

04:09:44  11  A.  Yes.

04:09:44  12  Q.  How would this come about?

04:09:46  13  A.  He would call the office, and whomever answered the phone

04:09:50  14  at the time was ordered to tell who was all there, get the

04:09:56  15  charts, take them to the back, pick up the phone at the back

04:09:58  16  desk, and he will ask who is all there and ask the last time

04:10:04  17  they were there.

04:10:04  18  Q.  Can you describe in more detail this conversation you had

04:10:08  19  with defendant.

04:10:08  20        MR. JONES:  Well, Judge, I need a foundation.

04:10:12  21  BY MR. COLE:

04:10:12  22  Q.  How often would he call?

04:10:14  23  A.  Every day.

04:10:14  24  Q.  How often would you talk to him?

04:10:18  25  A.  Maybe twice a week or something, twice a week.

| | | |
|---|---|---|
| 04:10:22 | 1 | Q.  Did he ask the same types of questions every time you |
| 04:10:26 | 2 | talked to him? |
| 04:10:26 | 3 | A.  Yes. |
| 04:10:26 | 4 | Q.  Can you describe these questions for the jury, please. |
| 04:10:30 | 5 | A.  Just to ask who all was at the clinic, take the charts to |
| 04:10:34 | 6 | the back, tell me -- look at the charts, tell me what the last |
| 04:10:38 | 7 | thing -- the test performed on the patient. |
| 04:10:42 | 8 | Q.  Did he ever ask you about insurance? |
| 04:10:48 | 9 | MR. JONES:  Objection, Judge.  These are leading |
| 04:10:48 | 10 | questions. |
| 04:10:50 | 11 | THE COURT:  Sustained. |
| 04:10:50 | 12 | BY MR. COLE: |
| 04:10:50 | 13 | Q.  Anything else that he asked you about the patients? |
| 04:10:52 | 14 | A.  No. |
| 04:10:52 | 15 | Q.  Did you notice whether there were certain types of |
| 04:10:58 | 16 | patients who he did not order tests for? |
| 04:11:00 | 17 | MR. JONES:  Objection, Judge. |
| 04:11:02 | 18 | THE COURT:  Sustained. |
| 04:11:02 | 19 | BY MR. COLE: |
| 04:11:04 | 20 | Q.  Did you notice anything about the types of patients that |
| 04:11:08 | 21 | he was discussing with you and the tests he was ordering? |
| 04:11:12 | 22 | MR. JONES:  Judge, I'm going to object. |
| 04:11:12 | 23 | THE COURT:  Sustained. |
| 04:11:14 | 24 | BY MR. COLE: |
| 04:11:18 | 25 | Q.  Would he order tests for Medicaid patients? |

| | | |
|---|---|---|
| 04:11:24 | 1 | MR. JONES: Judge, see, this is the same. |
| 04:11:24 | 2 | THE COURT: Sustained. Leading and suggestive. |
| 04:11:30 | 3 | BY MR. COLE: |
| 04:11:30 | 4 | Q. Did the defendant speak with anyone else at the clinic |
| 04:11:32 | 5 | about testing he wanted to have ordered? |
| 04:11:34 | 6 | A. Yes. |
| 04:11:34 | 7 | Q. Who else did he speak with? |
| 04:11:36 | 8 | A. LaTonya Miller, Paula Garza, like I said, whoever answered |
| 04:11:42 | 9 | the phone at the time that he called. |
| 04:11:44 | 10 | Q. Would he also speak to Mr. Baig? |
| 04:11:46 | 11 | A. Yes. |
| 04:11:46 | 12 | Q. What about Mr. Qasim? |
| 04:11:50 | 13 | A. No. |
| 04:11:50 | 14 | Q. Now, when the defendant asked -- would the defendant then |
| 04:11:56 | 15 | actually order tests for patients on the phone? |
| 04:12:00 | 16 | A. Yes. |
| 04:12:00 | 17 | Q. Now, would this be for new patients at the clinic or only |
| 04:12:06 | 18 | established patients? |
| 04:12:08 | 19 | A. Established patients. |
| 04:12:08 | 20 | Q. Did he ever order tests on new patients? |
| 04:12:12 | 21 | MR. JONES: Judge, she's answered this question. |
| 04:12:16 | 22 | THE COURT: Sustained. |
| 04:12:16 | 23 | BY MR. COLE: |
| 04:12:26 | 24 | Q. Let me talk to you about copays. How often did you take a |
| 04:12:32 | 25 | copayment from a patient? |

04:12:32   1   MR. JONES: Objection. Relevance, Judge.

04:12:34   2   THE COURT: Overruled.

04:12:36   3   THE WITNESS: Basically, not too much.

04:12:44   4   BY MR. COLE:

04:12:46   5   Q. When you say "not too much," what does that mean?

04:12:48   6   A. Every day, we would take two or three patients a day.

04:12:52   7   Q. Why were you not taking them from every patient?

04:12:56   8   A. Sometimes they just slipped through the cracks or we

04:13:00   9   forget to get them.

04:13:00   10   Q. Now, are you aware of how defendant acquired new patients?

04:13:12   11   A. I'm sorry?

04:13:16   12   Q. Are you aware of any marketing or anything else the

04:13:20   13   defendant did to acquire new patients?

04:13:22   14   A. Yes.

04:13:22   15   MR. JONES: Objection. Foundation, Judge.

04:13:24   16   BY MR. COLE:

04:13:24   17   Q. How were you aware of it?

04:13:26   18   A. The Trinity list, the Trinity Hospital has a list where

04:13:32   19   you can pull up the patients that were seen in the ER the day

04:13:34   20   before. The defendant, Dr. Chhibber --

04:13:38   21   THE COURT: The objection was to foundation. Would

04:13:42   22   you please establish personal knowledge.

04:13:44   23   BY MR. COLE:

04:13:46   24   Q. How do you know about this Trinity list?

04:13:46   25   A. I seen him do it.

04:13:48 | 1 | Q. You seen who do it?

04:13:50 | 2 | A. Dr. Chhibber.

04:13:50 | 3 | Q. Where did you see this?

04:13:52 | 4 | A. In the back where he usually sits.

04:13:56 | 5 | Q. When was this?

04:13:56 | 6 | A. When he'd come in in the morning or in the afternoon.

04:14:00 | 7 | Q. How often would this happen?

04:14:02 | 8 | A. Every day.

04:14:04 | 9 | Q. Can you tell the jury what it was that you observed the

04:14:10 | 10 | defendant doing?

04:14:10 | 11 | A. Going into the Trinity database, into the ER, pulling out

04:14:16 | 12 | the patients that were seen in the ER, and that's how I seen

04:14:20 | 13 | him do it, printing it out.

04:14:22 | 14 | Q. When he'd pull the patients out of the list of patients

04:14:26 | 15 | seen at the ER, what would he do with this list?

04:14:28 | 16 | A. He would give it to Paula Garza, check off who he wanted

04:14:32 | 17 | her to --

04:14:32 | 18 | MR. JONES: I'm going to object, Judge.

04:14:36 | 19 | THE COURT: All right. The objection is sustained.

04:14:38 | 20 | She's gone beyond the question.

04:14:40 | 21 | BY MR. COLE:

04:14:42 | 22 | Q. You said he would print off the list?

04:14:44 | 23 | A. Yes.

04:14:44 | 24 | Q. Would he do anything with the list that he printed off

04:14:48 | 25 | before he gave the list to anyone else?

04:14:50  1  A.  He will check off who he wanted to be called.

04:14:52  2  Q.  Did he ever tell you or did you ever observe the names

04:14:56  3  that he was checking off the list?

04:14:58  4  A.  No.

04:15:00  5  Q.  Do you know -- do you have any basis of understanding as

04:15:04  6  to why he checked off certain names?

04:15:06  7       MR. JONES:  Judge, I'm going to object.

04:15:08  8       THE COURT:  Sustained.

04:15:10  9  BY MR. COLE:

04:15:12  10 Q.  Did anyone ever -- did the defendant ever tell you why he

04:15:14  11 was checking off certain names?

04:15:16  12 A.  No.

04:15:16  13 Q.  Did you ever hear the defendant talk about why he was

04:15:22  14 checking off certain names?

04:15:24  15 A.  No.

04:15:24  16 Q.  Did you ever see a pattern in the names that were checked

04:15:26  17 off?

04:15:26  18      MR. JONES:  Judge, I object.

04:15:28  19      THE COURT:  Sustained.

04:15:28  20 BY MR. COLE:

04:15:30  21 Q.  Once the names on this list were checked off, what would

04:15:34  22 happen to this list?

04:15:34  23 A.  They would get called into the office to see Dr. Chhibber.

04:15:38  24 Q.  Who would call them?

04:15:40  25 A.  Paula.

| | | |
|---|---|---|
| 04:15:42 | 1 | Q.  Did you ever hear Paula calling them? |
| 04:15:46 | 2 | A.  Yes. |
| 04:15:46 | 3 | Q.  What did Paula say to them? |
| 04:15:48 | 4 | MR. JONES:  Object, Judge.  Hearsay. |
| 04:15:50 | 5 | THE COURT:  Sustained. |
| 04:15:52 | 6 | BY MR. COLE: |
| 04:15:56 | 7 | Q.  Now, can you describe for the jury how you left your |
| 04:16:00 | 8 | employment with the defendant. |
| 04:16:00 | 9 | A.  I was terminated in 2009.  I was called into his office. |
| 04:16:10 | 10 | He was out of town, and he couldn't get -- he left the checks |
| 04:16:14 | 11 | with his wife.  The wife called the office and asked if I |
| 04:16:18 | 12 | could wait until Monday to -- |
| 04:16:20 | 13 | MR. JONES:  Judge, I am going to object. |
| 04:16:22 | 14 | THE COURT:  Sustained.  Would you just put questions |
| 04:16:24 | 15 | to the witness instead of a narrative. |
| 04:16:28 | 16 | BY MR. COLE: |
| 04:16:28 | 17 | Q.  Do you have an understanding as to why it was you were |
| 04:16:32 | 18 | terminated from the defendant's employment? |
| 04:16:32 | 19 | A.  I believe it was just hearsay. |
| 04:16:38 | 20 | MR. JONES:  Judge, see, I am going to object. |
| 04:16:40 | 21 | THE COURT:  Okay.  I guess I have to sustain that |
| 04:16:42 | 22 | objection. |
| 04:16:44 | 23 | BY MR. COLE: |
| 04:16:46 | 24 | Q.  When you were terminated from the defendant's employment, |
| 04:16:48 | 25 | did you continue working for him for a period of time? |

04:16:50  1  A.  Yes.

04:16:50  2  Q.  How long?

04:16:52  3  A.  About a week.

04:16:54  4  Q.  Can you explain that to the jury, why you still worked for

04:16:58  5  him.

04:16:58  6  A.  Yes, I had got a loan from the defendant for $1600, and

04:17:08  7  after -- before I left, they were taking money out of my

04:17:12  8  check.  And once I was terminated, his wife asked me --

04:17:14  9          MR. JONES:  Judge, I object.

04:17:14  10          THE COURT:  Now, all right.  Put another question to

04:17:18  11  the witness.

04:17:18  12  BY MR. COLE:

04:17:20  13  Q.  Now, had you borrowed money from the defendant?

04:17:22  14  A.  Yes.

04:17:22  15  Q.  And you hadn't finished paying it back; is that correct?

04:17:26  16  A.  Yes.

04:17:26  17  Q.  And then when you were terminated, did you have a

04:17:30  18  conversation with the defendant about working with him a

04:17:32  19  little bit longer?

04:17:32  20  A.  Yes.

04:17:34  21  Q.  And why would you be working a little bit longer?

04:17:38  22  A.  To pay back the money.

04:17:38  23  Q.  Now, you recall being interviewed by an investigator for

04:17:44  24  Blue Cross; is that correct?

04:17:46  25  A.  Yes.

| | | |
|---|---|---|
| 04:17:46 | 1 | Q.  Did you tell -- what did you tell the investigator why you |
| 04:17:52 | 2 | were fired from your job? |
| 04:17:54 | 3 | A.  I didn't tell him. |
| 04:17:54 | 4 | MR. JONES:  I object, Judge.  That's hearsay. |
| 04:17:56 | 5 | THE COURT:  Sustained. |
| 04:17:58 | 6 | BY MR. COLE: |
| 04:18:00 | 7 | Q.  Did the defendant ever give you a job reference after your |
| 04:18:04 | 8 | termination? |
| 04:18:04 | 9 | A.  Yes. |
| 04:18:04 | 10 | Q.  With who? |
| 04:18:06 | 11 | A.  Dr. Byas. |
| 04:18:06 | 12 | Q.  How do you spell that? |
| 04:18:08 | 13 | A.  B-y-a-s. |
| 04:18:08 | 14 | Q.  And who is Dr. Byas? |
| 04:18:12 | 15 | A.  He is an internal medicine doctor. |
| 04:18:14 | 16 | Q.  And did Dr. Byas actually call you, or did you call him? |
| 04:18:22 | 17 | A.  He called me. |
| 04:18:24 | 18 | Q.  Did he explain to you why he called you? |
| 04:18:26 | 19 | A.  Yes, he wanted me -- |
| 04:18:26 | 20 | MR. JONES:  Objection, Judge. |
| 04:18:28 | 21 | THE COURT:  You know these are hearsay questions. |
| 04:18:30 | 22 | Please don't go into third-party conversations unless |
| 04:18:34 | 23 | Dr. Chhibber was present. |
| 04:18:36 | 24 | BY MR. COLE: |
| 04:18:36 | 25 | Q.  Did you ever go work for Dr. Byas? |

| | | |
|---|---|---|
| 04:18:38 | 1 | A.  No. |
| 04:18:40 | 2 | Q.  Why is that? |
| 04:18:40 | 3 | MR. JONES:  Judge, object. |
| 04:18:42 | 4 | THE COURT:  Sustained. |
| 04:19:22 | 5 | MR. COLE:  May I have a moment, your Honor? |
| 04:19:24 | 6 | THE COURT:  Yes. |
| 04:19:24 | 7 | (Brief pause.) |
| 04:19:24 | 8 | MR. COLE:  I have no other questions, your Honor. |
| 04:19:26 | 9 | THE COURT:  Cross-examination? |
| 04:19:26 | 10 | MR. JONES:  Yes, your Honor. |
| 04:19:28 | 11 | - - - |
| 04:19:28 | 12 | DENA HOPKINS, CROSS-EXAMINATION |
| 04:19:28 | 13 | BY MR. JONES: |
| 04:19:52 | 14 | Q.  Ms. Hopkins, one of the things that you said was that you |
| 04:19:56 | 15 | would perform these tests and that the doctor never asked you |
| 04:20:02 | 16 | how these tests go; is that correct? |
| 04:20:04 | 17 | A.  Yes. |
| 04:20:04 | 18 | Q.  Well, first of all, you had no expertise in reading EKG |
| 04:20:10 | 19 | results, did you? |
| 04:20:10 | 20 | A.  No. |
| 04:20:10 | 21 | Q.  So why would the doctor do a useless act by asking you |
| 04:20:18 | 22 | about the tracings on the EKG? |
| 04:20:20 | 23 | MR. COLE:  Object to the form. |
| 04:20:20 | 24 | THE COURT:  Sustained. |
| 04:20:22 | 25 | BY MR. JONES: |

| | | |
|---|---|---|
| 04:20:24 | 1 | Q. You couldn't -- as you just told us, you couldn't read the |
| 04:20:28 | 2 | tracings on the EKG, right? |
| 04:20:30 | 3 | A. Right. |
| 04:20:30 | 4 | Q. And the same thing was true with these ABI tests that you |
| 04:20:36 | 5 | could barely do the name for us, you couldn't interpret those |
| 04:20:42 | 6 | tests, could you? |
| 04:20:44 | 7 | MR. COLE: Object to the form of the question. |
| 04:20:46 | 8 | THE COURT: Could you restate it without the |
| 04:20:50 | 9 | editorial. |
| 04:20:54 | 10 | BY MR. JONES: |
| 04:20:54 | 11 | Q. Ma'am, you could look at those tests, and you did not |
| 04:20:56 | 12 | understand how to interpret those tests, could you? |
| 04:20:58 | 13 | A. No. |
| 04:20:58 | 14 | Q. And as for this whole thing with Trinity and these Trinity |
| 04:21:16 | 15 | lists, you have no idea whether these were Dr. Chhibber's |
| 04:21:22 | 16 | patients, do you? |
| 04:21:24 | 17 | A. No. |
| 04:21:24 | 18 | Q. You know, you talked to us about -- you talked about the |
| 04:22:18 | 19 | $1600 that you owed to Dr. Chhibber. Do you recall that? |
| 04:22:20 | 20 | A. Yes. |
| 04:22:20 | 21 | Q. I want to show you what's been marked as Government's |
| 04:22:26 | 22 | 146-1. And is that the -- is that the $1600 that Dr. Chhibber |
| 04:22:36 | 23 | loaned you? |
| 04:22:38 | 24 | A. Yes. |
| 04:22:38 | 25 | MR. COLE: Can I see a copy? I think you mean |

04:22:42  1  Defendant's 147.

04:22:44  2         MR. JONES:  Yes.

04:23:00  3  BY MR. JONES:

04:23:02  4  Q.  That's the check, is it not?

04:23:06  5  A.  Yes.

04:23:06  6  Q.  And that's the check that the doctor gave you on 7/23/08;

04:23:14  7  is that correct?

04:23:14  8  A.  Yes.

04:23:14  9  Q.  And he gave you that check because you and those three

04:23:16  10  children that you talked to us about were being put out of

04:23:18  11  your house, right?

04:23:20  12  A.  No.

04:23:20  13  Q.  Well, what did he give you the $1600 for?

04:23:24  14  A.  To move with.

04:23:26  15  Q.  That's right, because you had to get out.  You needed to

04:23:28  16  move, right?

04:23:28  17  A.  No.

04:23:28  18  Q.  Well, why do you say he gave you the $1600?

04:23:34  19  A.  To find a new apartment.

04:23:34  20  Q.  All right.  To find a new apartment.  Well, weren't you

04:23:38  21  being put out of the one you were in?

04:23:40  22  A.  No.

04:23:40  23  Q.  So he was still giving you the money so you could live in

04:23:42  24  a better place?

04:23:44  25  A.  Yes.

04:23:44  1   Q.  All right.  And what you told -- when you had an interview

04:23:52  2   with the FBI on 10/5/2011, you told the FBI that you still

04:24:00  3   owed Dr. Chhibber at the time of your leaving, that you still

04:24:04  4   owed him money; isn't that correct?

04:24:10  5          In fact, what you did was you told the FBI not that

04:24:14  6   it was paid off.  You said that you owed him $600 at the time

04:24:18  7   you left?

04:24:18  8          MR. COLE:  Object to the form.

04:24:22  9          THE COURT:  Well, I think he withdrew the first

04:24:24  10  question.

04:24:26  11         MR. JONES:  Yes.

04:24:26  12         THE COURT:  Do you understand the question?

04:24:26  13         MR. JONES:  Judge, I will rephrase it for her.

04:24:28  14         THE COURT:  Okay.

04:24:30  15  BY MR. JONES:

04:24:30  16  Q.  Isn't it a fact that on 10/5/2011, you told the FBI that

04:24:36  17  when you left, you still -- you had repaid approximately $600?

04:24:40  18  Isn't that what you told them?

04:24:42  19  A.  I am not -- can you say it again?

04:24:44  20  Q.  Yeah, I'm going to say it real slow.

04:24:46  21         MR. COLE:  Objection, your Honor.

04:24:48  22         THE COURT:  Sustained.

04:24:48  23  BY MR. JONES:

04:24:50  24  Q.  At the time -- didn't you tell the FBI on October 5th,

04:24:54  25  2011, that at the time you left Dr. Chhibber, you had paid

04:25:00  1  everything -- you only owed him $600?

04:25:04  2  A.  No.

04:25:06  3  Q.  Let me show you the interview from that day.  I just want

04:25:10  4  to see if that will refresh your recollection, that paragraph.

04:25:14  5       MR. COLE:  Objection, your Honor.  The witness has

04:25:18  6  not said her recollection needs to be refreshed.

04:25:20  7       THE COURT:  Overruled.

04:25:22  8  BY MR. JONES:

04:25:24  9  Q.  Do you see that paragraph, ma'am?

04:25:24  10  A.  I see it.

04:25:26  11  Q.  And I just want to know, is it still your story now

04:25:30  12  that --

04:25:30  13       MR. COLE:  Objection, your Honor.

04:25:32  14       THE COURT:  Sustained.

04:25:32  15  BY MR. JONES:

04:25:32  16  Q.  Is it still your testimony now that you didn't tell the

04:25:36  17  FBI that you only owed him $600 at the time you left?

04:25:42  18  A.  At the time I left, I owed him -- it was more than $600.

04:25:48  19  Q.  In fact, what you told the FBI, you didn't tell the FBI

04:25:50  20  about anything about your having worked this off.  You told

04:25:56  21  the FBI that they had been taking it out of your paychecks?

04:26:00  22  A.  Exactly.

04:26:00  23  Q.  Well, you know, ma'am, I got all your paychecks.

04:26:06  24  Government Exhibit --

04:26:06  25       MR. COLE:  Objection, your Honor.

| | | |
|---|---|---|
| 04:26:10 | 1 | THE COURT:  Go ahead. |
| 04:26:10 | 2 | BY MR. JONES: |
| 04:26:12 | 3 | Q.  Government Exhibit 145-1.  Why don't you tell us which one |
| 04:26:14 | 4 | of those paychecks that any of that money was ever taken out |
| 04:26:20 | 5 | of. |
| 04:26:24 | 6 | I'm sorry, Defendant's Exhibit. |
| 04:26:26 | 7 | THE COURT:  What was the number again? |
| 04:26:28 | 8 | MR. JONES:  145-1. |
| 04:27:14 | 9 | THE WITNESS:  I don't see it. |
| 04:27:14 | 10 | BY MR. JONES: |
| 04:27:14 | 11 | Q.  All right.  Now, obviously, you've told us that you were |
| 04:27:24 | 12 | fired by Dr. Chhibber; is that correct? |
| 04:27:26 | 13 | A.  Yes. |
| 04:27:26 | 14 | Q.  And you're very bitter about being fired, weren't you? |
| 04:27:30 | 15 | A.  No. |
| 04:27:30 | 16 | Q.  The best job that you have had -- you haven't had a job as |
| 04:27:36 | 17 | good as the one with Dr. Chhibber since you have been fired; |
| 04:27:38 | 18 | isn't that right? |
| 04:27:38 | 19 | A.  No. |
| 04:27:38 | 20 | Q.  Are you getting paid more now than you were being paid by |
| 04:27:44 | 21 | Dr. Chhibber? |
| 04:27:44 | 22 | A.  Yes. |
| 04:27:44 | 23 | Q.  When did that happen? |
| 04:27:46 | 24 | A.  Once I started working at the day care. |
| 04:27:48 | 25 | Q.  And how long has that been? |

04:27:50  1   A.  I have been there for three years.

04:27:52  2   Q.  Now, you admitted that at the time you started working for

04:28:02  3   Dr. Chhibber that you had a felony conviction for forgery;

04:28:06  4   isn't that correct?

04:28:06  5   A.  Yes.

04:28:08  6   Q.  Now, you never told the doctor that you had a felony

04:28:10  7   conviction for forgery, did you?

04:28:12  8   A.  Yes.

04:28:12  9   Q.  You say you told him?

04:28:14  10  A.  Yes, I did.

04:28:16  11  Q.  Well, then he really gave you a break by keeping you hired

04:28:20  12  after you say you told him that you had a felony conviction

04:28:24  13  for forgery; is that correct?

04:28:26  14          MR. COLE:  Objection.

04:28:26  15          THE COURT:  Sustained.

04:28:26  16  BY MR. JONES:

04:28:28  17  Q.  So you say he knew, but he kept you hired; is that right?

04:28:32  18  A.  Yes.

04:28:32  19  Q.  All right.  Ms. Hopkins, did you ever make a complaint to

04:29:52  20  the Inspector General?

04:29:52  21  A.  I don't understand the question.

04:29:52  22  Q.  Well, did you ever make a complaint to the Inspector

04:29:58  23  General of Illinois?

04:30:00  24  A.  No.

04:30:00  25  Q.  And if you had made a complaint to the Inspector General

| | | |
|---|---|---|
| 04:30:04 | 1 | of Illinois, I think we can assume that you know how to spell |
| 04:30:06 | 2 | your own name; is that correct? |
| 04:30:08 | 3 | MR. COLE:  Speculation, your Honor.  Objection. |
| 04:30:10 | 4 | THE COURT:  Sustained. |
| 04:30:12 | 5 | BY MR. JONES: |
| 04:30:22 | 6 | Q.  Here, I just want to show you what's been marked as |
| 04:30:26 | 7 | Defendant's Exhibit 44 and just ask, did you ever send this |
| 04:30:32 | 8 | email? |
| 04:30:36 | 9 | MR. JONES:  Hold on one second. |
| 04:30:40 | 10 | MR. HAMMERMAN:  We have it. |
| 04:30:42 | 11 | BY MR. JONES: |
| 04:30:44 | 12 | Q.  This is the email that purports to be to the Inspector |
| 04:30:46 | 13 | General under the name of D and then Hopkins.  Did you ever |
| 04:30:54 | 14 | send that email? |
| 04:30:54 | 15 | A.  No, I didn't. |
| 04:30:54 | 16 | MR. JONES:  Thank you.  I don't have any further |
| 04:30:56 | 17 | questions, Judge. |
| 04:30:56 | 18 | THE COURT:  Any redirect? |
| 04:30:58 | 19 | MR. COLE:  No, your Honor. |
| 04:30:58 | 20 | THE COURT:  All right.  Perfect timing.  We are going |
| 04:31:00 | 21 | to recess for the day.  Have a good evening.  Please don't |
| 04:31:04 | 22 | discuss the case with anyone. |
| 04:31:06 | 23 | We will resume at 9:00 o'clock tomorrow morning. |
| 04:31:08 | 24 | Thank you. |
| 04:31:08 | 25 | The jury leaves the courtroom.) |

04:31:42  1       THE COURT:  You are excused.  Thank you.

04:31:42  2   (Witness excused.)

04:31:50  3       THE COURT:  I reserved ruling on Government Exhibit

04:31:54  4  620, the big exhibit at the end of the Volume 2, I believe it

04:32:02  5  is.  There was an objection.  Do you want to state the basis

04:32:10  6  for your objection?

04:32:14  7       MR. ORMAN:  As the witness, Mr. Fahad, indicated, he

04:32:38  8  did not know how many patients the doctor saw on each day that

04:32:44  9  is reflected in the procedure logs, your Honor.  Absent that

04:32:48  10  information, the jury could draw the inference that this is

04:32:52  11  all there was and that every patient did, in fact, get tested

04:32:58  12  on those days when that just didn't happen.

04:33:08  13       THE COURT:  Would you explain specifically -- let me

04:33:12  14  look at 620.

04:33:18  15       Is it a foundational objection you have?  I am not

04:33:22  16  sure I understand.

04:33:24  17       MR. ORMAN:  It is a relevance objection because there

04:33:28  18  is no foundation or correlation will ever be made.

04:33:38  19       THE COURT:  These are the logs with patients' names

04:33:48  20  and the Xs?

04:33:50  21       MR. HAMMERMAN:  All the tests that they received,

04:33:56  22  your Honor.

04:33:56  23       MR. ORMAN:  Yes.

04:33:56  24       THE COURT:  Well, one thing I recall from the

04:34:06  25  witness' testimony was that these circles, certain things that

04:34:12    1  are circled, he said those weren't on these exhibits when he

04:34:18    2  saw them.

04:34:20    3           MR. ORMAN:  Yes.

04:34:20    4           THE COURT:  He never saw these circles.

04:34:22    5           MR. HAMMERMAN:  He didn't see the circles, your

04:34:24    6  Honor, and he also said they had no import to him, but he did

04:34:26    7  say that even those that were circled were tests that he

04:34:30    8  performed.  There was a question of whether or not these tests

04:34:34    9  were performed and what these logs reflect, and the witness

04:34:36   10  was very clear that these records reflect the tests that he

04:34:40   11  and Mr. Baig performed, these records were maintained -- they

04:34:44   12  were first of all generated at or about the time that the

04:34:46   13  information contained therein is reflected.

04:34:50   14           THE COURT:  But they have been altered or highlighted

04:34:52   15  in some way.

04:34:52   16           MR. HAMMERMAN:  There is a circle around certain of

04:34:56   17  them.  That's not -- your Honor, the import of the actual

04:34:58   18  records is that the tests were performed.  Whether or not --

04:35:02   19  and the question Mr. Orman asked was whether or not they were

04:35:04   20  free or not is of absolutely no relevance.  The question here

04:35:06   21  is whether the tests were performed, and a sufficient business

04:35:10   22  records foundation was laid for these.

04:35:12   23           Mr. Orman is making a relevancy argument he just

04:35:18   24  cited to your Honor, and that is the question is, does the

04:35:20   25  evidence tend to make the fact of the consequence more

04:35:22  1  probable or less probable.  Clearly, these records that showed

04:35:24  2  that every patient -- that these lists of patients were

04:35:28  3  receiving, you know, a number of these same tests, the same

04:35:32  4  type of tests at the same time day after day is clearly

04:35:36  5  relevant.  It tends to show that Dr. Chhibber was ordering an

04:35:42  6  enormous amount of these tests.

04:35:42  7  And the proper business records foundation, which

04:35:46  8  Mr. Orman did not challenge in his cross-examination and has

04:35:50  9  not challenged now in his objection, was laid.  So that meets

04:35:54  10  the relevancy standard.  It meets the business records

04:35:56  11  foundation.  We believe we have done everything we were

04:35:58  12  required to do for their admission, and we are now seeking

04:36:00  13  their admission.

04:36:02  14  THE COURT:  What more can the government do,

04:36:04  15  Mr. Orman?

04:36:06  16  MR. ORMAN:  I will tell you what they can do, Judge.

04:36:08  17  They can get an expert, as you advised them to do and which

04:36:14  18  they have chosen not to do.

04:36:16  19  THE COURT:  That was on the medical necessity issue.

04:36:18  20  MR. ORMAN:  Same issue, Judge.  The government's

04:36:22  21  arguing, Well, we have all of these tests; therefore,

04:36:28  22  something wrong must be going on.  They're missing the tie.

04:36:34  23  They need somebody to correlate these with something that

04:36:36  24  matters.  In other words, they need an expert to say, yeah,

04:36:42  25  there were a lot of tests, and tests 1, 2, and 4 should not

04:36:46   1   have been done.

04:36:48   2           MR. HAMMERMAN:  Your Honor --

04:36:50   3           MR. ORMAN:  The mere fact that a test is done means

04:36:52   4   nothing.  If we are going to allow the government all of these

04:36:58   5   tests, therefore, they must be bad, that's just not connecting

04:37:00   6   the information.

04:37:02   7           MR. HAMMERMAN:  Your Honor, there is simply no rule

04:37:02   8   of evidence that Mr. Orman is citing that would require the

04:37:06   9   government to have an expert opine on every issue put before

04:37:10  10   the jury.  There is no such rule.

04:37:12  11           These documents are relevant, and we have laid the

04:37:16  12   proper foundation for them.  They tend to show the fact of

04:37:22  13   consequences more probable than not.  That is all we are

04:37:24  14   required to show.

04:37:26  15           Mr. Orman's argument as to weight is in closing

04:37:28  16   argument.  It's not an argument of admission.  So we believe

04:37:30  17   that we have met our foundational requirements to admit the

04:37:38  18   document.  Mr. Orman, of course, is free to make the same

04:37:40  19   argument he is making to your Honor at closing and to say that

04:37:44  20   they don't know what test was or was not required, but that

04:37:46  21   goes to weight, not admission.  This meets the admissibility

04:37:50  22   requirements of relevance, and we would ask that it be

04:37:54  23   admitted, Judge.

04:37:54  24           THE COURT:  I do find that there was a sufficient

04:37:56  25   foundation laid for the admissibility of Government

04:38:02    1    Exhibit 620, and so Group Exhibit 620 is admitted.

04:38:02    2      (Above-mentioned exhibit was received in evidence.)

04:38:10    3          THE COURT:  Now, with respect to the defendant's

04:38:20    4    motion for an evidentiary hearing regarding the circumstances

04:38:24    5    of the destruction of emails and texting between Special

04:38:40    6    Agent --

04:38:40    7          MR. ORMAN:  Anton.

04:38:46    8          THE COURT:  -- Kathy Anton and the witness who

04:38:48    9    testified today, have the parties discussed a possible

04:38:52   10    stipulation as to her deleting those emails and text messages?

04:39:04   11          MR. HAMMERMAN:  We broached the subject matter with

04:39:06   12    Mr. Jones, who suggested that we convene an hour after court

04:39:10   13    was concluded today to see if we could work something out.  We

04:39:12   14    unfortunately did not have the opportunity to do so during the

04:39:14   15    lunch hour, so we were hoping to do so this evening.

04:39:18   16          THE COURT:  I must say counsel for both sides have

04:39:20   17    been extremely diligent and thorough.  I haven't seen a better

04:39:30   18    prepared case on both sides.  I know that you are busy.  But

04:39:32   19    see if you can work something out without my having to rule on

04:39:40   20    this motion.

04:39:40   21          MR. HAMMERMAN:  We'll do our best, your Honor.

04:39:40   22          MR. COLE:  Thank you, your Honor.

04:39:42   23          MR. HAMMERMAN:  Can I raise one more issue before the

04:39:44   24    court now because I believe it will be an issue tomorrow?

04:39:44   25          THE COURT:  Yes.

04:39:46  1    MR. HAMMERMAN:  We previously sought the admission of

04:39:50  2  Government Exhibit 628 and 629.  These are exhibits that were

04:39:56  3  mentioned during the testimony of Special Agent Kory Bakken.

04:39:58  4  We are seeking to admit these exhibits into evidence again

04:40:02  5  tomorrow during the testimony of one of our agents.  Based on

04:40:06  6  Mr. Orman's prior objection, I thought it would be appropriate

04:40:08  7  to raise the issue now.

04:40:10  8    We will be able, your Honor, to raise -- to establish

04:40:12  9  a business records foundation once again for these exhibits.

04:40:16 10  The witness who was required to put these exhibits together

04:40:20 11  and use them as part of her job performance will testify.

04:40:24 12    Mr. Orman, his objection last time was that it would

04:40:28 13  be somehow prejudicial for the jury to see progress notes

04:40:34 14  taken out of charts without the context around them, but as

04:40:38 15  your Honor may recall, immediately after Mr. Orman made that

04:40:42 16  particular argument, Mr. Jones cross-examined Twahki Rhodes by

04:40:48 17  showing her progress notes taken out of charts for the free

04:40:50 18  clinic days as he asked her again and again, Do you know if

04:40:54 19  this test was paid for, do you know if this test was paid for

04:40:56 20  and basically has now taken these same type of notes out and

04:41:00 21  used them as, frankly, a sword in their efforts to attack our

04:41:08 22  witnesses.

04:41:08 23    We will lay a proper business records foundation for

04:41:12 24  these records, and we believe that the defense argument that

04:41:14 25  they must all -- the charts must be taken in their entirety,

04:41:18   1   that argument can no longer be sustained now that they have

04:41:22   2   showed these individual pages outside of the context of charts

04:41:26   3   to our own witnesses.

04:41:28   4          MR. ORMAN:  He knows better, Judge.  The documents --

04:41:34   5          THE COURT:  Shame.

04:41:36   6          MR. HAMMERMAN:  I just want to do what Mr. Jones gets

04:41:38   7   to do, your Honor.  That's it.

04:41:38   8          MR. JONES:  That's a lot.

04:41:44   9          MR. ORMAN:  The documents that were shown to the

04:41:46   10  witness by counsel is generating a waiver.  The documents that

04:41:54   11  the government offered into evidence, we didn't object.  They

04:41:56   12  were in evidence.  What stops us from asking the witness

04:42:00   13  questions?  These documents are not in evidence, and,

04:42:04   14  hopefully, unless Mr. Hammerman keeps coming back or stops

04:42:08   15  coming back making the same arguments, we will deal with it

04:42:12   16  when the time comes.

04:42:14   17         MR. HAMMERMAN:  Your Honor, we'd rather address, of

04:42:16   18  course, an issue before the witness is in the middle of her

04:42:20   19  testimony and the matter can't be decided.

04:42:20   20         THE COURT:  I just hate to plow through all those

04:42:24   21  documents right now and find Government Exhibit 628 and 629,

04:42:30   22  and I am sure that you have a lot of preparation work to do.

04:42:34   23  I think it would be better when you have the witness here and

04:42:38   24  go through the business records routine, I will have the

04:42:42   25  exhibits in front of me, I promise I can make a more informed

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 04:42:46 | 1  | decision than I can right now. |
| 04:42:48 | 2  | MR. HAMMERMAN:  Yes, your Honor. |
| 04:42:50 | 3  | MR. JONES:  Judge, there is just one, and this won't |
| 04:42:54 | 4  | take any time, but I have to do it for the record.  You know, |
| 04:42:56 | 5  | your Honor, we had those motions that you sent down to Judge |
| 04:43:00 | 6  | Cole about the Brady and Giglio.  Basically what Judge Cole |
| 04:43:04 | 7  | said was that those become ripe at trial. |
| 04:43:08 | 8  | So I only say for the record now that we are here at |
| 04:43:12 | 9  | trial, if there is anything that we were supposed to have |
| 04:43:16 | 10 | gotten due to Brady and Giglio, I just make that again for the |
| 04:43:22 | 11 | record.  That's all I have to say about it. |
| 04:43:24 | 12 | THE COURT:  All right.  You re-enter your motion? |
| 04:43:30 | 13 | MR. JONES:  Yes, your Honor. |
| 04:43:32 | 14 | THE COURT:  It's noted.  Thank you. |
| 04:43:34 | 15 | MR. HAMMERMAN:  Thank you, your Honor. |
| 04:43:42 | 16 | (The trial was adjourned at 4:45 p.m. on March 5, 2012, |
| 04:43:54 | 17 | until 9:00 a.m. on March 6, 2012.) |
| 04:43:54 | 18 | |
|          | 19 | |
|          | 20 | |
|          | 21 | |
|          | 22 | |
|          | 23 | |
|          | 24 | |
|          | 25 | |